JOSEPH J. PERKOVICH, ESQ.
NY Bar No. 4481776
Phillips Black, Inc.
PO Box 4544
New York, NY 10163
Tel: (212) 400-1660
j.perkovich@phillipsblack.org

AMY P. KNIGHT, ESQ.
AZ Bar No. 031374
Knight Law Firm, PC
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Tel: (520) 878-8849
amy@amyknightlaw.com

Attorneys for Frank Jarvis Atwood

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Jarvis Atwood, | CASE NO. _____ |
| Plaintiff, | |
| v. | **EXHIBITS TO COMPLAINT** |
| David Shinn, Director, Arizona Department of Corrections Rehabilitation & Recovery; James Kimble, Warden, ASPC-Eyman; Jeff Van Winkle, Warden, ASPC-Florence; Lance Hetmer, Assistant Director for Prison Operations, Arizona Department of Corrections Rehabilitation & Recovery, | **This is a capital case.** |
| Defendants. | |

## EXHIBIT LIST

Exhibit 1       Tielborg Order (12/7/21)

Exhibit 2       Declaration of Phillip Davidson (5/9/22)

Exhibit 3       Declaration of Joel Zivot (5/17/22)

Exhibit 4       Department Order 710 - Execution Procedures

Exhibit 5       Execution Charts

Exhibit 6       Declaration of Amanda Bass (5/18/22)

Exhibit 7       Motion to Modify (6/22/22)

Exhibit 8       Motion to Set Briefing Schedule (1/5/22)

Exhibit 9       Dixon Doc 12 (5/6/22)

Exhibit 10      Dixon Doc 14 (5/6/22)

Exhibit 11      Dixon Doc 27 (5/8/22)

Exhibit 12      Dixon Doc 32 (5/9/22)

Exhibit 13      Declaration of James Ruble (5/18/22)

Exhibit 14      Potency Test

Exhibit 15      Purchase of Potassium Cyanide

Exhibit 16      Declaration of Carla McClain (10/20/93)

Exhibit 17      Declaration of Donna Hamm (4/14/92)

Exhibit 18      The Phoenix Gazette (4/7/92)

Exhibit 19      The Arizona Republic (Mar. 4, 1999)

Exhibit 20      Declaration of Tad Dunbar (4/15/92)

Exhibit 21    Declaration of Dennis Balske (4/13/92)

Exhibit 22    Declaration of Dan Lohwasser (4/15/92)

Exhibit 23    Declaration of Robert Marshall (4/14/92)

Exhibit 24    Declaration of Kenneth Rose (4/10/92)

Exhibit 25    Declaration of Gloria Lyon (4/7/92)

Exhibit 26    Declaration of John Steiner (4/X/92)

Exhibit 27    Tucson Citizen (3/4/99)

Exhibit 28    Declaration of James S. Williams, M.D., M.Sc. (5/4/22)

Exhibit 1

1
2 WO
3
4
5
6
7
8

MGD

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

9
10
11 v.
12
13
14

Frank Jarvis Atwood,

　　　　　　Plaintiff,

Panann Days, et al.,

　　　　　　Defendants.

No.　CV 20-00623-PHX-JAT (JZB)

**ORDER**

15　　　　Plaintiff Frank Jarvis Atwood, who is currently confined by the Arizona Department
16 of Corrections (ADC) in the Arizona State Prison Complex (ASPC)-Eyman, filed this civil
17 rights action pursuant to 42 U.S.C. § 1983.[1]  Before the Court is Plaintiff's Motion for
18 Temporary Restraining Order and Preliminary Injunction regarding his medical care.
19 (Doc. 109.)  The Court held a hearing on the Motion on October 29, 2021 and permitted
20 the Parties to file amended proposed findings of fact and conclusions of law.[2]  The Court's
21 findings of fact and conclusions of law based on the Parties' briefing and the hearing are
22 set forth herein.
23 . . . .

24
25
26
27
28

---

[1] Plaintiff filed the original Complaint pro se but is now represented by counsel.

[2] Plaintiff and Defendants Centurion and Olmstead ("Centurion Defendants") had filed proposed Findings of Fact and Conclusions of Law prior to the hearing.  (Docs. 147, 151.)  After the hearing, only Plaintiff filed amended proposed Findings of Fact and Conclusions of Law as well as a proposed order (Doc. 166); Centurion Defendants filed an Objection to Plaintiff's Proposed Order (Doc. 171).  Defendants Days, Shinn, Scott, Lopez, and Arnold ("ADC Defendants") did not file any proposed Findings of Fact and Conclusions of Law either before or after the hearing.

## I.     Findings of Fact

Plaintiff has been incarcerated by ADC since 1987.  (Doc. 147 ¶ 1.)  Philip A. Davidson, MD, a board-certified orthopedic surgeon, has evaluated Plaintiff telephonically, reviewed Plaintiff's medical records related to his current condition, and testified at the hearing.  Based on his review of Plaintiff's January 8, 2021 MRI of the lumber and cervical spine, Dr. Davidson concluded that Plaintiff has "severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia.  He has apparently overt radicular symptomatology as well as radiating pain, weakness, and motor dysfunction."  (Doc. 109 at 28-29 ¶ 37.)  Plaintiff's lumbar spine is his most painful condition, and "[his] neural symptomatology has contributed to the weakness that is limiting his ability to transfer and position, let alone ambulate.  In addition, the neural compression and degenerative spondylosis are highly painful, most acutely when prone or in an erect seated posture."  (*Id.* at 29 ¶ 38.)

Plaintiff's back pain began around 1990, and he has been treated over the past 30 years with oral medications.  (*Id.* at 21 ¶ 14.).  Plaintiff began using a wheelchair in 2015 and at that time he was classified an ADA (Americans with Disabilities Act) patient.  (Doc. 167 (Hearing Tr.) at 117.)  From 2011 to September 2020, Plaintiff was prescribed Tramadol, which effectively treated his pain.  (Doc. 109 at 23 ¶ 20.)  Plaintiff has tried numerous other medications, such as Cymbalta, for his pain, but they have either failed or Plaintiff had negative reactions to them.  (Doc. 167 at 61, 121.)

In September 2020, Defendant Nurse Practitioner Olmstead discontinued Plaintiff's Tramadol prescription, and from October 2020 to the present, Plaintiff has been prescribed a lidocaine patch and Tylenol, which have provided "no appreciable pain relief."  (Doc. 109 at 23 ¶ 20.)  Olmstead asserts that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects and that had or have been, at times, a part of his prescription medication regimen, and that there is no medical indication to continue this medication."  (Doc. 114-6 at 2 ¶ 4.)  According to Olmstead, "[n]arcotics are

very powerful medications that should only be used in the appropriate case and for the shortest duration needed, which is how they have been used." (*Id.*) Olmstead testified that Centurion's medical director told her it was Centurion's policy "that long-term opioids are not prescribed unless a patient has cancer pain or they are in a hospice setting." (Doc. 167 at 169.) During the hearing, the Court asked Defendants to produce the policy. (*Id.* at 208-209.) Following the hearing, Defendants notified the Court that "no formal written policy exists," and they submitted the declaration of Dr. Rodney Stewart, Centurion's Site Medical Director for ASPC-Eyman. (Doc. 165 at 1.) Dr. Stewart states that he has implemented a policy "that patients are not to be prescribed opioids, such as tramadol, for an extended or indefinite period of time unless that patient is suffering from cancer-related illness or pain, terminal illness with pain, and other serious long-term disease implicating severe pain symptoms." (Doc. 165-1 at 1 ¶ 5.)

Plaintiff has not walked since 2017 and without Tramadol suffers "incomprehensible pain every time he need[s] to transfer to bed, chair or wheelchair." (Doc. 109 at 22-23 ¶¶ 17, 19.) Plaintiff can only sleep sporadically because he cannot lie flat and must sit in his wheelchair or partially recline in bed to minimize the severity of constant pain. (*Id.* at 24 ¶ 23.) Plaintiff's pain interferes with nearly all activities of daily living. (Doc. 167 at 27-28.) Without Tramadol, Plaintiff's pain is severe at 9 or 10 out of 10, his ability to transfer to and from his wheelchair is decreased, and his sleep is even more compromised. (Doc. 109 at 27 ¶ 34.) With Tramadol, Plaintiff's pain decreases to a 5 or 6, a moderate and manageable pain level. (Doc. 167 at 112, 121.)

Plaintiff has a recent history of falling, secondary to weakness in his legs, including falls in November 2020 and March 2021 when he was not taking Tramadol. (Doc. 109 at 24 ¶ 22.) Plaintiff testified he has fallen a half dozen times since 2016, and he attributes his falls to his medical condition and not Tramadol because the falls occur when he tries to move, and he feels a twinge of pain and weakness and collapses. (Doc. 167 at 115.) Dr. Davidson testified that Plaintiff's falls are not necessarily attributable to Tramadol, and the

falls indicate to him that Plaintiff needs more assistance with transfers and needs to be in a safer environment.  (*Id*. at 49.)

In January 2021, Plaintiff suffered an extreme case of diarrhea, which was eventually diagnosed as a staph infection; the infection intensified Plaintiff's back pain and caused spasms, and he was unable to leave his bed or roll onto his side for nearly a week. (Doc. 109 at 25 ¶¶ 25-26.)  To accept meals and medication, Plaintiff crawled or slid across his cell's urine-covered and feces-smeared floor.  (*Id*. ¶ 25.)  Plaintiff received injections of Toradol and a corticosteroid injection, which provided some pain relief for a couple of weeks.  (Doc. 109 at 21 ¶ 15.)

Plaintiff received Tramadol when he was hospitalized in April 2021 and afterwards in the infirmary, but when he was moved back to the Browning Unit in June 2021, NP Olmstead reduced the dose of Tramadol to once daily with the intention of weaning Plaintiff off Tramadol completely.  (Doc. 109 at 26 ¶¶ 28-33.)

On April 6, 2021, Olmstead submitted an urgent request for a neurosurgery consultation; Olmstead noted that she reviewed the case with Dr. Young, who asked that a consult be entered with a neurosurgeon to see if Plaintiff was a candidate for epidural injections.  (Doc. 114-1 at 5-6.)  On June 25, 2021, Plaintiff had an appointment with neurosurgeon Dr. Feiz-Erfan at Valleywise Health, but Dr. Feiz-Erfan first wanted an updated MRI and a follow-up appointment in 4 to 6 weeks.  (Doc. 114-6 at 2 ¶ 7; Doc. 114-4 at 36-39.)  On June 30, 2021, Olmstead submitted a routine consultation request for an MRI of the cervical spine and for a follow-up appointment with the neurosurgeon once the MRI is completed.  (Doc. 114-16 at 2 ¶ 7; Doc. 114-5 at 11.)  The MRI was authorized, and Plaintiff had the cervical MRI on July 16, 2021.  (Doc. 114-5 at 11.; Doc. 130-1 at 2.)

Plaintiff next saw Dr. Feiz-Erfan on July 30, 2021, and Dr. Feiz-Erfan noted that Plaintiff's chief complaint was neck and back pain, but Plaintiff was also febrile and short of breath.  (Doc. 132-1 at 15, 17.)  Dr. Feiz-Erfan diagnosed Plaintiff with "status post anterior fusion, cervical 5-6, for myelopathy done by me on 12/11/2018.  New Diagnosis is canal stenosis, lumbar 1-2; adjacent level disease, cervical spine."  (*Id*.)  Dr. Feiz-Erfan's

Plan of Care was "Epidural injection, lumbar 1-2. Physical therapy," follow up in 3 months, and to go to the nearest emergency room for acute symptoms, noting that Plaintiff "looks ashen and pale and appears sick acutely." (*Id*.) Under "Patient Instructions," the doctor wrote, "Patient to have injections and PT and follow up in 6 weeks.[3] (*Id*. at 19.) Olmstead noted in an August 2, 2021 medical record that Plaintiff was admitted to Valleywise Hospital on July 30 for urosepsis and had surgery for a new left stent placement and cystoscopy. (*Id*. at 37.) Dr. Davidson testified that in Plaintiff's case, spinal injections would provide only temporary or transient relief, and injections could diminish the need for Tramadol if repeated two to three times a year, but that it is likely they would only provide partial relief and Plaintiff may still need Tramadol in addition.[4] (Doc. 167 at 57.)

On August 2, 2021, Olmstead submitted a routine consultation request for epidural lumbar injections. (Doc. 132-1 at 37.) As of the date of the hearing, October 29, 2021, Plaintiff had not received his first epidural injection, but defense counsel asserted Plaintiff would have an injection in the next two weeks. (Doc. 167 at 199.) After seeing Dr. Feiz-Erfan, Plaintiff had four half-hour physical therapy sessions at the prison, but he testified that the physical therapy ended up causing more discomfort than any benefit. (*Id*. at 119.)

In October 2021, Plaintiff was again in the infirmary and while there, a doctor prescribed Tramadol for his pain on October 20, 2021, but Plaintiff did not receive Tramadol until the night before the October 29, 2021 hearing. (*Id*. at 109.) Plaintiff testified that a nurse told him he received Tramadol just before the hearing because "they wanted to be able to say [Plaintiff] was on the medication again." (*Id*. at 109-110.)

Dr. Davidson recommends without reservation that Plaintiff again be prescribed Tramadol given that trials of other medications have not worked and because other narcotics that might help his pain could be more addictive and habit forming. (*Id*. at 60-61.) Dr. Davidson stated a typical dose is 50 mg twice a daily, but the dose would have to

---

[3] It is not clear from the record if Dr. Feiz-Erfan was planning one epidural injection or a series of injections because he used the singular "injection" in the "Plan of Care" and plural "injections" in the "Patient Instructions."

[4] Dr. Feiz-Erfan did not testify.

be adjusted based on what Plaintiff has taken in the past and on the effectiveness of the spinal injections. (*Id*. at 58.) Dr. Davidson's professional opinion is that "it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately.  These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available." (Doc. 109 at 30 ¶ 44.)  Defendants' expert, Dr. Thomas Fowlkes, is board-certified in emergency medicine and is currently the medical director at a county detention facility in Oxford, Mississippi. (Doc. 167 at 64.)  Dr. Fowlkes reviewed Plaintiff's medical records and agreed there was no evidence Plaintiff was addicted to Tramadol, that Plaintiff was diverting or abusing Tramadol, or that his cognition suffered because of Tramadol. (Doc. 167 at 80-85.)

## II.     Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  "A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The movant "has the burden of proof on each element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

(9th Cir. 2009)).  "A mandatory injunction orders a responsible party to take action," while "a prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Marlyn Nutraceuticals*, 571 F.3d at 879 (internal quotation marks omitted).  "The 'status quo' refers to the legally relevant relationship between the parties before the controversy arose."  *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

The Prison Litigation Reform Act imposes additional requirements on prisoner litigants who seek preliminary injunctive relief against prison officials and requires that any injunctive relief be narrowly drawn and the least intrusive means necessary to correct the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987, 999 (9th Cir. 2000).

"The urgency of obtaining a preliminary injunction necessitates a prompt determination" and makes it difficult for a party to procure supporting evidence in a form that would be admissible at trial.  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  As a result, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  In its determination on a motion for a preliminary injunction, "a court may properly consider evidence that would otherwise be inadmissible at trial."  *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV 15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion by considering "unverified client complaints" and the plaintiff's counsel's interested declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394 (the district court has discretion to rely on hearsay statements when deciding whether to issue a preliminary injunction).  A court may also consider evidence or developments that postdate the pleadings.  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

## III. Conclusions of Law

Plaintiff seeks an order requiring Defendants to provide him (1) "the necessary pain medication to treat his constant severe pain," (2) "rehousing to a unit that has wheelchair transferring assistance available at all times," and (3) referral to an orthopedic surgeon "to evaluate Plaintiff for possible surgical intervention to treat and improve his spinal condition." (Doc. 109 at 15.) Based on the hearing and Dr. Davidson's recommendation, it is clear Plaintiff is seeking a resumption of his previous Tramadol prescription and the epidural injection(s) recommended by Dr. Feiz-Erfan. Because Plaintiff is not currently prescribed Tramadol and or received epidural injections as of the hearing date, he is seeking mandatory, rather than prohibitory, injunctive relief, with respect to his pain relief as well as his requests to be rehoused in a different unit with wheelchair transfer assistance available at all times and an evaluation by an orthopedic surgeon.

### A. Pain Relief

#### 1. Likelihood of Success on the Merits

To establish a likelihood of success on the merits of an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The prisoner must show (1) that his condition constitutes a "serious medical need" and (2) that the defendant's current response to that need is deliberately indifferent. *Jett*, 439 F.3d at 1096; *see Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (where a plaintiff seeks injunctive relief, the deliberate indifference determination is based on the defendant's current conduct).

##### a) Serious Medical Need

Plaintiff has satisfied the objective prong of the deliberate indifference analysis. In the Court's January 12, 2021 Order on Plaintiff's previous request for injunctive relief, the

Court found no meaningful dispute that Plaintiff suffers from severe spinal pain, a serious medical condition. (Doc. 87 at 9.) Moreover, Centurion Defendants do not dispute that Plaintiff suffers from degenerative disc disease. (Doc. 114 at 3.) Indeed, Plaintiff's condition causes him chronic and severe pain that medical personnel have found worthy of attention and treatment. *See McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

### b)  Deliberate Indifference

With respect to the subjective prong, a plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted). A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842.

Here, there can be no dispute that Centurion Defendants are aware of Plaintiff's diagnosed condition and serious medical need because it is documented in his medical records showing decades of treatment for his spinal condition, including surgeries, medication trials, MRIs, and specialist appointments. Moreover, an orthopedic surgeon has recommended that Plaintiff have, at a minimum, palliative measures such as Tramadol and epidural injections, and a neurosurgeon has recommended epidural injection(s) and physical therapy.

After showing that a defendant was subjectively aware of the serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which

prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Jett*, 439 F.3d at 1096.

In the January 12, 2021 Order denying injunctive relief, the Court noted that Defendant Olmstead was taking steps to address Plaintiff's pain by means other than Tramadol, including seeking authorization for MRIs of Plaintiff's lumbar and cervical spine to assess whether there was further deterioration, which could support surgery or epidural spinal injections, and providing lidocaine pain patches. (Doc. 87 at 10.) However, at that time, the Court informed Defendants that a prolonged failure to address Plaintiff's severe pain through other means may warrant consideration of a new motion for injunctive relief. (*Id.* at 10-11.)

While Plaintiff had the lumbar and cervical spine MRIs on January 8, 2021, he did not see the neurosurgeon until June 25, 2021, which Centurion Defendants assert was the earliest appointment available to see the neurosurgeon. (Doc. 114 at 4 n.2.)  But Olmstead did not submit a consultation request for Plaintiff to see the neurosurgeon until April 6, 2021—three months after the MRIs were completed.  There is no explanation for this three-month delay in attempting to obtain authorization for the neurosurgery consult.  When Plaintiff saw the neurosurgeon in June 2021, the neurosurgeon wanted a new MRI, and when Plaintiff returned to the neurosurgeon on July 30, 2021, the neurosurgeon recommended epidural injections, physical therapy, and follow up in three months. Afterwards, Defendant Olmstead only submitted a routine consultation request for epidural lumbar injections, and as of the date of the hearing, October 29, 2021, Plaintiff had not had an epidural injection.  Plaintiff has had physical therapy sessions at the prison, but they caused him more discomfort than benefit.

Centurion Defendants argue there is no evidence Plaintiff has been denied appropriate medical care and that he simply disagrees with the medical providers who have changed his pain medication from a narcotic to a non-narcotic. (Doc. 114 at 6.)  They assert that "alternative means to treat Plaintiff's pain, including epidural steroid injections

and/or additional surgery, are currently being evaluated by the appropriate specialists."[5] (*Id.* at 4.)

Centurion Defendants have provided no explanation why Tramadol was appropriate for ten years and is suddenly inappropriate, requiring immediate cessation, or how the minimal pain relievers Plaintiff has received outside of the hospital or infirmary have been adequate to treat his significant pain issues. Defendant Olmstead makes the conclusory statement that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects . . . and that there is no medical indication to continue this medication." (Doc. 114-6 at 2.) Olmstead, though, does not say how Plaintiff manifested "poor tolerance/side effects" or point to any medical records showing poor tolerance/side effects to Tramadol. Nor does she explain why, if Plaintiff had poor tolerance/side effects to Tramadol which would contraindicate its use, he has been prescribed Tramadol while in the hospital and prison infirmary. Olmstead does say that Plaintiff "is still being prescribed some pain medication, including a topical aspercream [sic] lidocaine patch to place on his lower back for pain, due to the lower risk of drug interaction and side effects, especially with [Plaintiff's] advancing age the fact that he is a fall risk." (Doc. 114-6 at 2 ¶ 5.) But Olmstead does not address the history of falls Plaintiff has had since his regular Tramadol prescription was stopped in September 2020 or how Tramadol has increased the likelihood of falls by Plaintiff. Moreover, Dr. Davidson, who reviewed Plaintiff's medical records and evaluated Plaintiff by telephone, did not attribute the falls to Tramadol use and recommends that a "prescribed moderate dose of Tramadol should be sustained," noting Tramadol's "prior effectiveness and its lack of side-effects over the span of many years." (Doc. 109 at 29 ¶ 41.) Dr. Feiz-Erfan has recommended epidural injection(s), and, although Centurion Defendants indicated at the hearing that Plaintiff would have an

---

[5] Defendants made this argument before Plaintiff saw Dr. Feiz-Erfan for the second time on July 30, 2021.

injection around mid-November, it is unknown if Plaintiff will receive more than one injection or on a regular basis, as Dr. Davidson indicates may be necessary.

Centurion Defendants' post-hearing evidence of an unwritten policy that opiates only be prescribed for cancer patients with severe pain, terminal illness with pain, or other long-term disease implicating severe pain symptoms is unpersuasive, especially considering Plaintiff's past use of Tramadol for over ten years in the prison setting when Plaintiff was neither a cancer patient nor had a terminal illness. Specifically, the Court finds the policy unpersuasive because there was no evidence that it was based on a patient specific medical justification or a penological justification. Moreover, it appears Plaintiff's pain may fall under the unwritten policy's category of "long-term disease implicating severe pain symptoms."

Of particular concern to the Court is Centurion Defendants' delay of more than a year of treating Plaintiff's severe pain with something as effective as Tramadol. *See Hallet*, 296 F.3d at 744; *Jett*, 439 F.3d at 1096. Plaintiff's expert, who has interviewed and evaluated Plaintiff, recommended in June 2021 that Plaintiff be prescribed Tramadol on an ongoing basis, but Plaintiff has only received Tramadol when hospitalized or in the infirmary. Defendants finally sent Plaintiff to a specialist this summer, who recommended on July 30, 2021 that Plaintiff receive epidural injections and follow-up in three months, but Plaintiff had not received those injections as of October 29, 2021, and was not scheduled to receive an injection until sometime in November 2021, and there is no evidence that a follow-up appointment with Dr. Feiz-Erfan has been scheduled. The Ninth Circuit and other courts have routinely found that failure to follow a specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable

jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation).  In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

Based on this record, Plaintiff has shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pain.  While up until the time of the hearing Plaintiff had received minimal treatment, the evidence shows that treatment is inadequate.  And, the continual delays in providing adequate alternative pain management also support that Plaintiff will succeed on the merits of this claim.  A reasonable jury could find that, in these circumstances, Centurion Defendants failed to competently treat Plaintiff's serious pain needs and acted with deliberate indifference.

## 2. Irreparable Injury

In addition to showing a likelihood of success, Plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm.  *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th 1988) (speculative injury is not irreparable

injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22.  To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury.  *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674.  "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villanueva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)).  Pain can constitute irreparable harm.  *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *McNearney*, 2012 WL 3545267, at *14 (finding a likelihood of irreparable injury where the plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to the defendants' inadequate treatment plan); *Von Collin v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they").

Prior to his kidney issues earlier this year, Plaintiff reported to Dr. Davidson that his pain was constant at 8 out of 10, he suffers "incomprehensible pain" when he transfers to and from the wheelchair, a history of falls, that the pain is only somewhat lessened by remaining in a seated position, that he cannot lie down at all, and he only sleeps sporadically.  After Plaintiff's treatment for kidney issues, his pain is now at 9 out of 10, his ability to transfer has decreased even more, and his sleep is even more compromised.

Plaintiff's ongoing severe pain and associated issues are sufficient to support a finding of irreparable harm.  *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

### 3.   Balance of Hardships

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quotation omitted).  The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs a government entity's monetary costs.  *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("faced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiff's favor") (quotation omitted).

Centurion Defendants argue that "restructuring the procedures and policies for one single inmate could result in security and safety breaches, inmate unrest and staffing issues, particularly where the relief sought is not necessary or is already being processed."  (Doc. 114 at 9-10.)  They further argue that the relief requested would trigger federalism concerns and cause the Court to needlessly interfere with the prison's operations.

The Court is unconvinced by Centurion Defendants' general argument, without any citation to any procedures or policies, that "restructuring the procedures and policies for one single inmate could result in security and safety breaches [and] inmate unrest and staffing issues."  The Court is also unconvinced that granting Plaintiff pain relief would result in needless interference in the prison's operations.

As articulated above, Plaintiff is likely to suffer irreparable injury absent an injunction; thus, his injury is more than just speculative.  Furthermore, Centurion Defendants have made no showing that they will face any harm if an injunction issues.  The Court finds that the balance of hardships tips sharply in Plaintiff's favor.

### 4.  Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted).  Moreover, "the public has a strong interest in the provision of constitutionally-adequate health care to prisoners."  *McNearney*, 2012 WL 3545267, at *16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)); *see Farnam v. Walker*, 593 F. Supp.

2d 1000, 1017 (C.D. Ill. 2009) (holding that public had an interest in the maintenance of prisoner's health during the pendency of the lawsuit).

Centurion Defendants argue that granting injunctive relief "would not be in the public interest because it would require this Court to override the decisions of correctional authorities and medical providers, who are responsible for the safety, security, care and efficient operation of the prison, as well as for the healthcare of Plaintiff." (Doc. 114 at 10.) They further contend that "the public welfare militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights." (*Id.*)

Contrary to Centurion Defendants' assertions, the record supports Plaintiff's claims that he is suffering significant pain, sleeplessness, and related issues and is being denied constitutionally adequate medical care for his pain. The Court finds that it is in the public interest to prevent Plaintiff from suffering ongoing pain and other complications during the remainder of this lawsuit. Accordingly, this factor favors injunctive relief that requires Centurion Defendants to provide the epidural injection(s) recommended by Dr. Feiz-Erfan and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

### 5. Narrowly Tailored Relief

As stated, the PLRA requires any injunctive relief to be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2). Centurion Defendants do not address this factor.

As noted, Plaintiff wants his prescription for Tramadol re-started, as recommended by Dr. Davidson, and the epidural injection(s) recommended by Dr. Feiz-Erfan. Adhering to the specialists' recommendations is the most narrowly drawn relief necessary to correct the harm identified by Plaintiff. Thus, Plaintiff's request for relief satisfies the requirements of the PLRA.

### 6. Bond Requirement

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite this mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted). The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.*

Here, Centurion Defendants have not requested a bond or submitted any evidence regarding likely damages. Accordingly, the Court will waive the bond requirement.

Having met all requirements for injunctive relief, the Court will require Centurion Defendants to provide Plaintiff with the epidural injection(s) and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

**B.    Housing**

As to Plaintiff's request for different housing, ADC Defendants argue that this relief is wholly unrelated to the remaining claims in this lawsuit and therefore inappropriate. (Doc. 118 at 5.) In his First Amended Complaint, Plaintiff alleged that on July 12, 2019, Defendant Days moved Plaintiff from the death-row wheelchair pod to the death-row security threat group pod and housed Plaintiff in a cell without handicap bars, causing Plaintiff to fall repeatedly while transferring to and from his wheelchair to his bunk and toilet. (Doc. 36 at 5, 14.) ADC Defendants point out that the prison has now installed grab bars in Plaintiff's cell and the specific areas of the prison he requested. (Doc. 118 at 5, citing Doc. 61; *see also* Doc. 37 at 28 (denying as moot Plaintiff's request for grab bars in his cell and shower).) Plaintiff does not address ADC Defendants' argument that his request for a transfer to a different unit is unrelated to his existing claims or requested relief.

"[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation*

*Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015); *see Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming denial of a preliminary injunction request based on alleged retaliatory conduct unrelated to the basis of a prisoner's § 1983 claim). Plaintiff's requested relief for a transfer is unrelated to his claim about the lack of handicap bars in his cell and certain areas of the prison, which have been resolved, and there is no existing claim regarding 24-hour transfer assistance or that Plaintiff has requested and been denied such assistance. Accordingly, the Court will deny this request for relief.

### C. Surgical Evaluation

Plaintiff filed his Motion on June 22, 2021, seeking "an immediate evaluation by an orthopedic specialist to determine available surgical options that could treat and improve his condition." (Doc. 109 at 2.) Plaintiff's expert, Dr. Davidson, recommended an evaluation by either an orthopedic spine surgeon or neurosurgeon to determine his surgical options. In his Reply, Plaintiff states that he "asked this Court to order an evaluation with a neurosurgeon, and although he "was evaluated by such a specialist in late June, nothing has yet come of that evaluation and consult." (Doc. 125 at 5 n.2.) After he filed his Reply on July 19, 2021, Plaintiff saw Dr. Feiz-Erfan a second time—on July 30, 2021—and Dr. Feiz-Erfan recommended epidural injection(s) to relieve Plaintiff's pain. Dr. Feiz-Erfan did not include any recommendations or comments regarding surgical options in his report.

Because Plaintiff has now been evaluated by a neurosurgeon, and the Court has already ordered compliance with Dr. Feiz-Efran's recommendations for epidural injection(s), this request for injunctive relief is moot.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109).

(2) Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109) is **granted in part** as follows:

(a)    Within **ten (10) days** of the date of this Order, Centurion Defendants must re-start Plaintiff's prior prescription for Tramadol, unless a <u>specialist</u> has recommended an equally effective alternative pain medication.

(b)    Within **ten (10) days** of the date of this Order, Centurion Defendants must schedule the epidural injection(s) recommended by Dr. Feiz-Erfan unless the injection(s) have already occurred.

(c)    Centurion Defendants must file a Notice with the Court within 20 days of the date of this Order, that Plaintiff has been re-started on Tramadol, or on an equally effective alternative pain medication recommended by a specialist, has received at least one epidural injection, and when any future injections are scheduled.[6]

(d)    This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2).

(e)    Plaintiff is not required to post bond.

(3)    The Motion is otherwise **denied**.

Dated this 7th day of December, 2021.

James A. Teilborg
Senior United States District Judge

---

[6] The Court recognizes that for security reasons, it may not be appropriate for Defendants to divulge the exact dates and times of the scheduled appointments for injections. But Defendants' Notice must include the week(s) in which the injection(s) are scheduled. Defendants may redact the day—but not the month or year—of the appointments or may seek to file the dates under seal for ex parte review.

Exhibit 2

Pursuant to 28 U.S.C. § 1746 (2).

## DECLARATION OF PHILIP A.  DAVIDSON, M.D.

I, Philip A. Davidson, MD, declare and state as follows:

1.    I am a Board-Certified Orthopedic Surgeon and a member of Davidson Orthopedics and the Utah Orthopedic Spine & Injury Center in Salt Lake City. I have evaluated Mr. Frank Atwood telephonically and reviewed records related to his current condition, and I offer the observations and conclusions set forth below.

2.    In addition to my work with Davidson Orthopedics and the Utah Orthopedic Spine & Injury Center, I am a member of the staffs of Park City Medical Center, Salt Lake Regional Medical Center, LDS Hospital, and Alta View Hospital, and in 2015, I founded Davidson Orthopedics in Salt Lake City.

3.    I am a graduate of Harvard University, B.A., Magna cum Laude, Biology and Comparative Anatomy in 1983. I earned my Doctor of Medicine degree, with Honors in Research, from Cornell University Medical College in 1987.

4.    In 1992, I completed Orthopedic Residency Training with the Baylor College of Medicine and, in 1993, held a Sports Medicine Fellowship with the Kerlan-Jobe Orthopedic Clinic.

5.    Previously, I served on the affiliated faculty of the University of South Florida and successfully developed a large full service Orthopedic Clinic. I have served on FDA panels to evaluate the safety of Osteoarthritis treatments. I

have taught many courses to surgeons in the field of Cartilage Restoration and Joint Resurfacing and published many scientific articles in the orthopedic literature on topics ranging from non-surgical treatments for Knee Osteoarthritis to Resurfacing Surgery of the Shoulder. I have served in the US Naval Reserve as a LCDR in the Medical Corps.

6.   I am an official consultant of Major League Baseball, and The National Football League, having been jointly appointed by the players and owners of the leagues.

7.   For the past two decades, I have been acknowledged as one of the nation's foremost orthopedists treating articular cartilage disorders. My particular area of clinical and academic interest is in the field of biologic and anatomic joint resurfacing. I have been acknowledged by the orthopedic community as a surgical innovator and clinical researcher, publishing extensively and teaching surgeons both nationally and internationally.

8.   Before relocating my practice to Utah, where I co-founded Heiden-Davidson Orthopedics with Drs. Eric and Karen Heiden in 2008, I practiced in Tampa Bay, Florida for 15 years as a widely recognized Orthopedic Surgeon specializing in sports medicine. Since 2015 I have been practicing in Davidson Orthopedics and serving as Medical Director of the Utah Orthopedic Spine & Injury Center. I am actively licensed to practice medicine in the states of Wyoming, Utah and Washington. I have formerly

been licensed in the states of California and Texas. I am Board Certified by

the American Board of Orthopedic Surgery.

