JOSEPH J. PERKOVICH, ESQ.
NY Bar No. 4481776
Phillips Black, Inc.
PO Box 4544
New York, NY 10163
Tel: (212) 400-1660
j.perkovich@phillipsblack.org

AMY P. KNIGHT, ESQ.
AZ Bar No. 031374
Knight Law Firm, PC
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Tel: (520) 878-8849
amy@amyknightlaw.com

DAVID A. LANE, ESQ.
CO Bar No. 16422
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel: (303) 571-1000
dlane@kln-law.com

REID ALLISON, ESQ.
CO Bar No. 52754
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel: (303) 571-1000
rallison@kln-law.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

1

| | |
|---|---|
| Frank Jarvis Atwood, | ) No. CV-22-00860-PHX-MTL (JZB) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **PLAINTIFF'S MOTION FOR** |
| David Shinn, Director, Arizona | ) **TEMPORARY RESTRAINING** |
| Department of Corrections, Rehabilitation | ) **ORDER AND/OR PRELIMINARY** |
| & Reentry; James Kimble, Warden, | ) **INJUNCTION** |
| ASPC-Eyman; Jeff Van Winkle, Warden, | ) |
| ASPC-Florence; Lance Hetmer, Assistant | ) |
| Director for Prison Operations, Arizona | ) **(ORAL ARGUMENT REQUESTED)** |
| Department of Corrections, Rehabilitation | ) |
| & Reentry; Mark Brnovich, Attorney | ) **This is a capital case.** |
| General of Arizona; John Doe, Arizona- | ) |
| licensed Pharmacist, | ) **EXECUTION WARRANT ISSUED** |
| | ) **FOR JUNE 8, 2022, 10:00 A.M.** |
| Defendants. | ) |

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff respectfully moves for a temporary restraining order and preliminary injunction prohibiting Defendants and their agents from executing him according to Defendants' current Execution Procedures (Department Order 710).[1] Defendants oppose this motion.

## BACKGROUND

Mr. Atwood's physical condition due to bone deformities makes it physically impossible for him to lie down on the execution table without experiencing excruciating pain. Two highly qualified doctors have agreed that forcing him into restraints on the execution table and the insertion of intravenous catheters and lines during his lethal

---

[1] Arizona Department of Corrections, Rehabilitation and Reentry, Department Order 710 – Execution Procedures, amended Mar. 10, 2021, revised April 20, 2022), Exhibit 1. Hereafter, the corrections department may be referred to simply as the "Department" or "ADCRR."

injection procedure will gratuitously inflict severe pain and makes no accommodation for his known, obvious disability. Without this order, Mr. Atwood will be executed in a manner that violates his constitutional and federal statutory rights pursuant to, inter alia, the Americans with Disabilities Act, the Rehabilitation Act, 18 U.S.C. § 3599, 42 U.S.C. § 1983, and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### *Bone deformities*

Frank Atwood suffers from a longstanding and constantly deteriorating spinal condition that causes him severe pain. His pain is particularly acute when he is made to lie flat on his back. Defendants know this, and some of them have been the subject of prior injunctive relief in relation to their deliberate indifference to his medical needs exacerbating his chronic condition. When Mr. Atwood is able to be seated with his body at no less than a 60-degree angle, he avoids severe pain.

Defendants are scheduled to execute Mr. Atwood on June 8, 2022, beginning at 10:00 a.m. According to the Department's Execution Procedures, Mr. Atwood will be restrained to the Department's execution table, flat on his back, throughout the execution process, which the Department's prior execution logs indicate will span nearly an hour or longer even before the injection of the lethal drugs commences. Exhibit 2.

Pursuant to the Execution Procedures, while Mr. Atwood is restrained to the table, an IV Team will be responsible for inserting a primary IV catheter and a backup IV catheter. Exhibit 1, Att. D, ¶ E.1.

As demonstrated in Defendants' insertion of the IV lines in the execution of Mr. Clarence Dixon on May 11, 2022, Mr. Atwood will be exposed to a high risk of the infliction of yet further extreme pain in relation to these catheter insertions.

