Exhibit 7

# EXHIBIT 1

I, ███████████ hereby declare as follows:

1. I am over 18 years of age and would testify to the following based on my first-hand knowledge.

2. I am a licensed pharmacist in the State of Arizona.

3. As a licensed pharmacist in the State of Arizona, I am aware of and follow the guidelines and requirements found in the United States Pharmacopeia.

4. I have prior experience in properly preparing compounded sterile preparations.

5. I prepared a sodium pentobarbital solution using my training and experience as a licensed pharmacist.

6. I had the prepared sodium pentobarbital solution provided to a FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date. (See Attachments 1-3).

7. These test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing. (See Attachment 3).

8. On February 26, 2022, I prepared a sodium pentobarbital solution from the same sodium pentobarbital powder that was used for the stability study.

9. Based on the stability study test results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022.


DATED this 5th day of May, 2022.

███████████████████████████

# ATTACHMENT  1



# Certificate of Analysis

**CLIENT :**

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**FORMULATION ID :**

**DATE RECEIVED :** 09/24/2021

**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.5% (49.2302mg / 1mL) | 12/28/2021 |

Notes

Assay: The referenced method (AMIN-2089) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 90 of testing at pre-defined timepoints.



01/04/2022
_____
Date

Page 1 of 1

# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0310mg / 1mL) | 01/27/2022 |

Notes

Assay: The referenced method (AMIN         used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 120 of testing at pre-defined timepoints.

02/03/2022
_____
Date

# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0497mg / 1mL) | 03/02/2022 |

Notes

Time = Day 150 of testing at pre-defined timepoints.

Assay: The referenced method (AMIN) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

03/08/2022
—————————————
Date

# ATTACHMENT  2



# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Endotoxin | USP <85> | NMT 0.7 EU / mg | <0.2 EU / mg | 03/24/2022 |
| Sterility - (PRELIMINARY) | USP <71> | Sterile | No Growth at 5 Days | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.



03/28/2022
_____
Date



# Certificate of Analysis



**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| pH | USP <791> | Report Value | 10.6 | 03/24/2022 |
| Assay - Pentobarbital Sodium | | 92.0% - 108.0% | 100.3% (50.1515mg / 1mL) | 03/28/2022 |

Notes

Assay: The referenced method [redacted] used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 180 of testing at pre-defined timepoints.



04/04/2022

Date



# Certificate of Analysis



**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Sterility - (FINAL) | USP <71> | Sterile | Sterile | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.

04/06/2022
_____
Date



# Certificate of Analysis

**DESCRIPTION :**  Pentobarbital Sodium 50 mg/ml

**DATE RECEIVED :**  04/12/2022
**STORAGE :**  20°C to 25°C

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC | 90.0% - 110.0% | 98.2% (49.0968mg / 1mL) | 04/13/2022 |

Notes

The potency method(s) used for testing passed system suitability requirements per ▮▮▮▮▮▮▮ or non-cGMP analysis.
Product specific method validation is not available for this sample and specification(s) are for informational purposes only. Client
should verify the specification and analyte reported are correct for the compounded formulation.



04/13/2022
_____

Date

# ATTACHMENT  3



# STABILITY STUDY SUMMARY REPORT: PENTOBARBITAL

## PROJECT SUMMARY AND RESULTS

| Sample Description | Stability-Pentobarbital Sodium 50 mg/mL | | | | |
|---|---|---|---|---|---|
| Concentration | 50 mg/mL, Pentobarbital Sodium | | | | |
| Formulation ID | 4015 | | Dosage Form | Parenteral (IV) | |
| Storage Condition | 25°C ± 2°C/ 60%RH | | Lot Number | 39702 | |
| Container Description | 30 mL amber vial w/ 20 mL fill | | | | |

| Attribute | Methods | Specification (Description) | Initial (T0) ARL# 785881 | T90 D ARL# 786008 | T120 D ARL# 786023 | T150 D ARL# 818437 | T180 D ARL# 786025 |
|---|---|---|---|---|---|---|---|
| pH | USP ‹791› | Report Value | NT | NT | NT | NT | 10.6 |
| Sterility | USP ‹71› | Sterile | Sterile | Sterile | NT | NT | Sterile |
| Endotoxin | USP ‹85› | NMT 0.7 EU/mg | <0.2 EU/mg | <0.2 EU/mg | NT | NT | <0.2 EU/mg |
| Pentobarbital Sodium Assay | AMIN-2089 | % of Label (92.0-108.0%) | 96.4% | 98.5% | 98.1% | 98.1% | 100.3% |
| Assay Date Tested | - | - | 09/29/2021 | 12/28/2021 | 01/27/2022 | 03/02/2022 | 03/28/2022 |

## CONCLUSION

Physical and chemical data of Pentobarbital Sodium has demonstrated that Pentobarbital Sodium in the present formula and packaging met client provided specifications through 180 days in ambient storage conditions.

Exhibit 8

Pursuant to 28 U.S.C. § 1746(2).

### Declaration of James H. Ruble, PharmD, JD

I, James H. Ruble, declare as follows:

1. I have supplied several prior declarations in the Arizona Supreme Court in support of Mr. Atwood's litigation beginning in April 2021.

2. As reflected before, I reside in Utah and have been a registered pharmacist in that state since 1992, having earned the degrees of Doctor of Pharmacy, Juris Doctor, Bachelor of Science in Pharmacy, and Bachelor of Science in Biology from the University of Utah, Salt Lake City. I am an assistant dean for student affairs, an associate professor (clinical) in the Department of Pharmacotherapy, adjunct associate professor in the S.J. Quinney College of Law, and an adjunct associate professor in the School of Medicine – Center for Medical Ethics, Arts, and Humanities, in the College of Law, and in the Department of Pharmaceutical Chemistry and Pharmaceutics at the University of Utah.  I am currently president-elect of the American Society for Pharmacy Law. Exhibit A The information in this declaration is based upon my personal knowledge and sources of the type relied upon by researchers in my field.

3. I have compounded non-sterile and sterile pharmaceutical preparations for more than 25 years.   I have experience as a manager of a home infusion compounding pharmacy, including the compounding of high-risk compounded sterile preparations.   I have served as an independent, supervising pharmacist for compounding pharmacies under licensing probation with the State of Utah Division of Occupational and Professional Licensing.

4. I have reviewed recent disclosures from the State of Arizona, including information and testing records submitted in the federal litigation of Mr. Clarence Dixon earlier this month and relating to the attestations of the Department of Corrections' compounding pharmacist, who remains anonymous.

5. In the *Dixon* federal litigation, Mr. Dixon evidenced that the pharmacist's testing had failed and was deficient for establishing an expiry of the pentobarbital later than his scheduled execution date of May 11, 2022. The State responded to that evidence by seeking settlement of the suit by offering to prepare a new batch of pentobarbital approximately 48 hours before the time of execution. Mr. Dixon accepted that resolution, despite the impossibility of

sufficient inquiry to ensure the fitness of the chemicals for use under the Department's Execution Procedures.

6. This extraordinary turn of events transpired on the backdrop of the State having supplied limited information about the steps the Department's pharmacist has taken, which the pharmacist had characterized in their brief declaration dated May 5, 2022, as "stability testing." Exhibit B. The reliability of such "stability testing" is decisive for determining whether the Department's pharmacist can prepare compounded pentobarbital that is adequate for use in lethal injections under the Department's Execution Procedures.

7. Critical to this assessment is whether the pharmacist's assertions, along with the laboratory testing documentation the State has disclosed, permit the conclusion that the pharmacist has prepared pentobarbital sodium on or around April 7, 2022, when the State moved for Mr. Atwood's execution warrant, that has a beyond-use date, or "BUD," after his June 8, 2022 execution date.

8. As I have explained before, the BUD of any compounded preparation such as injectable pentobarbital is defined in the United States Pharmacopeia (USP) USP <797> (Chapter 797) as "the date or time after which a [compounded sterile preparation] shall not be stored or transported. The BUD is determined from the date and time the preparation is compounded."

9. BUD is also a defined term under Arizona Administrative Regulations, which govern the conduct of Arizona-licensed pharmacists, and provides:

> A date determined by a pharmacist and placed on a prescription label at the time of dispensing to indicate a time beyond which the contents of the prescription are not recommended to be used; or [a] date determined by a pharmacist and placed on a compounded pharmaceutical product's label at the time of preparation as specified in R4-23-410(B)(3)(d), R4-23-410(I)(6)(e), or R4-23-410(J)(1)(d) to indicate a time beyond which the compounded pharmaceutical product is not recommended to be used.

Ariz. Admin. Code R4-23-410.

10. Given the information made available to this point, the State has failed to compound pentobarbital for use on June 8, 2022, with a BUD after that date. As set forth below, the Department's pharmacist's stability testing results, on their face, failed. Further, the pharmacist has not conducted the testing under the prevailing pharmaceutical standards as enunciated in the USP and related guidance. Thus, the Department lacks a pharmaceutical

and pharmacopeia basis for claiming any BUD beyond the default empiric BUDs established under prevailing industry standards.

11. The USP has established empiric BUDs for high-risk compounded sterile preparations such as pentobarbital. According to USP <797>, for any compounded chemicals that lack reliable stability testing, the following basic BUD values apply: (a) 24 hours, if the product is stored at a controlled room temperature, (b) three days, if the product is refrigerated, and (c) 45 days, if the product is stored in a solid, frozen temperature.

12. Thus, the pentobarbital compounded on or around April 7, 2022 (for Mr. Atwood's execution), most likely exceeded its BUD by April 11, 2022—just three days after it was prepared. In the best-case scenario for the Department, the compounded chemicals were immediately frozen and have been kept frozen solid. Under those conditions, the pentobarbital could have a BUD of 45 days from the preparation date, which would be approximately this Sunday on May 22, 2022.

13. In this declaration I discuss shortfalls reflected both in the laboratory results the State has disclosed and the failings of the Department's pharmacist in satisfying basic stability testing requirements under industrial standards. Further, I address the implications of these inadequacies for Mr. Atwood, especially in the context of the unexpected resolution to the *Dixon* litigation in federal court.

14. The State's disclosures and representations, including those from the Department's pharmacist in their brief affidavit, only superficially address the major considerations for the compounding of the lethal injection chemicals. Before engaging with the limited information the State has supplied to this point, focus belongs on the significant revelations made in the pharmacist's affidavit.

15. The affidavit established that the pharmacist is Arizona-licensed and acknowledges that they "follow the guidelines and requirements found in the United States Pharmacopeia [USP]." Exhibit B at 2.

16. Judging from the laboratory testing documentation that the State has disclosed, which reflects lab methods used for 503A pharmacies, it is apparent that the Department's pharmacist practices within a 503A pharmacy. The 503B class, sometimes referred to as "outsourcing

compounding pharmacies", conducts large-scale production of compounded pharmaceuticals and is required to register with the FDA, and adhere to current Good Manufacturing Practices (cGMP) in its compounding practices; accordingly, they "resemble[] drug manufacturing more than … the professional practice of pharmacy."[1]

17. In contrast, a 503A compounder serves to compound for individual patients pursuant to prescription. 503A compounders are not subject to the drug approval process and the rigorous checks and regulatory procedures required under cGMPs.[2] Arizona regulations, however, do require 503A compounders to comply with official compendium requirements.[3] Arizona's official compendium is the latest revision of the United States Pharmacopeia and The National Formulary (USP–NF).[4]

18. Thus, it is obviously the case that any licensed compounding pharmacist working with a 503A pharmacy is obligated to adhere to the USP. While the pharmacist's acknowledgment establishes the proper bases for evaluating the adequacy of the work in compounding pentobarbital for Arizona's lethal injections, the recognition that they must follow the USP's guidance is merely conceding the existence of a fundamental, non-discretionary duty.

19. In 2021, the State sought scheduling for execution warrant motions based on representations attributed to the Department's pharmacist that any prospectively compounded pentobarbital would have an expiry of 90 days from the date of preparation. In June 2021, after the Arizona Supreme Court ordered scheduling for Messrs. Dixon and Atwood, the State returned to the Court to modify the scheduling based on a retraction attributed to the pharmacist indicating that only a 45-day BUD was possible for compounded pentobarbital unless "specialized testing" was conducted on the API. Based on records disclosed in recent months, it appears that the pharmacist embarked on sample testing some time in September 2021.

20. The change in the State's position was a dramatic course correction taken after Mr. Atwood's attorneys repeatedly presented extensive information about the prevailing pharmaceutical standards and the impossibility of the State's claims about the timeframe available to them

---

[1] Ex. 1 at 3, ¶ 13.
[2] 21 C.F.R., part 211.
[3] Ariz. Admin. Code § 4-23-410.
[4] A.R.S. § 32-1901.

for securing an execution date and conducting a lethal injection with compounded chemicals possessing a BUD later than the execution date.

21. Given that the pharmacist is obligated to follow USP requirements, it is important to give attention to the first area of concern in compounding a high-risk sterile preparation such as pentobarbital. Any "specialized testing" the Department's pharmacist may have carried out should begin with their handling of the original materials for the preparation, the active pharmaceutical ingredient, known as "API."

22. I have reviewed a publicly released redacted record of what appears to be an invoice dated October 22, 2020, indicating the Arizona Department of Corrections paying an undisclosed source $1,500,000 for a kilogram, in 1,000 1-gram vials, of pentobarbital sodium salt. Exhibit C. This procurement appears to provide the API the pharmacist has been using to prepare the solution for lethal injections.

23. The essential first step in any high-risk sterile compounding process, especially one in which multiple batches will be prepared from a particular API source, is to ascertain the purity of the API under industry standards. In simple terms, this means laboratory testing to yield a certificate of analysis ("COA"). The complex process for obtaining and evaluating a COA is described in USP <1080> Bulk Pharmaceutical Excipients – Certificate of Analysis.  A COA, provided by the manufacturer of the raw API, is indispensable, first, in establishing that the API is, in fact, what it has been represented to be by the seller. In a situation such as this one where obvious pedigree questions are apparent from the face of the limited available information and underscored by the absence of pertinent otherwise indispensable information, a COA is all the more important. Second, this lab analysis will identify impurities. This initial testing is especially important for that purpose as it is essential to identify the presence of pharmacologically active substances because the presence of such substances, in relation to the API itself, can create pharmacodynamic, and/or pharmacokinetic effects that can impede the pentobarbital's fundamental efficacy when injected.

24. Other essential considerations about the API are the rigorous, environmental storage conditions, which are of great importance given the size of the Department's purchase of the

salt its pharmacist is using for compounding. I am unaware of any disclosure addressing this vital factor for the API or, for that matter, any preparations made from it.

25. The bulk API for pentobarbital is nonsterile, which necessitates adherence to certain aseptic techniques and the verification of same at regular intervals. Sterile compounding of pentobarbital sodium injection must be done in a Direct Compounding Area that has ISO 5 quality airflow within a primary engineering control (e.g., a HEPA-filtered, horizontal laminar airflow workbench) that is located within a clean room that has ISO 7 quality airflow, as well as numerous additional engineering and design features.

26. USP <797> has robust expectations for cleaning and maintenance of the clean room and compounding equipment, as well as quality assurance processes and quality control testing of the equipment for microbial and other non-viable particulate contaminants. Compliance with these USP <797> requirements is mandatory. Nothing has been shared about the Department's pharmacist's compliance with these requirements.   In my experience, this is an area of substantial non-compliance with USP standards by 503A compounding pharmacies.

27. The pharmacist's May 5, 2022 affidavit relies on their shipment of "sodium pentobarbital solution provided to a[n] FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date." Ex. B at 2. However, there has been no description of the steps taken in preparing the solution. Whether the pharmacist used an appropriate methodology or stability protocol to prepare the solution for the eventual lab testing is critical in determining the adequacy of the preparation for purposes of extending the BUD of subsequently prepared compounding.

28. Thus, the assertion that stability testing is conducted by a lab is highly misleading. It is the responsibility of the pharmacist to conduct a stability protocol that culminates in external lab testing of the kind reflected in the limited testing disclosures turned over by the State in these cases. Industry standards dictate establishing a written stability protocol to achieve "specialized testing" sufficient to establish a BUD for subsequently compounded sterile preparations made from the same active and inactive (i.e., excipients, such as propylene glycol and alcohol) ingredients.

29. Such a written plan or protocol specifies and contemporaneously records testing of the API to determine the quality of the chemical and identify impurities. From that foundation, as well

6

as international standards, the methodology should entail preparation of a minimum of three batches and from each batch the provision of multiple samples for laboratory testing. Thus, the preparation of a single test batch is a striking deficiency in the methodology of the Department's pharmacist. Further, sound methodology contemplates enumeration of the tests to be performed on the samples, the testing conditions, the frequency and methodology of testing, the conditions of storage, including temperature and container qualities, and, critically, the specific formulation of the compounded preparation, noting the identity of not only the active ingredient (i.e., the pentobarbital sodium), but the identity of the other ingredients.

30. These criteria can be expected to yield results addressing the meaningful quality concerns for establishing a sound BUD. If sample batching satisfies the basic criteria, the resulting BUD may be transferable to subsequently prepared batches, but only if using identical ingredients and formulation as the sample batches.

31. It is apparent from the pharmacist's claims about the "specialized testing" performed on the single test batch prepared in or around September 2021 that they believed they established a 180-day span for setting a BUD for future compounding from the above-described kilogram of salt.

32. Judging from the pharmacist's opinion expressed in Mr. Dixon's case, it would seem that the State, if forced, would rely on the pharmacist to add 180 days to April 7, 2022, or a date near that day, to yield a BUD for the preparation made for Mr. Atwood's execution date.

33. This would be incorrect for various reasons, some of which are explored below. The first observation, though, is that BUD ascertainment is not retrospective. This is a fact of compounding that the Department's own Execution Procedures recognize in requiring the following:

> Upon receipt of the Warrant of Execution, the Housing Unit 9 Section Leader shall: . . . [e]nsure that complete sets of chemicals are on site, not expired, and immediately available for use. ADC will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that an execution is carried out. If the chemical's expiration or beyond-use date states only a month and year (e.g., "June 2017"), then ADC will not use that chemical after the last day of the month specified.

Attachment D, ¶ A.1.III.

7

34. On the face of this protocol, the Department is required to receive the compounded chemicals in a manner consistent with basic USP requirements, namely that a BUD has been established at the point of dispensing and that that date has been affixed to the preparation's container itself. This is an unsurprising requirement because it reflects basics under the USP and Arizona's corresponding administrative regulations. *Supra* ¶¶ 8-9.

35. In this context, the failure of the State simply to state *anywhere* the specific BUD for the injectable solution prepared for Mr. Atwood's June 8, 2022, execution defies the most basic conduct required of competent 503A compounding. It leads to an inference that the BUD has not been set out during the preparation of the chemicals.  Thus, the default, empiric BUD assignment for high-risk sterile preparations must apply.   In this circumstance, 24 hours at controlled room temperature, 3 days, at a cold temperature, or 45 days, in a solid frozen state.

36. In the *Dixon* federal litigation, the State asserted that the laboratory records it had disclosed for the September 2021 testing batch established basic stability for that test batch and, what is more, that from the 180-day BUD it claimed from that single batch's testing it could also extrapolate that 180-day BUD for *all future batches from the API salt*.

37. First, the testing results for that single batch reflect that it failed. The test batch was unusable as medicine or in an execution.

38. This failure underscores the above-mentioned fundamental standard for stability testing that multiple batches, no fewer than three, should be prepared for yielding multiple testing samples for each of the batches. From that array of preparations and samples, reliable data can arise. *Supra* ¶ 29.

39. Instead, the Department's pharmacist attempted a single testing batch and that batch simply did not satisfy the enumerated criteria under USP guidelines. As a result, the pharmacist is unable to selectively use lab results on the batch's potency to conjure a BUD *and then apply that BUD to all future batches from the same API salt*. But that is what this pharmacist has attempted to do.

40. Specifically, the pH of 10.6 reflected in the pharmacist's lab testing falls outside of the accepted parameters for pH for injectable pentobarbital sodium. These parameters, as set forth in the prevailing USP Monograph for this preparation, and pursuant to USP <791>, are

between 9.0 and 10.5. Exhibit D. The difference of 0.1 in pH, *viz.*, between the upper end of 10.5 and 10.6, appears modest, however, the published range is decisive; either the pH value for a given preparation falls within the parameters or it fails to meet that essential criterion.[5] The Department's test batch fails this critical measure. This batch was unusable and it is self-evident that a batch that would need to be discarded cannot supply data for extrapolation to establishing BUDs for other batches. This is apparent disregard for the USP requirements follows patterns that I observed as a supervising pharmacist overseeing pharmacies under licensing probation, and also notable given the attestation from the compounding pharmacy contracted to the Department, indicating compliance with USP requirements.

41. The USP is illuminating on the importance of pH in relation to the stability of an injectable (i.e., soluble) high-risk compounded sterile preparation:

> *pH Effect*
> The *degradation of many drugs in solution accelerates or decelerates exponentially* as the pH is decreased or increased over a specific range of pH values. Improper pH ranks with exposure to elevated temperature as a factor most likely to cause a clinically significant loss of drug, resulting from hydrolysis and oxidation reactions. A drug solution or suspension, for example, may be stable for days, weeks, or even years in its original formulation, but when mixed with another liquid that changes the pH, it degrades in minutes or days. It is possible that a pH change of only 1 unit (e.g., from 4 to 3 or 8 to 9) could decrease drug stability by a factor of 10 or greater.

<1191> Stability Considerations in Dispensing Practice (emphasis added).

42. Given the exponential effects of pH deviations on the degradation of many drugs, certainly including high-risk sterile compounds such as pentobarbital sodium, a nominally modest difference of 0.1 may cause profound change to the quality of the drug.

43. In the context of injectables such as, of course, pentobarbital sodium under the Department's Execution Procedures, an increase of this kind raises the spectre of catastrophic effects on venous endothelial cells during the prospective injection. These endothelial cells constitute the inner lining of veins and comprise the site of actual contact between injected solutions, i.e., pentobarbital sodium, and the venous circulatory system. Information available describes that a pH of 11 may kill these endothelial cells upon contact, stripping away any buffer for

---

[5] Further, the established optimal pH for pentobarbital sodium injection is 9.5. *See* package insert, Nembutal Sodium Solution CII.

the innumerable nerve endings throughout the venous system. The resulting pain from such a failure is incomprehensible. Yet the degree of departure from an acceptable outer limit of pH for pentobarbital sodium to a catastrophically high level is seemingly modest. Elevation of a pH level outside the accepted parameters presents serious concerns.

44. In this context, the State sought a swift resolution of Mr. Dixon's federal suit claiming that the pharmacist's "specialized testing" or "stability testing" had failed.

45. However, the form of that resolution, from the standpoint of the adequacy of the compounded pentobarbital ultimately used for Mr. Dixon's execution and the discarding of the basic framework in place to improve reliability in the drugs and avoid last minute instability in conducting lethal injections, is deeply concerning from a pharmaceutical standpoint.

46. The elements of the Department's Execution Procedures obligating it to obtain, upon issuance of a warrant, lethal injection drugs with a sufficient BUD for use on the scheduled execution date, Att. D, ¶ A.1.III, coupled with the Department's obligation to supply quantitative analysis of the specific drugs by ten days from the given warrant motion, Att. D, ¶ C.2, establish a rudimentary framework for managing the inherent risk of inefficacious drugs resulting from the processes of making high-risk compounded sterile preparations such as pentobarbital sodium. Even under optimal circumstances, very much can go wrong in making such sensitive preparations. Further, under the circumstances of compounding for executions, the absence of transparency in the actual preparation increases the inherent vulnerability in the compounding process. In my professional opinion, it is thus unsurprising that over the course of the past decades, numerous lethal injections have not gone according to plan.

47. The basic framework codified in the Execution Procedures should function to mitigate a substantial degree of the risk in this undertaking and provide far greater reliability in the preparation of lethal injection drugs than what has existed in the past from unsupported assurances about the readiness of the given drugs.

48. In Mr. Dixon's case, the first one under the Department's protocol requiring establishment of a BUD, the orderliness of this framework was discarded at the first indication of pharmaceutical inadequacy concerning the execution drugs.

49. In my review of the events in recent days culminating in Mr. Dixon's lethal injection on May 11, it appears that the State, through its Department's pharmacist, swapped the measured approach to execution drugs verification for ad hoc preparation at literally the last possible moment.

50. The Department thus relied on the above-referenced empiric BUD of three days for refrigerated high-risk sterile preparations (*supra* ¶¶ 11, 35), so that it could avoid an evaluation of the fitness of the drugs it had expected to use in Mr. Dixon's injection.

51. I am unable to opine on the adequacy of the pentobarbital solution ultimately used to carry out that execution and perhaps there will be additional scientific clarity if a post-execution analysis is conducted on Mr. Dixon. But whatever those results reflect, a substantial element of that execution, as a matter of the prohibition against cruel and unusual punishments, will remain unknowable because indications of pain can be masked in this process.

52. The juncture where meaningful steps can be taken to mitigate the substantial risk of inflicting severe pain in a lethal injection is at the point where the basic testing of the drugs can occur. When a batch is prepared about 48 hours prior to its use, key testing elements are simply unavailable. While potency can be tested, this tight timeframe prevents sterility and endotoxins testing, two vital components to the basic evaluation of the fitness of drugs for use in this context. Sterility testing takes two weeks, conventionally. Pyrogen testing for bacterial endotoxins, for example, also is infeasible on that compressed timeline.

53. My emphasis on the importance of conducting sterility and endotoxins testing concerns the detection of contaminants. The concern in the context of a lethal injection is not whether the receiver of the injection is susceptible to developing an infection from the process.  Infecting microbial organisms present other immediate harms besides just reproducing and spreading through the body.   Rather, it is important to detect contaminants in the injectable solution because the presence of crystalized particles within it is among the most likely factors leading to severely painful or even botched executions. Obviously, such debris placed into an injection could be catastrophic, as crystals are susceptible to causing embolisms (ie., a particulate blocking a blood vessel) and associated failings in the process, leading to a prolonged or ineffective execution and severe pain.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 18th day of May 2022.