9.   Mr. Frank Atwood is a 66-year-old man who has been referred for me to

review his medical records as well as to evaluate by telephone.  Mr. Atwood

is incarcerated. Mr. Atwood is now scheduled to be executed on June 8,

2022.

10.   I have reviewed hundreds of pages of assorted medically related

correspondences, grievances, and medical records pertaining to the

medical case and care of Mr. Frank Atwood produced to his attorneys from

Arizona's corrections department. This series of documents reflects that the

patient's medical needs are not being met and his care is being denied.

Records appear to cover decades. These include physical therapy notes

regarding Mr. Atwood's spine. Many notes pertain to his health issues

outside of orthopedics.

11.   On March 25, 2021, I conducted a telephonic consultation with Mr. Atwood.

I conducted an additional telephonic consultation with Mr. Atwood on June

7, 2021.

12.   This patient's chief issues center on neck pain, back pain, radicular

symptoms and weakness referrable to cervical and lumbar pathologies.

Based upon my interviews with Mr. Atwood, it is this examiner's opinion that

he has an excellent recollection of details and dates which appears to be

highly accurate. His insights provide great detail into his past medical history and the series of events pertaining to his health history.

13.  Mr. Atwood takes medications for a duodenal ulcer and hypertension.  His past medical history is positive for hepatitis C with stage IV cirrhosis and he reports a 3 cm lesion in his liver.  He has had a history of prostate issues but denies cancer.  He denies having diabetes.  Previous surgical history includes gallbladder resection, cataract surgery, knee surgery, and cervical fusion as described above.

HISTORY OF PRESENT ILLNESS:

14.  Mr. Atwood reports foremost about his back and related back pain.  He describes the pain as having begun in approximately 1990 and being treated over the past 30-plus years with oral medications.  He states that he has never had fluoroscopically-guided injections into the lumbar region.  He has had no surgery on his lumbar region.

15.  Records reflect Mr. Atwood has recently had several intramuscular injections of Toradol (between 15 mg and 30 mg), an anti-inflammatory, on various days in January 2021. Further, Mr. Atwood reports receiving a corticosteroid intramuscularly in his arm (circa February 2021) that he states provided some relief of back pain for a couple of weeks.  This injection was performed about 2-3 weeks prior to my first phone consultation with him. At that time, the benefits were wearing off.

16.   Mr. Atwood states that he has marked pain in the mid low-back region which

is dull and nonspecific in nature.  He states that the pain is a 9 out of 10

increasing to 10 out of 10 with certain activities, such as turning to get out of

bed.  In addition to the localized back pain, which is his worst complaint, he

also feels radiating pain shooting into the leg, right side more than left.  He

states that the radiating pain extends through his buttock and upper leg at a

strength of about 7 out of 10.  In the right leg, he states the pain is a big

problem but he is also bothered by marked weakness.  He experiences a

sensation of numbness in his foot and marked swelling in the foot.  He feels

and reports that the swelling is so great in his feet that he has difficulty

wearing shoes.

17.   Mr. Atwood reports weakness in his lower extremities to the extent that his

legs will not support him to stand.  He describes that he last walked in May

2017.  Now, he describes principally using his hands and upper extremities

to transfer from bed to wheelchair, but the transferring causes him

excruciating pain.  He was issued in the remote past a series of exercises

and stretching, but these are now too painful for him to perform.  He

experiences numbness and swelling in the left lower extremity down to his

foot.  His weakness is approximately equal, right and left.

18.   Mr. Atwood reports a long history of neck pain and cervical radiculopathies

beginning in about 2003.  He was subsequently evaluated and treated,

having a cervical fusion at C5-C6 in December 2018 that provided him with

some decreased weakness and limited pain relief.  His neck pain and the

dysfunction in his upper extremities is progressively worsening over the past

several years since the surgery.  He describes numbness in both of his

hands and has difficulty performing simple activities such as just holding a

pen, stating that he drops things and has distinct difficulty with numbness

more so than weakness in the bilateral upper extremities.  The pain in his

upper extremities he states is approximately equal right and left. It is worse

above the elbows, bilaterally extending principally to the area around the

shoulders in the middle of his back and what sounds like the region of his

scapulae.  He describes the pain as "burning and constricting," radiating into

his upper arms and shoulders. The pain is an 8 or 9 out of 10 on a constant

basis.

19.   In asking Mr. Atwood to somehow provide insight to the level of pain that he

is experiencing, he states, "I experience incomprehensible pain every time I

need to transfer to bed, chair or wheelchair."  Furthermore, he states that he

presently feels "incredibly weak" and where he had previously participated

in sporting activities, now, for a number of years, he has been unable to

walk and even has difficulty sitting erect. He reports that efforts to sit erect

are increasingly challenging and subject him to substantial, debilitating pain.

In addition, he is not able to lay supine (flat) without excruciating pain in his

spinal regions.

20.  Mr. Atwood also relates a recent history of falling, secondary to weakness in his legs.  He relates a fall in November of 2020 when he hit his face and knocked himself out.  He suffered a similar fall in March 2021.  He is markedly limited in his capacity to transfer, stating that within the confines of his cell, he has had to crawl to the door rather than walk or transfer to his wheelchair.

21.  Mr. Atwood suffers constant pain. In order to minimize its severity, he seeks to continually maintain a seated posture, either slouching in his wheelchair or partially reclining on his back, in bed while attempting to sleep. This general condition causes considerable sleeping difficulties.  Since Fall 2020, he has experienced too much pain to sleep either on his side or his back. Lying flat on his back severely exacerbates his conditions, causing maximum pain.  He is only able to sleep sporadically, by positioning himself partially upright, propped up with blankets.  Again, due to his spinal pathologies he is not able to lay in a supine position without experiencing severe pain. He has less pain in a sitting, rather than lying flat position. Being strapped down to a gurney or table would cause him severe pain. Sitting upright is considerably less painful for him.

22.  On January 8, 2021, MRI scans were conducted of Mr. Atwood, which are identified below (¶¶ 28-32).

23.  On February 8, 2021, Nurse Practitioner Olmstead evaluated Mr. Atwood wherein she discussed potential further treatment that could include epidural

steroid injections, further evaluation of effective pain management medication, and a neurosurgical consultation.  Mr. Atwood reports that a Dr. Stewart, a physician affiliated with Centurion, the prison health care provider, denied this surgical consultation and declined to otherwise offer a treatment plan for his pain and its underlying causes. To date, the patient has not had any neurosurgical consultations subsequent to the above-referenced MRI scans.

24. On or around May 3, 2021, a Dr. Mahn, the Medical Director of the ASPC-Florence infirmary, prescribed twice daily doses of Tramadol to address Mr. Atwood's severe back pain and other discomfort. He was also prescribed Tylenol with Codeine (No.4) twice daily. Mr. Atwood is now receiving the Tramadol regularly, getting appropriate relief.


IMAGING STUDIES:

25. I have reviewed Mr. Atwood's cervical MRI scan of January 8, 2021. Findings include:

   C2-C3 moderate canal stenosis with bilateral mild foraminal stenoses;

   C3-C4 moderate canal stenosis with bilateral severe foraminal stenoses;

   C4-C5 fusion with mild canal stenosis and bilateral severe foraminal stenoses;

   C5-C6 surgical fusion with punctate myelomalacia of the cervical cord and bilateral severe foraminal stenoses;

C6-C7 moderate canal stenosis with bilateral severe foraminal stenoses;

C7-T1 patent canal with bilateral severe foraminal stenoses.

26. I have reviewed the lumbar MRI scan from the same date (Jan. 8), and findings include:

T12-L1 mild right-sided foraminal stenosis;

L1-L2 moderate bilateral foraminal stenoses;

L2-L3 mild right-sided, severe left-sided foraminal stenoses;

L3-L4 severe bilateral foraminal stenoses with bilateral L3 encroachment;

L4-L5 severe bilateral foraminal stenoses;

L5-S1 severe right-sided, moderate left-sided foraminal stenoses with bilateral L5 neural encroachment.

IMPRESSONS:

27. Mr. Atwood has severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia.  He has apparently overt radicular symptomatology as well as radiating pain, weakness, and motor dysfunction.

28. His lumbar spine problem is his most painful condition. He has advanced lumbar spondylosis with overt radiculopathies.  His neural symptomatology has contributed to the weakness that is limiting his ability to transfer and position, let alone ambulate.  In addition, the neural compression and

degenerative spondylosis are highly painful, most acutely when prone or in an erect seated posture.

29. Based on his spinal diagnoses, it is my professional opinion that Mr. Atwood cannot be placed in a supine position on a gurney, strapped in place and maintained as such for any length of time without experiencing severe and immediate exacerbation of pain.

30. At this point in time, further treatment and evaluation are medically necessary and appropriate, and urgently needed.

31. Mr. Atwood needs to be seen immediately by an interventional pain specialist to ascertain whether fluoroscopically-guided injections such as epidural steroid injections would potentially provide some symptom relief from his basic, resting positions. Mr. Atwood has received Tramadol in the past and presently is being weaned of its use after his return to his housing unit (Browning Unit), from the Florence Complex's infirmary, where he was treated for the above-outlined kidney problems in April through early June 2021.

32. Critically, Mr. Atwood needs a surgical consultation with an orthopedic spine surgeon or neurosurgeon to ascertain and clarify his surgical options. He is an appropriate surgical candidate but I defer suggesting the exact surgical plan to a surgeon who would evaluate him in person, as well as review the foregoing imaging. However, surgical intervention is likely necessary to address the underlying causes of his chronic pain.

33. In addition to the curative interventions suggested above, it is my professional opinion that it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately. These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available.

34. It is my opinion that to a great extent, more likely than not, his current state of spinal degeneration and symptomatology is a result of negligence and under-treatment rendered while this patient has been incarcerated by the State of Arizona. If he had received timely, appropriate and standard health care then he would have been treated years ago with spinal injection therapies and potential further surgeries. By virtue of what appears to be gross undertreatment he has degenerated to the point where he is chronically in pain and now being managed to some extent by oral medications.

35. I strongly recommend that evaluation and treatment is immediately indicated with an interventional pain management physician. This physician could and would assess Mr. Atwood and render appropriate injection therapies. These would potentially be substantively palliative, and if not would provide diagnostic information to guide likely surgical treatment. He has had a one level cervical fusion in the past and more likely than not will require further

surgical decompression and fusion of both the cervical and lumbar spine regions.

36. If further information is required, I am available to provide more insights and opinions on this case. Additionally, the opinions rendered above could be updated pending receipt of further information or data.

37. If his execution is to proceed in the coming weeks prior to his receiving long denied medical and surgical care, then he should remain seated in a chair to avoid the infliction of extreme pain.


I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746 (2).

Executed this 9th day of May 2022, in Salt Lake City, Utah.

Philip A. Davidson, MD
Board Certified Orthopedic Surgeon

Exhibit 3

Pursuant to 28 U.S.C. § 1746 (2).

<u>DECLARATION OF JOEL B. ZIVOT, M.D., FRCP(C), MA</u>

I, Joel Zivot, being of sound mind and lawful age, hereby state under penalty of perjury as follows:

1. I am an associate professor and senior member of the Departments of Anesthesiology and Surgery, Emory University School of Medicine, in Atlanta, Georgia. I have been the medical director of several intensive care units and have been the program director to train critical care medicine physicians. I hold board certification in Anesthesiology from the Royal College of Physicians and Surgeons of Canada and The American Board of Anesthesiology. I am board certified in Critical Care Medicine from the American Board of Anesthesiology.

2. I have practiced anesthesiology and critical care medicine for 27 years and in that capacity, I have personally performed or supervised the care of over 50,000 patients.

3. I hold a medical license from the state of Georgia, and have held unrestricted medical license in Ohio, the District of Columbia, Michigan, and the Canadian provinces of Ontario and Manitoba. I hold a license to prescribe narcotics and other controlled substances from the US Drug Enforcement Administration (DEA).

4. I have been consulting with attorneys for Arizona prisoner Frank Atwood regarding Mr. Atwood's medical condition and the risks attendant to executing him by lethal injection.

5. I traveled to Arizona State Prison—Eyman in Florence on May 16, 2022 and personally examined Mr. Atwood.  This report draws from my evaluation of medical records, obtaining a medical history, and my physical examination of Mr. Atwood. Mr. Atwood is a 66-year-old man, about 5'8" in stature with a formerly medium build that appears to have suffered from atrophy for reasons addressed below.

6. I find that Mr. Atwood suffers from intense and profoundly debilitating pain along his spine as a consequence of chronic degeneration of vertebral bodies. This pain began approximately 30 years ago. These vertebral degenerative changes have caused multiple compressions of nerve roots as they pass from the spinal cord to the arms and legs. Compression of the nerve roots has resulted in permanent damage that manifests as profound weakness and unremitting pain.

7. Mr. Atwood's pain has been evaluated and treated with several different interventions. These include a cervical laminectomy with a fusion of C5-C6 (surgery to fuse two bones in his neck), physical therapy, epidural steroid injections (steroid injections between the bones of the spine), a variety of medications including many years of non-steroidal anti-inflammatories (Ibuprofen), anti-depressants, acetaminophen, and ultimately the opioid Tramadol.

8. As an anesthesiologists and intensive care doctor, I am an expert in the evaluation and treatment of acute and chronic pain. Mr. Atwood suffers from chronic pain which is mechanistically distinct from acute pain. This pain is the consequence of both a cervical and lumbosacral radiculopathy (long standing direct nerve damage caused by spinal bone compression). My review of reporting from a cervical MRI taken in January 2021

notes, among other indications of extreme disrepair, 16 instances of severe foraminal stenoses throughout his cervical and lumbar spine. Pain of this nature is extremely difficult to treat as can be attested to in the case of Mr. Atwood.

9. As is common in musculo-skeletal chronic pain states, posture and body positioning can be used to modify the experience of pain. This is akin to an antalgic gate – a method of walking that reduces a concomitant experience of pain. Mr. Atwood has identified how he can position his body in an attempt to relieve the bony compression on his nerve roots. As a strategy, this has also resulted in profound and permanent limitations of his body mechanics.

10. On my examination, I note that Mr. Atwood is unable to assume a recumbent position less than with his body at approximately a 60 degree head up angle. His neck extension is also limited secondary to fusion of the 5th and 6th cervical vertebrae. When his upper body is lowered to an angle less than 60 degrees, he experiences immediate and intense lower back pain, right greater than left, and radiating down the right leg to the knee. His right-side pain level is maximal, with the left nearly at that maximum level. This image below shows Mr. Atwood assuming the maximum recumbency he can tolerate.  Any increase in recumbency results in intense and immediate pain. Note the date and time stamp in the right lower portion of the photo.



11. I evaluated the physical strength of Mr. Atwood and found it to be profoundly diminished. Mr. Atwood is confined to a wheelchair and lacks the strength and

coordination to walk. His upper strength is poor, and his bilateral hand grip strength is a 2 out of 5 and I note corresponding wasting of the hand muscle groups. His upper arms have greatly reduced reflexes apart from the bilateral triceps.

12. His lower legs demonstrate bilateral muscle wasting from disuse and nerve injury. I note the presence of poor circulation and swelling in his feet. This is likely also related to disuse and nerve injury. He is able to move his legs, but the bilateral strength also corresponds to 2-to-3 out of 5. He has brisk reflexes at the knees but reduced reflexes at the ankles, which is indicative of prolonged disuse and nerve injury. He has evidence of skin mottling at the knees, also indicating reduced circulation.

13. I reviewed the execution procedures document from the Arizona Department of Corrections Rehabilitation and Reentry. This document was last amended April 20, 2022.  In this document, section 13.5.2.3 states that the inmate shall be secured on the execution table. Attachment D to that document also indicates prior to insertion of the IV line for the lethal injection, the inmate shall be "secured on the table by the prescribed means with the inmate's arms positioned at an angle away from the inmate's side." Att. D, D.3. The "prescribed means" or other details of securing the inmate do not appear to be further specified.

14. The procedures also state that "the Restraint Team Leader shall personally check the restraints which secure the inmate to the table to ensure they are not so restrictive as to impede the inmate's circulation, yet sufficient to prevent the inmate from manipulating the catheter and IV lines." Att. D, D.5. This reflects the procedure's maximal restriction of movement short of impeding circulation, which could impede the execution process itself directly or by indirect complications for the condemned person. These execution procedures lack any contemplation of *ad hoc* modification based on the inability of the condemned person, in this case Mr. Atwood, to lie flat and be restrained for any period of time. Mr. Atwood is not able to lie in a recumbent position on the execution table as a result of the experience of intense and untreatable pain.

15. In the execution procedure document, section 13.2.5 states the inmate will be given the option to receive a light sedative. Sedative medications are not analgesic (pain relieving) and such a practice would in no way mitigate the intense pain faced by Mr. Atwood should he be restrained on the execution table.

16. If Mr. Atwood would be executed by lethal injection, it will be necessary to restrain him in an upright and sitting position. This position, while necessary to mitigate the chronic and intense pain otherwise experienced by Mr. Atwood, makes the option of an intravenous central line in the neck or the groin not possible. These options are referenced in the Arizona's execution procedures as options if an intravenous line in the arm cannot be established. An intravenous central line inserted in the neck while sitting caries the high likelihood of causing a venous air embolus - air is sucked into the blood stream and enters the heart resulting in a cardiac arrest. The bent at the waist positioning of Mr. Atwood makes it not possible to access the femoral vein, which is located in the crease of the groin.

17. Upon full consideration of Mr. Atwood based on my history and physical examination and in consideration of the specifics of the Arizona execution procedure, I see no way that such a procedure could occur within the confines of the terms of the document. Forcefully subjecting Mr. Atwood to be positioned as stated in the written execution

procedures would result in subjecting Mr. Atwood to intense, excruciating, and unremitting pain from the moment he is so placed on the execution table and for the duration of his restraint in performance of the execution procedures.

Signed:

Joel B. Zivot, MD, FRCP(C), MA

May 17, 2022

Exhibit 4

**CHAPTER: 700**

**Operational Security**

<u>DEPARTMENT ORDER:</u>

**710 – Execution Procedures**

<u>OFFICE OF PRIMARY RESPONSIBILITY:</u>

**OPS**

<u>Effective Date:</u>

**June 13, 2017**

<u>Amendment:</u>

**April 20, 2022**

<u>Supersedes:</u>

**DO 710 (5/30/17)**

<u>Scheduled Review Date:</u>

**N/A**

<u>ACCESS</u>

☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections Rehabilitation and Reentry



## Department Order Manual

David Shinn, Director

# TABLE OF CONTENTS

PURPOSE ....................................................................................................................1

RESPONSIBILITY .......................................................................................................1

PROCEDURES .............................................................................................................2

1.0     DIRECTOR'S OFFICE RESPONSIBILITIES - NOTICE OF FILED WARRANT OF EXECUTION ...............2

2.0     COMPLEX AND DIRECTOR'S OFFICE RESPONSIBILITIES .........................................................2

3.0     EXECUTION TEAM MEMBERS ...................................................................4

4.0     COMMUTATION HEARING PROCEEDINGS ...............................................9

5.0     DESIGNATION OF WITNESSES BY DIRECTOR ......................................10

6.0     STATE AND LOCAL LAW ENFORCEMENT BRIEFING; SITE CHECKS .........................................11

7.0     THIRTY-FIVE DAYS PRIOR TO THE DAY OF EXECUTION – COMPLEX .....................................11

8.0     THIRTY-FIVE DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE ...........................12

9.0     TWENTY-ONE DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE .........................13

10.0    FOURTEEN DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE ............................14

11.0    TWO DAYS PRIOR TO THE DAY OF EXECUTION ....................................14

12.0    TWENTY-FOUR HOURS PRIOR TO THE DAY OF EXECUTION ..................15

13.0    TWELVE HOURS PRIOR TO AND THROUGH THE EXECUTION ................15

14.0    POST-EXECUTION ....................................................................................18

15.0    PROCEDURES FOR NEWS MEDIA ...........................................................19

IMPLEMENTATION .....................................................................................................21

ATTACHMENTS ..........................................................................................................21

FORMS LIST ...............................................................................................................21

AUTHORITY ................................................................................................................21

## PURPOSE

This Department Order establishes procedures for planning and carrying out the execution of a person convicted of a capital offense and sentenced to death. These procedures shall be followed as written, except that the Director of the Arizona Department of Corrections, Rehabilitation and Reentry (Director) is allowed to make limited deviations from or adjustments to these procedures when required to address certain unexpected or otherwise unforeseen contingencies, subject to the limitations on the Director's discretion as set forth herein. Except as expressly permitted herein, the Director shall not have any authority to deviate from or make adjustments to any material aspects of the execution process, including, but not limited to, the execution chemicals or dosages, consciousness checks, the access of the press and the inmate's counsel to the execution, and the timeframes established by this Department Order.

## RESPONSIBILITY

The Department ensures the execution of a person sentenced to death under State law by a court of competent authority and jurisdiction is carried out in keeping with statute, case law and professional practices.

The Department shall make every effort in the planning and preparation of an execution to ensure the execution process:

- Faithfully adheres to constitutional mandates against cruel and unusual punishment.
- Is handled in a manner that minimizes its impact on the safety, security and operational integrity of the prison and the community in which it occurs.
- Accommodates the public's right to obtain certain information concerning the execution.
- Reasonably addresses the privacy interests of persons as provided by law.
- Provides contingency planning to identify and address unforeseen problems.
- Allows for stays of execution, commutations and other exigencies up to the time that the sentence is imposed.
- Provides opportunity for citizens to exercise their First Amendment rights to demonstrate for or against capital punishment in a lawful manner.
- Ensures there is an appropriate response to unlawful civil disobedience, trespass and other violations of the law by any person attempting to interfere with the execution or the operation of the prison.

The Department shall detain, seek the arrest and encourage prosecution of persons whose conduct includes:

- Violating prohibitions against filming, taping, broadcasting or otherwise electronically documenting the execution of the inmate.
- Trespassing and otherwise entering upon Department property without authorization.
- Participating in unlawful demonstrations or unlawfully attempting to disrupt, prevent and otherwise interfere with the execution.
- Unlawfully threatening, intimidating and otherwise attempting to influence authorized persons involved in the execution process.
- These prohibitions apply to the inmate population as well as department personnel and members of the general public engaging or attempting to engage in disruptive and other prohibited behaviors.

Participating staff shall adhere to the Department's Code of Ethics and Guided Principles, evidencing:

- Appropriate levels of professionalism, restraint and courtesy when interacting with witnesses, demonstrators, attorneys, news media, state and local law enforcement and any other member of the public directly and indirectly involved with the imposition of the sentence of death.
- All assigned duties are performed proficiently and professionally.
- Their ability to exercise the option to withdraw from the process by the prescribed means at any time.
- Conduct that appropriately reflects the solemnity of the activities in which they elect to engage and the duties they choose to perform.
- Reserving public comment on any and all facets of the execution except as expressly provided in Department Order #201, Legal Services - Records Release.
- Any Department employee who learns of identifying information regarding any person who participates in or performs any function of an execution must keep that information confidential.

**IMPORTANT GUIDELINES REGARDING CONFIDENTIALITY AND VOLUNTARINESS OF PARTICIPATION IN AN EXECUTION:**

- The anonymity of any person, as defined in A.R.S. §1-215(28) and A.R.S. §13-105(30), who participates in or performs any ancillary function(s) in the execution, including the source of the execution chemicals, and any information contained in records that would identify those persons are, as required by statute, to remain confidential and are not subject to disclosure. A.R.S. §13-757(C).
- All team members serve on a strictly voluntary basis. At any point before, during or after an execution any team member may decline to participate or participate further without additional notice and explanation or repercussion.
- The Assistant Director for Prison Operations shall ensure all team members understand and comply with the provisions contained herein.

# PROCEDURES

### 1.0   DIRECTOR'S OFFICE RESPONSIBILITIES UPON NOTICE THAT THE STATE HAS FILED A MOTION FOR WARRANT OF EXECUTION

1.1   Upon notice from the Attorney General's Office that it has filed a Motion for Warrant of Execution in the Arizona Supreme Court:

1.1.1   General Counsel shall:

1.1.1.1   Notify the Director, Assistant Director for Prison Operations, the Wardens of ASPC-Florence and ASPC-Eyman or ASPC-Perryville, and the Media Relations Director.

1.1.1.2   Notify the Victim Services Team Leader, who shall contact the victim(s) and inform them that the State is seeking a Warrant of Execution.

1.1.2   The Director shall notify the inmate and the inmate's counsel in writing of the drug/lethal gas protocol that will be used in the event a Warrant of Execution is issued and the method of execution.

### 2.0   COMPLEX AND DIRECTOR'S OFFICE RESPONSIBILITIES UPON RECEIPT OF WARRANT OF EXECUTION

2.1   Upon receipt of the Warrant of Execution from the Attorney General's Office:

2.1.1   General Counsel shall:

    2.1.1.1   Notify the Director, Assistant Director for Prison Operations, the Wardens of ASPC-Florence and ASPC-Eyman or ASPC-Perryville, and the Media Relations Office.

    2.1.1.2   Forward the original Warrant of Execution to the Warden of ASPC-Florence.

    2.1.1.3   Forward copies of the original Warrant of Execution to the Warden of ASPC-Eyman or ASPC-Perryville.

    2.1.1.4   Notify the Victim Services Team Leader, who shall contact the victim(s) and inform them of the court's issuance of the Warrant of Execution.

2.1.2   The Director shall:

    2.1.2.1   Select the time of execution and provide notice to the Arizona Supreme Court and the parties at least 20 calendar days prior to the execution date. (Arizona Rules of Criminal Procedures, Rule 31.17(c)(3))

    2.1.2.2   Notify the inmate that if the offense was committed prior to November 23, 1992, the inmate shall choose in writing using the Method of Execution, Form 710-1, either lethal injection or lethal gas at least twenty-one days prior to the execution. If the inmate fails to choose either lethal injection or lethal gas, the penalty of death shall be inflicted by lethal injection (A.R.S. §13-757(B)).

    2.1.2.3   Have the authority to change the timeframes established in this Department Order in order to address certain unexpected or otherwise unforeseen contingencies only with regard to minor or routine contingencies not central to the execution process.

2.1.3   The ASPC-Eyman or ASPC-Perryville Warden shall:

    2.1.3.1   Direct the inmate to submit the Inmate Witness and Notification Information, Form 710-2, to the Warden no later than 14 days prior to the scheduled execution date.

        2.1.3.1.1   Inform the inmate that two clergy and five other persons may be invited to be present at the execution. The inmate may designate one clergy/spiritual advisor to accompany the inmate into the lethal injection execution chamber for audible prayer and religious touch, consistent with the U.S. Supreme Court's Opinion in *Ramirez v. Collier* (March 24, 2022), and the Department reserves the right to enforce as necessary any or all reasonable restrictions on the audible prayer and religious touch as set forth in the U.S. Supreme Court's Opinion. ***[Revision – April 20, 2022]***

        2.1.3.1.2   Notify the inmate that minors are prohibited from witnessing the execution pursuant to A.R.S. §13-758.

2.1.3.1.3    Notify the inmate that requests for Department or contract staff to attend the execution shall be denied.

2.1.3.1.4    Notify the inmate that requests for other inmates to attend the execution shall be denied.

2.1.3.2    Direct the inmate to review and update as necessary the Notification in Case of Accident, Serious Illness or Death and Disposition of Property, Form 711-1. The Warden shall direct the inmate to provide any changes no later than 14 days prior to the execution. If the inmate provides no instruction, the property and accounts shall be disposed in accordance with Department Order #711, Notification of Inmate Hospitalization or Death.

2.1.3.3    Advise the inmate that his/her body shall not be used for organ donation.

2.1.3.4    Summarize the options available with the inmate for release and disposition of their body after the autopsy is performed. The Warden shall direct the inmate to review the previously completed Disposition of Remains, Form 710-3, and update as necessary no later than 14 days prior to the execution. If the inmate provides no information or the information is insufficient or incorrect the deceased shall be disposed in accordance with Department Order #711, Notification of Inmate Hospitalization or Death.

2.1.3.5    Advise the inmate he may request a last meal by completing the Last Meal Request, Form 710-5, and returning it no later than 14 days prior to the execution. Reasonable effort shall be made to accommodate the request.

## 3.0    EXECUTION TEAM MEMBERS

3.1    The Assistant Director for Prison Operations shall:

3.1.1    Establish a training schedule and identify dates for periodic on-site practice by the Housing Unit 9 Section Teams, to include 10 training scenarios within the 12 months preceding the scheduled execution.

3.1.2    Conduct a minimum of two training sessions with multiple scenarios 2 days prior to the scheduled execution. The IV Team members shall participate in at least one training session with multiple scenarios within one day prior to the scheduled execution.

3.1.2.1    All training sessions shall be documented and be included as part of a permanent record created by the ASPC-Florence Warden to be submitted to the Department's General Counsel for archive, post execution.

3.1.3    Ensure periodic testing of all of the equipment in Housing Unit 9 occurs, affirming electrical, plumbing, heating and air conditioning units are in working order and the gas chamber is maintained.

3.2     The Assistant Director for Prison Operations provides for the planning and overall direction of all pre-execution, execution and post-execution activities. The Assistant Director coordinates the activities of the Southern and Northern Regional Operations Directors (SROD and NROD) and the ASPC-Eyman or ASPC-Perryville and ASPC-Florence Wardens who activate the following teams and oversee their activities, specifically:

  3.2.1     Command

    3.2.1.1     Consists of a minimum of three team members:

      3.2.1.1.1     Commander

      3.2.1.1.2     Recorder

      3.2.1.1.3     Telephone operator

      3.2.1.1.4     Others as necessary

    3.2.1.2     Team members are selected by the Assistant Director for Prison Operations with the documented approval of the Director.

    3.2.1.3     Its team leader is selected by the Assistant Director for Prison Operations.

    3.2.1.4     Primary function of Command is the overall coordination of execution procedures.

  3.2.2     Housing Unit 9 Section

    3.2.2.1     Consists of a section leader and two teams:

      3.2.2.1.1     Restraint Team

      3.2.2.1.2     Special Operations Team

    3.2.2.2     Team leaders are selected by the Assistant Director for Prison Operations with the documented approval of the Director.

    3.2.2.3     The section leader is the ASPC-Florence Warden.

    3.2.2.4     Primary function of the section leader is the overall coordination of activities of the Restraint Team and the Special Operations Team to ensure compliance with conditions of confinement and application of approved procedures.

  3.2.3     Restraint Team

    3.2.3.1     Consists of a minimum of seven team members, including one team leader.

    3.2.3.2     Restraint Team members and the team leader are selected by the Assistant Director for Prison Operations with the documented approval of the Director.

3.2.3.3    Primary function of the Restraint Team is to provide continuous observation of the inmate on the day of the execution and apply appropriate restraint procedures and inmate management prior to, during and after the execution.

3.2.4    Special Operations Team

3.2.4.1    Consists of a minimum of five team members:

3.2.4.1.1    Team Leader

3.2.4.1.2    Recorder

3.2.4.1.3    Three additional team members

3.2.4.2    Its team members and team leader are selected by the Assistant Director for Prison Operations with the documented approval of the Director.

3.2.4.3    The Special Operations Team Leader shall designate functions of the other team members, including the selection of a member to observe the procedure and serve as the Recorder.

3.2.4.4    Primary function of the Special Operations Team is to implement the protocols associated with the execution with its primary duty being the administration of the chemicals, and additionally mixing the chemicals under the direct supervision of the IV Team Leader.

3.2.5    Intravenous Team Members (IV Team)

3.2.5.1    The IV Team will consist of any two or more of the following: physician(s), physician assistant(s), nurse(s), emergency medical technician(s) (EMTs), paramedic(s), military corpsman or other certified or licensed personnel including those trained in the United States Military. All team members shall be currently certified or licensed within the United States to place IV lines.

3.2.5.2    The IV Team members shall be selected by the Director. Selection of any team member shall include a review of the proposed team member's qualifications, training, experience, and/or any professional license(s) and certification(s) they may hold. Licensing and criminal history reviews shall be conducted, by the Inspector General's Office prior to assigning or retaining any IV Team member and upon the issuance of a Warrant of Execution.

3.2.5.3    The Director shall designate the IV Team Leader. The Assistant Director for Prison Operations shall ensure all team members thoroughly understand all provisions contained herein as written and by practice.

3.2.5.4  The IV Team shall be responsible for inserting either peripheral IV catheters or a central femoral line as determined by the Director acting upon the recommendation of the IV Team Leader. The IV Team Leader shall ensure all lines are functioning properly throughout the procedure, supervise the Special Operations team in the mixing of the chemicals, preparing the syringes, and monitoring the inmate (including the level of consciousness and establishing the time of death). The IV Team Leader shall supervise the administration of the chemicals. A central femoral venous line shall not be used unless the person placing the line is currently qualified by experience, training, certification or licensure within the United States to place a central femoral line.

3.2.5.5  IV Team members shall only be required to participate in the training sessions scheduled for one day prior to the actual execution.

3.2.5.6  Documentation of IV Team members' qualifications, including training of the team members, shall be maintained by the Department Director or his designee.

3.2.6  Maintenance Response Team (MRT)

3.2.6.1  Consists of three team members and a team leader, and reports to Command.

3.2.6.2  Team members are selected by the ASPC-Florence Warden.

3.2.6.3  Primary function of MRT is to test all Housing Unit 9 equipment utilized to impose the sentence of death and to ensure electrical, plumbing, heating and air conditioning units are in working order.

3.2.7  Critical Incident Response Team (CIRT)

3.2.7.1  Consists of three team members and a team leader, and reports to Command.

3.2.7.2  The leader is the Employee Relations Administrator or designee.

3.2.7.3  Team members are CIRT responders and selected by the Employee Relations Administrator.

3.2.7.4  Primary function of CIRT is to educate staff regarding possible psychological responses and effective coping mechanisms to affected staff at all levels in the Department prior to, during and after the execution. CIRT shall provide ongoing follow up contact to staff.