### *Inadequately tested drugs*

Further, Plaintiff seeks the present relief in order to prevent Defendants from using inadequately tested, inadequately vetted high-risk compounded drugs for his lethal injection. Using such drugs would violate the prohibition against cruel and unusual punishments under the Eighth Amendment. It would also violate Plaintiff's right to procedural due process pursuant to the Fourteenth Amendment, with respect to his liberty interest in Defendants' adherence to their legal obligations under the Department's Execution Procedures concerning preparation of the compounded sodium pentobarbital solution designated for Mr. Atwood's execution.

The compounded pentobarbital solution Defendants have prepared for use in a June 8, 2022, execution of Mr. Atwood will expire before June 8, 2022. Approximately 48 hours before Mr. Dixon's May 11 execution, Defendants jettisoned the batch prepared specifically for that execution and prepared a replacement batch—a desperate step that bypassed measures integral to ensuring the solution was free of contaminants and suitable for its purpose of carrying out an execution free from inflicting extreme pain. Exhibit 3. Defendants cannot similarly deflect from the irretrievable inadequacy of the current batch of drugs for Mr. Atwood.

Both the required positioning and the inadequate preparation and testing of drugs

4

would cause the "unnecessary and wanton infliction of pain," in violation of Mr. Atwood's Eighth Amendment rights. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The contemplated procedures will also run afoul of the Americans with Disabilities Act, in failing to reasonably accommodate Mr. Atwood's known disability. Arizona's plan must be halted so that Mr. Atwood's constitutional rights can be protected and his ADA rights can be accommodated.

### *Both lethal injection while lying flat and lethal gas would violate Mr. Atwood's constitutional rights*

Arizona law gives a condemned prisoner the right to choose between lethal injection and lethal gas. Defendants have designated hydrogen cyanide as their chosen gas, which would also result in an excruciatingly painful death in violation of the Eighth Amendment. Plaintiff seeks the present relief to preserve his right to a constitutional choice of a method that is not likely to inflict excruciating pain upon him—and neither lethal injection while lying flat nor hydrogen cyanide gas constitutes such a method. Mr. Atwood is entitled to be free from Defendants' gratuitous infliction of pain and to preserve his liberty interest in the selection, under Article XXII, § 22 of the Arizona Constitution and A.R.S. § 13-757(B), of a constitutional lethal gas method rather than the unconstitutional method of hydrogen cyanide gas, which Defendants have designated under the Department's Execution Procedures in violation of the prohibition on cruel and unusual punishments of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

# FACTS

### *Severe spinal disease*

The Department has incarcerated Mr. Atwood since 1987. Exhibit 4, Order, *Atwood v. Days, et al.*, No. CV20-00623-PHX-JAT (JZB), Doc. 173 at 2 (D. Ariz. Dec. 7, 2021). His severely painful degenerative spinal condition, which has deteriorated with time, began around 1990, shortly after his arrival into the Department's custody. *Id.* Mr. Atwood has been wheelchair-bound since 2015 and has explicitly been classified as an ADA patient since then. *Id.* By 2020, his treatment in Defendants' custody was so inadequate that he was forced to bring suit pro se in his struggle for a basic minimum standard of medical care (*supra*). Thereafter, orthopedic surgeon Dr. Philip Davidson evaluated him and executed a declaration supporting Mr. Atwood's motion for preliminary injunction seeking the restoration of minimally adequate treatment. After an evidentiary hearing on October 29, 2021, a judge of this District Court issued an order on December 7, 2021, containing detailed factual findings about Mr. Atwood's condition, which remain true today. The court, in granting injunctive relief, concluded that Mr. Atwood had "shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pain," and that a reasonable jury could find the defendants' healthcare contractor "failed to competently treat [Mr. Atwood]'s serious pain needs and acted with deliberate indifference." *Id.* at 13.

On May 16, 2022, Dr. Joel Zivot, a board-certified anesthesiologist, physically examined Mr. Atwood after conducting a detailed record review. Confirming Dr.

Davidson's diagnoses and observations, Dr. Zivot concluded "Mr. Atwood suffers from intense and profoundly debilitating pain along his spine as a consequence of chronic degeneration of vertebral bodies" that have "caused multiple compressions of the nerve roots as they pass from the spinal cord to the arms and legs," which "has resulted in permanent damage that manifests as profound weakness and unremitting pain." Exhibit 5. From his review of Mr. Atwood's records, including MRI results from January, 2021, Dr. Zivot highlighted that Mr. Atwood suffers "among other indications of extreme disrepair, 16 instances of severe foraminal stenoses throughout his cervical and lumbar spine." *Id.* Dr. Zivot then determined, like Dr. Davidson, that Mr. Atwood cannot lie flat on his back without the immediate extreme exacerbation of his conditions, which produce the maximum pain level the body can experience. Ex. 5, ¶ 21.