Digitally signed by James Ruble
Date: 2022.05.18 10:47:43
-06'00'

_____

James H. Ruble, PharmD, JD

# EXHIBIT A

# *James H. Ruble*
April 2022

## PERSONAL DATA

| | |
|---|---|
| Birth: | Coronado, California |
| Citizenship: | United States of America |
| Address & Phone (W): | University of Utah College of Pharmacy, Skaggs Pharmacy Institute, 30 South 2000 East, Room 4924, Salt Lake City, Utah, 84112 Office: (801) 581-4514 |
| e-mail address: | jim.ruble@hsc.utah.edu |
| web profile: | https://faculty.utah.edu/u0035171-Jim_Ruble/hm/index.hml |

## EMPLOYMENT / PROFESSIONAL EXPERIENCE

### *Academia Position – Primary*

2021 – Present   Assistant Dean for Student Affairs, College of Pharmacy, University of Utah, Salt Lake City, Utah (effective 1 August 2021)

2013 – Present   Associate Professor (Clinical), Department of Pharmacotherapy, College of Pharmacy, Skaggs Pharmacy Institute, University of Utah, Salt Lake City, Utah
   Assistant Professor (Clinical) 2010 – 2013
   Clinical Assistant Professor (adjunct) 1995 – 2010

### *Academia Positions – Adjunct*

2020 – Present   Adjunct Associate Professor, SJ Quinney College of Law, University of Utah, Salt Lake City, Utah

2016 – Present   Adjunct Associate Professor, Center for Health Ethics, Arts and Humanities (CHeEtAH), School of Medicine, University of Utah, Salt Lake City, Utah

2017 – Present   Adjunct Associate Professor, Department of Pharmaceutics and Pharmaceutical Chemistry, College of Pharmacy, Skaggs Pharmacy Institute, University of Utah, Salt Lake City, Utah
   Adjunct Assistant Professor 2010 – 2016

2006 – 2011, 2018   Visiting Faculty, Roseman University of Health Sciences, South Jordan, Utah

### *Non-academia Positions – Health Care*

2018 – Present   Faculty Relations Specialist, Office of the Associate Vice President for Faculty and Academic Affairs, University of Utah Health, Salt Lake City, Utah

2016 – 2018   Ombudsman, Office of the Associate Vice President for Faculty and Academic Affairs, University of Utah Health, Salt Lake City, Utah

2009 – 2016   Clinical Pharmacist, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah

| 2007 – 2009 | Manager, Infusion Pharmacy, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 2004 – 2007 | Sterile Compounding/IV Admix Clinical Pharmacist, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 2000 – 2001 | Staff Pharmacist, Target Stores Pharmacy, Centerville, Utah |
| 1996 – 1999 | Clinical Pharmacist in Ambulatory Neurology and Neurosurgery, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 1995 – 1996 | Clinical Pharmacist in Drug Information, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 1994 – 1995 | Pediatric Pharmacy Team Coordinator, Pharmacy Department, Geisinger Medical Center, Janet Weis Children's Hospital, Danville, Pennsylvania |
| 1992 – 1994 | Staff Pharmacist, Pharmacy Department, Primary Children's Medical Center, Salt Lake City, Utah |
| 1989 – 1992 | Pharmacist Intern, Pharmacy Department, Primary Children's Medical Center, Salt Lake City, Utah |
| 1988 – 1990 | Clinical Technologist, Sleep Disorders Center, University of Utah Health Care, Salt Lake City, Utah |
| 1985 – 1988 | Pulmonary Function Technician, Pulmonary Laboratory, University of Utah Health Care, Salt Lake City, Utah |
| 1985 – 1985 | Anesthesiology Technician, Anesthesiology Workroom, University of Utah Health Care, Salt Lake City, Utah |

### *Non-academia Positions – Law and Consulting*

| 2013 – Present | Founder and Member, Salus Consulting, LLC, Bountiful, Utah |
| 2004 – 2006 | Attorney, Wasatch Intellectual Property Services, LLC, N. Salt Lake, Utah |
| 2002 – 2005 | Associate Attorney, Pate Pierce & Baird, PC, Salt Lake City, Utah |
| 2001 – 2001 | Law Clerk, Jones Waldo Holbrook & McDonough, PC, Salt Lake City, Utah |
| 2000 – 2000 | Independent Consultant, Christensen & Jensen, PC, Salt Lake City, Utah |

### EDUCATION

| Degree | Years | Institution |
| --- | --- | --- |
| Juris Doctor | 1999 – 2002 | University of Utah |
| Doctor of Pharmacy | 1992 – 1994 | University of Utah |
| Bachelor of Science – Pharmacy | 1989 – 1992 | University of Utah |
| Bachelor of Science – Biology (Molecular & Biochemistry emphasis) | 1984 – 1989 | University of Utah |

LICENSURE/CERTIFICATION/ADDITIONAL TRAINING

| | |
|---|---|
| 2019 – 2020 | Academic Leadership Fellows Program (ALFP) (Cohort 16), American Association of Colleges of Pharmacy, Arlington, Virginia |
| 2016 – 2017 | Conflict Resolution Graduate Certificate Program, University of Utah, Department of Communication    (Certificate awarded April 2017) |
| 2016 | Foundations of Organizational Ombudsman Practice, International Ombudsman Association (IOA), Santa Ana, California, June 2016 |
| 2014 – Present | Basic Life Support for Healthcare Providers (CPR and AED), American Heart Association |
| 2004 – Present | Registered Patent Attorney, United States Patent and Trademark Office, Reg. No. 56118 |
| 2002 – Present | Attorney, Utah State Bar, Member No. 09426 |
| 1994 – 1996 | Registered Pharmacist  – Pennsylvania Board of Pharmacy License No. RP041317R (expired 9/30/1996) |
| 1992 – Present | Registered Pharmacist – Utah Division of Occupational and Professional Licensing, License No. 153627-1701 (expires 9/30/2021) |
| 1986 – 1988 | Certified Pulmonary Function Technician (CPFT), National Board for Respiratory Care |
| 1985 – 1997 | Advanced Cardiovascular Life Support (ACLS), American Heart Association |
| 1985 – 1997 | Basic Life Support (BLS). American Heart Association |

HONORS, RECOGNITIONS & AWARDS

| | |
|---|---|
| 2021 | P1 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2020 | P4 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2019 | Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2019 | P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2018 | P1 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2017 | Overall Best Mediator, recognized by Peers and Faculty in Conflict Resolution Graduate Certificate Course, University of Utah, Salt Lake City, Utah |
| 2016 | P3 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2015 | Leadership in Ethics Education Award, Daniels Fund/David Eccles School of Business, University of Utah, Salt Lake City, Utah |
| 2015 | Outstanding Professor Award, Hinckley Institute, Univ. of Utah, Salt Lake City, Utah |
| 2014 | Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |

| | |
|---|---|
| 2014 | P4 and P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2011 | Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2011 | P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2005 | Partners-in-Caring Award, University of Utah Health Care, Salt Lake City, Utah |
| 1995 | Employee Recognition Award for Outstanding Service, Geisinger Medical Center, Danville, Pennsylvania |
| 1993 | Ewart Swinyard Scholarship, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 1992 | Facts and Comparisons Award for Excellence in Clinical Communications, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 1992 | McNeil Pharmaceuticals Award for Outstanding Achievement in Pharmacy Administration, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 1991 | Allen and Hanburys Scholarship, University of Utah, Salt Lake City, Utah |
| 1991 | Faculty Scholarship, College of Pharmacy, University of Utah, Salt Lake City, Utah |

RESEARCH AND SCHOLARLY WORK

*Grants*

| | |
|---|---|
| 2021 – 2023 | A database and heuristic of ethical issues in biomedical research. Principle Investigator:  James Ruble Total Budget:  $50,000  (proposal accepted for funding) Funding Source:  ALSAM |
| 2016 – 2019 | Treatment patterns, patient outcomes, and healthcare charges in hemophilia at Hemophilia Treatment Centers in the Intermountain West. Principal Investigator:  David Stenehjem, PharmD, BCOP Direct Costs: $462,500 Total Costs: $613,738 Role:  Co-Investigator (< 5%) Funding Source:  Biogen/IDEC |
| 2012 – 2014 | Evaluation, Research, Survey and Recommendations:  Physician Dispensing Exemption from Pharmacy Licensure. Principal Investigator:  Mark Munger, PharmD Direct Costs:  $67,000  Total Costs:  $67,000 Role:  Co-Investigator (40%) Funding Source:  State of Utah, MP12023 |
| 2011 – 2013 | Promoting the Pharmacy Profession as a Career Pathway for Female Students and Students from Ethnically Diverse Backgrounds Principal Investigator: James H. Ruble Direct Costs: $3,500   Total Costs: $3,500 Role: Principal Investigator (100%) Funding Source: Educational Resources Development Council |

| | |
|---|---|
| 2012 – 2012 | Evaluation of buffer solutions and impact of gas sterilization processes<br>Principal Investigator:  Mark Munger, PharmD<br>Direct Costs:  $15,000   Total Costs:  $15,000<br>Role:  <u>Co-Investigator (50%)</u><br>Funding Source:_BARD Access Systems, Inc. |
| 1998 – 1998 | Comprehensive evaluation of psychometric assessment tools in Alzheimer's disease<br>Principal Investigator: Gary Oderda, PharmD, MPH<br>Direct Costs: $10,000   Total Costs: $10,000<br>Novartis Pharmaceuticals Corporation<br>Role: <u>Co-Investigator (50%)</u> |

<u>PUBLICATIONS</u>

***Peer-Reviewed Journal Articles***

17. Bald E, Kourtides D, Cox N, Raber H, **Ruble J**, Richards B.  Comparison of a Self-Care Therapeutics Course Taught in the P1 versus the P2 Year.  *J Pharm Pract.* 2021 Aug 16:897 doi: 10.1177/08971900211038860

16. Carr C, Scoville J, **Ruble J**, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, Sarigul B, Hawryluk G.  An Audit and Comparison of pH, Measured Concentration, and Particulate Matter in Mannitol and Hypertonic Saline Solutions.  *Front Neurol.* 2021 May 17;12:667842. doi: 10.3389/fneur.2021.667842

15. Rosenberg E, Albert EL, Mospan GA, Panther S, **Ruble J**, Stein RL.  A Pilot Study Regarding Pharmacy Law Education Across Doctor of Pharmacy Programs.  *Am J Pharm Educ.* 2020;84(2):7172.  doi: 10.5688/ajpe7172.

14  Tak CR, Gunning K, Kim J, Sherwin CM, **Ruble JH**, Nickman NA, Biskupiak JE.  The effect of a prescription order requirement for pharmacist-administered vaccination on herpes zoster vaccination rates.  *Vaccine*. 2019 Jan 21;37(4):631-636. doi: 10.1016/j.vaccine.2018.12.003. Epub 2018 Dec 15.

13. **Ruble JH.**  Evaluation of US Federal Legislation for Opioid Abuse: 1973-2016.  *J Pain Palliat Care Pharmacother.*  2016 Sep;30(3):218-24. doi: 10.1080/15360288.2016.1211213.

12. Feehan M, Durante R, **Ruble JH**, Munger MA.  Qualitative Interviews about Pharmacist Prescribing in the Community Setting.  *Am J Health-Syst Pharm*. 2016 Sep 15;73(18):1456-61. doi: 10.2146/ajhp150691.

11. **Ruble JH.**  Tools for "decloaking" the elephant in the room:  Conflict-of-interest, Shared Decision-Making and Patient-Centered Care [Commentary]. *J Pain Palliat Care Pharmacother.*  2015 Jun;29(2):173-7.  doi: 10.3109/15360288.2015.1037519.

10. **Ruble JH.** The "death" of lethal injection as we know it?  An opportunity to reflect on the role of chemical execution in the US criminal justice system [Commentary]. *J Pain Palliat Care Pharmacother.*  2014 Sep;28(3):276-81. doi: 10.3109/15360288.2014.941133. Epub 2014 Aug 14.

9.   Munger MA, **Ruble JH**, Nelson SD, Ranker L, Petty RC, Silverstein, S, et al.  National Evaluation of Prescriber Drug Dispensing. *Pharmacotherapy.* 2014 Oct;34(10):1012-21. doi: 10.1002/phar.1461. Epub 2014 Jul 23.

8.   **Ruble JH.**  Prescriber-Pharmacist Collaboration:  Re-engineering the Partnership to Optimize Pain Patient Care [Commentary].  *J Pain Palliat Care Pharmacother*. 2013 Dec;27(4):365-6. doi: 10.3109/15360288.2013.849322. Epub 2013 Oct 21.

7.   **Ruble JH.**  Distribution of Controlled Substances in the US Supply Chain:  Where does the Compass Point? [Commentary].  *J Pain Palliat Care Pharmacother.* 2012 Sep;26(3):251-3. doi: 10.3109/15360288.2012.703983.

6.   Shrewsbury R, Augustine S, Birnie C, Nagel K, Ray D, **Ruble J,** Scolaro K, Athay Adams J.  AACP Report:  Assessment and Recommendations of Compounding Education in AACP Member Institutions.  *Am J Pharm Educ.*  2012 Sep 10;76(7):S9. doi: 10.5688/ajpe767S9.

5.   **Ruble JH**. Off-label Prescribing of Medications for Pain: Maintaining Optimal Care at an Intersection of Law, Public Policy and Ethics. *J Pain Palliat Care Pharmacother.* 2012;26:146-52.

4.   **Ruble JH**. Baxter v. Montana, Libertarianism, and End-of-Life: The Ripe Time for a Paradigm Shift. *J Pain Palliat Care Pharmacother.* 2010 Sep;24(3):263-70. doi: 10.3109/15360288.2010.502214.

3.   **Ruble J**, Matsuo F.  Antiepileptic-induced cutaneous drug reactions: Incidence, mechanisms, and management. *CNS Drugs*. 1999;12(3): 215-36.

2.   **Ruble J**, Muncey LA.  Beta-adrenergic agonists in the treatment of asthma. *J Pharm Care Pain Symptom Control*. 1997;5(4): 49-56.

1.   Goeser S, **Ruble J**.  Melatonin: Historical and clinical perspectives.  *J Pharm Care Pain Symptom Control*. 1997;5(1):37-49.

### *Letters and Other Publications*

8.   Pan RJ, **Ruble JH.**  A Commentary on Ethical Decision-Making in the Pharmacy Profession and the APhA Code of Ethics.  *Journal of the American Pharmacists Association*.  2021;61(2):E68-E70. doi.org/10.1016/j.japh.2020.10.021.
https://www.japha.org/article/S1544-3191(20)30547-1/fulltext

7.   **Ruble JH**, Brixner DA.  Comment & Response: Outpatient Pharmacy Expenditures for Children with Serious Chronic Illness in California, 2010-2012.  *JAMA*. 2016;315(7):706. doi:10.1001/jama.2015.16978.

6.   Subach RA, **Ruble J**.  Misprint of dosage interval for liposomal doxorubicin hydrochloride [Letter]. *Am J Health Syst Pharm*. 1996;53(14):1727.

5.   **Ruble JH.**  Pharmacoeconomics – an evolving tool in health technology assessment. Division of Medical Ethics and Humanities Newsletter, School of Medicine, University of Utah.  June 2016.  Available at:
http://medicine.utah.edu/internalmedicine/medicalethics/newsletters/index.php

4. **Ruble J**. Impact safety, efficiency, and the bottom line with premixed IV products. *Pharmacy Purchasing & Products*. 2008;*5*(2):34,36,38.

3. **Ruble J**. USP Chapter <797> Compliance: Important legal issues. *Pharmacy Purchasing & Products*. 2008;5(6):16,18,20.

2. **Ruble J**, Hill GK. Inadvertent Public Disclosure and Possible Loss of Intellectual Property Rights. *Nutraceutical Business & Technology* 2005;1(5):34-40.

1. **Ruble J**, Koberstein W, ed. Special Report: The Secure IPO Launch Plan – A Virtual Roundtable. *BioExecutive International* 2005;1(4):58-67.

### Book Chapters

2. **Ruble JH**. Legal Implications for Pharmacists: US Legal Framework, Regulatory Oversight, Civil Responsibility, and Professional Judgement. In: Pharmacy Student Survival Guide, 4th ed., Nemire R, Assa-Eley M, eds. New York, NY:McGraw-Hill Medical; 2022 [in press]

1. **Ruble JH**. Compounded medications in pain management: customized rational polypharmacy. In: Aronoff GM, editor. Medication management of chronic pain: what you need to know. Bloomington, IN:Trafford Publishing; 2017.

### Scientific Posters and Abstracts

16. Bald E, Kourtides D, Cox N, Raber H, **Ruble, J**, Nazminia K, Richards B. (2021). *Comparison of a Self-Care Therapeutics Course Taught in the P1 versus the P2 year.* American Association of Colleges of Pharmacy, Annual Meeting (virtual).

15. Paulson CM, **Ruble J**. (2020). *Pharmacists' Perceptions of Ethical Dilemmas Encountered in Community Practice.* Professional Development Poster Session, University of Utah College of Pharmacy, Salt Lake City, Utah.

14. Winter K, **Ruble J**. (2020). *Pharmacists' Perceptions of Ethical Dilemmas Encountered in Acute Care/Institutional Practice.* Professional Development Poster Session, University of Utah College of Pharmacy, Salt Lake City, Utah.

13. Winter K, **Ruble J**. (2019). *Pharmacist Perceptions of Ethical Dilemmas Encountered in Acute Care/Institutional Practice.* American College of Clinical Pharmacy (ACCP) Annual Meeting, New York City, New York.

12. Knight LH, Rimer E, **Ruble J**. (2019). *An Assessment of Potential Roles of a Clinical Pharmacist in Optimizing Health and Athletic Performance of Student Athletes.* College of Pharmacy Doctor of Pharmacy Program Poster Session. University of Utah, Salt Lake City, Utah.

11. Clark L, **Ruble J**. (2018). *UHealth Ombudsman Office: A Resource for Conflict Resolution.* UHealth Resiliency Program – Wellness Champions Poster Session. University of Utah, Salt Lake City, Utah.

10. Raber H, May A, Nyman H, **Ruble J**, Witt D. (2018). *The White Space Project.* UHealth Resiliency Program – Wellness Champions Poster Session. University of Utah, Salt Lake City, Utah.

9.  Carr C, Scoville J, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, **Ruble J**, Hawryluk G. (2018).  *A Comparison of Measured pH, Salinity, Osmometry, Nephelometry, and Particulate Matter in Mannitol and Hypertonic Saline [Abstract #41977]*.  American Association of Neurological Surgeons (AANS) Annual Meeting, New Orleans, Louisiana.

8.  Carr C, Scoville J, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, **Ruble J**, Hawryluk G. (2018).  *An Audit of pH, Salinity, Osmometry, Nephelometry, and Particulate Matter in Commercially Available Hyperosmolar Solutions [Abstract #41971]*.  American Association of Neurological Surgeons (AANS) Annual Meeting, New Orleans, Louisiana.

7.  Tak CR, Kim J, Gunning K, **Ruble JH**, Sherwin CMT, Nickman NA, Biskupiak J. (2018).  *Effect of a Prescription Order Requirement for Pharmacist-Administered Vaccination on Zoster Vaccination Rates*.  AMCP Managed Care and Speciality Pharmacy Annual Meeting, Boston, Massachusetts.

6.  Bowman N, **Ruble J**, Crouch BI.  *Homemade Play-Dough: Money Saving and Potentially Life-Threatening?*  North American Congress of Clinical Toxicology. (2016) NACCT Abstracts 2016, Clinical Toxicology, 54:8, 659-811, DOI: 10.1080/15563650.2016.1197486

5.  Skrabal MZ, Downs GE, Carter RA, Eagerton DH, Franson KL, Hritcko PM, Jungnickel PW, Kissack JC, **Ruble J**, Torrado C.  (2016).  *Marijuana Use Task Force (MUTF): Considerations for Schools Regarding Marijuana Use by Students, Faculty, and Preceptors*.  American Association of Colleges of Pharmacy Annual Meeting, Anaheim, California.

4.  Blumenthal D, Stephens S, Nyman H, Jennings B, **Ruble J**, et al. (2013).  *Rapid development and longitudinal incorporation of interprofessional education simulations into the pharmacy curriculum*.  American Association of Colleges of Pharmacy Annual Meeting, Chicago, Illinois.

3.  **Ruble J**, Edwards D, Schmidt J, et al. (2003). *Medication Use Review: Infliximab use in the ambulatory clinic infusion center at University Health Care*. Report presented to Pharmacy Administration, University of Utah Health Care, Salt Lake City, Utah.

2.  **Ruble J**, Constantino T, Godsey C, et al. (1998). *Topiramate (TPM) use in refractory epilepsy patients ineligible for surgical treatment [Abstract #100231]*. American Epilepsy Society 52nd Annual Meeting, Sheraton Convention Center, San Diego, California.

1.  Forshew DA, **Ruble J**, Bromberg MB. (1998). *A survey of ALS/MND specialists for medication preferences for relief of symptoms associated with ALS/MND. Platform Presentation*. The 9th International Symposium on ALS/MND, Park Hilton, Munich, Germany.

EDITORIAL EXPERIENCE

**Editorial Board Member**

*Journal of Pain & Palliative Care Pharmacotherapy*

**Reviewer Experience**

*Journal of Managed Care Pharmacy*, Alexandria, Virginia, USA

*Research in Social and Administrative Pharmacy*, Elsevier, Amsterdam, Netherlands

*Journal of Pain & Palliative Care Pharmacotherapy*, Informa Healthcare USA

*American Journal of Pharmaceutical Education*, Arlington, Virginia, USA

*Hospital Pharmacy Journal*, ThomasLand Publishers, St. Louis, Missouri, USA

*Pharmacist's Letter*, Therapeutic Research Center, Stockton, California, USA

*BMC Research Notes*, BioMed Central, London, UK

*Handbook of Nonprescription Drugs: An Interactive Approach to Self-Care, 20th Edition*, Chapter 4: Legal and Regulatory Issues in Self-Care Pharmacy Practice.


PRESENTATIONS

**Meeting Presentations**

National/Regional/Local

| | |
|---|---|
| 03/2023 | Case Law Updates.  American Pharmacists Association (APhA), Annual Meeting & Exposition, Phoenix, Arizona |
| 11/2022 | Case Law Updates. American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Naples, Florida |
| 08/2022 | Civility, Respect, and Professionalism in Academic Research.   Keynote Presentation.   Association of Research Integrity Officers (ARIO) National Meeting. Marriott Hotel and Conference Center, Salt Lake City, Utah |
| 11/2021 | Case Law Updates.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting,  Las Vegas, Nevada |
| 07/2021 | Teaching Pharmacy Students Resource Allocation Ethics in a Courageous New World.  American Association of Colleges of Pharmacy (AACP) Annual Meeting (virtual conference) |
| 03/2021 | Case Law Updates.  American Pharmacists Association (APhA), Annual Meeting & Exposition (virtual conference) |
| 11/2018 | Ethics in Pharmacy and Law: Practice implications of anti-discrimination standards in MRPC 8.4(g) and ACA section 1557.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Hilton Head, South Carolina |
| 07/2018 | Ethical, Legal, and Social Issues in the Era of Genomic Medicine: How Do We Best Educate Pharmacy Students. Special Presentation, American Association of Colleges of Pharmacy (AACP), AACP Annual Meeting, Boston, Massachusetts |
| 04/2018 | Opioid Crisis in Utah – Symposium.  Center for Law and Biomedical Sciences, SJ Quinney College of Law, University of Utah, Salt Lake City, Utah |

| | |
|---|---|
| 07/2017 | Ethical Dilemmas in Pharmacotherapy – Communication and Conflict Resolution Skills for the Pharmacy Learner Continuum.  Special Presentation, American Association of Colleges of Pharmacy (AACP), AACP Annual Meeting, Nashville, Tennessee |
| 04/2017 | Reducing Risk and Maintaining Empathy:  Professional Practice Tips for Risk Management & Strengthening Relationships.  Anticoagulation Forum National Meeting, Los Angeles, California |
| 03/2017 | Death-With-Dignity: Legal, Ethical, Clinical and Pharmaceutical Perspectives.  18th Annual Conference on Emerging Issues in Healthcare Law, American Bar Association (ABA) National Meeting, New Orleans, Louisiana |
| 11/2016 | Educator's Session – Formative and Summative Assessment in Pharmacy Law Education.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Austin, Texas |
| 05/2016 | Moral Distress and Moral Fatigue in Health Care Professionals.  Project ECHO – Burn and Soft Tissue Injury.  University of Utah Burn Center.  Salt Lake City, Utah |
| 01/2016 | Reducing Risk and Maintaining Empathy:  Professional Practice Tips for Risk Avoidance, Risk Mitigation & Strengthening Relationships.  Anticoagulation Forum Boot Camp.  Salt Lake City, Utah |
| 11/2014 | Pharmacy and the Continuum of Lethal Injection.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Indian Wells, California |
| 11/2014 | Educator's Session – Teaching Federal Pharmacy Law.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting.  Indian Wells, California |
| 10/2014 | Prescription Drugs and Poisonings:  Exploring the Landscape – Legal Perspective. Utah Poison Control Center 60th Anniversary Symposium.  Salt Lake City, Utah |
| 11/2013 | Compounding Paradigm Shift: A New Regulatory Landscape.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Jacksonville, Florida |
| 11/2012 | Pharmacy Compounding and Meningitis Tragedy Update: What Lessons Can We Learn?  Utah Board of Pharmacy, Salt Lake City, Utah |
| 09/2010 | Criminal Liability for Compounding Errors: A Discussion of Recent Cases. Utah Society of Health System Pharmacists, Annual Meeting, Salt Lake City, Utah |
| 07/2009 | Is Compounding Illegal or Unethical? A Discussion of Law and Ethics in Pharmaceutical Compounding. University of Utah College of Pharmacy Pharmacotherapy Department Seminar |
| 04/2009 | Equipoise and Clinical Research in an Academic Medicine Environment. University of Utah Health Care, Ethics Committee, Educational Presentation, Salt Lake City, Utah |
| 08/2007 | Investigational New Drug Applications: Information for Principal Investigators and IRB Panel Members. Institutional Review Board Annual Retreat, University of Utah, Salt Lake City, Utah |
| 08/2006 | INDA's – Investigational New Drug Applications: An Introduction in 10 Questions. Institutional Review Board Annual Retreat, University of Utah, Salt Lake City, Utah |

| 11/1998 | Ten Questions (and Answers) About Your Medications for Parkinson's Disease. St. George/Southern Utah Parkinson's Disease Association, Senior Center, St. George, Utah |
|---|---|
| 05/1998 | Know Your Medications: Ten Questions (and Answers) About Your Medications for Parkinson's Disease. Annual Meeting, Utah Chapter, American Parkinson's Disease Association. Moran Eye Center Auditorium, University of Utah, Salt Lake City, Utah |
| 09/1997 | Drug Therapies for Neurologic Disorders. 2nd Annual Salt Lake Veterans Affairs Hospital Gerontological Nursing Conference. Wyndham Hotel Convention Center, Salt Lake City, Utah |
| 11/1995 | Temporal Variation in Pharmacotherapy and the Drug Regulatory Process. Department of Pharmacy Practice, College of Pharmacy, University of Utah, Salt Lake City, Utah |

### *Grand Rounds, Invited and Professional Development Presentations*

| 03/2020 | Negotiation Essentials.  Leadership Development Seminar, University of Utah, Salt Lake City, Utah |
|---|---|
| 02/2020 | Communication, Leadership, and Conflict Competence.  Senior Leadership Development Conference, University of Utah Health, Salt Lake City, Utah |
| 10/2017 | Communication and Conflict Resolution Skills for Pharmacy Professionals. Pharmacy Grand Rounds, Department of Pharmacy Service, University of Utah Health, Salt Lake City, Utah |
| 10/2016 | Assisted Suicide:  Implications for Families and Society.  Fall Symposium.  J. Reuben Clark Law School, Brigham Young University, Provo, Utah |
| 09/2016 | Keynote Speech: Time and Opportunity. White Coat Ceremony.  College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 02/2015 | Lethal Injection in the United States Criminal Justice System: A Modern Kairos? Hinckley Institute at The University of Utah, Salt Lake City, Utah |
| 08/2014 | Art Imitating Life – Reflecting on the Fictional World of *Harry Potter* and Realities in Pharmacy and Pharmaceutical Sciences.  Eccles Health Sciences Library, University of Utah, Salt Lake City, Utah |
| 01/2011 | Pharmacist Liability: A Case Study. Grand Rounds, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 05/2006 | Applied Bioethics and Withdrawal of Life-Support in Dying Patients. Grand Rounds, Department of Pharmacy Services, University Health Care, University of Utah, Salt Lake City, Utah |
| 11/2003 | Fundamentals of Intellectual Property for the Neurologist and Neuroscientist. Grand Rounds, Department of Neurology, University of Utah School of Medicine, Salt Lake City, Utah |