3.2.8  Traffic Control Team

3.2.8.1  Consists of eight team members and a team leader, and reports to Command.

3.2.8.2  Team members and the team leader are selected by the Assistant Director for Prison Operations.

3.2.8.3    Primary function is to confer with state and local law enforcement agencies, establish check points and parameters for traffic control and formulate inter-agency emergency response strategies. The team also coordinates the ingress/egress for Department and contract staff and other persons whose attendance is necessary at ASPC-Eyman or ASPC-Perryville and ASPC-Florence. The Team's focus is the period of time starting twenty-four hours prior to the execution and concluding when normal activities resume after the execution.

3.2.9    Escort Team

3.2.9.1    Consists of eight team members and a team leader, and reports to Command.

3.2.9.2    Team members and the team leader are selected by the Assistant Director for Prison Operations.

3.2.9.3    Primary function is to coordinate the movement of all pre-approved witnesses on and off prison grounds and within its perimeter. One Escort Team is assigned to escort and assist pre-approved official, victim, media, and inmate witnesses. Escort team members always remain with witnesses within the established perimeter.

3.2.10    Victim Services Team

3.2.10.1    Consists of two team members and reports to the Escort Team leader.

3.2.10.2    The team leader is the Victim Services Office Administrator.

3.2.10.3    Primary function is to ensure victims of the crime that resulted in the imposition of death date are informed of the execution date and their opportunity to witness the execution. The team explains the execution process. If the victim is interested in attending, the team submits the victim's name(s) for consideration.

3.2.10.4    Day of the Execution – The team leader meets with the victim(s) in a predetermined staging area and accompanies them throughout the process, including a briefing by the Director or the Director's designee. The Team provides support and advocacy as appropriate.

3.2.10.5    If the victim(s) is interested in speaking with the media after the execution, the victim(s) is escorted to the Press Room for brief media availability.

3.2.10.6    Post-Execution - The team leader ensures the victim(s) receives follow up phone calls and support.

3.2.11    Population Assessment

3.2.11.1    Regional Operations Director:

3.2.11.1.1    Is responsible for the coordination of monitoring and evaluation of inmate activity at ASPC-Eyman and ASPC-Florence.

3.2.11.1.2  Continuously monitors and assesses the inmate population for any activity related to the execution or its impact on the prison's operation at ASPC-Eyman and ASPC-Florence.

3.2.11.2  ASPC-Perryville Warden:

3.2.11.2.1  Is responsible for the coordination of monitoring and evaluation of inmate activity at ASPC-Perryville.

3.2.11.2.2  Continuously monitors and assesses the inmate population for any activity related to the execution or its impact on the prison's operation.

3.3  <u>Designation of ADC Staff and Others Selected to Assist with the Execution</u>

3.3.1  The ASPC-Eyman or ASPC-Perryville and ASPC-Florence Wardens shall review the current teams' rosters and recommend retention and replacement of staff and alternates to the Assistant Director for Prison Operations.

3.3.2  The Assistant Director for Prison Operations shall evaluate the teams' composition and the Wardens' recommendations and forward final recommendations to the Director.

3.3.3  In the selection and retention of section leaders and Housing Unit 9 team members, the Assistant Director for Prison Operations shall consider:

3.3.3.1  No employee who was suspended or demoted in the past 12 months shall be considered. Any staff currently under investigation is also ineligible.

3.3.3.2  Special consideration may be given to staff with pertinent specialized training and qualifications.

3.3.3.3  Staff with less than two years employment with the Department shall not be considered.

3.3.3.4  No staff serving on any team shall be related to the inmate by blood or marriage or have any other legal relationship with the inmate, their family or the crime victim(s).

3.3.4  Staff participation in the execution process is strictly voluntary. No Department employee is required to attend or participate in an execution. Any staff volunteers may withdraw from performing their assigned duties specific to the execution at any time by advising their Team Leader, advising a Team Member or advising their immediate chain of command. All staff participating in the execution shall be required to sign a Notice of Execution Involvement, Form 710-8.

## 4.0  COMMUTATION HEARING PROCEEDINGS

4.1  The Arizona Board of Executive Clemency (ABOEC) shall advise the Department of its plans to convene a Commutation Hearing and its date and time. Upon receipt of the notice, the ASPC-Eyman or ASPC-Perryville Warden shall arrange for a location in which the Commutation Hearing will be held.

4.1.1     If the ABOEC Commutation Hearing is held at the prison, the Department shall:

         4.1.1.1     Require those in attendance to adhere to dress code as outlined in Department Order #911, <u>Inmate Visitation</u>.

         4.1.1.2     Comply with the open meeting laws as it applies to Board of Executive Clemency hearings pursuant to A.R.S. §38-431.08.

## 5.0    DESIGNATION OF WITNESSES BY DIRECTOR

5.1     The Director or designee shall be present during the execution.

    5.1.1     The Director shall invite:

         5.1.1.1     The Arizona Attorney General. A.R.S. §13-758.

         5.1.1.2     Twelve or more reputable citizens, including up to five Arizona-market media.

         5.1.1.3     The five official media witnesses selected as representatives, from media-print, television/cable, radio, and the local market where the crime occurred. These official media witnesses shall also agree to serve as pool reporters.

         5.1.1.4     Law Enforcement and prosecutors from the jurisdiction where the crime occurred.

         5.1.1.5     Any crime victims and survivors of the crime for which the sentence of death will be imposed, once the Victim Services Team identifies those persons and provides to the Director a list of victim witnesses within 14 days prior to the scheduled execution.

         5.1.1.6     In the event that the inmate wishes to designate one or more of their attorneys or other members of their legal team (not to exceed a cumulative three persons) to witness the execution, then the inmate shall identify these witnesses twenty-one days prior to the execution, and these witnesses shall sign and timely submit an Official Witness Agreement (Form 710-6), whereupon the Director shall invite these witnesses to attend the execution in accordance with section 10, subsection 10.2.1.1 of this Department Order.

    5.1.2     Minors shall not be permitted to witness an execution. A.R.S. §13-758.

    5.1.3     All witnesses are subject to a records check. Selection to participate is contingent upon security clearance and Witness Agreement to adhere to the provisions stipulated in the Official Witness Agreement and Official Witness/Pool Reporters Agreements, Forms 710-6 and 710-7. The Director shall retain full discretion as to the selection of and any changes in the witnesses selected for each scheduled execution.

**6.0   STATE AND LOCAL LAW ENFORCEMENT BRIEFING; SITE CHECKS**

6.1   The Assistant Director for Prison Operations shall ensure state and local law enforcement is periodically briefed and adequately prepared for the execution.

6.2   All of the equipment necessary to the administration of the execution shall be available on site and in good working order including:

6.2.1   Transportation vehicles

6.2.2   Communication devices with inter-operability capability and restricted frequencies

6.2.3   Climate control

6.2.4   Tool control

6.2.5   Safety equipment

6.2.6   Audio/visual equipment

6.2.7   Utility infrastructure

6.2.8   Key control/locking devices

6.2.9   Medical emergency response capability

6.3   The Assistant Director for Prison Operations shall take all necessary steps to timely rectify deficiencies.

**7.0   THIRTY-FIVE DAYS PRIOR TO THE DAY OF EXECUTION – COMPLEX**

7.1   The Warden or designee of ASPC-Eyman or ASPC-Perryville shall confirm in writing the following steps were completed:

7.1.1   Read the Warrant to the inmate.

7.1.2   Outline for the inmate how conditions of confinement will be modified over the next thirty-five days and briefly describe the relevant aspects of the execution process.

7.1.3   Offer the inmate the opportunity to contact their Attorney of Record by phone and to speak with a facility chaplain.

7.1.4   Obtain the inmate's current weight and provide that information to the Assistant Director for Prison Operations and the Housing Unit 9 Section Leader.

7.1.5   Transfer the inmate to the single-person cell on Death Row Browning or the Lumley Unit that has been retrofitted expressly for the purpose of holding the inmate.

7.1.5.1   Before transferring the inmate into the cell, the inmate shall be strip searched, screened on the BOSS chair and then issued a new set of clothes and shoes to wear.

7.1.5.2   The single-person cell shall be thoroughly searched prior to placing the inmate in the cell.

7.1.6   Place the inmate on 24-hour Continuous Observation and post staff to the inmate's cell on an on-going basis to maintain visual contact with the inmate until such time as the inmate is transferred to Housing Unit 9 at ASPC-Florence.

7.1.7   Establish an Observation Record to chronicle staff's observations of the inmate's activities and behavior until the sentence of death is imposed.

7.2   <u>Conditions of Confinement</u> – The ASPC-Eyman or ASPC-Perryville Warden shall:

7.2.1   Ensure none of the inmate's personal property is transferred with the inmate, except as provided in this section.

7.2.2   Have the inmate's personal property inventoried in their presence before the transfer of cells occurs and then have it boxed, sealed and removed from the cell. Store the inmate's property pending receipt of written instruction by the inmate regarding disposition of property or otherwise dispose of the property as outlined in section 2.0 of this Department Order.

7.2.3   Ensure all remaining property possessed by the inmate in the cell comply with indigent status items; any exceptions must be pre-approved in writing by the Assistant Director for Prison Operations.

7.2.4   Allow the inmate to keep in the cell one box each of legal and religious materials, a pencil and paper, and a book or periodical.

7.2.5   Issue the inmate a new mattress, pillow and bedding.

7.2.6   Provide the inmate limited hygiene supplies, including a towel and washcloth, and exchange these items on a daily basis.

7.2.7   Issue the inmate a clean set of clothing and bedding daily.

7.2.8   Ensure all inmate medications are unit-dosed and, when available issued in liquid form, and none of the inmate's medication including over-the-counter medications be dispensed or maintained by the inmate as Keep-on-Person.

7.2.9   Ensure the inmate has access to a department television set that is secured outside of the cell, and does not have access to any other appliances.

7.2.10  Continue to provide outdoor exercise and showers, non-contact visits and phone calls per the current schedule for other death row inmates in Browning or the Lumley Unit.

**8.0   THIRTY-FIVE DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE**

8.1   <u>The Assistant Director for Prison Operations</u>:

8.1.1   Identifies and assigns team leaders and members, with documented approval by the Director, and upon approval shall activate the teams.

8.1.2   Confirms preventive maintenance in Housing Unit 9 occurs and that an equipment inventory is completed, and appropriate and timely action is taken.

8.1.3   Directs the initiation of the Continuous Observation Log commencing on the 35th day prior to the day of the execution. The log shall follow the inmate from ASPC-Eyman or ASPC-Perryville to Housing Unit 9 at ASPC-Florence and be maintained until the execution occurs or a stay of execution is issued.

8.1.4   Activates the training schedule ensuring staff participating in the execution receives adequate training, written instruction and practice, all of which is documented.

8.2   The Assistant Director for Medical Services

8.2.1   Directs ADC's Medical Services staff or ADC's contracted Medical Services provider to conduct a medical records file review to identify any prescribed medication(s) and dosages the inmate is currently or was recently taking. ADC's Medical Services staff or ADC's contracted Medical Services provider shall modify prescribed medications as may be necessary.

8.2.2   Directs ADC's Medical Services staff or ADC's contracted Medical Services provider to dispense all inmate medications in unit doses and, when available in liquid form. No medication including over-the-counter medications shall be provided or maintained by the inmate as Keep-on-Person.

8.2.3   Ensures ADC's Medical Services staff or ADC's contracted Medical Services provider continuously monitors for significant changes in the inmate's medical or mental health and reports findings immediately to the Department's General Counsel.

8.3   The Media Relations Office:

8.3.1   Issues a news advisory announcing the date of the execution.

8.3.2   Facilitates up to one non-contact interview with the inmate by phone, per day, with media from the day the Warrant is issued until the day before the sentence of death is imposed excluding weekends and state and federal holidays. The inmate and Attorney of Record may select among these requests that are submitted to the Media Relations Office and recommend the order in which they occur. The inmate may refuse any or all media requests for interviews.

8.4   The Office of Victim Services – Identifies and advises victims of the crime for which the inmate has been sentenced to death of the issuance of the Warrant of Execution and the scheduled date and time of the execution.

## 9.0   TWENTY-ONE DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE

9.1   The Media Relations Office:

9.1.1   Forwards media-witness applications to the Inspector General for background investigation. The Inspector General shall advise the Director of any issues arising from such investigations.

9.1.2   Sends media-witness agreement forms (Official Witness Agreement, Form 710-6, and as applicable, Official Witness/Pool Reporter Agreement, Form 710-7) to identified media-witnesses, and establishes a deadline for the return of all such forms.

9.1.3    All witnesses shall sign and timely submit an Official Witness Agreement, Form 710-6, prior to being cleared and added to the witness list.

9.1.3.1    All official witnesses who are also members of media/press and are selected to serve as pool reporters shall also sign and timely return the Official Witness/Pool Reporter Agreement, Form 710-7.

## 10.0  FOURTEEN DAYS PRIOR TO THE DAY OF EXECUTION – CENTRAL OFFICE

10.1    The Inspector General or designee:

10.1.1    Finalizes arrangements with a Medical Examiner Office for the disposition of the body, security for the Medical Examiner's vehicle and the custodial transfer of the body.

10.1.2    Obtain a body bag and tag from the Medical Examiner's Office.

10.2    General Counsel:

10.2.1    Finalizes a list of all witnesses including official, victim, inmate witnesses and media/pool reporters, through coordination with the Offices of Victim Services and Media Relations, for the Director's review and documented approval.

10.2.1.1    Upon documented approval the Director or designee shall prepare a written invitation to each chosen witness. (See Attachment A.)

10.3    The Media Relations Office – Issue a news advisory announcing the date and time of the execution.

## 11.0  TWO DAYS PRIOR TO THE DAY OF EXECUTION

11.1    The Assistant Director for Prison Operations:

11.1.1    Schedules and conducts on-site scenario training sessions, modifying practices as warranted.

11.1.2    Confirms adequate staffing and vehicles are in place for regular operations and the execution.

11.2    The ASPC-Florence Warden:

11.2.1    Confirms staff assigned to the Maintenance Response Team (MRT) is scheduled and will be on-site eight hours prior to the time scheduled for the imposition of sentence.

11.2.2    Restricts access to Housing Unit 9 to those with expressly assigned duties.

11.2.3    Readies Housing Unit 9 for the transfer of the inmate.

11.2.4    Verifies execution inventory, including the chemicals to be used, and equipment checks are completed and open issues resolved.

**12.0  TWENTY-FOUR HOURS PRIOR TO THE DAY OF EXECUTION**

12.1    On-site scenario exercises continue.

12.2    Final preparation of Housing Unit 9 is completed. Each room receives final evaluation specific to its functions including security, climate control, lighting, sound, sanitation, and that separation screens and appropriate restraints are at the ready.

12.3    Detailed staff briefings are provided.

12.4    The ASPC-Eyman or ASPC-Perryville Warden shall ensure the inmate receives the last meal by 1900 hours. Every reasonable effort to accommodate the last meal request will have been made. All eating utensils and remaining food and beverage shall be removed upon completion of the meal.

12.5    The ASPC-Eyman or ASPC-Perryville Warden shall ensure non-contact visits and phone calls are concluded by 2100 hours.

   12.5.1    The inmate's telephone privileges shall be terminated at 2100 hours the day prior to the execution, excluding calls from the inmate's Attorney of Record and others as approved by the Assistant Director for Prison Operations.

   12.5.2    The inmate's visitation privileges shall be terminated at 2100 hours the day prior to the execution. The inmate will be permitted two hours of in-person visitation with no more than two Attorneys of Record, concluding one hour prior to the scheduled execution.

12.6    The inmate is prepared for transfer to Housing Unit 9 by the prescribed means.

**13.0  TWELVE HOURS PRIOR TO AND THROUGH THE EXECUTION**

13.1    <u>Restricting Access to Institution Property</u> – During the final twelve hours prior to the execution, access to ASPC-Eyman or ASPC-Perryville and ASPC-Florence is limited to:

   13.1.1    On-duty personnel.

   13.1.2    On-duty contract workers.

   13.1.3    Volunteers deemed necessary by the Wardens.

   13.1.4    Approved delivery vehicles.

   13.1.5    Law enforcement personnel on business-related matters.

   13.1.6    Restrictions to these facilities shall remain in effect until normal operations resume after the execution or a stay of execution is issued.

13.2    <u>Transfer of the inmate from Browning or Lumley Unit to Housing Unit 9</u>

   13.2.1    The inmate shall be secured and transferred by the Execution Restraint Team per the prescribed means the night before the execution.

   13.2.2    Housing Unit 9 staff shall take custody of the inmate and the Observation Log. Staff shall assume maintenance of the log until the execution is completed or a stay of execution is issued.

13.2.3   Upon the inmate's arrival, the inmate may be offered a mild sedative.

13.2.4   No later than five hours prior to the execution, the inmate shall be offered a light meal. All eating utensils and remaining food shall be removed upon completion of the meal.

13.2.5   No later than four hours prior to the execution, the inmate may be offered a mild sedative.

13.2.6   These time frames may be adjusted as necessary in the event of a stay of execution or other exigencies.

13.3   Housing Unit 9 Conditions of Confinement

13.3.1   The inmate shall remain on Continuous Watch. Staff shall record observations and make entries in the Observation Record during the final four hours in hours, and minutes.

13.3.2   The inmate shall be issued one pair each of pants, boxer shorts and socks, and a shirt on the morning of the execution.

13.3.3   The cell shall be furnished with a mattress, pillow and pillowcase, one each top and bottom sheet, a blanket, a washcloth and towel, and toilet paper.

13.3.4   The inmate may have a pencil and paper, religious items, a book or periodical and indigent-sized hygiene supplies (liquid soap, toothpaste) and a toothbrush and comb. These items may be made available only for the duration of the use and shall be removed immediately thereafter. Any other requested property shall require approval by the Assistant Director for Prison Operations, and shall be documented.

13.4   Population Management – ASPC-Eyman or ASPC-Perryville and ASPC-Florence shall go on lockdown status from between two to six hours prior to the time the execution is scheduled to occur at the direction of Command. They shall remain on lock down throughout the execution. After the conclusion of the execution, the prisons shall return to regular operations at the direction of Command.

13.5   Additional Operations Requirements

13.5.1   Witness Escort Teams shall process, transport and remain with pre-approved official witnesses, inmate witnesses, media witnesses and victim(s) witnesses through the conclusion of the execution and their return to designated staging areas per prescribed means.

13.5.1.1   Teams shall ensure each witness group is separated from the other witness groups at all times.

13.5.1.2   The Director or designee shall provide a brief overview of the execution for the official witnesses. The Director shall advise witnesses that the curtains in the execution chamber may be drawn prior to the conclusion of the execution in the event of a legitimate penological objective which would merit such closure and then reopened when the execution resumes, and that an IV Team member will enter into the chamber and physically manipulate the inmate to check consciousness.

13.5.1.3  In the event the inmate has designated one of his attorneys to witness the execution, temporary office space will be provided for the inmate's counsel in the Administration Building during the scheduled day of execution. One attorney and two additional members of the legal team may be permitted to remain in the office space during the execution. The inmate's legal team will be permitted to bring into the temporary office space one mobile phone, one tablet, and one laptop. While the attorney witness is in the witness room, a member of the Witness Escort Team shall hold one mobile phone designated by the attorney, to be made available to the attorney in exigent circumstances. The mobile phone may not be used inside the witness room.

13.5.2  Upon the direction of the Director to proceed:

13.5.2.1  The APSC-Florence Warden shall direct the Execution Restraint Team to prepare the inmate for escort into the execution chamber.

13.5.2.2  Prior to moving the inmate from the holding cell to the execution table, the Director shall confer with the Attorney General or designee and the Governor or designee to confirm there is no legal impediment to proceeding with the lawful execution.

13.5.2.3  When the inmate is secured on the execution table by the team and readied by qualified medical personnel, the Warden shall advise the Director.

13.5.2.4  The Director shall reconfirm with the Attorney General or designee and the Governor or designee that there is no legal impediment to proceeding. Upon oral confirmation that there is no legal impediment to proceeding with the execution, the Director may order the Warden to proceed with the execution.

13.5.2.4.1  If there is a legal impediment the Director shall instruct the ASPC-Florence Warden to stop, and to notify the inmate and witnesses that the execution has been stayed or delayed. The Warden shall also notify Command to notify the Media Relations staff who shall advise the media in the Press Room.

13.5.2.5  The Warden shall read aloud a summary of the Warrant of Execution. The Warden shall ask the inmate if he wishes to make a last statement. The microphone will remain on during the last statement. It will be turned off in the event the inmate uses vulgarity or makes intentionally offensive statements. If the microphone is turned off, it will be turned back on immediately after the completion of the last statement.

13.5.2.6  The Director shall instruct the disbursement of chemicals to begin by the prescribed means.

13.5.3  Pronouncement and Documentation of Death

13.5.3.1  The Director shall announce death when it has occurred.

13.5.3.2   The ASPC-Florence Warden shall complete and sign the return of the Death Warrant pursuant to A.R.S. §13-759. The Director shall file the document with the sentencing court and the Arizona Supreme Court within 48 hours.

13.5.3.3   A Medical Examiner shall take custody of the body and issue a Certificate of Death.

13.6   <u>Stay of Execution</u> – Upon receipt of notification that the court has issued a Stay of Execution; the Director shall consult with the Attorney General's Office and advise Command.

13.6.1   Upon receipt of notification, the Housing Unit 9 Section Leader shall:

13.6.1.1   Advise the witnesses a Stay of Execution has been issued.

13.6.1.2   Following consultation with the Director, direct that the catheters be removed, if applicable, and direct the Restraint Team to return the inmate to the holding cell.

13.6.1.3   Instruct the Special Operations to stand down.

13.6.2   Command shall inform the following teams of the Stay of Execution:

13.6.2.1   Traffic Control Team Leader

13.6.2.2   Population Assessment

13.6.2.3   Critical Incident Response Team Leader

13.6.2.4   Media Relations Director

13.6.2.5   Victim Services Team Leader

13.6.2.6   Escort Team leader

13.6.3   The Traffic Control Team Leader shall notify protestors of the issuance of the Stay of Execution.

13.6.4   The Escort Team shall commence escorting witness groups from Housing Unit 9 as set forth herein.

13.6.5   Upon Command's instruction, the inmate shall be transported from Housing Unit 9 back to Death Row at Browning or Lumley Unit and their personal possessions returned. Following the transport, the inmate will be permitted to consult with the inmate's attorney(s) upon request.

## 14.0   POST-EXECUTION

14.1   <u>Removing Witnesses from Housing Unit 9</u>

14.1.1   After the pronouncement of death, witnesses shall be escorted in the prescribed order from the facility.

14.1.1.1   Each group of witnesses will continue to be kept separated from the other groups at all times.

14.1.1.2   Official witnesses who are media pool reporters will return to the Press Room to participate in the media briefing.

14.1.1.3   Victim witnesses speaking with the media will be escorted to the Press Room.

14.1.2   Media may remain on site in a designated location outside the secure perimeter for a limited time to complete live broadcasts.

14.2   Site Clean Up

14.2.1   Under the supervision of a person designated by the ASPC-Florence Warden, Housing Unit 9 shall be cleaned and secured.

14.2.2   Institutional staff trained in infectious diseases preventive practices will utilize appropriate precautions in cleaning Housing Unit 9.

14.3   Normal Operations

14.3.1   Command shall determine when the prisons resume normal operations after receiving assessments from the Wardens of ASPC-Florence and ASPC-Eyman or ASPC-Perryville.

14.3.2   Department personnel shall be deactivated at the direction of Command.

14.4   Execution Documentation

14.4.1   The ASPC-Florence Warden shall be responsible to gather all documents pertaining to the execution and forward to the Department's General Counsel for archive.

14.4.2   Pursuant to A.R.S. §13-759 (B), the Director shall send written notification to the sentencing court and the Arizona Supreme Court stating the time, mode and manner in which the Warrant was carried out.  (See Attachments B and C.)

## 15.0  PROCEDURES FOR NEWS MEDIA

15.1   Reasonable efforts will be made to accommodate representatives of the news media before, during and after a scheduled execution however; the Department reserves the right to regulate media access to ensure the orderly and safe operations of its prisons.

15.2   The Media Relations Office shall coordinate the release of information to news media outlets. All Department and contract staff are expressly prohibited from providing information not readily available in the public domain.

15.3   Update Prior to the Execution – Following activation of the Press Room, the Media Relations Director and the Public Information Officer shall provide the news media with regular briefings or updates.

15.4   Media Orientation and Releases – The Media Relations Director shall provide general information regarding the execution and about the inmate.

15.4.1 Media Representatives will be informed how the press pool will be established and advised that if they are selected as press pool witnesses, they shall be required to complete and sign Media Witness Press Pool Agreement, Form 710-7, in addition the Official Witness Agreement, Form 710-6, prior to the execution.

15.4.2 Media Representatives will return to the Press Room after the execution to answer questions of all other media representatives concerning their observations during the execution, prior to filing or reporting their story.

15.5 Press Room Operations

15.5.1 Media representatives requesting to witness an execution must submit written requests to the Media Relations Office no later than 28 days prior to the execution. Each request must include the name, social security number and birth date of media requesting access. Only those news organizations that have submitted written requests within the stated time frame shall be considered.

15.5.2 The Media Relations Office shall finalize recommendations for selected media to perform official witness/pool reporter functions 14 days prior to the execution.

15.6 Briefing Packets and Updates

15.6.1 The Media Relations Office shall provide press briefing packets for reporters.

15.6.2 A brief summary of inmate's activities during the final twenty-four hours, activities related to the execution and sequence of events, may be provided.

15.7 News Media Selection

15.7.1 No more than five members of the Arizona media may be selected to witness the execution as official witnesses. Selected media will perform the additional duties of pool reporter:

15.7.1.1 Print

15.7.1.2 Radio

15.7.1.3 Television/Cable

15.7.1.4 Local media representative in the market where the crime was committed

15.7.2 Media is held to the same standards for conduct as are all other official witnesses.

15.7.3 Command may exclude any media witness at any time if the media witness fails to abide by the provisions of the Official Witness and Pool Reporter Agreements (Forms 710-6 and 710-7).

15.7.4 Media witnesses are not permitted to bring unauthorized items into Housing Unit 9. Unauthorized items include:

15.7.4.1 Electronic or mechanical recording devices

15.7.4.2 Still, moving picture or video tape camera

15.7.4.3 Tape recorders or similar devices

15.7.4.4   Radio/television broadcasting devices

15.7.5   Each pool reporter shall be provided a tablet of paper and a pencil to take notes from the time they complete security screening and board the bus until they are returned to the Press Room after the conclusion of the execution.

15.7.6   Official witnesses who are pool reporters shall attend a pre-execution briefing.

## IMPLEMENTATION

The ASPC-Florence and ASPC-Perryville Wardens shall maintain Post Order #015, Death Watch Security Officer, delineating post-specific responsibilities. The ASPC-Florence Warden shall also maintain Post Order #015-A01, Housing Unit-9 Security Watch.

## ATTACHMENTS

Attachment A - Letter of Invitation to Witness an Execution
Attachment B - Return of Warrant Notification - Supreme Court
Attachment C - Return of Warrant Notification - Superior Court
Attachment D - Preparation and Administration of Chemicals
Attachment E – Lethal Gas

## FORMS LIST

710-1, Method of Execution
710-2, Inmate Witness Information
710-3, Disposition of Remains
710-4, Authorized Witnesses for Execution Log (A, B and C)
710-5, Last Meal Request
710-6, Official Witness Agreement
710-7, Official Witness/Pool Reporter Agreement
710-8, Notice of Execution Involvement

## AUTHORITY

A.R.S. §1-215 (28), Definitions
A.R.S. §13-105 (30), Definitions
A.R.S. §13-757 (B), Methods of Infliction of Sentence of Death
A.R.S. §13-757 (C), Identity of Executioners
A.R.S. §13-758, Persons Present at Execution of Sentence of Death; Limitations
A.R.S. §13-759 (B), Return Upon Death Warrant
A.R.S. §13-4021 through 13-4026, Insanity or Pregnancy of Persons under Death Sentence
Arizona Rules of Criminal Procedure, Rule 31.17(c)(3),   Date and Time of Execution; Notification to Supreme Court

# ATTACHMENT A

**SAMPLE - LETTER OF INVITATION TO WITNESS AN EXECUTION**

Date

Name
Mailing address
Mailing address

Dear _____

Thank you for expressing interesting in serving as a witness.

Please be advised that you are selected to witness the execution of _____
[name] _____ [number], on _____ [date] at _____ [time] subject to the conditions stipulated
in this correspondence.

There are three kinds of witnesses. They are 1) Official Witnesses including Official Witnesses who are
members of the media and will serve as Pool Reporters, 2) the Inmate's Witnesses and 3) the Victim(s)
Witnesses.

All witnesses are required to complete the *Witness Agreement* form and return it to the Media Relations
Office of the Arizona Department of Corrections, Rehabilitation and Reentry no later than _____
[date] by fax, mail, hand delivery or as an e-mail attachment.

Official Witnesses who are members of the media and will be serving as Pool Reporters are also required to
complete the *Official Witnesses/Pool Reporters Agreement* form. This form must be returned as well to the
Media Relations Office of the Arizona Department of Corrections, Rehabilitation and Reentry no later than
the Friday before the scheduled date of the execution, _____ [date] by the same means.

Failure to fully complete and return on time the required forms with receipt by the Department before 5
P.M. on _____ [date], will result in your removal from the list of approved witnesses.

For additional information and to confirm receipt of your materials, you are welcome to contact the Media
Relations Office by phone at 602-542-3133, by fax at 602-542-2859 or e-mail at
media@azcorrections.gov.

Sincerely,

Media Relation Director

Applicable Attachments:
__*Witness Agreement* form
__ *Official Witnesses/Pool Reporters Agreement* form

## <u>ATTACHMENT B</u>

**SAMPLE - RETURN OF WARRANT NOTIFICATION**

Supreme Court

**DATE:**

The Honorable
Chief Justice of the Supreme Court of Arizona
402 Arizona State Courts Building
1501 West Washington Street
Phoenix, Arizona 85007-3329

**RE:**      Return of Warrant of Execution

State vs.

Supreme Court Number:

County Number:

Chief Justice:

This is to advise you that in accordance with the Warrant of Execution, Supreme Court Number, and pursuant to A.R.S. §13-759(B), the imposition of the sentence of death of _____ was carried out at the Arizona State Prison Complex-Florence on _____, 21 _____, at _____ A.M./P.M.

The mode and manner of the death was by lethal _____.

Sincerely,

David Shinn
Director
Arizona Department of Corrections, Rehabilitation and Reentry

## <u>ATTACHMENT C</u>

**SAMPLE - RETURN OF WARRANT NOTIFICATION**

Superior Court

**DATE:**

The Honorable
Presiding Judge
Superior Court of Arizona
In County
_____, Arizona

**RE:**     Return of Warrant of Execution

State vs.

Supreme Court Number:

County Number:

Judge _____:

This is to advise you that in accordance with the Warrant of Execution, Supreme Court Number, and pursuant to A.R.S. §13-759(B), the imposition of the sentence of death of _____ was carried out at the Arizona State Prison Complex-Florence on _____, 21 _____, at _____ A.M./P.M.

The mode and manner of the death was by lethal _____.

Sincerely,

David Shinn
Director
Arizona Department of Corrections, Rehabilitation and Reentry

# ATTACHMENT D

## PREPARATION AND ADMINISTRATION OF CHEMICALS

A.  Obtaining Chemicals and Equipment

    1.  Upon receipt of the Warrant of Execution, the Housing Unit 9 Section Leader shall:

        I.  Confirm the equipment for the procedure and ensure all equipment necessary to properly conduct the procedure is on site, immediately available for use and functioning properly.

        II.  Ensure all medical equipment, including an ultrasound machine and a backup electrocardiograph is on site, immediately available for use and functioning properly.

        III.  Ensure that complete sets of chemicals are on site, not expired, and immediately available for use. ADC will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that an execution is carried out.  If the chemical's expiration or beyond-use date states only a month and year (e.g., "June 2017"), then ADC will not use that chemical after the last day of the month specified.

        IV.  Ensure the chemicals are ordered, arrive as scheduled and are properly stored. The chemicals shall be stored in a secured, locked area that is temperature regulated and monitored to ensure compliance with manufacturer specifications, under the direct control of the Housing Unit 9 Section Leader.

B.  Preparation of Chemicals

    1.  Prior to the preparation of the chemicals, the Director or designee shall verify the chemicals to be used, the quantity and the expiration date.

    2.  At the appropriate time, the Housing Unit 9 Section Leader shall transfer custody of the chemicals to the Special Operations Team to begin the chemical(s) and syringe preparation in the chemical room, under the direct supervision by the IV Team Leader.

    3.  The Special Operations Team Leader will assign a team member(s) to assist preparing each chemical and the corresponding syringe. The IV Team Leader will supervise the process. The IV Team Leader, with the assistance of the Special Operations Team members, shall prepare the designated chemical(s) and syringes as follows:

        •  One-drug protocol - One full set of syringes is used in the implementation of the death sentence (Bank "A") and an additional complete set of the necessary chemicals shall be obtained and kept available in the chemical room, but need not be drawn into syringes unless the primary dosages prove to be insufficient for successful completion of the execution.

    4.  The IV Team Leader, with the assistance of a Special Operations Team member, shall be responsible for preparing and labeling the assigned sterile syringes in a distinctive manner identifying the specific chemical contained in each syringe by i) assigned number, ii) chemical name, iii) chemical amount and iv) the designated color, as set forth in the chemical charts below. This information shall be preprinted on a label, with one label affixed to each syringe to ensure the label remains visible.