> This severe pain limits Mr. Atwood substantially, rendering him unable to assume a recumbent position less than with his body at approximately a 60 degree head up angle. His neck extension is also limited secondary to fusion of the 5th and 6th cervical vertebrae. When his upper body is lowered to an angle less than 60 degrees, he experiences immediate and intense lower back pain, right greater than left, and radiating down the right to the knew.

Ex. 5, ¶ 10.

### *Difficulties with IV insertion*

Defendants will expose Mr. Atwood to a high risk of the infliction of yet further extreme pain through the performance of their "IV Team" under the Execution Procedures, in inserting the primary IV catheter and the secondary IV catheter. Ex. 1, Att. D, ¶ E.1. The IV team's performance in the execution of Mr. Dixon on May 11, 2022,

failed to meet even minimal standards for the insertion of catheters. This failing was consistent with the apparent inadequacy of the IV lines for Mr. Joseph Wood in his 2014 execution, as reflected in the astonishing level of drugs injected into his body during the course of 15 discrete injections over nearly two hours under a protocol contemplating a single injection.

As Mr. Dixon's counsel observed from the witness room, the IV Team Leader, with shaking hands, made two failed attempts at IV access in Mr. Dixon's arms and then, on a third attempt, connected IV tubing to the needle. Exhibit 6 at ¶¶ 5-8. It is not known whether this third IV was properly situated in a vein, or whether the IV catheter was merely rammed into the tissue surrounding the vein. After this third, possibly successful attempt, the IV team apparently abandoned peripheral IV access, and decided to place a catheter in Mr. Dixon's femoral vein (a large vein in the groin), *id.* at ¶¶ 10-13, doing so without the use the ultrasound equipment the Execution Procedures required to be on hand, Ex. 1, Att. D, ¶ A.2.

Should the IV Team, instead of inserting a peripheral IV line, hastily proceed to insert a central femoral line in Mr. Atwood while he is strapped to the table—as it did with Mr. Dixon— the pain and resulting uncontrollable movements such a procedure will cause, due to his preexisting poor health, is virtually certain to expose him to a very high risk of collateral severe injury, such as a punctured bladder, which could derail the execution process entirely. *See, e.g.*, *Hamm v. Dunn, et al.*, No. 2:17-cv-2084-KOB, Doc. 103 at 19 (N.D. Ala. Mar. 26, 2018).

### *Inadequate lethal injection drugs*

On May 3, 2022, eight days before his scheduled execution, Mr. Clarence Dixon filed a suit against the Department in this District Court. *Dixon v. ADCRR, et al.*, CV 22-00743-PHX-DJH. Mr. Dixon's suit concerned the Department's failure to disclose the expiry, known as the "beyond-use date" or "BUD," of the drugs intended for his scheduled execution—drugs the Department had compounded and tested the same way it has proceeded with Mr. Atwood's drugs. The District Court ordered the Department to state the BUD for Mr. Dixon's drugs. The department then filed a notice, attaching as an exhibit a nine-paragraph redacted and anonymized declaration from the Department's compounding pharmacist, Defendant John Doe, who identified himself as an Arizona-licensed pharmacist who "follow[s] the guidelines and requirements found in the United States Pharmacopeia." Exhibit 7.[2]

Defendant Doe attested to having prepared a single test batch of sodium pentobarbital solution, which he "provided to a [sic] FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date." *Id.* Defendant Doe then stated the "test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing." *Id.* Defendant Doe considered this to constitute a "stability study," and attested to having prepared the "solution from the same sodium pentobarbital powder that was used for the stability study" on February 26, 2022 (two days after the Stated had moved for Mr. Dixon's execution warrant). Finally, the pharmacist concluded that "[b]ased on the stability study results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022." *Id.*

---

[2] The gender of John Doe is not known. Plaintiff will use the pronouns "he" and "him" here for consistency.