### *Continuing Education Presentations*

| | |
|---|---|
| 11/2019 | Medical Cannabis in Utah: A Primer for Medical Pharmacy Providers (Webinar). Utah Department of Health/University of Utah School of Medicine, Salt Lake City, Utah |
| 04/2017 | Medical Aid-in-Dying, Pharmacy, Public Policy, and Perspectives.  Greater New York Hospital Association, Metropolitan New York City |
| 01/2017 | Ethical Challenges of Pharmaceuticals in Capital Punishment.  Continuing Professional Development Conference for Australian Healthcare Professionals. Canyons Resort, Park City, Utah |
| 01/2017 | Review and Update of Drug Interactions Commonly Encountered in Patient Care. Continuing Professional Development Conference for Australian Healthcare Professionals.  Canyons Resort, Park City, Utah |
| 06/2016 | Hemophilia Managed Care Review Board – Health Economics and Pharmacoeconomics Assessment – Analyzing Available Data to Assess the Value of Treatment Options and Collaborative Care Management.  Web-based Continuing Education Program.  Philadelphia, Pennsylvania |
| 01/2016 | New and Forthcoming Medicines and Pharmaceutical Technologies.  Continuing Professional Development Conference for Australian Healthcare Professionals. Canyons Resort, Park City, Utah |
| 01/2016 | Extemporaneous Compounding Regulations in Australia and the US and Prudent Professional Judgment.  Continuing Professional Development Conference for Australian Healthcare Professionals.  Canyons Resort, Park City, Utah |
| 09/2015 | Death With Dignity, Pharmacy and HB 391.  Utah Society of Health-System Pharmacists, McKay-Dee Hospital, Ogden, Utah |
| 02/2014 | Pharmacist Providers:  Professional Evolution or Passing Fancy? Utah Therapeutics and Pharmacy Law Continuing Education Program.  Roseman University of Health Sciences.  Salt Lake City and Logan, Utah |
| 09/2013 | Compounding Paradigm Shift:  Public Policies and Changes in Regulatory Landscape.  Utah Society of Health-System Pharmacists, Salt Lake City, Utah |
| 08/2013 | Hot Potato:  A Chronicle of Non-Sterile Compounding.  Utah Pharmacists Association, Layton, Utah |
| 11/2012 | Conflict, Compassion and Communication:  Ethical Reasoning in Drug Shortages and Resource Allocation.  Greater New York Hospital Association, Metropolitan New York City |
| 05/2012 (annually Presented) | Pharmacy Law Review and Refresher Course. University of Utah College of Pharmacy Continuing Pharmacy Education Program, Health Sciences Education Building, University of Utah, Salt Lake City, Utah. (Full-day CPE program in Pharmacy Law and Ethics) |
| 03/2011 | Ethics Panel Discussion: A Continuum of Pharmacy Issues at End-of-Life. Panel participant and moderator. Mid-Winter meeting: Utah Society of Health-System Pharmacists and University of Utah College of Pharmacy. Health Sciences Education Building, University of Utah, Salt Lake City, Utah |

| | |
|---|---|
| 11/2010 | Pharmacist Liability: A Case Study. Department of Pharmacy Services, Intermountain Medical Center. Murray, Utah |
| 03/2010 | USP <797> -- Planning, Implementation and Enforcement: Successes and Struggles. Southern Nevada Society of Health-System Pharmacists, Mid-year Meeting. Henderson, Nevada |
| 02/2010 | Pharmacist Liability: A Case Study. Utah Society of Health-System Pharmacists Annual Meeting. Davis Convention Center, Layton, Utah |
| 01/2010 | Brands, Generics, and Pay-for-Delay: Implications in Patient Care. University of Southern Nevada, Winter CPE Meeting. South Jordan, Utah, and Logan, Utah |
| 11/2009 | Disclosing a Dispensing Error: Ethical Reasoning. Utah Pharmacists Association, Fall Meeting. Wyndam Hotel and Convention Center, Salt Lake City, Utah |
| 05/2009 | Complying with Controlled Substances Laws While Maintaining Compassion for Patients. Continuing Education Program, University of Southern Nevada, South Jordan, Utah |
| 10/2008 | Conflict-of-Interest. Fall Continuing Education Program, University of Utah College of Pharmacy, Salt Lake City, Utah |
| 12/2007 | Applied Bioethics and Withdrawal of Life-support in Dying Patients. 14th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2006 | Review of Medicare/Medicaid Fraud and Abuse. 13th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2006 | Dealing with Conflict of Interest Ethical Issues. 13th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 04/2006 | Pharmacist Refusal to Dispense: An Overview of Legal and Ethical Issues. Utah Pharmacists Association Annual Meeting, Dixie Center, Saint George, Utah |
| 12/2005 | Pharmacist Refusal to Dispense: An Overview of Legal and Ethical Issues. Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2004 | Negligence Update: Pharmacists Duty to Warn. 11th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2004 | Business Law Primer for Pharmacists. 11th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2003 | Federal and State Administrative Law: FDA, FTC, DEA and State Boards. 10th Annual CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2003 | Federal Legislation and Pharmacy Practice Update. 10th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 10/2003 | Navigating Federal Drug Law: 1987-2003: Significant Legislation, Rx-to-OTC switch, Drug Importation. Annual Meeting, Utah Society of Health-System Pharmacists, University of Utah College of Pharmacy, Salt Lake City, Utah |
| 04/1999 | Medical Assistant In-service Lecture Series: Medication Injections and Commonly Used Oral Medications in the Ambulatory Clinic. Medical Assistants, University of Utah Hospitals & Clinics, Salt Lake City, Utah |

| 10/1998 | Treatment of Parkinson's Disease: New Tricks and Old Treats. Continuing Education Program, College of Pharmacy, University of Utah, Salt Lake City, Utah |

### *Industrial Presentations*

| 05/1998 | Parkinson's Disease, Multiple Sclerosis, and Amyotrophic Lateral Sclerosis, Partnership For Care Program, Athena Home Pharmacy Division, Athena Neurosciences, Embassy Suites, South San Francisco, California |
| 03/1997 | Idiopathic Parkinson's Disease. SmithKline Beecham Pharmaceuticals, Intermountain Sales Team, Chart House Restaurant, Salt Lake City, Utah |
| 12/1997 | Presenter, Pfizer Inc., Cerebyx: A new advance in seizure control. Paracelsus Family Practice Department, Salt Lake City, Utah |

### *News and Media Appearances*

| 05/2021 | "Warrant signed for Idaho's first death row execution since 2012 Idaho is seeking to execute convicted double-murderer Gerald Pizzuto Jr. next month" Idaho Capital Sun. (printed 5/7/21). https://idahocapitalsun.com/2021/05/07/warrant-signed-for-idahos-first-death-row-execution-since-2012/ |
| 05/2018 | "Competition in the Pharmaceutical Industry" *Top of Mind with Julie Rose*. BYU Radio. (aired 6/19/2018) https://www.byuradio.org/episode/c9d37a75-3db2-4b0b-ad6b-09c36bba5d2d?playhead=3130&autoplay=true |
| 11/2017 | "Compounding pharmacies and lethal injection" *VICE News with Gianna Tobani*. VICE Media/HBO. (interview filmed; not published). |
| 04/2017 | "Opioid Crisis" *Top of Mind with Julie Rose*. BYU Radio. (aired 6/28/2017) http://www.byuradio.org/episode/e5beffb6-9d27-4077-868b-b1891dd5f6ec?playhead=62&autoplay=true |
| 08/2015 | "Printing Pills" *Science Friday with Ira Flatow*. Public Radio International. (aired 8/7/2015) http://www.sciencefriday.com/segments/venomous-frogs-a-polar-bear-world-record-and-printing-pills/ |

## PROFESSIONAL ORGANIZATIONS & SERVICE

### *Professional Organizations*

| 2015 – 2019 | Member, American Society of Health-System Pharmacists (ASHP) |
| 2015 – 2017 | Member, American Pharmacists Association (APhA) |
| 2014 – Present | Member, Rho Chi Society – Pharmacy Honor Society |
| 2013 – Present | Member, American Society for Pharmacy Law (ASPL) |
| 2013 – 2021 | Faculty Advisor, National Community Pharmacists Association Chapter |
| 2012 – Present | Member, American Association of Colleges of Pharmacy (AACP) |
| 2004 – Present | Admitted to the United States Patent and Trademark Office Bar |
| 2002 – Present | Admitted to the United States District Court for the District of Utah Bar |

| 2002 – Present | Member, Utah State Bar Association |
| 1996 – 2011 | Member, Utah Society of Health-System Pharmacists |
| 1994 – Present | Member, Phi Lambda Sigma Pharmacy Leadership Society |
| 1990 – 1992 | Member, American Pharmacists Association – Academy of Student Pharmacists |

### Professional Service

| 2022-2025 | President-Elect, President, Past President, American Society for Pharmacy Law (ASPL) |
| 2016 – 2019 | Chair-Elect, Chair, Past Chair, Health Care Ethics Special Interest Group (SIG), American Association of Colleges of Pharmacy |
| 2015 – Present | Pharmacy Law Educator's Sub-Committee, American Society for Pharmacy Law (ASPL) Chair, 2015-2017 |
| 2015 – 2018 | Task Force Member, American Association of Colleges of Pharmacy, AACP Task Force on Marijuana Use by Students, Faculty and Preceptors |
| 2010 – 2012 | Task Force Member, American Association of Colleges of Pharmacy, AACP Task Force to Evaluate Compounding Instruction in US Pharmaceutical Education |
| 2009 – 2011 | Board Member-at-Large, Utah Society of Health-System Pharmacists |
| 2002 –2004 | Co-Chair, Utah Society of Health-System Pharmacists, Newsletter Committee |

### Public Service

| 2021 – 2023 | Member, Board of Directors, Wasatch Homeless Health Care, also known as: "4th Street Clinic", Salt Lake City, Utah |
| 2018 – Present | Member, Quality Improvement Committee, Wasatch Homeless Health Care, also known as: "4th Street Clinic", Salt Lake City, Utah |
| 2018 – 2022 | Chair, Controlled Substances Advisory Committee.  Utah Department of Health.  State of Utah |
| 2013 – 2018 | Pharmacy Compounding Task Force.  Utah Board of Pharmacy, Division of Occupational & Professional Licensing, Department of Commerce, State of Utah |
| 2013 – 2014 | Health Information Workgroup:  State of Utah Health Innovation Model Grant.  State of Utah Department of Health.  Center for Health and Informatics.  CFDA 93.624 |
| 2010 – 2016 | Presenter, Area Health Education Centers, Presented information on pharmacy careers and interactive pharmacy compounding demonstration for Health Careers Summer Camp for Rural Health Scholars Program at Southern Utah University |

Ruble, Page 15

UNIVERSITY COMMITTEE ACTIVITIES

***University Level – University of Utah***

| | |
|---|---|
| 2021 – 2027 | Member, Consolidated Hearing Committee (CHC), Academic Senate, University of Utah |
| 2021 – 2024 | Member, Academic Appeals and Misconduct Committee, Academic Senate, University of Utah |
| 2017 – 2021 | Member, Curriculum Policy Review Board / Special Fee Review Committee |
| 2016 – 2019 | Member, Faculty Committee on Community and Governmental Relations |
| 2006 – 2009 | Member, Institutional Review Board |

***University of Utah Health Care System***

| | |
|---|---|
| 2007 – 2017 | Hospital Ethics Committee |
| |     Chair, 2015 – 2017 |
| |     Co-Chair, 2013 – 2015 |
| |     Clinical Ethics Consultation Team, 2007 – 2017 |
| 2009 – 2010 | USP <797> Compounding Task Force, Department of Pharmacy Services |

***College Level – University of Utah College of Pharmacy***

| | |
|---|---|
| 2021 – Present | Member, Executive Committee |
| 2018 – Present | Member, Learning and Teaching Committee |
| 2017 – 2021 | Chair, Curriculum Committee |
| 2015 – 2018 | Member, Scholastic Standards Committee |
| 2013 – 2015 | Member, Inter-Professional Education (IPE) Committee |
| 2012 – 2017 | Member and P1 Steward, Curriculum Development Committee |
| 2011 – 2014 | Member, Admissions Committee |
| 2011 – Present | Member, Student Mentoring Committee |
| 2009 – 2011 | Member, Diversity Advisory Committee |

CURRENT & PAST AREAS OF TEACHING RESPONSIBILITY

***Courses Directed***

| | |
|---|---|
| 2022 – 2023 | LAW 7360-001:  Health Law |
| 2020 – Present | LAW 7080-004:  FDA Law and Regulation |
| 2017 – 2018 | PHARM 5144:  Foundations in Drug Information and Critical Inquiry |
| 2015 – 2017, 2020 | PHARM 6243:  Community Practice (OTC & Self-Care) |
| 2010 – 2021 | PHARM 6242: Pharmaceutical Compounding and Drug Delivery Systems |

| 2009 – Present | PHARM 5142: Foundations in Pharmacy Law, Ethics, and Risk |
| 2008 – 2015 | PCTH 7436: Ethical Dilemmas in Pharmacotherapy & Pharmaceutical Science |

### *Additional Courses Taught*

| 2022 – Present | Contributor, BME 5120: Regulatory Affairs II (Biomedical Engineering) |
| 2011 – 2013 | Co-instructor, PHCEU 7975: Journal Club-PhD |
| 2010 – 2015 | Co-Instructor, PHARM 5113: Basics in Pharmaceutical Sciences |
| 2009 – Present | Co-Instructor, PHARM 5120: Foundations in Pharmaceutical Sciences |
| 2008 – 2010 | Primary Instructor, PCTH 7603: Home Health Clerkship |
| 2004 – Present | Co-Instructor, PHARM 5140: Foundations in Patient-Centered Care |
| 2009 – 2012 | Contributor, PCTH 7321: Introduction to Clerkships |
| 2011 – 2012 | Contributor, PCTH 6500: Research Ethics |
| 2012 – 2016 | Contributor, PCTH 6890: Research Seminar I |
| 2012 – 2016 | Contributor, PCTH 7100: Clinical Seminar I |

### *Other Didactic Lectures*

| 2019 | Communications, Workplace Conflict and Ombudsman Services.  Conflict Resolution Graduate Certificate Program, Department of Communications, University of Utah, Salt Lake City, Utah |
| 2018 – Present | Difficult Choices:  Ethics capstone for Foundations of Medicine, Medical Students, University of Utah School of Medicine, Salt Lake City, Utah |
| 2016 – 2019 | Basal Ganglia and Movement Disorders – Clinical Pharmacology, Medical Students, University of Utah School of Medicine, Salt Lake City, Utah |
| 1998 | Pharmacotherapy of Neurological Disorders. Physical Therapy Students. College of Health, University of Utah, Salt Lake City, Utah |
| 1998 – 1999 | Medical Assistant In-service Lecture Series: Medication injections and commonly used oral medications in the ambulatory clinic. Medical Assistants, University of Utah Health Care, Salt Lake City, Utah |

### *Department/Division Conferences*

| 10/2020 | Communications and Conflict, Division of Physical Medicine and Rehabilitation, University of Utah School of Medicine, Salt Lake City, Utah |
| 08/2019 | Communication and Conflict Resolution, Department of Family and Preventive Medicine, University of Utah School of Medicine, Salt Lake City, Utah |
| 06/2019 | Ethical Issues Surrounding Medical Cannabis.  Evening Ethics Presentation, Program in Medical Ethics and Humanities.  Department of Internal Medicine, University of Utah, Salt Lake City, Utah |

| | |
|---|---|
| 06/2019 | Ethics Training Workshop:  Ethics Consultation & Ethics Committees. College of Law, University of Utah, Salt Lake City, Utah |
| 05/2019 | When Clinicians Disagree: How to speak up when there is a power differential.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, and University of Utah Hospital, Salt Lake City, Utah |
| 03/2019 | Ethical and Legal Perspectives: Responsible pain management in the wake of the opioid crisis.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, Salt Lake City, Utah. |
| 10/2017 | Is an Ethically Appropriate Cost (or Price) Possible for Pharmaceuticals? Evening Ethics Presentation, Division of Medical Ethics and Humanities, Department of Internal Medicine, University of Utah, Salt Lake City, Utah |
| 07/2017 | Conflict Resolution for Healthcare Professionals.  Professional Development Seminar, Department of Pharmacotherapy, College of Pharmacy, Salt Lake City, Utah |
| 04/2017 | Leadership, Professional Advocacy, and Politics.  Career Opportunity Seminar, College of Pharmacy, Salt Lake City, Utah |
| 02/2017 | Clinical Ethical Reasoning and Decision Making.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, Salt Lake City, Utah |
| 01/2017 | Common Issues for Faculty Visitors to Ombudsman Office.  Senior Leadership Conference – Health Sciences Administration, University of Utah Health Sciences, Salt Lake City, Utah |
| 11/2011 | Communication of Risk in Pharmacotherapy: More Than Just a Four-Letter Word. Department of Pharmacotherapy, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 05/2011 | Ethics of High Cost Oncology Drugs: Identifying Victims, Villains, and Values. Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 09/2010 | Risk Management and the Lexicon of Pharmacy Practice. Task Force on Future Curricular Revision, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 08/1999 | New Antiepileptic Drugs: Advantages and Disadvantages. Clinical Sciences Conference, Department of Neurology, University of Utah, Salt Lake City, Utah |
| 08/1998 | Pharmacological Treatment of Parkinson's Disease: Current issues and future directions. Clinical Sciences Conference, Department of Neurology, University of Utah, Salt Lake City, Utah |
| 05/1997 | Antidepressant Selection in Patients with Neurologic Disorders. Clinical Sciences Conference, Department of Neurology, University of Utah. Salt Lake City, Utah |

| 06/1997 | Botulinum Toxin in Neurologic, Ophthalmologic, and Laryngeal Disorders. Pharmacy Department, University Hospital, Salt Lake City, Utah |

### *Forensic and Legal Consultation / Expert Witness*

| 05/2021 | **State of Arizona.** *Frank Jarvis Atwood v. State of Arizona*; In the Supreme Court for the State of Arizona.  No.CR–87–0135–AP Pima County Superior Court; Nos. CR14065 and CR15397Ninth Circuit; No. 14–99002 U.S. District Court No. CV–98–116–TUC–JCC |

| 11/2020 | **State of South Carolina.** *Richard Bernard Moore v. State of South Carolina*; In the Supreme Court for the State of South Carolina.  Case No. 2001-021895 |

| 10/2020 | **State of Utah.** *Kay Heath and Shauna Peterson v. Maple Mountain Pharmacy, Inc. et al*; In Utah District Court for Utah County, Fourth District.  Case No. 200401569 |

| 09/2018 | **State of Utah**. *In the matter of South Valley Compounding Pharmacy to Practice as a Pharmacy and to Dispense Controlled Substances in the State of Utah;* In the Utah Department of Commerce, Division of Occupational and Professional Licensing, Case No. DOPL 2018-158 |

| 07/2018 | **United States Supreme Court.** Brief amicus curiae of Pharmacy, Medicine, and Health Policy Experts. *Bucklew v. Precythe*, 585 US _____ (2018) (No. 17-8151), [US Supreme Court oral argument scheduled for November 6, 2018] |

| 07/2017 | **US Federal Court – District of Arizona**. *Guardian News & Media, LLC, et al. v. Charles L. Ryan, et al*.; In the United States District Court for the District of Arizona.  Case No. CV-14-02363-PHX-GMS |

| 06/2017 | **State of Arizona**. *Shannon Coleman, et al. v. Zion's Rx Formulations, LLC, et al*.; In the Superior Court of the State of Arizona, In and For the County of Maricopa. No. CV2015-006403 |

| 07/2016 | **US Federal Court of Appeals – Fifth Circuit**. *Jeffrey Wood, et al. v. Bryan Collier, et al*.; In the United States Court of Appeals for the Fifth Circuit. No. 16-20556 |

| 05/2016 | **US Federal Court – Southern District of Texas**. *Thomas Whitaker, et al. v. Brad Livingston, et al*.; In the United States District Court for the Southern District of Texas, Houston Division. Case No. 4: 13-cv-02901 |

| 11/2015 | **US Federal Court – Eastern District of Virginia.** *Alfredo Prieto v. Harold Clarke, et al*.; In the United States District Court for the Eastern District of Virginia, Alexandria Division.  Case No. 1:15cv1258 |

| 07/2015 | **State of Tennessee**. *Stephen M. West, et al. v. Derrick D. Schofield, et al*.; In the Chancery Court of Davidson County, Tennessee. Case No. 13-1627-I |

# EXHIBIT B

# EXHIBIT 1

I, ████████████ hereby declare as follows:

1. I am over 18 years of age and would testify to the following based on my first-hand knowledge.

2. I am a licensed pharmacist in the State of Arizona.

3. As a licensed pharmacist in the State of Arizona, I am aware of and follow the guidelines and requirements found in the United States Pharmacopeia.

4. I have prior experience in properly preparing compounded sterile preparations.

5. I prepared a sodium pentobarbital solution using my training and experience as a licensed pharmacist.

6. I had the prepared sodium pentobarbital solution provided to a FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date. (See Attachments 1-3).

7. These test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing. (See Attachment 3).

8. On February 26, 2022, I prepared a sodium pentobarbital solution from the same sodium pentobarbital powder that was used for the stability study.

9. Based on the stability study test results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022.


DATED this 5th day of May, 2022.

████████████████████

# ATTACHMENT  1



# Certificate of Analysis

**CLIENT :**

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**FORMULATION ID :**

**DATE RECEIVED :** 09/24/2021

**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.5% (49.2302mg / 1mL) | 12/28/2021 |

Notes

Assay: The referenced method (AMIN-2089) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 90 of testing at pre-defined timepoints.



01/04/2022

_____

Date

Page 1 of 1

# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0310mg / 1mL) | 01/27/2022 |

Notes

Assay: The referenced method (AMIN        used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 120 of testing at pre-defined timepoints.

02/03/2022

_____

Date

# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0497mg / 1mL) | 03/02/2022 |

Notes

Time = Day 150 of testing at pre-defined timepoints.

Assay: The referenced method (AMIN) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

03/08/2022
―――――――――――――――
Date

# ATTACHMENT  2



# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Endotoxin | USP <85> | NMT 0.7 EU / mg | <0.2 EU / mg | 03/24/2022 |
| Sterility - (PRELIMINARY) | USP <71> | Sterile | No Growth at 5 Days | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.



03/28/2022

Date



# Certificate of Analysis



**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL



**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|---------------|---------|-------------|
| pH | USP <791> | Report Value | 10.6 | 03/24/2022 |
| Assay - Pentobarbital Sodium | ▮▮▮▮ | 92.0% - 108.0% | 100.3% (50.1515mg / 1mL) | 03/28/2022 |

Notes

Assay: The referenced method ▮▮▮▮ used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 180 of testing at pre-defined timepoints.



04/04/2022

Date



# Certificate of Analysis



**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021

**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Sterility - (FINAL) | USP <71> | Sterile | Sterile | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.

04/06/2022
_____

Date

Page 1 of 1



# Certificate of Analysis

**DESCRIPTION :** Pentobarbital Sodium 50 mg/ml

**DATE RECEIVED :** 04/12/2022
**STORAGE :** 20°C to 25°C

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC | 90.0% - 110.0% | 98.2%<br>(49.0968mg / 1mL) | 04/13/2022 |

Notes

The potency method(s) used for testing passed system suitability requirements per ▮▮▮▮▮▮▮▮▮ or non-cGMP analysis.
Product specific method validation is not available for this sample and specification(s) are for informational purposes only. Client should verify the specification and analyte reported are correct for the compounded formulation.

04/13/2022
_____
Date

# ATTACHMENT 3

# STABILITY STUDY SUMMARY REPORT: PENTOBARBITAL

## PROJECT SUMMARY AND RESULTS

| Sample Description | Stability-Pentobarbital Sodium 50 mg/mL | | | | |
|---|---|---|---|---|---|
| Concentration | 50 mg/mL, Pentobarbital Sodium | | | | |
| Formulation ID | 4015 | | Dosage Form | Parenteral (IV) | |
| Storage Condition | 25°C ± 2°C/ 60%RH | | Lot Number | 39702 | |
| Container Description | 30 mL amber vial w/ 20 mL fill | | | | |

| Attribute | Methods | Specification (Description) | Initial (T0) ARL# 785881 | T90 D ARL# 786008 | T120 D ARL# 786023 | T150 D ARL# 818437 | T180 D ARL# 786025 |
|---|---|---|---|---|---|---|---|
| pH | USP ‹791› | Report Value | NT | NT | NT | NT | 10.6 |
| Sterility | USP ‹71› | Sterile | Sterile | Sterile | NT | NT | Sterile |
| Endotoxin | USP ‹85› | NMT 0.7 EU/mg | <0.2 EU/mg | <0.2 EU/mg | NT | NT | <0.2 EU/mg |
| Pentobarbital Sodium Assay | AMIN-2089 | % of Label (92.0-108.0%) | 96.4% | 98.5% | 98.1% | 98.1% | 100.3% |
| Assay Date Tested | - | - | 09/29/2021 | 12/28/2021 | 01/27/2022 | 03/02/2022 | 03/28/2022 |

## CONCLUSION

Physical and chemical data of Pentobarbital Sodium has demonstrated that Pentobarbital Sodium in the present formula and packaging met client provided specifications through 180 days in ambient storage conditions.



# EXHIBIT C





Order Date: 10/22/2020

Shipped To:

Arizona Department of Corrections
To be determined
      , AZ –

| PART# | DESCRIPTION | UNIT SIZE | QTY | PRICE | EXT PRICE |
|---|---|---|---|---|---|
| █ | **Pentobarbital sodium salt,   >99% USP Grade** Packaging (4-8 Jars) unlabled | 1 G | 1000 | $1500.00 | $1500000 |
| | Shipping Unmarked jars and boxes Shipping location AZ (to be determined) | | | | |

|  | $1,500,000 |
|---|---|
|  | $0 |
| **Total:** | **$1,500,000** |
| Amount Paid: | |
| **Amt Due Net 30 – $USD:** | **$1,500,000** |

# EXHIBIT D

Printed on: Thu Apr ... official status ... current ...

Printed by:

Official Date: Official as of 01-May-2018
DOI Ref: x58dn

Document Type: USP
DOI: https://doi.org/10.31003/USPNF_M62410_03_01

@2022 USPC

1

# Pentobarbital Sodium Injection

» Pentobarbital Sodium Injection is a sterile solution of Pentobarbital Sodium in a suitable solvent. Pentobarbital may be substituted for the equivalent amount of Pentobarbital Sodium, for adjustment of the pH. The Injection contains the equivalent of not less than 92.0 percent and not more than 108.0 percent of the labeled amount of $C_{11}H_{17}N_2NaO_3$.

**Packaging and storage**—Preserve in single-dose or multiple-dose containers, preferably of Type I glass. The Injection may be packaged in 50-mL containers.

**Labeling**—The label indicates that the Injection is not to be used if it contains a precipitate.

**USP Reference standards** ⟨11⟩—
USP Pentobarbital RS

**Identification**—The retention time of the major peak in the chromatogram of the *Assay preparation* corresponds to that in the chromatogram of the *Standard preparation,* as obtained in the *Assay.*

**Bacterial Endotoxins Test** ⟨85⟩ —It contains not more than 0.8 USP Endotoxin Unit per mg of pentobarbital sodium.

**pH** ⟨791⟩: between 9.0 and 10.5.

**Other requirements**—It meets the requirements under *Injections and Implanted Drug Products* ⟨1⟩.

**Assay**—

*Mobile phase*—Prepare a filtered and degassed pH 3.5 mixture of 0.01 M monobasic potassium phosphate and acetonitrile (65:35). Make adjustments if necessary (see *System Suitability* under *Chromatography* ⟨621⟩).

*Standard preparation*—Dissolve an accurately weighed quantity of USP Pentobarbital RS in *Mobile phase,* and dilute quantitatively, and stepwise if necessary, with *Mobile phase* to obtain a solution having a known concentration of about 0.1 mg per mL.

*Assay preparation*—Quantitatively dilute a suitable volume of Injection with *Mobile phase* to obtain a solution having a known concentration of about 0.1 mg per mL.