C.    Chemical Charts; Choice of Protocol

1.    Charts for all chemical protocols follow. The Director shall have the sole discretion as to which drug protocol will be used for the scheduled execution. This decision will be provided to the inmate and their counsel of record in writing at the time the state files a request for Warrant of Execution in the Arizona Supreme Court. If the Department is able to obtain the chemical pentobarbital in sufficient quantity and quality to successfully implement the one-drug protocol with pentobarbital set forth in Chart A, then the Director shall use the one-drug protocol with pentobarbital set forth in Chart A as the drug protocol for execution.  If the Department is unable to obtain such pentobarbital, but is able to obtain the chemical sodium pentothal in sufficient quantity and quality to successfully implement the one-drug protocol with sodium pentothal set forth in Chart B, then the Director shall use the one-drug protocol with sodium pentothal set forth in Chart B as the drug protocol for execution.

2.    A quantitative analysis of any compounded or non-compounded chemical to be used in the execution shall be provided upon request within ten calendar days after the state seeks a Warrant of Execution. The decision to use a compounded or non-compounded chemical will be provided to the inmate and their counsel of record in writing at the time the state files a request for Warrant of Execution in the Arizona Supreme Court.

**CHART A:  ONE-DRUG PROTOCOL WITH PENTOBARBITAL**

| CHEMICAL CHART | |
|---|---|
| **Syringe No.** | **Label** |
| **1A** | 20mL Sterile Saline Solution, **BLACK** |
| **2A** | 2.5gm  Pentobarbital, **GREEN** |
| **3A** | 2.5gm  Pentobarbital, **GREEN** |
| **4A** | 20mL Sterile Saline Solution, **BLACK** |

•    Syringes 2A, and 3A, will have a dose of 2.5 grams (gm) of Pentobarbital for a total of 5 grams. Each syringe containing Pentobarbital shall have a **GREEN** label which contains the name of chemical, chemical amount and the designated syringe number.

•    Syringes 1A, and 4A, each contain 20 milliliters (mL) of a sterile saline solution, and shall have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

**CHART B:  ONE-DRUG PROTOCOL WITH SODIUM PENTOTHAL**

| | |
|---|---|
| **Syringe No.** | **Label** |
| **1A** | 20mL Sterile Saline Solution, **BLACK** |
| **2A** | 1.25gm Sodium Pentothal, **GREEN** |
| **3A** | 1.25gm Sodium Pentothal, **GREEN** |
| **4A** | 1.25gm Sodium Pentothal, **GREEN** |
| **5A** | 1.25gm Sodium Pentothal, **GREEN** |
| **6A** | 20mL Sterile Saline Solution, **BLACK** |

- Syringes 2A, 3A, 4A, 5A, each contain 1.25gm/50mL of Sodium Pentothal / 1 in 50mL of sterile water in four 60mL syringes for a total dose of 5 grams of Sodium Pentothal. Each syringe containing Sodium Pentothal shall have a **GREEN** label which contains the name of chemical, chemical amount and the designated syringe number.

- Syringes 1A, and 6A, each contain 20mL of a sterile saline solution, and shall have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

3. After the IV Team prepares all required syringes with the proper chemicals and labels as provided in the Chemical Chart, the Special Operations Team, under the supervision of the IV Team, shall attach one complete set of the prepared and labeled syringes to the 2-Gang, 2-Way Manifold in the order in which the chemical(s) are to be administered. The syringes will be attached to the 2-Gang, 2-Way Manifold in a manner to ensure there is no crowding, with each syringe resting in its corresponding place in the shadow board which is labeled with the name of the chemical, color, chemical amount and the designated syringe number.

4. The syringes shall be affixed in such a manner to ensure the syringe labels are clearly visible. Prior to attaching the syringes to the 2-Gang, 2-Way Manifold, the flow of each gauge on the manifold shall be checked by the IV Team Leader running the sterile saline solution through the line to confirm there is no obstruction.

5. After all syringes are prepared and affixed to the 2-Gang, 2-Way Manifold in proper order, the Special Operations Team Leader shall confirm that all syringes are properly labeled and attached to the manifold in the order in which the chemicals are to be administered as designated by the Chemical Chart. Each chemical shall be administered in the predetermined order in which the syringes are affixed to the manifold.

6. The quantities and types of chemicals prepared and administered as set forth in this Department Order may not be changed in any manner without prior documented approval of the Director and publication of an amended Department Order. The Director's discretion with regard to the quantities and types of chemicals is otherwise limited to what is expressly set forth in this Department Order. If, after a Warrant of Execution has been issued, the Director determines that it is necessary to change the quantities or types of chemicals to be used in the impending execution, then the Director shall immediately notify the inmate and the inmate's counsel in writing, shall withdraw the existing Warrant of Execution, and shall apply for a new Warrant of Execution.

7. All prepared chemicals shall be utilized or properly disposed of in a timely manner after the time designated for the execution to occur.

8. The chemical amounts as set forth in the Chemical Chart are designated for the execution of persons weighing 500 pounds or less. The chemical amounts will be reviewed and may be revised as necessary for an inmate exceeding this body weight.

9. The Special Operations Team Recorder is responsible for completing the Correctional Service Log, Form 105-6. The Recorder shall document on the form the amount of each chemical administered and confirm that it was administered in the order set forth in the Chemical Chart. Any deviation from the written procedure shall be noted and explained on the form.

D. Movement and Monitoring of Inmate

1. Prior to moving the inmate from the holding cell to the execution table, the Director will confer with the Attorney General or designee and the Governor or designee to confirm there is no legal impediment to proceeding with the lawful execution and there are no motions pending before a court which may stay further proceedings.

2.    The inmate may be offered a mild sedative based on the inmate's need. The sedative shall be provided to the inmate no later than four hours prior to the execution, unless it is determined medically necessary. The offer of the mild sedative, the inmate's decision, and the administration of the sedative, if chosen, shall be documented in the watch log.

3.    At the designated time, the overhead microphone will be turned on, and shall be left on until the completion of the execution, and the inmate will be brought into the execution room and secured on the table by the prescribed means with the inmate's arms positioned at an angle away from the inmate's side. Existing closed-circuit monitors will allow witnesses in the designated witness room to observe this process.

4.    The inmate will be positioned to enable the IV Team or the Special Operations Team Leader and the Warden to directly observe the inmate and to monitor the inmate's face with the aid of a high resolution color camera and a high resolution color monitor.

5.    After the inmate has been secured to the execution table, the Restraint Team Leader shall personally check the restraints which secure the inmate to the table to ensure they are not so restrictive as to impede the inmate's circulation, yet sufficient to prevent the inmate from manipulating the catheter and IV lines.

6.    A microphone will be affixed to the inmate's shirt, and shall be left on until the completion of the execution, to enable the persons in the witness room and the IV Team or the Special Operations Team Leader to hear any utterances or noises made by the inmate throughout the procedure. The Special Operations Team Leader will confirm the microphone is functioning properly, and that the inmate can be heard in the chemical room and in the witness room.

7.    The Restraint Team members will attach the leads from the electrocardiograph to the inmate's chest once the inmate is secured. The IV Team Leader shall confirm that the electrocardiograph is functioning properly and that the proper graph paper is used. A backup electrocardiograph shall be on site and readily available if necessary. Prior to the day of, and on the day of the execution both electrocardiograph instruments shall be checked to confirm they are functioning properly.

8.    An IV Team member shall be assigned to monitor the EKG, and mark the EKG graph paper at the commencement and completion of the administration of the lethal chemical(s).

9.    Throughout the procedure, the IV Team Leader shall monitor the inmate's level of consciousness and electrocardiograph readings utilizing direct observation, audio equipment, camera and monitor as well as any other medically approved method(s) deemed necessary by the IV Team Leader. The IV Team Leader shall be responsible for monitoring the inmate's level of consciousness.

10.   Existing closed-circuit monitors will allow witnesses in the designated witness room to observe the IV Team's vein assessment and placement of IV catheters in the inmate. In addition, the audio feed from the overhead microphone and from the microphone affixed to the inmate's shirt shall remain on until the completion of the execution.

11.   A camera will be focused on the area in the chemical room in which syringes are injected into the IV line, and existing closed-circuit monitors will allow witnesses in the designated witness room to observe the administration of the lethal injection drug(s), including the administration of additional or subsequent doses of the drug(s). All cameras and monitors shall be placed in such a manner so as to ensure and preserve at all times the anonymity of all personnel involved in the execution process.

E.   Intravenous Lines

1.   The Director acting upon the advice of the IV Team Leader shall determine the catheter sites. A femoral central line shall only be used if the person inserting the line is currently qualified by experience, training, certification or licensure within the United States to insert a femoral central line. The IV Team members shall insert a primary IV catheter and a backup IV catheter.

2.   The IV Team Leader shall ensure the catheters are properly secured and properly connected to the IV lines and out of reach of the inmate's hands. A flow of sterile saline solution shall be started in each line and administered at a slow rate to keep the lines open.

3.   The primary IV catheter will be used to administer the lethal chemical(s) and the backup catheter will be reserved in the event of the failure of the first line. Any failure of a venous access line shall be immediately reported to the Director.

4.   The IV catheter in use shall remain visible to the Warden throughout the procedure.

5.   The Warden shall physically remain in the room with the inmate throughout the administration of the lethal chemical(s) in a position sufficient to clearly observe the inmate and the primary and backup IV sites for any potential problems and shall immediately notify the IV Team Leader and Director should any issue occur. Upon receipt of such notification, the Director may stop the proceedings and take all steps necessary in consultation with the IV Team Leader prior to proceeding further with the execution.

6.   Should the use of the backup IV catheter be determined to be necessary, a set of backup chemicals should be administered in the backup IV.

F.   Administration of Chemicals – One-Drug Protocol

1.   At the time the execution is to commence and prior to administering the lethal chemical, the Director will reconfirm with the Attorney General or designee and the Governor or designee that there is no legal impediment to proceeding with the execution. Upon receipt of oral confirmation that there is no legal impediment, the Director will order the administration of the chemical to begin.

2.   Upon receipt of the Director's order and under observation of the IV Team Leader, the Special Operations Team Leader will instruct the assigned Special Operations Team member(s) to begin dispensing the chemicals under the chosen drug protocol.

3.   Upon direction from the Special Operations Team Leader, the assigned Special Operations Team member will visually and orally confirm the chemical name on the syringe and then administer the first syringe of the sterile saline solution, followed by the full dose of the lethal chemical immediately followed by the sterile saline solution flush.

4.   When three minutes has elapsed since commencing the administration of the lethal chemical, the IV Team Leader, dressed in a manner to preserve their anonymity, will enter into the room where the Warden and inmate are located to physically confirm the inmate is unconscious by using all necessary medically appropriate methods, and verbally advise the Director of the same. The IV Team Leader will also confirm that the IV line remains affixed and functioning properly.

5.   If, after three minutes, the inmate remains conscious, the IV Team shall communicate this information to the Director, along with all IV Team input. The Director will determine how to proceed or, if necessary, to start the procedure over at a later time or stand down. The Director may direct the curtains to the witness viewing room be closed, and, if necessary, for witnesses to be removed from the facility, only in the event of a legitimate penological objective which would merit such closure and/or removal.

6.    If deemed appropriate, the Director may instruct the Special Operations Team to administer an additional dose of the lethal chemical followed by the sterile saline solution flush. This may be administered via the primary or backup IV catheter, as determined following consultation with the IV Team.

7.    Upon administering the lethal chemical and sterile saline solution from a backup set, the IV Team shall determine whether the inmate is unconscious by sight and sound, utilizing the audio equipment, camera and monitor. The IV Team Leader will again physically determine whether the inmate is unconscious using proper medical procedures and verbally advise the Director of the same.

8.    When all electrical activity of the heart has ceased as shown by the electrocardiograph, the IV Team Leader will confirm the inmate is deceased and the inmate's death shall be announced by the Director.

9.    The Special Operations Team Recorder shall document on the Correctional Services Log the start and end times of the administration of the lethal chemical.

10.   Throughout the entire procedure, the IV Team members, the Special Operations Team members and the Warden shall continually monitor the inmate using all available means to ensure that the inmate remains unconscious and that there are no complications.

G.   Contingency Procedure

1.    An Automated External Defibrillator (AED) will be readily available on site in the event that the inmate goes into cardiac arrest at any time prior to dispensing the chemicals; trained medical staff shall make every effort to revive the inmate should this occur.

2.    Trained medical personnel and emergency transportation, neither of which is involved in the execution process, shall be available in proximity to respond to the inmate should any medical emergency arise at any time before the order to proceed with the execution is issued by the Director.

3.    If at any point any team member determines that any part of the execution process is not going according to procedure, they shall advise the IV Team Leader who shall immediately notify the Director. The Director may consult with persons deemed appropriate and will determine to go forward with the procedure, limited to the option provided in Attachment D, §F(6), or to stand down. If the Director determines to stand down, then trained medical staff shall make every reasonable effort to revive the inmate.

4.    There shall be no deviation from the procedures as set forth herein, except as expressly allowed herein. There shall be no deviation from the procedures as set forth herein without prior consent from the Director. Although such consent may be verbal or in writing, the Director must memorialize and maintain a written record of having granted any deviations, which record must include a detailed description of the deviation, the basis for the deviation, and the basis for the Director's consent thereto.

H.   Post Execution Procedures

1.    Upon the pronouncement of death, the Director shall notify the Governor or designee and the Attorney General or designee via telephone that the sentence has been carried out and the time that death occurred.

2.    An IV Team member will clamp and cut the IV lines leaving them connected to the inmate for examination by a Medical Examiner.

3.   A Criminal Investigations Unit Investigator and a Medical Examiner will take photos of the inmate's body:

- While in restraints prior to being placed in the body bag,
- Without restrains prior to being placed in the body bag,
- Sealed in the body bag, and
- A photo of the seal in place on the bag.

4.   The inmate's body will be placed on a Medical Examiner's gurney and released into the custody of a Medical Examiner's Office.

5.   Once the inmate's body is placed in a Medical Examiner's transport vehicle, it will be escorted off the premises. The Examiner's Office will take the inmate's body to the medical examiner's office designated by the county.

I.   Documentation of Chemicals and Stay

1.   In the event that a pending stay results in more than a two hour delay, the catheters shall be removed, if applicable, and the inmate shall be returned to the holding cell until further notice.

2.   The Correctional Service Logs the list of identifiers and the EKG tape shall be submitted to the Department's General Counsel for review and storage.

J.   Debrief and Policy Review

1.   The IV and Special Operations Teams will participate in an informal debriefing immediately upon completion of the event.

2.   Upon an assignment to a Team, team members shall review Department Order #710, Execution Procedures.

3.   Periodically, and in the discretion of the Director, a review of Department Order #710, Execution Procedures along with this attachment may be reviewed to confirm it remains consistent with the law. General Counsel shall advise the Director immediately upon any change that may impact these procedures.

# ATTACHMENT E

## LETHAL GAS

1.  Approximately 10 minutes before the execution, Chemical Operators #1 and #2 shall sequentially pour 6 QUARTS OF DISTILLED WATER and 5 PINTS OF SULPHURIC ACID into the mixing pot (9).  THE WATER SHOULD BE POURED FIRST. UPON COMPLETION OF POURING THE WATER, 5 PINTS OF SULFURIC ACID SHOULD BE POURED NEXT.  RUBBER GLOVES AND GLASS FUNNEL SHALL BE USED. THE ACID MUST BE POURED SLOWLY TO PREVENT SPLATTERING. This mixture should remain in the mixing pot (9) for approximately 10 minutes so as to attain an adequate mix and maximum temperature. Keep away from acid fumes and possible splatter caused by boiling. This mixture will yield a 41.5% concentration.

    - Chemical Operator #1 shall ensure that the mixture shall not pass to the chair receptacle until after the Chamber door is closed and instructions received from the Chamber Operator.

    - The Caustic Soda Neutralizing solution shall be prepared by Chemical Operator #2 immediately after the completion of the acid mixture.

    - Chemical Operator #2 shall put on rubber gloves and dissolve 1 pound of CAUSTIC SODA into 2½ gallons of water already in a pour-spout can.  Once the mixing process is complete, this solution should be kept near the mixing on the floor in close proximity to the mixing pot (9).

    - Chemical Operator #2 shall dissolve 30 grains of Phenolptalein Solution in 4 ounces of alcohol. If the solution is pre-mixed, then skip this step.

    - Chemical Operator #2 shall relay to the Special Operations Team Leader that the chemical mixing process is complete.

    - The Housing Unit 9 Team Leader will notify the Director that the chemical mixing is complete and the chamber is ready.

    - The Director will instruct the Housing Unit 9 Team Leader to move the inmate to the chamber.

2.  The inmate shall be brought into the execution room and placed in the Chamber and strapped in the chair by the Restraint Team.  The internal Chamber microphone will be turned on and a microphone will be affixed to the inmate's shirt and also turned on; both microphones shall remain on until the completion of the execution (the microphones will remain on during any last statement by the inmate, but will be turned off in the event the inmate uses vulgarity or makes intentionally offensive statements; if the microphones are turned off, they will be turned back on immediately after the completion of the last statement) to enable the persons in the witness room and the Special Operations Team Leader to hear any utterances or noises made by the inmate throughout the procedure.  The Special Operations Team Leader will confirm that the microphones are functioning properly and that the inmate can be heard in the operations room and in the witness room.

    a.  Closed-circuit monitor(s) will allow witnesses in the designated witness room to observe this process and shall remain on until the completion of the execution.  All cameras and monitors shall be placed in such a manner so as to ensure and preserve at all times the anonymity of all personnel involved in the execution process.

3.    Chemical Operator #2 shall place 4 petri dishes containing the Phenolptalein Solution inside the chamber so as to be clearly visible to the Chamber Operator. (Location should be at each designated corner of the chamber.)

4.    After the inmate is strapped in the chair, Chemical Operator #2 shall verify that the petri dishes containing Phenolphthalein are still in their proper place.

5.    Chemical Operator #2 shall inspect the GAS VALVE LEVER (1) and GAS VALVE POT (10) to ensure that it is dry and in the Closed position. Once this is confirmed, Chemical Operator #2 shall place the sodium cyanide packets in the GAS VALVE POT (10) under the chair.

6.    Chemical Operator #2 and the Chamber Operator shall close the Chamber door and ensure that it is properly sealed.

7.    The Chamber Operator shall ensure that the fan damper is in the closed position. Once this is confirmed, the chamber fan shall be activated and left on.

- The manometer H pressure gauge readings on the chamber shall be monitored to determine air tightness of Chamber.

- The Chamber will be considered air-tight if the manometer gauge to the right has a higher reading than the left.

- If the readings on both the manometer H gauges remain equal, the Chamber Operator shall notify the Housing Unit 9 Team Leader immediately.

8.    The Chamber Operator shall position himself at the GAS VALVE LEVER (1).

9.    The Chamber Operator shall ensure that the Outlet Valve (4) is closed.  This Outlet Valve (4) shall remain closed until the chamber is cleared.

10.    Chemical Operator #2 shall proceed back to the Chemical preparation room.

11.    The Housing Unit 9 Team Leader shall notify the Director that the chamber is ready.

12.    Chemical Operator #1 and the Chamber Operator shall release the mixed acid and water from the mixing pot (9) into the Gas Generator by opening the Acid Mixing Pot Valve (Red lever) and Inlet Valve (3). Chemical Operator #1 shall visually observe the liquid drain from the mixing pot. Once fully drained, Chemical Operator #1 shall close the Acid Mixing Pot Valve and place it in the Closed Position.

13.    Chemical Operator #1 shall notify the Chamber Operator that the acid mixture is fully drained.

14.    The Chamber Operator shall close the inlet valve (3) and advise the Chemical Operators when complete.

15.   Chemical Operator #2 shall fill the mixing pot (9) with the Caustic Soda solution.

16.   The Chamber Operator shall then advise the Housing Unit 9 Team Leader that the Chamber is ready for use.

17.   The Housing Unit 9 Team Leader shall notify the Director that everything is ready to proceed. The Director shall make the final notifications to the Attorney General.

18.   The Director shall instruct the Chamber Operator to remove the locking pin of the GAS VALVE LEVER (1) (Sodium Cyanide immersion lever) and open the immersion valve, to drop the pellets into the acid in the gas generator.  The Gas Valve Lever (1) shall remain open until the clearing process of chamber is initiated.

19.   With the Chamber in operation, the Housing Unit 9 Team Leader and the Recorder will observe and record as necessary. A member of the medical team shall monitor the Inmate and EKG and shall advise the Director when the inmate has expired, providing the corresponding time of death.

20.   The Director will announce that the execution has been completed. The Housing Unit 9 Team Leader will instruct the Operators to "Clear the Chamber".

   • NOTE:  The length of time required should be determined by a member of the medical team and the Housing Unit 9 Team Leader.  It is recommended that this period should be no less than 10 minutes.

21.   When the Housing Unit 9 Team Leader announces "Clear the Chamber", the Chamber Operator shall move the exhaust fan damper lever (5) into the open position.

22.   The Chamber Operator shall close the GAS VALVE LEVER (1) into the closed position for clearing.

23.   Chemical Operator #1 and the Chamber Operator shall drain the Caustic Soda Solution into the gas generator. Chemical Operator #1 shall open the Acid Mixing Pot Valve (9). The Chamber Operator shall open the Inlet Valve (3) and allow caustic soda to fully drain into the gas generator.

24.   Chemical Operator #1 shall monitor the CAUSTIC SODA SOLUTION until the Acid Mixing Pot is fully drained and empty.

25.   Once the Acid Mixing Pot (9) is empty, Chemical Operator #1 shall close the mixing pot valve (Red Valve) and instruct the Chamber Operator to close the Inlet Valve (3).

26.   The Chamber Operator shall inform the Chemical Operators once the Inlet Valve (3) is closed.

27.   The Chemical Operator shall fill the mixing pot with water.

28.   The Chamber Operator shall open the air manifold intake lever (2), which may be opened with graduated steps.

29.   The Chamber Operator shall open the Outlet Valve (4), opening the gas generator drain valve first, and then opening the Inlet Valve (3).

30.   Once the Inlet and Outlet Valves are fully open, the Chamber Operator shall inform the Chemical Operators to begin flushing.

31.   The Chemical Operators shall open the water faucet, allowing additional water to flow into the mixing pot (9).

- The Chemical Operators shall observe the drainage of water from the mixing pot to ensure that the flushing is proceeding properly.   During this period, the Chamber Operator shall perform the following functions:

  a.   The Chamber Operator and Chemical Operator #1 shall fully open the anhydrous ammonia tank valve, then open ammonia control valves (7) and (8) (on the regulators) gradually to reach the saturation to allow the effective neutralization of the residual chemicals in the chamber, gas generator and plumbing.   After 30 seconds, both Operators shall close the ammonia tanks in the following sequence: The tank valves shall be closed first, and, after approximately 30 seconds, the regulator valves (7) and (8) shall be closed. This will allow the ammonia to drain from the piping.   Anhydrous ammonia valves should be CLOSED OUT AT LEAST THREE MINUTES BEFORE OPENING THE CHAMBER DOOR.

  b.   After the Chamber is completely evacuated of gas and purged of the ammonia fumes, the phenolphthalein in the petri dishes should turn red (pinkish) in color.  This color change is an indication that the Chamber door may be safely opened. A member of the medical team and Restraint Team now may enter, using masks for protection from any residual ammonia fumes.  The Chamber Operator shall close the air valve lever (2).

- CAUTION:  Although smoke tests suggest that the Chamber is purged in approximately 3 to 5 minutes, it is recommended that the period between opening the exhaust and air inlet valves and opening the Chamber door be about 15 minutes.   As a precautionary measure, it is recommended that the Physician and the Restraint Team removing the body wear hydrocyanic acid gas masks or approved respirators and rubber gloves and that the hair of the deceased inmate be ruffled in order to allow any residually trapped gas to escape. Close the Chamber door, but not tightened more than contact with the gasket, and aerate for one hour as necessary to clear any residual ammonia.

32.   The Restraint Team shall hose down all the surfaces and the deceased inmate prior to removal from the chair.

Exhibit 5

**State of Arizona: Timeline of Execution Procedures 2010-2014[1]**

| Inmate | Restraint process commenced | Restraint process completed | Witnesses in place | IV commenced | IV completed | Drugs administered | Pronounced sedated | Pronounced dead |
|---|---|---|---|---|---|---|---|---|
| **Landrigan** 10/26/10 | 21:31 | 21:32 | 22:10 | 22:01 | 22:01 | 22:15 | 22:18 | 22:26 |
| **King** 3/29/11 | 9:10 | 9:17 | 10:00 | 9:18 | 9:47 | 10:05 | 10:09 | 10:22 |
| **Beaty** 5/25/11 | 18:41 | 18:41 | 19:22 | 18:44 | 19:07 | 19:27 | 19:31 | 19:38 |
| **Bible** 6/30/11 | 10:09 | 10:09 | 10:54 | 10:30 | 10:30 | 11:05 | 11:06 | 11:11 |
| **West** 7/19/11 | 9:57 | 10:01 | 10:57 | 10:25 | 10:25 | 11:05 | 11:06 | 11:10 |
| **Moorman** 2/29/12 | 9:50 | 9:51 | 10:19 | 9:56 | 10:22 | 10:23 | 10:28 | 10:33 |
| **Towery** 3/8/12 | 9:48 | 9:49 | 11:13 | 9:52 | 10:59 | 11:17 | 11:22 | 11:26 |
| **Kemp** 4/25/12 | 9:10 | 9:17 | 9:56 | 9:20 | 9:46 | 10:01 | 10:06 | 10:08 |
| **Lopez** 6/27/12 | 9:46 | 9:51 | 9:54 | 9:55 | 10:03 | 10:08 | 10:13 | 10:37 |
| **Cook** 8/8/12 | 9:43 | 9:49 | 9:54 | 9:58 | 10:21 | 10:26 | 10:31 | 11:03 |
| **Stockley** 12/5/12 | 9:42 | 9:50 | 9:52 | 9:53 | 10:47 | 10:52 | 10:57 | 11:12 |
| **Schad** 10/9/13 | 9:28 | 9:34 | N/A | 9:37 | 9:48 | 10:03 | 10:08 | 10:12 |
| **Jones** 10/23/13 | 9:23 | 9:29 | N/A | 9:39 | 10:31 | 10:35 | 10:40 | 10:52 |
| **Wood** 7/23/14 | 13:23 | 13:31 | 13:31 | 13:40 | 13:47 | 13:52 | 13:57 | 15:49 |

---

[1] Counsel sourced all the information included in this table from Arizona Department of Corrections service logs. Using these special operation checklists for lethal injections, obtained through DFS 26(a)(1) Disclosures and Responses, Counsel compiled the information into the above table.

## State of Arizona: Duration of Execution Procedures in Minutes 2010-2014[*]

| Condemned | Restraint process | Gathering of Witnesses | Preparation for IV insertion | IV insertion | Preparation of lethal drugs | Time until loss of consciousness | Time until death | Total time on Gurney |
|---|---|---|---|---|---|---|---|---|
| Landrigan 10/26/10 | 1" | 9" | 29" | >1" | 5" | 3" | 8" | 55" |
| King 3/29/11 | 7" | 13" | 1" | 29" | 5" | 4" | 13" | 72" |
| Beaty 5/25/11 | >1" | 15" | 3" | 23" | 5" | 4" | 7" | 57" |
| Bible 6/30/11 | >1" | 24" | 21" | >1" | 11" | 2" | 4" | 62" |
| West 7/19/11 | 4" | 32" | 24" | >1" | 8" | 1" | 4" | 73" |
| Moorman 2/29/12 | 1" | >1" | 5" | 26" | 1" | 5" | 5" | 43" |
| Towery 3/8/12 | 1" | 14" | 3" | 67" | 4" | 5" | 4" | 98" |
| Kemp 4/25/12 | 7" | 10" | 3" | 26" | 5" | 5" | 2" | 58" |
| Lopez 6/27/12 | 5" | 3" | 1" | 8" | 5" | 5" | 24" | 51" |
| Cook 8/8/12 | 6" | 5" | 4" | 23" | 5" | 5" | 32" | 80" |
| Stockley 12/5/12 | 8" | 2" | 1" | 54" | 5" | 5" | 15" | 90" |
| Schad 10/9/13 | 6" | >1" | 3" | 11" | 15" | 5" | 4" | 44" |
| Jones 10/23/13 | 6" | >1" | 10" | 52" | 4" | 5" | 12" | 89" |
| Wood 7/23/14 | 8" | >1" | 9" | 7" | 5" | 5" | 113" | 147" |
|  |  |  |  |  |  |  |  |  |
| Median time[1] | 5.5" | 7" | 3.5" | 23" | 5" | 5" | 7.5" | 67" |
| Mean time[2] | 4.3" | 9.1" | 8.4" | 23.3" | 5.9" | 4.2" | 17.6" | 72.8" |

[1] The median time reflects the value that falls at the midpoint of the values when arranged chronologically, such that there is an equal probability of a value falling above or below the median.

[2] The mean time reflects the sum of all values in the column, divided by the number of values.

[*] Data comprising this table is from Arizona Department of Corrections service logs consisting of special operation checklists for lethal injections, obtained through Fed. R. Civ. P. 26(a)(1) Disclosures and Responses.