Defendant Doe's disclosures in litigation prior to this complaint reflect no information about the methodology or procedures used in preparing the single test batch relied on to determine the BUD, nor any information about the analysis used to calculate and establish a transferrable BUD from the bald laboratory numbers from the "stability study." To date, there is no evidence that Defendant Doe has established any documented methodology for the testing designed to yield a BUD that may be assigned to subsequent preparations.

Prevailing standards for such testing anticipate "a minimum of three batches and from each batch the provision of multiple samples." Exhibit 8 at ¶ 29. Further, it is necessary to document the kinds of testing, the testing conditions, and the storage conditions. *Id.* Prevailing standards recognize that the compounding ingredients—both the active ingredient (in this case, pentobarbital sodium) and inactive ones—remain identical in future batches and that documentation of this is maintained. Absent such identicality, a BUD cannot be extrapolated to a subsequently prepared compound. *Id.*

Review of the third-party laboratory results Defendants have provided to Plaintiff to date reflect, on their face, that the single test batch Defendant Doe has prepared failed to meet prevailing pharmaceutical standards. *Id.* at ¶ 40. Specifically, the batch failed to satisfy the USP Monograph-established pH range of 9.0 and 10.5, given that it returned a 10.6 pH. Such a result renders the "batch . . . unusable and it is self-evident that a batch that would need to be discarded cannot supply data for extrapolation to establishing BUDs for other batches." *Id.* "Elevation of a pH level outside the accepted parameters presents serious concerns," *id.* ¶ 43, due to "the exponential effects of pH deviations on the degradation of many drugs, certainly including high-risk sterile compounds such as pentobarbital sodium." *Id.* ¶ 42. Elevated pH levels are susceptible to "catastrophic effects on venous endothelial cells," which "constitute the inner lining of veins and comprise the site of actual contact between injected solutions, i.e., pentobarbital sodium,

and the venous circulatory system." *Id.* ¶ 43. A pH reaching 11 could "strip[] away any buffer for the innumerable nerve endings throughout the venous system." *Id.*

### Defendants' Designation of Hydrogen Cyanide

Under Arizona constitutional and statutory law, Mr. Atwood is entitled to a choice of constitutional methods: either lethal injection or lethal gas. *Supra*. Prior to the entry of his execution warrant on May 3, 2022, Mr. Atwood was, of course, unable to choose a method for his execution.[3] Thus, any dispute about the lethal gas method or, for that matter, Defendants' lethal injection method, did not ripen for Mr. Atwood until the date of that Arizona Supreme Court order. Under A.R.S. § 13-757(B), Mr. Atwood was entitled to choose lethal gas as his execution method until May 19, 2022, 20 days prior to his execution date of June 8, 2022, under his execution warrant.

On May 14, 2022, undersigned counsel sent a demand letter to counsel for Defendants explaining that their designation of hydrogen cyanide gas renders the State's gas method unconstitutional and that the use of nitrogen could be readily implemented and would be constitutional. The following day, counsel for Defendants responded, stating their "disagree[ment] that ADCRR's current procedures regarding lethal gas violate any applicable statutory or constitutional provision and, therefore, ADCRR will not be making any changes to these procedures." Exhibit 9.

On May 18, 2022, the day before the lapsing of the 20-day period at 12:01 a.m. on

_____

[3] In anticipation of the warrant, he sought administrative relief within the Department's proper grievance procedures, yet Defendants refused to process his submission and, further, refused to process his attempted appeal from the initial refusal.

May 20, 2022, counsel for Mr. Atwood wrote Defendants' counsel to request nitrogen gas as his execution method while stating "Mr. Atwood is <u>not</u> hereby choosing <u>cyanide</u> gas as his method of execution." Exhibit 10. The letter further set forth:

> While the State is on the precipice of violating its obligation to provide a constitutional choice within the time period contemplated by the statute, the Arizona Constitution ensures Mr. Atwood's right to choose between the injection and gas methods. Unless and until the State provides the options it is statutorily and constitutionally required to provide, the fact that Mr. Atwood has refused to submit an ostensible choice of method that does not provide two real options cannot be construed as a failure to choose as contemplated by A.R.S. § 13-757(B), nor as an affirmative choice of lethal injection. In fact, the State has precluded Mr. Atwood from making the choice because of the State's violations, which he continues to demand that the State remedy.