*Chromatographic system* (see *Chromatography* ⟨621⟩)—The liquid chromatograph is equipped with a 214-nm detector and a 4.6-mm × 25-cm column that contains 5-µm packing L1. The flow rate is about 1.0 mL per minute. Chromatograph the *Standard preparation,* and record the peak responses as directed for *Procedure:* the capacity factor, $k'$, is not less than 2.5; the column efficiency is not less than 15,000 theoretical plates; the tailing factor is not more than 1.5; and the relative standard deviation for replicate injections is not more than 2.0%.

*Procedure*—Separately inject equal volumes (about 10 µL) of the *Standard preparation* and the *Assay preparation* into the chromatograph, record the chromatograms, and measure the responses for the major peaks. Calculate the percentage of $C_{11}H_{17}N_2NaO_3$ in the portion of Injection taken by the formula:

$$100(248.25/226.27)(C_S/C_U)(r_U/r_S)$$

in which 248.25 and 226.27 are the molecular weights of pentobarbital sodium and pentobarbital, respectively; $C_S$ is the concentration, in mg per mL, of USP Pentobarbital RS in the *Standard preparation; $C_U$* is the final concentration, in mg per mL, of the *Assay preparation; and $r_U$ and $r_S$* are the peak areas obtained from the *Assay preparation* and the *Standard preparation,* respectively.

Exhibit 9

**PHILLIPS BLACK, INC.**

a nonprofit, public interest law practice

JOSEPH J. PERKOVICH                    j.perkovich@phillipsblack.org        **Principal Attorneys:**
PO Box 4544                            212 400 1660 (tel)                   Jennifer Merrigan[†]
New York, New York 10163               973 221 9509 (fax)                   John R. Mills[‡]
                                                                            Joseph J. Perkovich[§]
                                                                            Jessica Sutton[^]

May 14, 2022

VIA E-MAIL (bkeogh@azadc.gov; Jeffrey.Sparks@azag.gov)
Brad Keogh                             Jeffrey L. Sparks
Arizona Dep't of Corrections,          Office of the Attorney General
      Rehabilitation and Reentry       Capital Litigation Section
1601 W. Jefferson                      2005 N. Central Avenue
Phoenix, AZ 85008                      Phoenix, AZ 85004

Re:  Frank J. Atwood, June 8, 2022, execution date

Messrs. Keogh and Sparks:

I write regarding Mr. Atwood's impending execution date of June 8, 2022, and his Arizona constitutional and statutory option to choose lethal gas as its method, as noted in the warrant issued on May 3, 2022. The Department's Execution Procedures,[1] which specify cyanide gas, violate Mr. Atwood's right to a choice of method.

Article 22, section 22 of the Arizona Constitution guarantees Mr. Atwood the right to choose between lethal gas and lethal injection as his method of execution. Arizona Revised Statutes § 13-757(B) implements that right and contemplates a choice of lethal gas by twenty days before the execution date, which, for Mr. Atwood's warrant, falls on May 19, 2022. However, the Department's designation of sodium cyanide with a sulfuric acid and water mixture, to make hydrogen cyanide,[2] renders this statutory method unconstitutional. To be clear, locking a human being in a chamber and flooding it with gas to extinguish his life should be a barbarism banished to history, not a current mode of correctional administration. Nonetheless, numerous other gases instead of cyanide may be used to conduct a constitutional execution under Arizona law. After the issuance of his execution warrant, Mr. Atwood proposed such an alternative, nitrogen, to the Department through its administrative grievance procedure as called for under the Prison Litigation Reform Act of 1995.[3] The Department refused to process his grievance. Thus, this letter demands that the Department immediately implement a nitrogen lethal gas method.

Mr. Atwood, who is physically disabled, possesses a dire individual need for a lawful gas method due to spinal disease, worsened from years of medical neglect while in the Department's custody. Application of the Department's lethal injection procedures, which require the condemned's full restraint to the execution table, would inflict on Mr. Atwood the maximum level of pain the human

---

[1] *Infra* n.6.
[2] *Infra* n.6 (Attachment E).
[3] Pub. L. 104-134.

† Admitted in Missouri and Pennsylvania
‡ Admitted in Arizona, California, and North Carolina
§ Admitted in New York
^ Admitted in Massachusetts and Missouri

brain can process.[4] Based on past execution logs, this would likely transpire for upwards of an hour *before* the actual administration of the Department's execution chemicals, a compounded injectable solution of unestablished adequacy and provenance that, itself, could cause extreme pain and fail in manifold ways, including by reducing Mr. Atwood to a vegetative state or by taking his life only after a prolonged, torturous process.

As you know, Arizona's constitution and statute fail to designate a kind of gas for its lethal gas method,[5] and historically that determination has fallen to the Department. As noted, the current manual specifies the use of sodium cyanide with a sulfuric acid and water mixture, which produces hydrogen cyanide.[6] The Execution Procedures can actually include gas method specifications because Arizona is the only United States jurisdiction with a purportedly operational gas chamber, a vessel manufactured and procured in 1949.[7] Notwithstanding the Department's possession of an operational chamber and the explicit persistence of this execution method under the state's constitution and statute, the Department's ten immediately prior manuals, dating back to 2010, make no mention of any procedure for a lethal gas execution, let alone designate the kind of gas for one.[8] I have not seen any manual issued between the date of the Department's last cyanide execution, Mar. 3, 1999,[9] and Dec. 16, 2010,[10] thus I am unaware whether the Department's procedures had thereafter ceased contemplating the gas method.[11]

Twenty-five years before the delivery of the Department's gas chamber, Nevada was the first state to use cyanide, executing Mr. Gee Jon on February 8, 1924, after its supreme court upheld the statute ushering in the lethal gas method nationally.[12] Initially, Nevada envisioned administering the poison into the condemned's "cell at night to execute him in his sleep," but "because half the

---

[4] *See Atwood v. Days, et al.*, 2:20-cv-623-JAT-JZB, Doc. 173 at 2 (D. Ariz. Dec. 7, 2021)

[5] Ariz. Const. art. XXII, § 22; A.R.S. § 13-757(B).

[6] Department Order 710 – Execution Procedures, effective Jun. 13, 2021, last revised Apr. 20, 2022; Attachment E, Lethal Gas.

[7] Just three other states contemplate a "lethal gas" choice. Cal. Penal Code § 3604 (lethal injection is administered, unless prisoner chooses lethal gas); Mo. Ann. Stat. § 546.720 (statute contemplates injection and gas and is ambiguous as to selection; Missouri has not used lethal gas in modern period); Wyo. Stat. Ann. § 7-13-904 (designates lethal gas only in the event lethal injection is deemed unconstitutional). In the past seven years, three states have legislated a nitrogen hypoxia option. On April 17, 2015, the Oklahoma Legislature first amended its methods statute to authorize nitrogen hypoxia in the event lethal injection is held unconstitutional or deemed "otherwise unavailable." Okla. Stat. Ann. Tit. 22 § 1014. On March 22, 2018, Alabama adopted a prisoner choice of nitrogen hypoxia or electrocution in conjunction with the default method of lethal injection. Ala. Code § 15-18-82.1.b. On April 14, 2022, the Mississippi Legislature amended its statute, effective July 1, 2022, to permit a nitrogen hypoxia execution even when lethal injection is available. 2022 Miss. Laws H.B. 1479, amending Miss. Code Ann. § 99–19–51.

[8] These ten manuals have the following effective dates: Dec. 17, 2010; Sep. 5, 2011; Jan. 25, 2012; Mar. 26, 2014; Sep. 30, 2015; Apr. 29, 2016; Jan. 11, 2017; Jun. 7, 2017; Jun. 13, 2017; and Nov. 20, 2019.

[9] *Infra* n.20.

[10] *Supra* n.8.

[11] Public records reflect the Department's purchase in late 2020 of substantial amounts of potassium cyanide, a different kind of cyanide from what the Department now specifies (*viz.*, sodium cyanide). While it is not apparent the Department is capable of carrying out its own cyanide gas plan, Mr. Atwood's present demand to use an alternative gas is premised on the nature, itself, of the poisonous gas the Department currently designates rather than any question of the Department's capacity to deploy it. But such capacity is by no means apparent.

[12] *State v. Gee Jon*, 211 P. 676 (Nev. 1923).

Brad Keogh & Jeffrey Sparks                                                                                                    3
May 14, 2022

cell block potentially could have been killed . . . a special enclosure had to be built."[13] Thus was born the prototypical gas chamber for penological use, a precursor to large-scale chambers to deploy cyanide gas for genocidal use.[14] In the years between Nevada's innovation and Nazi Germany's massive scaling of the technology, Arizona supplanted hanging with lethal gas by a 1933 plebiscite amending the constitution, which the state supreme court promptly upheld.[15] States carried out nearly 600 cyanide gas executions in the decades following Nevada's legislation and before *Furman v. Georgia*[16] struck down all capital statutes.[17]

Upon reestablishment of capital punishment after *Gregg v. Georgia*[18] only 11 lethal gas executions have occurred in the United States,[19] all of which used cyanide gas and the last of which was this Department's execution in 1999 of Walter LaGrand, entailing 18 minutes of violent asphyxiation.[20] As I am sure you are aware, Mr. LaGrand's was one of just two such executions the Department conducted post-*Gregg*; it also used hydrogen cyanide[21] to execute Donald Harding in 1992,[22] a death reported as "extremely violent," in which Mr. Harden's "body turn[ed] from red to purple," and credited with the constitutional amendment adopting lethal injection as the state's default method.[23]

---

[13] Allen Huang, *Hanging, Cyanide Gas, and the Evolving Standards of Decency: The Ninth Circuit's Misapplication of the Cruel and Unusual Punishment Clause of the Eighth Amendment*, 74 Or. L. Rev. 995, 1004 (1995) (citing Michael V. DiSalle, *The Power of Life or Death* (1965), at 21).

[14] *See generally United Kingdom v. Tesch*, 1 L. Rep. Tr. War. Crim. 93 (1947) (finding supplier of Zyklon B cyanide gas to German concentration camps in violation of "the laws and usages of war").

[15] *Hernandez v. State*, 43 Ariz. 424, (1934) (rejecting challenge on ex post facto and cruel and unusual punishments grounds).

[16] 408 U.S. 238 (1972).

[17] *See generally* Scott Christianson, *The Last Gasp: The Rise and Fall of the American Gas Chamber* (2010).

[18] 428 U.S. 153 (1976).

[19] Since the post-*Gregg* resumption of executions, in Utah in 1977, there were only nine lethal gas executions conducted outside of Arizona: one in Nevada in 1979, four in Mississippi between 1983 and 1989, two in California in 1992 and 1993, and two in North Carolina in 1994 and 1998. *See* Death Penalty Information Center, Execution Database: deathpenaltyinfo.org.

[20] Patty Machelor, *LaGrand: 18 minutes to die*, Tucson Citizen, Mar. 4, 1999.

[21] *Supra* n.6.

[22] Charles Howe, *Arizona Killer Dies in Gas Chamber*, S.F. Chron., Apr. 7, 1992, at A2. *See Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 655–56 (1992) (Stevens, J., dissenting) (citation omitted). In dissent from per curiam order vacating stays of execution, Justice Stevens recapitulated eyewitness descriptions of Mr. Harding's cyanide gas execution, which took ten minutes and thirty-one seconds:

> When the fumes enveloped Don's head he took a quick breath. A few seconds later he again looked in my direction. His face was red and contorted as if he were attempting to fight through tremendous pain. His mouth was pursed shut and his jaw was clenched tight. Don then took several more quick gulps of the fumes. [] At this point Don's body started convulsing violently. ... His face and body turned a deep red and the veins in his temple and neck began to bulge until I thought they might explode. [] After about a minute Don's face leaned partially forward, but he was still conscious. Every few seconds he continued to gulp in. He was shuddering uncontrollably and his body was racked with spasms. His head continued to snap back. His hands were clenched. [] After several more minutes, the most violent of the convulsions subsided. At this time the muscles along Don's left arm and back began twitching in a wavelike motion under his skin. Spittle drooled from his mouth.... [] Don did not stop moving for approximately eight minutes, and after that he continued to twitch and jerk for another minute. Approximately two minutes later, we were told by a prison official that the execution was complete.

[23] AP, *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, New York Times, Apr. 25, 1992, § 1, 9.

Brad Keogh & Jeffrey Sparks                                                                                    4
May 14, 2022

As noted above,[24] California conducted two cyanide gas executions in the modern era, in 1992 and 1993, precipitating constitutional challenges in federal court culminating in the Ninth Circuit's ruling in *Fierro v. Gomez*,[25] which held "the district court's factual findings regarding . . . the type and level of pain inflicted during execution by lethal gas under California's [cyanide] protocol, when combined with its finding that there exists a substantial risk that this pain will last for several minutes, dictate" that the protocol violated the Cruel and Unusual Punishments Clause.[26] The State of California petitioned for certiorari review, and during the petition's pendency, the California Legislature made lethal injection the primary method of execution.[27] Given the overhaul of the statute, the Supreme Court summarily granted, vacated, and remanded the case,[28] calling for further consideration in light of the legislation.[29] In the wake of the California litigation, a habeas corpus petitioner challenged Arizona's lethal gas statute—as apart from its own protocol of cyanide gas.[30] The Ninth Circuit ruled *sua sponte* that that question was unripe under Article III ripeness doctrine, which serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."[31]

Two years later, the aforementioned Walter LaGrand sought to challenge Arizona's lethal gas on the eve of his execution, having chosen that method in order to do so. During that litigation, Arizona conceded that its cyanide gas protocol was substantially similar to the California protocol held unconstitutional after trial in *Fierro*, and that a trial on its own gas protocol would produce a record identical to *Fierro*'s.[32] The Supreme Court, however, deemed the choice of gas as a waiver rather than the means by which a challenge of that method ripens.[33] Given these precedents, Mr. Atwood's present moment—under warrant and before Arizona's statute requires a choice of lethal gas—is precisely ripe for resolution of the constitutionality of cyanide gas.

In holding California's protocol unconstitutional in *Fierro* in 1996,[34] the Ninth Circuit found that the evidence of California's two cyanide gas executions established that the condemned endured conscious exposure to the poisonous gas "probably … anywhere from 15 seconds to one minute," with "a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes."[35] Of course, this degree of suffering from cyanide asphyxiation pales in comparison to Arizona's executions of Messrs. Harding and LaGrand,

---

[24] *Supra* n.19.

[25] 77 F.3d 301, 308 (9th Cir. 1996).

[26] *Id.*

[27] Cal. Penal Code § 3604.

[28] *Gomez v. Fierro*, 519 U.S. 918 (1996).

[29] Nonetheless, by the time of *Fierro*, it had become "clear that [the use of cyanide gas] exacted 'exquisitely painful' sensations of 'anxiety, panic, [and] terror,' leading courts to declare it unconstitutional." *Arthur v. Dunn*, 137 S. Ct. 725 (2017) (Sotomayor, J., dissenting from denial of certiorari in method of execution challenge) (quoting *Fierro*, 77 F.3d at 308).

[30] *Poland v. Stewart* ,117 F.3d 1094 (9th Cir. 1997).

[31] *Id.* at 1104 (quoting *Clinton v. Acequia, Inc.* 94 F.3d 568, 572 (9th Cir. 1996).

[32] *LaGrand v. Stewart*, 173 F.3d 1144, 1148 (9th Cir. 1999).

[33] *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999).

[34] 77 F.3d at 308.

[35] *Fierro*, 77 F.3d at 308 (quoting *Fierro v. Gomez*, 865 F. Supp. 1387, 1389 (N.D. Cal. 1994)).

wherein the men agonized, largely conscious, for over 10 and 18 minutes, respectively, before succumbing.[36]

But lethal gas itself does not require the use of a chemical agent banned under the multilateral Chemical Weapons Convention.[37] Scientific, medical, and industrial hygiene research have long established that various inert or noble gases can be used in a constitutional execution.[38] Oklahoma, Alabama, and Mississippi have recognized this in the context of their own profound difficulties with lethal injection executions and thus in recent years have incorporated nitrogen hypoxia into their methods statutes.[39] At bottom, lethal gas per se is not an unconstitutional method, but the use of a radically noxious poison, especially one integral to the Nazi Holocaust, plainly is.

In closing, it is surreal that, in 2022, Mr. Atwood must make the case that cyanide gas is odious and unlawful. That Mr. Atwood must seek the refuge of a gas chamber prepared to extinguish his life with a *benign* gas such as nitrogen should also seem absurd. But it is a vitally necessary method for him now and the only conceivable one available under Arizona law for the Department to carry out his sentence constitutionally. I implore you to address the unmistakable failings of the Department's current procedures immediately and to thereby remedy this grave constitutional violation and potential moral failing in the name of the people of Arizona.

Sincerely,

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH

cc:     Laura Chiasson, Esq. (laura.chiasson@azag.gov)
        Sam Kooistra, Esq. (sam@azcapitalproject.org)
        Amy P. Knight, Esq. (amy@amyknightlaw.com)
        David A. Lane, Esq. (dlane@kln-law.com)

---

[36] *Supra* nn.20, 22.
[37] *See* Chemical Weapons Convention Implementation Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681. 22 U.S.C.A. § 6701 (12)(C) (Schedule 3 chemical agents, including hydrogen cyanide).
[38] Lubomir Straka, et al., *Sucidal Nitrogen Inhalation by Use of Scuba Full-Face Diving Mask*, 58 J. Forensic Sc. 1, 3 (2013); J. Ernsting, *The Effect of Brief Profound Hypoxia upon the Arterial and Venous Oxygen Tensions in Man*, J. Physiol. 169, Air Force Inst. Of Av. Med. 1-23 (1963) 292-311.
[39] *Supra* n.7.



**Sam Kooistra <sam@azcapitalproject.org>**

---

# Frank Atwood: Jun. 8, 2022, execution

**Sparks, Jeffrey** <Jeffrey.Sparks@azag.gov>              Mon, May 16, 2022 at 3:51 PM
To: Joe Perkovich <j.perkovich@phillipsblack.org>, Brad Keogh <bkeogh@azadc.gov>
Cc: "Chiasson, Laura" <Laura.Chiasson@azag.gov>, Sam Koistra <sam@azcapitalproject.org>, Amy Knight
<amy@amyknightlaw.com>, David Lane <dlane@kln-law.com>

Mr. Perkovich,

We are in receipt of you letter of May 14 demanding that ADCRR implement a nitrogen lethal gas method. We disagree that
ADCRR's current procedures regarding lethal gas violate any applicable statutory or constitutional provision and, therefore, ADCRR
will not be making any changes to these procedures.

Thank you,


Jeff Sparks

Chief Counsel

Capital Litigation Section



Office of the Attorney General

Solicitor General's Office

Capital Litigation Section

2005 N. Central Ave.

Phoenix, AZ 85004

(602) 542-4686

Jeffrey.Sparks@azag.gov

[Quoted text hidden]

Exhibit 32

**PHILLIPS BLACK, Inc.**

a nonprofit, public interest law practice

Joseph J. Perkovich
PO Box 4544
New York, New York 10163

*j.perkovich@phillipsblack.org*
212 400 1660 (tel)
973 221 9509 (fax)

Principal Attorneys:
Jennifer Merrigan[†]
John R. Mills[‡]
Joseph J. Perkovich[§]
Jessica Sutton[^]

May 18, 2022

VIA E-MAIL (Jeffrey.Sparks@azag.gov)
Jeffrey L. Sparks
Office of the Attorney General
Capital Litigation Section
2005 N. Central Avenue
Phoenix, AZ 85004

Re:  Frank J. Atwood, June 8, 2022, execution date

Mr. Sparks:

I write in relation to Mr. Atwood's right to choose a lethal gas execution method under A.R.S. § 13-757(B), a choice that he is entitled to make through May 19, 2022, in relation to the June 8, 2022, execution date under his warrant entered May 3, 2022. *State v. Atwood*, CR-87-0135-AP.

Under Article 22, Section 22 of the Arizona Constitution and A.R.S. § 13-757(B), Mr. Atwood is entitled to a choice of lethal gas that does not violate the Eighth Amendment to the United States Constitution or Article 2, Section 15 of the Arizona Constitution.

As my correspondence to you and Mr. Keogh of May 14, 2022, reflects, the Department of Corrections, Rehabilitation and Reentry (the "Department")'s specification of cyanide gas under its Execution Procedures (DO 710) renders the State's lethal gas option unconstitutional.[1] Further, there is no impediment to the Department implementing a constitutional lethal gas method instead. The Department's failure to provide a constitutional gas method thus violates Mr. Atwood's rights under the Arizona and United States Constitutions and A.R.S. § 13-757(B). That right is especially important for Mr. Atwood because as explained in my May 14 letter (*supra*), the State's lethal injection method violates the Eighth Amendment as applied to Mr. Atwood. He therefore has extraordinary reasons to exercise his right to choose a constitutional lethal gas execution, as this choice permits self-help to overcome the State's Eighth Amendment violation by its lethal injection method.

---

[1] That demand letter follows Mr. Atwood's individual submission of a grievance against the Department's designation of cyanide gas submitted on May 1, 2022, and which the Department disposed of as "unprocessed," both initially and on appeal on May 5, 2022.

[†] Admitted in Missouri and Pennsylvania
[‡] Admitted in Arizona, California, and North Carolina
[§] Admitted in New York
[^] Admitted in Massachusetts and Missouri

Jeffrey Sparks                                                                                                    2
May 18, 2022

As you know, A.R.S. § 13-757(B) requires the inmate to choose his method 20 days prior to his execution, and further provides that if he fails to choose, the State will use lethal injection.[2] That provision cannot apply where the State has not offered lawful choices. Mr. Atwood is <u>not</u> hereby choosing <u>cyanide</u> gas as his method of execution. But Mr. Atwood respectfully demands that the State immediately designate a constitutional lethal gas method under the Department's Execution Procedures so he may have his right to choose a lethal gas method restored before the State violates § 13-757(B) upon the lapsing of the 20-day choice period ending 12:01 a.m., May 20. While the State is on the precipice of violating its obligation to provide a constitutional choice within the time period contemplated by the statute, the Arizona Constitution ensures Mr. Atwood's right to choose between the injection and gas methods. Unless and until the State provides the options it is statutorily and constitutionally required to provide, the fact that Mr. Atwood has refused to submit an ostensible choice of method that does not provide two real options cannot be construed as a failure to choose as contemplated by A.R.S. § 13-757(B), nor as an affirmative choice of lethal injection. In fact, the State has precluded Mr. Atwood from making the choice because of the State's violations, which he continues to demand that the State remedy.

Finally, it has come to our attention that both the Complex Warden and the Deputy Warden have approached Mr. Atwood in Browning Unit and exhorted him to elect one of the existing methods of execution, notwithstanding the unavailability of a legally valid choice. Mr. Atwood is represented by counsel, and the Department's staff must not communicate with him about his legal choices without counsel present. Please advise Department personnel that, on behalf of Mr. Atwood's legal team, I may be reached in relation to any future questions or matters of that nature.

Sincerely,

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH

cc:   Brad Keogh, Esq. (bkeogh@azadc.gov)
      Laura Chiasson, Esq. (laura.chiasson@azag.gov)
      Sam Kooistra, Esq. (sam@azcapitalproject.org)
      Amy P. Knight, Esq. (amy@amyknightlaw.com)
      David A. Lane, Esq. (dlane@kln-law.com)

---

[2] The Department's Execution Procedures purport to curtail this statutorily dictated choice period by one day, requiring the condemned to choose 21 days prior to the execution. The Department does not have the power to override the statutory provision. Accordingly, Mr. Atwood is statutorily entitled to a lawful choice of method until May 19, and it remains the State's obligation to remedy its deprivation of his choice before that statutory period lapses. Beyond May 19, Mr. Atwood's state constitutional entitlement to lawful choices between injection and gas persists, as do his federal constitutional rights attendant to that right.



**Sam Kooistra <sam@azcapitalproject.org>**

# Frank Atwood: Jun. 8, 2022 execution date: choice of method

**Sparks, Jeffrey** <Jeffrey.Sparks@azag.gov>                    Thu, May 19, 2022 at 8:26 AM
To: Joe Perkovich <j.perkovich@phillipsblack.org>
Cc: Brad Keogh <bkeogh@azadc.gov>, "Chiasson, Laura" <Laura.Chiasson@azag.gov>, Amy Knight
<amy@amyknightlaw.com>, Sam Koista <sam@azcapitalproject.org>, David Lane <dlane@kln-law.com>

Mr. Perkovich,

As I stated previously, ADCRR will not be making any changes to its current lethal gas procedures.

Thank you,

Jeff

Jeff Sparks

Chief Counsel

Capital Litigation Section



Office of the Attorney General

Solicitor General's Office

Capital Litigation Section

2005 N. Central Ave.

Phoenix, AZ 85004

(602) 542-4686

Jeffrey.Sparks@azag.gov

[Quoted text hidden]

Exhibit 11

Pursuant to 28 U.S.C. § 1746 (2).

## DECLARATION OF PHILIP A.  DAVIDSON, M.D.

I, Philip A. Davidson, MD, declare and state as follows:

1.   I am a Board-Certified Orthopedic Surgeon and a member of Davidson
     Orthopedics and the Utah Orthopedic Spine & Injury Center in Salt Lake
     City. I have evaluated Mr. Frank Atwood telephonically and reviewed
     records related to his current condition, and I offer the observations and
     conclusions set forth below.

2.   In addition to my work with Davidson Orthopedics and the Utah Orthopedic
     Spine & Injury Center, I am a member of the staffs of Park City Medical
     Center, Salt Lake Regional Medical Center, LDS Hospital, and Alta View
     Hospital, and in 2015, I founded Davidson Orthopedics in Salt Lake City.

3.   I am a graduate of Harvard University, B.A., Magna cum Laude, Biology and
     Comparative Anatomy in 1983. I earned my Doctor of Medicine degree, with
     Honors in Research, from Cornell University Medical College in 1987.

4.   In 1992, I completed Orthopedic Residency Training with the Baylor College
     of Medicine and, in 1993, held a Sports Medicine Fellowship with the
     Kerlan-Jobe Orthopedic Clinic.

5.   Previously, I served on the affiliated faculty of the University of South Florida
     and successfully developed a large full service Orthopedic Clinic. I have
     served on FDA panels to evaluate the safety of Osteoarthritis treatments. I

have taught many courses to surgeons in the field of Cartilage Restoration and Joint Resurfacing and published many scientific articles in the orthopedic literature on topics ranging from non-surgical treatments for Knee Osteoarthritis to Resurfacing Surgery of the Shoulder. I have served in the US Naval Reserve as a LCDR in the Medical Corps.

6.    I am an official consultant of Major League Baseball, and The National Football League, having been jointly appointed by the players and owners of the leagues.

7.    For the past two decades, I have been acknowledged as one of the nation's foremost orthopedists treating articular cartilage disorders. My particular area of clinical and academic interest is in the field of biologic and anatomic joint resurfacing. I have been acknowledged by the orthopedic community as a surgical innovator and clinical researcher, publishing extensively and teaching surgeons both nationally and internationally.

8.    Before relocating my practice to Utah, where I co-founded Heiden-Davidson Orthopedics with Drs. Eric and Karen Heiden in 2008, I practiced in Tampa Bay, Florida for 15 years as a widely recognized Orthopedic Surgeon specializing in sports medicine. Since 2015 I have been practicing in Davidson Orthopedics and serving as Medical Director of the Utah Orthopedic Spine & Injury Center. I am actively licensed to practice medicine in the states of Wyoming, Utah and Washington. I have formerly

been licensed in the states of California and Texas. I am Board Certified by the American Board of Orthopedic Surgery.

9.  Mr. Frank Atwood is a 66-year-old man who has been referred for me to review his medical records as well as to evaluate by telephone.  Mr. Atwood is incarcerated. Mr. Atwood is now scheduled to be executed on June 8, 2022.