# SPECIAL OPERATIONS CHECKLIST

Case 2:22-cv-00860-MTL--JZB   Document 1-1   Filed 05/19/22   Page 84 of 220
DFS' 26(a)(1) Disclosures & Responses to RFP's 00458
Special Operations: Checklist
Page 1 of 6

**RESTRICTED**
**SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initi |
|---|---|---|---|---|---|
| **DAY PRIOR TO EXECUTION** | | | | | |
| 2200 | Restraint Team prepares inmate for transport from Browning Unit to Housing Unit 9. | 5/24/11 | 2100 | | |
| 2230 | Restraint Team transports inmate from Browning Unit to Housing Unit 9 in Central Unit. | 5/24/11 | 2215 arrives at Browning Unit 2245 arrives at Housing Unit 9 | | |
| 2235 | Inmate is secured in cell in Housing Unit 9 and first Continuous Observation Team takes charge of condemned (1 supervisor / 2 staff) - Code-4's called in every 20 minutes. | 5/24/11 | 2245 | | |
| 2245 | Inmate is offered hygiene supplies | 5/24/11 | Did not request | | |
| 2300 | All hygiene supplies are removed from inmate's holding cell. | 5/24/11 | N/A | | |
| 2300 | Inmate may be offered a mild sedative. (Only if requested) | 5/24/11 | Did not request | | |
| **DAY OF EXECUTION** | | | | | |
| 0300 | First Observation Team relieved. Second Team starts continuous observation. | 5/25/11 | 0300 | | |
| 0530 | The inmate shall be offered a light meal. All eating utensils and remaining food will be removed upon completion of the meal. | 5/25/11 | 0557 | | |
| 0600 | Housing Unit 9 Section Leader will authorize Execution Restraint Team access to Housing Unit #9. | 5/25/11 | 0600 | | |
| 0600 | Trash removed from inmate's holding cell. | 5/25/11 | N/A | | |
| 0600 | Housing Unit 9 Section Leader will authorize Special Ops Team access to Housing Unit 9. | 5/25/11 | 0539 | | |
| | Housing Unit 9 Section Leader will authorize Medical Personnel access to Housing Unit 9. | 5/25/11 | 0600 | | |
| | Special Ops Team will confirm camera, monitor, and audio system are functioning clearly and properly. | 5/25/11 | 0600 & 1831 | | |
| | Special Ops Team will confirm EKG is operational and equipment for assigned medical staff to mark tape is functional. | 5/25/11 | 0600 & 1831 | | |
| 0605 | Inmate offered hygiene supplies. | 5/25/11 | Did not request | | |

**RESTRICTED**
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0620 | Hygiene supplies removed from inmate's holding cell. | 5/25/11 | N/A | | |
| 0630 | Second Observation Team relieved. Third Observation Team starts continuous observation. | 5/25/11 | 0700 | | |
| | First Observation Team starts continuous observation. | 5/25/11 | 1100 | | |
| | Inmate offered light (lunch) meal | 5/25/11 | 1350 | | |
| | Second Observation Team starts continuous observation. | 5/25/11 | 1500 | | |
| 0700 | Rest of Restraint Team arrives at Housing Unit 9. | 5/25/11 | 1652 | | |
| 0800 | Execution table is prepared. | 5/25/11 | 1738 | | |
| 0800 | Execution table should be prepared at least two (2) hours prior to scheduled time of execution. | 5/25/11 | 1738 | | |
| 0830 | All items removed from inmate's cell (linen, property, etc.) | 5/25/11 | 1759 | | |
| 0900 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint – request permission to proceed. | 5/25/11 | 1825 | | |
| 0900 | Condemned inmate to be placed in upper restraints by restraint / escort team after strip search | 5/25/11 | 1825 | | |
| 0905 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready. | 5/25/11 | 1832 | | |
| 0905 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Section Leader, "We may proceed with movement". | 5/25/11 | 1833 (start) 1835 – AG's Office 1836 – Governor's Office (left message) | | |
| 0905 | Housing Unit 9 Section Leader checks with Director before proceeding with movement of inmate. | 5/25/11 | 1837 | | |
| 0905 | When signaled by Housing Unit 9 Section Leader the Restraint / Escort teams remove the inmate from cell. Apply lower restraints and proceed with movement. | 5/25/11 | 1837 | | |

Case 2:22-cv-00860-MTL--JZB   Document 1-1   Filed 05/19/22   Page 86 of 220
DFS' 26(a)(1) Disclosures & Responses to RFP's 00460
Special Operations: Checklist
Page 3 of 6

**RESTRICTED**
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0905 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind leader. | 5/25/11 | 1838 | | |
| 0910 | Inmate secured by chest and ankle straps. Team Leader at head of table, two at arms two at feet. | 5/25/11 | 1841 | | |
| 0910 | Secure wrists with soft restraints. | 5/25/11 | 1841 | | |
| 0910 | Secure arms (maintain good circulation). | 5/25/11 | 1841 | | |
| 0910 | Secure upper torso. | 5/25/11 | 1841 | | |
| 0910 | Secure legs (maintain good circulation). | 5/25/11 | 1841 | | |
| 0910 | Restraint / Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | 5/25/11 | 1841 | | |
| | Inmate Secured to Table | 5/25/11 | 1841 | | |
| | The Housing Unit 9 Section Leader advises the Director inmate is secure on table and request approval to proceed with medical procedure. | 5/25/11 | 1844 | | |
| | IV's are inserted into inmate's arms or a catheter is inserted into inmate's leg. EKG equipment is hooked up to inmate. Ensure a good flow of saline. | 5/25/11 | 1844 -- begin 1907 - complete | | |
| 0910 | Restraint / Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room. Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing EKG functioning. | 5/25/11 | 1907 | | |
| 0940 | Housing Unit 9 Section Leader advises Director that medical procedure is complete. | 5/25/11 | 1907 | | |
| 0945 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | 5/25/11 | 1909 | | |
| 0945 | Command directs movement of witnesses to Housing Unit 9 in the following order:  Victim Witnesses, Official Witnesses, Media Witnesses, Inmate Witnesses. | 5/25/11 | 1909 | | |
| 0955 | Command to Housing Unit 9 Section Leader -- all witnesses are in place. | 5/25/11 | 1922 | | |
| 0955 | Housing Unit 9 Section Leader will advise Director that witnesses are in position and requests authorization to proceed. | 5/25/11 | 1922 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 00461

## RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0959 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Section Leader, "We may proceed". | 5/25/11 | 1923 – Governor's Office 1924 – AG's Office | | |
| 1001 | Upon receipt of permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. *Turn on audio when ready.* | 5/25/11 | 1924 | | |
| 1001 | Housing Unit 9 Section Leader reads the Execution Order. | 5/25/11 | 1924 | | |
| 1002 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | 5/25/11 | 1926 | | |
| 1002 | Inmate makes his last statement. The last statement will be summarized. *Turn off audio.* <br><br> Last Statement: <br> *I just want to say to the Fornoff family - I'm sorry, I'm sorry.  God will let you see her again.* <br><br> *Freddie – I love you, I kept my promise.* <br><br> *Thank all of you for being here for me.* | 5/25/11 | 1926 | | |
| 1002 | Director advises Special Operations Team Leader to proceed with phase one. | 5/25/11 | 1926 | | |
| 1002 | **Phase 1:**  First injection commences. Four syringes filled with 1.25 grams each of Pentobarbital and sterile water. Process takes about 3 minutes. Saline flush follows.  (1-5) | 5/25/11 | 1927 – begin 1930 -end | | |
| 1003 | Once first injection is complete, Special Operations Team Leader instructs medical consultant to **ensure inmate is unconscious.** Medical consultant will enter execution chamber and check inmate to confirm the inmate is unconscious. | 5/25/11 | 1931 | | |
| 1005 | *Turn on audio.* <br> Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. <br> *Turn off audio* | 5/25/11 | 1931 | | |
| 1005 | Once inmate is confirmed unconscious by the medical consultant, Special Operations Team Leader advises Director.  Director provides order to continue to second injection. | 5/25/11 | 1931 | | |

Case 2:22-cv-00860-MTL--JZB   Document 1-1   Filed 05/19/22   Page 88 of 220
DFS' 26(a)(1) Disclosures & Responses to RFP's 00462
Special Operations: Checklist
Page 5 of 6

**RESTRICTED**
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1005 | **Phase 2:** Second injection commences. (6-8) Pancuronium Bromide | 5/25/11 | 1931 | | |
| 1006 | Second injection completed. Saline flush follows. | 5/25/11 | 1933 | | |
| 1007 | **Phase 3:** Third injection commences. (9-11) Potassium Chloride | 5/25/11 | 1933 | | |
| 1008 | Third injection completed. Saline flush follows. | 5/25/11 | 1934 | | |
| | Commence 9B / 10B - Potassium Chloride | 5/25/11 | 1934 | | |
| | Completed 11B Heparin/Saline Flush | 5/25/11 | 1936 | | |
| 1008 | Special Ops Team Leader advises Director when injections are complete. | 5/25/11 | 1936 | | |
| 1008 | Designated qualified person checks vital signs on EKG. | 5/25/11 | 1938 | | |
| TBD | Designated qualified person **pronounces death** in the Chemical Room. | 5/25/11 | 1938 | | |
| TBD | Director informed of death by Special Ops Team Leader. | 5/25/11 | 1938 | | |
| TBD | Director advises Witnesses that the execution is concluded. | 5/25/11 | 1938 | | |
| TBD | Housing Unit 9 Section Leader closes the curtains. | 5/25/11 | 1938 | | |
| TBD | Housing Unit 9 Section Leader will notify Command to proceed with witness extrication. | 5/25/11 | 1938 | | |
| TBD | Team Leader instructs medical consultant to cut lines to IV's. | 5/25/11 | 1940 | | |
| TBD | CIU Investigator examines the body | 5/25/11 | 1941 | | |
| TBD | Coroner / Medial Examiner examines the body | 5/25/11 | 1941 | | |
| TBD | All team members-Special Ops remain in Chemical administration / restraint/escort rooms. Team enters and removes restraints from the inmate. The inmate is then placed on a gurney. | 5/25/11 | 1951 | | |
| TBD | Restraint / Escort Team will assist Coroner in the removal of the inmate's body. | 5/25/11 | 1951 | | |
| TBD | Body placed in Coroner's vehicle. | 5/25/11 | 1952 | | |
| TBD | All teams perform any clean-up chores. | 5/25/11 | 2015 | | |
| TBD | Housing Unit 9 Section Leader gives directive to secure the Execution Facility. | 5/25/11 | 2015 | | |

Housing Unit 9 Team Leader

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| **DAY PRIOR TO EXECUTION** | | | | | |
| 2200 | Restraint Team prepares inmate for transport from Browning Unit to Housing Unit 9. | 6/29/11 | 2200 | | |
| 2230 | Restraint Team transports inmate from Browning Unit to Housing Unit 9 in Central Unit. | 6/29/11 | 2230 | | |
| 2235 | Inmate is secured in cell in Housing Unit 9 and first Continuous Observation Team takes charge of condemned (1 supervisor / 2 staff) - Code-4's called in every 20 minutes. | 6/29/11 | 2249 | | |
| 2245 | Inmate is offered hygiene supplies | 6/29/11 | Did not request | | |
| 2300 | All hygiene supplies are removed from inmate's holding cell. | 6/29/11 | N/A | | |
| 2300 | Inmate may be offered a mild sedative. (Only if requested) | 6/30/11 | 0559 | | |
| **DAY OF EXECUTION** | | | | | |
| 0300 | First Observation Team relieved. Second Team starts continuous observation. | 6/30/11 | 0300 | | |
| 0630 | The inmate shall be offered a light meal. All eating utensils and remaining food will be removed upon completion of the meal. | 6/30/11 | 0801 | | |
| 0700 | Housing Unit 9 Section Leader will authorize Execution Restraint Team access to Housing Unit #9. | 6/30/11 | 0700 | | |
| 0700 | Trash removed from inmate's holding cell. | 6/30/11 | 0823 | | |
| 0700 | Housing Unit 9 Section Leader will authorize Special Ops Team access to Housing Unit 9. | 6/30/11 | 0700 | | |
| | Housing Unit 9 Section Leader will authorize Medical Personnel access to Housing Unit 9. | 6/30/11 | 0700 | | |
| | Special Ops Team will confirm camera, monitor, and audio system are functioning clearly and properly. | 6/30/11 | 0700 | | |
| | Special Ops Team will confirm EKG is operational and equipment for assigned medical staff to mark tape is functional. | 6/30/11 | 0700 | | |
| 0705 | Inmate offered hygiene supplies. | 6/30/11 | Did not request | | |
| 0720 | Hygiene supplies removed from inmate's holding cell. | 6/30/11 | N/A | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 01075

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0730 | Second Observation Team relieved. Third Observation Team starts continuous observation. | 6/30/11 | 0705 | | |
| 0800 | Rest of Restraint Team arrives at Housing Unit 9. | 6/30/11 | 0800 | | |
| 0900 | Execution table is prepared. | 6/30/11 | 0900 | | |
| 0900 | Execution table should be prepared at least two (2) hours prior to scheduled time of execution. | 6/30/11 | 0900 | | |
| 0930 | All items removed from inmate's cell (linen, property, etc.) | 6/30/11 | 0930 | | |
| 1000 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint – request permission to proceed. | 6/30/11 | 1000 | | |
| 1000 | Condemned inmate to be placed in upper restraints by restraint / escort team after strip search | 6/30/11 | 1000 | | |
| 1005 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready. | 6/30/11 | 1003 | | |
| 1005 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Section Leader, "We may proceed with movement". | 6/30/11 | 1004 – Governors Office 1004 - AG's Office | | |
| 1005 | Housing Unit 9 Section Leader checks with Director before proceeding with movement of inmate. | 6/30/11 | 1005 | | |
| 1005 | When signaled by Housing Unit 9 Section Leader the Restraint / Escort teams remove the inmate from cell.  Apply lower restraints and proceed with movement. | 6/30/11 | 1005 | | |
| 1005 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind leader. | 6/30/11 | 1005 | | |
| 1010 | Inmate secured by chest and ankle straps. Team Leader at head of table, two at arms two at feet. | 6/30/11 | 1019 | | |
| 1010 | Secure wrists with soft restraints. | 6/30/11 | 1009 | | |
| 1010 | Secure arms (maintain good circulation). | 6/30/11 | 1009 | | |
| 1010 | Secure upper torso. | 6/30/11 | 1009 | | |

Case 2:22-cv-00860-MTL--JZB   Document 1-1   Filed 05/19/22   Page 91 of 220
Special Operations: Checklist                    DFS' 26(a)(1) Disclosures & Responses to RFP's 01076
Page 3 of 5

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1010 | Secure legs (maintain good circulation). | 6/30/11 | 1009 | | |
| 1010 | Restraint / Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | 6/30/11 | 1009 | | |
| | *Inmate Secured to Table* | 6/30/11 | 1009 | | |
| | Housing Unit 9 Section Leader advises the Director inmate is secure on table and request approval to proceed with medical procedure. | 6/30/11 | 1014 | | |
| | IV's are inserted into inmate's arms or a catheter is inserted into inmate's leg.  EKG equipment is hooked up to inmate.  Ensure a good flow of saline. | 6/30/11 | 1030 | | |
| 1010 | Restraint / Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room.  Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing EKG functioning. | 6/30/11 | 1030 | | |
| 1040 | Housing Unit 9 Section Leader advises Director that medical procedure is complete. | 6/30/11 | 1030 | | |
| 1045 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | 6/30/11 | 1042 | | |
| 1045 | Command directs movement of witnesses to Housing Unit 9 in the following order:  Victim Witnesses, Official Witnesses, Media Witnesses, Inmate Witnesses. | 6/30/11 | 1043 | | |
| 1055 | Command to Housing Unit 9 Section Leader – all witnesses are in place. | 6/30/11 | 1054 | | |
| 1055 | Housing Unit 9 Team Section will advise Director that witnesses are in position and requests authorization to proceed. | 6/30/11 | 1054 | | |
| 1059 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed". | 6/30/11 | 1055 – Governors Office 1056 – AG's Office 1100 – Proceed w/execution | | |
| 1101 | Upon receipt of permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. *Turn on audio when ready.* | 6/30/11 | 1100 | | |

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1101 | Housing Unit 9 Section Leader reads the Execution Order. | 6/30/11 | 1100 | | |
| 1102 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | 6/30/11 | 1101 | | |
| 1102 | Inmate makes his last statement. The last statement will be summarized. *Turn off audio.*<br><br>Last Statement:<br><br>I'd like to thank my family, my lawyers.  Love em all and everything is ok.  That's it. | 6/30/11 | 1101 | | |
| 1102 | Director advises Special Operations Team Leader to proceed with phase one. | 6/30/11 | 1102 | | |
| 1102 | **Phase 1:**  First injection commences. Four syringes filled with 1.25 grams each of Pentobarbital and sterile water. Process takes about 3 minutes. Saline flush follows.  (1-5) | 6/30/11 | 1105 | | |
| 1105 | Once first injection is complete, Special Operations Team Leader instructs medical consultant to **ensure inmate is unconscious**. Medical consultant will enter execution chamber and check inmate to confirm the inmate is unconscious. | 6/30/11 | 1105 | | |
| 1105 | *Turn on audio.* Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. *Turn off audio* | 6/30/11 | 1106 | | |
| 1105 | Once inmate is confirmed unconscious by the medical consultant, Special Operations Team Leader advises Director.  Director provides order to continue to second injection. | 6/30/11 | 1106 | | |
| 1106 | **Phase 2:**  Second injection commences. (6-8) Pancuronium Bromide | 6/30/11 | 1106 | | |
| 1107 | Second injection completed.  Saline flush follows. | 6/30/11 | 1107 | | |
| 1108 | **Phase 3:**  Third injection commences. (9-11) Potassium Chloride | 6/30/11 | 1108 | | |
| 1109 | Third injection completed.  Saline flush follows. | 6/30/11 | 1109 | | |
| | Phase 3 initiated Potassium Chloride – 10A | 6/30/11 | 1109 | | |
| | Phase 3 initiated Potassium Chloride – 10B | 6/30/11 | 1110 | | |
| | Phase 3 completed 10A & 10B | 6/30/11 | 1111 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 01078

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1109 | Special Ops Team Leader advises Director when injections are complete. | 6/30/11 | 1111 | | |
| 1109 | Designated qualified person checks vital signs on EKG. | 6/30/11 | 1111 | | |
| TBD | Designated qualified person **pronounces death** in the Chemical Room. | 6/30/11 | 1111 | | |
| TBD | Director informed of death by Special Ops Team Leader. | 6/30/11 | 1111 | | |
| TBD | Director advises Witnesses that the execution is concluded. | 6/30/11 | 1111 | | |
| TBD | Housing Unit 9 Section Leader closes the curtains. | 6/30/11 | 1111 | | |
| TBD | Housing Unit 9 Section Leader will notify Command to proceed with witness extrication. | 6/30/11 | 1112 | | |
| TBD | Team Leader instructs medical consultant to cut lines to IV's. | 6/30/11 | 1118 | | |
| TBD | CIU Investigator examines the body | 6/30/11 | 1119 | | |
| TBD | Coroner / Medial Examiner examines the body | 6/30/11 | 1119 | | |
| TBD | All team members-Special Ops remain in Chemical administration / restraint/escort rooms. Team enters and removes restraints from the inmate. The inmate is then placed on a gurney. | 6/30/11 | 1123 | | |
| TBD | Restraint / Escort Team will assist Coroner in the removal of the inmate's body. | 6/30/11 | 1129 | | |
| TBD | Body placed in Coroner's vehicle. | 6/30/11 | 1130 | | |
| TBD | All teams perform any clean-up chores. | 6/30/11 | 1130 | | |
| TBD | Housing Unit 9 Section Leader gives directive to secure the Execution Facility. | 6/30/11 | 1140 | | |

Housing Unit 9 Section Leader

*Carson A. McWilliams*

Date  7-13-11

DFS' 26(a)(1) Disclosures 01977

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | Institutional Unit Central Unit | Period Covered |
|---|---|---|
| | | Hour _____0800_____ Date ___8/08/2012_____ |
| Housing Unit/Post/Duty Assignment Housing Unit 9 Section Leader | | Hour _____ Date _____ |

| Staff Member *(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed | Staff Member *(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | ■ | 0800 | 1138 | | | | |
| HU9 Recorder | ■ | 0800 | 1136 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Execution table is prepared at least two hours prior to scheduled time of execution. | |
| | | |
| 0934 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution. Per Governor's General Counsel, at this time there is no reason to not proceed. | |
| | | |
| 0935 | Director makes initial call to the Attorney General's office to ascertain if there are any reasons to not proceed with the execution. Per Attorney General's office, at this time there is no reason to not proceed. | |
| | | |
| 0936 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; requests permission to proceed. Director grants permission to proceed. | |
| | | |
| 0937 | Inmate placed in upper restraints by restraint/escort team after strip search. | |
| | | |
| 0937 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready to move the inmate to the injection room. | |
| | | |
| 0937 | The Director informs Housing Unit 9 Section Leader (proceed with movement of inmate to the injection room). | |
| | | |
| 0937 | Inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Restraint Team Leader behind. Support staff behind Restraint Team Leader. | |

Page **1** of **3**

DFS' 26(a)(1) Disclosures 01978

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 0941 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9 witness room. |
| 0954 | Command advised Housing Unit 9 Section Leader that all witnesses are in place. Housing Unit 9 Section Leader advises Director witnesses are in place. |
| 0959 | Restraint/Escort Team moves back to holding area, Restraint Team Leader at the Execution Room door. All items not part of the event is removed from the Execution Room. |
| 0959 | Housing Unit 9 Section Leader advises the Director the inmate is secure on the table and ready for the IV procedure. Director grants permission to proceed. |
| 1003 | Acting upon the advice of the IV Team Leader, the Director determines the catheter site(s). |
| 1021 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution Room. Special Ops Team Leader inside the Chemical Room. Inmate is secured to the table with IV flowing, EKG functioning. |
| 1021 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. |
| 1022 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution. Per Governor's General Counsel, at this time there is no reason to not proceed. |
| 1023 | Director makes initial call to the Attorney General's office to ascertain if there are any reasons to not proceed with the execution. Per Attorney General's office, at this time there is no reason to not proceed. |
| 1023 | The Director informs Housing Unit 9 Section Leader "we may proceed". |
| 1023 | With permission from the Director and confirmation to proceed, Housing Unit 9 Section Leader opens the curtains. |
| 1024 | Housing Unit 9 Section Leader reads the Execution Order. |
| 1025 | Housing Unit 9 Section Leader asks the inmate if he would like to make a last statement. |

DFS' 26(a)(1) Disclosures 01979

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 1025 | Inmate makes his last statement. |
|------|----------------------------------|
| 1031 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. |
| 1103 | Director informed of death by Special Ops Team Leader. |
| 1103 | Director advises witnesses that the execution is concluded. |
| 1103 | Housing Unit 9 Section Leader closes the curtains. |
| 1107 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses from Delta Staging. |
| 1115 | Housing Unit 9 Section Leader instructs IV Team to cut lines to IV's. |
| 1117 | CIU Investigator examines the body. |
| 1117 | Coroner/Medical Examiner examines the body. |
| 1122 | Team enters and removes restraints from the inmate and places inmate on a gurney. |
| 1127 | Restraint/Escort Team assists Coroner in the removal of the inmate's body. |
| 1128 | All Teams perform clean up duties. |
| 1131 | The IV Team and Special Operations Team participate in an informal debriefing with the Director and Division Director. |
| 1138 | Housing Unit 9 Section Leader gives directives to secure the Execution Facility. |
| / | End log |

DFS' 26(a)(1) Disclosures 01980

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

 ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | | Institutional Unit Central Unit | | Period Covered | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Hour 042 Date 8/8/12 | | | | |
| Housing Unit/Post/Duty Assignment Lethal Injection Room Log | | | | Hour 1024 Date 8/8/12 | | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Recorder | ███ | 042 | 1024 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 042 | Restraint team enters lethal injection room. | ███ |
| 043 | Legs restrained. (maintain good circulation) | |
| 043 | Harness applied. | |
| 043 | Remove left (hard) restraint. | |
| 044 | Restraint Team Leader asks the inmate how he's doing; Inmate nods his head | |

Shift Commander's Comment: (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01981

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff |
|---|---|---|
| 944 | Apply left (soft) restraint. | |
| | | |
| | | |
| | | |
| 944 | Left arm restrained. | |
| | | |
| | | |
| | | |
| 944 | Remove right (hard) restraint. | |
| | | |
| | | |
| | | |
| 944 | Apply right (soft) restraint. | |
| 945 | Restraint Team Leader asks inmate if he's ok; inmate nods head | |
| | | |
| | | |
| 945 | Right arm restrained. | |
| | | |
| | | |
| | | |
| | | |
| | | |

Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01982

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0944 | Remove belly chains. | |
| 0947 | Inmate asks how long it takes to die | |
| 0947 | ███████ advises the inmate he will have the opportunity to ask questions later. | |
| 0948 | Restraint Team Leader checks all restraints. | |
| 0948 | Restraint Team Leader advises inmate where the microphone is located. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| 0949 | Inmate is restrained. | |
| 0949 | Restraint Team Leader asks inmate if he's OK; inmate nods his head. | |
| 0950 | ███████ advises the Restraint Team there is not a good EKG reading | |
| 0950 | Restraint Team Leader advises inmate they need to adjust EKG Pads; inmate responds with "it's alright". | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01983

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0952 | Inmate asks if the family the victims showed up. | ▮ |
| 0952 | Restraint Team Leader responds "I don't know". And advises the Inmate all witnesses will be to your right side | |
| 0952 | Restraint Team Leader advises the Restraint Team Members to switch EKG pads and EKG leads | |
| 0957 | ▮▮▮ advises the inmate the IV Team will be coming in for vein assessment. He also advised the inmate where the attorneys will be seated in the witness room. | |
| | | |
| | | |
| 0958 | IV Team enters lethal injection room, and conducts vein assessment | |
| 0958 | IV Team Leader advises the inmate they are just here for vein assessment and they will advise before they do anything that will hurt. | |
| 0958 | IV Team advises inmate he is going to put on a tourniquet to get the veins out. | |
| 1000 | IV Team advises inmate they are going to look at the left side now. | |
| 1001 | Inmate states thank god my hand looks pretty good. | |

Commander's Comment: *(Notes or comments concerning entries above: comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01984

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1003 | IV Team explains IV procedure to the inmate. Inmate is advised after assessment the forearms will be the best place. They are going to try a couple times in each arm. If they are not successful they will have to go in through the groin. | |
| 1004 | IV Team asks the inmate to pump his hand | |
| 1004 | Inmate asked if there are any witnesses. | |
| 1004 | Restraint Team Leader advises the inmate all witnesses are behind the curtain and they all are witnessing the procedure CCTV. | |
| 1007 | IV Team advises the inmate they are going to do the same thing on the other side (right side). IV Team asks the inmate to pump his hand again. | |
| 1009 | IV Team asks the inmate to slide his hand over. | |
| 1011 | IV Team asks the inmate to pump his hand again. | |
| 1012 | IV Team advises the Restraint Team Leader they lost flow and advises the line to be closed. | |
| 1013 | Restraint Team Leader asks the inmate if he's doing OK; inmate replied yes. | |
| 1013 | IV Team advises the inmate he is putting on a | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01985

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| | tourniquet and he will feel a little pressure. | |
| 1014 | Restraint Team Leader advises the inmate to relax. | |
| 1014 | IV Team advises the inmate he's going to feel a little bee sting. | |
| 1015 | Restraint Team Leader advises the inmate to relax. | |
| 1017 | IV Team advises the drip is fitrating and Not flowing. There is no flow. | |
| 1018 | Restraint Team Leader asks the inmate how he's doing; inmate Nods his head. | |
| 1019 | IV Team advises he is securing secondary. Pretty good flow. | |
| 1020 | IV Team advises inmate they are done. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01986

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1020 | IV Team exits the lethal injection room. | |
| 1021 | ▮▮▮▮▮ advises the inmate he did well, and states the will walk in and everybody will walk out. Inmate was advised where the attorneys will be seated in the witness room. ▮▮▮▮ advised the inmate when the Warden comes in he will read the warrant and he will be provided the opportunity for last words. | |
| 1021 | Inmate asked ▮▮▮ how long it would take him to die. ▮▮▮▮ advises him he will feel real tired and will fall asleep. | |
| 1022 | ▮▮▮▮ asks the inmate if he has any questions before he walks out; Inmate stated no. Inmate then stated "Thanks for being decent." | |
| 1024 | Restraint Team exits the lethal injection room. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:   (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09



**ARIZONA DEPARTMENT OF CORRECTIONS**         DFS' 26(a)(1) Disclosures 01990

**Correctional Service Log**

| Institution/Facility | Institutional Unit | Period Covered | | |
|---|---|---|---|---|
| ASPC - Florence | Central Unit | Hour *0730*  Date *08-08-12* | | |
| Housing Unit/Post/Duty Assignment | | Hour *1120*  Date *08-08-12* | | |
| Housing Unit 9, Special Operations | | | | |

| Staff Member (Last, First M.I. and Title) | Staff | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ▓ | *0730* | *1120* | | | | |
| SOT Recorder | ▓ | *0730* | *1120* | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| *0730* | Special Operations and IV Teams assembled for execution of inmate: | |
| | Last: *Cook*         First: *Daniel Wayne*  ADC#: *69007* | |
| *0800* | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| *0832* | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| *0844* | Commenced the preparation of chemicals and syringes. | |
| *0859* | Completed preparing, labeling, and affixing syringes to the manifold. | |
| *0859* | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| *0947* | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. | |
| | Initial blood pressure: *134 / 79* | |
| *0952* | (A) (B) | |
| *0958* | Witness Room AV feed turned on. | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

ARIZONA DEPARTMENT OF CORRECTIONS          DFS' 26(a)(1) Disclosures 01991

## Correctional Service Log

| me of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initial |
|---|---|---|
| 0958 | IV procedure commenced. | |
| | | |
| 1021 | IV procedure completed. Primary IV catheter placed in inmate's *Left AC* | |
| | Backup IV catheter placed in inmate's *LEFT HAND*. | |
| 1026 | *C* | |
| 1026 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1026 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1027³² | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1028 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1028. | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1029 | Drug protocol completed. | |
| | | |
| 1030³² | 3 minute point: _1030³²_. Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1031 | IV Team Leader verified the inmate is sedated. | |
| 1046 | *Switched EKG MACHINE FOR ADDITIONAL TAPE* | |
| 1103 | IV Team Leader pronounced death. | |
| | . | |
| | | |
| | Additional entries: | |
| 0952 | A. *EKG MACHINE AND EKG leads Switched* | |
| | *OUT DUE TO INTERFERANCE.* | |
| 0955 | B. *EKG GOOD READING* | |

ft Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**                    DFS' 26(a)(1) Disclosures 01992

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1020 | ADDITIONAL COMMENTS FROM INMATE AFTER MICROPHONE TURNED OFF : "TO MY LAWYERS" "RED ROBIN ROW"  "I'M DONE", "I LOVE YOU" | ■ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | ■ | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered | | |
|---|---|---|---|---|
| ASPC - Florence | Central Unit | Hour *0700* | Date *10/23/13* | |
| Housing Unit/Post/Duty Assignment | | Hour *1111* | Date *10/23/13* | |
| Housing Unit 9, Special Operations | | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ■ | *0700* | *1111* | | | | |
| SOT Recorder | ■ | *0700* | *1111* | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| *0700* | Special Operations and IV Teams assembled for execution of inmate: Last: *Jones*   First: *Robert G*   ADC#: *70564* | ■ |
| *0700* | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| *0715* | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| *0827* | Commenced the preparation of chemicals and syringes. | |
| *0841* | Completed preparing, labeling, and affixing syringes to the manifold. | |
| *0841* | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| *0927* | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. Initial blood pressure: *133 / 85* | |
| *0937* | Witness Room AV feed turned on. | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0939 | IV procedure commenced. | ███ |
| 1031 | IV procedure completed. Primary IV catheter placed in inmate's ℞ Femoral | ███ |
|  | Backup IV catheter placed in inmate's ℞ A/c | |
| 1035 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1036 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1037 ᵒ⁴ | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1038 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1039. | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1039 | Drug protocol completed. | |
| 1040 ᵒ⁴ | 3 minute point: _1040 ᵒ⁴_.  Confirmed 3 minutes have elapsed since commencing the administration of chemicals. | |
| 1040 | IV Team Leader verified the inmate is sedated. | |
| 1052 | IV Team Leader pronounced death. | |
| N/a | Additional entries: | |
| N/a | A. | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

 ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | Institutional Unit Central Unit | Period Covered Hour 0923   Date 10/23/13 |
|---|---|---|
| Housing Unit/Post/Duty Assignment Lethal Injection Room Log | | Hour 1034   Date 10/23/13 |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Recorder | ▮ | 0923 | 1034 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0923 | Restraint team enters lethal injection room. | |
| | | |
| 0923 | Legs restrained. (maintain good circulation) | |
| | | |
| 0924 | Harness applied. | |
| | | |
| 0924 | Remove left (hard) restraint. | |
| | | |
| 0924 | Apply left (soft) restraint. | |
| 0924 | RTM asks inmate how that feels. JM replied thats OK. | |
| 0925 | Left arm restrained. | |
| | | |
| 0925 | Remove right (hard) restraint. | |
| | | |
| 0925 | Apply right (soft) restraint. | |
| 0925 | RTM asks inmate how that feels. JM replied thats OK. | |
| 0925 | Right arm restrained. | |
| | | |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 925 | RTL advises Ilm of the application of the pulse and blood pressure cuff. |
|------|------|
| | |
| 926 | Ilm asks the RTL if they "Got It" (referring to pressure cuff.) |
| | |
| 927 | RTL advises the inmate yes. |
| | |
| 927 | RTL advises the inmate they are going to hook up the EKG leads and he is going to have to shave him. |
| | |
| 928 | RTM adjusts blood pressure cuff |
| | |
| 929 | Ilm stated the blood pressure thing got a little tight. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 0929 | Remove belly chains. |
| | |
| 0929 | Restraint Team Leader checks all restraints. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| 0929 | Inmate is restrained |
| 0929 | ▓▓▓▓▓ advises the inmate that IV Team will be in shortly, and asked the inmate if he had any questions. |
| 0930 | Inmate replied NO. |
| 0931 | RTL advises the inmate that the IV Team will be in shortly to assess his veins. |
| 0931 | Inmate stated that he has no problems giving blood. |
| 0932 | RTL asked inmate if the right restraint is too tight |
| 0932 | Inmate stated that it's just tingling a bit. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 932 | RTL adjusted the right restraint and asks the inmate if that feels better. |
| 933 | Inmate stated yes. |
| 935 | RTL asked the inmate if he's still doing OK. |
| 936 | Inmate stated he's doing fine and asks if the strap under his neck can be adjusted. |
| 936 | RTL advised the inmate the IV Team will be coming in for the assessment. |
| 936 | Inmate asked the RTL what arm. |
| 936 | RTL advised he doesnt know. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 937 | IV Team enters lethal injection room, and conducts vein assessment |
|---|---|
| 937 | IVTL advised the inmate they are here to do the IV procedure, and for now they are only conducting an assessment. The inmate was also advised that they will let him know when they do something where he will feel a poke. |
| 938 | IVTL advised that they will be right back. |
| 938 | I/M asked the RTM if they are going to do both arms or just one. |
| 939 | RTM advised the inmate that the IV Team will advise when they return. |
| 939 | IV Team explains IV procedure to the inmate. |
| 940 | IVTM begins to apply the tourniquet and advised the inmate its going to be a little tight, and advised the inmate to be real still. |
| 942 | IVTM requested the ultra sound machine, and conducts ultra sound of left arm. |
| 947 | RTL asked the inmate if he's had a blood draw lately |
| 947 | Inmate advised that he hasnt had a blood draw and that its just a rash and he has on his chest also. |
| 948 | Inmate asked the IVTL which one are you trying to find. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 948 | IVTL advised the inmate they have to find one first. |
| 948 | Inmate Stated the one he's used is down by his wrist. |
| 949 | RTL asked the IVTL if he needs them to adjust the left restraint. |
| 949 | IVTL advised the RTL yes that they may need to. |
| 949 | Inmate advised the RTL that by his elbow there's a big fat one. |
| 950 | Inmate asked the IVTL if he found it. |
| 950 | IVTL advised that he thinks he found it. |
| 951 | IVTL Stated its not compressable. |
| 952 | Inmate Stated he could to the IV himself as he's been Shooting dope for so long he knows which veins to hit. |
| 953 | IVTL advised IVTM to go with 18. |
| 954 | Inmate Stated he was hoping for a Small one. |
| 955 | IVTM requested Secondary line, and asked the SDT to check flow. |
| 955 | SDT advised there is almost no flow to it. |
| 956 | IVTL advised that they are going to have to pull it, and try the other side |
| 957 | Inmate asked what happened, and the RTL advised they weren't getting a good flow. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 958 | JVTL applied the tourniquet and conducted ultra sound. Stated not a very big calibur but its there. | |
| 1000 | JVTM advised the inmate he is going to feel a little stick. | |
| 1001 | Inmate asked the JVTL if they are allowed to do it on the top of his hands. | |
| 1002 | JVTL advised the inmate they try to avoid that due to the restraints. | |
| 1002 | JVTM advised he found one and its nice and plump, and asked the SOT to check flow. | |
| 1003 | SOT advised that the flow is very slow. | |
| 1005 | JVTM advised that the flow is good (secondary). | |
| 1006 | RN JVTL advised the inmate they have one and the other is going to be in his upper thigh, and he will use a little anesthetic. | |
| 1008 | JVTL advised the inmate he wasnt going to cut anything up there. | |
| 1009 | Inmate stated he knows hes not going to need it anymore but darn. | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1011 | IVTL advised its compressable. | |
| 1014 | IVTL advised the inmate he's going to feel coldness. | |
| 1016 | Inmate stated he hopes thats not the needle. | |
| 1016 | IVTL advised the inmate no its not and they are going to use the same size needle they used in his arm. | |
| 1016 | Inmate asked what time it was. | |
| 1016 | RTM advised sixteen after ten. | |
| 1018 | IVTL advised the inmate he is going to feel a little bee sting and burning. Also putting a little more anesthetic in. | |
| 1021 | IVTL stated thats it and asked the inmate if he's hanging in there. | |
| 1022 | Inmate advised the IVTL that its not what he's doing its just someone else poking him. | |
| 1022 | IVTL advised the inmate he's going to feel a little pressure | |
| 1023 | IVTL asked to check the flow for the primary line. | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1023 | SOT advised that the flow is good. | |
| 1024 | IVTL advised the inmate they are going to sew this in so it doesn't come out and have to put him through this again. | |
| 1028 | IVTL advised the inmate they are all set and thanked the inmate for his cooperation. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1030 | IV Team exits the lethal injection room. | ███ |
| 1030 | ███ advised the inmate the RT is going to cover him up and explained what is going to happen. ie, Warden will enter the room, read the warrant, curtain will open and if he decides to say last words the microphone is above his head. He also advised where his attorney will be seated in the witness room. ███ thanked the inmate for his cooperation. | |
| | | |
| 1034 | Restraint Team exits the lethal injection room. | ███ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Institution/Facility ASPC-Florence | Institutional Unit Central Unit | Period Covered |
|---|---|---|
| Housing Unit/Post/Duty Assignment Housing Unit 9 Section Leader | | Hour 0815 Date 4/25/2012 |
| | | Hour 1032 Date 4/25/2012 |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | ■ | 0850 | 1032 | | | | |
| HU9 Recorder | ■ | 0815 | 1032 | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0832 | Execution table is prepared at least two hours prior to scheduled time of execution. | |
| 0834 | All items removed from inmate's cell (Linen, property, etc) | |
| 0900 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; request permission to proceed. | |
| 0906 | Condemned inmate to be placed in upper restraints by restraint/escort team after strip search. | |
| 0906 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready. | |
| 0907 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed with movement". | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/08