*Id.*

On May 19, Defendants' counsel reiterated their unwillingness to modify their Execution Procedures. *Id.*

With Defendants' designation of hydrogen cyanide gas, had Mr. Atwood selected the lethal gas method by the statutory deadline of May 19, Supreme Court authority would foreclose his ability to challenge the method's violation of the Eighth Amendment. *Stewart v. LaGrand*, 526 U.S. 115 (1999) (per curiam). Thus, Mr. Atwood filed the present complaint on May 19, seeking, inter alia, vindication of his liberty interest in the present Arizona constitutional and statutory guarantees of his choice of a lethal gas method. His present complaint pleads a readily implemented constitutional gas for that method—nitrogen.

**ARGUMENT**

Ordinarily, "[a] plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where "the balance of hardships tips sharply in the plaintiff's favor," the plaintiff need only "demonstrate[] . . . that serious questions going to the merits were raised" to satisfy the merits prong of the analysis and justify an injunction. *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).[4] Mr. Atwood must be granted a temporary restraining order and/or preliminary injunction because his Eighth Amendment rights will be violated by his execution according to Arizona's protocol, and executing him without reasonable accommodation for his known disability would violate his rights under the ADA.

As detailed below, Mr. Atwood (1) is likely to succeed on the merits of both his Eighth Amendment and ADA claims and (2) would suffer obvious irreparable harm if he is killed by the state in an unconstitutional manner. Moreover, (3) the balance of equities here tips strongly in his favor and (4) the public has a strong interest in upholding the constitutional rights of those the State seeks to kill.

I.     **Plaintiff Is Likely to Succeed on the Merits of His Claims.**

   a.  **Mr. Atwood is likely to succeed on his Eighth Amendment Claim.**

---

[4] "The standard for issuing a TRO is the same as that for issuing a preliminary injunction." *Shakur v. Ryan*, No. CIV 14-2318-TUC-CKJ, 2015 U.S. Dist. LEXIS 114628, at *21 (D. Ariz. Aug. 25, 2015).

The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285 (1976) (internal quotation omitted). The Amendment proscribes the "unnecessary and wanton infliction of pain." *Id.* at 104. "Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force." *Roper v. Simmons*, 543 U.S. 551, 568, 125 S. Ct. 1183, 1194 (2005).

When an incarcerated person challenges the State's planned method of execution, he must show a substantial risk of needless suffering. *See Glossip v. Gross*, 576 U.S. 863, 877 (2015). An incarcerated person must also "identify an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Id.* (internal quotation and citation omitted). Ultimately, "[a] stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e must show that the risk is substantial when compared to the known and available alternatives." *Id.* at 877-78 (internal citation omitted).

Arizona's execution protocol requirement of laying an individual supine on a gurney and strapping them down before injecting them with lethal drugs is a violation of the Eighth Amendment as applied to Mr. Atwood. Mr. Atwood is known to suffer severe pain in this position, due to his longstanding degenerative spinal condition.

"Lying flat on his back severely exacerbates [Mr. Atwood's] conditions, causing maximum pain. He is only able to sleep sporadically." Exhibit 11 at ¶ 21. Indeed, "Mr.

Atwood cannot be placed in a supine position on a gurney, strapped in place and maintained as such for any length of time without experiencing severe and immediate exacerbation of pain." *Id.* ¶ 29. A Judge in this District has already noted (after briefing and a daylong hearing that included expert testimony) that Mr. Atwood suffers especially severe pain when lying flat on his back. Exhibit 4 at 2.

The prospect of moving forward under the Department's lethal injection protocol is precisely the type of gratuitously inflicted pain the Eighth Amendment prohibits. *Bucklew v. Precythe*, 139 S. Ct. 1112 (2019). Defendants know Mr. Atwood's condition and he has repeatedly highlighted for them the impossibility of proceeding under this protocol without violating the prohibition against Cruel and Unusual Punishments. Even so, they plan to restrain him to the execution table in a way that will be excruciating, given his condition. Readily implemented alternatives to the Department's lethal injection protocol are well within reach.

A nitrogen gas method, as Plaintiff has pleaded and had previously demanded Defendants designate in place of the patently unconstitutional hydrogen cyanide gas method, is first among these. This method requires no alteration of extant Arizona law, and merely requires Defendants to procure readily available equipment, such as a gas mask and nitrogen cylinders. The present complaint posits, inter alia, that the delivery of 50 liters/minute flow rate through a pilot's oxygen mask would rapidly exceed an individual's maximum inspiratory rate, causing him to breathe pure nitrogen and to rapidly lose consciousness and expire. Doc. 1 at 42. Use of a mask in this fashion further

permits Mr. Atwood's religious exercise with respect to the administering of last rites as he is put to death.