10. I have reviewed hundreds of pages of assorted medically related correspondences, grievances, and medical records pertaining to the medical case and care of Mr. Frank Atwood produced to his attorneys from Arizona's corrections department. This series of documents reflects that the patient's medical needs are not being met and his care is being denied. Records appear to cover decades. These include physical therapy notes regarding Mr. Atwood's spine. Many notes pertain to his health issues outside of orthopedics.

11. On March 25, 2021, I conducted a telephonic consultation with Mr. Atwood. I conducted an additional telephonic consultation with Mr. Atwood on June 7, 2021.

12. This patient's chief issues center on neck pain, back pain, radicular symptoms and weakness referrable to cervical and lumbar pathologies. Based upon my interviews with Mr. Atwood, it is this examiner's opinion that he has an excellent recollection of details and dates which appears to be

highly accurate. His insights provide great detail into his past medical history and the series of events pertaining to his health history.

13. Mr. Atwood takes medications for a duodenal ulcer and hypertension. His past medical history is positive for hepatitis C with stage IV cirrhosis and he reports a 3 cm lesion in his liver. He has had a history of prostate issues but denies cancer. He denies having diabetes. Previous surgical history includes gallbladder resection, cataract surgery, knee surgery, and cervical fusion as described above.


HISTORY OF PRESENT ILLNESS:

14. Mr. Atwood reports foremost about his back and related back pain. He describes the pain as having begun in approximately 1990 and being treated over the past 30-plus years with oral medications. He states that he has never had fluoroscopically-guided injections into the lumbar region. He has had no surgery on his lumbar region.

15. Records reflect Mr. Atwood has recently had several intramuscular injections of Toradol (between 15 mg and 30 mg), an anti-inflammatory, on various days in January 2021. Further, Mr. Atwood reports receiving a corticosteroid intramuscularly in his arm (circa February 2021) that he states provided some relief of back pain for a couple of weeks. This injection was performed about 2-3 weeks prior to my first phone consultation with him. At that time, the benefits were wearing off.

16.   Mr. Atwood states that he has marked pain in the mid low-back region which

is dull and nonspecific in nature.  He states that the pain is a 9 out of 10

increasing to 10 out of 10 with certain activities, such as turning to get out of

bed.  In addition to the localized back pain, which is his worst complaint, he

also feels radiating pain shooting into the leg, right side more than left.  He

states that the radiating pain extends through his buttock and upper leg at a

strength of about 7 out of 10.  In the right leg, he states the pain is a big

problem but he is also bothered by marked weakness.  He experiences a

sensation of numbness in his foot and marked swelling in the foot.  He feels

and reports that the swelling is so great in his feet that he has difficulty

wearing shoes.

17.   Mr. Atwood reports weakness in his lower extremities to the extent that his

legs will not support him to stand.  He describes that he last walked in May

2017.  Now, he describes principally using his hands and upper extremities

to transfer from bed to wheelchair, but the transferring causes him

excruciating pain.  He was issued in the remote past a series of exercises

and stretching, but these are now too painful for him to perform.  He

experiences numbness and swelling in the left lower extremity down to his

foot.  His weakness is approximately equal, right and left.

18.   Mr. Atwood reports a long history of neck pain and cervical radiculopathies

beginning in about 2003.  He was subsequently evaluated and treated,

having a cervical fusion at C5-C6 in December 2018 that provided him with

some decreased weakness and limited pain relief. His neck pain and the dysfunction in his upper extremities is progressively worsening over the past several years since the surgery. He describes numbness in both of his hands and has difficulty performing simple activities such as just holding a pen, stating that he drops things and has distinct difficulty with numbness more so than weakness in the bilateral upper extremities. The pain in his upper extremities he states is approximately equal right and left. It is worse above the elbows, bilaterally extending principally to the area around the shoulders in the middle of his back and what sounds like the region of his scapulae. He describes the pain as "burning and constricting," radiating into his upper arms and shoulders. The pain is an 8 or 9 out of 10 on a constant basis.

19. In asking Mr. Atwood to somehow provide insight to the level of pain that he is experiencing, he states, "I experience incomprehensible pain every time I need to transfer to bed, chair or wheelchair." Furthermore, he states that he presently feels "incredibly weak" and where he had previously participated in sporting activities, now, for a number of years, he has been unable to walk and even has difficulty sitting erect. He reports that efforts to sit erect are increasingly challenging and subject him to substantial, debilitating pain. In addition, he is not able to lay supine (flat) without excruciating pain in his spinal regions.

20. Mr. Atwood also relates a recent history of falling, secondary to weakness in his legs. He relates a fall in November of 2020 when he hit his face and knocked himself out. He suffered a similar fall in March 2021. He is markedly limited in his capacity to transfer, stating that within the confines of his cell, he has had to crawl to the door rather than walk or transfer to his wheelchair.

21. Mr. Atwood suffers constant pain. In order to minimize its severity, he seeks to continually maintain a seated posture, either slouching in his wheelchair or partially reclining on his back, in bed while attempting to sleep. This general condition causes considerable sleeping difficulties. Since Fall 2020, he has experienced too much pain to sleep either on his side or his back. Lying flat on his back severely exacerbates his conditions, causing maximum pain. He is only able to sleep sporadically, by positioning himself partially upright, propped up with blankets. Again, due to his spinal pathologies he is not able to lay in a supine position without experiencing severe pain. He has less pain in a sitting, rather than lying flat position. Being strapped down to a gurney or table would cause him severe pain. Sitting upright is considerably less painful for him.

22. On January 8, 2021, MRI scans were conducted of Mr. Atwood, which are identified below (¶¶ 28-32).

23. On February 8, 2021, Nurse Practitioner Olmstead evaluated Mr. Atwood wherein she discussed potential further treatment that could include epidural

steroid injections, further evaluation of effective pain management medication, and a neurosurgical consultation.  Mr. Atwood reports that a Dr. Stewart, a physician affiliated with Centurion, the prison health care provider, denied this surgical consultation and declined to otherwise offer a treatment plan for his pain and its underlying causes. To date, the patient has not had any neurosurgical consultations subsequent to the above-referenced MRI scans.

24. On or around May 3, 2021, a Dr. Mahn, the Medical Director of the ASPC-Florence infirmary, prescribed twice daily doses of Tramadol to address Mr. Atwood's severe back pain and other discomfort. He was also prescribed Tylenol with Codeine (No.4) twice daily. Mr. Atwood is now receiving the Tramadol regularly, getting appropriate relief.


IMAGING STUDIES:

25. I have reviewed Mr. Atwood's cervical MRI scan of January 8, 2021. Findings include:

    C2-C3 moderate canal stenosis with bilateral mild foraminal stenoses;

    C3-C4 moderate canal stenosis with bilateral severe foraminal stenoses;

    C4-C5 fusion with mild canal stenosis and bilateral severe foraminal stenoses;

    C5-C6 surgical fusion with punctate myelomalacia of the cervical cord and bilateral severe foraminal stenoses;

C6-C7 moderate canal stenosis with bilateral severe foraminal stenoses;

C7-T1 patent canal with bilateral severe foraminal stenoses.

26.  I have reviewed the lumbar MRI scan from the same date (Jan. 8), and

findings include:

T12-L1 mild right-sided foraminal stenosis;

L1-L2 moderate bilateral foraminal stenoses;

L2-L3 mild right-sided, severe left-sided foraminal stenoses;

L3-L4 severe bilateral foraminal stenoses with bilateral L3

encroachment;

L4-L5 severe bilateral foraminal stenoses;

L5-S1 severe right-sided, moderate left-sided foraminal stenoses with

bilateral L5 neural encroachment.

IMPRESSONS:

27.  Mr. Atwood has severe cervical spondylosis with severe radicular symptoms

to include, of great importance, C5-C6 myelomalacia.  He has apparently

overt radicular symptomatology as well as radiating pain, weakness, and

motor dysfunction.

28.  His lumbar spine problem is his most painful condition. He has advanced

lumbar spondylosis with overt radiculopathies.  His neural symptomatology

has contributed to the weakness that is limiting his ability to transfer and

position, let alone ambulate.  In addition, the neural compression and

degenerative spondylosis are highly painful, most acutely when prone or in an erect seated posture.

29. Based on his spinal diagnoses, it is my professional opinion that Mr. Atwood cannot be placed in a supine position on a gurney, strapped in place and maintained as such for any length of time without experiencing severe and immediate exacerbation of pain.

30. At this point in time, further treatment and evaluation are medically necessary and appropriate, and urgently needed.

31. Mr. Atwood needs to be seen immediately by an interventional pain specialist to ascertain whether fluoroscopically-guided injections such as epidural steroid injections would potentially provide some symptom relief from his basic, resting positions. Mr. Atwood has received Tramadol in the past and presently is being weaned of its use after his return to his housing unit (Browning Unit), from the Florence Complex's infirmary, where he was treated for the above-outlined kidney problems in April through early June 2021.

32. Critically, Mr. Atwood needs a surgical consultation with an orthopedic spine surgeon or neurosurgeon to ascertain and clarify his surgical options.  He is an appropriate surgical candidate but I defer suggesting the exact surgical plan to a surgeon who would evaluate him in person, as well as review the foregoing imaging.  However, surgical intervention is likely necessary to address the underlying causes of his chronic pain.

33. In addition to the curative interventions suggested above, it is my professional opinion that it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately. These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available.

34. It is my opinion that to a great extent, more likely than not, his current state of spinal degeneration and symptomatology is a result of negligence and under-treatment rendered while this patient has been incarcerated by the State of Arizona. If he had received timely, appropriate and standard health care then he would have been treated years ago with spinal injection therapies and potential further surgeries. By virtue of what appears to be gross undertreatment he has degenerated to the point where he is chronically in pain and now being managed to some extent by oral medications.

35. I strongly recommend that evaluation and treatment is immediately indicated with an interventional pain management physician. This physician could and would assess Mr. Atwood and render appropriate injection therapies. These would potentially be substantively palliative, and if not would provide diagnostic information to guide likely surgical treatment. He has had a one level cervical fusion in the past and more likely than not will require further

surgical decompression and fusion of both the cervical and lumbar spine regions.

36. If further information is required, I am available to provide more insights and opinions on this case.  Additionally, the opinions rendered above could be updated pending receipt of further information or data.

37. If his execution is to proceed in the coming weeks prior to his receiving long denied medical and surgical care, then he should remain seated in a chair to avoid the infliction of extreme pain.

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746 (2).

Executed this 9th day of May 2022, in Salt Lake City, Utah.

Philip A. Davidson, MD
Board Certified Orthopedic Surgeon

Exhibit 12

# APPENDIX B

TMF 01/01.00    GENERAL PROVISIONS

TMF 01/01.01    Purpose of Technical Manual
TMF 01/01.02    Cross Reference
TMF 01/01.03    Policy
TMF 01/01.04    Definitions

REVISED 06/10/10                                        TMF 01/01 - pg. 1

GLOSSIP000092

  
GLOSSIP000093

TMF 01/01.00    <u>GENERAL PROVISIONS</u>

TMF 01/01.01    <u>Purpose of Technical Manual</u>

       A.   The purpose of this Technical Manual is to provide the Department's policies, procedures and post orders for planning and carrying out the sentence for the execution of a person convicted of a capital offense.

       B.   This chapter shall include policies and procedures related to:

          1.   planning and preparation;

          2.   execution of the sentence;

          3.   post-execution requirements and process;

          4.   security and control;

          5.   witnesses and official visitors

          6.   news media access limitations and briefing;

          7.   delays, stays, and commutations;

          8.   support services functions;

          9.   briefing and training; and

         10.  documentation, review and audit.

       C.   Post orders are included for the staff and others involved in the execution planning, implementation, documentation and review.

TMF 01/01.02    <u>Cross Reference</u>

       A.   <u>Department Policies and Procedures Manuals</u>

          AGr05  Media Relations
          FDr14  Inmate Property

       B.   <u>Other Authority</u>

          UCA 77-19-6   Judgement of death-Warrant-Delivery of warrant-Determination of execution time.

GLOSSIP000094

| | |
|---|---|
| UCA 77-19-10 | Judgement of death-Location and procedures for execution. |
| UCA 77-19-11 | Who may be present-Photographic and recording equipment. |
| UCA 77-19-12 | Return upon death warrant. |
| UCA 26-4-6 | Investigation of deaths by county attorney-Requests for autopsies. |
| UCA 26-4-7 | Deaths over which medical examiner has jurisdiction. |
| BPPPM 3.12 | Commutation Hearings for Death Penalty Cases |

TMF 01/01.03   <u>Policy</u>

It is the policy of the Department that:

A.   execution of persons sentenced to death under Utah law by a court of competent authority and jurisdiction be carried out in the legally prescribed manner;

B.   the Department shall make every effort in the planning and preparation of the execution event to ensure that the execution process:

1.   adheres to the intent of the law;

2.   is handled in a manner which minimizes negative impact on the safety, security and operational integrity of the prison;

3.   accommodates the need for public access to information concerning the event;

4.   reasonably addresses the privacy interests of those persons for whom the law, Department policy or commonly-held principles of decency require such privacy;

5.   provides sufficient staffing to ensure that unplanned problems can be accommodated and overcome;

6.   prepares for stays of execution, commutations and other delays in the execution count-down;

7.   provides an opportunity for interested persons to exercise their First

REVISED 06/10/10                                    TMF 01/01 - pg. 3

GLOSSIP000095

Amendment rights to demonstrate for or against capital punishment in a lawful manner;

8. ensures a firm and adequate response to unlawful civil disobedience, trespass, or other violations of the law by persons attempting to disrupt, prevent or other-wise frustrate the lawful process associated with the execution; and

9. anticipates and provides for sufficient support needs for the execution and the prison as a whole;

C. the Department shall arrest and encourage the prosecution of persons, including but not limited to, those who:

1. violate 77-19-11 UCA prohibitions against filming, taping, sketching, broadcasting or otherwise electronically documenting the death of the condemned;

2. trespass or otherwise enter upon prison property without proper permission and clearance from the Department;

3. participate in unlawful demonstrations;

4. unlawfully attempt to or disrupt, prevent or otherwise interfere with the execution;

5. being inmates, are involved in disruptive, assaultive or other proscribed behavior; or

6. unlawfully threaten, intimidate or terrorize persons involved in the execution process;

D. staff involved in the execution make every effort within the requirements and limits of these polices and procedures and the laws of the State of Utah to:

1. minimize the anxiety and negative impact of the execution on the victim's and inmate's family and friends witnessing the execution;

REVISED 06/10/10                          TMF 01/01 - pg. 4

GLOSSIP000096

2.  display appropriate levels of
    professionalism, restraint, and courtesy
    in interaction with witnesses,
    demonstrators, news media, and other
    non-staff persons during the execution
    process; and

3.  not permit interactions, emotion or
    intimidation to prevent their proper
    handling of missions and duties;

E.  the Department review the adequacy and/or the
    performance of:

1.  the policies and procedures employed;

2.  the Department staff members involved in
    the execution;

3.  members of allied agencies assisting
    with the execution; and

4.  statutes and other authority impacting
    the execution; and

F.  the evaluation of each execution event be
    used to improve operational procedures for
    the future.

TMF 01/01.04   <u>Definitions</u>

**allied agency**          refers to another criminal
                           justice agency

**Attorney General's**     staff at the Attorney
**Office**                 General's Office or any
                           designated contract attorney
                           approved to carry out the
                           responsibilities described in
                           this technical manual

**attorney of record**    the condemned inmate's
                           attorney and other assisting
                           legal personnel

GLOSSIP000097

| | |
|---|---|
| broadcast media | refers to radio and television media |
| civilians | any person not a member of the Department, allied law enforcement agency, nor mutual aid agencies |
| Command Post Director | the member who is assigned to supervise the command post functions and activities |
| commutation | the change from a greater to a lesser punishment after conviction |
| drug injection box | box or boxes each of which shall contain one complete set-up for lethal injection; with or without drugs |
| execution building | refers to the area containing the execution chamber |
| execution chamber | the immediate enclosed areas containing the condemned at the moment of execution |

REVISED 06/10/10

GLOSSIP000098

| | |
|---|---|
| **mutual aid** | agencies or personnel that provide medical, fire suppression, and other support services to the Draper site |
| **news magazines** | magazines having a national circulation being sold by news stands to the general public and by mail circulation |
| **news media** | collectively refers to those involved with news gathering for newspapers, news magazines, radio, television or news services |
| **news media members** | persons over the age of eighteen who are primarily employed in the business of gathering or reporting news for newspapers, news magazines, national or international new services or radio or television stations licensed by the Federal Communications Commission |
| **newspaper** | for purposes of this chapter, the publication: |

REVISED 06/10/10

GLOSSIP000099

1.    circulates among the general public;

2.    publishes legal notices in the community in which it is located or the area to which it distributes; and

3.    contains items of general interest to the public such as political, commercial, religious or social affairs

**pardon**         an act of grace by an appropriate authority exempting a person from punishment for a crime

**press**          refers to the print media; also see "news media", generally

**reprieve**      the temporary suspension of the execution

**respite**       see "reprieve"

**security curtains**   the curtains which cover the viewing room windows in the executionchamber

**Warden**        warden assigned to the Draper site

**witness viewing**   the areas from which the

REVISED 06/10/10

TMF 01/01 – pg. 8

GLOSSIP000100

area                              execution is viewed by
                                  government witnesses, inmate's
                                  witnesses and news media
                                  witnesses

REVISED 06/10/10                              TMF 01/01 - pg. 9

GLOSSIP000101

```
TMF 01/02.00    PRE-EXECUTION CHECKLIST

TMF 01/02.01    General Provisions
TMF 01/02.02    Prior to Receiving Death Warrant
TMF 01/02.03    Receipt of Death Warrant to Thirty Days Prior to
                Execution
TMF 01/02.04    Twenty-Nine to Fourteen Days Prior to the
                Execution
TMF 01/02.05    Thirteen to Seven Days Prior to Execution
TMF 01/02.06    Six to Three Days Prior to Execution
TMF 01/02.07
```

GLOSSIP000102

TMF 01/02.00    PRE-EXECUTION CHECKLIST

TMF 01/02.01    General Provisions

A.    Purpose of Chapter

1.    The purpose of this chapter is to provide a checklist of procedures and events which should occur between the issuing of the death warrant and 24 hours prior to the execution.

2.    Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

3.    This chapter will be divided to cover the following time periods:

a.    prior to the death warrant being issued;

b.    issuing of death warrant to 30 days prior to the execution;

c.    14 to 29 days prior to the execution;

d.    7 to 13 days prior to the execution;

e.    3 to 6 days prior to the execution; and

f.

B.    Policy

1.    It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary in the preparation of the execution are completed in a timely manner.

REVISED 06/10/10                              TMF 01/02   – pg. 11

GLOSSIP000103

2. This count-down, though offering flexible application, should be observed and followed as written unless deviation or adjustment is required for carrying out the execution.

3. The Executive Director/designee may direct deviation from or adjustment to the policies and procedures in this manual at any time when necessary for the good of the Department's mission in carrying out the execution. Approval for the changes shall be documented in writing.

TMF 01/02.02   <u>Prior to Receiving Death Warrant</u>

A.   <u>Execution Planning Team</u>

When it appears an execution is imminent, prior to the issuing of the death warrant, the Warden shall select an Execution Planning Team. The Team may include:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

REVISED 06/10/10                                    TMF 01/02   – pg. 12

GLOSSIP000104

B.   Involve Additional Planning Assistance

Other persons who may be invited to attend on a meeting-by-meeting basis, include:

1.   a representative or representatives from the Attorney General's Office;

2.   a representative from the office of the County Attorney which prosecuted the condemned;

3.   a representative from the Board of Pardons and Parole;

4.   representatives from the law enforcement agencies which investigated the case involving the condemned;

5.   representatives from law enforcement and other allied agencies who may be asked to assist with various aspects of the execution; and

6.   any other persons deemed necessary or appropriate by the Executive Director/designee, DIO Director or Warden.

C.   Develop Assignments

When it is reasonable to believe a death warrant will be issued in the near future, the Execution Planning Team and those additional persons deemed appropriate shall meet to:

1.   review the Execution Plan (TMF 01);

2.   make assignments for the pending execution;

3.   develop a schedule of events;

4.   assign responsibilities related to revision of the Execution Plan, if needed; and

5.   take any other steps necessary to prepare for the issuance of the

GLOSSIP000105

deathwarrant and begin the execution
count down.

D.   Identify Possible Execution Dates

1.   The Execution Planning Team shall review
the Department's schedule of events and
identify favorable and unfavorable dates
within the period of time in which the
execution may be ordered.

2.   Information concerning the Department's
requests/concerns related to scheduling
shall be communicated to the Attorney
General's Office to be communicated to
the sentencing court.

TMF 01/02.03   Receipt of Death Warrant to Thirty Days Prior to
Execution

Upon receipt of a death warrant from a competent
court, the following procedures shall be initiated
and should be completed at least 30 days prior to
execution.

A.   Receipt of Death Warrant

1.   Upon receipt of the death warrant and as
soon as practical thereafter, a meeting
of the Execution Planning Team shall be
scheduled by the Warden.

2.   The Execution Planning Team shall then
coordinate the implementation of the
procedures set forth in this technical
manual under the direction of the
Warden.

B.   Time and Place of Execution

1.   Date

The date for the execution shall be that
day set by the sentencing judge.

REVISED 06/10/10                    TMF 01/02   - pg. 14

GLOSSIP000106

2.    <u>Time</u>

"The Department of Corrections shall determine the hour, within the appointed day, at which the judgment is executed." 77-19-6(3)

3.    <u>Location</u>

C.    <u>Condemned Inmate's Choice of Witnesses</u>

1.    The condemned inmate shall be informed that he may designate religious representatives, friends, or relatives not exceeding a total of five in number to witness the execution.  77-19-11 (2) (d)UCA

2.    Refer to TMF 01/07.

D.    <u>Disposition of Personal Property</u>

1.    The inmate shall be contacted for instructions concerning the disposition of his personal property.

2.    Refer to TMF 01/05.06.

E.    <u>Disposition of Funds in Inmate's Account</u>

1.    The condemned shall be contacted for instructions concerning the disposition of the funds in any accounts controlled or administered by the prison or Department.

2.    Refer to TMF 01/05.06 and TMF 01/05.07.

F.    <u>Organ Donation</u>

Organ donation is not an option for condemned inmates.

G.    <u>Disposition of Body</u>

REVISED 06/10/10                    TMF 01/02   – pg. 15

GLOSSIP000107

1. The condemned shall be asked for instructions concerning the disposition of his remains following the execution.

2. Refer to TMF 01/05.08.

H. Designate Persons Required to Assist with Execution

1. Those persons necessary to carry out the execution shall be identified.

   a. The Executive Director/designee, DIO Director or Warden shall be responsible for identifying, selecting and obtaining the services of the executioners. See TMF 01/05.03 and TMF 01/05.04.

   b. The Public Affairs Director shall be responsible for coordinating the notification of the news media and selection of individual news media witnesses. See TMF 01.08.02.

   c. The Warden shall be responsible for designating those persons necessary to carry out and support the execution.

2. Redundancy in assignment may be developed for all vital or important positions. The Warden, DIO Director, and Executive Director/designee shall determine which positions require back-up and shall ensure adequate coverage is provided.

3. "Compensation for members of a firing squad or persons administering intravenous injections shall be in an amount determined by the director of the Division of Finance." 77-19-10 (4)UCA

   a. The Department shall negotiate with the executioners and Division of Finance the fee to be paid to the executioners.

GLOSSIP000108

b.

c.

I.   Other Approved Witnesses

The Executive Director/designee shall
designate other approved witnesses as
outlined in TMF 01/07.03.

J.   Contact with State Medical Examiner

1.   Contact shall be made with the State
Medical Examiner to coordinate the
Medical Examiner's role.

2.   The Medical Examiner shall be requested
to provide direction concerning:

a.   transfer of custody of the executed
inmate from the Warden to the
Medical Examiner;

b.

c.

3.   Refer to TMF 01/04.

K.   Support Services

1.   The Support Services Deputy Warden
coordinates the functions of Support
Services Section Personnel.

2.   Support Services units shall include,
but not be limited to:

GLOSSIP000109

      a.    the Food Services Unit (See TMF 01/05.19); and

      b.    the Maintenance Unit (See TMF 01/05.18).

L.  The Correctional Medical Administrator coordinates functions of the Medical Unit personnel.  (See TMF 01/05.18)

M.  <u>Brief Prison Administrators</u>

    1.    It is necessary to maintain as nearly as possible a normal prison operation during the execution and the activities preceding and following the execution.

    2.    Prison administrators should be briefed as appropriate on plans for the execution, restrictions on access, crowd control, additional security procedures, etc., on an on-going basis.

    3.    Briefings should begin as soon as plans begin to evolve which will effect the general prison operation, and should continue until the operation returns to normal.

TMF 01/02.04  <u>Twenty-Nine to Fourteen Days Prior to the Execution</u>

A.  <u>Witnesses</u>

    1.    The Executive Director/designee shall develop a final list of witnesses consistent with the requirements of 77-19-11 (2) and (3) UCA.

    2.    Any changes to the Government witness list shall be approved by the Executive Director.

    3.    Each witness shall be required to sign an agreement prior to being cleared and added to the witness list.

GLOSSIP000110

4. The Executive Director may make additions to the witness list when necessary.

5. Refer to TMF 01/05.05.

B. Underline{News Media}

1. Witness requests shall be received and processed by the Public Affairs Office in accordance with TMF 01/08.02.

2. Alternate coverage/accommodations for members of the press selected to be present at alternate site shall be handled consistent with TMF 01/08.03.

C. Inmate Property and Accounts

1. Finalize arrangements for disposition of the condemned inmate's property and accounts 14 days prior to execution.

2. Refer to TMF 01/05.06 and TMF 01/05.07.

D. Disposition of Body

1. Finalize, if possible, decision concerning disposition of the body.

2. Refer to TMF 01/05.08.

E. Selection of Executioners

1. Finalize the selection of executioners and their back-ups.

2. Refer to TMF 01/05.03 and TMF 01/05.04.

F. Medical/Medical Examiner

1. Finalize arrangements for a physician consistent with 77-19-10UCA.

2.

GLOSSIP000111

      3.    Refer to TMF 01/05.08.

G.   <u>Practices and Rehearsals</u>

      1.    Initiate practice sessions for persons involved in the various parts of the execution event.

      2.    Not all of the persons involved will practice together.  Individual teams will practice as units, with inter-team practices scheduled, as necessary.

TMF 01/02.05   <u>Thirteen to Seven to Days Prior to Execution</u>

A.   <u>Inmate Property/Accounts</u>

All paperwork on disposition of property and accounts should be completed at least seven days prior to the execution.

B.   <u>Disposition of Body</u>
All paperwork should be completed at least seven days prior to the execution.

C.   <u>Food Services</u>

      1.    At least seven days prior to execution, contact the condemned inmate to arrange last meal.  TMF 01/05.18.

      2.    Determine with the Warden, Draper Site Security Deputy Warden, and Public Affairs Director what beverage and food service will be needed at the various locations where staff will be working.

D.   <u>Purchase of Substances to Be Used in Lethal Injection</u>

      1.    Purchase substances to be used in the execution.

      2.    Refer to TMF 01/05.11.

E.   <u>Support Services</u>

REVISED 06/10/10                        TMF 01/02   - pg. 20

GLOSSIP000112

Finalize all arrangements involving the
Support Services assistance with the Support
Services Director.

F.   Finalize all arrangements involving the
Medical Section assistance with the
Correctional Medical Administrator.

G.   Allied Agencies

Finalize arrangements with allied agencies
assisting with the execution.

TMF 01/02.06   Six to Three Days Prior to Execution

A.   Witnesses

1.   All witness agreements should be signed.

a.   Copies shall be provided to the:

(1)   Command Post Director; and

(2)   Auditor-in-Charge.

b.   Persons refusing to sign agreements
shall not be permitted to attend.