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0908 | When signaled by Housing Unit 9 Section Leader, the Restraint/ Escort team removes the inmate from cell.  Apply lower restraints and proceed with movement. | |
| 0909 | Restraint Team Leader checks with Housing Unit 9 Section Leader before proceeding with movement of inmate. | |
| 0909 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind Team Leader. | |
| 0910 | Inmate secured by chest and ankle straps, Team Leader at head of table, two at arms, two at feet. | |
| 0910 | Secure wrists with soft restraints. | |
| 0910 | Secure arms (maintain good circulation). | |
| 0910 | Secure upper torso. | |
| 0910 | Secure legs (maintain good circulation). | |
| 0917 | Restraint/Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0918 | Housing Unit 9 Section Leader advises the Director inmate is secure on table and requests approval to proceed with IV procedure. | |
| 0920 | The Director, acting upon the advise of the IV Team Leader, shall determine the catheter(s) site(s). | |
| 0946 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room.  Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing, EKG functioning. | |
| 0946 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. | |
| 0946 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. (No victim witnesses) | |
| 0946 | Command directs movement of witnesses to Housing Unit 9 in the following order: Inmate Witnesses, Media Witnesses, Official Witnesses. | |
| 0956 | Command advises Housing Unit 9 Section Leader that all witnesses are in place. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0956 | Housing Unit 9 Section Leader advises Director that witnesses are in position and requests authorization to proceed. | |
| 0957 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed". | |
| 1000 | With permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. | |
| 1000 | Housing Unit 9 Section Leader reads the Execution Order | |
| 1001 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | |
| 1001 | Inmate makes his last statement. | |
| 1006 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. | |
| 1008 | Director informed of death by Special Ops Team Leader. | |
| 1008 | Director advises witnesses that the execution is concluded. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1008 | Housing Unit 9 Section Leader closes the curtains. | |
| 1009 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses. | |
| 1013 | Housing Unit 9 Secton Leader instructs IV Team to cut lines to IV's | |
| 1018 | CIU Investigator examines the body. | |
| 1018 | Coroner / Medical Examiner examines the body. | |
| 1021 | Team enters and removes restraints from the inmate. | |
| 1026 | The inmate is placed on a gurney. | |
| 1027 | Restraint / Escort Team assists Coroner in the removal of the inmate's body. | |
| 1028 | Inmate's body is placed in Coroner's vehicle. | |
| 1028 | All teams perform clean-up chores. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1028 | The IV and Special Operations Teams will participate in an | |
| | informal debriefing with the Director and Division Director | |
| | immediately upon completion of the event. | |
| | **Everything went according to schedule and everyone did a | |
| | great job. There was a small problem with setting up the EKG, | |
| | but was resolved and handled well with no issues during the | |
| | event.  All Team Leaders reported a remarkable job by all | |
| | involved. | |
| | | |
| | | |
| 1032 | Housing Unit 9 Section Leader gives directive to secure the | |
| | Execution Facility. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered |
|---|---|---|
| ASPC - Florence | Central Unit | Hour _0720_  Date _04/25/12_ |
| Housing Unit/Post/Duty Assignment | | Hour _1010_  Date _04/25/12._ |
| Housing Unit 9, Special Operations | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ▮ | 720 | 1010 | | | | |
| SOT Recorder | ▮ | 0720 | 1010 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0720 | Special Operations and IV Teams assembled for execution of inmate _Kemp_ ADC# 099144 | ▮ |
| 0725 | Audio, visual, and medical equipment inspected. | |
| 0830 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | ▮ |
| 0830 | Commenced the preparation of chemicals and syringes. | ▮ |
| 0846 | Completed preparing, labeling, and affixing syringes to the manifold. | ▮ |
| 0846 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | ▮ |
| 0918 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached.  Initial blood pressure: _135 / 76_ | ▮ |
| 0920 | IV procedure commenced. | ▮ |

Shift Commander's Comments: (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0946 | IV procedure complete. Primary IV catheter placed in inmate's *Right* | |
| | *Femoral* Backup IV catheter placed in inmate's *LEFT  A/C.* | |
| | | |
| 1001 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1001 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1002²¹ | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1003 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1003 | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1004 | Drug protocol completed. | |
| | | |
| 1005²¹ | 3 minute point: *1005  ²¹* .  Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1006 | IV Team Leader assessed consciousness and confirmed the inmate is sedated. | |
| | | |
| 1008. | IV Team Leader pronounces death. | |
| | | |
| | | |
| N/A | Additional entries: | |
| N/A | A. | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures & Responses to RFP's 00023

# SPECIAL OPERATIONS CHECKLIST

Special Operations: Checklist
Page 1 of 5

## RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initial |
|---|---|---|---|---|---|
| **DAY PRIOR TO EXECUTION** | | | | | |
| 2200 | Restraint Team prepares inmate for transport from Browning Unit to Housing Unit 9. | 3/28/11 | 2100 | | |
| 2230 | Restraint Team transports inmate from Browning Unit to Housing Unit 9 in Central Unit. | 3/28/11 | 2158 | | |
| 2235 | Inmate is secured in cell in Housing Unit 9 and first Continuous Observation Team takes charge of condemned (1 supervisor / 2 staff) - Code-4's called in every 20 minutes. | 3/28/11 | 2201 | | |
| 2245 | Inmate is offered hygiene supplies | 3/28/11 | Did not request | | |
| 2300 | All hygiene supplies are removed from inmate's holding cell. | 3/28/11 | N/A | | |
| 2300 | Inmate may be offered a mild sedative. (Only if requested) | 3/28/11 | 0205 – requested 0220 - administered | | |
| **DAY OF EXECUTION** | | | | | |
| 0300 | First Observation Team relieved. Second Team starts continuous observation. | 3/29/11 | 0300 | | |
| 0530 | The inmate shall be offered a light meal. All eating utensils and remaining food will be removed upon completion of the meal. | 3/29/11 | 0504 | | |
| 0600 | Housing Unit 9 Team Leader will authorize Execution Restraint Team access to Housing Unit #9. | 3/29/11 | 0700 | | |
| 0600 | Trash removed from inmate's holding cell. | 3/29/11 | N/A | | |
| 0600 | Housing Unit 9 Team Leader will authorize Special Ops Team access to Housing Unit 9. | 3/29/11 | 0525 | | |
| | Housing Unit 9 Team Leader will authorize Medical Personnel access to Housing Unit 9. | 3/29/11 | 0525 | | |
| | Special Ops Team will confirm camera, monitor, and audio system are functioning clearly and properly. | 3/29/11 | 0525 | | |
| | Special Ops Team will confirm EKG is operational and equipment for assigned medical staff to mark tape is functional. | 3/29/11 | 0525 | | |
| 0605 | Inmate offered hygiene supplies. | 3/29/11 | Did not request | | |
| 0620 | Hygiene supplies removed from inmate's holding cell. | 3/29/11 | N/A | | |

Special Operations: Checklist
Page 2 of 5

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0630 | Second Observation Team relieved. Third Observation Team starts continuous observation. | 3/29/11 | 0658 | | |
| 0700 | Rest of Restraint Team arrives at Housing Unit 9. | 3/29/11 | 0700 | | |
| 0800 | Execution table is prepared. | 3/29/11 | 0800 | | |
| 0800 | Execution table should be prepared at least two (2) hours prior to scheduled time of execution. | 3/29/11 | 0800 | | |
| 0830 | All items removed from inmate's cell (linen, property, etc.) | 3/29/11 | 0830 | | |
| 0900 | Housing Unit 9 Team Leader advises Director that inmate is ready for search and restraint – request permission to proceed. | 3/29/11 | 0900 | | |
| 0900 | Condemned inmate to be placed in upper restraints by restraint / escort team after strip search | 3/29/11 | 0900 | | |
| 0905 | Restraint Team Leader notifies Housing Unit 9 Team Leader that inmate is restrained and the team is ready. | 3/29/11 | 0905 | | |
| 0905 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed with movement". | 3/29/11 | 0909 – Governor's Office 0910 – AG's Office | | |
| 0905 | Housing Unit 9 Team Leader checks with Director before proceeding with movement of inmate. | 3/29/11 | 0910 | | |
| 0905 | When signaled by Housing Unit 9 Team Leader the Restraint / Escort teams remove the inmate from cell.  Apply lower restraints and proceed with movement. | 3/29/11 | 0911 | | |
| 0905 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind leader. | 3/29/11 | 0911 0912 (placed on table) | | |
| 0910 | Inmate secured by chest and ankle straps. Team Leader at head of table, two at arms two at feet. | 3/29/11 | 0917 | | |
| 0910 | Secure wrists with soft restraints. | 3/29/11 | 0917 | | |
| 0910 | Secure arms (maintain good circulation). | 3/29/11 | 0917 | | |
| 0910 | Secure upper torso. | 3/29/11 | 0917 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 00026

## RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0910 | Secure legs (maintain good circulation). | 3/29/11 | 0917 | | |
| 0910 | Restraint / Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | 3/29/11 | 0917 | | |
| | *Inmate Secured to Table* | | | | |
| | The Warden advises the Director inmate is secure on table and request approval to proceed with medical procedure. | 3/29/11 | 0917 | | |
| | IV's are inserted into inmate's arms or a catheter is inserted into inmate's leg. EKG equipment is hooked up to inmate. Ensure a good flow of saline. | 3/29/11 | 0918 | | |
| 0910 | Restraint / Escort Team Leader and Housing Unit 9 Team Leader positioned in Execution room. Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing EKG functioning. | 3/29/11 | 0947 | | |
| 0940 | Housing Unit Team Leader advises Director that medical procedure is complete. | 3/29/11 | 0947 | | |
| 0945 | Housing Unit 9 Team Leader advises Command to begin movement of witnesses to Housing Unit 9. | 3/29/11 | 0950 | | |
| 0945 | Command directs movement of witnesses to Housing Unit 9 in the following order: Victim Witnesses, Official Witnesses, Media Witnesses, Inmate Witnesses. | 3/29/11 | 0950 | | |
| 0955 | Command to Housing Unit 9 Team Leader – all witnesses are in place. | 3/29/11 | 1000 | | |
| 0955 | Housing Unit 9 Team Leader will advise Director that witnesses are in position and requests authorization to proceed. | 3/29/11 | 1001 | | |
| 0959 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed". | 3/29/11 | 1002 – Governor's Office 1003 – AG's Office | | |
| 1001 | Upon receipt of permission from Director and confirmation to proceed, Housing Unit 9 Team Leader opens curtains. *Turn on audio when ready.* | 3/29/11 | 1003 | | |
| 1001 | Housing Unit 9 Team Leader reads the Execution Order. | 3/29/11 | 1003 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 00027

Special Operations: Checklist
Page 4 of 5

**RESTRICTED**
**SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1002 | Housing Unit 9 Team Leader asks inmate if he would like to make a last statement. | 3/29/11 | 1004 | | |
| 1002 | Inmate makes his last statement. The last statement will be summarized. *Turn off audio.* Last Statement: None.  When inmate King was asked if he would like to make a statement – he replied "No". | 3/29/11 | 1004 | | |
| 1002 | Director advises Special Operations Team Leader to proceed with phase one. | 3/29/11 | 1005 | | |
| 1002 | **Phase 1:** First injection commences. Four syringes filled with 1.25 grams each of Sodium Thiopental and sterile water. Process takes about 3 minutes. Saline flush follows.  (1-5) | 3/29/11 | 1005 | | |
| 1003 | Once first injection is complete, Special Operations Team Leader instructs medical consultant to **ensure inmate is unconscious.** Medical consultant will enter execution chamber and check inmate to confirm the inmate is unconscious. | 3/29/11 | 1008 | | |
| 1005 | *Turn on audio.* Housing Unit 9 Team Leader advises witnesses the inmate has been sedated. *Turn off audio* | 3/29/11 | 1009 | | |
| 1005 | Once inmate is confirmed unconscious by the medical consultant, Special Operations Team Leader advises Director.  Director provides order to continue to second injection. | 3/29/11 | 1010 | | |
| 1005 | **Phase 2:** Second injection commences. (6-8) Pancuronium Bromide | 3/29/11 | 1010 | | |
| 1006 | Second injection completed.  Saline flush follows. | 3/29/11 | 1012 | | |
| 1007 | **Phase 3:** Third injection commences. (9-11) Potassium Chloride | 3/29/11 | 1012 | | |
| 1008 | Third injection completed.  Saline flush follows. | 3/29/11 | 1014 | | |
| | Commences Bank B- Potassium Chloride | 3/29/11 | 1015 | | |
| | Chloride 9A Potassium Chloride | 3/29/11 | 1015 | | |
| | Commences 10B Potassium Chloride | 3/29/11 | 1016 | | |
| | Commences 11B Heparin/Saline Flush | 3/29/11 | 1017 | | |
| | Commences 2B Sodium Thiopental | 3/29/11 | 1019 | | |

Case 2:22-cv-00860-MTL-JZB   Document 1-1   Filed 05/19/22   Page 132 of 220
DFS' 26(a)(1) Disclosures & Responses to RFP's 00028

Special Operations: Checklist
Page 5 of 5

**RESTRICTED**
**SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| | Commences 2B Sodium Thiopental | 3/29/11 | 1020 | | |
| | Commences 4B Sodium Thiopental | 3/29/11 | 1022 | | |
| 1008 | Special Ops Team Leader advises Director when injections are complete. | 3/29/11 | 1022 | | |
| 1008 | Designated qualified person checks vital signs on EKG. | 3/29/11 | 1022 | | |
| TBD | Designated qualified person **pronounces death** in the Chemical Room. | 3/29/11 | 1022 | | |
| TBD | Director informed of death by Special Ops Team Leader. | 3/29/11 | 1022 | | |
| TBD | Director advises Witnesses that the execution is concluded. | 3/29/11 | 1022 | | |
| TBD | Housing Unit 9 Team Leader closes the curtains. | 3/29/11 | 1022 | | |
| TBD | Housing Unit 9 Team Leader will notify Command to proceed with witness extrication. | 3/29/11 | 1022 | | |
| TBD | Team Leader instructs medical consultant to cut lines to IV's. | 3/29/11 | 1024 | | |
| TBD | CIU Investigator examines the body | 3/29/11 | 1026 | | |
| TBD | Coroner / Medial Examiner examines the body | 3/29/11 | 1026 | | |
| TBD | All team members-Special Ops remain in Chemical administration / restraint/escort rooms. Team enters and removes restraints from the inmate. The inmate is then placed on a gurney. | 3/29/11 | 1035 | | |
| TBD | Restraint / Escort Team will assist Coroner in the removal of the inmate's body. | 3/29/11 | 1035 | | |
| TBD | Body placed in Coroner's vehicle. | 3/29/11 | 1035 | | |
| TBD | All teams perform any clean-up chores. | 3/29/11 | 1040 | | |
| TBD | Housing Unit 9 Team Leader gives directive to secure the Execution Facility. | 3/29/11 | 1050 | | |

Housing Unit 9 Team Leader                    ?-30-11

# SPECIAL OPERATIONS CHECKLIST

DFS' 26(a)(1) Disclosures & Responses to RFP's 02805

Special Operations: Checklist
Page 1 of 5

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| **DAY PRIOR TO EXECUTION** | | | | | |
| 2200 | Restraint Team prepares inmate for transport from Browning Unit to Housing Unit 9. | 10/25/10 | 2100 | | |
| 2230 | Restraint Team transports inmate from Browning Unit to Housing Unit 9 in Central Unit. | 10/25/10 | 2136 | | |
| 2235 | Inmate is secured in cell in Housing Unit 9 and first Continuous Observation Team takes charge of condemned (1 supervisor / 2 staff) - Code-4's called in every 20 minutes. | 10/25/10 | 2205 | | |
| 2245 | Inmate is offered hygiene supplies | 10/25/10 | Never requested | | |
| 2300 | All hygiene supplies are removed from inmate's holding cell. | 10/25/10 | N/A | | |
| 2300 | Inmate may be offered a mild sedative. (Only if requested) | 10/25/10 | 2355 | | |
| **EARLY MORNING OF EXECUTION** | | | | | |
| 0300 | First Observation Team relieved. Second Team starts continuous observation. | 10/26/10 | 0300 | | |
| 0530 | The inmate shall be offered a light meal. All eating utensils and remaining food will be removed upon completion of the meal. | 10/26/10 | 0600 | | |
| 0600 | Housing Unit 9 Team Leader will authorize Execution Restraint Team access to Housing Unit #9. | 10/26/10 | 0600 | | |
| 0600 | Trash removed from inmate's holding cell. | 10/26/10 | 0600 | | |
| 0600 | Housing Unit 9 Team Leader will authorize Special Ops Team access to Housing Unit 9. | 10/26/10 | 0600 | | |
| | Housing Unit 9 Team Leader will authorize Medical Personnel access to Housing Unit 9. | 10/26/10 | 0600 | | |
| | Special Ops Team will confirm camera, monitor, and audio system are functioning clearly and properly. | 10/26/10 | 0600 | | |
| | Special Ops Team will confirm EKG is operational and equipment for assigned medical staff to mark tape is functional. | 10/26/10 | 0600 | | |
| 0605 | Inmate offered hygiene supplies. | 10/26/10 | Never requested | | |
| 0620 | Hygiene supplies removed from inmate's holding cell. | 10/26/10 | N/A | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 02806

Special Operations: Checklist
Page 2 of 5

**RESTRICTED**
## SPECIAL OPERATIONS: CHECKLIST
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|-----------|-----------|-------|-------|---------------------------|-----------|
| 0630 | Second Observation Team relieved. Third Observation Team starts continuous observation. | 10/26/10 | 0700 | | |
| 0700 | Rest of Restraint Team arrives at Housing Unit 9. | 10/26/10 | 0700 | | |
| 0800 | Execution table is prepared. | 10/26/10 | 2030 | | |
| **DAY OF EXECUTION** | | | | | |
| 0800 | Execution table should be prepared at least two (2) hours prior to scheduled time of execution. | 10/26/10 | 2030 | | |
| 0830 | All items removed from inmate's cell (linen, property, etc.) | 10/26/10 | 2115 | | |
| 0900 | Housing Unit 9 Team Leader advises Director that inmate is ready for search and restraint -- request permission to proceed. | 10/26/10 | 2116 | | |
| 0900 | Condemned inmate to be placed in upper restraints by restraint / escort team after strip search | 10/26/10 | 2120 | | |
| 0905 | Restraint Team Leader notifies Housing Unit 9 Team Leader that inmate is restrained and the team is ready. | 10/26/10 | 2120 | | |
| 0905 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed with movement". | 10/26/10 | 2121 – AG's Office 2121 – Governors Office | | |
| 0905 | Housing Unit 9 Team Leader checks with Director before proceeding with movement of inmate. | 10/26/10 | 2122 | | |
| 0905 | When signaled by Housing Unit 9 Team Leader the Restraint / Escort teams remove the inmate from cell. Apply lower restraints and proceed with movement. | 10/26/10 | 2122 | | |
| 0905 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind leader. | 10/26/10 | 2125 | | |
| 0910 | Inmate secured by chest and ankle straps. Team Leader at head of table, two at arms two at feet. | 10/26/10 | 2126 | | |
| 0910 | Secure wrists with soft restraints. | 10/26/10 | 2131 | | |
| 0910 | Secure arms (maintain good circulation). | 10/26/10 | 2131 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 02807

Special Operations: Checklist
Page 3 of 5

**RESTRICTED**
**SPECIAL OPERATIONS: CHECKLIST**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0910 | Secure upper torso. | 10/26/10 | 2131 | | |
| 0910 | Secure legs (maintain good circulation). | 10/26/10 | 2131 | | |
| 0910 | Restraint / Escort Team Leader will checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | 10/26/10 | 2131 | | |
| | *Inmate Secured to Table* | 10/26/10 | 2132 | | |
| | The Warden advises the Director inmate is secure on table and request approval to proceed with medical procedure. | 10/26/10 | 2132 | | |
| | IV's are inserted into inmate's arms or a catheter is inserted into inmate's leg.  EKG equipment is hooked up to inmate.  Ensure a good flow of saline. | 10/26/10 | 2201 | | |
| 0910 | Restraint / Escort Team Leader and Housing Unit 9 Team Leader positioned in Execution room.  Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing EKG functioning. | 10/26/10 | 2201 | | |
| 0940 | Housing Unit Team Leader advises Director that medical procedure is complete. | 10/26/10 | 2201 | | |
| 0945 | Housing Unit 9 Team Leader advises Command to begin movement of witnesses to Housing Unit 9. | 10/26/10 | 2202 | | |
| 0945 | Command directs movement of witnesses to Housing Unit 9 in the following order:  Inmate Witnesses, Media Witnesses, Official Witnesses, Victim Witnesses. | 10/26/10 | 2202 <br> 2205 Inmate <br> 2207 Media <br> 2208 Official <br> 2210 Victim | | |
| 0955 | Command to Housing Unit 9 Team Leader – all witnesses are in place. | 10/26/10 | 2210 | | |
| 0955 | Housing Unit 9 Team Leader will advise Director that witnesses are in position and requests authorization to proceed. | 10/26/10 | 2210 | | |
| 0959 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed". | 10/26/10 | 2211 – <br> AG's Office <br> 2213 <br> Governors Office | | |
| 1001 | Upon receipt of permission from Director and confirmation to proceed, Housing Unit 9 Team Leader opens curtains. *Turn on audio when ready.* | 10/26/10 | 2213 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 02808

## RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1001 | Housing Unit 9 Team Leader reads the Execution Order. | 10/26/10 | 2213 | | |
| 1002 | Housing Unit 9 Team Leader asks inmate if he would like to make a last statement. | 10/26/10 | 2214 | | |
| 1002 | Inmate makes his last statement. The last statement will be summarized. *Turn off audio.* <br><br> **Last words:** <br> Well, I'd like to say thank you to my family for being here and all my friends, and Boomer Sooner." | 10/26/10 | 2214 | | |
| 1002 | Director advises Special Operations Team Leader to proceed with phase one. | 10/26/10 | 2215 | | |
| 1002 | **Phase 1:** First injection commences. Eight syringes filled with 1.25 grams each of Sodium Pentothal and sterile water. Process takes about 3 minutes. Saline flush follows.  (1-5) | 10/26/10 | 2215 | | |
| 1003 | Once first injection is complete, Special Operations Team Leader instructs medical consultant to **ensure inmate is unconscious.** Medical consultant will enter execution chamber and check inmate to confirm the inmate is unconscious. | 10/26/10 | 2218 | | |
| 1005 | *Turn on audio.* Housing Unit 9 Team Leader advises witnesses the inmate has been sedated. *Turn off audio* | 10/26/10 | 2218 | | |
| 1005 | Once inmate is confirmed unconscious by the medical consultant, Special Operations Team Leader advises Director.  Director provides order to continue to second injection. | 10/26/10 | 2219 | | |
| 1005 | **Phase 2:** Second injection commences. (6-8) Pancuronium Bromide | 10/26/10 | 2219 | | |
| 1006 | Second injection completed.  Saline flush follows. | 10/26/10 | 2221 | | |
| 1007 | **Phase 3:** Third injection commences. (9-11) Potassium Chloride | 10/26/10 | 2221 | | |
| 1008 | Third injection completed.  Saline flush follows. | 10/26/10 | 2223 | | |
| 1008 | Special Ops Team Leader advises Director when injections are complete. | 10/26/10 | 2223 | | |
| 1008 | Designated qualified person checks vital signs on EKG. | 10/26/10 | 2226 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 02809

Special Operations: Checklist
Page 5 of 5

**RESTRICTED**
**SPECIAL OPERATIONS: CHECKLIST**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| TBD | Designated qualified person **pronounces death** in the Chemical Room. | 10/26/10 | 2226 | | |
| TBD | Director informed of death by Special Ops Team Leader. | 10/26/10 | 2226 | | |
| TBD | Director advises Witnesses that the execution is concluded. | 10/26/10 | 2226 | | |
| TBD | Housing Unit 9 Team Leader closes the curtains. | 10/26/10 | 2226 | | |
| TBD | Back-up chemicals pushed into inmate. | 10/26/10 | N/A | | |
| TBD | Housing Unit 9 Team Leader will notify Command to proceed with witness extrication. | 10/26/10 | 2227 | | |
| TBD | Special Operations Team Leader advises Director back up chemicals are completed. Team Leader instructs medical consultant to cut lines to IV's. | 10/26/10 | 2231 2232 (Complete) | | |
| TBD | CIU Investigator examines the body | 10/26/10 | 2233 | | |
| TBD | Coroner / Medial Examiner examines the body | 10/26/10 | 2233 2237 (complete) | | |
| TBD | All team members-Special Ops remain in Chemical administration / restraint/escort rooms. Team enters and removes restraints from the inmate. The inmate is then placed on a gurney. | 10/26/10 | 2237 2241 (Complete) | | |
| TBD | Restraint / Escort Team will assist Coroner in the removal of the inmate's body. | 10/26/10 | 2241 | | |
| TBD | Body placed in Coroner's vehicle. | 10/26/10 | 2242 | | |
| TBD | All teams perform any clean-up chores. | 10/26/10 | 2243 | | |
| TBD | Housing Unit 9 Team Leader gives directive to secure the Execution Facility. | 10/26/10 | 2245 | | |
| | | | | | |
| | | | | | |
| | | | | | |

Housing Unit 9 Team Leader

Date 10-26-10

DFS' 26(a)(1) Disclosures 01218



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Institution/Facility | Institutional Unit | Period Covered | | |
|---|---|---|---|---|
| ASPC–Florence | Central Unit | Hour 0800 | Date | 6/27/12 |
| **Housing Unit/Post/Duty Assignment** | | Hour 0800 | Date | 6/27/12 |
| Housing Unit 9 Section Leader | | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | | 0800 | 1115 | | | | |
| HU9 Recorder | ▮ | 0800 | 1115 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Execution table is prepared at least two hours prior to scheduled time of execution. | ▮ |
| 0916 | All items removed from inmate's cell (Linen, property, etc) | |
| 0938 | The Director picks up the red phone and calls General Counsel Joe Sciarotta and Kent Cattani from the Attorney General's office to advise we are ready to move inmate from holding cell to injection table if there are no reasons to delay procedure. | ▮ |
| 0939 | The Director informs Housing Unit 9 Section Leader to proceed with movement. | ▮ |
| 0940 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint. | |
| 0941 | Condemned inmate placed in upper restraints by restraint/escort team after strip search. | ▮ |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**
DFS' 26(a)(1) Disclosures 01219

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0944 | Restraint Team Leader notifies Housing Unit 9 Section Leader that upper restraints are applied and the team is ready. | |
| 0944 | When signaled by Housing Unit 9 Section Leader, the Restraint/Escort team removes the inmate from cell.  Lower restraints applied. | |
| 0944 | Restraint Team Leader checks with Housing Unit 9 Section Leader before proceeding with movement of inmate. | |
| 0945 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind Team Leader. | |
| 0945 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | |
| 0945 | Command directs movement of witnesses to Housing Unit 9 in the following order: Inmate Witnesses, Media Witnesses, Official Witnesses, Victim Witnesses. | |
| 0954 | Restraint/Escort Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0954 | Command advises Housing Unit 9 Section Leader that all witnesses are in place. | |
| 0954 | Housing Unit 9 Section Leader advises the Director inmate is secure on the table, all witnesses are in place, and requests approval to proceed with IV procedure. | |
| 0956 | The Director, acting upon the advise of the IV Team Leader, shall determine the catheter(s) site(s). | |
| 1003 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room.   Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing, EKG functioning. | |
| 1004 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. | |
| 1004 | The Director picks up the red phone and makes a final check with Governor's General Counsel and Attorney General's Office to ascertain if the execution may proceed. There is no reason to delay the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed". | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-8
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

DFS' 26(a)(1) Disclosures 01221

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1006 | With permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. | |
| 1007 | Housing Unit 9 Section Leader reads the Execution Order. | |
| 1008 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | |
| 1008 | Inmate makes his last statement.  ("No, I do not") | |
| 1013 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. | |
| 1037 | Director informed of death by Special Ops Team Leader. | |
| 1037 | Director advises witnesses that the execution is concluded. | |
| 1037 | Housing Unit 9 Section Leader closes the curtains. | |
| 1038 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses. | |
| 1043 | Housing Unit 9 Secton Leader instructs IV Team to cut lines to IV's | |
| 1046 | CIU Investigator examines the body. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**              DFS' 26(a)(1) Disclosures 01222

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1046 | Coroner / Medical Examiner examines the body. | |
| | | |
| 1050 | Team enters and removes restraints from the inmate. | |
| | | |
| 1055 | The inmate is placed on a gurney. | |
| | | |
| 1056 | Restraint / Escort Team assists Coroner in the removal of the inmate's body. | |
| | | |
| 1057 | Inmate's body is placed in Coroner's vehicle. | |
| | | |
| 1057 | All teams perform clean-up chores. | |
| | | |
| 1104 | The IV and Special Operations Teams participate in an informal debriefing with the Director and Division Director immediately upon completion of the event. | |
| | Division Director: Great job. Medical procedure went flawless. | |
| | New monitor process in witness room went very well. Reminder | |
| | to everyone that we need to watch how we refer to each other | |
| | in the inmate's presence (do not use names or titles). Next | |
| | training session will involve adjusting the inmate microphone. | |
| | Director: Perfect job and excellent team efforts by everyone. | |
| | Thank you all for doing a great job. | |
| | Deputy Director: Comments were made and validated regarding | |
| | the professionalism of this team.   Great job. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**                    DFS' 26(a)(1) Disclosures 01223

## Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1115 | Housing Unit 9 Section Leader gives directive to secure the Execution Facility. | ███ |
| | | |
| | End recording ███ | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09



**ARIZONA DEPARTMENT OF CORRECTIONS**

DFS' 26(a)(1) Disclosures 01224

**Correctional Service Log**

| Institution/Facility | Institutional Unit | Period Covered | |
|---|---|---|---|
| ASPC - Florence | Central Unit | Hour 0800   Date 06-27-12 | |
| Housing Unit/Post/Duty Assignment | | Hour 1054   Date 06-27-12 | |
| Housing Unit 9, Special Operations | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ▓ | 0800 | 1054 | | | | |
| SOT Recorder | ▓ | 0800 | 1054 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Special Operations and IV Teams assembled for execution of inmate:<br><br>Last: LOPEZ    First: Samuel    ADC#: 43833 | ▓ |
| 0810 | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| 0815 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | ▓ |
| 0830 | Commenced the preparation of chemicals and syringes. | |
| 0856 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0900 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 0954 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached.<br><br>Initial blood pressure:   131 / 79. | |
| 0955 | Witness Room AV feed turned on. | ▓ |

**Shift Commander's Comments:** (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01225

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0955 | IV procedure commenced. | |
| | | |
| 1003 | IV procedure completed. Primary IV catheter placed in inmate's (R) Elbow A/C | |
| | Backup IV catheter placed in inmate's (L) Elbow A/C. | |
| | | |
| 1008 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1008 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1009 12 | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1010 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1011 | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1011. | Drug protocol completed. | |
| | | |
| 1012 12 | 3 minute point: 1012 12 . Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1013 | IV Team Leader verified the inmate is sedated. | |
| | | |
| 1037 | IV Team Leader pronounced death. | |
| | | |
| | | |
| N/A | Additional entries: | |
| N/A | A. | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-8
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

DFS' 26(a)(1) Disclosures 01226

Correctional Service Log

 ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | | Institutional Unit Central Unit | | Period Covered | | |
|---|---|---|---|---|---|---|
| | | | | Hour 946 | Date 6/27/12 | |
| Housing Unit/Post/Duty Assignment Lethal Injection Room Log | | | | Hour 1006 | Date 6/27/12 | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Recorder | ■ | 946 | 1006 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 946 | Restraint team enters lethal injection room. | ■ |
| | | |
| | | |
| 946 | Legs restrained. (maintain good circulation) | ■ |
| | | |
| | | |
| 946 | Harness applied. | ■ |
| | | |
| | | |
| 947 | Remove left (hard) restraint. | ■ |
| | | |
| | | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01227