A second readily implemented method is firing squad, which is not contemplated under Arizona's constitutional and statutory scheme and would require legislation to be lawful. Utah, before and after statehood, has used this method, the constitutionality of which the Supreme Court has repeatedly confirmed. *Bucklew*, 139 S. Ct. at 1123 (citing *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1879)). Implementation of this method entails minimal accommodations within Defendants' prison complex. Utah's current protocol leaves nothing to the imagination for implementation. Exhibit 12.

In light of the above, Mr. Atwood is likely to succeed on the merits of his Eighth Amendment claim. At the very least, he has raised "serious questions going to the merits" of his claim to satisfy the merits prong of the analysis and justify an injunction. *Alliance of the Wild Rockies*, 632 F.3d at 1134-35.

### b. Mr. Atwood is likely to succeed on his ADA Claim.

Mr. Atwood can also show a likelihood of success on his ADA claim. The Americans with Disabilities Act and Rehabilitation Act "unambiguously extend[] to state prison inmates." *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) (discussing the Americans with Disabilities Act); *see also Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016). "When the plaintiff has alerted the public entity to his need for

accommodation,' [or that need is obvious]⁵ the public entity has a 'well settled' duty to 'undertake a fact-specific investigation to determine what constitutes a reasonable accommodation.'" *Munoz v. Cal. Dep't of Corr. & Rehab.*, 842 F. App'x 59, 62 (9th Cir. 2021) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). "This duty requires the public entity 'to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary.'" *Munoz*, 842 F. App'x at 62 (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999)) (alteration in original).

"To show intentional discrimination, this circuit requires that the plaintiff show that a defendant acted with 'deliberate indifference,' which requires 'both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood.' *Updike v. Multnomah Cty.*, 870 F.3d 939, 950-51 (9th Cir. 2017). "To meet the second prong, the entity's failure to act 'must be a result of conduct that is more than negligent, and involves an element of deliberateness.'" *Id.* Fundamentally, "[a] public entity may not disregard the plight and distress of a disabled individual." *Updike v. Multnomah Cty.*, 870 F.3d 939, 950-51 (9th Cir. 2017).

Mr. Atwood is likely to succeed on the merits of his ADA claim. He is indisputably disabled and has been since, at latest, 2015, when he first became wheelchair bound. Defendants are well aware of his condition, and it is obvious. In particular,

---

⁵ *See, e.g., Updike v. Multnomah Cty.*, 870 F.3d 939, 950-51 (9th Cir. 2017).

Defendants know that Mr. Atwood suffers severe pain when he is supine, flat on his back. Even so, Defendants have moved for an execution warrant pursuant to an Arizona execution protocol that will force Mr. Atwood to be restrained supine on his back. As made clear above, this will cause him severe, unnecessary pain, even before the lethal injection drugs are administered.

Defendants have an obligation under the ADA to reasonably accommodate Mr. Atwood in the means they use to execute him. This could mean placing him in different bodily positions and/or using entirely different methods of execution like those discussed above. Most importantly, Arizona has a duty under federal law "to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary." *Munoz*, 842 F. App'x at 62. Arizona did not do this before seeking an execution warrant, despite its knowledge of Mr. Atwood's disability, and there is no indication that Arizona plans to engage in this process before attempting to kill Mr. Atwood in an excruciating manner. In light of these facts, Mr. Atwood can also show a likelihood of success on his ADA claim.

## II.     Plaintiff Will Suffer Irreparable Harm, and the Balance of Equities Favors Him.

"When adjudicating a preliminary injunction motion, the Ninth Circuit expects lower courts to protect physical harm to an individual over" other considerations, such as monetary costs to government entities. *Rosado v. Alameida*, 349 F. Supp. 2d 1340, 1348 (S.D. Cal. 2004) (citing *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) ("faced with [] a conflict between financial concerns and preventable human suffering,

[the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor.") and *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2003) (affirming preliminary injunction in favor of disabled plaintiffs challenging the county's decision to close specialty medical facility; balance of hardships tipped in favor of plaintiffs, who would be deprived of necessary treatment and suffer increased pain and medical complications)). "There can be no greater irreparable and permanent harm than death. Plaintiff will be irreparably harmed if his execution is not carried out in 'a constitutional manner.'" *Floyd v. Daniels*, No. 3:21-cv-00176-RFB-CLB, 2022 WL 2827291, at *6 (D. Nev. Jul. 6, 2021) (quoting *Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011)).