2.   Exceptions to the time requirements will
permit delayed signing of agreements for
witnesses coming in from out-of-state.

B.   Brief Allied Agencies

1.   Members of allied agencies who have not
participated in practice sessions or
have not otherwise been briefed
previously, shall be briefed and their
post or responsibilities explained.

2.   Briefings will include a detailed review
of the individual's post order.

C.   Inmate Property and Accounts

1.   Complete all unfinished paperwork and
arrangements.

2.   If the condemned fails to cooperate in
these arrangements, he shall be notified

GLOSSIP000113

that the property and money will be
disposed of according to state law, and
Department policy.

D.   Executioners

The Warden shall:

1.

2.   ensure completion of all arrangements
     necessary for security of executioners
     and protection of their identities.

E.   Equipment Check/Inventory

1.

2.   Refer to TMF 01/05.10(Firing Squad) and
     01/10.09 (Lethal Injection).

TMF 01/02.07

A.   Observation Period

1.

2.

3.   Refer to TMF 01/05.12.

B.   Meeting of Execution Planning Team

The Team shall meet to examine preparation
for the execution.  The checklists shall be
reviewed and immediate assignments made to
bring all items current with the schedule of
events.

REVISED 06/10/10                          TMF 01/02  - pg. 22

GLOSSIP000114

Refer to TMF 01/02 pre-execution checklist
Refer to TMF 01/03 execution checklist
Refer to TMF 01/04 post execution procedure

C.  Review of Procedures

Conduct final review of procedures.

D.  Arrangements for Pickup of Executioners

1.

2.

E.  Food Services

1.  Verify last meal preparation.

2.  Verify beverage/food preparations for
working teams.

F.  Communications

1.  Verify installation of and test
communications equipment for:

a.

b.

c.  Information Center.

2.  Refer to TMF 01/05.10.

G.  Contact Support Agencies

1.  Contact:

a.  the Attorney General's Office;

b.  the State Medical Examiner's
Office;

GLOSSIP000115

          c.    allied law enforcement agencies; and

          d.    the Governor's Office.

    2.    Verify that each agency fully understands its role and is prepared to complete tasks.

H.    <u>Equipment Check</u>

    1.    Complete pre-execution inventory and equipment check.

    2.    All systems should be tested.

GLOSSIP000116

TMF 01/03.00     EXECUTION CHECKLIST

TMF 01/03.01     General Provisions
TMF 01/03.02
TMF 01/03.03
TMF 01/03.04
TMF 01/03.05
TMF 01/03.06

GLOSSIP000117

TMF 01/03.00   <u>EXECUTION CHECKLIST</u>

TMF 01/03.01   <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

          1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur

          2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

      B.   <u>Policy</u>

          1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary to carry out the execution are completed in a carefully coordinated manner.

          2.   The execution shall be carried out in a manner consistent with state law.

TMF 01/03.02

      A.

          1.

          2.

          3.   Refer to TMF 01/05.12.

      B.

GLOSSIP000118

1.

2.    Refer to TMF 01/05.12.

C.    <u>Inmate Communication</u>

1.

2.

3.

4.    Refer to TMF 01/05.12.

D.    <u>Food Services</u>

1.    The Warden/designee shall contact the
condemned to make arrangements for the
final three meals.

2.    The final meal shall be served.

3.    Refer to TMF 01/05.18.

E.

GLOSSIP000119

1.

    a.

    b.

    c.

    d.

2.   Refer to TMF 01/03.03 and TMF 01/05.08.

F.   Equipment Check

1.

2.   Refer to TMF 01/05.10 and TMF 01/05.11.

TMF 01/03.03

A.   Final Briefing

1.

2.   The final briefing shall be attended by the Executive Director/designee, DIO Director, Warden, special teams and other persons specified by the Executive Director or Warden.  The Warden shall conduct the meeting, with the Executive Director/designee and DIO Director providing policy decisions, as needed.

3.   During the briefing, participants shall:

    a.   identify problems, develop solutions and specify time lines and approve modified policy changes;

GLOSSIP000120

    b.  provide status reports;

    c.  coordinate support services involvement; and

    d.  conduct final review of count down procedures.

  B.  Food Services

    1.  The condemned shall be fed at specifiedtimes

    2.

    3.  Refer to TMF 01/05.18

  C.  Visits

    1.

    2.

  D.  Restricting Access to Prison Property

    1.

      a.

      b.

      c.

      d.

      e.

    2.

GLOSSIP000121

a.

b.

3.

E.

1.

2.

3.

4.

TMF 01/03.04

A.

1.

a.

GLOSSIP000122

b.

c.

2.

   a.

   b.

   c.

3.

   a.

   b.

   c.

4.

   a.

GLOSSIP000123

b.

B.

1.

2.

TMF 01/03.05

A.   <u>Pre-Execution Procedures</u>

1.   The Warden shall ensure that all count-
down procedures for all required
activities and actions are completed.

2.   Immediate action to complete any
unfinished required procedures shall be
initiated.

B.   <u>Execution Site Teams Assemble</u>

1.

2.   The Tie-Down Teams and their back-ups
will be positioned to await escort of
the condemned to the execution chamber.

C.   <u>Contact with the Attorney General's Office</u>

GLOSSIP000124

1.

    a.

    b.

       (2)

2.

3.

    a.

    b.

4.

GLOSSIP000125

TMF 01/03.06

    A.   <u>Communications with Attorney General's Office</u>

           Refer to TMF 01/03.05,C, above.

    B.   <u>Final Sequence of Events: Preparation</u>

        1.   <u>Bringing Condemned Inmate to Execution Chamber</u>

           The condemned inmate shall be:

           a.   removed from the observation cell by the Tie-Down Team;

           b.        dressed in a clean jump suit (the color of the jump suit will be at the discretion of the Warden);

           c.

           d.   escorted to the execution chamber.

        2.   <u>Tie-Down Procedures</u>

                    the condemned shall be tied down as explained in TMF 01/05.13(lethal injection) or TMF 01/05.14(firing squad).

        3.   <u>Prepare Condemned Inmate for Execution</u>

           The condemned shall be readied for execution:

           a.   if lethal injection, by completing the I.V. set-up procedure (See TMF 01/05.15); or

           b.   if firing squad, by completing the firing squad set-up procedures (See TMF 01/05.16).

        4.   <u>Admit Witnesses</u>

GLOSSIP000126

a.    Witnesses shall be admitted and
      escorted to assigned viewing areas.

b.    The government witnesses shall
      enter first and shall be escorted
      to the government witness area.
      The escort shall remain with the
      witnesses.

c.    Following the government witnesses,
      the authorized witnesses invited by
      the condemned, and the victim's
      witnesses shall be admitted and
      escorted to the designated witness
      area.

      (1)   If any of the condemned
            inmate's invited witnesses, or
            the victim's witnesses wish to
            be on-site but not actually
            witness the execution,
            accommodations may be made for
            them.

      (2)   The escort officers shall
            remain with the condemned
            inmate's witnesses and the
            victim's witnesses.

d.    The last witnesses to be admitted
      shall be the news media
      representatives.

      (1)   The members of the news media
            selected to witness the
            execution shall be escorted to
            the designated witness room.
            They shall be separate from
            the condemned inmate's
            witnesses and the victim's
            witnesses.  Escort officers
            shall remain with the news
            media witnesses and ensure
            their separation from the
            other visitors while at the
            execution site.

      (2)   The two pool photographers
            shall be escorted to a
            designated site, away from,
            and out of sight of, the
            execution chamber.  They shall

GLOSSIP000127

be secured inside the designated site until after the execution and until such time that they are allowed to film the cleaned up execution chamber.

C.   Final Sequence of Events: Execution

1.   Staff Witness

a.   Staff participating in the preparation for the execution shall exit the execution site.

b.   Staff members remaining to participate in and observe the execution shall include the:

(1)   Executive Director/designee;

(2)   Executive Director's back-up;

(3)   DIO Director;

(4)   Warden;

(5)   Executioners;

(6)   Escort Officers; and

(7)   other staff as designated by the Executive Director/designee, DIO Director, or Warden.

2.   Count-Down

a.   At the designated hour mandated for the execution, when everything is ready, the phone communication shall be terminated and the Executive Director/designee shall instruct the Warden to proceed with the execution.

b.   The Warden and DIO Director shall pull open the curtains covering the witness room windows.

GLOSSIP000128

    c.    The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

        (1)    The statement should not exceed two minutes.

        (2)    If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution procedure.

        (3)    If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

        (4)    Audio recording equipment may be used by the Department for the purpose of recording the defendant's last words.  The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

    d.

    e.    The Executive Director/designee shall instruct the executioners in the case of death by injection, or the firing squad leader in the case of a firing squad execution to proceed with the execution:

        (1)    upon receiving the Warden's signal to proceed;

        (2)    after verifying the earliest legal execution time has passed; and

        (3)    if no instruction to halt has been received from the Attorney General's Office.

GLOSSIP000129

f.   Following the instruction from the
     Executive Director/designee to
     execute the condemned inmate, the
     executioners shall immediately
     proceed with the execution as
     required in TMF 01/05.15(if by
     lethal injection) or TMF
     01/05.16(if by firing squad).

q.   If the execution is ordered delayed


     the Executive Director shall
     instruct the executioners to step
     away from the execution equipment
     and shall notify them that the
     execution has been stayed or
     delayed.  The procedures set forth
     under TMF 01/06 shall then be
     initiated.

REVISED 06/10/10                    TMF 01/03   - pg. 38

GLOSSIP000130

TMF 01/04.00    POST-EXECUTION PROCEDURES

TMF 01/04.01    General Provisions
TMF 01/04.02    Certification of Death
TMF 01/04.03    Removing Witnesses from Execution Chamber
TMF 01/04.04    Removal of Executed Inmate
TMF 01/04.05    Removing Executioners from the Execution Area
TMF 01/04.06    Site Clean-Up
TMF 01/04.07    News Media Re-Entry to Execution Site
TMF 01/04.08    Returning to Standard Operation
TMF 01/04.09    Audit of Execution
TMF 01/04.10    Post-Execution Countdown Schedule

GLOSSIP000131

TMF 01/04.00   <u>POST-EXECUTION PROCEDURES</u>

TMF 01/04.01   <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

          The purpose of this chapter is:

          1.   to provide the procedures to be followed following the death by execution of the condemned inmate;

          2.   to identify the responsibilities for tasks to be completed; and

          3.   to provide for the transfer of the body of the condemned from the custody of the Department.

      B.   <u>Policy</u>

          It is the policy of the Department that:

          1.   the witnesses to the execution shall be removed from the execution chamber for the news media witnesses who shall be removed to a secondary location until permitted to return for a filming opportunity in the execution chamber;

          2.   the condemned inmate shall be examined by a licensed physician following the administering of the fatal drugs or the first volley by the firing squad to ensure that death has occurred;

          3.   the physician, when satisfied that death has occurred, shall certify the condemned inmate dead;

          4.   following the certification of death, the body of the condemned shall be surrendered to the State Medical Examiner;

          5.   after removal of the body, the chamber shall be restored and the news media permitted to return to photograph the chamber;

GLOSSIP000132

6. after the chamber has been photographed, the news media shall be returned to the designated area to brief the other assembled members of the news media;

7.

8. the entire execution process will be reviewed and evaluated by the AuditBureau to permit a post-execution examination of the competence, efficiency and effectiveness of the execution procedures and staff (see TMF 01/20).

TMF 01/04.02    Certification of Death

A. After the drugs have been administered/or the execution completed by firing squad:

1. the Warden shall wait a maximum of three minutes;

2. the Warden shall then tell the DIO Director/designee to summon the attending physician to the condemned; and

3. the physician shall take the condemned's vital signs.

B. If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds until vital signs cease.

C. If execution is by firing squad, and if after a maximum of ten minutes from the first volley, there are still signs of life, the physician will inform the Warden. The Warden will then initiate the steps in TMF 01/05.16.

D. When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

TMF 01/04.03    Removing Witnesses from Execution Chamber

REVISED 06/10/10                    TMF 01/04  - pg. 41

GLOSSIP000133

2.    The Medical Examiner, or his designee,
      may issue the death certificate for
      deaths that occur at the prison. (UCA
      26-4-7, 26-4-10)

TMF 01/04.05    Removing Executioners from the Execution Area

A.

B.

C.

TMF 01/04.06    Site Clean-Up

A.    The injection team shall (if execution was by
      lethal injection):

      1.    use universal precautions and protective
            equipment to protect for blood or other
            potentially infectious materials;

      2.

      3.

      4.

      5.

B.    The Tie-Down Team shall be responsible for:

      1.    using universal precautions and
            protective equipment to protect against
            blood and other potentially infectious
            material; and

GLOSSIP000134

A.  After the certification of death by the physician, the curtains shall be closed by the Warden and DIO Director/designee and the witnesses shall be escorted from the witness viewing rooms

    1.

    2.

    3.

    4.

    5.

B.  The news media shall be escorted to an alternate location in the execution building until they can be returned for the filming opportunity after the execution chamber has been cleaned up.

C.  The condemned inmate's witnesses, government witnesses, and the victim's witnesses shall be escorted to waiting transportation vehicles

D.

TMF 01/04.04   Removal of Executed Inmate

A.  After the witnesses have been removed:

    1.  if the execution is by lethal injection, the IV should be cut by the executioners in order for the catheters to remain in the executed inmate's body; and

    2.

B.  The State Medical Examiner/designee shall be escorted into the death chamber

    1.  The State Medical Examiner has jurisdiction over all deaths that occur at the Utah State Prison. (UCA 26-4-7)

REVISED 06/10/10                              TMF 01/04  – pg. 42

GLOSSIP000135

        2.     cleaning up the execution site, using
             universal precautions where appropriate.

TMF 01/04.07   News Media Re-Entry to Execution Site

     A.   After the site is restored and cleaned, the
          news media witnesses and pool photographers
          shall be escorted to the execution site.

     B.   The photographers shall be permitted to
          tape/photograph the site and observation cell
          (if approved by the Warden) as required in
          TMF 01/08.

     C.

TMF 01/04.08   Returning to Standard Operation

     A.

        1.

        2.

     B.

     C.

TMF 01/04.09   Review of Execution

Refer to TMF 01/20.

TMF 01/04.10   Post-Execution Countdown Schedule

     See Exhibit 04-1 for the proposed schedule for the
     post-execution period.
       (Sample for Lethal Injection)

                 Execution

GLOSSIP000136

_____
Date

0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006  CURTAINS PULLED
0006 TO 0008  LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY WARDEN TO BEGIN EXECUTION
0023 SIGNAL BY EXECUTIONER THAT DRUGS HAVE BEEN ADMINISTERED
0024 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0027 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0028 CURTAINS CLOSED
0029
0030
0031
0034 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0036
0037

0038 CLEAN UP CREW INTO DEATH CHAMBER
0039
0040

0040 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0100 MEDIA RETURNED TO STAGING AREA

GLOSSIP000137

(Sample for Firing Squad)

Execution Time Line

_____
Date

0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006 CURTAINS PULLED
0006 TO 0008 LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY DIRECTOR/DESIGNESS TO BEGIN EXECUTION
0011 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0014 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0015 CURTAINS CLOSED
0017
0018
0019
0021 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
BODY
0023
0025

0026 CLEAN UP CREW INTO DEATH CHAMBER
0031 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
CHAMBER
0050 MEDIA RETURNED TO STAGING AREA

REVISED 06/10/10                     TMF 01/04   - pg. 46

GLOSSIP000138

TMF 01/05.00    EXECUTION PROCEDURES

TMF 01/05.01    General Provisions
TMF 01/05.02    Death Warrant
TMF 01/05.03    Selection of Executioners by Lethal Injection
TMF 01/05.04    Selection of Executioners by Firing Squad
TMF 01/05.05    Designation of Persons Required, Permitted or
                Prohibited from Witnessing the Execution
TMF 01/05.06    Disposition of Condemned Inmate's Property
TMF 01/05.07    Disposition of Money in Inmate Account
TMF 01/05.08    Disposition of the Body of the Condemned
TMF 01/05.09    Equipment Check/Inventory: Lethal Injection
TMF 01/05.10    Equipment Check/Inventory: Firing Squad
TMF 01/05.11    Acquisition and Storage of Drugs for Lethal
                Injection
TMF 01/05.12    Observation Period and Related Activities
TMF 01/05.13    Tie-Down Procedures: Lethal Injection
TMF 01/05.14    Tie-Down Procedures: Firing Squad
TMF 01/05.15    Execution by Lethal Injection
TMF 01/05.16    Execution by Firing Squad
TMF 01/05.17    Pre-Execution Rehearsals and Practices
TMF 01/05.18    Support Services Functions

GLOSSIP000139

TMF 01/05.00   <u>EXECUTION PROCEDURES</u>

TMF 01/05.01   <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

       1.   This chapter provides the procedures which are used when the Department exercises its statutory responsibility to carry out an execution.

       2.   The topics include those procedures which are employed:

          a.   immediately prior to receiving the death warrant;

          b.   from receiving the death warrant to and during the execution;

          c.   immediately following the execution; and

          d.   during the debriefing and audit phases of the execution.

    B.   <u>Policies</u>

       1.   It is the policy of the Department that the procedures employed in preparing for and carrying out an execution be comprehensive and clearly defined.

       2.   The procedures shall be developed consistent with state and federal law.

TMF 01/05.02   <u>Death Warrant</u>

    A.   <u>Judgement of Death</u>

       1.   When judgment of death is rendered, a warrant signed by the judge and attested by the clerk under the seal of the court, shall be drawn and delivered to the sheriff of the county where the conviction is made.  77-19-6 UCA

       2.   The Sheriff shall deliver the warrant and a certified copy of the judgment to the UDC Executive Director/designee at

GLOSSIP000140

the time of delivering the defendant to the custody of the Department.  77-19-6 UCA

3.  The warrant states the conviction and judgment, the method of execution, and the appointed day the judgement is to be executed.  The Department of Corrections shall determine the hour, within the appointed day, at which the judgement is to be executed.

B.  Return Upon Death Warrant

1.  After the execution, the UDC Executive Director/designee shall make a return upon the death warrant showing the time, place and manner in which it was executed.  77-19-12 UCA

a.  The "Certificate of Execution":

(1)  shall be signed by the Warden and the physician; and

(2)  shall include the full names and official titles of the official witnesses.

b.  The "Certificate of Execution" shall be submitted for review to the Executive Director/designee.

c.  Following review by the Executive Director/designee, the "Certificate of Execution" shall be returned to the Warden.

2.  The "Certificate of Execution" shall be directed by registered mail to the clerk of the court of the county from which the individual executed was sentenced.

3.  A return receipt shall be requested from the recipient.

4.  A copy of the certificate shall be placed in the deceased inmate's file.

TMF 01/05.03    Selection of Lethal Injection ExecutionTeam

REVISED 06/10/10                               TMF 01/05   - pg. 49

GLOSSIP000141

A.   Statutory Requirements

    1.   The Executive Director/designee shall
ensure that the method of judgment of
death specified in the warrant is
carried out at a secure correctional
facility operated by the department at
an hour determined by the department on
the date specified in the warrant.  77-
19-10 (1) UCA

    2.   When the judgment of death is to be
carried out by lethal intravenous
injection, the executive director of the
department or his designee shall select
two or more persons trained in
accordance with accepted medical
practices to administer intravenous
injections, who shall each administer a
continuous intravenous injection, one of
which shall be a lethal quantity of
sodium thiopental or other equally or
more effective substance sufficient to
cause death.  77-19-10 (2) UCA

B.   Selection of Execution Team

    1.   If the judgment of death is to be
carried out by intravenous lethal
injection, a minimum of two persons,
each trained to administer intravenous
injections shall be selected for the IV
team.

    2.   Method of Selection

        a.   The DIO Director/designee and the
Warden of the Utah State Prison,
Draper site, shall be members of
the execution team by virtue of
their official position.

        b.   The Executive Director/designee,
DIO Director/designee and the

GLOSSIP000142

Warden shall select a minimum of four (4) additional members, other than the DIO Director/designee and Warden, for the execution team.

1. Of the four (4) additional members, a minimum of two (2) execution team members will be on the IV team.

2. No member of the execution team, other than the DIO Director/designee and Warden, shall be required to serve as a member of the execution team without consent.

3. The Executive Director/designee, DIO Director/designee, and Warden will designate one execution team member as the execution team leader.

   a. The execution team leader shall not be the DIO Director/designee or the Warden; and

   b. The execution team leader shall not be a member of the IV team.

4. The Executive Director/designee, DIO Director/designee, and Warden shall review the qualifications of the IV team members according to requirements outlined in subsection (3)(a through d) and other relevant information as to appropriate training and skills in administering intravenous injections. One IV team member will be designated as the IV team leader.

c. Following the examination and evaluation of candidates, the Executive Director/designee, DIO Director/designee and Warden, shall

REVISED 06/10/10                    TMF 01/05   – pg. 51

GLOSSIP000143

select the execution team members.

d. All execution team members shall read and understand the execution procedures. The Warden shall conduct a review of the execution procedures annually.

3. IV Team Qualifications

a. At least two (2) members of the execution team shall be designated as the IV team for an execution by lethal injection.

b. Each member of the IV team shall be a:

1. Phlebotomist;

2. Emergency Medical Technician;

3. Paramedic; or

4. Military Corpsman.

c. Each member of the IV team shall:

1. Have at least one (1) year of professional experience in his specialty;

2. Remain certified in his specialty or profession; and

3. Fulfill all continuing education requirements in his specialty or profession.

d. Prior to participating in an execution, the members of the IV team shall have participated in at least three (3) complete execution practices.

GLOSSIP000144

4. Securing Services

   a. The Warden/designee shall contact
      those chosen for the execution team
      to notify them of their selection
      and verify their willingness and
      availability to perform the duties
      of execution by lethal injection.

      1. If any person declines
         participation, the Executive
         Director/designee, DIO
         Director/designee and Warden
         will select a replacement
         according to the processes
         outlined in this section.

      2. If all of the execution team
         members agree to participate,
         their individual roles as
         execution team members shall
         be explained to them.

   b.

TMF 01/05.04   Selection of Executioners by Firing Squad

   A. Statutory Requirements

      1. "The Executive Director of Corrections/
         designee shall ensure that the method of
         judgment of death specified in the
         warrant is carried out at a secure
         correctional facility operated by the
         Department of Corrections." 77-19-10(1)
         UCA

      2. "If the judgment of death is to be
         carried out by firing squad, the
         Executive Director of Corrections or his
         designee shall select a five-person
         firing squad of peace officers."77-19-10
         (3) UCA

GLOSSIP000145

B.   Selection of Executioners

    1.   A five-person execution team, plus twoalternates and a team leader shall be chosen for the firing squad.

    2.   The alternate(s) shall be selected to replace any member(s) of the firing squad who are unable to discharge their required functions.

    3.   Persons selected for the firing squad shall be POST certified peace officers.

    4.   Selected peace officers will be required to demonstrate proficiency with weapons designated to carry out the execution.

        a.   Under conditions substantially similar to those of the execution chamber, proficiency shall be exhibited by:

            1.   Firing each weapon.

            2.   At a minimum of 21 feet, accurately hitting the target of the same dimension as that which will be attached to the condemned.

        b.   During the proficiency test, failure to accurately hit the specified target with one round from each weapon fired shall disqualify the officer.

    5.

C.   Method of Selection

    1.   The Executive Director/designee, DIO Director and Warden shall be responsible for the selection process.

REVISED 06/10/10                              TMF 01/05   - pg. 54

GLOSSIP000146

2.

3.   The final choice of firing squad members
     shall be the responsibility of the
     Executive Director/designee, DIO
     Director and Warden.

4.   The Executive Director/designee, DIO
     Director/designee and Warden shall
     review the qualifications of the firing
     squad, including required proficiency as
     outlined in section (B4) and other
     relevant information.

D.   Securing Services

     1.   The Executive Director and/orWarden
          shall contact those chosen for the
          firing squad, alternates and team leader
          to notify them of their selection and to
          verify their willingness and
          availability to perform the execution
          duties.

          a.   If any person rescinds his original
               offer to participate, the selection
               team shall meet to select a
               replacement.

          b.   If all of the selectees agree,
               their individual roles shall be
               explained to them.

     2.

TMF 01/05.05   Designation of Persons Required, Permitted or
               Prohibited from Witnessing the Execution

          A.   The Utah Code limits and identifies those
               persons who may attend and witness the
               execution.  (See TMF 01/07.03.)

REVISED 06/10/10                          TMF 01/05   – pg. 55

GLOSSIP000147

B.  The Warden shall designate the required personnel to carry out the statutory requirements of an execution.  Staff should include:

1.        Deputy Warden;

2.    Observation Officers

3.        Tie-down Officers,

4.    one Team Foreman for the escort/Tie-Down Team;

5.    executioners (reference TMF 01/05.03 & .04);

6.    Clean-up Officers (number to be determined by the Warden/designee), assigned to clean up the execution chamber immediately following the execution;

7.    Guide Officers (number to be determined by the Warden/designee);

8.

9.

C.  The Warden/designee shall designate the appropriate resources necessary to carry out the requirements of an execution.  The designated individuals shall be responsible for:

1.    advising the Warden concerning any medical supplies, etc.;

2.    the preparation and supervision of meals prepared during the observation period, and for the condemned inmate's last meal;

REVISED 06/10/10                              TMF 01/05  – pg. 56

GLOSSIP000148

3.   ordering, verifying, picking-up the
     drugs, equipment, etc., necessary to
     carry out an execution by lethal
     injection; and

4.   pronouncing the death of the condemned
     inmate.

TMF 01/05.06   <u>Disposition of Condemned Inmate's Property</u>

A.   <u>Contact with Condemned Inmate</u>

1.   At least 30 days prior to the scheduled
     execution the condemned inmate should be
     contacted to discuss arrangements for
     disposing of his property.

2.   At least 14 days prior to the execution
     property-disposition arrangements should
     be finalized.

3.   At least seven days prior to the
     execution all paperwork required for
     final disposition should be completed.

4.   If the condemned is uncooperative,
     doesn't wish to make specific property-
     disposition arrangements, or for any
     other reason has not made arrangements
     for disposition, he shall be notified
     the property will be disposed of as
     required under 64-13-15 (1) UCA.

B.   <u>Options for Disposing of Property</u>

1.   Property may be released to an
     authorized visitor (family, friend or
     attorney).  The release would follow the
     normal property release procedures.

2.   Property may be mailed through the U.S.
     Postal Service.  The prison's Mail Unit
     shall process the mailing consistent
     with standard mail procedures.  Indigent
     status does not cover property-release
     postage.

3.   Property may be donated to a charitable
     organization.

GLOSSIP000149

4.  If the condemned fails to designate a property-disposition option:

> "if property is not claimed within one year of death...it becomes property of the state and may be used for correctional purposes or donated to a charity within the state." 64-13-15 (1) UCA

C.  Release Procedure

1.  Following a decision to release the condemned's property, the property shall be:

    a.  inventoried by       staff; and

    b.  transferred to the property room.

2.  The release will then follow according to the appropriate release procedures. Refer to FDr14, "Inmate Property" and FDr03, "Inmate Mail."

TMF 01/05.07   Disposition of Money in Inmate Account

A.  Contact with Condemned Inmate

Follow the time-table for contact with the condemned outlined for property under TMF 01/05.06.

B.  Options for Disposing of Inmate Accounts

1.  The condemned shall be required to complete a money transfer form releasing the money in his account to his next of kin or other person or organization of his choice.

2.  If the condemned refuses or otherwise fails to complete the necessary forms, the funds shall be disposed of consistent with state law.

TMF 01/05.08   Disposition of the Body of the Condemned

A.  Release to Medical Examiner

GLOSSIP000150

1.  After the executed inmate is pronounced
    dead, the body shall be released from
    the restraints and removed from the
    execution chamber.