**ARIZONA DEPARTMENT OF CORRECTIONS**

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 947 | Apply left (soft) restraint. | |
| 947 | Restraint Team Member asks inmate Lopez how left restraint feels. | |
| 947 | Inmate Lopez advised good. | |
| 947 | Left arm restrained. | |
| | | |
| | | |
| | | |
| 947 | Remove right (hard) restraint. | |
| | | |
| 947 | Restraint Team Member advises inmate Lopez to arch his back (to remove belly chain). | |
| 948 | Apply right (soft) restraint. | |
| 948 | Restraint Team Member asks inmate Lopez if the right restraint feels OK | |
| 948 | Inmate Lopez advised yes. | |
| 948 | Right arm restrained. | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01228

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 948 | Remove belly chains. | |
| 949 | Restraint Team Member asks inmate Lopez if hes doing ok | |
| 949 | Inmate Lopez advises hes doing well. | |
| | | |
| 950 | Restraint Team Leader checks all restraints. | |
| 950 | Restraint Team Leader asks inmate Lopez if hes ok | |
| 950 | Inmate Lopez advises "Yes, Im doing well". Inmate Lopez then asked if the dark curtain on his right hand side is where the witnesses are. | |
| 950 | ███████ advises inmate Lopez after the ~~in~~ restraint procedure is complete she will explain the process to him. | |
| 950. | Restraint Team Member advises inmate Lopez he is going to apply EKG leads. | |
| | | |
| 951 | Inmate is restrained. | |
| 952 | ███████ advises inmate Lopez right above his head is the Microphone; when the curtains open he advises inmate Lopez where his attorneys will be seated. Inmate Lopez is then advised the IV Team will be entering the room. | |
| 952 | ███████ asks inmate Lopez if he has any questions. | |
| 952 | Inmate Lopez advises ███████ he has none at all. | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01229

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 952 | ▓▓▓▓▓ advises inmate Lopez to try and relax, and he's doing OK. He also advises him if he has any questions he can ask the gentleman standing at the head of the table. | |
| 954 | Restraint Team Leader asks inmate Lopez if he's doing OK. | |
| 954 | Inmate Lopez advises yes. | |
| 954 | Inmate Lopez asks Restraint Team Leader if his reins look alright. | |
| 954 | Restraint Team Leader advises inmate Lopez the IV Team will make that assessment. | |
| 955 | IV Team enters lethal injection room, and conducts vein assessment | |
| 955 | IV Team Leader advises inmate Lopez they (IV Team) are here to conduct the vein assessment and they will advise before they do anything that will be uncomfortable. | |
| 956 | Restraint Team Leader advises inmate Lopez he is doing good. | |
| 956 | Inmate Lopez asks the IV Team if they (rein in arms) look alright. | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS                    DFS' 26(a)(1) Disclosures 01230

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 95ϵ | IV Team explains IV procedure to the inmate. | |
| 95ϵ | IV Team begins primary (right side). Inmate Lopez is advised this in the tourniquet, and he will feel a cold sensation and then a poke. | |
| 1000 | IV Team begins secondary (left side). Inmate Lopez is advised they are going to do the same as they did on the right side. | |
| 1000 | Restraint Team Leader advises inmate Lopez he's doing good. | |
| 1002 | Inmate Lopez says he has a question for the IV Team. He asks if those are the only two IV lines that are going to be inserted. | |
| 1002 | IV Team Member advises "yes sir." | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:   *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

DFS' 26(a)(1) Disclosures 01231

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1002 | IV Team exits the lethal injection room. | ███ |
| 1003 | ███████ advises inmate Lopez IV Procedure is complete. He then advises inmate Lopez this team (Restraint Team) will leave the room and the Warden will enter and read read the Warrant. | |
| 1004 | Inmate Lopez then says "I know you guys are just doing your job, and you don't like doing this." | |
| 1004 | ███████ tells inmate Lopez we appreciate his cooperation and we try to do this in the most humane way possible. | |
| | | |
| | | |
| 1006 | Restraint Team exits the lethal injection room. | ███ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered | | |
|---|---|---|---|---|
| ASPC-Florence | Central Unit | Hour 0900 | Date 2/29/12 | |
| Housing Unit/Post/Duty Assignment | | Hour 1100 | Date 2/29/12 | |
| Housing Unit 9 Section Leader | | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | ■ | 0600 | 1100 | | | | |
| HU9 Recorder | ■ | 0830 | 1100 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0915 | Execution table is prepared at least two hours prior to scheduled time of execution. | ■ |
| 0915 | All items removed from inmate's cell (Linen, property, etc) | ■ |
| 0930 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; request permission to proceed. | ■ |
| 0939 | Condemned inmate to be placed in upper restraints by restraint/escort team after strip search. | ■ |
| 0939 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready. | ■ |
| 0940 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed.  If there is no delay in the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed with movement". | ■ |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0940 | When signaled by Housing Unit 9 Section Leader, the Restraint/ Escort team removes the inmate from cell. Apply lower restraints and proceed with movement. | |
| 0942 | Restraint Team Leader checks with Housing Unit 9 Section Leader before proceeding with movement of inmate. | |
| 0942 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind Team Leader. | |
| 0950 | Inmate secured by chest and ankle straps, Team Leader at head of table, two at arms, two at feet. | |
| 0950 | Secure wrists with soft restraints. | |
| 0950 | Secure arms (maintain good circulation). | |
| 0950 | Secure upper torso. | |
| 0950 | Secure legs (maintain good circulation). | |
| 0950 | Restraint/Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0951 | Housing Unit 9 Section Leader advises the Director inmate is secure on table and requests approval to proceed with IV procedure. | |
| 0955 | The Director, acting upon the advise of the IV Team Leader, shall determine the catheter(s) site(s). | |
| 1005 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room.  Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing, EKG functioning. | |
| 1005 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. | |
| 1008 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | |
| 1009 | Command directs movement of witnesses to Housing Unit 9 in the following order: Inmate Witnesses, Media Witnesses, Official Witnesses, Victim Witnesses. | |
| 1019 | Command advises Housing Unit 9 Section Leader that all witnesses are in place. | |
| **Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)* | | |

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1019 | Housing Unit 9 Section Leader advises Director that witnesses are in position and requests authorization to proceed. | |
| 1019 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed". | |
| 1021 | With permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. | |
| 1022 | Housing Unit 9 Section Leader reads the Execution Order | |
| 1022 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | |
| 1023 | Inmate makes his last statement. | |
| 1028 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. | |
| 1033 | Director informed of death by Special Ops Team Leader. | |
| 1033 | Director advises witnesses that the execution is concluded. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1033 | Housing Unit 9 Section Leader closes the curtains. | |
| 1034 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses. | |
| 1040 | Housing Unit 9 Secton Leader instructs IV Team to cut lines to IV's | |
| 1041 | CIU Investigator examines the body. | |
| 1041 | Coroner / Medical Examiner examines the body. | |
| 1050 | Team enters and removes restraints from the inmate. The inmate is placed on a gurney. | |
| 1051 | Restraint / Escort Team assists Coroner in the removal of the inmate's body. | |
| 1052 | Inmate's body is placed in Coroner's vehicle. | |
| 1053 | All teams perform clean-up chores. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1055 | The IV and Special Operations Teams will participate in an | ■■■ |
| | informal debriefing with the Director and Division Director | |
| | immediately upon completion of the event. | |
| | 1) Special Ops Team Leader - lines need to be only as long as | |
| | they need to be. When hooked up they will be shortened down so | |
| | we don't have excess. | |
| | 2) Push back picking up the inmate at Browning by 15 minutes. | |
| | 3) Director. Good job by everyone. Took care of States business and | |
| | did it professionally | |
| 1100 | Housing Unit 9 Section Leader gives directive to secure the | ■■■ |
| | Execution Facility. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09



**Correctional Service Log**

| Institution/Facility | Institutional Unit | Period Covered | |
|---|---|---|---|
| ASPC - Florence | Central Unit | Hour 0640  Date 02-29-12 | |
| | | Hour 1050  Date 02-29-12 | |

Housing Unit/Post/Duty Assignment

Housing Unit 9, Special Operations

| Staff Member (Last, First M.I. and Title) | Staff | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ███ | 0640 | 1050 | | | | |
| SOT Recorder | ███ | 0640 | 1050 | | | | |
| | ███ | | | | | | |
| | ███ | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0640 | Special Operations and IV Teams assembled for execution of inmate | ████ |
| 0852 | Audio, visual, and medical equipment inspected. | ████ |
| 0904 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | ████ |
| 0907 | Commenced the preparation of chemicals and syringes. | |
| 0921 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0921 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 0949 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached.   Initial blood pressure:  145 / 77 | |
| 0956 | IV procedure commenced. | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

## Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1006 | IV procedure complete. Primary IV catheter placed in inmate's *LEFT Periphial* Backup IV catheter placed in inmate's *Right Periphial* | |
| | | |
| 1023 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1023 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1024²⁴ | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1025 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1026 | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1026 | Drug protocol completed. | |
| | | |
| 1027²⁴ | 3 minute point: _1027²⁴_. Confirmed 3 minutes have elapsed since commencing the administration of chemicals. | |
| | | |
| 1028 | IV Team Leader assessed consciousness and confirmed the inmate is sedated | |
| | | |
| 1033 | IV Team Leader pronounces death. | |
| | | |
| | Additional entries: *NONE* | |
| | A. *N/A* | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered | |
|---|---|---|---|
| ASPC - Florence | Central Unit | Hour 0700  Date 10/09/13 | |
| Housing Unit/Post/Duty Assignment | | Hour 1015  Date 10/09/13 | |
| Housing Unit 9, Special Operations | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | | 0700 | 1015 | | | | |
| SOT Recorder | | 0700 | 1015 | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0700 | Special Operations and IV Teams assembled for execution of inmate: Last: _Ichad_  First: _Edward_  ADC#: _40496_ | |
| 0715 | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| 0757 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| 0758 | Commenced the preparation of chemicals and syringes. | |
| 0812 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0815 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 0931 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. Initial blood pressure: _124/72_ | |
| 0936 | Witness Room AV feed turned on. | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-8
8/6/09

## Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0937 | IV procedure commenced. | |
| | | |
| 0948 | IV procedure completed. Primary IV catheter placed in inmate's ⓇA/C | |
| | Backup IV catheter placed in inmate's ⓁA/C | |
| | | |
| 1003 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1003 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1004⁴⁸ | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1005 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1006 | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1007 | Drug protocol completed. | |
| | | |
| 1007⁴⁸ | 3 minute point: _1007⁴⁸_.  Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1008 | IV Team Leader verified the inmate is sedated. | |
| | | |
| 1012 | IV Team Leader pronounced death. | |
| | | |
| | | |
| N/A | Additional entries: | |
| N/A. | A. | |
| | | |
| | | |

| Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)* |
|---|
| |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

 ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | | | Institutional Unit Central Unit | | Period Covered | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Hour 927 | | Date 10/9/13 | |
| Housing Unit/Post/Duty Assignment Lethal Injection Room Log | | | | | Hour 1001 | | Date 10/9/13 | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Recorder | ■ | 927 | 1001 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 927 | Restraint team enters lethal injection room. | |
| 927 | RTL asks inmate Schad if he's alright. Inmate replies with yes. | |
| | RTM advises inmate Schad of the process. | |
| 928 | Legs restrained. (maintain good circulation) | |
| | | |
| | | |
| | | |
| 928 | Harness applied. | |
| 928 | RTM asks inmate Schad if he's alright. Inmate replies with yes. | |
| | | |
| 928 | Remove left (hard) restraint. | |
| | | |
| | | |
| | | |

| Shift Commander's Comment: (Notes or comments concerning entries above; comments deemed appropriate) |
|---|
| |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 929 | Apply left (soft) restraint. | |
| 929 | RTM asks inmate Schad if that feels OK. Inmate replies with yes. | |
| 929 | Left arm restrained. | |
| | | |
| | | |
| 929 | Remove right (hard) restraint. | |
| 929 | RTL advises inmate Schad they will be doing the same thing to his right arm. | |
| 930 | Apply right (soft) restraint. | |
| 930 | RTM asks inmate Schad if that feels OK. Inmate replies with yes. | |
| 930 | Right arm restrained. | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 930 | Remove belly chains. | |
| 930 | Inmate Schad states that he has good veins. | |
| 930 | RTL advises inmate Schad that he is going to have to shave him a little. | |
| 931 | Inmate Schad advises the RTL to do what he has to do. | |
| 932 | RTM asks inmate Schad if he's still doing alright. Inmate Schad replies with yes I'm fine. | |
| 933 | DO asks Inmate Schad how he's doing. Inmate Schad advises he's doing good. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0933 | Restraint Team Leader checks all restraints. | |
| 0934 | DD advises inmate Schad that the IV Team will be entering the room and will explain everything to him; and advises him to do what they say. Inmate replies with yes Sir. | |
| 0934 | Inmate is restrained. | |
| 0936 | RTL asks inmate Schad if he's still doing OK. Inmate replies with yes. | |
| | | |
| | | |
| | | |
| 0936 | IV Team enters lethal injection room, and conducts vein assessment | |
| 0936 | IV TL advises inmate Schad they are here to do the IV procedure assessment of his veins. | |
| 0937 | Inmate Schad advises the IVTL that his veins should be good; the only time they were used was to give blood. | |
| 0937 | IVTM advises inmate Schad to make a fist | |
| 0937 | IVTL states they will be back. | |
| 0937 | Inmate Schad states he's not going anywhere. | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0938 | IV Team explains IV procedure to the inmate. | |
| 0939 | IVTM advises inmate Schad they are going to go ahead and try on his inner elbow first. Inmate Schad states OK. | |
| 0940 | IVTM advises inmate Schad he is going to put on a tourniquet and that it's going to be tight for a minute. Inmate Schad replies with OK. | |
| 0940 | IVTM asks a RTM to remove the cuff | |
| 0940 | IVTM advises inmate Schad that he's going to feel a little stick and for him to try not to move | |
| 0941 | IVTM advises inmate Schad that his veins are good. | |
| 0941 | Inmate Schad states thats what he's been told. | |
| 0942 | RTM asks Special Ops to check the flow. | |
| 0942 | IVTL advises to cut the flow; were flowing. | |
| 0942 | IVTM advises inmate Schad that he's going to do the same thing on this side - apply tourniquet, and while he's getting things ready for him to pump his fist. | |
| 0944 | IVTM advises inmate Schad that he's going to feel a little stick | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 945 | RTL asks inmate Schad if hes doing OK. Inmate Schad replies with yes, oh yeah. | |
| 946 | IVTM advises its not working | |
| 946 | IVTL advises IVTM to go a little higher. | |
| 946 | IVTM advises inmate Schad hes going to feel a little stick | |
| 947 | RTM asks Special ops to check the flow | |
| 947 | RTM asks inmate Schad if hes doing OK. Inmate replies with yes. | |
| 948 | IVTL advises inmate Schad he did fine and thanked him for his cooperation. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| 9u8 | IV Team exits the lethal injection room. | |
| 949 | DO advises inmate Schad she did very well and in nine minutes he will get this started. He then advises inmate Schad what will occur next: the Warden will come in, the curtains will open, he will see his attorney, media, and official witnesses. He is also advised where the microphone is in case he would like to give his last words. Lastly, he's advised if he needs anything to advise the RTL. | |
| Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)* | | |
| | | |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 951 | Inmate Schad states OK. | |
| 951 | Inmate Schad asks the RTL if his blood is all over. When this is done at the hospital his blood just goes all over the place. | |
| 951 | RTL asks inmate Schad if he's doing OK. Inmate states yes. | |
| 954 | RTL asks inmate Schad how he's doing. Inmate Schad states he's doing fine. | |
| 954 | RTL advises inmate Schad he's done well this whole time. Inmate Schad replies with I appreciate it. | |
| 1000 | RTL asks inmate Schad if he's still doing OK. Inmate states yes. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1001 | Restraint Team exits the lethal injection room. | ■ |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | | | | Institutional Unit Central Unit | | Period Covered | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Hour _____ 0800 _____ Date _____ 12/05/2012 _____ | | |
| Housing Unit/Post/Duty Assignment Housing Unit 9 Section Leader | | | | | | Hour _____ 1145 _____ Date _____ 12/05/2012 _____ | | |
| Staff Member *(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed | Staff Member *(Last, First M.I. and Title)* | | Staff Initials | Time Arrived | Time Departed |
| HU9 Section Leader | | 0800 | 1145 | | | | | |
| HU9 Recorder | | 0800 | 1145 | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Execution table is prepared at least two hours prior to scheduled time of execution. | |
| 0911 | Director makes initial calls to the Governor's General Counsel and Attorney General's office brief counsel on status of event procedures. | |
| 0930 | All items are removed from inmate's cell (Linen, property, etc) | |
| 0931 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; requests permission to proceed. Director grants permission to proceed. | |
| 0938 | Inmate placed in upper restraints by restraint/escort team after strip search. | |
| 0938 | Director makes call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution. Per Governor's General Counsel, at this time there is no reason to not proceed. | |
| 0939 | Director makes call to the Attorney General's office to ascertain if there are any reasons to not proceed with the execution. Per Attorney General's office, at this time there is no reason to not proceed. | |
| 0940 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready to move the inmate to the injection room. | |

Page **1** of 4

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 0940 | The Director informs Housing Unit 9 Section Leader (proceed with movement of inmate to the injection room). |
| 0940 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9 witness room. |
| 0942 | Inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Restraint Team Leader behind.  Support staff behind Restraint Team Leader |
| 0952 | Command advised Housing Unit 9 Section Leader that all witnesses are in place. Housing Unit 9 Section Leader advises Director witnesses are in place. |
| 0952 | Housing Unit 9 Section Leader advises the Director the inmate is secure on the table and ready for the IV procedure. Director grants permission to proceed. |
| 0956 | Acting upon the advice of the IV Team Leader, the Director determines the catheter site(s). |
| 1047 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution Room. Special Ops Team Leader inside the Chemical Room.  Inmate is secured to the table with IV flowing, EKG functioning. |
| 1047 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. |
| 1048 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution.  Per Governor's General Counsel, at this time there is no reason to not proceed. |
| 1049 | Director makes initial call to the Attorney General's office to ascertain if there are any reasons to not proceed with the execution.  Per Attorney General's office, at this time there is no reason to not proceed. |
| 1050 | The Director informs Housing Unit 9 Section Leader "we may proceed". |
| 1051 | Restraint/Escort Team moves back to holding area, Restraint Team Leader at the Execution Room door. All items not part of the event is removed from the Execution Room. |
| 1052 | With permission from the Director and confirmation to proceed, Housing Unit 9 Section Leader opens the curtains. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time | Description |
|------|-------------|
| 1052 | Housing Unit 9 Section Leader reads the Execution Order. |
| 1052 | Housing Unit 9 Section Leader asks the inmate if he would like to make a last statement. |
| 1057 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. |
| 1112 | Director informed of death by Special Ops Team Leader. |
| 1112 | Director advises witnesses that the execution is concluded. |
| 1112 | Housing Unit 9 Section Leader closes the curtains. |
| 1113 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses from Delta Staging. |
| 1113 | Director makes calls to the Governor's General Counsel and Attorney General's office and advises the execution is concluded. |
| 1120 | Housing Unit 9 Section Leader instructs IV Team to cut lines to IV's. |
| 1121 | CIU Investigator examines the body. |
| 1121 | Coroner/Medical Examiner examines the body. |
| 1130 | Team enters and removes restraints from the inmate and places inmate on a gurney. |
| 1131 | Restraint/Escort Team assists Coroner in the removal of the inmate's body. |
| 1133 | All Teams perform clean up duties. |
| 1134 | The IV Team and Special Operations Team participate in an informal debriefing with the Director and Division Director. |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 45 | Housing Unit 9 Section Leader gives directives to secure the Execution Facility. | |
|---|---|---|
| | | |
| / | End log. | |



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered | |
|---|---|---|---|
| ASPC - Florence | Central Unit | Hour 0730 | Date 12-05-12 |
| Housing Unit/Post/Duty Assignment | | Hour 1130 | Date 12-05-12 |
| Housing Unit 9, Special Operations | | | |

| Staff Member (Last, First M.I. and Title) | Staff | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ▮ | 0730 | 1130 | | | | |
| SOT Recorder | ▮ | 0730 | 1130 | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0730 | Special Operations and IV Teams assembled for execution of inmate: | |
| | Last: STOKLEY   First: RICHARD D.   ADC#: 092408 | |
| 0759 | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| 0815 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| 0830 | Commenced the preparation of chemicals and syringes. | |
| 0849 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0850 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 0945 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached.   Initial blood pressure: 160 / 86 | |
| 0953 | Witness Room AV feed turned on. | |

Shift Commander's Comments: (Notes or comments concerning entries above; comments deemed appropriate)

Page 1 of 3

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

## Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0953 | IV procedure commenced. | |
| | | |
| 1047 | IV procedure completed. Primary IV catheter placed in inmate's ℞ FEMOROl | |
| | Backup IV catheter placed in inmate's ℞ ForEArm. | |
| | | |
| 1052 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1053 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1053 40 | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1054 | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1054. | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1055 | Drug protocol completed. | |
| | | |
| 1056 40 | 3 minute point: _1056 40_.  Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1057 | IV Team Leader verified the inmate is sedated. | |
| 1102 | Internal Defibrillator Discharged | |
| 1112 | IV Team Leader pronounced death. | |
| | | |
| | | |
| N/A | Additional entries: | |
| N/A. | A. | |
| | | |
| | | |
| | | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

## Correctional Service Log

| me of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1052 | Inmate States "Send it on through" | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

ît Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log



ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | | Institutional Unit Central Unit | | Period Covered Hour 942 Date 12/5/12 | | | |
|---|---|---|---|---|---|---|---|
| Housing Unit/Post/Duty Assignment Lethal Injection Room Log | | | | Hour 1050 Date 12/5/12 | | | |
| Staff Member *(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed | Staff Member *(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed |
| HU9 Recorder | ▮ | 942 | 1050 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 942 | Restraint team enters lethal injection room. | |
| | | |
| | | |
| | | |
| 942 | Legs restrained. (maintain good circulation) | |
| 943 | I/M - RTL - Who is the Phlebotomist cause I have a joke for them | |
| | | |
| 943 | Harness applied. | |
| | | |
| | | |
| | | |
| 943 | Remove left (hard) restraint. | |
| | | |
| | | |
| | | |

Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| auu | Apply left (soft) restraint. | |
| | | |
| | | |
| | | |
| auu | Left arm restrained. | |
| 944 | RTL - I/m - Hows that feel? | |
| 944 | I/m - RTL - I'M OK | |
| | | |
| 944 | Remove right (hard) restraint. | |
| auu | RTL - I/m - Is that OK? | |
| 944 | I/m - RTL - Its ▮▮ firm but not cutting anything off. | |
| | | |
| 944 | Apply right (soft) restraint. | |
| 944 | RTM - I/m - I'm going to open your shirt. | |
| 945 | I/m - RTM - Thats alright; I'm fine. | |
| | | |
| 945 | Right arm restrained. | |
| 946 | RTM - I/m - I'm going to have to shave a little bit of hair off. | |
| 946 | I/m - RTM - Take all you want | |
| 946 | I/m - RTL - Restraint on the right is a little tight. | |
| 946 | RTL - I/m - We'll adjust once we get the EKG hooked up. | |
| | | |
| | Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)* | |
| | | |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0447 | Remove belly chains. | |
| 0448 | Re-adjusted right restraint | |
| 0448 | RTL-I/M - Is that better? | |
| 0449 | I/M-RTL - Yes its OK. It was just tight around the bicep | |
| 0449 | Restraint Team Leader checks all restraints. | |
| 0449 | ▄▄▄ I/M. In a few minutes the IV team will come in to assess your veins. | |
| 0450 | I/M -I just want to say two things. I have ▄▄ Hepatitas C and take Coumadin which may make my blood like water. They need to find a vein. | |
| 0450 | RTL-I/M- The IV Team will be in to assess | |
| 0450 | I/M-RTL- just dont want anyone getting Hepatitas | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0950 | Inmate is restrained. | ███ |
| 0952 | ████ I/m - Are you OK? | |
| 0952 | I/m - ████ - I'm great | |
| 0952 | ████ discusses the process with the I/m. He advises him where his attorney will be sitting when the curtains opens; advises him he will have an opportunity for last words and advises him where the microphone is located. ████ asks the I/m if he has any questions | ███ |
| L,2 | I/m- ████ no. Tell the IV Team I have a Phlebotomy joke for them. | |
| ████ | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| 0953 | IV Team enters lethal injection room, and conducts vein assessment | ███ |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 953 | IV TL- I/m- Hello Sir. We're here to do an assessment. We heard what you said about Hepatitas C. Thank you; we take precautions with that. | |
| 955 | I/m- IV TL- Did you hear about the Phlebotomist who wrote the romance novel? The two corpuscles fell in love in vein. | |
| 955 | IV TM- I/m - just rotate your arm. | |
| 956 | RTL- I/m - Are you OK? | |
| 9:56 | I/m- RTL- Sure. I grew up a long time ago. Wish I could die doing something meaningful -you know | |
| 957 | RTL- I/m- your doing good- just relax. | |
| 957 | I/m- RTL- No problem. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment:   (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0957 | IV Team explains IV procedure to the inmate. | |
| | Looks like you have pretty good veins. We're gonna do a little shave with the razor. | |
| 0958 | IVTM-IM- because of your Coumadin I'm getting everything in place. | |
| 0958 | IM-IVTM- My blood just comes out like water. | |
| 0958 | IVTM-IM - gonna be a little tight. A little stick here. Try and relax a little. It's going to feel like a bee sting. I'll take the pressure off when I get the line. | |
| 1001 | IM-IVTM- thats OK, it doesn't bother me. | |
| 1001 | IVTL-IM- you did good on that one. | |
| 1002 | IVTL-IM- we're going to do the same thing on this side. It's gonna be a little tight and your going to feel coolness. | |
| 1003 | RTM-SO- Do you have a sharps container. | |
| 1004 | IVTL- May have to go a little higher on this side. | |
| 1005 | IVTL-IM- Is this side usually more fragile. | |
| 1005 | IM-IVTL - I dont know. I usually have them do butterflys. It usually depends on who does it. | |

Shift Commander's Comment:  (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| | Orientals make the best phlebotomists. | |
| 1007 | IVTM- this sides really weak. As soon as you hit them they pop. | |
| 1008 | IVTL -IVTM- go a little higher on the bicep. | |
| 1009 | IVTL IVTM - looks good. Anything on the other side. | |
| 1011 | I/M- thats a first for me. I didnt know there was one up there. | |
| 1011 | IVTL I/M- We usually dont go up that far if we can find ones on the arm. | |
| 1018 | IVTM- I/M- Have you ever been on Prednisone? | |
| 1018 | I/M- IVTM- I've been in the hospital alot and I dont always know what medicine I'm on. | |
| 1013 | IVTL I/M- left side is weak and is not going to work. | |
| 1013 | I/M- IVTL - I had a fracture one time. | |
| 1014 | IVTL I/M- We can try another one on the right side or go for the big one on the thigh. With that we'll give you a little anesthesia. | |
| 1015 | IVTM- IVTL- Do you want me to keep trying or go for femoral. | |

Shift Commander's Comment:  *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1016 | IVTL-IVTM- Let me go talk with the Director. | |
| 1017 | IM- feels like there's something under my achilles tendon. | |
| 1018 | RTL-IM- It's probably the restraint. | |
| 1018 | IVTL-IM- We're going to mobolize the vessel. That will allow us to make sure we are in the right spot. After that you will get a local anesthesia. | |
| 1019 | IM- My left wrist is real uncomfortable. | |
| 1020 | RTL-IM- After the IV is done we will adjust. | |
| ..20 | IVTL-IM- We're gonna cut up the wonderful drawers they gave you. Dont worry we'll be modest. | |
| 1021 | IM laughed. | |
| 1024 | RTM-IVTL- Do you want us to adjust his legs for you. | |
| 1025 | IVTL-RTM- yes. | |
| 1028 | IVTL-IM - Your going to feel a little sting, like a bee sting. | |
| 1028 | IM-IVTL- I appreciate that; Ive always hated needles. | |

Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken:   Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1028 | IVTL-IM- Going to start with a little one. A little bee sting. We're going to make this as painless as possible. A little more anesthesia in. Going to let that get good and numb while I do some more preparations. | |
| 1031 | RTL-IM- You doing OK. | |
| 1031 | IM-RTL- Yes. | |
| 1033 | IVTL-IM- Your going to feel a little pressure now. | |
| 1033 | IM- IVTL  I felt it. | |
| 4 | IVTL-IM- What do you feel? | |
| 1034 | IV-IVTL- Its just a real sensitive area. A little pain up there. It stings. | |
| 1034 | RTL-IM- Your doing good. | |
| 1034 | IVTL-IM- OK we're in. We're going to take the needle out now. Thats the worst of it. You may feel a little pressure now. | |
| 1037 | IM-IVTL- Thats OK. | |
| 1038 | IM- There's something in the middle of my eyeball and nose. Is there lint there? | |
| 1038 | IVTL-IM- Sewing this in so I dont have to put | |

Shift Commander's Comment:   *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| | him through that a second time. | |
| 1040 | ▓▓ IM-IVTL- That's good (and laughed). I'm having | |
| | a real problem not passing gas. | |
| 1043 | IVTL-IVTM- Checking flows. | |
| 1044 | RTM-SO - Check flow on primary. | |
| 1045 | ▓▓▓▓ -RTM- Have them change the | |
| | bandage on the left side | |
| 1046 | RTM- Re-adjusted left restraint. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment: (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log
ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1047 | IV Team exits the lethal injection room. | |
| 1048 | RTL- Im- Still doing OK | |
| 1048 | Im- RTL- yeah | |
| 1048 | Im- How long does it take that drug to work? | |
| 1049 | RTM- Im- not long. | |
| 1049 | Im - Still worried about that thing regulating my heart. | |
| 1049 | RTM- Im- you'll be OK. | |
| 1049 | Im- ulf I wake up it aint on purpose. | |
| | | |
| | | |
| | | |
| 1050 | Restraint Team exits the lethal injection room. | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comment: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09



# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| Institution/Facility | Institutional Unit | Period Covered |
|---|---|---|
| ASPC - Florence | Central Unit | Hour 0730 Date 03-08-12 |
| Housing Unit/Post/Duty Assignment | | Hour 1141 Date 03-08-12 |
| Housing Unit 9, Special Operations | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | ■ | | | | | | |
| SOT Recorder | ■ | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0730 | Special Operations and IV Teams assembled for execution of inmate ROBERT TOWERY ADC # 051550 | |
| 0748 | Audio, visual, and medical equipment inspected. | |
| 0800 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| 0840 | Commenced the preparation of chemicals and syringes. | |
| 0856 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0858 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 0947 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. Initial blood pressure: 141/69 | |
| 0952 | IV procedure commenced. | |

Shift Commander's Comments: (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/6/09

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff |
|---|---|---|
| 1059 | IV procedure complete. Primary IV catheter placed in inmate's *Right* | |
| | *Femoral* Backup IV catheter placed in inmate's *Right Hand*. | |
| | | |
| 1117 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1117 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1118 ⁰¹⁰ | • **Syringe 2A, 2.5 gm Pentobarbital** | |
| 1118. | • **Syringe 3A, 2.5 gm Pentobarbital** | |
| 1119. | • **Syringe 4A, 60 mL Heparin/Saline** | |
| 1119. | Drug protocol completed. | |
| | | |
| 1121 ¹⁰ | 3 minute point: _1122 ¹⁰_ . Confirmed 3 minutes have elapsed since | |
| | commencing the administration of chemicals. | |
| | | |
| 1122 | IV Team Leader assessed consciousness and confirmed the inmate is sedated | |
| | | |
| 1126. | IV Team Leader pronounces death. | |
| | | |
| | | |
| | Additional entries: *N/A.* | |
| | A. | |
| | | |
| | | |
| | | |
| | | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-8
8/8/09



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Institution/Facility<br>ASPC-Florence | Institutional Unit<br>Central Unit | Period Covered |
|---|---|---|
| | | Hour 0900  Date 03/08/12 |
| Housing Unit/Post/Duty Assignment<br>Housing Unit 9 Section Leader | | Hour 1205  Date 03/08/12 |

| Staff Member<br>(Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member<br>(Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | ■ | 0600 | 1205 | | | | |
| HU9 Recorder | ■ | 0830 | 1205 | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0900 | Execution table is prepared at least two hours prior to scheduled time of execution. | |
| 0930 | All items removed from inmate's cell(linen, property, etc.) | |
| 0930 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; request permission to proceed. | |
| 0930 | Condemned inmate to be placed in upper restraints by restraint/escort team after strip search. | |
| 0935 | Director's briefing:<br>Inmate Towery's attorney told him to ask the Director two questions –<br>1) What is the protocol?  2)Where were the drugs obtained?<br>Inmate Towery stated it was not necessary but in order to console the inmate the Director answered both questions.<br>The Director asked inmate Towery if he received the letter | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-8
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| ime of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| | advising the protocol to be used. Inmate Towery acknowleged | |
| | the letter he received advising the one drug protocol would | |
| | be used. The Director advised inmate Towery the chemicals | |
| | were lawfully obtained in the United States. Deacon Sheffer | |
| | had avised the Director earlier that inmate Towery was in a | |
| | good place and he had asked inmate Towery to cooperate. | |
| | | |
| | | |
| 0938 | Restraint Team Leader notifies Housing Unit 9 Section Leader | |
| | that inmate is restrained and the team is ready. | |
| | | |
| | | |
| 0939 | The Director picks up the red phone and makes a check to | |
| | ascertain if the execution may proceed.  If there is no delay | |
| | in the procedure, the Director informs Housing Unit 9 Section | |
| | Leader, "We may proceed with movement." | |
| | | |
| | | |
| 0940 | When signaled by Housing Unit 9 Section Leader, the Restraint | |
| | Escort team removes the inmate from cell; apply lower | |
| | restraints and proceed with movement. | |
| | | |
| | | |
| 0940 | Restraint Team Leader checks with Housing Unit 9 Section | |
| | Leader before proceeding with movement of inmate. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-0
8/8/09