Ultimately, "the deprivation of [Mr. Atwood's] constitutional rights under the Eighth Amendment is itself sufficient to establish irreparable harm." *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Nelson v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134, 131 S. Ct. 746, 178 L. Ed. 2d 667 (2011) ("Unlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014) ("Irreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm.")).

Mr. Atwood will suffer severe, needless pain, if he is strapped down supine pursuant to Arizona's protocol. This would be true if the process took a minute and, judging from the Department's own logs from the 14 executions prior to Mr. Dixon's on May 11, the process can be expected to take upwards of an hour *before the lethal chemicals are injected*. Exhibit 2.

### III. The Balance of Equities Overwhelmingly Favors Mr. Atwood and An Injunction Serves the Public Interest.

Finally, the balance of equities favors Mr. Atwood and an injunction halting Arizona's current slipshod plan to execute him is in the public interest. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The balance of equities overwhelmingly favors Mr. Atwood, as he is set to suffer completely unnecessary pain, which the State could easily alleviate through different methods of execution. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (holding that courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."). Doing so would not harm or be inequitable to the State in any way. "Even if the Court were to find that the [Arizona] Defendants would somehow be inconvenienced by a stay, this inconvenience would pale in comparison to [Mr. Atwood's] interest in preventing his unlawful execution." *Floyd v. Daniels*, No. 3:21-cv-00176-RFB-CLB, 2022 WL 2827291, at *7 (D. Nev. Jul. 6, 2021).

As to the public interest, it is self-evident that "all citizens have a stake in upholding the Constitution," the public's "concerns are implicated when a constitutional right has been violated," *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005), especially when that violation occurs in the name of the people. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Calif. Chamber of Com. v. Council for Educ. Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (cleaned up).

Critically, granting preliminary relief would injure no public interest. *Alliance for the Wild Rockies*, 632 F.3d at 1138. This motion for injunctive relief does not seek to prevent the State from carrying out its wish to kill Mr. Atwood; it only insists that the State does so in a manner that respects his constitutional and federal statutory rights. The State and the public have no particular interest in Mr. Atwood being killed on June 8, 2022, as opposed to a later date when a plan can be put in place that does not clearly violate Mr. Atwood's rights.

The Ninth Circuit has made clear that "it is always in the public interest to prevent the violation of a party's constitutional rights." *De Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Indeed, "perhaps no greater public interest exists than protecting a citizen's rights under the constitution." *Legal Aid Soc'y of Hawaii v. Legal Services Corp.*, 961 F. Supp. 1402, 1409 (D. Haw. 1997). "The public at large is not served by . . . the willful or wanton infliction of pain and suffering on prisoners." *Duran v. Anaya*, 642 F. Supp. 510, 527 (D.N.M. 1986).

Because Mr. Atwood satisfies each prong of the preliminary injunction standard, this Court must halt Defendants' attempt to kill him in a way that will cause him needless severe pain and violate his constitutional and federal statutory rights. "The public's interest in the imposition and finality of a death sentence is based upon an implicit assumption that such an ultimate sanction was implemented in a fair and just manner." *Floyd*, 2022 WL 2827291, at *7. "The '[p]ublic interest is never served by a state's depriving an individual of a constitutional right.'" *Barbee v. Collier*, 2021 U.S. Dist. LEXIS 193811, at *21-22 (S.D. Tex. 2021). Without an injunction and consideration of the issues raised herein, the public will have no such assurance in this case.

## CONCLUSION

This Court must enter a preliminary injunction prohibiting Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from executing Mr. Atwood according to the Department's Execution Procedures effective until such time as Defendants can assure this Court that Mr. Atwood's execution would be in compliance with the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and aforementioned legislation.

Respectfully submitted this 26th day of May 2022,

JOSEPH J. PERKOVICH, ESQ.
NY Bar No. 4481776
Phillips Black, Inc.
PO Box 4544
New York, NY 10163
Tel: (212) 400-1660
j.perkovich@phillipsblack.org