2.  The body shall be immediately
    surrendered to the State Medical
    Examiner/designee.

GLOSSIP000151

TMF 01/05.09   Equipment Check/Inventory: Lethal Injection

    A.   Responsibility

       1.   The IV team shall conduct a check of equipment and materials necessary to conduct the execution.

       2.

    B.   Inventory

       1.

       2.

       3.

          a.

          b.

       4.

    C.   Bloodborne Pathogen Precaution

       1.   As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber

GLOSSIP000152

gloves and bloodborne pathogen
protection supplies and equipment.

TMF 01/05.10   Equipment Check/Inventory: Firing Squad

A.   The Warden shall ensurean equipment check of
appliances necessary to carry out an
execution.

B.

1.

2.

3.

4.

5.

6.

7.

C.   The execution team leader shall be
responsible to arrange for:

1.        .30-caliber rifles;

2.          live rounds of ammunition;

3.        blank rounds of ammunition;

4.   practice sessions and dry fire;

5.   ensuring equipment is clean and
operable; and

6.   back-up equipment for items 1, 2, 3,
above.

D.              prior to the execution:

1.   the executioners shall be escorted into
the execution chamber by the DIO
Director/designee; and

GLOSSIP000153

2.

E.   Bloodborne Pathogens Precaution

As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber gloves and bloodborne pathogen protection supplies and equipment.

TMF 01/05.11   Procurement, Storage and Accountability of Chemicals for Lethal Injection

A.   Purchase

1.             the Warden shall provide to the pharmacist for his official records a memorandum specifying:

a.   The drugs which must be obtained;

b.   A copy of the judgment of death; and

c.   A copy of the state statute.  77-19-10(2) UCA

2.                          the pharmacist shall order the drugs from the vendor.  Upon receiving the drugs, the pharmacist shall:

a.

b.   Immediately notify the Warden that the drugs have been received;

c.

d.

GLOSSIP000154

e.

1.

2.

3.

4.

f.

3.   Storage and Handling of Drugs

a.

b.   See the next two pages for the
     Equipment and Materials Checklist.

UTAH STATE DEPARTMENT OF CORRECTIONS
Equipment and Materials Checklist: Execution by Injection

REVISED 06/10/10                          TMF 01/03  -  pg. 03

GLOSSIP000155

| Quantity | Item | Code |
|---|---|---|
| | Sodium Thiopental (Pentathal), 500 mgm., w/diluent | A |
| | Pancuronium Bromide (Paravulon), 50 mgm. Ampules | A |
| | Potassium Chloride, 240 miliequiv. Ampules | A |
| | Valium injection, 10 mgm | A |
| | Syringe, 60 cc Lur Lock | |
| | Syringe, 10 cc Lur Lock | |
| | Syringe, 5 cc Lur Lock | |
| | Needle, 18 Ga., 1 ½ | |
| | Needle, 25 Ga., 1 ¼ | |
| | Angiocath, 14 Ga., 2 ¼" | |
| | Angiocath, 18 Ga., 1 ¼" | |
| | Angiocath, 16 Ga., 1 ¼" | |
| | Normal saline, IV bad, 1000C | |
| | Lidocaine HCL, 2% w/Epinephrine | |
| | Lidocaine HCL, 2% w/o Epinephrine 2 | |
| | Solution injection set, 70" long with | |
| | Y-injection site:  Travenol Code: #2C0005S | |
| | Extension set, 35" long; Travenol Code #2C0066 | |
| | Stethoscopes | |
| | Boxes of alcohol preps | |
| | Rolls of Kling | |
| | Adhesive tape, 1" | |
| | Adhesive tape, 2" | |
| | Scissors, bandage, Pr. | |
| | Tourniquet | |
| | Hemostat, sterile | |
| | Flashlight, w/batteries | A |
| | Batteries, flashlight, (spares) | A |
| | Ace wraps 3" | |
| | Needle holders | |
| | 10 packs sterile gauze | |
| | Sharp containers | |

REVISED 06/10/10             TMF 01/05  – pg. 64

GLOSSIP000156

| | BIO-Hazardous trash bags | |
| | Extra large impervious gowns | |
| | IV hangars | |
| | Mayo stand | |
| | Terry cloth towels | |
| | Goose neck light | |
| | Blood spill kits | |
| | Trash containers | |
| | Electronic Heart Monitor (EKG) | |

TMF 01/05.12   Observation Period and Related Activities

    A.   Access

        1.

        2.

        3.

    B.   Preparation of the Observation Cell

        1.

           a.

           b.

           c.

        2.   Stocking the Cell

GLOSSIP000157

a.  The observation cell shall be outfitted with the following items:

(1)  mattress (1);

(2)  pillow (1);

(3)  pillow case (1);

(4)  sheets (2);

(5)  blankets (2);

(6)  towel (1);

(7)  soap, small (1);

(8)  toilet paper, roll (1);

(9)  jump suit (color to be determined by the Warden) (1);

(10) socks (1 pr.);

(11) shower thongs (1 pr.); and

(12) pocket comb, no metal (1).

b.  If requested, the cell will also have the following items purchased new

(1)  Bible (1);

(2)  magazine

(3)  newspaper ; and

(4)  photographs .

c.  The following items may be given on request, as needed,

(1)  toothbrush (1);

GLOSSIP000158

(2)   toothpaste

(3)

d.   If the condemned inmate receives
mail the officer shall allow the
condemned inmate adequate time to
read the mail

f.

g.   Additional property shall be
approved by the warden.

3.   Test Equipment

a.

b.

c.

1.

2.

3.

REVISED 06/10/10                         TMF 01/05 - pg. 67

GLOSSIP000159

4.

5.

6.

     a

     b.

D.   <u>Securing Condemned Inmate's Property/Cell</u>

1.

2.

3.

GLOSSIP000160

b.

    (1)

    (2)

    (3)

    (4)

c.

    (1)

    (2)

    (3)

    (4)

4.    Personal property shall be separated from prison property, and the personal property put into a suitable container and sealed.  Each search team member shall initial the seal.

5.    The designated property officer shall sign for and assume responsibility for the inventoried property.

6.

    a.

GLOSSIP000161

b.

7.

8.    The personal property shall be taken to
      the DIO property room for storage.

E.    Observation Function

1.

a.

b.

c.

d.

e.

f.

g.

2.

a.

b.

GLOSSIP000162

3.

4.

5.

F.   Activities During the Observation Period

1.

2.   Unless previously served, meal service,
including the last meal, shall be served
during the observation period.

3.

GLOSSIP000163

4.

     a.

     b.

     c.

GLOSSIP000164

TMF 01/05.13   <u>Tie-Down Procedures: Lethal Injection</u>

  A. <u>Transfer of Condemned Inmate to Execution Site</u>

    1. The condemned inmate shall be escorted from the observation cell to the execution chamber by the Tie-Down Team.

    2.

      a.

      b.

      c.

      d.

  B. <u>Positioning of Tie-down Team</u>

    1.

    2.

    3.

    4.

    5.

  C. <u>Securing Inmate to Gurney</u>

REVISED 06/10/10         TMF 01/05 – pg. 73

GLOSSIP000165

1.

2.

    a.

    b.

    c.

    d.

    e.

    f.

    g.

3.

GLOSSIP000166

4.

5.   Upon completion of the execution and as
directed by the Warden, the Tie-Down
Team shall enter the execution chamber
and remove the straps in the reverse
order as outlined above.

TMF 01/05.14   <u>Tie-Down Procedures: Firing Squad</u>

A.   <u>Bringing Condemned Inmate to Execution
Chamber</u>

The condemned inmate should be escorted from
the observation cell to the execution chamber
by the Tie-Down Team

B.   <u>Positioning the Tie-Down Team</u>

1.

2.

3.

4.

C.   <u>Securing the Inmate to the Chair</u>

1.

2.

GLOSSIP000167

a.

b.

3.

4.

5.   Upon completion of the execution and as
directed by the Warden, the Tie-Down
Team shall re-enter the execution
chamber and remove the straps in reverse
order as outlined above.

TMF 01/05.15   Lethal Injection Protocol

A.

1.

2.

GLOSSIP000168

B.   Preparation of Syringes

    1.

        a.

        b.

        c.

    2.   The execution team leader shall providethe drug box to the IV team leader.

        a.   The IV team leader shall prepare each chemical in accordance with the manufacturer's instructions and draw them into the two (2) sets of syringes.

        b.   The second member of the IV team and the execution team leader shall observe preparation of the chemicals and verify that the instructions and procedures have been carried out correctly.

        c.

    3.   The syringes containing the chemicals shall be prepared and loaded in the following order:

        a.   Two 60-cc syringes, each containing 240 milliequivalents of Potassium Chloride in 50-cc and label syringes "Syringe #3.

        b.   Two 60-cc syringes, each containing fifty (50) milligrams of Pancuronium Bromide in 50-cc and

GLOSSIP000169

label syringes "Syringe #2".

c.  Two 60-cc syringes, each containing
    three (3) gm of Sodium Thiopental
    in 50-cc and label syringes
    "Syringe #1".

d.  The secondary syringes containing
    each of the three chemicals are to
    serve the following purposes.

    1.  Secondary syringe of Sodium
        Thiopental is prepared in the
        event the condemned
        has not lost consciousness
        sixty (60) seconds after the
        first administration of the
        chemical.

    2.  Secondary syringes containing
        Potassium Chloride and
        Pancuronium Bromide are
        prepared in the event the
        condemned has not been
        pronounced dead after the
        first administration of the
        chemicals.

4.  Any syringes that are loaded with lethal
    injection chemicals that are not used
    during the execution shall:

    a.  Be returned to the Warden by the
        execution team leader;

    b.  Be destroyed by the Warden,

5.  Any unused chemicals that were not mixed
    in preparation of the lethal injection
    shall:

    a.  Be returned to the Warden by the IV
        team leader;

    b.  Be destroyed by the Warden,

C.

D.

E.   <u>The IV team leader:</u>

    1.   Shall, along with the second IV team member, verify two (2) labeled sets of each of the three (3) chemicals are present, filled, and clearly labeled;

    2.   Provide the two (2) labeled sets of each of the three (3) chemicals contained in the drug box to the execution team leader who will verify, along with another execution team member, selected by the execution team leader, the appropriate number of syringes have been surrendered and are clearly labeled; and

    3.   Prepare the IV set-up.

F.   <u>IV Set-up Procedure by IV Team</u>

    1.   The connector of Administration Set (McGaw V1417 or equivalent) shall be inserted into the bag of Normal Saline IV solution.

    2.   The Flo Trol clamp located above the "Y" site shall control the flow of solution.

    3.   A 35-inch Extension Set (Travenol 2C0066 or equivalent) shall be connected to the needle adapter of the Administration Set.

GLOSSIP000171

4.  The set-up for administration into the back-up IV site may require additional Extension Sets due to the potential of additional distance.

5.  All connections should then be taped to ensure they do not come apart during the procedure.

6.  The tubing shall be cleared of air by removing the protector from the needle adapter and opening the Flo Trol clamp letting the tube fill with solution.

7.  The Flo Trol clamp shall then be closed and the protective cap over the needle adapter replaced.

8.  Steps 1 through 7 shall be repeated for the second set-up.

G.  Injection Procedure by IV Team

1.  The Warden shall order the condemned person escorted to the execution chamber and strapped to the gurney.

2.  The IV team shall run the IV lines to the condemned person by the following:

    a.  Site and insert one (1) primary IV line; and

    b.  Site and insert one (1) back-up IV line.

3.  The IV team members shall determine the location of the IV sites on the body of the condemned person.

4.

    a.

    b.

    c.

    d.

GLOSSIP000172

H.   IV Placement Process by IV Team

    1.   The angiocath shall be inserted into the vein of the primary IV site.

    2.   To best ensure that a needle is inserted properly into a vein, the IV team members shall look for the presence of blood in the valve of the sited needle.

    3.   The inner needle is then withdrawn and the needle adapter is placed on the angiocath.

        a.

        b.

    4.   The flow of normal saline shall be started and administered at a slow rate to keep open.

    5.   Step 1 through 3 shall be repeated for the back-up IV site.

    6.   The Administration Sets shall be running at a slow rate of flow, to keep open and ready for the insertion of syringes containing the injection chemicals.

    7.   Both set-ups shall be observed by the IV team members to ensure they are both patent and functioning properly.

    8.   No further action is necessary at this time.

I.   Lethal Injection Procedure

    1.   The execution team shall:

REVISED 06/10/10                    TMF 01/05  -  pg. 81

GLOSSIP000173

a.   Securely connect the electrodes of the cardiac monitor to the condemned person; and

b.   Ensure the equipment is functioning properly.

2.   At the designated hour mandated for the execution, when everything is ready:

a.   The DIO Director/designee and Warden shall pull open the curtains covering the witness room windows.

b.   The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

1.   The statement should not exceed two minutes.

2.   If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution.

3.   If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

4.   The Department, for the purpose of recording the condemned inmate's last words, may use audio recording equipment.

a.   The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

b.   No form of duplication of the audio shall be permitted.

c.   The Warden, witnessed by the DIO Director/designee, shall

destroy any audio
recording.

c.     At the conclusion of the remarks,
       or when the Warden determines it is
       time to proceed, a prearranged
       signal shall then be given by the
       Warden to the Executive
       Director/designee.

d.     The Executive Director/designee
       shall order the execution team
       leader to begin the administration
       of the chemicals providing:

       1.    The earliest legal execution
             time has been verified and has
             passed; and

       2.    No instruction to halt has
             been received from the
             Attorney General's Office.

e.     Following the instruction from the
       Executive Director/designee to
       execute the condemned inmate, the
       execution team leader shall
       immediately proceed with the
       execution.

f.

       1.

       2.

       3.

3.  Upon the Executive Director/designee's
    order to proceed, the execution team
    leader shall begin the following

GLOSSIP000175

sequence:

a.   The flow of the normal saline into
the arm shall be cut off using the
Flo Trol clamp.

b.   The clamp should be moved as close
to the "Y" site as possible.

c.   The 18 ga needle of Syringe #1
(three (3) gm of Sodium Thiopental)
shall be inserted into the "Y" site
and the injection shall commence.

1.   A steady, even flow of the
injection shall be maintained
with only a minimum amount of
force applied to the syringe
plunger.

2.   When the entire contents of
the syringe have been
injected, syringe #1 shall be
removed from the "Y" site.

d.   The Flo Trol clamp should then be
opened fully and allowed to run for
15 seconds.

e.   The Flo Trol clamps shall then be
closed.

f.   A period of sixty (60) seconds
shall pass after the administration
of the Sodium Thiopental and
closure of the Flo Trol clamp.

1.   After the passage of sixty
(60) seconds:

a. If it appears to the
Warden based on his
visual inspection that
the condemned person is
not unconscious:

i.   The Warden shall
notify the Executive
Director/designee;

ii.   The Executive
Director/designee

REVISED 06/10/10

TMF 01/05 - pg. 84

will order the execution team to switch to the back-up IV site;

iii. The Executive Director/designee shall order that the back-up IV site be used with a new flow of Sodium Thiopental

(secondary syringe labeled Syringe #1); and

iv. The Executive Director/designee shall order the remaining sequence of chemicals to be injected through the back-up IV site.

2. If it appears to the Warden based on his visual inspection that the condemned person is unconscious after the first injection of Sodium Thiopental, the Warden shall notify the Executive Director/designee who will then order the execution team to continue to the next step in the sequence.

g. The 18 ga needle of Syringe #2 (fifty (50) milligrams of Pancuronium Bromide) shall be inserted into the "Y" site and the injection shall commence;

1. A steady, even flow of the injection shall be maintained with only the minimum amount of force applied to the syringe plunger.

2. When the entire contents of the syringe have been injected, Syringe #2 shall be

REVISED 06/10/10

TMF 01/05 - pg. 85

GLOSSIP000177

removed from the "Y" site.

h.   After syringe #2 has been given,
     the Flo Trol clamp should be opened
     fully for 15 seconds.

i.   The Flo Trol clamp shall then be
     closed.

j.   The 18 ga needle of Syringe #3 (240
     milliequivalents of Potassium
     Chloride) shall be inserted into
     the "Y" site and the injection
     shall commence;

     1.   A steady, even flow of the
          injection shall be maintained
          with only the minimum amount
          of force applied to the
          syringe plunger.

     2.   When the entire contents of
          the syringe have been
          injected, Syringe #3 shall be
          removed from the "Y" site.

k.   The Flo Trol clamp shall then be
     opened fully and allowed to run for
     15 seconds.

l.   The Flo Trol clamp shall then be
     closed.

m.   An execution team member designated
     by the execution team leader shall
     start a stopwatch once the lethal
     injections are complete.

n.   The execution team leader shall:

     1.   Observe the heart monitor; and

     2.   Advise the attending physician
          electrical activity of the
          heart has ceased as indicated
          by a flat line on the heart
          monitor.

o.   The Warden shall notify the
     Executive Director/designee if it
     appears an additional set of lethal
     chemicals needs to be administered

GLOSSIP000178

due to the following conditions:

1.   Heart monitor does not indicate a flat line after ten (10) minutes; or

2.   The attending physician is not able to declare the time of death after ten (10) minutes.

p.   In the event death has not occurred;

   1. The Executive Director/designee will order the process established in subsection (2)(f) of this section and subsequent sections to continue with the secondary set of syringes until death has occurred.

q.   During the execution by lethal injection, the DIO Director/designee and Warden shall:

1.   Watch the primary IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

2.   In the event that an IV fails, leaks, if the catheter comes out of the vein, or any other problem arises, the execution team shall be ordered to switch to the back-up IV.

3.   In the event the execution team is ordered to switch to the back-up IV, the DIO Director/Warden shall watch the back-up IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

J.   Post Lethal Injection Steps

1.   When the physician declares death, the Executive Director/designee, DIO

REVISED 06/10/10                    TMF 01/05 - pg. 87

GLOSSIP000179

Director/designee and Warden shall be
informed.

2.   The DIO Director and Warden shall close
the viewing room curtains.

3.   The Executive Director/designee shall
make appropriate contact with the
Governor and Attorney General informing
them of the completion of the execution.

K.   Disposal of BIO-Hazardous Contaminated Items

1.   The execution team leader shall place
items that have been contaminated with
blood or other potentially infectious
materials (OPIM) that have the potential
to puncture into a puncture proof
container (sharps container).

2.   The execution team leader shall place
other types of blood or other
potentially infectious materials in
trash containers lined with a red BIO-
Hazardous waste bag.

3.   The Correctional Medical Administrator
shall ensure that the contaminated waste
is disposed of in the proper Dumpster.

TMF 01/05.16   Execution by Firing Squad

A.

B.

1.   Refer to TMF 01/05.10.

2.   The team leader shall load the weapons
and prepare to issue them to the members
of the firing squad.

3.   Two rounds shall be loaded in each
weapon.

4.   Care shall be taken to preclude any
knowledge by the members of the firing

GLOSSIP000180

squad of who is issued the weapon with
two blank cartridges.

C.   The Warden shall direct that an aiming point
     or target be placed over the condemned
     inmate's heart.

D.   Upon completion of "C", above, the Warden
     shall direct the person who placed the target
     to exit the execution chamber.

E.   After the target is in place and all
     witnesses are secured, the Warden shall
     direct that the viewing room curtains be
     opened.

F.   After all preliminaries are completed, the
     Warden, at the conclusion of the condemned
     inmate's last words (which shall not exceed
     two minutes and cease at any point should the
     condemned use foul language), shall place the
     hood over the condemned's head.

     (1)   Audio recording equipment may be used by
           the Department for the purpose of
           recording the defendant's last words.

     (2)   The Department shall permanently destroy
           the recording made under this subsection
           not later than 24 hours after the
           completion of the execution.

     (3)   No form of duplication of the audio
           shall be permitted.

     (4)   The Warden, witnessed by the DIO
           Director/designee, shall destroy any
           audio recording.

G.   The DIO Director/designee, Warden, and any
     other observers shall exit the execution
     chamber.

H.   When the Warden enters the executioners' room
     and secures the door, if no stay or delay in
     the execution has been ordered, the Executive
     Director/designee shall immediately order the
     firing squad team leader to begin the cadence
     for the executioners to fire.

GLOSSIP000181

I.  A designated execution team member shall start a stopwatch once the first volley has been fired.

J.  If the condemned inmate appears to be unconscious, upon the order of the Executive Director, the Warden and DIO Director shall re-enter the execution chamber after the first volley.

   1.  The Warden shall wait a maximum of three minutes after the first volley and then call for the physician to check the vital signs of the condemned.

      a.  If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds.

      b.  When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

      c.  After death is certified, the Warden shall direct that the viewing room curtains be closed.

   2.  If, after a maximum of ten minutes from the first volley, the inmate is unconscious but alive, the Warden shall direct the physician to make a final check of the condemned's vital signs.

      a.  If on final check, vital signs are detected, the Warden shall order the physician to exit the execution chamber.

      b.  The Warden and DIO Director shall re-enter the executioner's room.

      d.  The Executive Director/designee shall order the firing squad team leader to make the weapons ready to fire.

      e.  The Executive Director/designee shall immediately order the firing squad team leader to begin the

GLOSSIP000182

cadence for the firing squad to
fire a second volley.

    f.    After the firing of the second
volley, the Warden and DIO Director
shall re-enter the execution
chamber and proceed with paragraph
"J,1", above.

K.    If, after the first volley is fired, the
condemned is obviously conscious, the
Executive Director/designee shall instruct
the firing squad team leader to immediately
prepare the weapons to fire again.

    1.    The firing squad team leader shall ready
the weapons in a controlled and safe
manner.

    2.    The firing squad team leader shall
ensure the executioners do not see which
weapon contains the blank cartridges.

    3.    When the weapons are ready, if the
condemned is still obviously conscious,
the Warden shall ensure no staff members
are in the execution chamber.

    4.    Upon notice from the Warden that the
execution chamber is clear, the
Executive Director shall immediately
order the firing squad team leader to
begin the cadence for the executioners
to fire a second volley.

    5.    After the second volley, continue with
"J", above.

L.    The Executive Director shall make
notification of the condemned's death to the
Governor and the Attorney General.

TMF 01/05.17    <u>Pre-Execution Rehearsals and Practices</u>

A.    A minimum of three rehearsals and practices
shall be conducted to carry out an execution
in a timely fashion maintaining the necessary

GLOSSIP000183

security.   Practice/rehearsal shall be
provided for but will not be limited to:

1.   briefing;

2.   removing the condemned inmate from the
observation cell;

3.

4.   escort to execution chamber;

5.   tie-down procedures completed;

6.   approximate time for IV injection
procedure (execution time approximate);

7.   clearing and escorting witnesses to/from
execution site;

8.   security curtains opened and closed;

9.   condemned inmate's body removed from
execution table/chair;

10.

11.   clean-up;

12.   debriefing outlined;

13.   firing of weapons; and

14.   ensure sufficient precautions are taken
to minimize the risk of bio-hazardous
exposure.

B.   Planning backward from the execution shall be
used to develop realistic time lines for each
function involved in the execution.

C.

1.   Discrepancies, concerns or proposed
modifications due to system problems

GLOSSIP000184

shall be immediately reported to the
Warden.

2.

TMF 01/05.18   Support Services Functions

A.   Food Services

1.   Observation Period Meal Service

a.

b.   The Food Services Director/designee
shall confirm the condemned's
choice of a last meal.   The
confirmation should be made 48-24
hours prior to the execution.

c.

d.

e.   Alcoholic beverages shall not be
served nor used for cooking.

2.   Beverage and Food Service for Staff

a.   Because of the length of time many
persons will be required to remain
on site without being able to
leave, it may be necessary to serve
food and beverages to those
assigned to the execution.

REVISED 06/10/10                        TMF 01/05 – pg. 93

GLOSSIP000185

b.

c.  Food and beverage services may be
    provided to:

    (1)  the command post;

    (2)  the Information Center;

    (3)  the food preparation area of
         the building in which the
         execution will occur;

    (4)  to the Draper site Security
         Deputy Warden for delivery to
         perimeter posts; and

    (5)  other sites as needed.

d.

B.  Medical Staff

1.  Receipt of Death Warrant

    Upon receipt of the death warrant the
    Correctional Medical Administrator
    shall:

    a.  review the medical procedures, post
        orders and equipment checklist and
        make recommendations in writing to
        the Warden concerning any back-up
        or duplication of any medical

GLOSSIP000186

paraphernalia that may be necessary to carry out an execution; and

b. shall confer with the Chief Physician and assign all execution-related tasks to be completed.

2. Thirteen to Seven Days

a. At least thirteen days prior to the execution the Warden shall provide to the pharmacist, for his official record, authorization to purchase drugs.  Authorization shall be in the form of a memorandum including:

(1) the names of the drugs which shall be obtained;

(2) a copy of the judgement of death; and

(3) a copy of the state statute (77-19-10 (2) UCA).

b. At least seven days prior to the execution the pharmacist shall order the drugs from the vendor (refer to chapter TMF 01/05.11).

(1) If the state's prime vendor cannot deliver the drugs, the pharmacists shall make arrangements with other vendors or hospitals to obtain the drugs.

(2) If the drugs cannot be delivered to the prison by the primary vendor or their delivery service to the prison, the pharmacist shall notify the Correctional Medical Administrator.

(2) The Correctional Medical Administrator shall make arrangements with the Draper site Security Deputy Warden to have an officer accompany them

GLOSSIP000187

to the location where the
other drugs may be obtained.

c.

3.

4.

5.

   a.

   b.

   c.

6.

   a.

      (1)   the sodium pentothal syringes
         shall be prepared by the
         pharmacist at the direction of
         the Warden when it appears the
         execution shall be carried
         out;

GLOSSIP000188

      (2)   a medical-response team shall
be on standby to provide any
medical attention which may be
needed during the time of the
scheduled execution;

      (3)   a USP emergency equipment kit
and a back-up kit shall be
made available at the
execution site; and

      (4)   the Correctional Medical
Administrator (CMA)/designee
and a USP Medical staff with
skills in intravenous
injections, I.V. set-up,
cut-down, etc., shall be
available at the execution
site to provide medical
assistance in the execution
chamber, if necessary.

  b.   Equipment and lethal drugs shall be
gathered up by the CMA/designee
following the execution.

      (1)   The CMA/designee shall be
responsible for the disposal
of the medical equipment used
for lethal injection in
accordance with TMF 01/05.15.

      (2)

C.   <u>Maintenance Staff</u>

  1.   <u>Receipt of Death Warrant</u>

    a.   Upon receipt of the death warrant
the Deputy Warden Support Services
shall:

      (1)   review the maintenance
procedures and the equipment
checklist and make recom-
mendations in writing for
changes, additional equipment,
etc. as is viewed essential

GLOSSIP000189

and provide such recommendations to the Warden prior to the scheduled execution date; and

(2)   confer with the Maintenance Director and assign all execution related tasks to be completed.

b.   The Maintenance Director shall then prepare a task completion calendar which shall be presented to the Deputy Warden Support Services for approval, including:

(1)   a review of the maintenance procedure and the equipment checklist;

(2)   recommendations to the Warden in writing of changes, additional equipment, etc. as is viewed essential prior to the scheduled execution date;

(3)   identification of strategies to ensure that all systems, equipment, and mechanisms associated with the execution facility are functional and are readily repairable given an unexpected malfunction;

(4)   identification of emergency equipment, materials, and substances necessary to ensure that system, equipment, and/or mechanism malfunctions are expeditiously remedied;

(5)   establishment of inspection checklist and time frames for:

(a)   the facility designated for the execution;

(b)   the observation cell; and

(c)   emergency backup systems;

REVISED 06/10/10                                        TMF 01/05 - pg. 98

GLOSSIP000190

(6) ensuring that all maintenance service/repair trucks are in good operational condition and supplied with equipment, tools, and supplies necessary to correct all execution related emergencies; and

(7) identification of maintenance personnel necessary to address all execution day maintenance emergencies.