# ARIZONA DEPARTMENT OF CORRECTIONS

## Correctional Service Log

| ne of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| | | |
| | | |
| 0940 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides; Team Leader behind. Support staff behind Team Leader. | |
| | | |
| 0948 | Inmate secured by chest and ankle straps; Team Leader at head of table, two at arms, two at feet. | |
| 0948 | Secure wrists with soft restraints. | |
| | | |
| 0948 | Secure arms (maintain good circulation). | |
| | | |
| 0948 | Secure upper torso. | |
| | | |
| 0948 | Secure legs (maintain good circulation). | |
| | | |
| 0949 | Restraint/Escort Team Leader checks all restraints.  Team moves back to holding area, Team Leader at door.  Remove any item not part of the event. | |
| | | |
| 0949 | Housing Unit 9 Section Leader advises the Director inmate is secure on table and requests approval to proceed with IV procedure. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 0952 | The Director, acting upon the advice of the IV Team Leader, shall determine the catheter(s) site(s). | ████ |
| 1028 | After multiple attempts of the left and right peripheral - (approximately 4 in right - 2 in left), IV Team Leader recommended right femoral as primary and left peripheral as back- up. | ████ |
| 1031 | Director calls the Attorney General's Office and provides an update regarding the IV process | ████ |
| 1037 | The Director spoke with Jeff Zick at the Attorney General's Office. | ████ |
| 1050 | Right femoral was successful;left peripheral was unsuccessful Discussion held with the Director and the IV Team Leader regarding back-up catheter. Right hand peripheral was decided as back-up and was successful at 1059. | ████ |
| 1059 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room. Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing, EKG functioning. | ████ |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1059 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. | |
| 1103 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | |
| 1104 | Command directs movement of witnesses to Housing Unit 9 in the following order: Inmate Witnesses, Media Witnesses, Official Witnesses, Victim Witnesses. (no victim witnesses attend) | |
| 1113 | Command advises Housing Unit 9 Section Leader that all witnesses are in place. | |
| 1113 | Housing Unit 9 Section Leader advises Director that witnesses are in position and requests authorization to proceed. | |
| 1114 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed.  If there is no delay in the procedure, the Director informs Housing Unit 9 Section Leader, "We may proceed." | |
| 1115 | With permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. | |

Shift Commander's Comments: (Notes or comments concerning entries above; comments deemed appropriate)

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| me of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1115 | Housing Unit 9 Section Leader reads the Execution Order. | |
| 1116 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | |
| 1117 | Inmate makes his last statement. | |
| 1122 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. | |
| 1126 | Director informed of death by Special Ops Team Leader. | |
| 1126 | Director advises witnesses that the execution is concluded. | |
| 1127 | Housing Unit 9 Section Leader closes the curtains. | |
| 1130 | Housing Unit 9 Section Leader notifies Command to proceed with removal of witnesses. | |
| 1134 | Housing Unit 9 Section Leader instructs IV Team to cut lines to IV's. | |
| 1137 | CIU Investigator examines the body. | |
| 1137 | Coroner/Medical Examiner examines the body. | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
6/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

## Correctional Service Log

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1144 | Team enters and removes restraints from the inmate; the inmate is placed on a gurney. | |
| | | |
| | | |
| 1144 | Restraint/Escort Team assists Coroner in the removal of the inmate's body. | |
| | | |
| 1147 | Inmate's body is placed in Coroner's vehicle. | |
| | | |
| 1147 | All teams perform clean-up chores. | |
| | | |
| 1154 | The IV and Special Operations Teams will participate in an informal debriefing with the Director and Division Director immediately upon completion of the event. | |
| | Director:  *The execution was more challenging because of the mandated order regarding two catheter points.  I will be speaking to the Attorney General regarding the attorney visit the morning of the execution.  In the past this concluded at 7:00 A.M., not 9:15 A.M.  The attorney visit contributed to delay along with the inmates bad veins.  The Director thanked everyone for their patience, and advised two more executions are coming up (no dates set yet).* | |
| | Deputy Director ███  *The IV Team expressed their thanks and appreciation for the support received from everyone.* | |

Shift Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/6/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| me of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| | *Division Director Patton: Movement last night went well. We* | |
| | *will look at getting radios and chargers for Housing Unit 9.* | |
| | | |
| | *Special Operations Team Leader: The calmness of the Restraint* | |
| | *Team made the IV Team calm.* | |
| | | |
| 1205 | *Housing Unit 9 Section Leader gives directive to secure the* | |
| | *Execution Facility.* | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

105-6
8/8/09

DFS' 26(a)(1) Disclosures & Responses to RFP's 01659

Special Operations: Checklist
Page 1 of 5

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| | **DAY PRIOR TO EXECUTION** | | | | |
| 2200 | Restraint Team prepares inmate for transport from Browning Unit to Housing Unit 9. | 7/18/11 | 2130 | | |
| 2230 | Restraint Team transports inmate from Browning Unit to Housing Unit 9 in Central Unit. | 7/18/11 | 2209 | | |
| 2235 | Inmate is secured in cell in Housing Unit 9 and first Continuous Observation Team takes charge of condemned (1 supervisor / 2 staff) - Code-4's called in every 20 minutes. | 7/18/11 | 2209 | | |
| 2245 | Inmate is offered hygiene supplies | 7/18/11 | Refused | | |
| 2300 | All hygiene supplies are removed from inmate's holding cell. | 7/18/11 | N/A | | |
| 2300 | Inmate may be offered a mild sedative. (Only if requested) | 7/18/11 | 2230 | | |
| | **DAY OF EXECUTION** | | | | |
| 0300 | First Observation Team relieved. Second Team starts continuous observation. | 7/19/11 | 0250 | | |
| 0630 | The inmate shall be offered a light meal. All eating utensils and remaining food will be removed upon completion of the meal. | 7/19/11 | 0647 (refused) | | |
| 0700 | Housing Unit 9 Section Leader will authorize Execution Restraint Team access to Housing Unit #9. | 7/19/11 | 0700 | | |
| 0700 | Trash removed from inmate's holding cell. | 7/19/11 | n/a | | |
| 0700 | Housing Unit 9 Section Leader will authorize Special Ops Team access to Housing Unit 9. | 7/19/11 | 0700 | | |
| | Housing Unit 9 Section Leader will authorize Medical Personnel access to Housing Unit 9. | 7/19/11 | 0700 | | |
| | Special Ops Team will confirm camera, monitor, and audio system are functioning clearly and properly. | 7/19/11 | 0700 | | |
| | Special Ops Team will confirm EKG is operational and equipment for assigned medical staff to mark tape is functional. | 7/19/11 | 0700 | | |
| 0705 | Inmate offered hygiene supplies. | 7/19/11 | Refused | | |
| 0720 | Hygiene supplies removed from inmate's holding cell. | 7/19/11 | N/A | | |
| 0730 | Second Observation Team relieved. Third Observation Team starts continuous observation. | 7/19/11 | 0707 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 01660

Special Operations: Checklist
Page 2 of 5

## RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 0800 | Rest of Restraint Team arrives at Housing Unit 9. | 7/19/11 | 0700 | | |
| 0900 | Execution table is prepared. | 7/19/11 | 0900 | | |
| 0900 | Execution table should be prepared at least two (2) hours prior to scheduled time of execution. | 7/19/11 | 0900 | | |
| 0930 | All items removed from inmate's cell (linen, property, etc.) | 7/19/11 | 0930 | | |
| 1000 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint – request permission to proceed. | 7/19/11 | 0948 | | |
| 1000 | Condemned inmate to be placed in upper restraints by restraint / escort team after strip search | 7/19/11 | 0948 | | |
| 1005 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready. | 7/19/11 | 0955 | | |
| 1005 | The Director picks up the red phone and makes a check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Section Leader, "We may proceed with movement". | 7/19/11 | 0947 – Governors Office 0948 - AG's Office | | |
| 1005 | Housing Unit 9 Section Leader checks with Director before proceeding with movement of inmate. | 7/19/11 | 0955 | | |
| 1005 | When signaled by Housing Unit 9 Section Leader the Restraint / Escort teams remove the inmate from cell.  Apply lower restraints and proceed with movement. | 7/19/11 | 0955 | | |
| 1005 | Condemned inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Team Leader behind. Support staff behind leader. | 7/19/11 | 0955 | | |
| 1010 | Inmate secured by chest and ankle straps. Team Leader at head of table, two at arms two at feet. | 7/19/11 | 0957 | | |
| 1010 | Secure wrists with soft restraints. | 7/19/11 | 0957 | | |
| 1010 | Secure arms (maintain good circulation). | 7/19/11 | 0957 | | |
| 1010 | Secure upper torso. | 7/19/11 | 0957 | | |
| 1010 | Secure legs (maintain good circulation). | 7/19/11 | 0957 | | |

# RESTRICTED
## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
## ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1010 | Restraint / Escort Team Leader checks all restraints. Team moves back to holding area, Team Leader at door. Remove any item not part of the event. | 7/19/11 | 1001 | | |
| | *Inmate Secured to Table* | 7/19/11 | 1001 | | |
| | Housing Unit 9 Section Leader advises the Director inmate is secure on table and request approval to proceed with medical procedure. | 7/19/11 | 1004 | | |
| | IV's are inserted into inmate's arms or a catheter is inserted into inmate's leg.  EKG equipment is hooked up to inmate.  Ensure a good flow of saline. | 7/19/11 | 1025 | | |
| 1010 | Restraint / Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution room.  Special Ops Team Leader inside of the chemical room. Inmate is secured to table with IV flowing EKG functioning. | 7/19/11 | 1025 | | |
| 1040 | Housing Unit 9 Section Leader advises Director that medical procedure is complete. | 7/19/11 | 1025 | | |
| 1045 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9. | 7/19/11 | 1048 | | |
| 1045 | Command directs movement of witnesses to Housing Unit 9 in the following order:  Inmate Witnesses, Media Witnesses, Official Witnesses, Victim Witnesses | 7/19/11 | 1048 | | |
| 1055 | Command to Housing Unit 9 Section Leader – all witnesses are in place. | 7/19/11 | 1057 | | |
| 1055 | Housing Unit 9 Team Section will advise Director that witnesses are in position and requests authorization to proceed. | 7/19/11 | 1057 | | |
| 1059 | The Director picks up the red phone and makes a final check to ascertain if the execution may proceed. If there is no delay in the procedure the Director informs Housing Unit 9 Team Leader, "We may proceed". | 7/19/11 | 1058 | | |
| 1101 | Upon receipt of permission from Director and confirmation to proceed, Housing Unit 9 Section Leader opens curtains. *Turn on audio when ready.* | 7/19/11 | 1100 | | |
| 1101 | Housing Unit 9 Section Leader reads the Execution Order. | 7/19/11 | 1100 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 01662

Special Operations: Checklist
Page 4 of 5

**RESTRICTED**

## SPECIAL OPERATIONS: CHECKLIST (LETHAL INJECTION)
### ESCORT FROM HOLDING CELL TO TABLE

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1102 | Housing Unit 9 Section Leader asks inmate if he would like to make a last statement. | 7/19/11 | 1101 | | |
| 1102 | Inmate makes his last statement. The last statement will be summarized. *Turn off audio.* <br><br> Last Statement: none | 7/19/11 | 1101 | | |
| 1102 | Director advises Special Operations Team Leader to proceed with phase one. | 7/19/11 | 1102 | | |
| 1102 | **Phase 1:** First injection commences. Four syringes filled with 1.25 grams each of Pentobarbital and sterile water. Process takes about 3 minutes. Saline flush follows. (1-5) | 7/19/11 | 1105 | | |
| 1105 | Once first injection is complete, Special Operations Team Leader instructs medical consultant to **ensure inmate is unconscious**. Medical consultant will enter execution chamber and check inmate to confirm the inmate is unconscious. | 7/19/11 | 1106 | | |
| 1105 | *Turn on audio.* Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. *Turn off audio* | 7/19/11 | 1106 | | |
| 1105 | Once inmate is confirmed unconscious by the medical consultant, Special Operations Team Leader advises Director. Director provides order to continue to second injection. | 7/19/11 | 1106 | | |
| 1106 | **Phase 2:** Second injection commences. (6-8) Pancuronium Bromide | 7/19/11 | 1106 | | |
| 1107 | Second injection completed. Saline flush follows. | 7/19/11 | 1107 | | |
| 1108 | **Phase 3:** Third injection commences. (9-11) Potassium Chloride | 7/19/11 | 1107 | | |
| 1109 | Third injection completed. Saline flush follows. | 7/19/11 | 1108 | | |
| | Commence Potassium Chloride – 9B | 7/19/11 | 1108 | | |
| | Completed Potassium Chloride – 9B | 7/19/11 | 1109 | | |
| | Commence Potassium Chloride – 10B | 7/19/11 | 1109 | | |
| | Completed 10B | 7/19/11 | 1109 | | |
| | Commence Heparin/Saline  -11B | 7/19/11 | 1109 | | |
| | Completed  Heparin/Saline 11B | 7/19/11 | 1110 | | |

DFS' 26(a)(1) Disclosures & Responses to RFP's 01663

Special Operations Checklist
Page 5 of 5

**RESTRICTED**
**SPECIAL OPERATIONS CHECKLIST (LETHAL INJECTION)**
**ESCORT FROM HOLDING CELL TO TABLE**

| Timeline: | Function: | Date: | Time: | Housing Unit 9 CC Notify: | Initials: |
|---|---|---|---|---|---|
| 1109 | Special Ops Team Leader advises Director when injections are complete. | 07/19/11 | 1110 | | |
| 1109 | Designated qualified person checks vital signs on EKG. | 07/19/11 | 1110 | | |
| TBD | Designated qualified person pronounces death in the Chemical Room. | 07/19/11 | 1110 | | |
| TBD | Director informed of death by Special Ops Team Leader. | 07/19/11 | 1110 | | |
| TBD | Director advises Witnesses that the execution is concluded. | 07/19/11 | 1110 | | |
| TBD | Housing Unit 9 Section Leader closes the curtains. | 07/19/11 | 1110 | | |
| TBD | Housing Unit 9 Section Leader will notify Command to proceed with witness extrication. | 07/19/11 | 1110 | | |
| TBD | Team Leader instructs medical consultant to cut lines to IV's. | 07/19/11 | 1119 | | |
| TBD | CIU Investigator examines the body | 07/19/11 | 1119 | | |
| TBD | Coroner / Medical Examiner examines the body | 07/19/11 | 1119 | | |
| TBD | All team members-Special Ops remain in Chemical administration / restraint/escort rooms. Team enters and removes restraints from the inmate. The inmate is then placed on a gurney. | 07/19/11 | 1123 | | |
| TBD | Restraint / Escort Team will assist Coroner in the removal of the inmate's body. | 07/19/11 | 1128 | | |
| TBD | Body placed in Coroner's vehicle. | 07/19/11 | 1128 | | |
| TBD | All teams perform any clean-up chores. | 07/19/11 | 1130 | | |
| TBD | Housing Unit 9 Section Leader gives directive to secure the Execution Facility. | 07/19/11 | 1135 | | |

Housing Unit 9 Section Leader

Date  7-20-11

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Chemical Disposition Form**

| Inmate Name (Last, First MI) | ADC# | Date of Execution |
|---|---|---|
| West, Thomas Paul | 68781 | July 19, 2011 |

Chemicals administered during execution:

| | Chemical (Incl. Labeled Dose) | # of Units Prepared | # of Units Used | Total Dosage | Time First Administered |
|---|---|---|---|---|---|
| 1 | Xylocaine (20 ml @ 1%) | 1 | 1 | 20 ml | 1004 |
| 2 | Heparin (5 ml syringe) | 109 | 51 | 255 ml | 1025 |
| 3 | Pentobarbital (50 ml @ 50mg/ml = 2.5 g) | 6 | 2 | 5 mg | 1101 |
| 4 | Pancuronium Bromide (10 ml @ 1 mg/ml = 10 mg) | 34 | 12 | 120 mg | 1106 |
| 5 | Potassium Chloride (20 ml @ 2 mEq/ml = 40 mEq) | 12 | 12 | 480 mEq | 1107 |
| 6 | Potassium Chloride (30 ml @ 2 mEq/ml = 60 mEq) | 4 | 0 | 0 | N/A |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

Chemicals depleted but not used for the execution (ie, viles broken/damaged):

| | Chemical (incl. Labeled Dose) | # of Units Prepared | # of Units Used | Total Dosage | Time Administered |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |

Special Operations Team Leader verification:

| Printed Name (Last, First MI) | EIN | Signature | Date |
|---|---|---|---|
| ▮▮▮▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮▮▮▮▮ | July 19, 2011 |

Form: 710-CDF

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility ASPC-Florence | Institutional Unit Central Unit | | Period Covered | | | |
|---|---|---|---|---|---|---|
| | | | Hour | 0800 | Date | 07/23/2014 |
| Housing Unit/Post/Duty Assignment Housing Unit 9 Section Leader | | | Hour | 1650 | Date | 07/23/2014 |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Section Leader | | 0800 | 1620 | | | | |
| HU9 Recorder | | 0800 | 1620 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Execution table is prepared at least two hours prior to scheduled time of execution. | |
| | | |
| 0916 | All items are removed from inmate's cell (Linen, property, etc) | |
| | | |
| 0918 | Housing Unit 9 Section Leader advises Director that inmate is ready for search and restraint; requests permission to proceed.  Director grants permission to proceed. | |
| | | |
| 0921 | Director receives call from Donna Hallam (Arizona Supreme Court) advising a temporary stay will be issued. | |
| | | |
| 0922 | Director advises the Housing Unit 9 Section Leader to disregard the search and restraint of the inmate. | |
| | | |
| 0950 | Director receives call from the Arizona Supreme Court advising a temporary stay has been issued. | |
| | | |
| 1003 | Director exits Housing Unit 9 to brief witnesses regarding the temporary stay. | |
| | | |
| 1113 | Director advises stay has been lifted. | |
| | | |
| 1313 | Inmate placed in upper restraints by restraint/escort team after strip search. | |
| | | |

ADC x-file rel 2014.08.01 105

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | | |
|---|---|---|
| 1313 | Restraint Team Leader notifies Housing Unit 9 Section Leader that inmate is restrained and the team is ready to move the inmate to the injection room. | |
| 1319 | Housing Unit 9 Section Leader advises Director all witnesses have arrived at internal staging and requests permission to apply lower restraints to the inmate and move to the injection room. | |
| 1320 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution.  Per Governor's General Counsel, at this time there is no reason to not proceed. | |
| 1321 | Director makes initial call to the Attorney General's Office to ascertain if there are any reasons to not proceed with the execution.  At this time there is no reason to not proceed. | |
| 1321 | The Director informs Housing Unit 9 Section Leader (proceed with movement of inmate to the injection room). | |
| 1321 | Housing Unit 9 Section Leader advises Command to begin movement of witnesses to Housing Unit 9 witness room. | |
| 1322 | Inmate escorted to Execution Room; one staff in front, two at the inmate's sides, Restraint Team Leader behind.  Support staff behind Restraint Team Leader | |
| 1331 | Restraint Team Leader advises the Housing Unit 9 Section Leader that inmate is restrained to the table. | |
| 1331 | Command advised Housing Unit 9 Section Leader that all witnesses are in place. Housing Unit 9 Section Leader advises Director witnesses are in place. | |
| 1334 | Housing Unit 9 Section Leader advises the Director the inmate is secure on the table and ready for the IV procedure. Director grants permission to proceed. | |
| 1335 | Monitor turned on in witness room. | |
| 1337 | Acting upon the advice of the IV Team Leader, the Director determines the catheter site(s). | |
| 1346 | Restraint/Escort Team Leader and Housing Unit 9 Section Leader positioned in Execution Room. Special Ops Team Leader inside the Chemical Room.  Inmate is secured to the table with IV flowing, EKG functioning. | |

ADC x-file rel 2014.08.01 106

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | | |
|---|---|---|
| 1347 | Housing Unit 9 Section Leader advises Director that IV procedure is complete. | |
| | | |
| 1348 | Director makes initial call to the Governor's General Counsel to ascertain if there are any reasons to not proceed with the execution.  Per Governor's General Counsel, at this time there is no reason to not proceed. | |
| | | |
| 1349 | Director makes initial call to the Attorney General's office to ascertain if there are any reasons to not proceed with the execution.  Per Attorney General's office, at this time there is no reason to not proceed. | |
| | | |
| 1349 | The Director informs Housing Unit 9 Section Leader "we may proceed". | |
| | | |
| 1349 | With permission from the Director and confirmation to proceed, Housing Unit 9 Section Leader opens the curtains. | |
| | | |
| 1350 | Housing Unit 9 Section Leader reads the Execution Order. | |
| | | |
| 1351 | Housing Unit 9 Section Leader asks the inmate if he would like to make a last statement. | |
| | | |
| 1351 | Inmate makes his last statement. | |
| | | |
| 1357 | Housing Unit 9 Section Leader advises witnesses the inmate has been sedated. | |
| | | |
| 1423 | Director orders IV Team to assess sedation and check IV. | |
| | | |
| 1424 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1441 | Director orders IV Team to assess sedation and check IV. | |
| | | |
| 1442 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1449 | Director orders IV Team to assess sedation and check IV. | |

ADC x-file rel 2014.08.01 107

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | | |
|---|---|---|
| 1450 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1501 | Director orders IV Team to assess sedation and check IV. | |
| | | |
| 1502 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1515 | Director makes call to Governor's Office to give update on execution and assessment of inmate. | |
| | | |
| 1529 | Director orders IV Team to assess sedation and check IV. | |
| | | |
| 1530 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1539 | Director orders IV Team to assess sedation and check IV. | |
| | | |
| 1540 | Inmate remains sedated. No issues with IV. | |
| | | |
| 1542 | Director speaks to Jeff Zick in the Attorney General's Office regarding contingency plan and proceeding with execution. | |
| | | |
| 1549 | Director informed of death by Special Ops Team Leader. | |
| | | |
| 1549 | Director advises witnesses that the execution is concluded. | |
| | | |
| 1549 | Housing Unit 9 Section Leader closes the curtains. | |
| | | |
| 1550 | Housing Unit 9 Section Leader notifies command to proceed with removal of witnesses from Delta Staging. | |
| | | |
| 1553 | CIU Investigator examines the body. | |
| | | |

ADC x-file rel 2014.08.01 108

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 1553 | Coroner/Medical Examiner examines the body. | |
|------|---------------------------------------------|---|
| 1602 | Housing Unit 9 Section Leader instructs IV Team to cut lines to IV's | |
| 1607 | Team enters and removes restraints from the inmate and places inmate on a gurney. | |
| 1608 | Restraint/Escort Team assists Coroner in the removal of the inmate's body. | |
| 1609 | All Teams perform clean up duties. | |
| 1620 | Housing Unit 9 Section Leader gives directives to secure the Execution Facility. | |
| / | End log. | |

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Institution/Facility<br>ASPC-Florence | Institutional Unit<br>Central Unit | Period Covered |
|---|---|---|
| | | Hour 1323  Date 7/23/14. |
| Housing Unit/Post/Duty Assignment<br>Lethal Injection Room Log | | Hour 1349  Date 7/23/14 |

| Staff Member<br>*(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed | Staff Member<br>*(Last, First M.I. and Title)* | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| HU9 Recorder | | 1323 | 1349 | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken:  Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 1323 | Restraint team enters lethal injection room. | |
| 1323 | Legs restrained. (maintain good circulation) | |
| 1323 | Harness applied. | |
| 1324 | Remove left (hard) restraint. | |
| 1324 | Apply left (soft) restraint. | |
| 1324 | RIL asks inmate if it feels OK; inmate nods. | |
| 1325 | Left arm restrained. | |
| 1325 | Remove right (hard) restraint. | |
| 1325 | RIL advises inmate they are going to apply pulse monitor | |
| 1325 | Apply right (soft) restraint. | |
| 1325 | Right arm restrained. | |
| 1325 | RIL asks inmate if it feels OK; inmate nods | |

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | | |
|---|---|---|
| | | |
| | | |
| 1325 | Remove belly chains. | |
| 1326 | RTL advises inmate they are going to have to shave his upper body | |
| 1329 | RTL advises inmate they are going to apply a second blood pressure cuff. | |
| | | |
| | | |
| | | |
| 1329 | Restraint Team Leader checks all restraints. | |
| 1329 | RTL asks inmate if left restraint feels alright | |
| 1330 | Inmate advises RTL that its a little tight but it wont matter in a few minutes. Also states you'll see a scar under there | |
| 1330 | RTL advises inmate they will adjust it. | |
| 1330 | Inmate says thank you. | |
| | | |
| 1330 | Inmate is restrained | |
| 1331 | RTL advises inmate our IV team is going to come in and do an assessment. | |
| 1333 | RTL ask inmate if he feels OK; inmate advises yes but its a little cold in here | |
| | | |

ADC x-file rel 2014.08.01 111

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| Time | Entry |
|------|-------|
| 1335 | IV Team enters lethal injection room, and conducts vein assessment |
| 1335 | IVTL advises inmate they are here to do the IV procedure; and right now they are just going to do an assessment. |
| 1336 | IVTL advises the inmate they'll be right back. |
| | |
| | |
| 1338 | IV Team explains IV procedure to the inmate. |
| 1338 | IVTL advises the inmate they are going to apply a tourniquet |
| 1340 | DVTM advises the inmate he will get this done as quick as he can. Also advises the inmate hes going to feel a little stick. |
| 1340 | DVTM advises the inmate he is going to remove the tourniquet and blood pressure cuff. |
| 1341 | RTM asks SO for primary line |
| 1341 | RTM ask SO to check flow |
| 1341 | SO advises RTM flow is good. |
| 1348 | DVTM advises the inmate they are going to do the same thing on this side |
| 1344 | RTM asks SO for secondary line |
| 1345 | RTM asks SO to check flow |
| 1344 | SO advises RTM flow is good. |
| | |

ADC x-file rel 2014.08.01 112

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 1347 | IV Team exits the lethal injection room. |
| 1347 | RTL advises the inmate that over to his right when the curtains open the witnesses will be there |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| 1349 | Restraint Team exits the lethal injection room. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

ADC x-file rel 2014.08.01 113



**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| Institution/Facility | Institutional Unit | Period Covered | |
|---|---|---|---|
| ASPC - Florence | Central Unit | Hour 0860 | Date 07·23·14 |
| | | Hour 1718 | Date 07·23·14 |
| Housing Unit/Post/Duty Assignment | | | |
| Housing Unit 9, Special Operations | | | |

| Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed | Staff Member (Last, First M.I. and Title) | Staff Initials | Time Arrived | Time Departed |
|---|---|---|---|---|---|---|---|
| SOT Leader | | 6800 | 1718 | | | | |
| SOT Recorder | | 0800 | 1718 | | | | |
| | | | | | | | |
| | | | | | | | |

| Time of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action Taken, etc. | Staff Initials |
|---|---|---|
| 0800 | Special Operations and IV Teams assembled for execution of inmate: Last: **WOOD**  First: **JOSEPH R.**  ADC#: **086279** | |
| 0804 | Audio, visual, and medical equipment inspected. Witness Room AV feed off. | |
| 0818 | IV Team Leader checked and verified the flow of each gauge and confirmed there are no obstructions in the manifold or lines. | |
| 0819 | Commenced the preparation of chemicals and syringes. | |
| 0835 | Completed preparing, labeling, and affixing syringes to the manifold. | |
| 0836 | Special Operations Team Leader verified that all syringes are properly labeled and affixed in the correct location on the manifold. | |
| 1328 | EKG leads, Pulse/Oxygen monitor, and blood pressure cuff attached. Initial blood pressure: 137 / 84 | |

**Shift Commander's Comments:** *(Notes or comments concerning entries above; comments deemed appropriate)*

ADC x-file rel 2014.08.01 114

105-6
8/8/09

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Correctional Service Log**

| me of Day | Occurrence/Action Taken: Events, Activities, Disciplinary Violations, Maintenance Requirements, Safety/Health Hazards, Other Information Received and Action taken, etc. | Staff Initials |
|---|---|---|
| 1340 | IV procedure commenced. | |
| 1347 | IV procedure completed. Primary IV catheter placed in inmate's _Left A/C_ | |
| | Backup IV catheter placed in inmate's _Right   A/C_ | |
| 1352 | Director instructed Special Ops Team Leader to commence with drug protocol: | |
| 1352 | • **Syringe 1A, 60 mL Heparin/Saline** | |
| 1353$^{22}$ | • **Syringe 2A, 50mg Midazolam and 50mg Hydromorphone** | |
| 1353 | • **Syringe 3A, 60 mL Heparin/Saline** | |
| 1354 | Drug protocol completed. | |
| 1356 | 3 minute point: _1356 $^{22}$_. Confirmed 3 minutes have elapsed since commencing the administration of chemicals. | |
| 1357 | IV Team Leader verified the inmate is sedated. | |
| 1408 | _SEE Additional Entries Noted Below_ | |
| 1549 | IV Team Leader pronounced death. | |
| | Additional entries: | |
| 1408 | _Syringe 1B 60mL Heparin/Saline_ | |
| 1409 | _Syringe 2B 50mg Midazolam and 50mg Hydromorphone_ | |
| 1409 | _Syringe 3B 60 mL Heparin/Saline_ | |
| 1410 | _Second Drug Protocol Complete._ | |

ft Commander's Comments: *(Notes or comments concerning entries above; comments deemed appropriate)*

ADC x-file rel 2014.08.01 115

105-6
8/6/09

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| | |
|---|---|
| 1413 | 2C 50 mg Midazolam 50 mg Hydromorphone BANK A |
| 1416 | 3C 60 mL Heparin Saline   BANK A |
| 1416 | Third Drug Protocol Complete. |
| 1424 | Inmate Remains Sedated. |
| 1425 | 1D 60 mL Heparin Saline BANK A |
| 1426 | 2D 50 mg Midazolam 50 mg Hydromorphone Bank A |
| 1427 | 3D 60 mL Heparin Saline BANK A |
| 1427 | 4th Drug Protocol Complete |
| 1433 | 1E 60 mL Heparin Saline Bank B |
| 1434 | 2E 50 mg Midazolam 50 mg Hydromorphone. Bank B. |
| 1434 | 3E 60 mL Heparin Saline Bank B |
| 1434 | 5th Drug Protocol Complete. |
| 1442 | Inmate Remains Sedated |
| 1443 | 1F 60 mL Heparin Saline BANK A |
| 1444 | 2F 50 mg Midazolam 50 mg Hydromorphone. Bank A. |
| 1444 | 3F 60 mL Heparin Saline Bank A |
| 1445 | 6th Drug Protocol Complete |
| 1450 | Inmate Remains Sedated |
| 1452 | 2G 50 mg Midazolam 50 mg Hydromorphone Bank B |
| 1452 | 3G 60 mL Heparin Saline BANK B. |
| 1453 | 7th Drug Protocol Complete. |
| 1458 | 2H 50 mg Midazolam 50 mg Hydromorphone. BANK A |
| 1459 | 3H 60 mL Heparine Saline Bank A |
| 1459 | 8th. Drug Protocol Complete. |
| 1502 | Inmate Remains Sedated |
| 1502 | 2I 50 mg Midazolam 50 mg Hydromorphone. BANK B |

ADC x-file rel 2014.08.01 116

ARIZONA DEPARTMENT OF CORRECTIONS

Correctional Service Log

| 1504 | 3I 60 mL HEPARIN Saline BANK B |
| 1504 | 9th. Drug Protocol Complete |
| 1507 | 2J 50 mg Midazolam/ 50 mg Hydromorphone. BANK A |
| 1508 | 3J 60 mL HEPARINE Saline BANK A |
| 1509 | 10th Drug Protocol Complete. |
| 1530 | Inmate Remains Sedated |
| 1531 | 2K 50 mg Midazolam/ 50 mg Hydromorphone BANK B |
| 1531 | 3K 60 mL HEPARIN Saline BANK B |
| 1532 | 11th Drug Protocol Complete |
| 1532 | 2L 50 mg Midazolam/ 50 mg. Hydromorphone BANK A |
| 1533 | 3L 60 mL HEPARIN Saline BANK A |
| 1533. | 12th Drug Protocol Complete. |
| 1536 | 2M 50 mg Midazolam/ 50 mg Hydromorphone. BANK B |
| 1537 | 3M 60 mL Saline BANK B |
| 1537 | 13th Drug Protocol Complete |
| 1540 | Inmate. Remains SEDATED |
| 1540 | 2N 50 mg Midazolam/ 50 mg. Hydromorphone. BANK A. |
| 1541 | 3N 60 mL Saline Bank A |
| 1541 | 14th Drug Protocol Complete |
| 1545 | 2O 50 mg Midazolam/ 50 mg Hydromorphone. BANK B |
| 1545 | 3O 60 mL Saline BANK B |
| 1546 | 15th Drug Protocol Complete. |
| 1548 | Inmate Remains SEDATED |

4 of 5

ADC x-file rel 2014.08.01 117

105-6
8/6/09