2.

The Maintenance Director shall:

a. complete a pre-inventory check of the necessary equipment; and

b. complete a written report to the Deputy Warden Support Services of equipment, etc. requiring repair, replacement or duplications, including recommendations to correct problems and time frame necessary to make necessary corrections.

3.

The Deputy Warden Support Services shall direct the Maintenance Director to:

a.

c. conduct an inspection of the following equipment:

(1) execution chamber;

(2) observation cell; and

(3) emergency back-up systems and equipment.

4.

REVISED 06/10/10                         TMF 01/05 - pg. 99

GLOSSIP000191

a.

    (1)

    (2)

    (3)

b.    A pre-inventory check shall be completed to ensure equipment is operational and in proper working order.

5.

a.

    (1)

    (2)

        (a)

        (b)

        (c)

    (3)    emergency back-up systems and equipment.

b.    Emergency equipment shall be checked to ensure readiness for the execution.

6.

a.    Complete the procedures as outlined in 5, above.

b.

c.

GLOSSIP000192

GLOSSIP000193

d.

(1)

(2)

(3)

(4)

(5)

(6)

REVISED 06/10/10                    TMF 01/05 - pg. 101

GLOSSIP000194

GLOSSIP000195

```
TMF 01/07.00    WITNESSES

TMF 01/07.01    General Provisions
TMF 01/07.02    News Media Witnesses
TMF 01/07.03    Designation of Persons Required, Permitted or
                Prohibited from Witnessing
TMF 01/07.04    Witness Agreement
```

GLOSSIP000196

TMF 01/07.00   <u>WITNESSES</u>

TMF 01/07.01   <u>General Provisions</u>

     A.   <u>Purpose of Chapter</u>

         The purpose of this chapter is to:

         1.   identify the types and number of witnesses permitted to attend the execution; and

         2.   to provide legal requirements concerning the witnessing of the execution.

     B.   <u>Policy</u>

         It is the policy of the Department that:

         1.   procedures for selecting witnesses to the execution shall conform with 77-19-11 UCA;

         2.   witnesses shall enter into written agreements before being approved for attendance; and

         3.   witnesses shall be subject to search prior to being admitted.

TMF 01/07.02   <u>News Media Witnesses</u>

     A.   Members of the news media shall be permitted to witness the execution.

     B.   Selection shall be at the discretion of the Executive Director/designee.

     C.   Refer to TMF 01/08 for news media selection procedures.

TMF 01/07.03   <u>Designation of Persons Required, Permitted or Prohibited from Witnessing</u>

     A.   The Utah Code limits and identifies those persons who may attend and witness the execution.

REVISED 06/10/10                                    TMF 01/07  – pg. 108

GLOSSIP000197

1.   The Executive Director of Corrections or his designee shall:

   a.   cause a physician to attend the execution, 77-19-10 (5) UCA; and

   b.   permit the attendance at the execution of members of the press and broadcast news media named by the Executive Director of the Department/or his designee, 77-19-11 (4) UCA.

2.   At the discretion of the Executive Director of the Department of Corrections/designee, the following may attend the execution:

   a.   the prosecuting attorney, or his designated deputy, of the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(a) UCA;

   b.   no more than two law enforcement officials from the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(b) UCA;

   c.   the Attorney General or his designee, 77-19-11 (2)(c) UCA;

   d.   religious representatives, friends, or relatives designated by the defendant, not exceeding a total of five persons, 77-19-11 (2)(d) UCA; and

   e.   unless approved by the Executive Director, no more than five close relatives of the deceased victim, as selected by the Executive Director, but giving priority in the order listed in TMF 01/01.04.

3.   The persons enumerated in Subsection (2) may not be required to attend, nor may any of them attend as a matter of right, 77-19-11 (3) UCA.

REVISED 06/10/10                    TMF 01/07 - pg. 109

4.    The following persons may also attend
      the execution:

      a.    staff as determined necessary for
            the execution by the Executive
            Director of the Department of
            Corrections/designee; and

      b.    no more than three correctional
            officials from other states that
            are preparing for executions, but
            no more than two correctional
            officials may be from any one
            state, as designated by the
            Executive Director of the
            Department of Corrections or his
            designee, 77-19-11 (7)(a) UCA.

5.    Other necessary staff designated by the
      Executive Director of the Department of
      Corrections/designee shall be permitted
      to the execution.

      a.    The "necessary staff" shall include
            those persons identified in the
            post orders and procedures in
            TMF 01.

      b.    "Necessary staff" shall not be
            limited to members of the Utah
            Department of Corrections but may
            include members of allied agencies
            assisting with the execution.

6.    The Department is empowered and directed
      by 77-19-11 (8) UCA to adopt rules
      governing the attendance of persons at
      the execution.

7.    No person under the age of 18 may attend
      the execution.

B.    For those persons who shall carry out the
      execution or serve in support roles in the
      execution area, refer to TMF 01/05.05 B, C.

GLOSSIP000199

TMF 01/07.04    Witness Agreement

(See following page for Witness Agreement.)

**Rules of Conduct for Witnesses Observing an Execution
at the
Utah State Prison**

1. That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2. That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3. That you conduct yourself in a lawful and orderly manner;

4. That you comply with all lawful directives of correctional personnel while on Department property;

5. That you will not bring to the execution site any photographic or recording equipment; and

6. That you understand that the Department of Corrections will not provide mental health services to witnesses.

7. That you understand the Department of Corrections is required to record/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.


_____        _____
    Signature of Witness                    Date


_____        _____
UDC Representative                        Date


REVISED 06/10/10                    TMF 01/07 - pg. 111

GLOSSIP000200

TMF 01/08.00     NEWS MEDIA PROCEDURES

TMF 01/08.01     General Provisions
TMF 01/08.02     News Media Selection
TMF 01/08.03     Alternate Coverage/Accommodations
TMF 01/08.04     News Media Attendance at the Execution
TMF 01/08.05     Limitations on Coverage
TMF 01/08.06     News Media Briefing
TMF 01/08.07     News Media Support and Equipment
TMF 01/08.08     Media Representative Agreement

REVISED 06/10/10                          TMF 01/08  - pg. 112

GLOSSIP000201

TMF 01/08.00    NEWS MEDIA PROCEDURES

TMF 01/08.01    General Provisions

    A.   Purpose of Chapter

        The purpose of this chapter is:

        1.   to provide the policies, procedures and requirements for providing access to the execution and information relating to the execution to the news media;

        2.   to provide the procedure for:

           a.   releasing background information;

           b.   releasing information during the execution;

           c.   coverage of the execution; and

        3.   to provide requirements for safeguarding the institution and protected information.

    B.   Policy

        1.   It shall be the policy of the Department to permit press access to the execution and information concerning the execution consistent with the requirements of the constitutions and laws of the United States and state of Utah.

        2.   The Department is generally required to provide no more access to the news media, to the inmates and facilities it supervises and controls than that available to the general public.

        3.   The Department and the Utah Code recognize the need for the public to be informed concerning executions conducted by the Department of Corrections.

           a.   The Department will participate and cooperate with the news media to inform the public concerning the execution.

           b.   Information should be provided in a timely manner.

GLOSSIP000202

4.  If the condemned is willing, the
    Department may allow an opportunity
    forthe condemned to speak with the news
    media.  If allowed, the interview may:

    a.  include those members of the news
        media selected to witness the
        execution;

    b.  include additional members of the
        news media authorized by the
        Department, but not including more
        than one reporter from the same
        agency; and

    c.  be held at a time and location
        determined by the Department.

5.  During exigent circumstances,
    communication may be temporarily
    suspended until the situation has been
    stabilized.  Exigent circumstances shall
    include, but not be limited to:

    a.  riots;

    b.  hostage situations;

    c.  fires or other disasters; or

    d.  other inmate disorders.

6.  Refer to Chapter AGr05,"Media Relations"
    for general news media access to
    information, inmates and facilities.

TMF 01/08.02   News Media Selection

A.  Number in Attendance

    The Department shall permit members of the
    press and broadcast news media to witness the
    execution.

B.  Authority to Select

    The Executive Director/designee shall be
    responsible for selecting the members of the

REVISED 06/10/10                         TMF 01/08 – pg. 114

GLOSSIP000203

news media who will be permitted to witness
the execution.  77-19-11(4) UCA

C.  <u>Selection Process</u>

1.  After the court sets a date for the
    execution of the death penalty, news
    directors or editors may submit a
    written list of news media witnesses
    (one per organization) and other news
    personnel needed at the execution, to
    the attention of the Executive Director
    at least 30 days prior to the execution.
    When administrative convenience or
    fairness to the news media dictates, the
    Department in its discretion may extend
    the request deadline.

2.  Requests for consideration may be
    granted by the Executive
    Director/designee provided they contain
    the following:

    a.  a statement setting forth facts
        showing that the requesting
        individual falls within the
        definition of "member of the press
        and broadcast news media" set forth
        in these regulations;

    b.  an agreement to act as a pool
        representative as described in
        these regulations;

    c.  an agreement that the media member
        will abide by all of the
        conditions, rules and regulations
        while in attendance at the
        execution; and

    d.  agreement that they will conduct
        themselves consistent with existing
        press standards.

3.  Upon receipt of a news director's or
    editor's request for permission for news
    media witnesses to attend the execution,
    the Executive Director/designee may take
    such steps as he deems necessary to
    verify the statements made in the
    request.  After verifying the
    information in the requests, selection

GLOSSIP000204

of witnesses shall be made by the
Executive Director/designee.

4.   The Executive Director/designee shall
     identify the media members who have been
     selected to witness the execution.
     Media members shall be selected on a
     rotating basis from the following
     organizations:

     a.   Salt Lake daily newspapers;

     b.   television stations licensed and
          broadcasting daily in the State of
          Utah;

     c.   one newspaper of general
          circulation in the county in which
          the crime occurred;

     d.   one radio station licensed and
          broadcasting in the State of Utah;
          and

     e.   the remainder from a pool of
          broadcast, print and wire services
          news media organizations operating
          in Utah.

5.   In the event that the Executive Director
     is unable to name a news media witness
     from each of the above-described
     organizations, he shall name other
     qualifying media members to attend.

6.   No news media witnesses other than those
     named to attend the execution as
     described in this chapter shall be
     permitted to witness the execution.

D.   Pool Photographers

     1.   Two photographers shall be appointed as
          pool photographers to photograph/film
          the execution chamber following clean
          up.

     2.   The pool photographers may be selected
          from agencies other than those

REVISED 06/10/10                    TMF 01/08  – pg. 116

GLOSSIP000205

represented among those witnessing the
execution.

TMF 01/08.03    Alternate Coverage/Accommodations

A.    Additional Media Selected

1.    The Executive Director may designate
additional members of the press and
broadcast news media who request and
receive permission to be allowed at a
location designated by the Executive
Director on prison property during the
execution.

2.    The additional media selected shall be
from both the print and broadcast media.

B.    Alternate Location

1.    The alternate location shall be a press
briefing area.

2.    Media members must contact the
Department's Public Affairs Director at
least 14 days prior to the execution
date to make any special arrangements
for hook ups or other necessary
arrangements. Any expense incurred
shall be borne by the specific news
media requiring special equipment or
hook ups.

3.    No special access nor briefings will be
provided to members of the press who are
not selected as witnesses nor selected
for the alternate site.

4.    The alternate site shall be made
available to the selected members of the
news media at 1700 hours the day prior
to the scheduled execution date.

C.    Briefing Media at the Alternate Site

1.    The Public Affairs Director shall
arrange for:

a.    pre-execution briefings;

b.    distribution of media briefing
packages;

      c.    briefings throughout the execution event; and

      d.    post-execution briefings by the news media who witnessed the execution.

   2.    The news media witnesses to the execution shall be returned to the media briefing area to answer questions from media members at the alternate site.

TMF 01/08.04   <u>News Media Attendance at the Execution</u>

   A.    The Warden/designee shall permit the members of the press and broadcast news media, selected by the Executive Director/designee in accordance with these regulations, to witness the execution.

   B.    Each news media witness attending the execution shall be carefully searched prior to admittance to the execution chamber.

      1.

         a.    Electronic or mechanical recording devices include, but are not limited to, still, moving picture or video cameras, tape recorders or similar devices, broadcasting devices, or artistic paraphernalia, such as notebooks, and drawing pencils or pens, etc.

         b.    Violation of this prohibition is a class B misdemeanor. 77-19-11(5)

         c.    Only a small notebook (no larger than 4" x 6") and a pen or pencil issued by the Department shall be permitted.

   2.    Only the selected members of the news media (witnesses and two pool photographers) shall be allowed to

GLOSSIP000207

attend the pre-execution briefing.  The
group will be escorted into a briefing
room.

a.

b.

c.

3.

a.

b.

4.    Persons requesting to witness the
execution shall be required to sign a
statement or release absolving the
institution or any of its staff from any

REVISED 06/10/10                                TMF 01/08  –  pg. 119

GLOSSIP000208

legal recourse resulting from the
exercise of search requirements or other
provisions of the witness agreement.

C.   The Warden/designee shall not exclude any
news media witness duly selected in
accordance with these regulations from
attendance at the execution except as
described in these regulations, nor may the
Warden/designee cause a selected news media
witness to be removed from the execution
chamber unless the media member:

1.   refuses to submit to a reasonable search
as permitted in these regulations;

2.   faints, becomes ill or requests to be
allowed to leave during the execution;

3.   causes a disturbance within the
execution chamber; or

4.   refuses or fails to abide by the
conditions and regulations set forth by
the Department.

D.   The execution chamber shall be arranged so as
to provide space for the attending news media
witnesses and the space arranged shall have a
view of the execution site, with the
exception of:

1.   a view of the members of the firing
squad, if employed; or

2.   if lethal injection is chosen, those
directly administering the method of
execution, who shall be concealed from
the view of the media members so that
their identities will remain unknown.

E.   The selected news media witnesses shall be
transported as a group to the execution
location prior to the execution and shall be
allowed to remain there throughout the
proceeding.

F.   The Department shall designate a
representative or representatives to remain
with the media members throughout the
execution proceedings for the purpose of
supervising and escorting.

GLOSSIP000209

G.  News media witnesses shall be admitted to the execution area on the date set for the execution only after:

   1.  proof of identification have been presented to the Public Affairs Director/designee at the staging area;

   2.  receiving an orientation by the Public Affairs Director/designee; and

   3.  signing an agreement to abide by conditions required of news media witnesses to the execution.

H.  After the execution has been completed and the site has been restored to an orderly condition, news media witnesses may be permitted to return to the execution chamber for purposes of filming, photographing and recording the site.

   1.  Re-entry to the site shall be permitted only after the site has been restored to an orderly condition, including:

      a.  removal of the body of the condemned;

      b.  evacuation of those involved in administering the execution; and

      c.  clean up of the execution chamber.

   2.  Restoring the site to an "orderly condition" prior to the filming opportunity shall not unnecessarily disturb the physical arrangements for the execution.

   3.  Media members permitted to return to the execution chamber for the filming and recording of the site shall include:

      a.  the news media witnesses who were selected to witness the execution;

      b.  one pool television camera man; and

      c.  one pool newsprint photographer.

GLOSSIP000210

4.   The film/videotape shall not be used in any news or other broadcast until made available to all agencies participating in the pool.  All agencies receiving the film/videotape will be permitted to usethem in news coverage and to retain the film/videotape for file footage.

I.   News media representatives shall, after being returned from the execution to the staging area, act as pool representatives for other media representatives covering the event.

1.   The pool representatives shall meet at the designated media center and provide an account of the execution and shall freely answer all questions put to them by other media members and shall not be permitted to report their coverage of the execution back to their respective news organizations until after the non-attending media members have had the benefit of the pool representatives' account of the execution.

a.   News media members attending the post-execution briefing shall agree to remain in the briefing room and not leave nor communicate with persons outside the briefing room until the briefing is over.

b.   The briefing shall end when the attending news media members are through asking questions or after 90 minutes, whichever comes first.

2.

TMF 01/08.05   Limitations on Coverage

A.   The Warden, with the concurrence of the Executive Director, may alter these regulations to impose additional conditions, restrictions and limitations on media coverage of the execution when such requirements become necessary for the

REVISED 06/10/10                    TMF 01/08  –  pg. 122

GLOSSIP000211

preservation of prison security, personal
safety or other legitimate interests which
may be in jeopardy.

B.   If extraordinary circumstances develop, the
additional conditions and restrictions
shallbe no more restrictive than required to
meet the exigent circumstances.

TMF 01/08.06   <u>News Media Briefing</u>

A.   <u>Pre-Execution Briefing Packets</u>

1.   The Public Affairs Director shall
prepare a press briefing packet for
reporters approved to witness the
execution, or to cover the execution
from the news media staging area.

2.   The briefing press packet should be
provided to news media representatives
as they arrive at the staging area.

3.   The contents of the press briefing
packet shall include, but not be limited
to, biographical information on the
condemned, the list of official
witnesses, pool reporters, family
witnesses, execution procedures,
sequence of events, and the history of
executions in Utah.

4.   Updates will generally be communicated
and/or distributed to the press on an
hourly basis beginning about 1700 hours
the day preceding the execution.
Briefing updates should include:

a.   a summary of activities related to
the execution procedures and
sequence of events; and

b.   a summary of the condemned inmate's
activities during his final 24
hours.

B.   <u>Death Announcement</u>

1.   The Public Affairs
Representative/designee shall read a
prepared statement to the press, prior
to the post-execution press conference,
announcing that the execution has been
completed.

GLOSSIP000212

2.   The announcement shall include, but not be limited to:

    a.   the time of the execution;

    b.   the time the condemned was pronounced dead; and

    c.   the condemned's final words.

C.   <u>Post-Execution Conference</u>

1.   The post-execution conference shall begin immediately following the arrival of the pool reporters from the execution site.

2.   The Public Affairs Director shall introduce the members of the press who witnessed the execution and facilitate the post-execution conference.

3.   The Executive Director, Deputy Director, Institutional Operations Division Director and/or Warden may appear and answer questions at the press conference.

4.   The post-execution conference shall continue for ninety minutes or until the questioning of the reporters who witnessed the execution has been completed; whichever comes first.

D.   <u>Travel Routes</u>

1.

2.

E.   <u>Media Center</u>

1.   The Media Center shall be located in the designated staging area.

REVISED 06/10/10                                TMF 01/08 - pg. 124

GLOSSIP000213

2.  The Public Affairs Director shall assume responsibility for routine press briefings at the Media Center.

3.  Press briefings and the post-execution conference will be held at the Media Center.

4.  News media personnel may not access nor occupy any other part of the staging area. The media shall have access only to the designated media center.

5.  Members of the news media may not seek, speak to or interview any official visitor while at the staging area.

6.


TMF 01/08.07   <u>News Media Support and Equipment</u>

A.  <u>Telephones</u>

1.  The Public Affairs Director shall coordinate all telephone needs with the Deputy Warden Support Services at the Utah State Prison.

2.  Each news agency requiring dedicated telephone lines, shall submit in writing its telephone needs to the Public Affairs Director 14 days prior to the scheduled execution. Agencies requesting dedicated phone lines will be responsible for the cost of those lines.

3.  The Department shall install a reasonable number of telephones, for local use and collect calls only, for news media use at the Media Center. If the Department is unable to install collect-call only telephones, personal cellular phones may be used.

B.  <u>Electrical Outlets</u>


REVISED 06/10/10                          TMF 01/08 – pg. 125

GLOSSIP000214

Each news agency must communicate its needs
for electrical power to the Public Affairs
Director 14 days prior to the scheduled
execution.

C.   <u>Refreshments</u>

The Public Affairs Director may inquire about
having a private caterer at the staging area
for the media to purchase items.

D.   <u>News Media Support Vehicles</u>

1.

2.

TMF 01/08.08   <u>Media Representative Agreement</u>

(See following page for Media Representative
agreement.)

GLOSSIP000215

Rules of Conduct for Media Representatives Observing an Execution
at the
Utah State Prison

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment;

6.  That you understand that the Department of Corrections will not provide mental health services to witnesses; and

7.  That you understand the Department of Corrections is required torecord/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.


News Organization_____


_____          _____
    Signature of News Media Witness          Date


_____          _____
    News Agency Editor/Producer              Date


REVISED 06/10/10                    TMF 01/08  -  pg. 127

GLOSSIP000216

GLOSSIP000217

```
TMF 01/20.00   REVIEWAND DOCUMENTATION

TMF 01/20.01   General Provisions
TMF 01/20.02   Review Assignment
TMF 01/20.03   Documentation of Execution
TMF 01/20.04   Retention and Safeguarding Documentation
TMF 01/20.05   UDC Employee Questionnaire
```

TMF 01/20.00    REVIEW AND DOCUMENTATION

TMF 01/20.01    General Provisions

    A.   Purpose of Chapter

        The purpose of this chapter is to provide the policies, procedures and requirements for reviewingthe execution process.

    B.   Policy

        1.   It shall be the policy of the Department that of the execution process shall be performed as ordered by the Executive Director.

        2.   Auditors assigned to perform thesereviewsshall beallowed access to designated aspects of the executionpreparation.

        3.   Auditors participating in the reviewof the execution are not to be involved in the execution preparationprocess, but shall act as observers only and, at all times, act in such a way that they create the least disruption possible in that process.

        5.   Appropriate documentation of the execution shall be created, collected, safeguarded, and retained to provide an adequate review trail and a proper historical record.

        6.   Documentation shall be protected in accordance with 64-13-25(2) UCA.

TMF 01/20.02    ReviewAssignment

    Authority to Conduct a Review

        1.   The Executive Director shall be responsible for determining if a reviewis to take place in each execution.

        2.   The Auditor(s) selected for the execution review shall, upon direction

GLOSSIP000219

from the Executive Director, prepare a questionnaire to be completed by staff involved in the execution process.  The survey shall be approved by the Executive Director and all responses shall be confidential.  Only the Executive Director may grant release of the survey responses.

TMF 01/20.03   Documentation of Execution

Documentation to be Retained

Documentation which shall be retained shall include:

1.   the warrant and all other legal papers;

2.   correspondence, both official and unofficial, which is received by the Department of Corrections;

3.   minutes of meetings held for purposes of planning or disseminating information;

4.   inter-agency written communication;

5.   intra-departmental written communication;

6.   logs, journals, chronological notes, etc., of key locations; and

7.   a newspaper file.

TMF 01/20.04   Retention and Safeguarding Documentation

A.   Execution File

1.   An execution file shall be established for each condemned person.  The file shall be organized into sections which should include:

a.   legal documents;

b.   official correspondence;

       c.    unofficial correspondence;

       d.    intra-departmental written communication;

       e.    chronological notes, logs, etc.; and

       f.    meeting minutes.

2.    Each section of the execution file shall have material filed in chronological order.

3.    All working documents which cannot be filed during the execution process or immediately after, shall be copied and a copy shall be placed in the execution file.

4.    All intra-departmental communication shall have a courtesy copy to the execution file.

B.    <u>Execution File Maintenance</u>

    1.

    2.

C.    <u>Access to Execution File</u>

Only those individuals authorized by the Executive Director of Corrections, DIO Director, or Warden, shall have access to the execution file.

D.    <u>Long-Term Storage</u>

To ensure that all documents concerning an execution shall be retained to provide a reviewtrail and an adequate historical record, the execution file shall be stored in accordance with the archive's plan of the Department.

GLOSSIP000221

TMF 01/20.05   <u>UDC EMPLOYEE QUESTIONNAIRE</u>

<u>               </u>
Name of the Condemned

<u>INSTRUCTIONS</u>:

Please complete this questionnaire as soon after the execution as possible.  Answer each question completely and accurately.  Add as many pages as necessary if answers need more space.

Complete and return this questionnaire to the AuditBureau at Utah Department of Corrections, 14717 S. Minuteman Drive, Draper, 84020, by _____.

Thank you.


FULL NAME:_____

TITLE:_____

LOCATION:_____

FUNCTION DURING THE
EXECUTION:_____

1.  Were you provided adequate direction for your area of responsibility?

    If you answered "No," please explain what direction would havebeen beneficial to you.

    _____
    _____
    _____

2.  Were you adequately trained or briefed in your area of  responsibility?

    Yes___No____

    If you answered "No," please explain what training or briefing would have been beneficial to you.

    _____
    _____
    _____

3.  Did you observe anything that you thought was not adequately addressed?

    Yes___No___

    If you answered "Yes," please explain.

    _____
    _____
    _____

GLOSSIP000222

4.   Please make any additional comments or suggestions.

_____
_____
_____
_____
_____
_____
_____
_____

**THANK YOU!**

GLOSSIP000223

TMF 01/21.00     TRAINING AND BRIEFING

TMF 01/21.01     General Provisions
TMF 01/21.02     Training and Briefing Components

GLOSSIP000224

TMF 01/21.00   <u>TRAINING AND BRIEFING</u>

TMF 01/21.01   <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

       The purpose of this chapter is to provide the policy and procedure concerning briefing and training of staff, members of allied agencies and others involved in an execution.

    B.   <u>Policy</u>

       It is the policy of the Department that staff and others involved in carrying out an execution:

      1.   receive comprehensive briefings covering:

         a.   their duties and responsibilities;

         b.   the specifics of post orders covering assigned positions;

         c.   communication and chain of command;

         d.   overview of functions and activities during the execution;

      2.   are provided copies of post orders outlining the duties and responsibilities of assigned positions;

      3.   receive the level of briefing and training necessary based on the requirements of assigned duties;

      4.   rehearse and practice functions which involve:

         a.   difficult timing;

         b.   a high degree of skill;

         c.   procedures of a highly critical nature; and/or

         d.   moderately difficult or complex interaction with others; and

GLOSSIP000225

5.    receive instructions concerning back-up systems to provide:

    a.    problem-resolution assistance;

    b.    policy decisions;

    c.    crisis management assistance; and

    d.    information requests.

**TMF 01/21.02**   <u>Training and Briefing Components</u>

A.   <u>General</u>

Training and briefing shall include, but not be limited to:

1.    issuing all members or other participants a post order for their assigned positions;

2.    providing an orientation or briefing covering assigned duties and general operational information;

3.    if necessary, detailed training covering legal, operational or technical aspects of assigned position;

4.    if necessary, rehearsal of job functions; and

5.    key positions in Manual TMF 01.

B.   <u>Post Orders</u>

1.    Each member or other participant shall be issued the post order or instructions for his assigned position.

2.    The post order shall include, but not be limited to:

    a.    the position title;

    b.    location(s) of assignment;

    c.    title of supervisor;

GLOSSIP000226

      d.    supervisory role, if any;

      e.    duties and responsibilities-- general and specific; and

      f.    emergency role.

3.    When appropriate, one or more chapters of TMF 01 may be issued with a post order.

4.    All post orders (and any accompanying manual material) shall be returned at the completion of the execution event.

C.   <u>Briefing/Orientation</u>

1.    Most assignments will be very specialized, involving a narrow range of duties.  For such positions, briefing/orientation sessions will be all the training required in addition to the general training skills and experience of the persons assigned.

2.    Orientation sessions shall include but not be limited to:

      a.    an overview of the execution process and operational components;

      b.    location of assigned post;

      c.    chain of command and organizational information;

      d.    an overview of the countdown of activities and procedures leading to the execution;

      e.    an explanation of support and crisis intervention systems;

      f.    interaction with the news media;

      g.    a review of the specific post order requirements, duties and other elements; and

GLOSSIP000227

h.   a question-and-answer period.

D.   <u>Training/Rehearsal</u>

1.   For assignments requiring more technical or complex functions, critical timing or interaction elements, or duties of a particularly difficult nature, more comprehensive training shall be required.

2.   Team leaders shall be responsible for training and scheduling rehearsals as needed for team members.

GLOSSIP000229