Exhibit 6

## DECLARATION OF AMANDA C. BASS

I, Amanda C. Bass, declare under penalty of perjury the following to be true and correct to the best of my information and belief:

1.  I am employed as an Assistant Federal Public Defender by the Office of the Federal Public Defender for the District of Arizona ("FPD"). I have worked as an attorney specializing in capital habeas litigation in the FPD's Capital Habeas Unit for approximately six years.

2.  The FPD was appointed to Clarence Dixon's case in 2014 and, since 2019, I have served as lead counsel in his federal habeas case.

3.  On May 11, 2022, I witnessed Clarence's execution which occurred in Housing Unit 9 at the Arizona State Prison Complex in Florence, Arizona. The viewing room was arranged like a theater: on one side of the room was a large glass window with the curtains drawn; three televisions were positioned directly above the large glass window that separated the viewing room from the execution chamber; and on the other side of the viewing room directly facing the glass window were approximately six rows of seating that extended upwards and away from the glass window at an angle.

4.  I entered the viewing room at 9:27 a.m. At 9:32 a.m. the curtains to the execution chamber opened. Clarence was strapped to the gurney and a white blanket covered him up to his chest area. His right side faced the witnesses. Four corrections officers—all dressed in black, wearing sunglasses, hats, and their faces and heads covered with a black mask—were standing around the gurney near Clarence's head. Two individuals dressed in medical scrubs (who I assumed were medical staff members) were also in the room. The television screens to the far left and right above the viewing window depicted Clarence on the gurney from an overhead angle. His entire body was visible. The television screen in center depicted eight syringes split into two batches of four. Towards the back of the execution chamber was a large covered window with a slot through which only a person's gloved hands were visible. Throughout the execution, someone in this room would pass lines through the slot to the medical staff members in the execution chamber who then attached them to Clarence.

5.  At 9:33 a.m., a medical staff member placed a tourniquet on Clarence's left upper arm and began looking at his upper arm in an apparent attempt to locate a vein. At 9:36 a.m. the medical staff member attempted to insert an IV into Clarence's left upper arm. The medical staff member's hands appeared to be shaking.

1

Initials _ACB_

6.      At 9:37 a.m., Clarence asked the medical staff member, "Are you a doctor?" The response from the medical staff member was not audible. Clarence asked, "Is that your best doctor's voice?" At 9:38 a.m., Clarence said to the medical staff member, "I thought you took a Hippocratic Oath? But money is better than that, right?" At 9:39 a.m., Clarence told the medical staff member, "Make sure you miss the first time. Teach me a lesson, right?" At 9:40 a.m., the medical staff member's hands appeared to be shaking.

7.      At 9:41 a.m., the medical staff member put gauze at the site of the first IV attempt on Clarence's left upper arm. Clarence cleared his throat. The medical staff member then made a second attempt at inserting an IV into Clarence's left arm, this time in the lower arm around the wrist area. I could see Clarence begin to twitch his feet. At 9:42 a.m., Clarence grimaced in apparent pain.

8.      At 9:44 a.m., the medical staff member removed the tourniquet and moved to Clarence's right upper arm. At 9:46 a.m., it appeared that an IV was set in Clarence's upper right arm. Clarence grimaced, groaned in apparent pain, and said "Ow" At 9:47 a.m., the medical staff member said, "Line A, please." Two correctional officers pulled a long plastic line through the window slot and appeared to untangle the lines. At 9:49 a.m., Clarence grimaced in apparent pain.

9.      At 9:49 a.m., a medical staff member left the execution chamber. At 9:50 a.m., Clarence held out three fingers on his right hand. A medical staff member entered the room with a plastic box containing what appeared to be a blue blanket which was used to cover Clarence's lower body. Clarence stated, "Gotta get a fem going, otherwise it's gas." At 9:52 a.m., Clarence stated, "This is funny, trying to be all sterile while you're trying to kill me. How bizarre is that? How twisted is that? You guys worship death, don't you? Ghouls one and all." At 9:55 a.m., Clarence said "No wonder there's no tape recording of these things. You listen to them while you get off." At 9:55 a.m. Clarence stated that, "I wanted to invite the Chief Justice Brutinel. He signed the death warrant. With all the crap that was happening it slipped my mind."

10.     At 9:56 a.m., a medical staff member injected a clear liquid into Clarence's right upper leg after telling him, "You'll feel a prick and a sting." Medical staff members appeared to be attempting to locate the femoral vein. At 9:59 a.m. and at 10:00 a.m., Clarence grimaced in apparent pain. At 10:01 a.m., a medical staff member picked up what looked like a scalpel and appeared to continue attempting to access the femoral vein. At 10:03 a.m., a medical staff member wiped blood from Clarence's leg. Clarence stated, "I'm sorry you're watching this Deana. You know I didn't kill you."

2

Initials _ALB_

11.   At 10:08 a.m., a medical staff member appeared to be sticking a line into Clarence's right femoral vein. A corrections officer appeared to be leaning over and holding down Clarence's left leg near his calf/foot area.

12.   At 10:10 a.m., Clarence began coughing. A medical staff member continued cleaning up the blood on his right leg. At 10:11 a.m., Clarence continued to cough and periodically lifted his head while doing so. A medical staff member taped the lines to Clarence's leg while Clarence coughed more.

13.   At 10:12 a.m., the blue surgical blanket was removed and the lines were taped to Clarence's right leg. At 10:13 a.m., the medical staff began to leave then returned to check the lines and attach another piece of tape to the femoral line. Before exiting the execution chamber, the medical staff member put the white blanket back over Clarence but left his legs exposed.

14.   At 10:16 a.m., the four corrections officers exited the execution chamber. A male corrections staff member entered the execution chamber, read the warrant of execution, and announced that the death sentence was to be carried out. He asked Clarence if he had any last words. At 10:17 a.m., Clarence's last words were, "The Arizona Supreme Court should follow the law. They denied my appeal. Denied my petition. It would not recognize A.R.S. 15-1627 paragraphs F and G (1981). It would have changed the outcome of the trial. I do and will always proclaim innocence. Now let's get this shit over with."

15.   At 10:19 a.m., Clarence stated, "Maybe I'll see you on the other side, Deana. I did not know you or remember you. Maybe I'll see you on the other side." At 10:20 a.m. Clarence's eyes fluttered. He held out three fingers on his right hand. Clarence made two snorting noises. At 10:21 a.m., on the center television screen gloved hands could be seen pushing down on a syringe. Clarence's mouth opened and he did not move again. At 10:24 a.m., the center television screen showed gloved hands pushing another syringe.

16.   At 10:28 a.m., a medical staff member entered the execution chamber and swabbed both of Clarence's eyes. At 10:29 a.m., a corrections staff member entered the execution chamber and announced that "the inmate is sedated." At 10:30 a.m., the corrections staff member announced that the execution was completed, announced the time of death, and exited the execution chamber. The curtains closed.

//

//

Initials

Signed this 18th day of _May_, 2022.

_Amanda C. Bass_
Name

_Amanda C. Bass_
Signature

_Phoenix, Arizona_
City, State

4

Initials _ACB_

Exhibit 7

**ARIZONA SUPREME COURT**

| | |
|---|---|
| STATE OF ARIZONA, | No. CR–87–0135–AP |
| Appellee | Pima County Superior Court |
| v. | Nos. CR14065 and CR15397 |
| FRANK JARVIS ATWOOD, | Ninth Circuit No. 14–99002 |
| Appellant. | U.S. District Court No. CV–98–116–TUC–JCC |
| | MOTION TO MODIFY BRIEFING SCHEDULE |
| | (Capital Case) |

The State of Arizona hereby respectfully moves to modify the briefing schedule this Court established in this matter for the State's Motion for Warrant of Execution under A.R.S. § 13–759(A). The State's anticipated motion has previously been disclosed, *see* Motion to set Briefing Schedule, filed 4/6/21, at Ex. A, and it is presently due to be filed on July 21, 2021, for an anticipated conference date of August 24, 2021. Order, filed 5/21/21. Should this Court grant an execution warrant on August 24, Atwood's execution would occur 35 days later, on September 28, 2021. *See* A.R.S. § 13–759(A). This request is supported by the existence of "highly extraordinary circumstances," *see* Order, filed 5/21/21, in the form of new information recently acquired from the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) bearing on the compounded

1

pentobarbital's beyond-use date.  Moreover, Atwood will not suffer any prejudice from modifying the briefing schedule.

ADCRR's retained compound pharmacist previously advised ADCRR that the pentobarbital to be used in Atwood's execution would have a 90-day beyond-use date once compounded.  *See* Motion to Set Briefing Schedule, filed 4/6/21, at 2.  The State moved for a briefing schedule in good-faith reliance on that opinion. The pharmacist, however, has now revised that opinion and has advised ADCRR that, until certain specialized testing of a sample batch is conducted, pentobarbital that is compounded for Atwood's execution will have an initial beyond-use date of 45 days.  The specialized testing could extend the beyond-use date of subsequently compounded doses from the same batch of pentobarbital.  However, this testing has not yet commenced and will not be completed in time to accommodate the briefing schedule.

As discussed in previous pleadings, ADCRR's compound pharmacist will compound the pentobarbital shortly after the date on which the State's Motion is filed to comply with the protocol's testing and disclosure requirements.  *See* ADCRR Dep't Order 710, Attach. D, ¶ C.2.[1]   Under the current briefing schedule—which was set in reliance on the previously quoted 90-day beyond-use

---

[1] Publicly available at
https://corrections.az.gov/sites/default/files/policies/700/0710_031021.pdf.

2

date—the pentobarbital will expire prior to Atwood's anticipated execution on September 28.  Under the terms of a civil settlement, ADCRR may not "use or select for use in an execution" any chemicals having a beyond-use date falling before the date of an execution.  *See* Motion to Set Briefing Schedule, filed 4/6/21, at Ex. C, pp. 2–3, ¶ (2)(f).

Accordingly, the State respectfully requests that this Court modify the briefing schedule currently in place so that the September 28 projected execution date will fall within the 45-day initial beyond-use date of the compounded pentobarbital.  As stated above, this Court has identified an anticipated conference date of August 24, 2021, *see* Order, filed 5/21/21, and the State has already disclosed to this Court and counsel a copy of the Motion for Warrant of Execution that it intends to file.  *See* Motion to Set Briefing Schedule, filed 4/6/21, at Ex. A. The State thus proposes the following briefing schedule:

- The State shall file its Motion for Warrant of Execution no later than 5:00 p.m. on August 13, 2021;

- Atwood shall respond to the Motion no later than 5:00 p.m. on August 17, 2021;

- The State shall file its reply, if any, no later than 5:00 p.m. on August 18, 2021.

Atwood will not suffer any prejudice from modifying the briefing schedule. This is the first request for any sort of modification to the briefing schedule. Moreover, Atwood's current deadline for responding to the State's motion (a copy

of which he has had for months, thereby enabling him to begin work on his response) is August 4, 2021.  *See* Order, filed 5/21/21.  The State's proposed modification would thus give him an additional 13 days to prepare his response. And as discussed in prior pleadings, *see* Motion to Set Briefing Schedule, filed 4/6/21, at 5–6, this proceeding is limited to the narrow question whether the "conviction and sentence of death [have been] affirmed and the first post-conviction relief proceedings have concluded."  A.R.S. § 13–759(A); *see* Ariz. R. Crim. P. 31.23(b).  Atwood's response to this question should therefore be fairly easy to prepare.[2]

Accordingly, for the foregoing reasons, the State respectfully moves to modify the briefing schedule that the Court established in this matter for the State's Motion for Warrant of Execution.

_____

[2] In the event this Court is not inclined to modify the briefing schedule as discussed above, then the State respectfully moves in the alternative for a temporary stay of the briefing schedule.  This option is not preferred because it would necessitate scheduling a new conference date for the execution warrant and, by extension, result in a new projected execution date.  This would create unnecessary delay and emotional trauma for the victims in this aging capital case.  *See* Ariz. Const. Art. 2, § 2.1(A)(10) (entitling victim to prompt and final conclusion of the case). However, this option would allow ADCRR to confirm that the compounded chemical will carry a longer beyond-use date.  Should this Court stay the proceeding, the State will promptly notify this Court and counsel when testing is complete and any new beyond-use date determined.

DATED this 22nd day of June, 2021.

Respectfully submitted,

Mark Brnovich
Attorney General
(Firm State Bar No. 14000)


<u>s/Lacey Stover Gard</u>
Deputy Solicitor General/Chief of Capital
Litigation Section
400 West Congress, Bldg. S–215
Tucson, Arizona  85701–1367
Lacey.Gard@azag.gov
CLDocket@azag.gov
Telephone: (520) 628–6520
(State Bar Number 22714)
Attorneys for Appellee

QZPRWHBG0F11MC

Exhibit 8

## ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA, | No. CR–87–0135–AP |
| Appellee | Pima County Superior Court Nos. CR14065 and CR15397 |
| v. | |
| FRANK JARVIS ATWOOD, | Ninth Circuit No. 14–99002 |
| Appellant. | U.S. District Court No. CV–98–116–TUC–JCC |
| | MOTION TO SET BRIEFING SCHEDULE FOR MOTION FOR WARRANT OF EXECUTION. |
| | (Capital Case) |

The State of Arizona hereby gives notice of its intent to move for a warrant of execution under Rule of Criminal Procedure 31.23(b) for Frank Jarvis Atwood. A copy of the State's anticipated motion is attached hereto as Exhibit A. For the reasons that follow, the State respectfully moves this Court to establish a firm briefing schedule in advance of the motion's filing to ensure that the State's motion will be decided by this Court on a date certain and the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) can accordingly comply with its testing and disclosure obligations regarding the drug to be used in the execution.

In the event Atwood selects lethal injection as his method of execution, *see* A.R.S. § 13–757(B), ADCRR intends to execute him using compounded

pentobarbital.  Once compounded, the drug has a beyond-use date of 90 days from the date of compounding.  In April 2021, the State filed a similar motion in this case based on an opinion from ADCRR's retained compound pharmacist that, once compounded, the pentobarbital to be used would have an initial beyond-use date of 90 days.  After this Court set a briefing schedule, however, the compound pharmacist revised his original opinion and advised that, until certain specialized testing of a sample batch was conducted, pentobarbital compounded for Atwood's execution would have an initial beyond-use date of 45 days.  No. CR-87-0135-AP, Motion to Modify Briefing Schedule, filed June 22, 2021.  That testing has now been completed, establishing that the pentobarbital to be used in Atwood's execution will have a beyond-use date of at least 90 days.

The current lethal-injection protocol and a related civil settlement prohibit ADCRR from using or selecting for use any drug that will be expired or past its use-by date at the time the execution is carried out.  *See* ADCRR Dep't Order 710, Attach. D, ¶ A.1.III; *see also* Exhibit B (federal court order).[1]  Therefore, to ensure strict compliance with the protocol, ADCRR intends to carry out the execution during the drug's 90-day shelf life—established by the recent testing—from the date of compounding.

---

[1] Departmental Order 710 is publicly available at https://corrections.az.gov/sites/default/files/policies/700/0710_031021.pdf.

Separately, the lethal-injection protocol requires ADCRR to disclose to Atwood upon request (which he will presumably make), a quantitative analysis of the chemical to be used in his execution within 10 days of the State's filing of a motion for warrant of execution. *See* ADCRR Dep't Order 710, Attach. D, ¶ C.2. To ensure ADCRR can meet this obligation to provide testing results within 10 days and also have the compounded pentobarbital be within the 90-day shelf-life on the date of the execution, the drug must be compounded no more than a few days before the deadline for providing the testing report (*i.e.*, 10 days after the State's motion for warrant of execution is filed in this Court). This is because, as noted above, once the drug is compounded, its 90-day shelf life will begin to run.

Under an ordinary briefing schedule, assuming no extensions are requested or received, and that this Court does not prescribe different deadlines, Atwood would receive 10 days to respond to the State's motion and the State would receive 5 days to file its reply. *See* ARCAP (6)(a)(2); *see also* Ariz. R. Crim. P. 31.6(e). This Court would then conference the motion and, if it grants the motion, would fix an execution date 35 days from the date the motion is granted. *See* A.R.S. § 13–759(A); Ariz. R. Crim. P. 31.23(c). But when extended filing periods are granted, as is virtually inevitable in capital cases, the pre-warrant briefing process

alone, not including the statutory 35-day waiting period on the execution warrant, can last for months.[2]

The State therefore respectfully requests that this Court issue a set briefing schedule for the State's anticipated motion for warrant of execution. The State requests that this Court identify in advance the date on which it will consider and potentially issue the execution warrant and, working backward, calendar deadlines as follows[3]:

1. The State shall file its motion for an execution warrant (along with its motion to consolidate, if necessary) approximately 30 days before this Court's conference date. The motion shall be identical to Exhibit A to this pleading.

2. Atwood shall respond to the State's motions within 10 calendar days of the date of the motions' filing.

3. The State shall file its replies, if any, within 5 calendar days of the filing of Atwood's responses.

---

[2] For example, the pre-warrant litigation for inmate Robert Glen Jones spanned approximately 2 months. *See* No. CR–98–0537–AP, Motion for Warrant of Execution (filed on June 25, 2013); Warrant of Execution (issued on August 27, 2013). Likely because another inmate was also pending execution, Jones's execution date was fixed for a date past the 35-day statutory waiting period. *See id.*, Warrant of Execution (fixing date for execution as October 23, 2013). Nearly 4 months thus elapsed between the State's request for an execution warrant and Jones's execution.

[3] The State has this date filed a similar motion in inmate Clarence Dixon's case. *See* No. CR–08–0025–AP. The State asks that this Court stagger the respective briefing schedules so that the cases are not conferenced at the same time.

While the responsive briefing is ongoing, ADCRR will ensure that the pentobarbital is compounded and tested and the testing results disclosed within 10 days of the State's motion's filing (Item #1 above). This schedule would ensure that ADCRR can comply with its obligation to provide quantitative testing results of the compounded pentobarbital within 10 days after the State files its motion for a warrant of execution and carry out the execution within the drug's 90-day shelf life.

This procedure also will not prejudice Atwood. As discussed, the State has attached to this pleading a copy of its anticipated motion for warrant of execution. *See* Exhibit A. Atwood therefore has received notice of the State's motion and can begin to work on his response, as well as any other last-minute litigation he intends to pursue, while he awaits this Court's briefing schedule. Atwood has also received, through this motion, advanced notice that ADCRR intends to use compounded pentobarbital in his execution should he select lethal injection, which will enable him to pursue expeditiously any civil challenges he deems appropriate.[4]

Moreover, the issue before this Court in determining whether to issue a warrant is narrow: this Court need only determine whether Atwood's first post-conviction proceeding and habeas appellate review have concluded. *See* A.R.S. §

---

[4] Under the protocol, ADCRR is not required to disclose the drug to be used until the State files a motion for warrant of execution. *See* ADCRR Dep't Order 710, Attach. D, ¶¶ C.1 & C.2.

13–759(A); Ariz. R. Crim. P. 31.23(b).  If those proceedings have terminated, as the State will show, *see* Exhibit A, the relevant statute and procedural rule, respectfully, leave this Court no discretion to deny the warrant.  *See* A.R.S. 13–759(A) (directing that "the supreme court *shall* issue a warrant of execution" once the first post-conviction proceeding has concluded, and that the "supreme court *shall* grant subsequent warrants of execution on a motion by the state") (emphasis added); Ariz. R. Crim. P. 31.23(b) ("On the State's motion, the Supreme Court *must* issue a warrant of execution when federal habeas corpus proceedings and habeas appellate review conclude.") (emphasis added).

Accordingly, in light of this Court's narrow inquiry, combined with the State's early disclosure of its anticipated motions for an execution warrant and to consolidate, a firm briefing schedule from the date the Court will conference the motion on the timeframe set forth above is appropriate.  For these reasons, the State respectfully requests that this Court grant this motion and set a briefing schedule for its upcoming motion for warrant of execution.

/ / /

/ / /

/ / /

DATED this 5th day of January, 2022.

Respectfully submitted,

Mark Brnovich
Attorney General
(Firm State Bar No. 14000)


s/Jeffrey L. Sparks
Acting Chief Counsel
Capital Litigation Section
2005 N. Central Ave.
Phoenix, AZ 85004
Jeffrey.Sparks@azag.gov
CLDocket@azag.gov
Telephone: (602) 542–4686
(State Bar Number 27536)

Attorneys for Appellee

# EXHIBIT A

## ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA,<br><br>          Appellee<br><br>     v.<br><br>FRANK JARVIS ATWOOD,<br><br>        Appellant. | No. CR–87–0135–AP<br><br>Pima County Superior Court<br>Nos. CR14065 and CR15397<br><br>Ninth Circuit No. 14–99002<br><br>U.S. District Court No. CV–98–116–TUC–JCC<br><br>MOTION FOR WARRANT OF EXECUTION<br><br>(Capital Case) |

Pursuant to A.R.S. § 13–759(A) and Arizona Rule of Criminal Procedure 31.23(b), the State of Arizona moves this Court for a Warrant of Execution for Frank Jarvis Atwood. Atwood's direct appeal, first post-conviction proceeding, and federal habeas proceeding have concluded. Accordingly, under § 13–759(A) and Rule 31.23(b), a warrant of execution must issue. *See* A.R.S. 13–759(A) ("After a conviction and sentence of death are affirmed and the first post-conviction relief proceedings have concluded, the supreme court shall issue a warrant of execution that authorizes the director of the state department of corrections to carry out the execution thirty-five days after the supreme court's mandate or order denying review or upon motion by the state. The supreme court shall grant subsequent warrants of execution on a motion by the state."); Ariz. R.

1

Crim. P. 31.23(b) ("On the State's motion, the Supreme Court must issue a warrant of execution when federal habeas corpus proceedings and habeas appellate review conclude.").

A jury convicted Atwood of the 1984 kidnapping and first-degree murder of 8-year-old V.L.H. *State v. Atwood*, 171 Ariz. 576, 591–96 (1992). A judge sentenced Atwood to death for the first-degree murder conviction. *Id.* at 591. This Court affirmed Atwood's convictions and sentences on direct review, *see id.*, and the United States Supreme Court denied certiorari, *Atwood v. Arizona*, 506 U.S. 1084 (1993) (Mem.). The trial court denied Atwood's first petition for post-conviction relief, this Court denied review, *see* No. 97–0289–PC, and the United States Supreme Court again denied certiorari, *Atwood v. Arizona*, 523 U.S. 1082 (1998).

Atwood filed his federal habeas petition on March 12, 1998, and the district court denied relief on January 27, 2014. *See Atwood v. Ryan*, 2014 WL 289987 (D. Ariz. Jan. 27, 2014). The Ninth Circuit affirmed the district court's decision on September 13, 2017, *Atwood v. Ryan*, 870 F.3d 1033 (9th Cir. 2017), and denied Atwood's petitions for panel and en banc rehearing on January 8, 2018, with no judge requesting a vote on whether to rehear the matter en banc. *See* Ninth Circuit No. 14–99002, Dkt. # 76. Atwood failed to file a timely petition for writ of certiorari, and the United States Supreme Court denied his motion to file a petition

out-of-time. *See Atwood v. Ryan*, 139 S. Ct. 298 (2018) (Mem.).

    Atwood's federal habeas appeals have thus concluded.  This Court should therefore issue an execution warrant.  *See* A.R.S. § 13–759(A); Ariz. R. Crim. P. 31.23(b).

    DATED this ___ day of ____, 2022.

                    Respectfully submitted,

                    Mark Brnovich
                    Attorney General
                    (Firm State Bar No. 14000)

                    s/Jeffrey L. Sparks
                    Acting Chief Counsel
                    Capital Litigation Section
                    2005 N. Central Ave.
                    Phoenix, AZ 85004
                    Jeffrey.Sparks@azag.gov
                    CLDocket@azag.gov
                    Telephone: (602) 542–4686
                    (State Bar Number 27536)
                    Attorneys for Appellee

RH8TTKMZ0CZMA4

# EXHIBIT B

1
2
3
4
5

6            IN THE UNITED STATES DISTRICT COURT

7               FOR THE DISTRICT OF ARIZONA

8

9   First Amendment Coalition of Arizona, Inc.;       No. CV-14-01447-PHX-NVW
    Charles Michael Hedlund; Graham S. Henry;
10  David Gulbrandson; Robert Poyson; Todd            **ORDER   FOR   DISMISSAL   OF**
    Smith; Eldon Schurz, and Roger Scott,             **CLAIMS SIX AND SEVEN**
11
                Plaintiffs,
12
13  v.

14  Charles L Ryan, Director of ADC; James
    O'Neil, Warden, ASPC—Eyman; Greg
15  Fizer, Warden, ASPC—Florence; and Does
    1-10, Unknown ADC Personnel, in their
16  official capacities as Agents of ADC,

17                Defendants.

18

19
          Plaintiffs  Charles  Michael  Hedlund,  Graham  S.  Henry,  David  Gulbrandson,
20
    Robert Poyson, Todd Smith, Eldon Schurz, and Roger Scott (collectively, "Plaintiffs"),
21
    and Defendants Charles L. Ryan, Director of the Arizona Department of Corrections
22
    ("ADC"); James O'Neil, Warden, ASPC–Eyman; and Greg Fizer, Warden, ASPC–
23
    Florence (collectively, "Defendants"), have jointly stipulated to dismiss Claims Six and
24
    Seven of Plaintiffs' Second Amended Complaint (ECF Nos. 94 & 97) and Supplemental
25
    Complaint (ECF No. 163) ("Claims Six and Seven"), based upon the recitals in the
26
    parties' concurrently filed Stipulated Settlement Agreement for Dismissal of Claims Six
27
    and Seven ("Stipulated Settlement Agreement") (ECF No. 186), and under the terms that
28
    follow below.

1     Having considered the parties' Stipulated Settlement Agreement, and good cause

2 appearing, IT IS HEREBY ORDERED that:

3     (1)     Claims Six and Seven of Plaintiffs' Second Amended Complaint and

4 Supplemental Complaint are dismissed, without prejudice.

5     (2)     Upon any showing by any Plaintiff or any other current or future prisoner

6 sentenced to death in the State of Arizona that any of the Defendants, any of the

7 Defendants' successors, or the ADC intend to engage in or have actually engaged in any

8 of the following conduct (together, the "Prohibited Conduct"):

9          (a)     adopt language in any future version of the ADC's execution

10          procedures that purports to disclaim the creation of rights or obligations;

11          (b)     grant the ADC and/or the ADC Director the discretion to deviate

12          from timeframes set forth in the ADC's execution procedures regarding issues that

13          are central to the execution process, which include but are not limited to those

14          relating to execution chemicals and dosages, consciousness checks, and access of

15          the press and counsel to the execution itself;

16          (c)     change the quantities or types of chemicals to be used in an

17          execution after a warrant of execution has been sought without first notifying the

18          condemned prisoner and his/her counsel of the intended change, withdrawing the

19          existing warrant of execution, and applying for a new warrant of execution;

20          (d)     select for use in an execution any quantity or type of chemical that

21          is not expressly permitted by the then-current, published execution procedures;

22          (e)     fail to provide upon request, within ten calendar days after the State

23          of Arizona seeks a warrant of execution, a quantitative analysis of any

24          compounded or non-compounded chemical to be used in an execution that reveals,

25          at a minimum, the identity and concentration of the compounded or non-

26          compounded chemicals;

27          (f)     use or select for use in an execution any chemicals that have an

28          expiration or beyond-use date that is before the date that an execution is to be

- 2 -

1   carried out; or use or select for use in an execution any chemicals that have an
2   expiration or beyond-use date listed only as a month and year that is before the
3   month in which the execution is to be carried out;

4       (g)   adopt or use any lethal-injection protocol that uses a paralytic
5   (including but not limited to vecuronium bromide, pancuronium bromide, and
6   rocuronium bromide); or

7       (h)   adopt any provision in any future version of the ADC's execution
8   procedures that purports to permit prisoners or their agents to purchase and/or
9   supply chemicals for use in the prisoner's own execution; then

10  Claims Six and Seven shall be reinstated and reopened pursuant to Rule 60(b)(6) of the
11  Federal Rules of Civil Procedure, and, based on the agreement and consent of the parties
12  granted in their concurrently filed Stipulated Settlement Agreement, an injunction shall
13  immediately issue in this action or in a separate action for   breach   of   the   parties'
14  Stipulated Settlement Agreement, permanently enjoining   Defendants,   Defendants'
15  successors, and the ADC from engaging in any of the   Prohibited Conduct.

16      (3)   Plaintiffs shall not be awarded attorneys' fees or costs incurred in litigating
17  Claims Six and Seven unless Defendants, Defendants' successors, or the ADC breach the
18  parties' Stipulated Settlement Agreement, in which case Plaintiffs shall be entitled to an
19  award, either in this action or in a separate action for breach of the parties' Stipulated
20  Settlement Agreement, of their reasonable attorneys' fees and costs incurred in litigating
21  this action from its inception through the date of this Order (which currently are in excess
22  of $2,630,000), as determined by the Court after briefing by the parties. In that
23  circumstance, Plaintiffs shall also be entitled to seek to collect their reasonable attorneys'
24  fees and costs incurred in moving to enforce the parties' Stipulated Settlement Agreement
25  and this Order.

26      (4)   The stay order (Doc. 68) entered November 24, 2014, is vacated.

27

28

- 3 -

1    With the entry of this Order, all claims of all parties have been disposed of.  The
2    Clerk shall terminate this case.
3        Dated: June 22, 2017.
4
5                                          _____
6                                              Honorable Neil V. Wake
                                          Senior United States District Judge
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit 9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Clarence Wayne Dixon,

                Petitioner,

v.

Arizona Department of Corrections Rehabilitation and Reentry, et al.,

                Respondents.

No. CV-22-00743-PHX-DJH (JFM)

**ORDER**

In this civil rights action, Plaintiff Clarence Dixon challenges ADCRR's failure to provide Beyond Use Date information for the compounded pentobarbital the State intends to use to execute him next Wednesday, May 11, 2022. Plaintiff filed an Emergency Motion for Temporary Restraining Order or Preliminary Injunction to compel that information or stay his execution (Doc. 5).

Defendants filed a Motion to Dismiss and a Response indicating it had provided the information Plaintiff requested (Doc. 9). Defendants attached a redacted laboratory report reflecting various testing of compounded pentobarbital which, according to Defendants, includes "what facially is a BUD." Plaintiff disputes that the information provided is responsive to his request for confirmation that the State plans to execute him with unexpired pentobarbital (Doc. 11).

Upon review of the laboratory report, the Court will direct Defendants to file a supplemental Notice as reflected herein.

The Notice must state the Beyond Use Date for the compounded pentobarbital the

State intends to use to execute Plaintiff next Wednesday, May 11, 2022. If unable to provide that specific information, the Notice must explain to the Court why the State is unable to provide such information. To the extent that the State needs additional certification from the compounding pharmacist to establish the BUD, the Court will allow them to obtain that additional certification, but the Notice must explain: 1) exactly how it intends to obtain any additional testing or certification and 2) when it will be provided to Plaintiff and to the Court.

Because of the obvious time constraints, the Court will set this matter for a status conference tomorrow, Saturday May 7, 2022 at 11.30 a.m. to discuss any issues relating to the State's forthcoming notice.

**IT IS ORDERED:**

(1)     Before midnight on May 6, 2022, Defendants must file a Notice as described herein.

(2)     This matter is set for a Telephonic Status Conference tomorrow, **Saturday May 7, 2022 at 11.30 a.m.** to discuss any issues relating to the State's forthcoming notice. The Court will email the parties dial-in instructions.

Dated this 6th day of May, 2022.

Honorable Diane J. Humetewa
United States District Judge

- 2 -

Exhibit 10

# EXHIBIT 1

I, ███████████ hereby declare as follows:

1. I am over 18 years of age and would testify to the following based on my first-hand knowledge.

2. I am a licensed pharmacist in the State of Arizona.

3. As a licensed pharmacist in the State of Arizona, I am aware of and follow the guidelines and requirements found in the United States Pharmacopeia.

4. I have prior experience in properly preparing compounded sterile preparations.

5. I prepared a sodium pentobarbital solution using my training and experience as a licensed pharmacist.

6. I had the prepared sodium pentobarbital solution provided to a FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date. (See Attachments 1-3).

7. These test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing. (See Attachment 3).

8. On February 26, 2022, I prepared a sodium pentobarbital solution from the same sodium pentobarbital powder that was used for the stability study.

9. Based on the stability study test results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022.

DATED this 5th day of May, 2022.

████████████████████

# ATTACHMENT  1



# Certificate of Analysis

**CLIENT :**

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**FORMULATION ID :**

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.5% (49.2302mg / 1mL) | 12/28/2021 |

Notes

Assay: The referenced method (AMIN-2089) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 90 of testing at pre-defined timepoints.



01/04/2022

Date

# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1%<br>(49.0310mg / 1mL) | 01/27/2022 |

Notes

Assay: The referenced method (AMIN        used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 120 of testing at pre-defined timepoints.

02/03/2022
_____

Date

# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0497mg / 1mL) | 03/02/2022 |

Notes

Time = Day 150 of testing at pre-defined timepoints.

Assay: The referenced method (AMIN) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

03/08/2022
_____
Date

# ATTACHMENT  2



# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Endotoxin | USP <85> | NMT 0.7 EU / mg | <0.2 EU / mg | 03/24/2022 |
| Sterility - (PRELIMINARY) | USP <71> | Sterile | No Growth at 5 Days | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.



03/28/2022

Date



# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| pH | USP <791> | Report Value | 10.6 | 03/24/2022 |
| Assay - Pentobarbital Sodium |  | 92.0% - 108.0% | 100.3% (50.1515mg / 1mL) | 03/28/2022 |

Notes

Assay: The referenced method ▮▮▮▮▮▮ used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 180 of testing at pre-defined timepoints.



04/04/2022
_____
Date



# Certificate of Analysis



**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Sterility - (FINAL) | USP <71> | Sterile | Sterile | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.



04/06/2022

Date



# Certificate of Analysis

**DESCRIPTION :** Pentobarbital Sodium 50 mg/ml

**DATE RECEIVED :** 04/12/2022
**STORAGE :** 20°C to 25°C

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC | 90.0% - 110.0% | 98.2% (49.0968mg / 1mL) | 04/13/2022 |

Notes

The potency method(s) used for testing passed system suitability requirements per ▮▮▮▮▮▮▮ or non-cGMP analysis. Product specific method validation is not available for this sample and specification(s) are for informational purposes only. Client should verify the specification and analyte reported are correct for the compounded formulation.



04/13/2022
_____

Date

# ATTACHMENT  3



# STABILITY STUDY SUMMARY REPORT: PENTOBARBITAL

## PROJECT SUMMARY AND RESULTS

| Sample Description | Stability-Pentobarbital Sodium 50 mg/mL | | |
|---|---|---|---|
| Concentration | 50 mg/mL, Pentobarbital Sodium | | |
| Formulation ID | 4015 | Dosage Form | Parenteral (IV) |
| Storage Condition | 25°C ± 2°C/ 60%RH | Lot Number | 39702 |
| Container Description | 30 mL amber vial w/ 20 mL fill | | |

| Attribute | Methods | Specification (Description) | Initial (T0) ARL# 785881 | T90 D ARL# 786008 | T120 D ARL# 786023 | T150 D ARL# 818437 | T180 D ARL# 786025 |
|---|---|---|---|---|---|---|---|
| pH | USP ‹791› | Report Value | NT | NT | NT | NT | 10.6 |
| Sterility | USP ‹71› | Sterile | Sterile | Sterile | NT | NT | Sterile |
| Endotoxin | USP ‹85› | NMT 0.7 EU/mg | <0.2 EU/mg | <0.2 EU/mg | NT | NT | <0.2 EU/mg |
| Pentobarbital Sodium Assay | AMIN-2089 | % of Label (92.0-108.0%) | 96.4% | 98.5% | 98.1% | 98.1% | 100.3% |
| Assay Date Tested | - | - | 09/29/2021 | 12/28/2021 | 01/27/2022 | 03/02/2022 | 03/28/2022 |

## CONCLUSION

Physical and chemical data of Pentobarbital Sodium has demonstrated that Pentobarbital Sodium in the present formula and packaging met client provided specifications through 180 days in ambient storage conditions.

Exhibit 11

MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

JEFFREY L. SPARKS (STATE BAR NO. 027536)
GINGER JARVIS (STATE BAR NO. 014887)
JASON EASTERDAY (STATE BAR NO. 023191)
ASSISTANT ATTORNEYS GENERAL

CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 542-4686
CLDOCKET@AZAG.GOV
ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Clarence Wayne Dixon,<br><br>                              Plaintiff,<br><br>     -v-<br><br>Arizona Department of<br>Corrections, Rehabilitation &<br>Reentry, et al.,<br><br>                              Defendants. | CV 22–00743–PHX–DJH (JFM)<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER**<br><br>**HEARING SET FOR 5/9/2022 AT 11:00 A.M.** |

Plaintiff Clarence Dixon is scheduled to be executed on May 11, 2022 for his conviction of the 1978 first degree murder of 21-year-old Arizona State University student Deana Bowdoin. *See State v. Dixon*, 250 P.3d 1174 (Ariz. 2011). He seeks to enjoin the State from carrying out his lawfully-imposed sentence solely on the basis that, as part of testing performed to establish a beyond use date for the compounded pentobarbital to be used in his execution, a pH test resulted in a value of 10.6, rather than 9.0–10.5. But Dixon has failed to demonstrate a substantial likelihood of success on the merits of his Eighth and Fourteenth Amendment claims based on this fact, and the other relevant factors also weigh against a stay. This Court should therefore deny Dixon's request for temporary restraining order or preliminary injunction.

**PROCEDURAL BACKGROUND**

Plaintiff is scheduled to be executed on May 11, 2022, for his conviction of the 1978 first degree murder of 21-year-old Arizona State University student Deana Bowdoin.  *See State v. Dixon*, 250 P.3d 1174 (Ariz. 2011).  Scant days before his execution, Dixon filed a Complaint asserting a First Amendment and Due Process right to information regarding the beyond use date ("BUD") of the compounded pentobarbital Defendants intend to use in his execution.  Dkt. # 1.  He also asked this Court to enjoin Defendants from executing him until they provided the requested information.  Dkt. # 5.  On May 6, 2022, this Court ordered Defendants to file a notice stating the BUD for the compounded pentobarbital to be used in Dixon's execution.  Dkt. # 12.  Defendants did so, filing a Notice stating that the BUD of the compounded pentobarbital to be used in Dixon's execution was August 25, 2022.  Dkt. # 14.  Defendants also provided a declaration from the pharmacist who compounded the pentobarbital stating that the BUD was August 25, 2022, based on stability testing of a preparation of pentobarbital from the same original powder as the preparation to be used in Dixon's execution.  *See* Dkt. # 14, Exhibit 1.

This Court held a hearing on May 7, 2022, at which it granted Defendants' motion to dismiss the complaint as moot because "Plaintiff has been provided the information he requested" and, additionally, because his First Amendment claim was foreclosed by *First Amendment Coalition of Arizona v. Ryan*, 938 F.3d 1069, 1080 (9th Cir. 2019).  Dkt. # 16.  At the hearing Dixon indicated he would likely amend his complaint to raise additional claims related to use of the compounded pentobarbital with the BUD of August 25, 2022.  *Id.*

On May 8, 2022, Dixon filed an Amended Complaint asserting a violation of the Eighth and Fourteenth Amendments premised on the unsupported conclusion that the compounded pentobarbital to be used in his execution will be expired. Dkt. # 21-1.  He also asked for a preliminary injunction or temporary restraining order

1    enjoining Defendants from executing him with an expired drug.  Dkt. # 23.  The

2    entire premise of Dixon's claims and request for emergency injunctive relief is

3    wholly unsupported.  The beyond use date of the drug to be used in his execution is

4    August 25, 2022.  His request for injunctive relief should be denied.

5                    **LEGAL STANDARD FOR INJUNCTIVE RELIEF**

6            Finally, a plaintiff seeking a preliminary injunction or TRO must establish

7    that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable

8    harm without an injunction, (3) the balance of equities tips in his favor, and (4) an

9    injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.

10   7, 20 (2008).  "Speculative injury does not constitute irreparable injury."  *Goldie's*

11   *Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir.

12   1984) (citation omitted).   And a preliminary injunction is "'an extraordinary

13   remedy that may only be awarded upon a clear showing that the plaintiff is entitled

14   to such relief.'"  *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1312 (9th

15   Cir. 2015).   These principles apply "even in the context of an impending

16   execution."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012); *see also Hill v.*

17   *McDonough,* 547 U.S. 573, 583–84 (2006) ("Filing an action that can proceed

18   under § 1983 does not entitle the complainant to an order staying an execution as a

19   matter of course.").

20           Finally, if this Court grants injunctive relief, Defendants request that this

21   Court grant Plaintiff a preliminary injunction rather than a temporary restraining

22   order.   Unlike an order granting a preliminary injunction, an order granting a

23   temporary restraining order ordinarily is not an appealable order.  *SEIU v. Nat'l*

24   *Union of Healthcare Workers,* 598 F.3d 1060, 1067 (9th Cir. 2010).  Since Dixon's

25   execution is scheduled for May 11, a temporary restraining order would serve to

26   vacate the Arizona Supreme Court's warrant of execution without providing an

27   appealable order to the State.  A preliminary injunction, in contrast, would preserve

28   Defendants' ability to seek appellate review of any grant of injunctive relief.

## THIS COURT SHOULD DENY INJUNCTIVE RELIEF

Dixon's request for a preliminary injunction or TRO should be denied because he cannot demonstrate that the *Winter* factors favor granting him preliminary relief.

### I.    *Dixon cannot show a reasonable likelihood of success on the merits.*

First, Dixon has failed to show a reasonable likelihood of success on the merits of his Eighth or Fourteenth Amendment claims.

### A. Dixon's Eighth Amendment claim fails.

To succeed on an Eighth Amendment method-of-execution claim, a prisoner must establish that the method presents a risk that is "sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008)) (cleaned up). And for the prisoner to prevail, "there must be a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Id.* (quoting *Baze*, 553 U.S. at 50) (cleaned up). Moreover, a prisoner cannot succeed on a method-of-execution challenge "merely by showing a slightly or marginally safer alternative." *Id.* (quoting 553 U.S. at 51). A prisoner has the burden of identifying an "alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Id.* (quoting 553 U.S. at 52) (cleaned up). This is likewise true for an as-applied method-of-execution challenge. *See Bucklew v. Precythe*, 587 U.S. ___, ___, 139 S. Ct. 1112, 1126 (2019) ("identifying an available alternative is a requirement of *all* Eighth Amendment method-of-execution claims alleging cruel pain) (cleaned up, emphasis in original). As the Supreme Court has recently reiterated, pentobarbital, which will be used in Dixon's execution is "widely conceded to be able to render a person fully insensate and does not carry the risks of pain that some have associated with other lethal injection protocols." *Barr v.*

*Lee*, 140 S. Ct. 2590, 2591 (2020) (cleaned up).

Finally, the Supreme Court has cautioned that "challenges to lethal injection protocols test the boundaries of the authority and competency of federal courts" and thus the federal courts "should not embroil themselves in ongoing scientific controversies beyond their expertise." *Glossip*, 576 U.S. at 882 (quoting *Baze*, 553 U.S. at 51) (cleaned up). Thus, in his challenge to ADCRR's protocol, Dixon bears the burden to show, based on evidence presented, that there is a "substantial risk of severe pain" in the pentobarbital execution procedure scheduled for later this week. *Id.*

Dixon has presented no evidence to justify a stay of execution and has not shown a reasonable likelihood that he can meet his burden under *Glossip* to show that the pentobarbital to be used on May 11 is "sure or very likely to cause serious illness and needless suffering and give rise to sufficiently imminent dangers." Dixon's Eighth Amendment Claim is premised on the unsupported conclusion that the compounded pentobarbital is expired. Dkt. # 23, at 6, 11–12. Dixon argues that because the Summary Report indicates that the pH of the tested pentobarbital was 10.6, which is 0.1 beyond the stated range of 9.0 to 10.5, the drug "failed this test" and therefore the BUD of the compounded pentobarbital to be used in his execution cannot extend past 45 days. Dkt. # 6. As a result, he contends, by using the compounded pentobarbital prepared on February 26, 2022, in his execution, Defendants will violate the execution protocol's requirement that they "will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that the execution is carried out." Dkt. # 9–1, Exhibit 1, at Attachment D, ¶ A.1.I. But, importantly, Dixon has presented no evidence that a particular pH test result of .1 beyond the stated range precludes the pharmacist from extending the BUD, as the pharmacist did.

In support of his argument that the 10.6 pH result means that compounded pentobarbital's BUD cannot be extended, Dixon points to his expert's statement

1   that, in addition to potency, "[t]here are other parameters such as pH … that need

2   to be also included … in order to offer a complete and accurate picture of the drug

3   quality and provide assurance that the medication will perform as expected." Dkt.

4   # 21-3, ¶ 24. And although Dixon's expert states in a different report that

5   pentobarbital "should" be tested for "pH: 9.0-10.5," Dkt. # 21-2, ¶ 31, Dixon has

6   presented no evidence stating that a pH result of 10.6 automatically precludes

7   extension of the BUD beyond 45 days. Moreover, the United States

8   Pharmacopeia, 22 General Chapter <797> Pharmaceutical Compounding-Sterile

9   Preparations," does not state that a pH test is required to extend a BUD beyond 45

10  days. *See* USP 23 <797> at "STORAGE AND BEYOND-USE DATING." Dixon

11  therefore cannot establish a reasonable likelihood of success on the merits of his

12  Eighth Amendment claim because he has failed to demonstrate that the

13  pentobarbital is expired.

14      Even if Dixon could show that the pentobarbital will be "expired" due to the

15  pH test result, he still has no plausible Eighth Amendment claim. To obtain a stay,

16  Dixon must show a substantial likelihood that he can establish that the

17  compounded pentobarbital to be used in his execution creates a substantial risk of

18  severe pain. *Glossip*, 576 U.S. at 877. He has not done so. Nothing Dixon has

19  presented establishes that the compounded pentobarbital is degraded, unstable, or

20  ineffective, much less that it will "cruelly superadd[] pain to the death sentence."

21  *Bucklew*, 139 S. Ct. at 1125. As shown in the Stability Study Summary, the testing

22  results show that the pentobarbital solution is sterile and within the assay

23  parameters. See Dkt. # 14–1, Exhibit 1, Attachment 3. As for pH, Dixon has not

24  presented any evidence that the additional 0.1 value will cause any pain, much less

25  the "serious illness and needless suffering" required to establish an Eighth

26  Amendment claim. And his reference to his age and declining health simply

27  speculates that the pentobarbital may take longer to work, *see* Dkt. # 23, at 11–12,

28  which does not approach the threshold for an Eighth Amendment claim to establish

6

a substantial risk of serious harm.  There is no Eighth Amendment claim here, and Dixon's request to stay his execution should be denied.

**B. Dixon does not have a due process liberty interest in ADCRR Department Order 710 ("DO 710") and even if he does, it will not be violated.**

Dixon claims that he has a due process liberty interest created by ADCRR DO 710's requirement that no drug will be used in an execution that is past its BUD.  Dkt. # 23, at 8–11.  Dixon does not possess such a liberty interest, and in the alternative, even if he does it will not be violated because the compounded pentobarbital to be used in his execution is not expired.

*1. DO 710 does not create a liberty interest under the 14th Amendment.*

The Fourteenth Amendment prohibits a State from depriving any person of "life, liberty, or property, without due process of law;…" U.S. Const. amend. XIV, § 1. "To create a liberty interest, a statute or regulation must contain 'explicitly mandatory language,' *i.e.,* specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Rodriguez v. McLoughlin*, 214 F.3d 328, 338 (2d Cir. 2000) (quoting *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)).  Moreover,

> It should be obvious that the mandatory language requirement is not an invitation to courts to search regulations for *any* imperative that might be found.  The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether [the plaintiff] may be deprived of the particular interest in question.

*Thompson*, 490 U.S. at 464 n.4 (emphasis in original).  Also, just because ADCRR "has established procedures to be followed does not mean that it has created a protectable liberty interest." *Rodriguez*, 214 F.3d at 339.  "A liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality." *Olim v. Wakinekona*, 461 U.S. 238, 280 (1983) (alteration omitted) (citing *Shango v. Jurich*, 681 F.2d 1091, 1100–01 (7th Cir. 1982)). "Process is not an end in itself.  Its constitutional purpose is to protect a substantive

1   interest to which the individual has a legitimate claim of entitlement." *Id.*

2          "Where a particular amendment 'provides an explicit textual source of

3   constitutional protection' against a particular sort of government behavior, 'that

4   Amendment, not the more generalized notion of "substantive due process," must

5   be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273

6   (1994) (Rehnquist, C.J., for plurality) (quoting *Graham v. Connor*, 490 U.S. 386,

7   395 (1989)). In other words, "if a constitutional claim is covered by a specific

8   constitutional provision, such as the Fourth or *Eighth Amendment*, the claim must

9   be analyzed under the standard appropriate to that specific provision, not under the

10  rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7

11  (1997) (emphasis added); *see also Hall v. City of Los Angeles*, 697 F.3d 1059,

12  1068 (9th Cir.2012) ("Where a particular Amendment provides an explicit textual

13  source of constitutional protection against a particular sort of government behavior,

14  that Amendment, not the more generalized notion of substantive due process, must

15  be the guide for analyzing such a claim.").

16         Further, "[a] violation of state law does not by itself constitute a violation of

17  the Federal Constitution." *Nordlinger v. Hahn*, 505 U.S. 1, 26 (1992). In *Pavatt v.*

18  *Jones*, 627 F.3d 1336, 1341 (10th Cir. 2010), the court found that a death row

19  inmate failed to establish a substantial likelihood of prevailing on a due process

20  challenge to the state's execution protocol based on the inmate's assertion that the

21  protocol violated state law. In reaching that conclusion, the court noted that there

22  was no indication the state denied the inmate the opportunity to challenge the

23  protocol administratively or in state court. *Id.* Here, Dixon does not even contend

24  that ADCRR's protocol violates state law, only that the protocol (which is not law)

25  will be violated. If an alleged violation of state law did not create a protected

26  liberty interest under the due process clause, then surely an alleged violation of a

27  protocol that is not law cannot.

28         DO 710's requirement to use non-expired drugs does not create a protectable

1    liberty interest because it is merely a procedure to be followed. Dixon's

2    substantive liberty interest is to be executed without violating the Eighth

3    Amendment's prohibition against "cruel and unusual punishment[]." The use of

4    execution drugs within its BUD is merely a procedural safeguard. Dixon, by

5    claiming to have a liberty interest in the drug's BUD, is demanding needless

6    formality which the Supreme Court has found inappropriate. Instead, Dixon's

7    claim must be analyzed under the Eighth Amendment's specific rubric and not

8    under the generalized due process rubric.

9        For example, in *Sepulvado v. Jindal*. 729 F.3d 413 (5th Cir. 2013),

10    Louisiana sought to carry out an execution without disclosing its execution

11    protocol. *Id*. at 415—16. Louisiana, however, disclosed it would use a single dose

12    of pentobarbital. *Id*. Sepulvado joined an existing a 42 U.S. § 1983 suit alleging

13    that failure to disclose the details of the execution protocol violated his Due

14    Process rights under the Fourteenth Amendment. *Id*. "There is no violation of the

15    Due Process Clause from the uncertainty that Louisiana has imposed on Sepulvado

16    by withholding the details of its execution protocol." *Id*. at 420. Thus, if a state

17    may withhold its execution protocols in conformity with Due Process Clause, the

18    fact of disclosing the protocols to explain the procedures cannot create such a due

19    process right.

20        In the alternative, even if Dixon could establish a due process liberty interest

21    in assuring that his execution is carried out consistent with the execution protocol,

22    Department Order 710, and the Eighth Amendment, he has not alleged a plausible

23    violation of that interest. First, Dixon points to no authority for the idea that he

24    possesses a procedural right to challenge the BUD provided by Defendants.

25    Defendants' execution procedures do not purport to create any such right, and

26    Dixon cites no constitutional provision, statute, or case law supporting such a right.

27    By comparison, if Defendants were using a manufactured drug for Dixon's

28    execution with a manufacturer's expiration date on the label, Dixon would not be

1   entitled to obtain information documenting how the manufacturer arrived at a

2   particular expiration date in order to dispute its accuracy.  The same is true here.

3   Although Defendants' execution protocol makes clear they will not use any drug

4   that is past its BUD, it purports to create no procedural right to challenge an

5   expiration date or BUD assigned to the drug that will be used in an execution.

6   Second, as explained above, Dixon has failed to establish that the August 25,

7   2022, BUD certified by ADCRR's pharmacist is invalid based on the pH test

8   result.  The fact that Defendants' pharmacist apparently requested more testing

9   than is necessary to determine the BUD does not then turn that additional testing

10  into a requirement.  The test results show that there no risks of "sub-potency" or

11  "degradation," Dkt. # 23, at 11, because the Pentobarbital Sodium Assay test

12  results showed that the compounded pentobarbital fell within the 92.0–108.0%

13  requirements up to 180 days from initial testing.  Dkt. # 14–1, Exhibit 1,

14  Attachment 3 (Stability Study Summary Report).

15  The fact remains that, based on the Stability Study Summary Report, the

16  FDA-registered testing laboratory concluded that the compounded pentobarbital

17  "met client provided specifications through 180 days in ambient storage

18  conditions." *Id.*  And, based on those same results, the licensed pharmacist, who is

19  "aware of and follow[s] the guidelines and requirements found in the United States

20  Pharmacopeia," concluded that the BUD of the compounded pentobarbital

21  prepared on February 26, 2022 was August 25, 2022, 180 days from its

22  preparation.  *Id.* at Exhibit 1, ¶¶ 2–3, 9.  If extending the BUD required that the pH

23  test results fell between 9.0 and 10.5, then neither the lab nor the pharmacist would

24  have reached the conclusions they did.

25  Dixon's attempt to invalidate the BUD stated in the pharmacist's declaration

26  thus fails.  As a result, even if Dixon could establish a due process liberty interest

27  in Defendants' not violating their execution protocol (which he cannot), Dixon

28  nevertheless cannot establish a reasonable likelihood of success on the merits of

10

1   his due process claim because he has failed to allege facts suggesting that any
2   violation will occur.

3       **II.    *Dixon will not suffer irreparable harm.***

4       Nor do Dixon's unsupported conclusions meet his burden to establish to
5   establish *Winter's* second factor, that he will suffer irreparable harm absent an
6   injunction.  To meet the "irreparable harm" requirement, Plaintiff must do more
7   than simply allege imminent harm; he must demonstrate it. *Caribbean Marine*
8   *Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).  Mere
9   "[s]peculative injury does not constitute irreparable injury sufficient to warrant
10  granting a preliminary injunction." *Id*. at 674-75.  The party seeking preliminary
11  relief may not rely on "unsupported and conclusory statements regarding harm [it]
12  might suffer" to justify its requested relief. *Herb Reed Enters., LLC v. Fla. Entm't*
13  *Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

14      Defendants have established that the compounded pentobarbital to be used
15  in Dixon's execution has a BUD of August 25, 2022, well after his scheduled
16  execution date.  Thus, Defendants are in compliance with the requirement that they
17  not use a drug past its BUD, and Dixon will suffer no harm if his request for
18  preliminary injunction is denied.  "Absent a showing of irreparable harm,
19  Plaintiff's Motion for Preliminary Injunction fails as a matter of law." *Center for*
20  *Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

21      **III.   *The balance of equities and public interest do not favor an***
        ***injunction.***

22      Finally, Dixon also fails to establish that the third and fourth *Winter* factors,
23  balance of the equities and public interest, weigh in favor of a stay of execution.
24  The Supreme Court has recognized that a stay of execution "is not available as a
25  matter of right, and equity must be sensitive to the State's strong interest in
26  enforcing its criminal judgments without undue interference from the federal
27  courts." *Hill*, 547 U.S. at 584.  Regarding the equities, "[a] court considering a
28  stay must also apply 'a strong equitable presumption against the grant of a stay

11

1  where a claim could have been brought at such a time as to allow consideration of

2  the merits without requiring entry of a stay.'" *Id.* (quoting *Nelson v. Campbell*,

3  541 U.S. 637, 650 (2004)).   Dixon waited to file his lawsuit regarding the

4  compounded pentobarbital's BUD until only days remained before his scheduled

5  execution, and amended his complaint to include the current claims a mere *3* days

6  before his execution.  Although he claims he diligently sought the requested BUD

7  information from ADCRR, he could have brought his claim at an earlier time in

8  order to allow consideration without necessitating a stay of his lawfully imposed

9  death sentence and scheduled execution. *See Rhines v. Weber*, 544 U.S. 269, 277–

10 78 (2005) (Court recognizing that "capital [habeas] petitioners might deliberately

11 engage in dilatory tactics to prolong their incarceration and avoid execution of the

12 sentence of death").   This equitable consideration should weigh strongly against

13 granting his request for a stay. *See Hill*, 547 U.S. at 584.

14     The Supreme Court has also long recognized a "State's *significant interest* in

15 enforcing its criminal judgments." *Nelson*, 541 U.S. at 650 (emphasis added).

16 And both the State and the victims of crime have an important interest in timely

17 enforcement of a criminal sentence. *Hill*, 547 U.S. at 584; *see also Nelson*, 541

18 U.S. at 644 ("a State retains a significant interest in meting out a sentence of death

19 in a timely fashion").   Similarly, "any time a State is enjoined by a court from

20 effectuating statutes enacted by representatives of its people, it suffers a form

21 of *irreparable injury*." *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3, 183

22 L.Ed.2d 667 (2012) (Roberts, C.J., in chambers) (emphasis added) (alterations and

23 citation omitted).  Here, Dixon's conviction and death sentence are long final on

24 direct appeal, and he has exhausted his state post-conviction and federal habeas

25 corpus remedies.  Under those circumstances, A.R.S. § 13-759(A) provides for the

26 lawful carrying out of executions, stating that a warrant of execution shall be

27 issued with the execution occurring on the 35th day following the issuance of the

28 warrant.  Plaintiff's request for a TRO or preliminary injunction seeks to prevent

that from occurring—thereby enjoining Arizona law from being effectuated. Additionally, Arizona crime victims have a constitutional right to a prompt and final conclusion of the case. *See* Ariz. Const. art. II, § 2.1(10). Justice for Dixon's victims has been delayed far too long already.

"The federal courts can and should protect States from dilatory or speculative suits." *Hill*, 547 U.S. at 585. Dixon has failed to establish a likelihood of success on the merits. There is no risk irreparable harm because the drug used in his execution will be within its BUD. And given his last-minute filing and the State's considerable interest in timely carrying out lawful sentences, the balance of equities and public policy weigh against a stay of execution. Because Dixon fails to establish that the relevant factors weigh in favor of a stay, his request for a TRO or preliminary injunction should be denied. *Winter*, 555 U.S. at 20.

### IF THIS COURT ENTERS AN INJUNCTION, IT SHOULD ALLOW DEFENDANTS TO CARRY OUT DIXON'S EXECUTION WITH NEWLY COMPOUNDED PENTOBARBITAL THAT IS WITHIN A BUD THAT DOES NOT REQUIRE STABILITY TESTING

The basis for Dixon's request for injunctive relief is his argument that the pentobarbital prepared on February 26, 2022, to be used in his execution is expired. He contends that the stability study disclosed by Defendants "cannot be used to extend the BUD beyond 45 days, the outer limits set by pharmacy compounding standards." Dkt. # 23, at 2. Thus, he asserts, the pentobarbital prepared on February 26, 2022, is expired, and he asks this Court to enjoin Defendants from executing him using it. If this Court grants the injunctive relief Dixon requests, the constitutional violations he has pled would be remedied by executing him on May 11, 2022, with newly compounded pentobarbital that will not be past its BUD on the date of execution. Thus, an order granting an injunction should allow ADCRR to overcome the injunction and proceed with Dixon's execution using newly-compounded pentobarbital that is within a BUD that has not been extended by stability testing. Indeed, Dixon concedes that using "a drug that

13

1   will not be expired on the date of his execution" is a "known and available
2   alternative" to using the pentobarbital compounded on February 26, 2022. Dkt. #
3   23, at 12.

4        ADCRR is prepared, in the event this Court grants an injunction, to have a
5   new preparation of pentobarbital compounded on May 9, 2022, and stored under
6   refrigeration, for use in the execution on May 11, 2022. As a result, any injunction
7   entered by this Court should state that Defendants may proceed with Dixon's 10:00
8   a.m., May 11, 2022, execution if it uses pentobarbital that was prepared no less
9   than 72 days prior to that date and time and kept refrigerated. ADCRR is also
10  prepared to provide potency testing results of such newly compounded
11  pentobarbital approximately 24 hours prior to the actual time of execution.
12  Dixon's expert admits that according to USP Chapter 797, without any stability
13  testing, a pentobarbital solution that is "kept refrigerated" has a BUD of 72 hours.
14  Dkt. # 21–2, ¶ 10. Accordingly, pentobarbital prepared on May 9, 2022, and kept
15  refrigerated, would have a BUD of the time of preparation on May 12, 2022, the
16  day *after* Dixon's execution. Thus, any injunction against executing Dixon with
17  the pentobarbital compounded on February 26, 2022, should allow ADCRR to
18  execute Dixon with pentobarbital compounded on May 9, 2022, and kept under
19  refrigeration. Dixon cannot object to this course of action because he himself
20  suggests it as a viable alternative. In other words, if the Court finds that Dixon has
21  met his burden for a TRO or preliminary injunction, this Court should not stay
22  Dixon's execution altogether, but should only determine whether ADCRR can use
23  the pentobarbital prepared on February 26, 2022, and permit ADCRR to proceed
24  using Dixon's own identified alternative of pentobarbital that is within its beyond
25  use date.

26
27
28

**IV.    *Conclusion.***

Based on the foregoing, Defendants' respectfully request that this Court deny Dixon's request for a preliminary injunction or temporary restraining order against Defendants carrying out his scheduled execution.

Respectfully submitted this 8th day of May, 2022.

Mark Brnovich
Attorney General


s/ Jeffrey Sparks____
Chief Counsel

Ginger Jarvis
Jason Easterday
Assistant Attorneys General
Attorneys for Defendants

# CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document using ECF on the following registered participants of the ECF System:

Jennifer M. Moreno
Therese M. Day
Amanda C. Bass
Jennifer_moreno@fd.org
Therese_day@fd.org
Amanda_bass@fd.org

*Attorneys for Plaintiff*

Liz Gallagher

SKRAUSOG0DYCQ2

Exhibit 12

JON M. SANDS
FEDERAL PUBLIC DEFENDER
DISTRICT OF ARIZONA
JENNIFER M. MORENO (CA BAR NO. 244967)
THERESE M. DAY (GA BAR NO. 213810)
AMANDA C. BASS (AL BAR NO. 1008H16R)
Assistant Federal Public Defenders
850 WEST ADAMS STREET, SUITE 201
PHOENIX, ARIZONA 85007
JENNIFER_MORENO@FD.ORG
THERESE_DAY@FD.ORG
AMANDA_BASS@FD.ORG
602.382.2718 TELEPHONE
602.382.2800 FACSIMILE
COUNSEL FOR PLAINTIFF

MARK BRNOVICH
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)
JEFFREY L. SPARKS (STATE BAR NO. 027536)
GINGER JARVIS (STATE BAR NO. 014887)
JASON EASTERDAY (STATE BAR NO. 023191)
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
2005 N. CENTRAL AVENUE
PHOENIX, ARIZONA 85004
TELEPHONE: (602) 542-4686
CLDOCKET@AZAG.GOV
ATTORNEYS FOR DEFENDANTS

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Clarence Wayne Dixon,<br><br>                    Plaintiff,<br><br>        -v-<br><br>Arizona Department of Corrections, Rehabilitation & Reentry, et al.,<br>                    Defendants. | CV 22–00743–PHX–DJH<br><br><br>**STIPULATED SETTLEMENT AGREEMENT AND [PROPOSED] ORDER** |

Plaintiff Clarence Wayne Dixon ("Plaintiff") and Defendants the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR"); David Shinn, Director of the ADCRR; James Kimble, Warden, ASPC – Eyman; (collectively, "Defendants") hereby stipulate and agree as follows:

**WHEREAS**, on January 5, 2022, the State of Arizona moved the Arizona Supreme Court to set a briefing schedule on its anticipated motion for a warrant of execution for Plaintiff. *See* Motion to Set Briefing Schedule for Motion for Warrant of Execution, *State of Arizona v. Clarence Wayne Dixon*, No. CR–08–0025–AP (Ariz. Jan. 5, 2022);

**WHEREAS**, on February 9, 2022, the Arizona Supreme Court granted the State's motion and set a briefing schedule on the warrant for Plaintiff's execution that concluded on March 31, 2022. Order, *State of Arizona v. Clarence Wayne Dixon*, No. CR–08–0025–AP (Ariz. Feb. 9, 2022);

**WHEREAS**, on April 5, 2022, the Arizona Supreme Court issued a warrant of execution for Plaintiff, and his execution is scheduled to occur on May 11, 2022;

**WHEREAS**, on May 3, 2022, Plaintiff filed in the United States District Court for the District of Arizona a 42 U.S.C. § 1983 civil action against Defendants, *Dixon v. ADCRR, et al.*, No. CV-22-00743-PHX-DJH (JFM), asserting claims for violations of the First and Fourteenth Amendments to the United States Constitution;

**WHEREAS**, on May 4, 2022, Plaintiff filed an Emergency Motion for Temporary Restraining Order or Preliminary Injunction requesting that the Court issue an order preventing ADCRR from executing Dixon without proving him the Beyond Use Date ("BUD") of the drug to be used for his execution;

**WHEREAS**, on May 7, 2022, the United States District Court for the District of Arizona held a telephonic status conference and an order granting Defendants' Motion to Dismiss the Complaint;

**WHEREAS**, on May 8, 2022, Dixon filed a new motion for preliminary injunction or temporary restraining order and a First Amended Complaint raising claims for violations of the Eighth and Fourteenth Amendments;

**WHEREAS**, Defendants deny the pentobarbital intended to be used in Plaintiff's execution has exceeded its BUD and opposed Plaintiff's Motion for Preliminary Injunction or Temporary Restraining Order;

**WHEREAS**, in Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction or Temporary Restraining Order (Dkt. 27) Defendants offered to prepare a new solution of compounded pentobarbital on May 9, 2022, stored under refrigeration for use on May 11, 2022. (Dkt. 27, at 14.)

**WHEREAS**, Plaintiff in his Reply in Support of Emergency Motion for Temporary Restraining Order or Preliminary Injunction offered to Defendants the following terms:

a. The compounding pharmacist will compound a new batch of drugs tomorrow [on May 9, 2022], consistent with what was stated in Defendants' Opposition filed this afternoon, May 8, 2022;

b. The pharmacist will provide a declaration (identity redacted) that states the date of compounding and the storage conditions;

c. The result of the 'quantitative' analysis for this batch of drugs will be provided to Plaintiff's counsel before the drug is used to carry out his execution; and

d. This settlement does not constitute a waiver for any other prisoner who faces a future execution date of the entitlement to the "quantitative" analysis within the time frames set forth under the protocol.

**IT IS THEREFORE STIPULATED AND AGREED** that:

1. Defendants shall undertake or cause to be done:

a. The compounding pharmacist has compounded a new batch of pentobarbital on May 9, 2022, consistent with what was stated in Defendants' Opposition, filed May 8, 2022;

b. Defendants will provide Plaintiff declaration(s) from the pharmacist and others (identities redacted) that states the date of compounding and the storage conditions;

c. The result of the "quantitative" analysis for this batch of drugs will be provided to Plaintiff's counsel before the drug is used to carry out his execution; and

d. This settlement does not constitute a waiver for any other prisoner who faces a future execution date of the entitlement to the "quantitative" analysis within the time frames sent forth under the protocol.

2. The parties agree that CV-22-00743-PHX-DJH (JFM) is dismissed with prejudice upon the production of the declaration(s) and test results that meet the requirements of this agreement.

3. This settlement agreement does not violate or trigger any enforcement mechanisms found in *First Amendment Coalition of Arizona, et al. v. Charles Ryan, et al.*, CV–14–01447–NVW (JFM), Dkt. # 186, 187.

**IT IS SO STIPULATED**

Respectfully submitted this 9th day of May, 2022.

Jon M. Sands
Federal Public Defender

Jennifer M. Moreno
Therese M. Day
Amanda C. Bass
Assistant Federal Public Defenders

By: s/Jennifer M. Moreno
Counsel for Plaintiff

Mark Brnovich
Attorney General

Jeffrey Sparks
Ginger Jarvis
Jason Easterday
Assistant Attorneys General

By: s/ Jeffrey Sparks___
Counsel for Defendants

4

# CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022, I electronically transmitted the attached document to the Clerk's Office using the ECF System for filing and served the attached document using ECF on the following registered participants of the ECF System:

Jennifer M. Moreno
Therese M. Day
Amanda C. Bass
jennifer_moreno@fd.org
therese_day@fd.org
amanda_bass@fd.org

*Attorneys for Plaintiff*

s/Liz Gallagher

SPQWNBQS0D19C3

Exhibit 13

Pursuant to 28 U.S.C. § 1746(2).

### Declaration of James H. Ruble, PharmD, JD

I, James H. Ruble, declare as follows:

1. I have supplied several prior declarations in the Arizona Supreme Court in support of Mr. Atwood's litigation beginning in April 2021.

2. As reflected before, I reside in Utah and have been a registered pharmacist in that state since 1992, having earned the degrees of Doctor of Pharmacy, Juris Doctor, Bachelor of Science in Pharmacy, and Bachelor of Science in Biology from the University of Utah, Salt Lake City. I am an assistant dean for student affairs, an associate professor (clinical) in the Department of Pharmacotherapy, adjunct associate professor in the S.J. Quinney College of Law, and an adjunct associate professor in the School of Medicine – Center for Medical Ethics, Arts, and Humanities, in the College of Law, and in the Department of Pharmaceutical Chemistry and Pharmaceutics at the University of Utah.  I am currently president-elect of the American Society for Pharmacy Law. Exhibit A The information in this declaration is based upon my personal knowledge and sources of the type relied upon by researchers in my field.

3. I have compounded non-sterile and sterile pharmaceutical preparations for more than 25 years.   I have experience as a manager of a home infusion compounding pharmacy, including the compounding of high-risk compounded sterile preparations.   I have served as an independent, supervising pharmacist for compounding pharmacies under licensing probation with the State of Utah Division of Occupational and Professional Licensing.

4. I have reviewed recent disclosures from the State of Arizona, including information and testing records submitted in the federal litigation of Mr. Clarence Dixon earlier this month and relating to the attestations of the Department of Corrections' compounding pharmacist, who remains anonymous.

5. In the *Dixon* federal litigation, Mr. Dixon evidenced that the pharmacist's testing had failed and was deficient for establishing an expiry of the pentobarbital later than his scheduled execution date of May 11, 2022. The State responded to that evidence by seeking settlement of the suit by offering to prepare a new batch of pentobarbital approximately 48 hours before the time of execution. Mr. Dixon accepted that resolution, despite the impossibility of

sufficient inquiry to ensure the fitness of the chemicals for use under the Department's Execution Procedures.

6. This extraordinary turn of events transpired on the backdrop of the State having supplied limited information about the steps the Department's pharmacist has taken, which the pharmacist had characterized in their brief declaration dated May 5, 2022, as "stability testing." Exhibit B. The reliability of such "stability testing" is decisive for determining whether the Department's pharmacist can prepare compounded pentobarbital that is adequate for use in lethal injections under the Department's Execution Procedures.

7. Critical to this assessment is whether the pharmacist's assertions, along with the laboratory testing documentation the State has disclosed, permit the conclusion that the pharmacist has prepared pentobarbital sodium on or around April 7, 2022, when the State moved for Mr. Atwood's execution warrant, that has a beyond-use date, or "BUD," after his June 8, 2022 execution date.

8. As I have explained before, the BUD of any compounded preparation such as injectable pentobarbital is defined in the United States Pharmacopeia (USP) USP <797> (Chapter 797) as "the date or time after which a [compounded sterile preparation] shall not be stored or transported. The BUD is determined from the date and time the preparation is compounded."

9. BUD is also a defined term under Arizona Administrative Regulations, which govern the conduct of Arizona-licensed pharmacists, and provides:

> A date determined by a pharmacist and placed on a prescription label at the time of dispensing to indicate a time beyond which the contents of the prescription are not recommended to be used; or [a] date determined by a pharmacist and placed on a compounded pharmaceutical product's label at the time of preparation as specified in R4-23-410(B)(3)(d), R4-23-410(I)(6)(e), or R4-23-410(J)(1)(d) to indicate a time beyond which the compounded pharmaceutical product is not recommended to be used.

Ariz. Admin. Code R4-23-410.

10. Given the information made available to this point, the State has failed to compound pentobarbital for use on June 8, 2022, with a BUD after that date. As set forth below, the Department's pharmacist's stability testing results, on their face, failed. Further, the pharmacist has not conducted the testing under the prevailing pharmaceutical standards as enunciated in the USP and related guidance. Thus, the Department lacks a pharmaceutical

and pharmacopeia basis for claiming any BUD beyond the default empiric BUDs established under prevailing industry standards.

11. The USP has established empiric BUDs for high-risk compounded sterile preparations such as pentobarbital. According to USP <797>, for any compounded chemicals that lack reliable stability testing, the following basic BUD values apply: (a) 24 hours, if the product is stored at a controlled room temperature, (b) three days, if the product is refrigerated, and (c) 45 days, if the product is stored in a solid, frozen temperature.

12. Thus, the pentobarbital compounded on or around April 7, 2022 (for Mr. Atwood's execution), most likely exceeded its BUD by April 11, 2022—just three days after it was prepared. In the best-case scenario for the Department, the compounded chemicals were immediately frozen and have been kept frozen solid. Under those conditions, the pentobarbital could have a BUD of 45 days from the preparation date, which would be approximately this Sunday on May 22, 2022.

13. In this declaration I discuss shortfalls reflected both in the laboratory results the State has disclosed and the failings of the Department's pharmacist in satisfying basic stability testing requirements under industrial standards. Further, I address the implications of these inadequacies for Mr. Atwood, especially in the context of the unexpected resolution to the *Dixon* litigation in federal court.

14. The State's disclosures and representations, including those from the Department's pharmacist in their brief affidavit, only superficially address the major considerations for the compounding of the lethal injection chemicals. Before engaging with the limited information the State has supplied to this point, focus belongs on the significant revelations made in the pharmacist's affidavit.

15. The affidavit established that the pharmacist is Arizona-licensed and acknowledges that they "follow the guidelines and requirements found in the United States Pharmacopeia [USP]." Exhibit B at 2.

16. Judging from the laboratory testing documentation that the State has disclosed, which reflects lab methods used for 503A pharmacies, it is apparent that the Department's pharmacist practices within a 503A pharmacy. The 503B class, sometimes referred to as "outsourcing

3

compounding pharmacies", conducts large-scale production of compounded pharmaceuticals and is required to register with the FDA, and adhere to current Good Manufacturing Practices (cGMP) in its compounding practices; accordingly, they "resemble[] drug manufacturing more than … the professional practice of pharmacy."[1]

17. In contrast, a 503A compounder serves to compound for individual patients pursuant to prescription. 503A compounders are not subject to the drug approval process and the rigorous checks and regulatory procedures required under cGMPs.[2] Arizona regulations, however, do require 503A compounders to comply with official compendium requirements.[3] Arizona's official compendium is the latest revision of the United States Pharmacopeia and The National Formulary (USP–NF).[4]

18. Thus, it is obviously the case that any licensed compounding pharmacist working with a 503A pharmacy is obligated to adhere to the USP. While the pharmacist's acknowledgment establishes the proper bases for evaluating the adequacy of the work in compounding pentobarbital for Arizona's lethal injections, the recognition that they must follow the USP's guidance is merely conceding the existence of a fundamental, non-discretionary duty.

19. In 2021, the State sought scheduling for execution warrant motions based on representations attributed to the Department's pharmacist that any prospectively compounded pentobarbital would have an expiry of 90 days from the date of preparation. In June 2021, after the Arizona Supreme Court ordered scheduling for Messrs. Dixon and Atwood, the State returned to the Court to modify the scheduling based on a retraction attributed to the pharmacist indicating that only a 45-day BUD was possible for compounded pentobarbital unless "specialized testing" was conducted on the API. Based on records disclosed in recent months, it appears that the pharmacist embarked on sample testing some time in September 2021.

20. The change in the State's position was a dramatic course correction taken after Mr. Atwood's attorneys repeatedly presented extensive information about the prevailing pharmaceutical standards and the impossibility of the State's claims about the timeframe available to them

---

[1] Ex. 1 at 3, ¶ 13.
[2] 21 C.F.R., part 211.
[3] Ariz. Admin. Code § 4-23-410.
[4] A.R.S. § 32-1901.

for securing an execution date and conducting a lethal injection with compounded chemicals possessing a BUD later than the execution date.

21. Given that the pharmacist is obligated to follow USP requirements, it is important to give attention to the first area of concern in compounding a high-risk sterile preparation such as pentobarbital. Any "specialized testing" the Department's pharmacist may have carried out should begin with their handling of the original materials for the preparation, the active pharmaceutical ingredient, known as "API."

22. I have reviewed a publicly released redacted record of what appears to be an invoice dated October 22, 2020, indicating the Arizona Department of Corrections paying an undisclosed source $1,500,000 for a kilogram, in 1,000 1-gram vials, of pentobarbital sodium salt. Exhibit C. This procurement appears to provide the API the pharmacist has been using to prepare the solution for lethal injections.

23. The essential first step in any high-risk sterile compounding process, especially one in which multiple batches will be prepared from a particular API source, is to ascertain the purity of the API under industry standards. In simple terms, this means laboratory testing to yield a certificate of analysis ("COA"). The complex process for obtaining and evaluating a COA is described in USP <1080> Bulk Pharmaceutical Excipients – Certificate of Analysis.  A COA, provided by the manufacturer of the raw API, is indispensable, first, in establishing that the API is, in fact, what it has been represented to be by the seller. In a situation such as this one where obvious pedigree questions are apparent from the face of the limited available information and underscored by the absence of pertinent otherwise indispensable information, a COA is all the more important. Second, this lab analysis will identify impurities. This initial testing is especially important for that purpose as it is essential to identify the presence of pharmacologically active substances because the presence of such substances, in relation to the API itself, can create pharmacodynamic, and/or pharmacokinetic effects that can impede the pentobarbital's fundamental efficacy when injected.

24. Other essential considerations about the API are the rigorous, environmental storage conditions, which are of great importance given the size of the Department's purchase of the

salt its pharmacist is using for compounding. I am unaware of any disclosure addressing this vital factor for the API or, for that matter, any preparations made from it.

25. The bulk API for pentobarbital is nonsterile, which necessitates adherence to certain aseptic techniques and the verification of same at regular intervals. Sterile compounding of pentobarbital sodium injection must be done in a Direct Compounding Area that has ISO 5 quality airflow within a primary engineering control (e.g., a HEPA-filtered, horizontal laminar airflow workbench) that is located within a clean room that has ISO 7 quality airflow, as well as numerous additional engineering and design features.

26. USP <797> has robust expectations for cleaning and maintenance of the clean room and compounding equipment, as well as quality assurance processes and quality control testing of the equipment for microbial and other non-viable particulate contaminants. Compliance with these USP <797> requirements is mandatory. Nothing has been shared about the Department's pharmacist's compliance with these requirements.   In my experience, this is an area of substantial non-compliance with USP standards by 503A compounding pharmacies.

27. The pharmacist's May 5, 2022 affidavit relies on their shipment of "sodium pentobarbital solution provided to a[n] FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date." Ex. B at 2. However, there has been no description of the steps taken in preparing the solution. Whether the pharmacist used an appropriate methodology or stability protocol to prepare the solution for the eventual lab testing is critical in determining the adequacy of the preparation for purposes of extending the BUD of subsequently prepared compounding.

28. Thus, the assertion that stability testing is conducted by a lab is highly misleading. It is the responsibility of the pharmacist to conduct a stability protocol that culminates in external lab testing of the kind reflected in the limited testing disclosures turned over by the State in these cases. Industry standards dictate establishing a written stability protocol to achieve "specialized testing" sufficient to establish a BUD for subsequently compounded sterile preparations made from the same active and inactive (i.e., excipients, such as propylene glycol and alcohol) ingredients.

29. Such a written plan or protocol specifies and contemporaneously records testing of the API to determine the quality of the chemical and identify impurities. From that foundation, as well

6

as international standards, the methodology should entail preparation of a minimum of three batches and from each batch the provision of multiple samples for laboratory testing. Thus, the preparation of a single test batch is a striking deficiency in the methodology of the Department's pharmacist. Further, sound methodology contemplates enumeration of the tests to be performed on the samples, the testing conditions, the frequency and methodology of testing, the conditions of storage, including temperature and container qualities, and, critically, the specific formulation of the compounded preparation, noting the identity of not only the active ingredient (i.e., the pentobarbital sodium), but the identity of the other ingredients.

30. These criteria can be expected to yield results addressing the meaningful quality concerns for establishing a sound BUD. If sample batching satisfies the basic criteria, the resulting BUD may be transferable to subsequently prepared batches, but only if using identical ingredients and formulation as the sample batches.

31. It is apparent from the pharmacist's claims about the "specialized testing" performed on the single test batch prepared in or around September 2021 that they believed they established a 180-day span for setting a BUD for future compounding from the above-described kilogram of salt.

32. Judging from the pharmacist's opinion expressed in Mr. Dixon's case, it would seem that the State, if forced, would rely on the pharmacist to add 180 days to April 7, 2022, or a date near that day, to yield a BUD for the preparation made for Mr. Atwood's execution date.

33. This would be incorrect for various reasons, some of which are explored below. The first observation, though, is that BUD ascertainment is not retrospective. This is a fact of compounding that the Department's own Execution Procedures recognize in requiring the following:

> Upon receipt of the Warrant of Execution, the Housing Unit 9 Section Leader shall: . . . [e]nsure that complete sets of chemicals are on site, not expired, and immediately available for use. ADC will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that an execution is carried out. If the chemical's expiration or beyond-use date states only a month and year (e.g., "June 2017"), then ADC will not use that chemical after the last day of the month specified.

Attachment D, ¶ A.1.III.

34. On the face of this protocol, the Department is required to receive the compounded chemicals in a manner consistent with basic USP requirements, namely that a BUD has been established at the point of dispensing and that that date has been affixed to the preparation's container itself. This is an unsurprising requirement because it reflects basics under the USP and Arizona's corresponding administrative regulations. *Supra* ¶¶ 8-9.

35. In this context, the failure of the State simply to state *anywhere* the specific BUD for the injectable solution prepared for Mr. Atwood's June 8, 2022, execution defies the most basic conduct required of competent 503A compounding. It leads to an inference that the BUD has not been set out during the preparation of the chemicals.  Thus, the default, empiric BUD assignment for high-risk sterile preparations must apply.   In this circumstance, 24 hours at controlled room temperature, 3 days, at a cold temperature, or 45 days, in a solid frozen state.

36. In the *Dixon* federal litigation, the State asserted that the laboratory records it had disclosed for the September 2021 testing batch established basic stability for that test batch and, what is more, that from the 180-day BUD it claimed from that single batch's testing it could also extrapolate that 180-day BUD for *all future batches from the API salt*.

37. First, the testing results for that single batch reflect that it failed. The test batch was unusable as medicine or in an execution.

38. This failure underscores the above-mentioned fundamental standard for stability testing that multiple batches, no fewer than three, should be prepared for yielding multiple testing samples for each of the batches. From that array of preparations and samples, reliable data can arise. *Supra* ¶ 29.

39. Instead, the Department's pharmacist attempted a single testing batch and that batch simply did not satisfy the enumerated criteria under USP guidelines. As a result, the pharmacist is unable to selectively use lab results on the batch's potency to conjure a BUD *and then apply that BUD to all future batches from the same API salt*. But that is what this pharmacist has attempted to do.

40. Specifically, the pH of 10.6 reflected in the pharmacist's lab testing falls outside of the accepted parameters for pH for injectable pentobarbital sodium. These parameters, as set forth in the prevailing USP Monograph for this preparation, and pursuant to USP <791>, are

between 9.0 and 10.5. Exhibit D. The difference of 0.1 in pH, *viz.*, between the upper end of 10.5 and 10.6, appears modest, however, the published range is decisive; either the pH value for a given preparation falls within the parameters or it fails to meet that essential criterion.[5] The Department's test batch fails this critical measure. This batch was unusable and it is self-evident that a batch that would need to be discarded cannot supply data for extrapolation to establishing BUDs for other batches. This is apparent disregard for the USP requirements follows patterns that I observed as a supervising pharmacist overseeing pharmacies under licensing probation, and also notable given the attestation from the compounding pharmacy contracted to the Department, indicating compliance with USP requirements.

41. The USP is illuminating on the importance of pH in relation to the stability of an injectable (i.e., soluble) high-risk compounded sterile preparation:

> *pH Effect*
> The *degradation of many drugs in solution accelerates or decelerates exponentially* as the pH is decreased or increased over a specific range of pH values. Improper pH ranks with exposure to elevated temperature as a factor most likely to cause a clinically significant loss of drug, resulting from hydrolysis and oxidation reactions. A drug solution or suspension, for example, may be stable for days, weeks, or even years in its original formulation, but when mixed with another liquid that changes the pH, it degrades in minutes or days. It is possible that a pH change of only 1 unit (e.g., from 4 to 3 or 8 to 9) could decrease drug stability by a factor of 10 or greater.

<1191> Stability Considerations in Dispensing Practice (emphasis added).

42. Given the exponential effects of pH deviations on the degradation of many drugs, certainly including high-risk sterile compounds such as pentobarbital sodium, a nominally modest difference of 0.1 may cause profound change to the quality of the drug.

43. In the context of injectables such as, of course, pentobarbital sodium under the Department's Execution Procedures, an increase of this kind raises the spectre of catastrophic effects on venous endothelial cells during the prospective injection. These endothelial cells constitute the inner lining of veins and comprise the site of actual contact between injected solutions, i.e., pentobarbital sodium, and the venous circulatory system. Information available describes that a pH of 11 may kill these endothelial cells upon contact, stripping away any buffer for

---

[5] Further, the established optimal pH for pentobarbital sodium injection is 9.5. *See* package insert, Nembutal Sodium Solution CII.

the innumerable nerve endings throughout the venous system. The resulting pain from such a failure is incomprehensible. Yet the degree of departure from an acceptable outer limit of pH for pentobarbital sodium to a catastrophically high level is seemingly modest. Elevation of a pH level outside the accepted parameters presents serious concerns.

44. In this context, the State sought a swift resolution of Mr. Dixon's federal suit claiming that the pharmacist's "specialized testing" or "stability testing" had failed.

45. However, the form of that resolution, from the standpoint of the adequacy of the compounded pentobarbital ultimately used for Mr. Dixon's execution and the discarding of the basic framework in place to improve reliability in the drugs and avoid last minute instability in conducting lethal injections, is deeply concerning from a pharmaceutical standpoint.

46. The elements of the Department's Execution Procedures obligating it to obtain, upon issuance of a warrant, lethal injection drugs with a sufficient BUD for use on the scheduled execution date, Att. D, ¶ A.1.III, coupled with the Department's obligation to supply quantitative analysis of the specific drugs by ten days from the given warrant motion, Att. D, ¶ C.2, establish a rudimentary framework for managing the inherent risk of inefficacious drugs resulting from the processes of making high-risk compounded sterile preparations such as pentobarbital sodium. Even under optimal circumstances, very much can go wrong in making such sensitive preparations. Further, under the circumstances of compounding for executions, the absence of transparency in the actual preparation increases the inherent vulnerability in the compounding process. In my professional opinion, it is thus unsurprising that over the course of the past decades, numerous lethal injections have not gone according to plan.

47. The basic framework codified in the Execution Procedures should function to mitigate a substantial degree of the risk in this undertaking and provide far greater reliability in the preparation of lethal injection drugs than what has existed in the past from unsupported assurances about the readiness of the given drugs.

48. In Mr. Dixon's case, the first one under the Department's protocol requiring establishment of a BUD, the orderliness of this framework was discarded at the first indication of pharmaceutical inadequacy concerning the execution drugs.

49. In my review of the events in recent days culminating in Mr. Dixon's lethal injection on May 11, it appears that the State, through its Department's pharmacist, swapped the measured approach to execution drugs verification for ad hoc preparation at literally the last possible moment.

50. The Department thus relied on the above-referenced empiric BUD of three days for refrigerated high-risk sterile preparations (*supra* ¶¶ 11, 35), so that it could avoid an evaluation of the fitness of the drugs it had expected to use in Mr. Dixon's injection.

51. I am unable to opine on the adequacy of the pentobarbital solution ultimately used to carry out that execution and perhaps there will be additional scientific clarity if a post-execution analysis is conducted on Mr. Dixon. But whatever those results reflect, a substantial element of that execution, as a matter of the prohibition against cruel and unusual punishments, will remain unknowable because indications of pain can be masked in this process.

52. The juncture where meaningful steps can be taken to mitigate the substantial risk of inflicting severe pain in a lethal injection is at the point where the basic testing of the drugs can occur. When a batch is prepared about 48 hours prior to its use, key testing elements are simply unavailable. While potency can be tested, this tight timeframe prevents sterility and endotoxins testing, two vital components to the basic evaluation of the fitness of drugs for use in this context. Sterility testing takes two weeks, conventionally. Pyrogen testing for bacterial endotoxins, for example, also is infeasible on that compressed timeline.

53. My emphasis on the importance of conducting sterility and endotoxins testing concerns the detection of contaminants. The concern in the context of a lethal injection is not whether the receiver of the injection is susceptible to developing an infection from the process. Infecting microbial organisms present other immediate harms besides just reproducing and spreading through the body. Rather, it is important to detect contaminants in the injectable solution because the presence of crystalized particles within it is among the most likely factors leading to severely painful or even botched executions. Obviously, such debris placed into an injection could be catastrophic, as crystals are susceptible to causing embolisms (ie., a particulate blocking a blood vessel) and associated failings in the process, leading to a prolonged or ineffective execution and severe pain.

11

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 18th day of May 2022.

Digitally signed by James Ruble
Date: 2022.05.18 10:47:43
-06'00'

_____

James H. Ruble, PharmD, JD

# EXHIBIT A

# *James H. Ruble*
April 2022

## PERSONAL DATA

| | |
|---|---|
| Birth: | Coronado, California |
| Citizenship: | United States of America |
| Address & Phone (W): | University of Utah College of Pharmacy, Skaggs Pharmacy Institute, 30 South 2000 East, Room 4924, Salt Lake City, Utah, 84112 Office: (801) 581-4514 |
| e-mail address: | jim.ruble@hsc.utah.edu |
| web profile: | https://faculty.utah.edu/u0035171-Jim_Ruble/hm/index.hml |

## EMPLOYMENT / PROFESSIONAL EXPERIENCE

### *Academia Position – Primary*

| | |
|---|---|
| 2021 – Present | Assistant Dean for Student Affairs, College of Pharmacy, University of Utah, Salt Lake City, Utah (effective 1 August 2021) |
| 2013 – Present | Associate Professor (Clinical), Department of Pharmacotherapy, College of Pharmacy, Skaggs Pharmacy Institute, University of Utah, Salt Lake City, Utah |
| | Assistant Professor (Clinical) 2010 – 2013 |
| | Clinical Assistant Professor (adjunct) 1995 – 2010 |

### *Academia Positions – Adjunct*

| | |
|---|---|
| 2020 – Present | Adjunct Associate Professor, SJ Quinney College of Law, University of Utah, Salt Lake City, Utah |
| 2016 – Present | Adjunct Associate Professor, Center for Health Ethics, Arts and Humanities (CHeEtAH), School of Medicine, University of Utah, Salt Lake City, Utah |
| 2017 – Present | Adjunct Associate Professor, Department of Pharmaceutics and Pharmaceutical Chemistry, College of Pharmacy, Skaggs Pharmacy Institute, University of Utah, Salt Lake City, Utah |
| | Adjunct Assistant Professor 2010 – 2016 |
| 2006 – 2011, 2018 | Visiting Faculty, Roseman University of Health Sciences, South Jordan, Utah |

### *Non-academia Positions – Health Care*

| | |
|---|---|
| 2018 – Present | Faculty Relations Specialist, Office of the Associate Vice President for Faculty and Academic Affairs, University of Utah Health, Salt Lake City, Utah |
| 2016 – 2018 | Ombudsman, Office of the Associate Vice President for Faculty and Academic Affairs, University of Utah Health, Salt Lake City, Utah |
| 2009 – 2016 | Clinical Pharmacist, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |

| | |
|---|---|
| 2007 – 2009 | Manager, Infusion Pharmacy, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 2004 – 2007 | Sterile Compounding/IV Admix Clinical Pharmacist, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 2000 – 2001 | Staff Pharmacist, Target Stores Pharmacy, Centerville, Utah |
| 1996 – 1999 | Clinical Pharmacist in Ambulatory Neurology and Neurosurgery, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 1995 – 1996 | Clinical Pharmacist in Drug Information, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 1994 – 1995 | Pediatric Pharmacy Team Coordinator, Pharmacy Department, Geisinger Medical Center, Janet Weis Children's Hospital, Danville, Pennsylvania |
| 1992 – 1994 | Staff Pharmacist, Pharmacy Department, Primary Children's Medical Center, Salt Lake City, Utah |
| 1989 – 1992 | Pharmacist Intern, Pharmacy Department, Primary Children's Medical Center, Salt Lake City, Utah |
| 1988 – 1990 | Clinical Technologist, Sleep Disorders Center, University of Utah Health Care, Salt Lake City, Utah |
| 1985 – 1988 | Pulmonary Function Technician, Pulmonary Laboratory, University of Utah Health Care, Salt Lake City, Utah |
| 1985 – 1985 | Anesthesiology Technician, Anesthesiology Workroom, University of Utah Health Care, Salt Lake City, Utah |

### *Non-academia Positions – Law and Consulting*

| | |
|---|---|
| 2013 – Present | Founder and Member, Salus Consulting, LLC, Bountiful, Utah |
| 2004 – 2006 | Attorney, Wasatch Intellectual Property Services, LLC, N. Salt Lake, Utah |
| 2002 – 2005 | Associate Attorney, Pate Pierce & Baird, PC, Salt Lake City, Utah |
| 2001 – 2001 | Law Clerk, Jones Waldo Holbrook & McDonough, PC, Salt Lake City, Utah |
| 2000 – 2000 | Independent Consultant, Christensen & Jensen, PC, Salt Lake City, Utah |

### EDUCATION

| Degree | Years | Institution |
|---|---|---|
| Juris Doctor | 1999 – 2002 | University of Utah |
| Doctor of Pharmacy | 1992 – 1994 | University of Utah |
| Bachelor of Science – Pharmacy | 1989 – 1992 | University of Utah |
| Bachelor of Science – Biology (Molecular & Biochemistry emphasis) | 1984 – 1989 | University of Utah |

LICENSURE/CERTIFICATION/ADDITIONAL TRAINING

| | |
|---|---|
| 2019 – 2020 | Academic Leadership Fellows Program (ALFP) (Cohort 16), American Association of Colleges of Pharmacy, Arlington, Virginia |
| 2016 – 2017 | Conflict Resolution Graduate Certificate Program, University of Utah, Department of Communication     (Certificate awarded April 2017) |
| 2016 | Foundations of Organizational Ombudsman Practice, International Ombudsman Association (IOA), Santa Ana, California, June 2016 |
| 2014 – Present | Basic Life Support for Healthcare Providers (CPR and AED), American Heart Association |
| 2004 – Present | Registered Patent Attorney, United States Patent and Trademark Office, Reg. No. 56118 |
| 2002 – Present | Attorney, Utah State Bar, Member No. 09426 |
| 1994 – 1996 | Registered Pharmacist  – Pennsylvania Board of Pharmacy License No. RP041317R (expired 9/30/1996) |
| 1992 – Present | Registered Pharmacist – Utah Division of Occupational and Professional Licensing, License No. 153627-1701 (expires 9/30/2021) |
| 1986 – 1988 | Certified Pulmonary Function Technician (CPFT), National Board for Respiratory Care |
| 1985 – 1997 | Advanced Cardiovascular Life Support (ACLS), American Heart Association |
| 1985 – 1997 | Basic Life Support (BLS). American Heart Association |

HONORS, RECOGNITIONS & AWARDS

| | |
|---|---|
| 2021 | P1 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2020 | P4 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2019 | Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2019 | P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2018 | P1 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2017 | Overall Best Mediator, recognized by Peers and Faculty in Conflict Resolution Graduate Certificate Course, University of Utah, Salt Lake City, Utah |
| 2016 | P3 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 2015 | Leadership in Ethics Education Award, Daniels Fund/David Eccles School of Business, University of Utah, Salt Lake City, Utah |
| 2015 | Outstanding Professor Award, Hinckley Institute, Univ. of Utah, Salt Lake City, Utah |
| 2014 | Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah |

2014    P4 and P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah

2011    Distinguished Teaching Award & Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah

2011    P2 Class Teacher of the Year, College of Pharmacy, University of Utah, Salt Lake City, Utah

2005    Partners-in-Caring Award, University of Utah Health Care, Salt Lake City, Utah

1995    Employee Recognition Award for Outstanding Service, Geisinger Medical Center, Danville, Pennsylvania

1993    Ewart Swinyard Scholarship, College of Pharmacy, University of Utah, Salt Lake City, Utah

1992    Facts and Comparisons Award for Excellence in Clinical Communications, College of Pharmacy, University of Utah, Salt Lake City, Utah

1992    McNeil Pharmaceuticals Award for Outstanding Achievement in Pharmacy Administration, College of Pharmacy, University of Utah, Salt Lake City, Utah

1991    Allen and Hanburys Scholarship, University of Utah, Salt Lake City, Utah

1991    Faculty Scholarship, College of Pharmacy, University of Utah, Salt Lake City, Utah


## RESEARCH AND SCHOLARLY WORK

### *Grants*

2021 – 2023    A database and heuristic of ethical issues in biomedical research.
Principle Investigator:  James Ruble
Total Budget:  $50,000  (proposal accepted for funding)
Funding Source:  ALSAM

2016 – 2019    Treatment patterns, patient outcomes, and healthcare charges in hemophilia at Hemophilia Treatment Centers in the Intermountain West.
Principal Investigator:  David Stenehjem, PharmD, BCOP
Direct Costs: $462,500 Total Costs: $613,738
Role:  Co-Investigator (< 5%)
Funding Source:  Biogen/IDEC

2012 – 2014    Evaluation, Research, Survey and Recommendations:  Physician Dispensing Exemption from Pharmacy Licensure.
Principal Investigator:  Mark Munger, PharmD
Direct Costs: $67,000  Total Costs:  $67,000
Role:  Co-Investigator (40%)
Funding Source:  State of Utah, MP12023

2011 – 2013    Promoting the Pharmacy Profession as a Career Pathway for Female Students and Students from Ethnically Diverse Backgrounds
Principal Investigator: James H. Ruble
Direct Costs: $3,500   Total Costs: $3,500
Role: Principal Investigator (100%)
Funding Source: Educational Resources Development Council

| 2012 – 2012 | Evaluation of buffer solutions and impact of gas sterilization processes<br>Principal Investigator:  Mark Munger, PharmD<br>Direct Costs:  $15,000   Total Costs:  $15,000<br>Role:  <u>Co-Investigator (50%)</u><br>Funding Source:_BARD Access Systems, Inc. |
|---|---|
| 1998 – 1998 | Comprehensive evaluation of psychometric assessment tools in Alzheimer's disease<br>Principal Investigator: Gary Oderda, PharmD, MPH<br>Direct Costs: $10,000   Total Costs: $10,000<br>Novartis Pharmaceuticals Corporation<br>Role: <u>Co-Investigator (50%)</u> |

<u>PUBLICATIONS</u>

***Peer-Reviewed Journal Articles***

17. Bald E, Kourtides D, Cox N, Raber H, **Ruble J**, Richards B.  Comparison of a Self-Care Therapeutics Course Taught in the P1 versus the P2 Year.  *J Pharm Pract.* 2021 Aug 16:897 doi: 10.1177/08971900211038860

16. Carr C, Scoville J, **Ruble J**, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, Sarigul B, Hawryluk G.  An Audit and Comparison of pH, Measured Concentration, and Particulate Matter in Mannitol and Hypertonic Saline Solutions.  *Front Neurol.* 2021 May 17;12:667842. doi: 10.3389/fneur.2021.667842

15. Rosenberg E, Albert EL, Mospan GA, Panther S, **Ruble J**, Stein RL.  A Pilot Study Regarding Pharmacy Law Education Across Doctor of Pharmacy Programs.  *Am J Pharm Educ.* 2020;84(2):7172.  doi: 10.5688/ajpe7172.

14  Tak CR, Gunning K, Kim J, Sherwin CM, **Ruble JH**, Nickman NA, Biskupiak JE.  The effect of a prescription order requirement for pharmacist-administered vaccination on herpes zoster vaccination rates.  *Vaccine*. 2019 Jan 21;37(4):631-636. doi: 10.1016/j.vaccine.2018.12.003. Epub 2018 Dec 15.

13. **Ruble JH.**  Evaluation of US Federal Legislation for Opioid Abuse: 1973-2016.  *J Pain Palliat Care Pharmacother.*  2016 Sep;30(3):218-24. doi: 10.1080/15360288.2016.1211213.

12. Feehan M, Durante R, **Ruble JH**, Munger MA.  Qualitative Interviews about Pharmacist Prescribing in the Community Setting.  *Am J Health-Syst Pharm*. 2016 Sep 15;73(18):1456-61. doi: 10.2146/ajhp150691.

11. **Ruble JH.**  Tools for "decloaking" the elephant in the room:  Conflict-of-interest, Shared Decision-Making and Patient-Centered Care [Commentary]. *J Pain Palliat Care Pharmacother.*  2015 Jun;29(2):173-7.  doi: 10.3109/15360288.2015.1037519.

10. **Ruble JH.** The "death" of lethal injection as we know it?  An opportunity to reflect on the role of chemical execution in the US criminal justice system [Commentary]. *J Pain Palliat Care Pharmacother.*  2014 Sep;28(3):276-81. doi: 10.3109/15360288.2014.941133. Epub 2014 Aug 14.

9.  Munger MA, **Ruble JH**, Nelson SD, Ranker L, Petty RC, Silverstein, S, et al.  National Evaluation of Prescriber Drug Dispensing. *Pharmacotherapy.* 2014 Oct;34(10):1012-21. doi: 10.1002/phar.1461. Epub 2014 Jul 23.

8.  **Ruble JH.**  Prescriber-Pharmacist Collaboration:  Re-engineering the Partnership to Optimize Pain Patient Care [Commentary].  *J Pain Palliat Care Pharmacother*. 2013 Dec;27(4):365-6. doi: 10.3109/15360288.2013.849322. Epub 2013 Oct 21.

7.  **Ruble JH.**  Distribution of Controlled Substances in the US Supply Chain:  Where does the Compass Point? [Commentary].  *J Pain Palliat Care Pharmacother.* 2012 Sep;26(3):251-3. doi: 10.3109/15360288.2012.703983.

6.  Shrewsbury R, Augustine S, Birnie C, Nagel K, Ray D, **Ruble J,** Scolaro K, Athay Adams J.  AACP Report:  Assessment and Recommendations of Compounding Education in AACP Member Institutions.  *Am J Pharm Educ.*  2012 Sep 10;76(7):S9. doi: 10.5688/ajpe767S9.

5.  **Ruble JH**. Off-label Prescribing of Medications for Pain: Maintaining Optimal Care at an Intersection of Law, Public Policy and Ethics. *J Pain Palliat Care Pharmacother.* 2012;26:146-52.

4.  **Ruble JH**. Baxter v. Montana, Libertarianism, and End-of-Life: The Ripe Time for a Paradigm Shift. *J Pain Palliat Care Pharmacother.* 2010 Sep;24(3):263-70. doi: 10.3109/15360288.2010.502214.

3.  **Ruble J**, Matsuo F.  Antiepileptic-induced cutaneous drug reactions: Incidence, mechanisms, and management. *CNS Drugs*. 1999;12(3): 215-36.

2.  **Ruble J**, Muncey LA.  Beta-adrenergic agonists in the treatment of asthma. *J Pharm Care Pain Symptom Control*. 1997;5(4): 49-56.

1.  Goeser S, **Ruble J**.  Melatonin: Historical and clinical perspectives.  *J Pharm Care Pain Symptom Control*. 1997;5(1):37-49.


### *Letters and Other Publications*

8.  Pan RJ, **Ruble JH.**  A Commentary on Ethical Decision-Making in the Pharmacy Profession and the APhA Code of Ethics.  *Journal of the American Pharmacists Association*.  2021;61(2):E68-E70. doi.org/10.1016/j.japh.2020.10.021.  https://www.japha.org/article/S1544-3191(20)30547-1/fulltext

7.  **Ruble JH**, Brixner DA.  Comment & Response: Outpatient Pharmacy Expenditures for Children with Serious Chronic Illness in California, 2010-2012.  *JAMA*. 2016;315(7):706. doi:10.1001/jama.2015.16978.

6.  Subach RA, **Ruble J**.  Misprint of dosage interval for liposomal doxorubicin hydrochloride [Letter]. *Am J Health Syst Pharm*. 1996;53(14):1727.

5.  **Ruble JH.**  Pharmacoeconomics – an evolving tool in health technology assessment. Division of Medical Ethics and Humanities Newsletter, School of Medicine, University of Utah.  June 2016.  Available at:  http://medicine.utah.edu/internalmedicine/medicalethics/newsletters/index.php

4. **Ruble J**. Impact safety, efficiency, and the bottom line with premixed IV products. *Pharmacy Purchasing & Products*.  2008;*5*(2):34,36,38.

3. **Ruble J**. USP Chapter <797> Compliance: Important legal issues. *Pharmacy Purchasing & Products*.  2008;5(6):16,18,20.

2. **Ruble J**, Hill GK.  Inadvertent Public Disclosure and Possible Loss of Intellectual Property Rights. *Nutraceutical Business & Technology* 2005;1(5):34-40.

1. **Ruble J**, Koberstein W, ed.  Special Report: The Secure IPO Launch Plan – A Virtual Roundtable. *BioExecutive International* 2005;1(4):58-67.

### Book Chapters

2. **Ruble JH**.  Legal Implications for Pharmacists: US Legal Framework, Regulatory Oversight, Civil Responsibility, and Professional Judgement.  In: Pharmacy Student Survival Guide, 4th ed., Nemire R, Assa-Eley M, eds.  New York, NY:McGraw-Hill Medical; 2022 [in press]

1. **Ruble JH**.  Compounded medications in pain management:  customized rational polypharmacy.  In: Aronoff GM, editor.  Medication management of chronic pain: what you need to know.  Bloomington, IN:Trafford Publishing; 2017.

### Scientific Posters and Abstracts

16. Bald E, Kourtides D, Cox N, Raber H, **Ruble, J**, Nazminia K, Richards B. (2021).  *Comparison of a Self-Care Therapeutics Course Taught in the P1 versus the P2 year*.  American Association of Colleges of Pharmacy, Annual Meeting (virtual).

15. Paulson CM, **Ruble J**. (2020).  *Pharmacists' Perceptions of Ethical Dilemmas Encountered in Community Practice*.  Professional Development Poster Session, University of Utah College of Pharmacy, Salt Lake City, Utah.

14. Winter K, **Ruble J**. (2020).  *Pharmacists' Perceptions of Ethical Dilemmas Encountered in Acute Care/Institutional Practice*.  Professional Development Poster Session, University of Utah College of Pharmacy, Salt Lake City, Utah.

13. Winter K, **Ruble J**. (2019).  *Pharmacist Perceptions of Ethical Dilemmas Encountered in Acute Care/Institutional Practice*.  American College of Clinical Pharmacy (ACCP) Annual Meeting, New York City, New York.

12. Knight LH, Rimer E, **Ruble J**. (2019).  *An Assessment of Potential Roles of a Clinical Pharmacist in Optimizing Health and Athletic Performance of Student Athletes*.  College of Pharmacy Doctor of Pharmacy Program Poster Session.  University of Utah, Salt Lake City, Utah.

11. Clark L, **Ruble J**. (2018).  *UHealth Ombudsman Office: A Resource for Conflict Resolution*.  UHealth Resiliency Program – Wellness Champions Poster Session.  University of Utah, Salt Lake City, Utah.

10. Raber H, May A, Nyman H, **Ruble J**, Witt D. (2018).  *The White Space Project*.  UHealth Resiliency Program – Wellness Champions Poster Session.  University of Utah, Salt Lake City, Utah.

9. Carr C, Scoville J, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, **Ruble J**, Hawryluk G. (2018). *A Comparison of Measured pH, Salinity, Osmometry, Nephelometry, and Particulate Matter in Mannitol and Hypertonic Saline [Abstract #41977].* American Association of Neurological Surgeons (AANS) Annual Meeting, New Orleans, Louisiana.

8. Carr C, Scoville J, Condie C, Davis G, Floyd C, Kelly L, Monson K, Reichert E, **Ruble J**, Hawryluk G. (2018). *An Audit of pH, Salinity, Osmometry, Nephelometry, and Particulate Matter in Commercially Available Hyperosmolar Solutions [Abstract #41971].* American Association of Neurological Surgeons (AANS) Annual Meeting, New Orleans, Louisiana.

7. Tak CR, Kim J, Gunning K, **Ruble JH**, Sherwin CMT, Nickman NA, Biskupiak J. (2018). *Effect of a Prescription Order Requirement for Pharmacist-Administered Vaccination on Zoster Vaccination Rates.* AMCP Managed Care and Speciality Pharmacy Annual Meeting, Boston, Massachusetts.

6. Bowman N, **Ruble J**, Crouch BI. *Homemade Play-Dough: Money Saving and Potentially Life-Threatening?* North American Congress of Clinical Toxicology. (2016) NACCT Abstracts 2016, Clinical Toxicology, 54:8, 659-811, DOI: 10.1080/15563650.2016.1197486

5. Skrabal MZ, Downs GE, Carter RA, Eagerton DH, Franson KL, Hritcko PM, Jungnickel PW, Kissack JC, **Ruble J**, Torrado C. (2016). *Marijuana Use Task Force (MUTF): Considerations for Schools Regarding Marijuana Use by Students, Faculty, and Preceptors.* American Association of Colleges of Pharmacy Annual Meeting, Anaheim, California.

4. Blumenthal D, Stephens S, Nyman H, Jennings B, **Ruble J**, et al. (2013). *Rapid development and longitudinal incorporation of interprofessional education simulations into the pharmacy curriculum.* American Association of Colleges of Pharmacy Annual Meeting, Chicago, Illinois.

3. **Ruble J**, Edwards D, Schmidt J, et al. (2003). *Medication Use Review: Infliximab use in the ambulatory clinic infusion center at University Health Care.* Report presented to Pharmacy Administration, University of Utah Health Care, Salt Lake City, Utah.

2. **Ruble J**, Constantino T, Godsey C, et al. (1998). *Topiramate (TPM) use in refractory epilepsy patients ineligible for surgical treatment [Abstract #100231].* American Epilepsy Society 52nd Annual Meeting, Sheraton Convention Center, San Diego, California.

1. Forshew DA, **Ruble J**, Bromberg MB. (1998). *A survey of ALS/MND specialists for medication preferences for relief of symptoms associated with ALS/MND. Platform Presentation.* The 9th International Symposium on ALS/MND, Park Hilton, Munich, Germany.

EDITORIAL EXPERIENCE

**Editorial Board Member**

*Journal of Pain & Palliative Care Pharmacotherapy*

**Reviewer Experience**

*Journal of Managed Care Pharmacy*, Alexandria, Virginia, USA

*Research in Social and Administrative Pharmacy*, Elsevier, Amsterdam, Netherlands

*Journal of Pain & Palliative Care Pharmacotherapy*, Informa Healthcare USA

*American Journal of Pharmaceutical Education*, Arlington, Virginia, USA

*Hospital Pharmacy Journal*, ThomasLand Publishers, St. Louis, Missouri, USA

*Pharmacist's Letter*, Therapeutic Research Center, Stockton, California, USA

*BMC Research Notes*, BioMed Central, London, UK

*Handbook of Nonprescription Drugs: An Interactive Approach to Self-Care, 20th Edition*, Chapter 4: Legal and Regulatory Issues in Self-Care Pharmacy Practice.


PRESENTATIONS

**Meeting Presentations**

National/Regional/Local

| | |
|---|---|
| 03/2023 | Case Law Updates.  American Pharmacists Association (APhA), Annual Meeting & Exposition, Phoenix, Arizona |
| 11/2022 | Case Law Updates. American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Naples, Florida |
| 08/2022 | Civility, Respect, and Professionalism in Academic Research.   Keynote Presentation.   Association of Research Integrity Officers (ARIO) National Meeting. Marriott Hotel and Conference Center, Salt Lake City, Utah |
| 11/2021 | Case Law Updates.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting,  Las Vegas, Nevada |
| 07/2021 | Teaching Pharmacy Students Resource Allocation Ethics in a Courageous New World.  American Association of Colleges of Pharmacy (AACP) Annual Meeting (virtual conference) |
| 03/2021 | Case Law Updates.  American Pharmacists Association (APhA), Annual Meeting & Exposition (virtual conference) |
| 11/2018 | Ethics in Pharmacy and Law: Practice implications of anti-discrimination standards in MRPC 8.4(g) and ACA section 1557.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Hilton Head, South Carolina |
| 07/2018 | Ethical, Legal, and Social Issues in the Era of Genomic Medicine: How Do We Best Educate Pharmacy Students. Special Presentation, American Association of Colleges of Pharmacy (AACP), AACP Annual Meeting, Boston, Massachusetts |
| 04/2018 | Opioid Crisis in Utah – Symposium.  Center for Law and Biomedical Sciences, SJ Quinney College of Law, University of Utah, Salt Lake City, Utah |

07/2017    Ethical Dilemmas in Pharmacotherapy – Communication and Conflict Resolution Skills for the Pharmacy Learner Continuum.  Special Presentation, American Association of Colleges of Pharmacy (AACP), AACP Annual Meeting, Nashville, Tennessee

04/2017    Reducing Risk and Maintaining Empathy:  Professional Practice Tips for Risk Management & Strengthening Relationships.  Anticoagulation Forum National Meeting, Los Angeles, California

03/2017    Death-With-Dignity: Legal, Ethical, Clinical and Pharmaceutical Perspectives.  18th Annual Conference on Emerging Issues in Healthcare Law, American Bar Association (ABA) National Meeting, New Orleans, Louisiana

11/2016    Educator's Session – Formative and Summative Assessment in Pharmacy Law Education.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Austin, Texas

05/2016    Moral Distress and Moral Fatigue in Health Care Professionals.  Project ECHO – Burn and Soft Tissue Injury.  University of Utah Burn Center.  Salt Lake City, Utah

01/2016    Reducing Risk and Maintaining Empathy:  Professional Practice Tips for Risk Avoidance, Risk Mitigation & Strengthening Relationships.  Anticoagulation Forum Boot Camp.  Salt Lake City, Utah

11/2014    Pharmacy and the Continuum of Lethal Injection.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Indian Wells, California

11/2014    Educator's Session – Teaching Federal Pharmacy Law.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting.  Indian Wells, California

10/2014    Prescription Drugs and Poisonings:  Exploring the Landscape – Legal Perspective. Utah Poison Control Center 60th Anniversary Symposium.  Salt Lake City, Utah

11/2013    Compounding Paradigm Shift: A New Regulatory Landscape.  American Society for Pharmacy Law (ASPL) – Fall Seminar National Meeting, Jacksonville, Florida

11/2012    Pharmacy Compounding and Meningitis Tragedy Update: What Lessons Can We Learn?  Utah Board of Pharmacy, Salt Lake City, Utah

09/2010    Criminal Liability for Compounding Errors: A Discussion of Recent Cases. Utah Society of Health System Pharmacists, Annual Meeting, Salt Lake City, Utah

07/2009    Is Compounding Illegal or Unethical? A Discussion of Law and Ethics in Pharmaceutical Compounding. University of Utah College of Pharmacy Pharmacotherapy Department Seminar

04/2009    Equipoise and Clinical Research in an Academic Medicine Environment. University of Utah Health Care, Ethics Committee, Educational Presentation, Salt Lake City, Utah

08/2007    Investigational New Drug Applications: Information for Principal Investigators and IRB Panel Members. Institutional Review Board Annual Retreat, University of Utah, Salt Lake City, Utah

08/2006    INDA's – Investigational New Drug Applications: An Introduction in 10 Questions. Institutional Review Board Annual Retreat, University of Utah, Salt Lake City, Utah

| 11/1998 | Ten Questions (and Answers) About Your Medications for Parkinson's Disease. St. George/Southern Utah Parkinson's Disease Association, Senior Center, St. George, Utah |
| --- | --- |
| 05/1998 | Know Your Medications: Ten Questions (and Answers) About Your Medications for Parkinson's Disease. Annual Meeting, Utah Chapter, American Parkinson's Disease Association. Moran Eye Center Auditorium, University of Utah, Salt Lake City, Utah |
| 09/1997 | Drug Therapies for Neurologic Disorders. 2nd Annual Salt Lake Veterans Affairs Hospital Gerontological Nursing Conference. Wyndham Hotel Convention Center, Salt Lake City, Utah |
| 11/1995 | Temporal Variation in Pharmacotherapy and the Drug Regulatory Process. Department of Pharmacy Practice, College of Pharmacy, University of Utah, Salt Lake City, Utah |

### *Grand Rounds, Invited and Professional Development Presentations*

| 03/2020 | Negotiation Essentials.  Leadership Development Seminar, University of Utah, Salt Lake City, Utah |
| --- | --- |
| 02/2020 | Communication, Leadership, and Conflict Competence.  Senior Leadership Development Conference, University of Utah Health, Salt Lake City, Utah |
| 10/2017 | Communication and Conflict Resolution Skills for Pharmacy Professionals. Pharmacy Grand Rounds, Department of Pharmacy Service, University of Utah Health, Salt Lake City, Utah |
| 10/2016 | Assisted Suicide:  Implications for Families and Society.  Fall Symposium.  J. Reuben Clark Law School, Brigham Young University, Provo, Utah |
| 09/2016 | Keynote Speech: Time and Opportunity. White Coat Ceremony.  College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 02/2015 | Lethal Injection in the United States Criminal Justice System: A Modern Kairos? Hinckley Institute at The University of Utah, Salt Lake City, Utah |
| 08/2014 | Art Imitating Life – Reflecting on the Fictional World of *Harry Potter* and Realities in Pharmacy and Pharmaceutical Sciences.  Eccles Health Sciences Library, University of Utah, Salt Lake City, Utah |
| 01/2011 | Pharmacist Liability: A Case Study. Grand Rounds, Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 05/2006 | Applied Bioethics and Withdrawal of Life-Support in Dying Patients. Grand Rounds, Department of Pharmacy Services, University Health Care, University of Utah, Salt Lake City, Utah |
| 11/2003 | Fundamentals of Intellectual Property for the Neurologist and Neuroscientist. Grand Rounds, Department of Neurology, University of Utah School of Medicine, Salt Lake City, Utah |

*Continuing Education Presentations*

11/2019     Medical Cannabis in Utah: A Primer for Medical Pharmacy Providers (Webinar).
            Utah Department of Health/University of Utah School of Medicine, Salt Lake City,
            Utah

04/2017     Medical Aid-in-Dying, Pharmacy, Public Policy, and Perspectives.  Greater New
            York Hospital Association, Metropolitan New York City

01/2017     Ethical Challenges of Pharmaceuticals in Capital Punishment.  Continuing
            Professional Development Conference for Australian Healthcare Professionals.
            Canyons Resort, Park City, Utah

01/2017     Review and Update of Drug Interactions Commonly Encountered in Patient Care.
            Continuing Professional Development Conference for Australian Healthcare
            Professionals.  Canyons Resort, Park City, Utah

06/2016     Hemophilia Managed Care Review Board – Health Economics and
            Pharmacoeconomics Assessment – Analyzing Available Data to Assess the Value
            of Treatment Options and Collaborative Care Management.  Web-based
            Continuing Education Program.  Philadelphia, Pennsylvania

01/2016     New and Forthcoming Medicines and Pharmaceutical Technologies.  Continuing
            Professional Development Conference for Australian Healthcare Professionals.
            Canyons Resort, Park City, Utah

01/2016     Extemporaneous Compounding Regulations in Australia and the US and Prudent
            Professional Judgment.  Continuing Professional Development Conference for
            Australian Healthcare Professionals.  Canyons Resort, Park City, Utah

09/2015     Death With Dignity, Pharmacy and HB 391.  Utah Society of Health-System
            Pharmacists, McKay-Dee Hospital, Ogden, Utah

02/2014     Pharmacist Providers:  Professional Evolution or Passing Fancy? Utah
            Therapeutics and Pharmacy Law Continuing Education Program.  Roseman
            University of Health Sciences.  Salt Lake City and Logan, Utah

09/2013     Compounding Paradigm Shift:  Public Policies and Changes in Regulatory
            Landscape.  Utah Society of Health-System Pharmacists, Salt Lake City, Utah

08/2013     Hot Potato:  A Chronicle of Non-Sterile Compounding.  Utah Pharmacists
            Association, Layton, Utah

11/2012     Conflict, Compassion and Communication:  Ethical Reasoning in Drug Shortages
            and Resource Allocation.  Greater New York Hospital Association, Metropolitan
            New York City

05/2012     Pharmacy Law Review and Refresher Course. University of Utah College of
(annually   Pharmacy Continuing Pharmacy Education Program, Health Sciences Education
Presented)  Building, University of Utah, Salt Lake City, Utah. (Full-day CPE program in
            Pharmacy Law and Ethics)

03/2011     Ethics Panel Discussion: A Continuum of Pharmacy Issues at End-of-Life. Panel
            participant and moderator. Mid-Winter meeting: Utah Society of Health-System
            Pharmacists and University of Utah College of Pharmacy. Health Sciences
            Education Building, University of Utah, Salt Lake City, Utah

| | |
|---|---|
| 11/2010 | Pharmacist Liability: A Case Study. Department of Pharmacy Services, Intermountain Medical Center. Murray, Utah |
| 03/2010 | USP <797> -- Planning, Implementation and Enforcement: Successes and Struggles. Southern Nevada Society of Health-System Pharmacists, Mid-year Meeting. Henderson, Nevada |
| 02/2010 | Pharmacist Liability: A Case Study. Utah Society of Health-System Pharmacists Annual Meeting. Davis Convention Center, Layton, Utah |
| 01/2010 | Brands, Generics, and Pay-for-Delay: Implications in Patient Care. University of Southern Nevada, Winter CPE Meeting. South Jordan, Utah, and Logan, Utah |
| 11/2009 | Disclosing a Dispensing Error: Ethical Reasoning. Utah Pharmacists Association, Fall Meeting. Wyndam Hotel and Convention Center, Salt Lake City, Utah |
| 05/2009 | Complying with Controlled Substances Laws While Maintaining Compassion for Patients. Continuing Education Program, University of Southern Nevada, South Jordan, Utah |
| 10/2008 | Conflict-of-Interest. Fall Continuing Education Program, University of Utah College of Pharmacy, Salt Lake City, Utah |
| 12/2007 | Applied Bioethics and Withdrawal of Life-support in Dying Patients. 14th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2006 | Review of Medicare/Medicaid Fraud and Abuse. 13th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2006 | Dealing with Conflict of Interest Ethical Issues. 13th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 04/2006 | Pharmacist Refusal to Dispense: An Overview of Legal and Ethical Issues. Utah Pharmacists Association Annual Meeting, Dixie Center, Saint George, Utah |
| 12/2005 | Pharmacist Refusal to Dispense: An Overview of Legal and Ethical Issues. Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2004 | Negligence Update: Pharmacists Duty to Warn. 11th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2004 | Business Law Primer for Pharmacists. 11th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2003 | Federal and State Administrative Law: FDA, FTC, DEA and State Boards. 10th Annual CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 12/2003 | Federal Legislation and Pharmacy Practice Update. 10th Annual Winter CE Program, University of Arizona College of Pharmacy, Park City, Utah |
| 10/2003 | Navigating Federal Drug Law: 1987-2003: Significant Legislation, Rx-to-OTC switch, Drug Importation. Annual Meeting, Utah Society of Health-System Pharmacists, University of Utah College of Pharmacy, Salt Lake City, Utah |
| 04/1999 | Medical Assistant In-service Lecture Series: Medication Injections and Commonly Used Oral Medications in the Ambulatory Clinic. Medical Assistants, University of Utah Hospitals & Clinics, Salt Lake City, Utah |

10/1998       Treatment of Parkinson's Disease: New Tricks and Old Treats. Continuing
              Education Program, College of Pharmacy, University of Utah, Salt Lake City, Utah

### *Industrial Presentations*

05/1998       Parkinson's Disease, Multiple Sclerosis, and Amyotrophic Lateral Sclerosis,
              Partnership For Care Program, Athena Home Pharmacy Division, Athena
              Neurosciences, Embassy Suites, South San Francisco, California

03/1997       Idiopathic Parkinson's Disease. SmithKline Beecham Pharmaceuticals,
              Intermountain Sales Team, Chart House Restaurant, Salt Lake City, Utah

12/1997       Presenter, Pfizer Inc., Cerebyx: A new advance in seizure control. Paracelsus
              Family Practice Department, Salt Lake City, Utah

### *News and Media Appearances*

05/2021       "Warrant signed for Idaho's first death row execution since 2012
              Idaho is seeking to execute convicted double-murderer Gerald Pizzuto Jr. next
              month"  Idaho Capital Sun. (printed 5/7/21).
              https://idahocapitalsun.com/2021/05/07/warrant-signed-for-idahos-first-death-row-
              execution-since-2012/

05/2018       "Competition in the Pharmaceutical Industry" *Top of Mind with Julie Rose*.  BYU
              Radio.  (aired 6/19/2018)  https://www.byuradio.org/episode/c9d37a75-3db2-4b0b-
              ad6b-09c36bba5d2d?playhead=3130&autoplay=true

11/2017       "Compounding pharmacies and lethal injection" *VICE News with Gianna Tobani*.
              VICE Media/HBO.  (interview filmed; not published).

04/2017       "Opioid Crisis" *Top of Mind with Julie Rose*.  BYU Radio.  (aired 6/28/2017)
              http://www.byuradio.org/episode/e5beffb6-9d27-4077-868b-
              b1891dd5f6ec?playhead=62&autoplay=true

08/2015       "Printing Pills" *Science Friday with Ira Flatow*.  Public Radio International. (aired
              8/7/2015) http://www.sciencefriday.com/segments/venomous-frogs-a-polar-bear-
              world-record-and-printing-pills/

## PROFESSIONAL ORGANIZATIONS & SERVICE

### *Professional Organizations*

2015 – 2019       Member, American Society of Health-System Pharmacists (ASHP)

2015 – 2017       Member, American Pharmacists Association (APhA)

2014 – Present    Member, Rho Chi Society – Pharmacy Honor Society

2013 – Present    Member, American Society for Pharmacy Law (ASPL)

2013 – 2021       Faculty Advisor, National Community Pharmacists Association Chapter

2012 – Present    Member, American Association of Colleges of Pharmacy (AACP)

2004 – Present    Admitted to the United States Patent and Trademark Office Bar

2002 – Present    Admitted to the United States District Court for the District of Utah Bar

| | |
|---|---|
| 2002 – Present | Member, Utah State Bar Association |
| 1996 – 2011 | Member, Utah Society of Health-System Pharmacists |
| 1994 – Present | Member, Phi Lambda Sigma Pharmacy Leadership Society |
| 1990 – 1992 | Member, American Pharmacists Association – Academy of Student Pharmacists |

## *Professional Service*

| | |
|---|---|
| 2022-2025 | President-Elect, President, Past President, American Society for Pharmacy Law (ASPL) |
| 2016 – 2019 | Chair-Elect, Chair, Past Chair, Health Care Ethics Special Interest Group (SIG), American Association of Colleges of Pharmacy |
| 2015 – Present | Pharmacy Law Educator's Sub-Committee, American Society for Pharmacy Law (ASPL) Chair, 2015-2017 |
| 2015 – 2018 | Task Force Member, American Association of Colleges of Pharmacy, AACP Task Force on Marijuana Use by Students, Faculty and Preceptors |
| 2010 – 2012 | Task Force Member, American Association of Colleges of Pharmacy, AACP Task Force to Evaluate Compounding Instruction in US Pharmaceutical Education |
| 2009 – 2011 | Board Member-at-Large, Utah Society of Health-System Pharmacists |
| 2002 –2004 | Co-Chair, Utah Society of Health-System Pharmacists, Newsletter Committee |

## *Public Service*

| | |
|---|---|
| 2021 – 2023 | Member, Board of Directors, Wasatch Homeless Health Care, also known as: "4th Street Clinic", Salt Lake City, Utah |
| 2018 – Present | Member, Quality Improvement Committee, Wasatch Homeless Health Care, also known as: "4th Street Clinic", Salt Lake City, Utah |
| 2018 – 2022 | Chair, Controlled Substances Advisory Committee.  Utah Department of Health.  State of Utah |
| 2013 – 2018 | Pharmacy Compounding Task Force.  Utah Board of Pharmacy, Division of Occupational & Professional Licensing, Department of Commerce, State of Utah |
| 2013 – 2014 | Health Information Workgroup:  State of Utah Health Innovation Model Grant.  State of Utah Department of Health.  Center for Health and Informatics.  CFDA 93.624 |
| 2010 – 2016 | Presenter, Area Health Education Centers, Presented information on pharmacy careers and interactive pharmacy compounding demonstration for Health Careers Summer Camp for Rural Health Scholars Program at Southern Utah University |

UNIVERSITY COMMITTEE ACTIVITIES

***University Level – University of Utah***

| | |
|---|---|
| 2021 – 2027 | Member, Consolidated Hearing Committee (CHC), Academic Senate, University of Utah |
| 2021 – 2024 | Member, Academic Appeals and Misconduct Committee, Academic Senate, University of Utah |
| 2017 – 2021 | Member, Curriculum Policy Review Board / Special Fee Review Committee |
| 2016 – 2019 | Member, Faculty Committee on Community and Governmental Relations |
| 2006 – 2009 | Member, Institutional Review Board |

***University of Utah Health Care System***

| | |
|---|---|
| 2007 – 2017 | Hospital Ethics Committee |
| | Chair, 2015 – 2017 |
| | Co-Chair, 2013 – 2015 |
| | Clinical Ethics Consultation Team, 2007 – 2017 |
| 2009 – 2010 | USP <797> Compounding Task Force, Department of Pharmacy Services |

***College Level – University of Utah College of Pharmacy***

| | |
|---|---|
| 2021 – Present | Member, Executive Committee |
| 2018 – Present | Member, Learning and Teaching Committee |
| 2017 – 2021 | Chair, Curriculum Committee |
| 2015 – 2018 | Member, Scholastic Standards Committee |
| 2013 – 2015 | Member, Inter-Professional Education (IPE) Committee |
| 2012 – 2017 | Member and P1 Steward, Curriculum Development Committee |
| 2011 – 2014 | Member, Admissions Committee |
| 2011 – Present | Member, Student Mentoring Committee |
| 2009 – 2011 | Member, Diversity Advisory Committee |

CURRENT & PAST AREAS OF TEACHING RESPONSIBILITY

***Courses Directed***

| | |
|---|---|
| 2022 – 2023 | LAW 7360-001:  Health Law |
| 2020 – Present | LAW 7080-004:  FDA Law and Regulation |
| 2017 – 2018 | PHARM 5144:  Foundations in Drug Information and Critical Inquiry |
| 2015 – 2017, 2020 | PHARM 6243:  Community Practice (OTC & Self-Care) |
| 2010 – 2021 | PHARM 6242: Pharmaceutical Compounding and Drug Delivery Systems |

Ruble, Page 16

| | |
|---|---|
| 2009 – Present | PHARM 5142: Foundations in Pharmacy Law, Ethics, and Risk |
| 2008 – 2015 | PCTH 7436: Ethical Dilemmas in Pharmacotherapy & Pharmaceutical Science |

### Additional Courses Taught

| | |
|---|---|
| 2022 – Present | Contributor, BME 5120: Regulatory Affairs II (Biomedical Engineering) |
| 2011 – 2013 | Co-instructor, PHCEU 7975: Journal Club-PhD |
| 2010 – 2015 | Co-Instructor, PHARM 5113: Basics in Pharmaceutical Sciences |
| 2009 – Present | Co-Instructor, PHARM 5120: Foundations in Pharmaceutical Sciences |
| 2008 – 2010 | Primary Instructor, PCTH 7603: Home Health Clerkship |
| 2004 – Present | Co-Instructor, PHARM 5140: Foundations in Patient-Centered Care |
| 2009 – 2012 | Contributor, PCTH 7321: Introduction to Clerkships |
| 2011 – 2012 | Contributor, PCTH 6500: Research Ethics |
| 2012 – 2016 | Contributor, PCTH 6890: Research Seminar I |
| 2012 – 2016 | Contributor, PCTH 7100: Clinical Seminar I |

### Other Didactic Lectures

| | |
|---|---|
| 2019 | Communications, Workplace Conflict and Ombudsman Services.  Conflict Resolution Graduate Certificate Program, Department of Communications, University of Utah, Salt Lake City, Utah |
| 2018 – Present | Difficult Choices:  Ethics capstone for Foundations of Medicine, Medical Students, University of Utah School of Medicine, Salt Lake City, Utah |
| 2016 – 2019 | Basal Ganglia and Movement Disorders – Clinical Pharmacology, Medical Students, University of Utah School of Medicine, Salt Lake City, Utah |
| 1998 | Pharmacotherapy of Neurological Disorders. Physical Therapy Students. College of Health, University of Utah, Salt Lake City, Utah |
| 1998 – 1999 | Medical Assistant In-service Lecture Series: Medication injections and commonly used oral medications in the ambulatory clinic. Medical Assistants, University of Utah Health Care, Salt Lake City, Utah |

### Department/Division Conferences

| | |
|---|---|
| 10/2020 | Communications and Conflict, Division of Physical Medicine and Rehabilitation, University of Utah School of Medicine, Salt Lake City, Utah |
| 08/2019 | Communication and Conflict Resolution, Department of Family and Preventive Medicine, University of Utah School of Medicine, Salt Lake City, Utah |
| 06/2019 | Ethical Issues Surrounding Medical Cannabis.  Evening Ethics Presentation, Program in Medical Ethics and Humanities.  Department of Internal Medicine, University of Utah, Salt Lake City, Utah |

| | |
|---|---|
| 06/2019 | Ethics Training Workshop:  Ethics Consultation & Ethics Committees. College of Law, University of Utah, Salt Lake City, Utah |
| 05/2019 | When Clinicians Disagree: How to speak up when there is a power differential.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, and University of Utah Hospital, Salt Lake City, Utah |
| 03/2019 | Ethical and Legal Perspectives: Responsible pain management in the wake of the opioid crisis.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, Salt Lake City, Utah. |
| 10/2017 | Is an Ethically Appropriate Cost (or Price) Possible for Pharmaceuticals? Evening Ethics Presentation, Division of Medical Ethics and Humanities, Department of Internal Medicine, University of Utah, Salt Lake City, Utah |
| 07/2017 | Conflict Resolution for Healthcare Professionals.  Professional Development Seminar, Department of Pharmacotherapy, College of Pharmacy, Salt Lake City, Utah |
| 04/2017 | Leadership, Professional Advocacy, and Politics.  Career Opportunity Seminar, College of Pharmacy, Salt Lake City, Utah |
| 02/2017 | Clinical Ethical Reasoning and Decision Making.  Internal Medicine Resident Conference.  George Whalen Veteran's Affairs Medical Center, Salt Lake City, Utah |
| 01/2017 | Common Issues for Faculty Visitors to Ombudsman Office.  Senior Leadership Conference – Health Sciences Administration, University of Utah Health Sciences, Salt Lake City, Utah |
| 11/2011 | Communication of Risk in Pharmacotherapy: More Than Just a Four-Letter Word. Department of Pharmacotherapy, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 05/2011 | Ethics of High Cost Oncology Drugs: Identifying Victims, Villains, and Values. Department of Pharmacy Services, University of Utah Health Care, Salt Lake City, Utah |
| 09/2010 | Risk Management and the Lexicon of Pharmacy Practice. Task Force on Future Curricular Revision, College of Pharmacy, University of Utah, Salt Lake City, Utah |
| 08/1999 | New Antiepileptic Drugs: Advantages and Disadvantages. Clinical Sciences Conference, Department of Neurology, University of Utah, Salt Lake City, Utah |
| 08/1998 | Pharmacological Treatment of Parkinson's Disease: Current issues and future directions. Clinical Sciences Conference, Department of Neurology, University of Utah, Salt Lake City, Utah |
| 05/1997 | Antidepressant Selection in Patients with Neurologic Disorders. Clinical Sciences Conference, Department of Neurology, University of Utah. Salt Lake City, Utah |

| 06/1997 | Botulinum Toxin in Neurologic, Ophthalmologic, and Laryngeal Disorders. Pharmacy Department, University Hospital, Salt Lake City, Utah |

### *Forensic and Legal Consultation / Expert Witness*

| 05/2021 | **State of Arizona.** *Frank Jarvis Atwood v. State of Arizona*; In the Supreme Court for the State of Arizona.  No.CR–87–0135–AP Pima County Superior Court; Nos. CR14065 and CR15397Ninth Circuit; No. 14–99002 U.S. District Court No. CV–98–116–TUC–JCC |
| 11/2020 | **State of South Carolina.** *Richard Bernard Moore v. State of South Carolina*; In the Supreme Court for the State of South Carolina.  Case No. 2001-021895 |
| 10/2020 | **State of Utah.** *Kay Heath and Shauna Peterson v. Maple Mountain Pharmacy, Inc. et al*; In Utah District Court for Utah County, Fourth District.  Case No. 200401569 |
| 09/2018 | **State of Utah**. *In the matter of South Valley Compounding Pharmacy to Practice as a Pharmacy and to Dispense Controlled Substances in the State of Utah;* In the Utah Department of Commerce, Division of Occupational and Professional Licensing, Case No. DOPL 2018-158 |
| 07/2018 | **United States Supreme Court.**  Brief amicus curiae of Pharmacy, Medicine, and Health Policy Experts. *Bucklew v. Precythe*, 585 US _____ (2018) (No. 17-8151), [US Supreme Court oral argument scheduled for November 6, 2018] |
| 07/2017 | **US Federal Court – District of Arizona**.  *Guardian News & Media, LLC, et al. v. Charles L. Ryan, et al*.; In the United States District Court for the District of Arizona.  Case No. CV-14-02363-PHX-GMS |
| 06/2017 | **State of Arizona**.  *Shannon Coleman, et al. v. Zion's Rx Formulations, LLC, et al*.; In the Superior Court of the State of Arizona, In and For the County of Maricopa. No. CV2015-006403 |
| 07/2016 | **US Federal Court of Appeals – Fifth Circuit**.  *Jeffrey Wood, et al. v. Bryan Collier, et al*.; In the United States Court of Appeals for the Fifth Circuit. No. 16-20556 |
| 05/2016 | **US Federal Court – Southern District of Texas**.  *Thomas Whitaker, et al. v. Brad Livingston, et al*.; In the United States District Court for the Southern District of Texas, Houston Division. Case No. 4: 13-cv-02901 |
| 11/2015 | **US Federal Court – Eastern District of Virginia.**  *Alfredo Prieto v. Harold Clarke, et al*.; In the United States District Court for the Eastern District of Virginia, Alexandria Division.  Case No. 1:15cv1258 |
| 07/2015 | **State of Tennessee**.  *Stephen M. West, et al. v. Derrick D. Schofield, et al*.; In the Chancery Court of Davidson County, Tennessee. Case No. 13-1627-I |

# EXHIBIT B

# EXHIBIT 1

I, ████████████ hereby declare as follows:

1. I am over 18 years of age and would testify to the following based on my first-hand knowledge.

2. I am a licensed pharmacist in the State of Arizona.

3. As a licensed pharmacist in the State of Arizona, I am aware of and follow the guidelines and requirements found in the United States Pharmacopeia.

4. I have prior experience in properly preparing compounded sterile preparations.

5. I prepared a sodium pentobarbital solution using my training and experience as a licensed pharmacist.

6. I had the prepared sodium pentobarbital solution provided to a FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date. (See Attachments 1-3).

7. These test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing. (See Attachment 3).

8. On February 26, 2022, I prepared a sodium pentobarbital solution from the same sodium pentobarbital powder that was used for the stability study.

9. Based on the stability study test results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022.


DATED this 5th day of May, 2022.

████████████████████████████████

# ATTACHMENT  1



# Certificate of Analysis

**CLIENT :**

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021

**STORAGE :** 25°C & 60%RH

**FORMULATION ID :**

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.5% (49.2302mg / 1mL) | 12/28/2021 |

Notes

Assay: The referenced method (AMIN-2089) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 90 of testing at pre-defined timepoints.



01/04/2022

Date

Page 1 of 1

# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0310mg / 1mL) | 01/27/2022 |

Notes

Assay: The referenced method (AMIN     used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 120 of testing at pre-defined timepoints.

02/03/2022
_____
Date

# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| Assay - Pentobarbital Sodium | HPLC / AMIN-2089 | 92.0% - 108.0% | 98.1% (49.0497mg / 1mL) | 03/02/2022 |

Notes

Time = Day 150 of testing at pre-defined timepoints.

Assay: The referenced method (AMIN) used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

03/08/2022
_____
Date

# ATTACHMENT 2



# Certificate of Analysis

**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Endotoxin | USP <85> | NMT 0.7 EU / mg | <0.2 EU / mg | 03/24/2022 |
| Sterility - (PRELIMINARY) | USP <71> | Sterile | No Growth at 5 Days | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.



03/28/2022

Date



# Certificate of Analysis

**DESCRIPTION :**  Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :**  09/24/2021
**STORAGE :**  25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|---|---|---|---|---|
| pH | USP <791> | Report Value | 10.6 | 03/24/2022 |
| Assay - Pentobarbital Sodium | | 92.0% - 108.0% | 100.3% (50.1515mg / 1mL) | 03/28/2022 |

Notes

Assay: The referenced method _____ used for this analysis is validated for the specific product being tested under non-cGMP conditions at client's request.

Time = Day 180 of testing at pre-defined timepoints.



04/04/2022
_____
Date



# Certificate of Analysis



**DESCRIPTION :** Stability - Pentobarbital Sodium 50 mg/mL

**DATE RECEIVED :** 09/24/2021
**STORAGE :** 25°C & 60%RH

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Sterility - (FINAL) | USP <71> | Sterile | Sterile | 03/23/2022 |

Notes

Time = Day 180 of testing at pre-defined timepoints.

Sterility: The citation to USP <71> is conditioned on the accuracy of our customer's verification that the sampling program complies with the provisions of USP <71>.

04/06/2022
Date



# Certificate of Analysis



**DESCRIPTION :**  Pentobarbital Sodium 50 mg/ml

**DATE RECEIVED :**  04/12/2022

**STORAGE :**  20°C to 25°C

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC | 90.0% - 110.0% | 98.2%<br>(49.0968mg / 1mL) | 04/13/2022 |

Notes

The potency method(s) used for testing passed system suitability requirements per ▮▮▮▮▮▮▮▮ or non-cGMP analysis.
Product specific method validation is not available for this sample and specification(s) are for informational purposes only. Client
should verify the specification and analyte reported are correct for the compounded formulation.

04/13/2022
_____

Date

# ATTACHMENT 3

# STABILITY STUDY SUMMARY REPORT: PENTOBARBITAL



## PROJECT SUMMARY AND RESULTS

| Sample Description | Stability-Pentobarbital Sodium 50 mg/mL | | |
|---|---|---|---|
| Concentration | 50 mL/mL, Pentobarbital Sodium | | |
| Formulation ID | 4015 | Dosage Form | Parenteral (IV) |
| Storage Condition | 25°C ± 2°C/ 60%RH | Lot Number | 39702 |
| Container Description | 30 mL amber vial w/ 20 mL fill | | |

| Attribute | Methods | Specification (Description) | Initial (T0) ARL# 785881 | T90 D ARL# 786008 | T120 D ARL# 786023 | T150 D ARL# 818437 | T180 D ARL# 786025 |
|---|---|---|---|---|---|---|---|
| pH | USP ‹791› | Report Value | NT | NT | NT | NT | 10.6 |
| Sterility | USP ‹71› | Sterile | Sterile | Sterile | NT | NT | Sterile |
| Endotoxin | USP ‹85› | NMT 0.7 EU/mg | <0.2 EU/mg | <0.2 EU/mg | NT | NT | <0.2 EU/mg |
| Pentobarbital Sodium Assay | AMIN-2089 | % of Label (92.0-108.0%) | 96.4% | 98.5% | 98.1% | 98.1% | 100.3% |
| Assay Date Tested | - | - | 09/29/2021 | 12/28/2021 | 01/27/2022 | 03/02/2022 | 03/28/2022 |

## CONCLUSION

Physical and chemical data of Pentobarbital Sodium has demonstrated that Pentobarbital Sodium in the present formula and packaging met client provided specifications through 180 days in ambient storage conditions.

# EXHIBIT C




Order Date: 10/22/2020

Shipped To:

Arizona Department of Corrections
To be determined
    , AZ –

| PART# | DESCRIPTION | UNIT SIZE | QTY | PRICE | EXT PRICE |
|---|---|---|---|---|---|
| | **Pentobarbital sodium salt,   >99% USP Grade** Packaging (4-8 Jars) unlabled Shipping Unmarked jars and boxes Shipping location AZ (to be determined) | 1 G | 1000 | $1500.00 | $1500000 |

|  | $1,500,000 |
|---|---|
|  | $0 |
| **Total:** | **$1,500,000** |
| Amount Paid: | |
| **Amt Due Net 30 – $USD:** | **$1,500,000** |

# EXHIBIT D

Printed by:

Official Date: Official as of 01-May-2018
DOI Ref: x58dn

Document Type: USP
DOI: https://doi.org/10.31003/USPNF_M62410_03_01

@2022 USPC

1

# Pentobarbital Sodium Injection

» Pentobarbital Sodium Injection is a sterile solution of Pentobarbital Sodium in a suitable solvent. Pentobarbital may be substituted for the equivalent amount of Pentobarbital Sodium, for adjustment of the pH. The Injection contains the equivalent of not less than 92.0 percent and not more than 108.0 percent of the labeled amount of $C_{11}H_{17}N_2NaO_3$.

**Packaging and storage**—Preserve in single-dose or multiple-dose containers, preferably of Type I glass. The Injection may be packaged in 50-mL containers.

**Labeling**—The label indicates that the Injection is not to be used if it contains a precipitate.

*USP Reference standards* ⟨11⟩—
USP Pentobarbital RS

**Identification**—The retention time of the major peak in the chromatogram of the *Assay preparation* corresponds to that in the chromatogram of the *Standard preparation,* as obtained in the *Assay.*

**Bacterial Endotoxins Test** ⟨85⟩ —It contains not more than 0.8 USP Endotoxin Unit per mg of pentobarbital sodium.

**pH** ⟨791⟩:  between 9.0 and 10.5.

**Other requirements**—It meets the requirements under *Injections and Implanted Drug Products* ⟨1⟩.

**Assay**—

*Mobile phase*—Prepare a filtered and degassed pH 3.5 mixture of 0.01 M monobasic potassium phosphate and acetonitrile (65:35). Make adjustments if necessary (see *System Suitability* under *Chromatography* ⟨621⟩).

*Standard preparation*—Dissolve an accurately weighed quantity of USP Pentobarbital RS in *Mobile phase,* and dilute quantitatively, and stepwise if necessary, with *Mobile phase* to obtain a solution having a known concentration of about 0.1 mg per mL.

*Assay preparation*—Quantitatively dilute a suitable volume of Injection with *Mobile phase* to obtain a solution having a known concentration of about 0.1 mg per mL.

*Chromatographic system* (see *Chromatography* ⟨621⟩)—The liquid chromatograph is equipped with a 214-nm detector and a 4.6-mm × 25-cm column that contains 5-μm packing L1. The flow rate is about 1.0 mL per minute. Chromatograph the *Standard preparation,* and record the peak responses as directed for *Procedure:* the capacity factor, *k′,* is not less than 2.5; the column efficiency is not less than 15,000 theoretical plates; the tailing factor is not more than 1.5; and the relative standard deviation for replicate injections is not more than 2.0%.

*Procedure*—Separately inject equal volumes (about 10 μL) of the *Standard preparation* and the *Assay preparation* into the chromatograph, record the chromatograms, and measure the responses for the major peaks. Calculate the percentage of $C_{11}H_{17}N_2NaO_3$ in the portion of Injection taken by the formula:

$$100(248.25/226.27)(C_S/C_U)(r_U/r_S)$$

in which 248.25 and 226.27 are the molecular weights of pentobarbital sodium and pentobarbital, respectively; $C_S$ is the concentration, in mg per mL, of USP Pentobarbital RS in the *Standard preparation; $C_U$* is the final concentration, in mg per mL, of the *Assay preparation; and $r_U$* and *$r_S$* are the peak areas obtained from the *Assay preparation* and the *Standard preparation,* respectively.

Exhibit 14



# Certificate of Analysis

**DESCRIPTION :**  Pentobarbital Sodium 50 mg/ml

**DATE RECEIVED :**  04/12/2022

**STORAGE :**  20°C to 25°C

| Test | Method | Specifications | Results | Date Tested |
|------|--------|----------------|---------|-------------|
| Assay - Pentobarbital Sodium | HPLC | 90.0% - 110.0% | 98.2% (49.0968mg / 1mL) | 04/13/2022 |

Notes

The potency method(s) used for testing passed system suitability requirements per ▮▮▮▮▮ or non-cGMP analysis. Product specific method validation is not available for this sample and specification(s) are for informational purposes only. Client should verify the specification and analyte reported are correct for the compounded formulation.



04/13/2022
_____

Date



AZ Department of Corrections
Phoenix, AZ

**DATE**          April 18, 2022

## EXAMINATION REQUESTED

Drug Toxicology

## ITEMS

7.                Amber bottle

## ANALYSIS PERFORMED

Barbiturates Assay

## RESULTS / INTERPRETATIONS

7.  The following are the results from the analysis of this specimen:

Pentobarbital (a derivative of Barbituric Acid)          105 ± 21 ng/ml

105 ng/mL multiplied by (500,000:1 dilution) is equivalent to 52 mg/mL.

For quantitative values, the uncertainty of
the concentration is given at a level of
confidence greater than 95.45%.

Exhibit 15

| | | B/L DATE |
|---|---|---|
| | | 12/8/2020 |

| | | |
|---|---|---|
| S H I P   T O | AZ Department of Corrections<br>PRISON OPERATIONS<br>1645 West Jefferson,MC 321<br>Phoenix  AZ, CA  85007 | |

| | | DATE |
|---|---|---|
| | | 12/8/2020 |

| QUANTITY ORDERED | QUANTITY SHIPPED | PACKAGING | H M | DESCRIPTION |
|---|---|---|---|---|
| 2 | 2 | 1#BOTTLE | X | UN1680, POTASSIUM CYANIDE, SOLID<br>6.1, PGI, POTASSIUM CYANIDE BRICK<br>CHEMICALLY PURE  1 LB. BOTTLE<br>2 LB |

| | | | | |
|---|---|---|---|---|
| | | TOTAL COD AMOUNT DUE: | $1,529.50 | |

| Invoice Date |
|---|
| 12/17/2020 |

**Sold To:**

**Ship To:**

AZ Department of Corrections
PRISON OPERATIONS
1645 West Jefferson,MC 321
Phoenix   AZ, CA  85007

RECEIVED
DEC 2 1 2020
Prison Operations
Business Office

| Ship Date | Ship Via | | Freight Terms | | Payment Terms | |
|---|---|---|---|---|---|---|
| 12/16/2020 | | | | | COD | |

| | | | Order Date | | | |
|---|---|---|---|---|---|---|
| | | | 12/8/2020 | | | |

| QTY Shipped | Packaging | Total Quantity | Product | Unit Price | Amount |
|---|---|---|---|---|---|
| 2 | 1 # BOTTLE | 2 # | POTASSIUM CYANIDE BRICK CHEMICALLY PURE  1 L | 700.0000 / # | 1,400.00 |
| | | | Merchandise SubTotal | | 1,400.00 |
| | | | Tax | | 129.50 |
| | | | **Total Invoice** | | **1,529.50** |

| B/L DATE |
|---|
| 12/11/2020 |

| DATE |
|---|
| 12/11/2020 |

| QUANTITY ORDERED | QUANTITY SHIPPED | DESCRIPTION |
|---|---|---|
| 2 | 2 | UN1823, SODIUM HYDROXIDE, SOLID 8, PGII, SODIUM HYDROXIDE AR PELLETS SIGMA ALDRICH ACS REAGENT 500 GRAM BTL 1000 G |
|  |  | DS___ |
| 2 | 2 | UN1830, SULFURIC ACID 8, PGII, SULFURIC ACID #9681 BAKER ANALYZED REAGENT 2.5 L 5 L |

B/L DATE

12/11/2020

| | |
|---|---|
| **S H I P   T O** | AZ Department of Corrections<br>PRISON OPERATIONS<br>1645 West Jefferson,MC 321<br>Phoenix  AZ, CA  85007 |

**S O L D   T O**

INV. #

| CUST. ACCT. NO. | SALES AG. | OPERATOR | REQ. NO. | SHIP VIA | TERMS | 24 HOUR EMERGENCY NUMBER |
|---|---|---|---|---|---|---|

DATE

12/11/2020

| QUANTITY ORDERED | QUANTITY SHIPPED | | DESCRIPTION |
|---|---|---|---|
| 2 | 2 | | CHEMICALS, N.O.S NON-REGULATED<br>PHENOLPHTHALEIN<br>SIGMA ALDRICH 100 GRAM<br>200 G |

Total Weights:

| | |
|---|---|
| TOTAL COD AMOUNT DUE: | $687.11 |

| Invoice Date |
| --- |
| 12/17/2020 |

| Due Date |
| --- |
| 12/22/2020 |

**Sold To:**

**Ship To:**

AZ Department of Corrections
PRISON OPERATIONS
1645 West Jefferson,MC 321
Phoenix  AZ, CA  85007

RECEIVED

DEC 2 1 2020

Prison Operations
Business Office

| Ship Date | Ship Via | Freight Terms | Payment Terms |
| --- | --- | --- | --- |
| 12/16/2020 | OTHER | | COD |

| | | Order Date | |
| --- | --- | --- | --- |
| | | 12/11/2020 | |

| QTY Shipped | | Total Quantity | Product | Unit Price | Amount |
| --- | --- | --- | --- | --- | --- |
| 2 | | 2 E | PHENOLPHTHALEIN SIGMA ALDRICH 100 GRAM | 90.0000 / E | 180.00 |
| 2 | | 2 E | SULFURIC ACID  #9681 BAKER ANALYZED REAGE | 101.8600 / E | 203.72 |
| 2 | | 2 E | SODIUM HYDROXIDE AR PELLETS SIGMA ALDRICH ACS REAGENT 500 GRAM BTL | 62.2600 / E | 124.52 |
| | | | Merchandise SubTotal | | 508.24 |
| | | | Tax | | 47.01 |
| | | | Freight Charges | | 131.86 |
| | | | Total Invoice | | 687.11 |

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Request for Purchase / Purchase Order**

| Purchase Order Number |
|---|
| ██████████ |

| RFP Number | Activity Manager and Date* ██████ | AZ Contract Number |
|---|---|---|
| Budget Unit<br>DCA-Agency Support | Budget Group Authority and* | Purchasing and Date* |
| Date Prepared<br>12/17/2020 | Index | PCA | Accounting and Date* |
| Requestor and Phone* | Compt Obj | Vendor Number and Mail Code ██████████ |

| Vendor<br>ADCRR - Revolving Fund<br>Central Office<br><br>Phone Number ██████ | Ship To<br>1601 W Jefferson St<br>Phoenix, AZ 85007<br><br>Attn and M/C | Bill To<br>Attn: Financial Services<br>1645 W Jefferson St<br>Phoenix, AZ 85007<br>Customer Number |
|---|---|---|

| Line No. | Qty | Unit | Commodity No. | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 1 | LS | | Reimburse Central Office revolving fund for RFP numbers ████ and ████ using below chart of account elements:<br><br>Function ██████<br>Object: ████ | $2,216.61 | $2,216.61 |
| | | | | ████████████████ | | |

| Delivery Required | Terms** | FOB | Subtotal | $2,216.61 |
|---|---|---|---|---|
| | | | Tax | 0 |
| Received and Date* - *I certify this order received except as noted above.* | | | Freight | 0 |
| | | | Total | $2,216.61 |

\* Requires signature
~ Signature must be on file with Financial Services Bureau as authorized to sign RFP
+ Signature must be on file with the Financial Services Bureau as authorized to sign encumbrances/purchase orders
\*\* See reverse side for State of Arizona Purchase Order Terms and Conditions

| Authorized Agent and Date*+ |
|---|
| |

Distribution:   Original - Vendor      Copy -Accounting      Copy - Budget Group Authority      Copy - Receiver      Copy - Purchasing

302-2P
1/24/02

Arizona Department of Corrections, Rehabilitation and Reentry
Request for Purchase/Purchase Order

Purchase Order No.: ▮

| RFP No.: ▮ | Activity No.: ▮ | AZ Contract No.: |
|---|---|---|
| Budget Unit:<br>Prison Operations | Budget ▮ | Purchasing/Date*: |
| Date Prepared:<br>November 30, 2020 | Index: ▮ | Accounting/Date*: |
| Requested by/Phone*: ▮ | Compt Obj: ▮ | Vendor No./MC: |

| Vendor: ▮ | Ship to: | Bill to:<br>AZ Department of Corrections<br>Prison Operations<br>1645 West Jefferson, MC 321<br>Phoenix, Arizona 85007 |
|---|---|---|

| Line No. | Qty | Unit | Commodity No. | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 2 | bottles | | Potassium Cyanide - 1 lb bottles<br><br>Potassium Cyanide Brick<br>Chemically Pure 1 lb. bottle | 700.00 | $1,400.00 |

| | | |
|---|---|---|
| | Subtotal | $1,400.00 |
| Delivery Required: _____  Terms**: __NET 30__  FOB: DESTINATION | Tax | $129.50 |
| | Freight | |
| Received/Date*: | Total | $1,529.50 |

*Requires signature
~Signature must be on file with Fin Svcs Bu as authorized to sign RFP
+Signature must be on file with the Fin Svcs Bu as authorized to sign encumbrances/purchase orders
**See reverse side for State of Arizona Purchase Order Terms and Conditions
Distribution: White to Vendor, Yellow to Accounting, Pink to Business Office, Green to Receiver, Blue to Purchasing

Authorized Agent/Date* +

Arizona Department of Corrections, Rehabilitation and Reentry
Request for Purchase/Purchase Order

Purchase Order No.:

| RFP No.: | | AZ Contract No.: |
| Budget Unit: | Budget Unit Authority/Date =: | Purchasing/Date*: |
| Date Prepared: December 9, 2020 | Index: | Accounting/Date*: |
| Requested by/Phone*: | Compt Obj: | Vendor No./MC: |

| Vendor: | Ship to: | Bill to: AZ Department of Corrections Prison Operations 1645 West Jefferson, MC 321 Phoenix, Arizona 85007 |

| Line No. | Qty | Unit | Commodity No. | Description | Unit Price | Extended Price |
|---|---|---|---|---|---|---|
| 1 | 2 | each | | Phenolphthalein powder (100 gram) | 90.00 | $180.00 |
| 2 | 2 | each | | Sulfuric Acid 96-98% Reagent (2.5L) | 101.86 | $203.72 |
| 3 | 2 | each | | Sodium Hydroxide (Caustic Soda pellets) (500 gram) | 62.26 | $124.52 |
| | | | | Freight for Sulfuric Acid | | $131.86 |

| | | |
|---|---|---|
| Subtotal | | $640.10 |
| Tax 9.25% | | $47.01 |
| Freight | | |
| Total | | $687.11 |

Delivery Required: _____  Terms**: NET 30  FOB: DESTINATION

Received/Date*: _____

*Requires signature
–Signature must be on file with Fin Svcs Bu as authorized to sign RFP
+Signature must be on file with the Fin Svcs Bu as authorized to sign encumbrances/purchase orders
**See reverse side for State of Arizona Purchase Order Terms and Conditions
Distribution: White to Vendor, Yellow to Accounting, Pink to Business Office, Green to Receiver, Blue to Purchasing

Authorized Agent/Date*+



## STATE OF ARIZONA REMITTANCE ADVICE

WARRANT NO. ███████

AGY:  DCA                    AGENCY CONTACT: ACCOUNTING MANAGER              ███████

| INVOICE NO. | INVOICE DT. | INVOICE DESCRIPTION | DOCUMENT/LINE NO. | INVOICE AMT. | DISCOUNT AMT. | NET AMT. |
|---|---|---|---|---|---|---|
|  |  | ███████ | ███████ | $2,216.61 |  |  |

IF REMITTANCE ADVICE ABOVE IS BLANK, SEE HTTP://WWW.VENPAY.GAO.AZDOA.GOV/ FOR FURTHER DETAILS.

EVER WONDER WHERE YOUR PAYMENT FROM THE STATE IS? OR, WHICH STATE AGENCY PAID YOU THROUGH DIRECT DEPOSIT/ACH? VISIT OUR VENDOR PAYMENT WEBSITE, HTTP://WWW.VENPAY.GAO.AZDOA.GOV/.

| VENDOR NAME: | ███████ | ISSUE DATE: | | WARRANT AMOUNT: |
|---|---|---|---|---|
| VENDOR ID: | ███████ | 12/18/2020 | | $2,216.61 |

FOLD OR SEPARATE AT COLORED LINE BELOW

Exhibit 16

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison,<br><br>Defendants. | No. C-92-1482-MHP<br><br>**DECLARATION OF CARLA McCLAIN SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 37**

JCRC000082

## DECLARATION OF CARLA McCLAIN

I, Carla McClain, declare the following:

1.  On April 6, 1992, at approximately 12:10 a.m., I was a
media witness to the execution of Donald Harding, the first
execution in Arizona in twenty-nine years.  I have been a
reporter for almost twenty-five years, and for the last thirteen
years have written on health and medicine policy issues for the
Tucson Citizen.  I was chosen to witness this execution from
among the Citizen's staff based on seniority and experience.

2.  I was escorted along with the other witnesses to the
freshly painted death house, where we were taken inside one by
one.  The three windows which we faced were covered with blinds.
Slowly, the blinds were lifted.  Mr. Harding was already strapped
into the execution chair.  Mr. Harding was stripped to his
undershorts and the white flesh of his body seemed to fill the
heavy metal chair.  He was tightly strapped to the chair.

3.  Mr. Harding seemed agitated, his hands moving about
under the straps.  He appeared startled when the curtains were
lifted and he was facing the Arizona Attorney General.  Turning
his head, Mr. Harding saw his attorney and gave him a thumbs up
sign and a smile.

4. I could see the warden through the chamber as he stood with his hand on the lever that would lower the cyanide into the acid. I **saw** him drop his arm and heard the clank of the heavy lever which sent the pound of cyanide pellets into the vat of acid beneath the chair. I saw the deadly gas enshroud Mr. Harding in a fine, white mist.

5. Mr. Harding shuddered deeply, then slowly raised the middle finger of his left hand, aiming it at the warden who had set the execution in motion by bringing the lever down. Mr. Harding breathed deeply, his hands clenching. He groaned loudly and began to choke to death. His head dropped forward, and then swung up high and back. He groaned again and again, gasped, and his body turned bright red, almost purple as he clenched and convulsed in obvious pain.

6. As his head rolled to the right I saw his eyes begin to close. His head jerked up again, then rolled forward and then slowly down onto his chest. He was unconscious, finally, after more than two minutes.

7. **For several more** minutes his chest convulsed and his muscles **quivered. He seemed** to continue gasping and shuddering. His body heaved, and then he was still.

8. The witness room was silent. Several more minutes

DECLARATION OF CARLA McCLAIN          2

passed.  Then the public information officer for the prison
entered and announced the execution was complete.  Eleven minutes
had passed.


I declare under penalty of perjury under the laws of the State of
California and the United States of America that the foregoing is
true and correct.  Dated this 20th day of October, 1993.

CARLA McCLAIN

DECLARATION OF CARLA McCLAIN                    3

Exhibit 17

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone:  (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone:  (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID FIERRO, ROBERT HARRIS, and
ALEJANDRO GILBERT RUIZ, as
individuals and on behalf of themselves
and all others similarly situated,

            Plaintiffs,

v.

JAMES GOMEZ, as an individual, and in his
capacity as Director, California Department of
Corrections, and DANIEL VASQUEZ, as an
individual, and in his capacity as Warden of
San Quentin Prison,

            Defendants.

No.  C-92-1482-MHP

**DECLARATION OF DONNA
LEONE HAMM SUBMITTED
IN LIEU OF LIVE
TESTIMONY BY STIPULATION
OF THE PARTIES**

## PLAINTIFFS' EXHIBIT NO. 16

JCRC000086

DECLARATION OF DONNA HAMM

I, Donna Leone Hamm, declare as follows:

1.  Don Eugene Harding was executed in Arizona's gas chamber on April 6, 1992
beginning at 12:18 a.m., just over a week ago.  I knew Don for about eight months
prior to his execution.  Don had asked me to witness his execution so that I might
tell his family and the families of others on death row what actually happens when
one is killed by lethal gas.  Despite strong apprehensions, I agreed to honor his
request.

2.  Upon my arrival at Arizona State Prison, Florence, Arizona, I was escorted by a
prison official to the chapel where other witnesses for Don Harding were waiting.
As a group, we avoided talking about what we were about to see.  Instead, we shared
memories of our personal human experiences with Don and his family, and spoke about
carrying out his final wishes.  We were in the chapel for nearly an hour  during
which time a prison official had us draw numbers from a box.  This number established
the order in which we would enter into the viewing area and where we would stand
in proximity to the viewing windows of the gas chamber.  I drew number eighteen.

3.  At approximately 12:00 a.m., all the witnesses for Don, for the State and from
the media, converged on the sidewalk to walk over to the Death House.  No one spoke.
The only noises I could hear were my own footsteps and the sounds of some inmates
in the darkened cellblocks hollering at us as we passed by their windows.  We
filed into the Death House in the pre-designated order, as a prison staff member
checked off our lottery numbers.  I stood in the second of three rows, directly
behind where Don was seated in the gas chamber chair.  Three sides of the octagonal
gas chamber had windows for viewing.  As we entered and took our places, the blinds

were drawn.  When all the witnesses were assembled, an official announced that
Don's last appeal had failed and the execution would proceed.  The door to the
Death House viewing room was closed and an officer was ordered to roll up the
blinds.

4.  Don was strapped to the metal chair with numerous black restraints.  He was
facing away from us, dressed only in his underwear.  I had been warned in advance
of the ritualistic execution policies, and observed my fellow witnesses take on
behavior which could only be described as "execution etiquette" — an unspoken
but pervasive feeling that we were expected to act civilly and with detachment to
the coming events.  However, I was struck with a feeling of overwhelming dispair
as Don Harding, in the name of our government, had indeed been literally and
figuratively stripped of his humanity.

5.  I watched Don turn to look at one of his attorneys.  He forced a slight smile,
but could not disguise the child-like terror in his face.  He turned the other
direction and I believed he was looking for me.  He never knew I was there, as he
could not see the people standing directly behind him.  He moved around in the
chair, as much as the restraints would allow.  He seemed to be mumbling to himself.
He was agitated and fidgety.  Knowing Don as I did, I realized that his agitation
was born of his tragic desire to control one tiny aspect of this utterly dehumanizing
spectacle.  He wanted it to be quick and painless.

6.  About 60 seconds after the blinds were lifted, the pellets were released under
his chair.  I heard the loud noise as they were dropped into the acid.  It took
about 5 seconds for the mist, and the first trace of fumes, to reach him.  At
that point, Don's naked back inflated against the chair as if he were taking a

JCRC000088

large breath.   His head was thrown back violently against the chair and he
turned his head from side to side.  He jerked and twisted as if gasping for air.
At the same time, his body buckled against the straps.   Severe convulsing began,
and continued throughout.  Even through the thick glass of the gas chamber, I
heard him moan a low, gutteral sound of sheer torment.   I prayed for him to
go quickly.

7.  At one point, I was unable to sustain watching this prolonged suffering alone.
I broke from my assigned standing spot and walked over to Don's minister.  We
held on to each other and with his arm around my shoulder, I noticed how badly I
was shaking.  From that position, I could closely see Don's hand and arm twitching.
For the almost two minutes I stood there, his hand never stopped contorting in
bizarre ways.  His body, especially his back and neck had turned a deepening red.
His head flung back and then drooped against his chest.  The convulsions caused
his body to shake so badly that I momentarily thought the chair would shake.
The spasms and gasping lasted about seven minutes until his head dropped to his
chest for the last time.  Finally, he appeared to be dead, but I noticed what
appeared to be involuntary movement of his left hand.   I continued to pray that
this spectacle be over.

8.  I saw a prison doctor approach the glass from the other side of the chamber,
in front of Don.  He gazed  dispassionately at Don's now quieted body and quickly
moved away from the window and back into the shadows on the front side of the chamber.
Soon, a prison official announced to the witnesses that the execution was complete.
It had taken ten and one-half minutes.   The last look at Don was one I will never
forget.  Where minutes before his body had been hot red , it was now slumped over
and was ashen grey/beige — the antiseptic color of the gas chamber itself.  The

-4-

prison officials ordered the blinds to be closed.  The door to the outside
opened and we all filed out.


9.    Nothing in my life prepared me to witness the prolonged, ritualistic torture
of another human being.   I have struggled to put this experience into any kind of
human perspective.   I had spent a lot of time imagining painful death before.   My
father burned to death in a plane crash when I was 21 years old.   He died brutally
and his body was charred beyond recognition.   I am still plagued -- twenty-three
years later -- by gruesome images of his unspeakable suffering in the last painful
seconds of his life.   Nonetheless, as I watched the agony suffered by Don Harding,
I knew that his torment was far worse and much prolonged than that experienced by
my father.   I am told that my father probably died in 30 seconds.   Don endured his
torture for ten and one-half minutes.   His suffering was palpable and sickening,
and I felt it like a cloak draped over my body.   I winced with every convulsion,
moan, and every desperate contortion.   Those ten and one-half minutes were the
longest and most harrowing moments of my life.


10.   A little more than a week later, I am still in shock over what I witnessed.
I awake during the night startled and unable to sleep because of the terrifying
images of Don suffocating to death.   The images of his convulsing and with his
hand clenched to the chair will be etched in my mind forever.


11.   I am humiliated for my fellow man.   Don's punishment was to torture him
in view of 25 witnesses.   It was not the act of civilized people.   He suffered
in discernable agony for over ten minutes.   I talked with Don's family about his
execution, but I could not bring myself to tell them just how brutally he died.
Death by gas is barbaric, and an inhumane infliction of torture.

JCRC000090

-5-

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability, and that this declaration was executed on April 14, 1992 at Tempe, Arizona.

Donna Leone Hamm

JCRC000091

Exhibit 18

# Woods says he didn't see finger gesture

## Got Harding's message by way of eye contact

By Michael Murphy
THE PHOENIX GAZETTE

Attorney General Grant Woods said he did not see triple murderer Donald Eugene Harding's ultimate parting shot — an obscene gesture — through the gas chamber window.

Woods said he got the message anyway.

"He certainly looked at me, and he made faces at me a couple of times," Woods said on Tuesday. "He was smirking ... and basically, I felt, trying to convey the same things through facial expressions that he apparently tried to do with the middle finger."

The attorney general said he resisted a temptation to respond in kind to Harding, who was executed early Monday for the 1980 murders of two businessmen he robbed, hogtied, beat and shot in a Tucson motel room.

"The whole scene was too eerie and really tragic to want to participate in any way except as an observer," Woods said. "Regardless of what his antics were, I think it was appropriate for me to present a different demeanor."

"He needed to know from start to finish that we were not going to cut him any slack because he didn't deserve it. That means right up to the end."

Instead, Woods said he focused on another witness, Debrah Gage, whose father, Allan, was one of Harding's victims.

"I tried to minimize what Harding had to go through, but I think it pales in comparison to what all these other men, innocent men, went through in their final hours."

At the same time, Woods said the execution was "a terrible thing to witness," and said the experience hardened his resolve against use of the gas chamber.

Noting that he has always advocated lethal injections as a means of killing convicts, Woods said that watching the use of the gas chamber "solidified my opinion we should go to that."

"It took so long," he said. "I don't know who came up with this concept of a gas chamber in the first place. ... Maybe that was innovative a while ago, but it's not today.

"It makes me continue to appreciate that it should be reserved only for a very few because it is such an extreme step. I'm satisfied that that standard is being met in this state."

Woods said he believes executions under the death penalty will happen regularly if the state prison because his office has streamlined the appeals process.

He said the unbelievable spotlight on Harding's execution was positive because society needs to continually re-examine its beliefs in an area like this to make sure it's something it wants to do.

Exhibit 19

# LaGrand dies in state gas chamber

## Killer executed despite protests from Germany

**By Christina Leonard**
The Arizona Republic

FLORENCE — The LaGrand brothers chose the gas chamber in hopes their sentences would be commuted — and to illustrate the horrors of the death penalty.

Although witnesses stopped short of calling Walter Burnhart LaGRand's 18-minute death by lethal gas Wednesday night cruel and unusual, they did say it was disturbing to watch.

Bart Graves, a media witness with KTAR, said that LaGrand, 37, gurgled and coughed violently and his back muscles contorted until, finally, his head dropped.

He said the execution was difficult to watch because of "the sounds he was making and the intense gurgling and coughing." However, Arizona Attorney General Janet Napolitano, who also witnessed the execution, said it was not cruel and unusual.

*— Please see* **LAGRAND**, *Page A2*

*— Please see* **LAGRAND**, *Page A2*

## Related stories

**GERMANY:** Why are Germans so upset? **A2.**

**MONTINI:** What's the hot story, execution or Monica? **B1.**

**ONLINE:** Read previous stories about the LaGrand brothers on *The Republic*'s Web site, **www .azcentral.com.**

## Coming Sunday in Arts & Ideas

A German writer explains indignation over the execution of the LaGrand brothers.

# LaGrand executed for 1982 murder

— **LAGRAND**, *from Page A1*

"It was the punishment he chose," she said. "That was his election to make and his right to waive the 8th (Amendment)."

LaGrand died at 9:30 p.m., according to state Department of Corrections spokesman Michael Arra, despite protests from the German government and a flurry of international controversy over the death penalty. It was the state's first use of the gas chamber since 1992.

LaGrand apologized to the families of his victims first.

"To all my loved ones, I hope they find peace," he said. "To all of you here today, I forgive you, and I hope I can be forgiven in my next life."

As a cloud of white, steamlike mist rose, LaGrand began coughing, shook his head and gagged several times. A couple of minutes later, his head slumped forward. He coughed again, raised his head and slumped forward. He didn't raise his head after that, though over the next few minutes his shoulders appeared to move involuntarily.

LaGrand was sentenced to death for killing a bank manager during a botched robbery in 1982. His brother, Karl, was executed last week for the same crime.

Karl LaGrand changed his mind about being executed by gas an the hour before his scheduled execution Feb. 24. The brothers were convicted of murdering a 63-year-old bank manager in Marana during a bungled 1982 robbery attempt.

The cyanide gas began to flow from the floor of the gas chamber at 9:12 p.m. At 9:30, Walter LaGrand was pronounced dead. Heather Urquides, a reporter with the *Arizona Daily Star*, said LaGrand strained against the chair straps until he slumped over.

"It seemed like forever until the guy came over and said he was dead," she said.

Dawn Lopez, a Marana bank teller who survived the 1982 knife attack by LaGrand and his brother,



Ken Levine/Associated Press

Dawn Lopez survived the botched 1982 bank robbery. She was badly injured in the attack that killed Marana banker Kenneth Hartsock.

Karl, asked to leave the room before the execution was over.

The execution, originally scheduled for 3 p.m., had several last minute delays as desperate attempts for a stay were waged in international court. The German government filed a motion with the U.S. Supreme Court asking for a delay Wednesday so the World Court could be heard. However, the Solicitor General advised the high court that the request was not within the court's jurisdiction.

German media members were outraged that Americans would commit such a "medieval act."

Stephan Strothe, a German journalist, said that Americans are hellbent on putting LaGrand to death and that "in a civilized society, you should not strap somebody down and gas them."

The case drew widespread attention in Germany, which has no death penalty, prompting repeated diplomatic protests and an appeal to an international court.

Gov. Jane Hull rejected appeals from German Foreign Minister Joschka Fischer and Chancellor Gerhard Schroeder to stay the execution.

The brothers were born in Augs-



Associated Press

Walter LaGrand was executed in the gas chamber in Florence, the first time since 1992 that the gas chamber has been used.

---

## BACKGROUND

### Gas chamber facts

Only 10 of more than 500 inmates executed since the death penalty was restored in 1976 have died in the gas chamber.

Five states offer the gas chamber as an optional method of execution:

- Arizona.
- California.
- Wyoming.
- Maryland.
- Missouri.

*Source: Death Penalty Information Center*

---

burg, Germany, and moved to southern Arizona as children after their mother married an American serviceman. Karl was the first German citizen executed in the United States since World War II.

Includes information from the Associated Press.

Exhibit 20

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone:  (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone:  (415) 621-2493

Attorneys for Plaintiffs


# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison, <br><br> Defendants. | No.  C-92-1482-MHP <br><br> **DECLARATION OF TAD DUNBAR IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 14**

JCRC000092

## DECLARATION OF TAD DUNBAR

I, Tad Dunbar, do declare:

1.   I have been in the television news business for over
twenty-nine years.   After I graduated from Abilene Christian
College in Abilene, Texas, I went to work for several television
news departments in Texas.   I worked there for seven years, then
moved to Reno, Nevada, where I have worked as an anchorman at
Channel 8 News since 1969.

2.   In 1979, Nevada had its first post-<u>Furman</u> execution.   It
was the only the third in the nation and there was a great deal of
publicity surrounding the execution.   I agreed to act as a press
witness for Channel 8 News to the October 22, 1979 lethal gas
execution of Jesse Bishop at the Nevada State Prison in Carson
City.   As part of my assignment, I interviewed Jesse Bishop one
week before his scheduled execution. He was determined to be very
"cool" and dignified throughout his execution.

3.   There were fourteen witnesses at Mr. Bishop's execution.
Before we entered the observation room, a prison official told us
that if when we were in the room and we "smell anything funny --
hold your breath and exit the room quickly." Needless to say, this
was a bit unnerving.

4.  The witnesses were led into the observation room and stood
in sort of a semi-circle around the chamber.   Curtains were drawn
on the chamber.   When they were lifted, Mr. Bishop was already
strapped into the chair.   He was wearing blue jeans and a blue

1

JCRC000093

prison shirt. I had an unobstructed view of the most of his face and the front of his body. He looked around the room to see who had come to watch him die. His eyes met mine, and I soon heard a "clunk." The pellets had been released into the acid-water.

5. I didn't see any gas, but I noticed that Mr. Bishop took a deep breath. He immediately gasped and convulsed strenuously. His body stiffened and his head lurched back. His eyes widened, and he strained as much as the straps would allow. He unquestionably appeared to be in pain. I noticed that he had urinated on himself.

6. He alternately strained and then relaxed against the straps for about ten minutes. I could see his chest expand and contract. These movements became weaker as the minutes ticked away. I could not tell at what point Bishop finally died.

7. I had entered the observation room at the Nevada State Prison with no predisposed thoughts about the use of lethal gas. I was surprised to see that death did not appear to come rapidly or painlessly under that method of execution.

I declare, under penalty of perjury, that the foregoing is true and correct, and that this declaration was executed on April 15th, 1992 at Reno, Nevada.

Tad Dunbar

2

JCRC000094

Exhibit 21

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison, <br><br> Defendants. | No. C-92-1482-MHP <br><br> **DECLARATION OF DENNIS N. BALSKE, ESQ. IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 2**

JCRC000095

## <u>DECLARATION OF DENNIS N. BALSKE</u>

I, Dennis N. Balske, do declare:

1.  I am an attorney licensed to practice law in the States of Ohio and Alabama.  I received my J.D. degree from Ohio State University College of Law in 1974, where I subsequently taught from 1975 to 1978.  From 1978 to 1986, I was a staff attorney and then Legal Director at the Southern Poverty Law Center in Montgomery, Alabama.  I was the founder and first president of the Alabama Criminal Defense Lawyers Association in 1981.  I have been a member of the Alabama Supreme Court Advisory Committee on Criminal Procedure since 1985.  In 1986, I was awarded the Heeney Award, the highest award given by the National Association of Criminal Defense Lawyers, and in 1989, I received the Award of Merit from the Alabama State Bar Association.  I currently maintain a private practice in Montgomery, Alabama.

2.  For many years, I have specialized in trial and post-conviction representation of inmates charged with capital crimes.  One of my clients was Jimmy Lee Gray, the first man executed in Mississippi following reinstatement of the death penalty.  I represented Mr. Gray in post-conviction proceedings in 1983.  His case is reported as <u>Gray v. Lucas</u>, 677 F.2d 1086 (5th Cir. 1982).

3.  Mr. Gray was executed by cyanide gas on September 9, 1983, at 12:01 a.m. in Parchman, Mississippi.  At his request, I was a witness to his death.  I was made to stand with reporters in an area designated for observation.  The

area was hot and muggy and thick with the smell of bug spray. Although Mr. Gray's face was not covered, the chair into which he was strapped faced away from us. No vantage point from the observation area allowed a clear view of Mr. Gray's face. I saw only the back of Mr. Gray's head.

4. The signal was given, the pellets were dropped and white fumes rose from below the chair. Once the gas reached Mr. Gray's face, he began to thrash around in his chair. He jerked forward and back, repeatedly slamming his head on a metal support pole situated behind the chair. The chilling sound of his head desperately smashing against the pole reverberated through the area over and over again. About the seventh time he pounded his head against the pipe, his desperation was so great that the six-sided glass chamber seemed to shake with the impact. He slumped and lay still for a few moments, then tensed up and resumed his struggling, again smashing his head against the pole. Mr. Gray struggled for air while his body contorted and twisted.

5. A full eight minutes into the execution, while Jimmy Lee Gray writhed in agony, all reporters were ordered to leave. Several seconds later, I too was ordered from the observation room, despite my objections that Mr. Gray wanted me there and had the right to have his attorney present. I was made to leave while Mr. Gray was still struggling for air and banging his head. It was a nightmare.

6. Nothing in my experiences as an attorney or a human being could have prepared me to witness the prolonged and

torturous death of Jimmy Lee Gray.  I could tell that Mr. Gray was still alive when I and the other witnesses were forced to leave.  I believe that the prison officials made me leave prematurely, because they were deliberately trying to conceal the extreme and prolonged suffering caused by the cyanide gas.

7.  Although I fully expected that this would be an unpleasant manner of death for Mr. Gray, I had not anticipated the conditions under which I witnessed my client suffer.  As a witness, this execution was vile and repulsive to observe.  For Mr. Gray, it was clearly excruciating and horrific.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 13, 1992, at Montgomery, Alabama.

_____
DENNIS N. BALSKE


Sworn to and subscribed before me this the 13th day of April, 1992.

_____
NOTARY PUBLIC
My Commission Expires: 4-7-93

3

Exhibit 22

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison,<br><br>        Defendants. | No. C-92-1482-MHP<br><br>**DECLARATION OF DAN A. LOHWASSER SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

## PLAINTIFFS' EXHIBIT NO. 21

JCRC000099

## DECLARATION OF DAN A. LOHWASSER

I, Dan A. Lohwasser, declare as follows:

1. I live in Charlotte, North Carolina. I graduated from University of North Carolina, with a degree in journalism. I was a reporter for the United Press International from 1975 to 1984, and for the Charlotte Observer for two years. I am currently the senior vice president of a sports marketing company.

2. I was a helicopter pilot in the Viet Nam War, during which time I was exposed to violent death and hideous injuries. I have seen combat, as well as civilian casualties, in which people had suffered truly gruesome deaths. Therefore, I was not particularly concerned when I was asked to cover an execution in the gas chamber.

3. On September 8, 1983, as a reporter for United Press International, I traveled to Parchman, Mississippi to witness the lethal gas execution of Jimmy Lee Gray. I arrived at the Prison several hours before the scheduled execution and joined three other reporters in the administration building. We were instructed as to the rules and regulations to be followed, then driven to observation room.

4. **Jimmy** Lee Gray, wearing a prison jumpsuit, was escorted into the **chamber** by two guards. He was quickly strapped into the large, metal chair. A prison guard hooked the cyanide crystals beneath the chair, then left Mr. Gray alone. The chamber door was sealed. Very shortly afterwards, I heard the lever being

**1**

pulled and the cyanide dropped into the acid.

5. When the white mist began to rise, Mr. Gray leaned forward and inhaled. Then suddenly, his head snapped back and his body rose up against the straps. He was struggling to lift himself up out of the gas. His eyes were open and his head moved from side to side. His mouth took on an anguished, distorted expression as he gasped for air. These movements went on for about three to four minutes. After about four minutes, Mr. Gray's head fell forward on his chest, then he again raised it up and started to slam his head into the metal pole situated behind his chair. He let out a very long guttural groan. He looked like he was being strangled to death. It was obvious that Mr. Gray was in excruciating pain.

6. Eight minutes into the execution, while Mr. Gray was still smashing his head on the pole, a prison official sternly stated, "Gentlemen, let's go." All of the witnesses, including myself, were confused. Jimmy Lee Gray was still appeared to be alive, repeatedly smashing his head against a pole and gasping for air. I was to report to the press conference and describe the execution. I was very shocked by the scene before me and confused by the prison's decision to dismiss us partway through the execution.

7. The images of Jimmy Lee Gray helplessly searching the room with his eyes, straining to escape the gas, and smashing his head against that pole are permanently burned into my memory. These images are far more cruel, barbaric, and demoralizing than

**2**

any other violent and gruesome acts that I have witnessed.

8.   After the painful details of Jimmy Lee Gray's execution were made public, I fully believed that the gas chamber had been replaced by more humane methods of execution.  I was shocked and dismayed when I recently heard that an execution by lethal gas had been scheduled in California.  Death by lethal gas can never be anything less than brutal and inhumane.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct and that this declaration was executed on April __/5__, 1992.

DANIEL LOHWASSER

**3**

JCRC000102

Exhibit 23

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br><br>v. )<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison, )<br><br>Defendants. ) | No. C-92-1482-MHP<br><br>**DECLARATION OF ROBERT R. MARSHALL, ESQ. SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 23**

JCRC000103

## DECLARATION OF ROBERT R. MARSHALL, ESQ.

I, Robert Marshall, declare under penalty of perjury:

1.   I am an attorney licensed to practice law in the State of Mississippi.  Before completing my undergraduate studies in English at a Southern Baptist College in Clinton, Mississippi, I served for three years in the United States Army Infantry as a machine gunner and ultimately as an E5 sergeant.  I saw no combat, but I am no stranger to violence and sudden death.

2.   After receiving my J.D. from the University of Mississippi in Oxford in 1973, I worked for eight years with the firm of Young, Scanlon, & Sessums in Jackson, Mississippi, first as an associate and then as a partner.  I withdrew from the firm in 1981, and continued practice as a sole practitioner.  I currently maintain a private practice in Hattiesburg, specializing in bankruptcy and family law.  I am also a candidate for the M.S. degree in counseling psychology at the University of Southern Mississippi.

3.   In 1987, I shared an office with attorney Shirley Payne. Ms. Payne represented Connie Ray Evans in post-conviction proceedings in Mississippi, following a 1981 death sentence.  The final denial of Mr. Evans' request for a stay and petition for writ of certiorari is reported as Evans v. Thigpen, 483 U.S. 1033

1

JCRC000104

(1987).

4.   As Mr. Evan's execution date drew nearer, Ms. Payne
associated me onto the case.  She believed that the services of a
second attorney would be vitally important during the final hours
before execution.  Ms. Payne anticipated that legal proceedings
would continue into the final hours.  In that case, it was
essential that an attorney be with our client to inform him of
any changes in the status of the litigation and ensure that the
litigating attorney had confidential access to the personal
knowledge and assistance of the inmate.  Moreover, we considered
it important for one member of the defense team to witness the
execution.  Accordingly, I was among the witnesses to the
execution by lethal gas of Connie Ray Evans on July 7, 1987.

5.   The execution took place at Parchman, Mississippi, on a
hot, muggy summer night.  I was one of about 20 witnesses who
entered the observation room.  Glass observation windows of the
metal gas chamber protruded into the observation room, but
curtains were drawn on the chamber's windows.  Once the witnesses
were seated, s spokesman for the prison explained that procedure
and told the witnesses that Connie Ray would be probably be dead
after a minute or two but a healthy young male like Connie Ray
would live for several minutes after becoming brain dead.  The
curtains were opened.  Mr. Evans was already strapped into the
metal chair, dressed in a prison jumpsuit.  His head was tied to

2

JCRC000105

a metal post behind him.

6.   As the only attorney present on Mr. Evans' behalf, a special chair had been designated for me.  From this chair, I had a side view of Mr. Evans.  Reporters and other witnesses sat in the same observation room, but could see only the back of my client.  I could see through the chamber's windows to the side behind a wall where the State's witnesses sat.  These included the warden, assistant warden, chaplain, a representative from the attorney general's office, and the physician who pronounced Mr. Evans dead.

7.   The chamber was not sound proof -- I heard a "thump" and gas began to rise from below Mr. Evans' chair.  He then let out the first of several loud agonizing gasps.  I saw the muscles tightening and bulging on his neck.  His forced breathing and tensed body exhibited excruciating pain.  He lost control of his bodily functions.  Saliva drooled from his mouth, running down his chin, and hanging in a long rope from his chin.  I was on the verge of nausea, with a sick felling in the pit of my stomach, and I felt a nervous energy which both agitated and drained me. It took the cyanide gas thirteen minutes to kill Mr. Evans, the longest and most horrific thirteen minutes of my life.

8.   The beeping stopped on the heart monitor, and Mr. Evans was pronounced dead.  A prison official shut the curtains, and

3

JCRC000106

the witnesses were ushered out of the room. I was numb and
repulsed. I tried everything that I could to get the gruesome
visions of Connie Ray Evans's death out of my mind, but they
remain deeply etched. For almost five years, I've struggled with
recurring visions and intrusive thoughts about the horror and
repulsion of seeing Mr. Evans suffocate in an octagon-shaped
chamber while over twenty people anxiously watch. I continue to
have nightmares about Mr. Evans' torture. I have suffered post
traumatic stress disorder as a direct result of witnessing this
horrendous act. I received counseling from both a psychiatrist
and a clinical psychologist to help me recover and deal not only
with the stress disorder, but with the reality of the terrifying
experience which brought it on.

9. The execution of Mr. Evans is still a painful,
difficult, and disturbing subject for me to talk about; however,
I feel discussion is necessary in order to inform this country's
citizens that execution by lethal gas can never be anything less
than torturous and barbaric.

I declare under penalty of perjury that the foregoing is
true and correct and that this declaration was executed on the
14th day of April, 1992.

_Robert R. Marshall_
ROBERT R. MARSHALL

4

Exhibit 24

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison,<br><br>Defendants. | No. C-92-1482-MHP<br><br>**DECLARATION OF KENNETH ROSE, ESQ. SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

## PLAINTIFFS' EXHIBIT NO. 29

JCRC000108

## DECLARATION OF KENNETH ROSE

I, Kenneth Rose, declare as follows:

1.   I am an attorney licensed to practice law in the States
of Mississippi, North Carolina and Georgia.  I received my Arts
and Sciences undergraduate degree from Washington University in
Saint Louis, and my J.D. degree from Boston University Law School
in 1981.  Since that time, I have specialized in capital
litigation throughout the South.  From 1981 to 1984, I was a
Staff Attorney with the Team Defense Project in Atlanta, Georgia.
From 1984 to 1989, I established a private practice in Jackson,
Mississippi, where I continued to represent death-sentenced
prisoners in post-conviction litigation, and in 1989, I became
Director of the Mississippi Defense Resource Center.  I
currently maintain a private practice in Durham, North Carolina.

2.   Over the years, I have represented many inmates
sentenced to death, including Leo Edwards, the last person to die
in Mississippi's gas chamber.  I represented Mr. Edwards in post-
conviction proceedings from 1983 to 1989.  His final appeal is
reported as <u>Edwards v. Black</u>, 876 F.2d 377 (5th Cir. 1989).

3.   During the time that I knew him, Mr. Edwards was very
protective of the other inmates on death row.  He was more
concerned about how others would be affected by his legal

1

JCRC000109

proceedings and eventual execution than he was with his own needs and well-being. He tried to comfort and reassure those around him that everything would work out. Even as his execution approached, Leo Edwards was a source of strength and inspiration to those who knew him.

4. On June 21, 1989, at 12:01 a.m., Leo Edwards was executed in the gas chamber at Parchman, Mississippi. At his request, I witnessed the execution. There were approximately a dozen witnesses, as well as a number of correctional officers. We were led into an observation room containing two rows of seats, one behind the other.

5. The guards brought Mr. Edwards into the chamber. They strapped him into the chair with arm, leg and chest restraints, then secured a heavy black harness over his head. The head harness fit tightly and attached to a thick chin strap, effectively preventing him from turning his head. According to newspaper reports of the execution, my client had been heavily sedated just prior to being led into the gas chamber. Despite whatever sedatives he was on, his eyes searched frantically and he looked confused and disoriented, like a wounded, injured animal. Mr. Edwards was forced to sit in the chair and wait for about 5 minutes before the pellets were finally dropped.

6. The deadly gas was visible, appearing like steam which rose from below Mr. Edwards' chair. When it reached his face, he

2

JCRC000110

gasped, then started banging his head and throwing himself back and forth in the chair. His body strained so desperately against the straps that I was afraid they would cut him. He then let out a shriek of terror, the first of many. It was the sound of pure torment. My heart raced as I tried to control my own reaction to the torture I was witnessing. It seemed like hours passed as he writhed and pleaded. The shrieking and thrashing lasted for several minutes; he remained alive for some time after that.

7. I know that Mr. Edwards was conscious and suffering excruciating pain during the execution. I do not believe that an unconscious person could scream the agonizing screams that ripped through that room in Mississippi. I was disgusted and sickened by the pain and torment I saw in Leo Edwards' final desperate minutes of life.

8. It is my opinion that the execution of Leo Edwards was nothing less than torture and that slow asphyxiation by cyanide gas is a horrible and painful way to die.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 10, 1992, at Durham, North Carolina.

Kenneth Rose, Esq.

3

JCRC000111

Exhibit 25

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone:  (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone:  (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison,<br><br>            Defendants. | No.  C-92-1482-MHP<br><br>**DECLARATION OF GLORIA H. LYON SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 22**

JCRC000112

DECLARATION OF GLORIA H. LYON

I, Gloria H. Lyon, do declare:

1.  I live in San Francisco, California, where my husband
and I have raised our two sons.   I am a survivor of the
Holocaust; I have spoken to over 350 groups about my experiences.
For several years, I have been preparing a film documentary about
my Holocaust history.  I have attached videos which contain
footage of the ruins of the gas chambers and crematoria at
Auschwitz-Birkenau.

2.  I was born in Nagy Bereg, Czechoslovakia.  I had a
younger sister and four older brothers.  We lived in a small
rural community of farmers where my father owned and operated a
farm and vineyards.

3.  My entire family was picked up by German soldiers the
day after Passover in 1944; I was 14.  Although one of our
neighbors had warned my family the night before that the Germans
were picking up all of the Jews, we still had no idea of the
terror that awaited us.  We were taken to Auschwitz-Birkenau.

4.  It was only after three or four days at Auschwitz-
Birkenau that I realized that Auschwitz and the surrounding camps
were not just "relocation" camps; they were death camps.  Once a
girl was standing on a stool in the barracks, taking turns with
me singing, when a woman came over and smacked the girl.  She
said, "What do you think this is, a resort?  You see those smoke
stacks over there?  The putrid smell, the black smoke?  That is

1

JCRC000113

the remnants of camp prisoners, most of them were fellow Jews."
It was at this moment that I realized the Nazis' brutal plans.  I
lived in fear of the gas chambers every day thereafter.

   5.   At Birkenau, they separated the males from the females,
and then Dr. Josef Mengele further separated us into groups.  My
mother and I were ordered into one group, and my sister, Annuska,
age 12, was put into a large group which included the old, sick,
pregnant, and all the children.  Fortunately, Annuska escaped
from her group and caught back up with mother and me.  We later
learned that all the others in that group were murdered
immediately upon arrival in the huge gas chambers, in which
hundreds could be killed at one time.

   6.   I remember another time Annuska was taken from us.  An
SS officer came in and was harassing her, instructing her to
braid cloth around his boots.  When she was finished, he took
Annuska with him.  I believed that he was taking her to the gas
chamber.  I am not able to describe the pain and heartache that I
felt knowing that my sister was going to suffocate in the gas
chamber.  I knew it was a painful death, as I had heard screams
coming from the gas chamber.  Annuska, once again, returned
unharmed, but the feeling that I had during her absence is
indescribable.

   7.   Birkenau had four gas chambers and crematoria where the
corpses were burned.  On the way to work duty, my work detail
would have to walk by two crematoria and a lake into which they
dumped human ashes from the ovens.  I could often see people come

2

JCRC000114

in on the cattle cars and march over to gas chamber and crematorium #4. They would undress outside on the lawn and then enter what they were told was a shower house. I never saw anybody come out. Piercing cries and screams of anguish could be heard coming from the brick building. Even today, when I hear children crying, I am physically affected as my memory takes me back to the gas chambers at Birkenau. Sometimes the SS officers would hang blankets on the fence between our work place and the crematorium, in an effort to conceal the people being led to extermination. However, the screams were too chilling and the air too thick with smoke and smell of burning flesh for the guards to hide the truth. One of my jobs was to sort the clothes of those who were murdered in the gas chambers. The good quality clothes were packaged by us for shipment to Germany.

8. I shared the third tier of a bunk with eleven other girls. Obviously, we were unable to all lie down at once, so six of us would sit up while the other six lay down, and then we would switch positions. One night, my cousin Piroska Gelb was sitting up on the outer side of the bunk bed. She fell asleep and fell off the bunk. She broke a limb, so we had to lift her back onto the bunk. The next morning she was not able to come out for the daily head count. I saw a truck come to pick her up and I never saw her again. Undoubtedly, Piroska died in the gas chambers.

9. Every day of my incarceration, I lived with the constant torture and fear of "When am I going to be next? When is my

3

JCRC000115

mother going to be next? When is my best friend going to be next?" The selection was arbitrary and one never really knew who would be selected to go to the gas chamber. This arbitrariness was part of the torture and part of the Nazis' deception. The anticipation was too much for many prisoners to handle; it ate at their nerves and will to live every day. It was a daily occurrence to see people dead on the electric wire fences. They committed suicide, rather than die in a gas chamber or live under the constant fear and degradation.

10. I know first hand what it is to face death by poison gas. I was selected for extermination by Dr. Mengele, together with 30 other young women, and ordered onto a truck bound for the gas chamber. A guard in a low voice told us that our only chance for survival was to jump from the truck on the way. We were all naked, crammed into the truck like cattle. As the truck drove along, I asked who would come with me. Nobody responded. Everyone was starved, exhausted and robbed of all will power and hope. But I had my loving mother and sister to live for. When the truck approached the wooded area, the location of the gas chambers, I jumped off the slow moving truck and slid down into a deep ditch by the road. My body kept sticking to the ice. At the bottom, the water ran into a culvert which could not be seen from the road, and I crouched down in this culvert. I hid in the culvert about 24 hours, without any food or clothing. The fear of discovery and death in the gas chamber and the need to keep my mother from weakening over my death and consequently leaving

4

JCRC000116

Annuska alone, kept me going.  The next night I crawled out from
my hiding place, followed a little light some distance away, and
entered undetected into a barrack.  There I found a place for
myself among the inmates, one of whom gave me an overcoat.

11.  My mother and sister remained at Auschwitz-Birkenau.
When I was selected, my mother broke down crying; it was the last
time I ever saw her.  From Birkenau I was shipped to the
concentration camp of Bergen- Belsen.  Every day I wondered about
my family.  I wondered whether they were alive or dead.  Even
more, however, I was concerned about my mother's grief for me.  I
knew that everyone thought that I had died in the gas chamber,
and I worried about their grief.

12.  After liberation, the Swedish Red Cross took me to
Sweden.  They gave us food, new clothes, and showed us to the
showers.  But we were all afraid to enter the Red Cross showers.
We all made the immediate connection to the gas chambers.
Memories of the cries, the smell, and visions of prisoners taking
their final walk into the death chamber permeated my mind.   They
had to prove to us that the showers were real, that they spewed
water, not gas, before we agreed to use them.

13.  The visions of innocent men, women and children being
driven into the gas chambers, and the memories of horror,
anguish, and suffering continue to enter my dreams and come back
to me when I least expect them.  The connections are obvious,
however:  crying children, shower houses, smoke stacks, cattle
cars, and gas chambers.

5

JCRC000117

14.   When I learned of the scheduled execution of convicted murderer Robert Harris in the San Quentin gas chamber on April 21, 1992, it caused me to think again of the gas chambers of Nazi Germany and the millions of people tortured to death in them.

15.   Each of the innocent victims of the Holocaust was a unique person whose loss is important to all of us.  The circumstances of the convicts on death row can never be compared to the horror and suffering of the victims of the Holocaust. There is one similarity, however: the method of using poisonous gas to take a human life.

16.   Innocent Holocaust victims can never be compared with convicted murderers.  However, the fact remains that being suffocated to death with poisonous gas is always cruel, painful, inhumane and barbaric.  As a person who saw the daily horror of mass extermination by gas, I know that execution by gas is torture and it can never be anything less.  The torture begins with one's awareness of the way in which his or her life would be taken, and intensifies with one's knowledge of how slow and painful a method of execution gas is.

17.   I have devoted my life to teaching others about the Holocaust in the hope that we will remember the lessons of man's inhumanity to man and learn to live together in peace on this planet earth.  All of us survivors carry in our hearts the memory of the suffering of our families.  It is the legacy of the Holocaust that we must keep their memory alive and strive for the betterment of humanity.  Respect for human life is paramount.  We

6

JCRC000118

must expect civilized society to do better than what a murderer
has done, even though he or she has shown no compassion for other
human beings.   I know that the State of Israel, where many
thousands of Holocaust survivors have found sanctuary and have
rebuilt their lives, has abolished the death penalty altogether,
except for the crime of genocide.   In our enlightened country, at
least the cruelty of death by gassing should be abolished.

I declare under penalty of perjury that the foregoing is
true and correct and that this declaration was executed on April
7, 1992 at San Francisco, California.

Gloria H. Lyon

7

JCRC000119

Exhibit 26

WARREN GEORGE
CAROLYN L. REID
McCutchen, Doyle, Brown & Enersen
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

MICHAEL LAURENCE
MATTHEW A. COLES
American Civil Liberties Union
 Foundation of Northern California, Inc.
1663 Mission Street, Suite 460
San Francisco, California 94103
Telephone: (415) 621-2493

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DAVID FIERRO, ROBERT HARRIS, and ALEJANDRO GILBERT RUIZ, as individuals and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES GOMEZ, as an individual, and in his capacity as Director, California Department of Corrections, and DANIEL VASQUEZ, as an individual, and in his capacity as Warden of San Quentin Prison,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. C-92-1482-MHP<br><br>**DECLARATION OF JOHN M. STEINER, PH.D. SUBMITTED IN LIEU OF LIVE TESTIMONY BY STIPULATION OF THE PARTIES** |

**PLAINTIFFS' EXHIBIT NO. 33**

## DECLARATION OF JOHN M. STEINER, Ph.D.

I, John M. Steiner, declare under penalty of perjury:

1. I am a resident of Marin County, California, where I have lived since 1968. I am a Senior Professor of Sociology at Sonoma State University, and Director of the Sonoma State University Holocaust Studies Center. I received my Ph.D. Magna Cum Laude from the University of Freiburg, Germany in sociology with minors in psychology and psychopathology. Since receiving my Ph.D., I have held positions at the University of California at Berkeley, at the State Mental Hospital in Fulton, Missouri, at San Quentin, and at the Wright Patterson Air Force Base in Dayton, Ohio as a researcher in social psychology. I have been twice awarded both Fulbright and Alexander Von Humboldt research scholarships.

2. I was born in Prague, Czechoslovakia in 1925. I was a young adult when my immediate and extended family were captured and shipped to the concentration camp at Theresienstadt. My father, my aunt, and I are the only members of the family who survived the Nazi extermination camps. The rest of my family, the friends I grew up with in Prague, community leaders, and the many people I met while in the death camps were all killed. Some were gassed to death, some were shot, some were hanged, and

1

JCRC000010

others starved to death or were killed by other means.

3.  I was a prisoner in Nazi concentration camps, slave labor camps, ghettos and death camps, including Theresienstadt, Blechhammer, Auschwitz-Birkenau, Reichenbach, and Dachau.  My mother was gassed at Auschwitz-Birkenau, however, the exact details of her death have been kept from us.

4.  In the winter of 1945, along with hundreds of others, I was forced on a death march out of Blechhammer to the concentration camp at Reichenbach.  I saw hundreds of people die from exposure and exhaustion, and others who were shot to death by rear guards.  We were forced to march down roads lined with the dead and the dying.  My feet became frostbitten -- my toes were totally rotten, forcing me actually to remove large chunks of flesh, and the bones were exposed.  I had almost given up.  I was unable to walk and knew that this would certainly mean being shot to death, like so many others had been.  A small group of us were singled out by the guards and beaten and forced into a horse drawn carriage which took us to the concentration camp Reichenbach.  For reasons unknown to me, we were not left to die but were instead transported to that camp.

5.  From Reichenbach, we were transported by box cars to Dachau.  Approximately one hundred of us were dumped into each of these cars, literally on top of one another.  Those on the bottom

2

JCRC000011

were suffocated to death by the many bodies piled on top of them.
The corpses were ordered to remain packed in the box cars,
bloated and rotting. We were forced to remain inside, with more
and more people being shot, suffocated, and beaten to death. I
cannot convey in words the horror and odor of these box cars.

6. A pyramid of dead bodies grew in the center of the box
car where I was trapped. To keep myself from being beaten and
pushed to death, I had to crawl onto this pyramid of corpses and
hold my position by clinging to one beneath me.

7. For over a year, I was a prisoner in Auschwitz-Birkenau,
one of the death camps that used gas chambers to exterminate more
than 1.4 million Jews, Gypsies, social and political "deviants",
as well as Russian prisoners of war and diseased. While there, I
tried to deny what was happening around me for as long as I
could, refusing to believe that it was true. Although I saw it
every day, I could not accept the reality. When the SS guards
would come and round up the people to be gassed, many of us
refused to acknowledge what we could not accept. Then one
morning, Hans Fischer, my childhood friend from Prague and a
brilliant jazz pianist, was taken along with the entire transport
with which he had arrived to the gas chamber. He was removed
from the barracks and I never saw him again. Soon afterwards,
Hans Fischer's father, a renown psychiatrist from Prague, told me
that his son had been gassed, and it was at that moment that I

3

JCRC000012

began to accept the reality and the extent of this mass extermination. That was the end of my denial. I've had recurring nightmares about the gassing of Hans Fischer, my mother, and others being taken away, and about the torture and anguish they suffered.

8. Many of those who were gassed, including Hans Fischer and his entire transport, were given two days notice to prepare. This waiting time is one of the most agonizing times for all concerned. Being told that you are about to be gassed, and awaiting and contemplating a painful execution is one of the most cruel and dreadful forms of torture which can be imposed on anyone. Alexander Leipen, a friend of mine and prisoner who was also in the selected transport with Hans Fischer, escaped into a frenzy of writing mathematical formulas during these two days. He tried to remove himself from the unbearable reality by performing and resolving complex mathematical equations. I know of the indescribable pain extermination by gas causes because I and others in the death camps experienced this form of torture each day we survived.

9. At Auschwitz-Birkenau, the sick and the weak were always the most likely to be selected for extermination. I was terrified that Dr. Joseph Mengele would make selections for gassing at a time when I was ill with pneumonia, pleurisy, and later with icterus, and confined in the infirmary barrack. It

4

JCRC000013

was only through constant vigilance and the aid of others that I
was able to avoid selection and death until the end of 1944.


10.    Having survived the extermination camps, I came to the
United States in 1953.    In 1956, I enrolled at the University of
California at Berkeley as a doctoral candidate in sociology.    In
1957, as a part of my studies, I took a position with the
California Department of Corrections as a correctional counselor
in the psychiatric section at San Quentin, where I worked from
1957 until 1959.    During my employment at San Quentin, I was
asked to serve as a witness to an execution by lethal gas, which
I refused.


11.    I refused to act as a witness because, among other
things, I knew that lethal gas is an excruciatingly painful
method of execution.    Witnessing a person being gassed to death
would bring back horrendous memories of the hideous fate suffered
by millions, which included my family, extended relatives, and
friends.    Even without witnessing the execution, being at San
Quentin brought back all of the memories, including the ghastly
odors of the death camp Auschwitz-Birkenau.    Eventually, I had to
leave my work at the prison.    Being reminded of the horror of the
death camps solidified my belief that I could not work in an
institution that was executing people by the use of lethal gas.


12.    It is my constant hope and endeavor that we, as

5

JCRC000014

civilized people, can learn and have learned from these experiences.  The pending execution of Robert Harris, however, not only undermines this hope, but is also indicative that we have learned very little from the Holocaust.  The cruelty inherent in forcing the condemned to wait for their deaths in the gas chamber along with the actual pain suffered during the execution is a vivid reminder of the infamous Nazi gas chambers.  While it may be improper to compare the millions of innocent Holocaust victims with convicted death row inmates, there is one thing they have in common -- namely, violent death by lethal gas.  No human being, even if found guilty of murder and condemned to death, should be made to suffer the agonizing death caused by lethal gas, a notion which is posited on the questionable ideology advocating the law of retribution (lex talionis).  The horror that I witnessed by exposing human beings to lethal gas has left an indelible memory of indescribable cruelty in my mind.  It is the intentional infliction of pain and that strips us all of our human dignity and moral consciousness.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.  Signed this _____ day of April, 1992.

_____
JOHN M. STEINER, Ph.D.

6

Exhibit 27

# Tucson Citizen

## LaGrand: 18 minutes to die

by Patty Machelor on Mar 04, 1999, under Tucson and Arizona

Recommend 3          Share

• The victim's family members watch as the killer chokes on cyanide.

PATTY MACHELOR Citizen Staff Writer

The agonizing choking and gagging continued over several minutes.

Finally, shrouded in poisonous gas, Walter LaGrand slumped forward.

The 37-year-old killer had breathed his last breath.

Arizona's first gas chamber execution in seven years took 18 minutes before the condemned man's heart flat-lined at 9:30 last night.

That's seven minutes more than it took death row inmate Don Harding to die by cyanide poisoning on April 6, 1992.

Harding's gruesome death prompted a change in law to allow inmates who committed murder before 1992 to chose between the gas chamber and lethal injection.

Walter and Karl LaGrand – two half-brothers on death row since 1984 for stabbing a Marana bank manager 23 times in a robbery attempt before slitting his throat because he didn't know the safe combination – chose gas.

Karl LaGrand, 35, changed his mind at the last moment and was executed last week by the less-painful lethal injection.

Gov. Hull extended the same option to Walter LaGrand, but a 3 p.m. Friday deadline for such a request came and went – as did the traditional last-minute flurry of appeals for a stay of execution.

With LaGrand's death, the question now is whether legislators will allow the remaining 30 or so death-row inmates to make such a choice of death and spectacle.

The LaGrand executions were objected to by Germany, where the brothers were born. Their deaths drew heavy media coverage in Europe.

JCRC000004

"We have our laws, they have their laws," said Gov. Jane Hull. "We have respect for theirs. I hope they would have respect for our laws. Our state has capital punishment."

More than 30 people including news reporters and family members of the victim witnessed last night's execution.

As they moved into the room, witnesses faced a three-windowed capsule with blinds hiding the man who sat within it, awaiting his death.

A blue curtain sectioned off the injection chamber.

Creaking could be heard from behind the window, perhaps as LaGrand was fastened into the chair with a black harness, which was all that kept him from falling forward minutes later.

A Department of Corrections officer called over her radio, "Witnesses are staged."

The blinds were then raised, revealing the back of a man with thick, curly, dark hair clad in blue prison garb, which blended softly with the light yellow paint inside the chamber.

LaGrand's face could not be seen except by a very few, perhaps offering the convicted killer a final shred of dignity.

He offered a final statement with a surprisingly steady voice as he asked for forgiveness and told surviving stabbing victim Dawn Lopez and relatives of slain bank manager Kenneth Hartsock that he hopes they "find peace."

"I just want to say sorry to the Hartsock family. First time I really got to see that picture," he said, apparently referring to a photo of the victim being held up by Kathy Hartsock, the victim's daughter.

"I am truly sorry. I hope you find peace. I want to thank Helen (Hartsock's sister) for forgiving us. I want to say to her kids and to Lopez, Dawn Lopez, I hope you find peace."

Moments later, the execution proceeded as cyanide pellets were dropped into the acid below the chair.

The witness room fell silent as a mist of gas rose, much like steam in a shower, and Walter LaGrand became enveloped in a cloud of cyanide vapor.

He began coughing violently – three or four loud hacks – and then, in what appeared to be his last moments of consciousness, he made a gagging sound before falling forward at about 9:15 p.m.

The method of death is comparable to having a heart attack, according to prison officials.

LaGrand had not been told by prison officials what death by lethal gas would be like, said Charles Ryan, deputy director of prison operations.

Minutes passed as LaGrand's back rose and fell with shallow breaths and his head twitched.

JCRC000005

In the witness room, the only sound was the continuing hum of the light overhead.

Lopez, the bank clerk who survived the stabbing attack by the LaGrands, began to quietly weep. Moments later, she was escorted from the room by Deputy Pima County Attorney David White.

A few minutes later, at about 9:18, Walter LaGrand's right arm again twitched.

Kathy Hartsock then left the room, which had become uncomfortably warm.

DOC spokeswoman Camilla Strongin said from where she stood, she could see that LaGrand turned only once – apparently to see the photo Kathy Hartsock held of her father.

But shortly after, as the gas began to rise, Strongin noticed that LaGrand kept his eyes closed.

His hands, however, were red and clenched.

The LaGrands both chose to die by lethal gas weeks ago in order to appeal on grounds the method was a cruel and unusual punishment.

The tactic bought Karl LaGrand a few extra hours of life when the 9th U.S. Circuit Court of Appeals issued a stay, before the U.S. Supreme Court shot down the ruling without comment.

Changing his mind on the method of execution, Karl LaGrand died by lethal injection at 8 p.m. Feb. 24.

The German government, which banned the death penalty after World War II, tried to intervene and save the brothers but failed in attempting to have state officials await an investigation by the World Court.

Delays for Walter LaGrand began yesterday when the 9th U.S. Circuit Court of Appeals granted an injunction over the method of execution Walter LaGrand was facing.

At about 7:30, the U.S. Supreme Court lifted the injunction and issued a ruling that when Walter LaGrand chose gas over lethal injection, he waived his right to appeal the method as being unconstitutionally cruel and unusual punishment.

LaGrand's hope was also that the World Court would be able to intervene in his execution.

Hull on Tuesday ignored a clemency board's 2-1 recommendation that she issue a 60-day reprieve.

Hull met with Lopez and also with German Ambassador Jurgen Chrobog before deciding to go forward with the execution as scheduled.

Alexander Privitera, a German and bureau chief of the Washington, D.C., ProSieben television, said the German government was "too little, too late" in its attempt to save Karl LaGrand.

But he said he was shocked by the "immense arrogance" of Arizona Attorney General Janet Napolitano and Hull in "ignoring international law" and not granting a stay for the World Court to investigate the Walter LaGrand

JCRC000006

case.

Hull noted that the World Court has no legal authority to stop Arizona from executing a prisoner.

Edward Levy, chairman of the Arizona Executive Board of Clemency, and member Kathryn Brown voted Tuesday to grant Walter LaGrand a 60-day reprieve.

Fellow member Edith Richardson opposed the request.

Napolitano defended the state's position.

"I think that the United States cares about international law, but in this case it was too late," she said at a press conference, when questioned by Privitera.

She also refused to disclose her feelings about death by the gas chamber.

"It was the punishment he chose, and it was administered in this case. It was an execution. It's the law, and we carry out the law," she said.

WALTER LaGRAND'S FINAL STATEMENT

"I just want to say sorry to the Hartsock family. First time I really got to see that picture (possibly referring to a photo of Kenneth Hartsock being held by his daughter). I am truly sorry. I hope you find peace. I want to thank Helen (Hartsock's sister) for forgiving us. I want to say to her kids and to Lopez, Dawn Lopez, I hope you find peace. To all my loved ones, I hope they find peace. To all of you out here today, I forgive you. I hope I can be forgiven in my next life. That's all I have to say."

PHOTO CAPTIONS: Photos by MARY CHIND/Tucson Citizen

Monsignor Edward J. Ryle reads to other protesters outside the Arizona State Prison Complex-Florence yesterday. Walter LaGrand was executed inside despite the protests outside the prison.

Several people from Tucson drove to Florence to protest the gas chamber execution of Walter LaGrand.

Our Digital Archive

This blog page archives the entire digital archive of the Tucson Citizen from 1993 to 2009. It was gleaned from a database that was not intended to be displayed as a public web archive. Therefore, some of the text in some stories displays a little oddly. Also, this database did not contain any links to photos, so though the archive contains numerous captions for photos, there are no links to any of those photos.

There are more than 230,000 articles in this archive.

In TucsonCitizen.com Morgue, Part 1, we have preserved the Tucson Citizen newspaper's web archive from 2006 to 2009. To view those stories (all of which are duplicated here) go to Morgue Part 1

Exhibit 28

Pursuant to 28 U.S.C. § 1746(2)

### Declaration of James S. Williams, M.D., M.Sc.

I, James S. Williams, M.D., M.Sc., declare as follows:

1.  Attorneys for Frank J. Atwood, a man for whom the Arizona Supreme Court has issued a warrant scheduling his execution for June 8, 2022, have engaged me to address the efficacy and feasibility of firing squad as a means of execution.

## I. Introduction

### A. Qualifications

2.  I am engaged in active practice as an emergency services physician, primarily at Citizen's Hospital in Victoria, Texas, as well as several other hospitals. I hold medical licenses from the states of Nebraska, Texas, and Wisconsin.  I have been employed as the Medical Director of several emergency departments in Texas and Wisconsin, including Alice, Texas (09/2016-03/2018), Big Lake, Texas (10/2011-09/2015), and Waupaca, Wisconsin (12/2007-09/2011). I received my MD in 1991 from the University of Calgary in Alberta, Canada. I have been board-certified by the American Board of Family Medicine since 1998, and the Canadian College of Family Practice since 1993. I have been continuously certified in Advanced Trauma Life Support by the American College of Surgeons since 1994. I have more than 40,000 hours of ER and ICU experience, about 25% of which has been spent in direct trauma care. I have provided medical care to thousands of trauma patients during that time.

3.  I have used my medical skills while working closely with police departments. I was a Police Medical Officer with the City of Ripon, Wisconsin, Police Department from 2000-2010. My duties in this position were primarily administrative: writing and supervising policies for first responders, training police officers in the practice and principles of Trauma Critical Casualty Care ("TCCC"), and ensuring standards were maintained in all aspects of those fields. I also served as a SWAT Team Physician with Waupaca, Wisconsin, County Sheriff's Department from 2008 to 2011. In addition to the administrative and training responsibilities noted above, my duties in that position were more hands-on, in that I operated as an embedded component of the SWAT Team. I

1

participated in both training and actual SWAT operations with the Team. I was fully armed on all SWAT operations, was qualified to the same standards of firearms proficiency as all other officers on the SWAT team and was expected to perform to the same operational performance standards as all other members of the team. My duties included planning and conducting TCCC training for all SWAT operators, providing on-scene medical care to SWAT operators and civilians in the "hot zone" on operations, liaising with pre-hospital and hospital medical personnel in conjunction with SWAT operations, and acting as a fully functional SWAT operator myself as needed. I served in these posts while also performing my regular duties as a hospital emergency physician.

4. I am recognized as an expert in firearms. I draw on a lifetime of experiences working with firearms, including the hunting of small and large game, as a firearms instructor, and many years of competitive shooting at the local, state, regional, and national levels. I currently conduct firearms trainings for law enforcement agencies and authorized civilian organizations through my company, Tactical Anatomy Systems LLC. I have conducted approximately 80 trainings over the past 15 years, and about 10 over the past 5 years. My courses are certified by the Peace Officer Standards and Training councils ("POST") of several states, including Minnesota, Tennessee, Nevada, and Colorado. My courses are also used in many other states as non-POST-certified training, and in Canada, the United Kingdom, Australia, New Zealand, and a number of other countries for the training of police officers and military personnel. I have been recognized in this field by the American Society for Law Enforcement Training, the International Law Enforcement Training and Education Association, and the International Association of Law Enforcement Firearms Instructors, and I have spoken at national and international conferences sponsored by these and other organizations.

5. I have provided expert reports and advice to Federal Public Defenders in Dallas, Texas in the matter of *Danny Bible v. Texas Department of Corrections*; and a report and advice to the Federal Defenders Office in Atlanta, Georgia in *J.W. Ledford v. Gregory Dozier et al., Georgia Department of Corrections,* both in 2017. I testified as an expert at trial and at a deposition in the case of *McGehee et al v. Hutchinson et al.*, No. 4:17-cv-00179-KGB (E.D. Ark.) in 2019. In 2019 I also provided an expert report and advice to the Federal Defenders Office in Columbus, Ohio, in the matter of *Cleveland Jackson v. the*

*State of Ohio Department of Corrections*. In 2021 I was deposed as an expert in the case of *Richard Glossip v. Randy Chandler et al. (State of Oklahoma Dept. of Corrections)*. In 2020-21 I also provided a report and advice to the Federal Defenders Office in Las Vegas, Nevada in the matter of *Floyd v. Daniels, et al.,* and testified as an expert at trial in the same case in November, 2021. I testified as an expert in the case of *Richard Glossip v. Randy Chandler et al. (State of Oklahoma Dept. of Corrections)* in March, 2022.

6. I have no academic publications in the last 10 years. In 2006, I published a training manual entitled *Tactical Anatomy Instructor Manual*. My CV is attached to this report as Appendix A.

7. I am familiar with Mr. Atwood's current health status, including that he has a medical history of severe cervical spondylosis, has been disabled for years, and must use a wheelchair.

8. Mr. Atwood's attorneys have specifically engaged me to address four questions: (1) Would execution by firing squad cause death in a quick and painless manner? (2) Is execution by firing squad feasible in Arizona? (3) Is execution by firing squad generally feasible for a wheelchair user? (4) Would Mr. Atwood's health condition present complications for conducting a firing squad execution? I address these questions in detail below. In short, my answers to each of the first three questions is a "yes" and to the final question, a "no."

**B.      Materials considered**

9. In addition to drawing from my knowledge and experience in the fields of medicine and firearms, in preparing this report I have considered (1) Utah's protocol for executions by firing squad, attached to this report as Appendix B; (2) the U.S. Army's protocol for executions by firing squad, attached to this report as Appendix C; (3) the expert declaration of Philip A. Davidson, M.D. (Jun. 21, 2021), from a prior civil action, *Atwood v. Days, et al.*, 2:20-cv-00623-PHX-JAT (Doc. 109), as Appendix D; (4) an order entered Dec. 7, 2021 (Doc. 173), from the same civil action granting in part a temporary restraining order and preliminary injection concerning Mr. Atwood's medical treatment

for his spinal condition, as Appendix E; and (5) the sources listed in the endnotes of the report.

**II.    Whether execution by firing squad causes quick and painless death**

10.    Contemporary understanding of how gunshot wounds affect the human body is extensive. Gunshot wounds can be painful—but unless the bullet strikes and fractures one or more of the long bones of the limbs, pain can be and often is relatively minor, if not virtually painless. Impact of a high velocity rifle bullet into a target organism causes deformation and stretching of the soft tissues near the wound; this is referred to in terminal ballistics as formation of a temporary cavity. The temporary cavity stretches the nerves supplying the tissues penetrated by the bullet, which stuns them to the point of nonfunctionality which may be temporary or permanent. This produces a state of traumatic anesthesia reported by most gunshot wound victims.

11.    The physical trauma inflicted by gunshot wounds depends on a number of factors. The first factor is one of ballistics: what is the projectile or bullet's energy when it strikes the body? Energy is multiplied when several projectiles strike the body more or less simultaneously, such as the volley fire of a firing squad. Greater energy of impact imparts a greater degree of damage to the target organism, and subsequently more rapid incapacitation and death (assuming the projectile hits an appropriate target, as discussed further below). In an execution by firing squad, more projectiles striking the body simultaneously will impart a greater sum of energy and are therefore more likely to achieve the desired effect than a single projectile.[1,2,3]

12.    The second factor is one of anatomy: what vital organs are struck and disrupted by the projectile(s)? There are two ways to assure a quick and painless death: (1) targeting the heart: denying the central nervous system (CNS) the blood supply it requires to continue to function via shots to the *cardiovascular bundle*-the heart and the great vessels which lead to and from it-in the chest; or (2) targeting the brainstem:[4]  a shot or shots to the brainstem resulting in significant trauma to the brain CNS would be assured to cause a rapid death.

13.    A traditional firing squad execution causes death by the first method, cutting off blood to the CNS through trauma to the cardiovascular bundle. When the firing squad's bullets

strike the heart and great vessels, the immediate effect is to cause cessation of blood circulation at its source. Whether the heart stops electrophysiologically (by cessation of organized beating) or is structurally disrupted to the point of being unable to generate pulse pressure, or whether the arteries leading from the heart are disrupted such that blood flowing out of the heart cannot be delivered to the brain and body, the net effect is a catastrophic drop in blood pressure in the brain. The brain's function depends upon a continuous supply of oxygen via the blood, and if that blood supply is stopped, loss of consciousness ensues within a matter of 10 seconds or less, and cortical/brainstem death inevitably follows within a matter of minutes.[5,6,7]

14. By targeting the cardiovascular bundle, the firing squad causes death with minimal pain. This has been borne out by my professional experience treating gunshot wound victims, and by the experience of other medical and paramedical personnel with whom I have had extensive discussions over many years.

15. In addition to my professional experience and that of my medical colleagues, I have interviewed personnel who have served as field medics in the U.S. Armed Forces with respect to the effects of a gunshot wound to the cardiac bundle. They have informed me that the response to being shot with a rifle in the chest can be highly variable, depending on range, ballistic trajectory, and point and angle of impact, and the anatomic path of the bullet within the body. Regardless of these factors, however, subjects who are shot in the central chest (cardiovascular bundle) typically exhibit no life signs when examined, even when the time between injury and examination is only a matter of a few (five to fifteen) seconds. This body of experience supports the traditional firing-squad aiming point, and furthermore is in accordance with medical knowledge of the terminal effects of cardiovascular bundle gunshot wounds.[8,9]

16. The short interval between gunshot wound to the chest and death is also consistent with an examination of the experience of death by firing squad. In 1938, a physician monitored the heart activity of a man being executed by firing squad and found that his heart stopped 15 seconds after the shots were fired. *See Graph of Heartbeat in Execution*, Chicago Daily Tribune (Nov. 1, 1938) (reproduced below). Based on my examination of the ECG tracing in the photo, it appears the subject experienced immediate onset of ventricular fibrillation after bullet impact. This arrhythmia typically causes loss of

5

consciousness almost immediately, in my professional experience; and at that point the condemned would of course be insensible to pain.



CHICAGO DAILY TRIBUNE: TUESDAY, NOVEMBER 1, 1938.

**Graph of Heartbeat in Execution**
(Story in adjoining column.)

Dr. Stephen H. Besley points to cardiograph, the first ever made of a man's heart as bullets pierced it. The steady line shows the heartbeat as John Deering awaited the firing squad; the first flutter marks the impact of the bullets; the wild fluctuations are the death struggle; the end is death.

[Associated Press Wirephoto.]

**SLAYER'S HEART TRIPLES BEAT AS HE FACES DEATH**

Salt Lake City, Utah, Oct. 31.—[Special.]—The heart of John W. Deering, holdup murderer, beat three times faster than normal just before he was put to death today by a firing squad in the state prison here. The unprecedented recording was termed valuable to heart disease specialists as it showed clearly the effect of fear.

An electro-cardiograph film, recorded with the condemned man's permission, showed that Deering's heart beat jumped from normal 72 to 180, although he appeared outwardly calm. It maintained that rate for the several minutes required to complete preliminaries for the execution.

When the doomed man was asked for a last statement his heart beat fluttered wildly, then calmed after he spoke until bullets ended his life. The heart beat stopped 15.6 seconds after the bullets struck, but he was not pronounced dead until two and a half minutes after the five shots rang out. Utah is the only state in the union now using a firing squad.

17.    The question of the relative painfulness of gunshot wounds to the chest can be answered by the experience of persons who have survived thoracic gunshot wounds. Invariably, these persons describe the sensation as being that of a severe blunt blow to the chest, like a hard punch, or being struck with a club or bat. Most gunshot-wound patients I have treated in an emergency department or ICU setting have told me their experiences were similar if not identical: the sensation of a powerful blow, a prolonged numbness to the region of the gunshot wound (presumably due to the neural structures in the area being stunned by the temporary cavitation of tissues caused by the bullet's passage), and gradual onset of mild to moderate pain a few hours later.

18.    I received a gunshot wound to my right chest in April 1972. My experience is consistent with these reports. The bullet was a high-velocity .224 caliber projectile; in terms of ballistic energy, this would fall into the same category as a bullet from a police service caliber handgun on the order of a 9mm or .38 Special weapon. The sensation of being struck by the bullet was much like the sensation of receiving a hard tackle in a football game or being struck by a hard-pitched baseball: a powerful blunt blow, with no sharp,

burning, or other painful sensation. Because the bullet passed very close to the brachial plexus (a bundle of nerves under the clavicle), I had the immediate sensation of numbness or tingling in my neck, shoulder, and right arm, very much like the sensation of a "stinger," which I had experienced several times on the football and rugby field; while unpleasant, it did not seem to me to be in any way painful. I was transported to the hospital and received prompt care. I was asked repeatedly if I needed pain medication, and I declined each time because I simply wasn't experiencing anything I could identify as pain. This pain-free period lasted until approximately 3 hours after I received the wound, by which time I had developed severe muscular stiffness and pain in the chest and shoulder area, and I agreed to an injection of narcotic pain medication.

19.    Finally, it should be stated explicitly that execution by firing squad substantially reduces the chance of a "botched" execution due to error on the part of the executioner(s). The means by which death is affected is simple and straightforward, using an implement (rifle) with which a substantial proportion of the population in general, and the law enforcement population in particular—there are roughly 14,500 sworn officers in the state of Arizona—are expertly familiar. Thus, the chance of "operator error" being introduced into the execution is substantially less than it is in execution by lethal injection. Further, the means of execution—rifles and ammunition, rather than pharmacologic agents—is not subject to unreliability of supply.

## III.    Whether execution by firing squad is feasible.

### A.    Historical use of firing squads for executions.

20.    In order to address the feasibility of firing squads, I first sought answers to two questions concerning the historical use of this method.

21.    First, has execution by firing squad been successfully implemented in any other jurisdictions in the United States or abroad? The answer is "yes." In military justice, death by firing squad, or by gunshot wound, has been a traditional and common means of execution since at least the early 19th century. In modern times, the state of Utah has offered condemned prisoners a choice between lethal injection or death by gunshot wound, and since Gary Gilmore's execution in 1977, this method has been successfully implemented three times, most recently in 2010 (Ronnie Lee Gardner). It should also be

7

noted that execution by firing squad is permitted by statute in several other states, including Oklahoma and South Carolina, and was a prescribed execution protocol for the United States armed services up until 2019.

22.   These historical and statutory features suggest that it's possible to establish a protocol for successful implementation of death by gunshot wound in Arizona.

23.   The second question asks us to define what the term "firing squad" actually means in practical terms.

24.   Death by fusillade, or multiple riflemen firing simultaneously, has been a common means of military execution since at least the Napoleonic era. The rifle was typically the firearm selected for this purpose. Historically, this made sense, as armies usually had an abundance of riflemen armed with battle rifles, so forming a squad of them for a quick execution was possible almost anywhere. Typically, a battle rifle is considered the armament of the infantry soldier, a weapon capable of inflicting a fatal wound to an enemy combatant with a single well-placed bullet. A squad of soldiers armed with rifles could be counted upon to reliably dispatch a condemned man with little chance of his suffering undue pain, no chance of survival, and with a minimum of administrative impediments.

25.   In my opinion, the rifle meets the minimum threshold of lethality that a firing squad execution requires. The medical literature is incomplete as to the relative effectiveness of different types of small arms in causation of death, in part because mortality in the field precludes many gunshot wound victims from ever receiving medical care in a hospital, and in part because most medical authors are physicians with little actual firearms expertise to inform their discussion. However, hospital firearms injury data show that persons shot in the heart by a high-power centerfire rifle are at least twice as likely to die (48-50% vs 24.5%) than persons shot with a handgun. [10,11]

26.   Using any weapon lighter than the high-power centerfire rifle risks causing injuries insufficient to cause rapid or near-instantaneous incapacitation and death of the subject. And based on my review of the proven firing squad execution protocols extant (Utah and U.S. Army, see below) the minimum number of rifles to be used should be no fewer than five and the maximum no more than ten.

27.     The execution is traditionally accomplished by having the condemned man face a squad of riflemen, who on command fire their rifles simultaneously into the condemned man's chest; specifically, the *cardiovascular bundle* (the aggregate anatomic region comprising the heart and the large arteries and veins hear to and within the mediastinum) in the center of his chest. A squad, in American military terms, is a group of about 10 men. Historically, this number varies from four or five riflemen to as many as twenty. The condemned prisoner may stand or kneel or sit facing his executioners, and is fastened to a post, wall, or chair by straps, ropes, or other bindings. This binding serves to minimize movement by the condemned, allowing precise and fatal placement of the rifle shots by the firing squad.

28.     The squad's rifles are aimed at the central lower one-third of the condemned man's chest, in the vicinity of the heart. The primary purpose of this aiming point is to yield a quick death, and the secondary purpose is to avoid disfiguring the face and head of the person being shot.

**B.      Protocols for execution by firing squad.**

29.     To prepare this report, I reviewed Utah's current protocol for execution by firing squad and an older firing-squad protocol of the U.S. Army. In my opinion, these protocols or a similar protocol would suffice to cause a quick and painless death.

30.     In summary, the Utah form is as follows:

   a.   The condemned is secured in a seated position, with an aiming point or target affixed to the chest;

   b.   The firing squad, consisting of 5 riflemen, faces the condemned at a distance of 21 feet, armed with service rifles of .30 caliber;

   c.   The squad's rifles are loaded with 2 rounds each by the squad commander; one of the rifles is loaded with blank cartridges, but the members of the firing squad are not aware of which rifle is so loaded prior to firing;

   d.   On the order of the D.O.C. Director or his Designee, the firing squad commander gives the order to fire, and all 5 riflemen discharge their rifles at the target on the condemned man's chest simultaneously;

e.  Three minutes after the first volley, the attending physician examines the condemned to determine if life signs are present; if so, he continues to check for life signs every 1 minute to a maximum of 10 minutes; and if life signs are still present, a second volley shall be fired;

f.  If, after the first volley, the condemned shows obvious signs of life or consciousness, a second volley shall be immediately fired.

31.  The Army's procedure differs in some minor but practical points:

a.  The firing squad consists of 8 riflemen and a sergeant;

b.  The condemned is secured in a standing position to a post, with restraints at the waist and ankles;

c.  The squad's rifles are loaded such that at least one, but no more than 3, are loaded with blank ammunition;

d.  The squad is arrayed 15 paces (approximately 35 feet) from the condemned;

e.  On the order of the officer commanding, all 8 riflemen discharge their rifles at the target on the condemned's chest simultaneously;

f.  The officer commanding and medical officer will then examine the condemned, and if in the medical officer's opinion the condemned is still alive, the sergeant will be instructed to fire a "coup de grace" handgun bullet into the condemned's head, aiming just above the ear and with the muzzle one foot from the head.

**C.    Comments on Procedure:**

32.  The condemned needs to be firmly restrained so an accurate aiming point may be established. A circular target roughly 3-4 inches in dimension should be affixed over the lower 1/3 of the subject's sternum, overlapping the left sternal border, but not overlapping the inferior margin or right border of the sternum. This will direct the riflemen's bullets into the upper half of the heart, where the pace-making structures of the heart reside, or into the aorta and other great vessels, where the outflow of blood from the heart proceeds.

33.  Records reflect that Mr. Atwood has needed the aid of a wheelchair for years and is disabled, under the Americans with Disabilities Act. The Department of Corrections could readily apply the foregoing firing squad procedures for him while he is seated in a standard wheelchair, given such the standard aluminum frame and fabric backing of such

a medical device. For these purposes, it would be equivalent to a purpose-built chair. Alternatively, Mr. Atwood could be placed in a purpose-built seat and secured to it as contemplated in both protocols above.

34.   The number of riflemen in the squad seems to vary by jurisdiction, as noted previously, but five to ten rifles seems to be a reasonable number. (This includes, in most protocols, one or two rifles loaded with a blank cartridge.) Fewer than 5 rifles, as used in Utah for example, will risk the chance of failure to inflict sufficient injury to cause a quick death, and more than 10 increases the likelihood of more damage to the subject's body than is strictly necessary.

35.   The distance (21 to 35 feet) between the riflemen and the condemned is appropriate. This is also in keeping with the distance specified by the United States Military protocol.

36.    Any competent and qualified officer/rifleman in any Arizona's Department of Corrections (or any other branch of law enforcement) should be able to meet this marksmanship requirement easily.

37.    It should be noted that "service rifles of .30 caliber" as specified in the Utah protocol could for all practical purposes be any military or law enforcement grade rifle type and caliber. It seems reasonable to me that any general purpose rifle and caliber utilized by agencies of that state and by the Department of Corrections in particular would be suitable for the purposes of execution by firing squad.

38.   A suitable backstop should be employed immediately behind the body of the condemned. This should consist of a layer of ballistically absorbent material such as layers of lumber or sandbags, which would serve to block overpenetration of any bullets that passed entirely through the subject's body and would absorb body fluids expelled from the exit wound(s). Behind this should be placed an impervious ballistic barrier such as woven Kevlar to prevent bullet fragments from escaping the catchment area and causing ricochets that might injure members of the execution team or witnesses.

39.    The traditional practice of loading one of the firing squad rifles with blank ammunition may be of some redeeming value from a public relations perspective, but it is of questionable practical importance. Historically, this was likely expedient when the enlisted men serving on a firing squad did so under orders, rather than as volunteers, as riflemen may have had grave individual reservations about being required to serve as

executioners. The use of a random blank cartridge in one of the squad's rifles gave each rifleman a "plausible deniability" factor to relieve him from the guilt and/or public shame of having taken the life of a fellow soldier. In the context of a state-sanctioned execution in the present day, however, such an expedient seems unnecessary. The riflemen serving on the firing squad will necessarily be volunteers. Furthermore, any experienced rifleman is immediately aware of the fact when he fires a blank cartridge; there is little perceptible recoil. As such, each member of the execution team is unquestionably fully aware if he has fired a live round or a blank when he pulls the trigger, and any fiction generated to preserve anonymity is just that: a fiction. Whether this tradition is preserved in the development of a new protocol is up to the protocol's authors, but in this writer's opinion it is a dramatic gesture with little or no practical value.

### IV.    Conclusion

40.   This report comprises my best attempt to answer the questions put to me by Plaintiff's counsel regarding execution by firing squad. I conclude to a reasonable degree of certainty that the firing squad is a feasible means of execution in Arizona and will result in a quick and painless death.

41.   I reserve the right to revise my opinion should further relevant information come to my attention that clarifies, strengthens, or otherwise changes my opinion in the course of continued review. I sincerely hope that my efforts will prove to be of some worth to the Court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 4th  day of May 2022.

James S. Williams M.D.

**Endnotes**

1. Fackler, M. (1966) "Gunshot Wound Review"; Annals of Emergency Medicine 28(2): 194-203

2. DiMaio, V.J.M. (1999) *Gunshot Wounds:  Practical Aspects of Firearms, Ballistics, and Forensic Techniques* (2nd Ed.), CRC Press

3. Grossman, D. (1995) *On Killing*; Little Brown & Co.

4.  Fackler, op cit

5. Goila, A., Pawar, M. (2009), "The diagnosis of brain death"; Indian Journal of Critical Care Medicine 13(1):7-11

6. Young, G.B. (2017) "Diagnosis of brain death" *UpToDate* (online reference)

7. Magoun, H.W. (1952) "An ascending reticular activating system in the brain stem." AMA Archives of Neurology and Psychiatry 67(2): 145-154

8. Fackler, op cit

9. DiMaio, op cit

10.  Mandal A.K., Oparah S.S. (1989)  *J Thoracic and Cardiovascular Surgery*;97: 119-25

11.  DeJager E, McCarty JC, Jarman MP, Goralnick E (2019), *J American College of Surgery*, Sept; 229(3): 323

# APPENDIX A

**CURRICULUM  VITAE**
**James Stuart Williams MD**
609 Louisiana Ave, Corpus Christi, TX, 78404; Phone 432-301-2823

**Education**

- MD (1991) University of Calgary, Alberta, Canada
- MSc (1988) Endocrinology, University of Calgary, Alberta, Canada
- BSc (1976) Zoology, University of Calgary, Alberta, Canada

**Postgraduate Training**

- Board Certified in Family Medicine, American Board of Family Practice 1998, recertified 2006, 2013
- Board Certified in Family Medicine, College of Family Physicians of Canada, 1993; named Fellow of the College of Family Physicians of Canada, 2004 (currently certified)
- Family Medicine Residency (completed 1993 at Royal Alexandra Hospital), University of Alberta, Canada
- Neonatal Resuscitation1991, recertified 2002, 2004, 2013, 2015, 2017
- ATLS 1994, recertified 2002, 2007, 2012, 2016, 2020
- ACLS 1993, recertified 1995, 1997, 1999, 2001, 2003, 2005, 2007, 2009, 2011, 2013, 2015, 2017, 2019, 2021
- PALS, certified 1991, recertified 2013, 2015, 2017, 2019, 2021
- ALSO, certified 2000
- Certified as CIC (Sports Concussion Evaluation and Management) by ImPACT, Inc., 2012
- Certified in Diagnostic and Therapeutic Esophagogastroduodenoscopy (EGD), National Procedures Institute, 1999
- Certified in Diagnostic and Therapeutic Colonoscopy, National Procedures Institute, 1999; received full privileges in Colonoscopy, Polypectomy, and Biopsy, Berlin Memorial Hospital, 2000.
- Repeated completion of American College of Sports Medicine's *Team Physician Course Parts I and II*, February 2005
- Completed the American College of Sports Medicine's *Team Physician Course Parts I and II*, February 2001 (Completed Part I February 1998)
- Completed the American College of Sports Medicine's *Advanced Team Physician Course*, December 2003.

**Medical Licensure**

- State of Nebraska, 2018 to present
- State of Texas, 2011 to present
- State of Wisconsin, 1997 to present
- Province of Alberta, Canada, 1991 to 2003

**Employment History**

- Owner/operator of Anahata West / Anahata Wellness Center, Abilene, TX, 11/2020 to present
- Owner/operator of Anahata Wellness Center, Mequon, WI, (Anahata Mequon LLC) 09/2019 to 08/2020
- Owner/operator of Anahata Wellness Center, San Angelo, Corpus Christi, and Kingsville, TX, (Anahata Wellness Center PLLC) 10/2014 to present
- Emergency Department Physician, Citizens Hospital, Victoria, TX, 03/2018 to present (Schumacher Clinical Partners)
- Emergency Department Physician, St. Francis Hospital, Grand Island, NE, 07/2018 to present (Medicus Clinical Partners)
- Emergency Department Physician, Reeves County Hospital, Pecos, TX, 05/2015 to present
- Emergency Department Physician, Rio Grande Regional Hospital, Macallen, TX, 05/2020 to present
- Emergency Department Physician, Corpus Christi Medical Center, Corpus Christi, TX, 07/2020 to 09/2020
- Chief Medical Officer of Reagan County, TX, 05/2016 to present
- Medical Director, Reagan County TX Emergency Medical Services, 02/2015 to present
- Medical Director, Emergency Department, Christus Spohn Alice Hospital, 09/2016 to 03/1208 (EmCare Physicians)
- Emergency Department Physician, Christus Spohn Alice Hospital, September 2016 to present (EmCare Physicians)
- Emergency Department Physician, independent contractor for agencies including Concord Medical, EmCare Physicians, Schumacher Clinical Partners, Medicus, and Southwest Medical; 09/2015 to present
- Medical Director, Shannon Sports Concussion Clinic, San Angelo TX, 03/2012 to 05/2016
- Medical Director, Emergency Department, Reagan Memorial Hospital, Big Lake TX, 09/2011 to 09/2015
- Family physician, Shannon Clinic, San Angelo/Big Lake TX, 09/2011 to 09/2015
- Head Team Physician, Ripon College, Ripon WI, 09/1998-08/2011
- Medical Director, Emergency Department, Riverside Medical Center, Waupaca, Wisconsin, 12/2007 to 09/2011
- Emergency Department Physician, Riverside Medical Center, Waupaca, Wisconsin,

06/2005 to 09/2011

- Emergency Department Physician,  Riverview Hospital, Wisconsin Rapids, WI, 06/2003 to 06/2005 fulltime and on locum tenens basis 2005 to 2006
- Adjunct Lecturer in Pharmacology; Department of Chemistry, Ripon College, Spring Semester 2004
- Emergency Department Physician (Fulltime), Berlin Memorial Hospital, 07/2002 to 06/2003
- Family Practitioner, CHN Family Healthcare Clinic, Ripon, Wisconsin, 04/1997 to 08/2002
- Emergency Department Duty Physician (part-time), Berlin Memorial Hospital, Berlin, WI, 06/1998 to 08/2002
- Emergency Department Duty Physician, Ripon Medical Center, Ripon, WI, 07/1997 to 04/2000
- Organizing partner and chief negotiator of Glenmore Clinic, a proposed multidisciplinary medical clinic comprising 6 family physicians and 2 Internal Medicine specialists, 1996.
- Family Practitioner (private practice), in Didsbury, AB, Canada, and in Calgary, AB, Canada, 06/1993 to 04/1997
- Trauma ICU/Cardiovascular-Surgical ICU Duty Physician at Rockyview General    Hospital, Holy Cross Hospital,  and Foothills Provincial General Hospital, 08/1994 to 03/1997
- Sub-contract Physician for Calgary Remand Center,  Calgary Correctional Institution, and Calgary Young Offenders Centre, 1994-1997
- Graduate Teaching Assistant, Dept. of Anatomy and Physiology, Faculty of Medicine, University of Calgary, 1986-87
- Mathematics and Chemistry teacher, Alternative High School, Calgary Public Board of Education, Calgary, Canada, 1987-88
- Principal, Westlock Christian School, Westlock, Alberta, Canada, 1983-84
- Vice-Principal, Ft. Saskatchewan Christian School, Ft. Sask., Alberta, Canada, 1980-83
- Chemistry and Biology Teacher, Ft. Assiniboine School, Barrhead, Alberta, Canada, 1977-80

**Private Practice History**
- Operation of Anahata Wellness Center PLLC, a wellness clinic offering services in weight loss programs, neutraceutical therapy, bioidentical hormone replacement therapy, and medical aesthetics; 2014 to present.
    - Big Lake, TX, 09/2014 - 09/2016
    - Kingsville, TX, 11/2019 - present
    - Mequon, WI, 08/2019-08/2020
    - Abilene, TX, 12/2020 - present
- Operation of solo private practice clinic in Calgary, Alberta, Canada, 01/1994-04/1997

**Board Certifications**
- Diplomate, American Board of Family Medicine, 1998 to present
- Fellow (FCFP), College of Family Physicians of Canada, 2004 to present
- Certificant (CCFP), College of Family Physicians of Canada, 1993 to 2004

**Scholarships & Awards**

- Named a Fellow of the College of Family of Physicians of Canada, 2004
- Ripon Public Schools *Friend of Education* Award; for my twice yearly lectures to Ripon High School Students on the topics of STDs and Teen Pregnancy, 2003
- Alberta Heritage Trust Fund Studentship in Medical Research, 1986-88; for academic merit
- Calgary Co-op Scholarship, 1985; for academic merit

**Committees, Appointments, and Elected Offices**

- 2016-present: Member, Medical Executive Committee, Christus Spohn Alice Hospital, Alice, TX
- 2014-15: Chief of Medical Staff, Reagan Memorial Hospital, Big Lake, TX
- 2010-11: Chief of Medical Staff, Riverside Medical Center, Waupaca, WI
- 2008 to 2011: Medical Officer and SWAT Team member, Waupaca WI County Sheriff's Department
- Member, Wisconsin Sports Concussion Collaborative, 2005-2011
- 1997 to 2011: Head Team Physician, Ripon College Athletic Department, Ripon, Wisconsin
- 2001 to 2011: Medical Liaison Officer, City of Ripon WI Police Department
- 2000 to 2003: Medical Director, Ripon College
- 1999 – 2002:  Director, Ripon Area Service Center, a non-profit organization dedicated to the provision of safe residential and workplace environments for mentally handicapped persons
- 1999 - 2001: Chief of Medical Staff, Ripon Medical Center, Ripon, Wisconsin
- 1995-97:  Chairman, Fee-for-Comprehensive-Care Working Group, Alberta Medical Association; this committee was the key working group researching and developing strategies for implementation of physician remuneration systems for Canadian Physicians during this time period; our work was under national scrutiny. Two of the papers we generated have been widely read and cited in Canadian and international health policy and economics.
- 1995-96:  Member, College of Physicians and Surgeons of Alberta Advisory Committee on Communications; jointly responsible for developing a communications strategy for promoting the medical profession to the public.
- 1995:  Delegate,  from Alberta Medical Association, to the regular meetings of a national *ad hoc* committee of the Canadian Medical Association to discuss physician remuneration models; Ottawa, Ontario.
- 1994-95:  Member, Alberta Medical Association Task Force on Alternative Remuneration Methods in Primary Care (ARMPC).  Predecessor committee to the FCC Working Group, described above.

- 1994-95:  Member, Organization Committee of the Calgary Regional Medical Staff Association.
- 1993: Chief Negotiator, Professional Association of Interns and Residents of Alberta (PAIRA); responsible for salary negotiations for all post-graduate medical trainees in the province.
- 1991-93:  Treasurer, PAIRA; responsible for association's annual budget of $250,000.
- 1991-93:  PAIRA representative to College of Physicians and Surgeons of Alberta Committee on Professional Education.
- 1990-91:  Graduating President of the Class of 1991, University of Calgary Medical School.
- 1989-91: Student representative, Alberta Medical Association's Committee on Intraoperative and Anaesthetic Deaths.

**Memberships**

- Citizens Hospital Medical Staff, Victoria, TX, 2018-present
- St. Francis Hospital Medical Staff, Grand Island, NE, 2018-present
- Christus Spohn Hospital System Medical Staff at Alice, Beeville, and Kleburg campuses, September 2016 to present
- Reeves County Hospital Medical Staff, Pecos, TX, 2015-present
- Shawano Medical Center Medical Staff, Shawano, WI, 2019-20
- Reagan County Memorial Hospital Medical Staff, 2011 to 2016
- Shannon Clinic Medical Staff, 2011 to 2016.
- Texas Medical Association 2012 to present.
- Riverside Medical Center Medical Staff, 2005 to 2011
- Wisconsin Sports Concussion Collaborative, 2005 to 2011
- International Association of Law Enforcement Firearms Instructors, 2006 to present
- International Law Enforcement Educator and Trainers Association, 2007 to present
- Association of Emergency Physicians, 2003 to present
- Riverview Hospital Medical Staff, 2003 to 2006
- American College of Sports Medicine, 2000 to present
- American Society for Law Enforcement Training, 1999 to 2005
- State Medical Society of Wisconsin, 1997 to 2011
- College of Family Physicians of Canada, 1991 to present.
- Berlin Memorial Hospital Medical Staff, 1997 to 2004
- Ripon Medical Center Medical Staff, 1997 to 2011
- Canadian Medical Association, 1988-97
- Alberta Medical Association, 1988-97
- Rockyview General Hospital Medical Staff, 1994-97
- Foothills Provincial General Hospital Medical Staff, 1994-97
- Calgary General Hospital Medical Staff, 1994-97

- Grace Hospital for Women Medical Staff, 1994-96
- Didsbury General Hospital Medical Staff, 1993-1995
- Edmonton English Springer Spaniel Club, 1991-1993
- Calgary English Springer Spaniel Training Club, 1988-1995


**Lectures and Conferences** (selected)

- 06/2018: Speaker/Instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), Houston, TX
- 01/2017: Speaker, National Forensic Examiners Conference, Nashville TN
- 06/2010: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), San Antonio, TX
- 04/2009: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 06/2009: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), West Palm Beach, FL
- 04/2008: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 06/2008: Speaker/instructor at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), Reno, NV
- 04/2007: Speaker/instructor at the Annual Training Conference of the International Law Enforcement Educators and Trainers Association (ILEETA), Wheeling, IL
- 05/2007: Keynote Speaker to the General Assembly at the Annual Training Conference of the International Association of Law Enforcement Firearms Instructors (IALEFI), San Antonio, TX
- 06/2006: Speaker, "Proven & Practical Techniques for Training Patrol Officers in Three-Dimensional Target Visualization", at IALEFI Annual Training Conference, West Palm Beach, FL
- 01/2006: Speaker, "Proven & Practical Techniques for Training Patrol Officers in Three-Dimensional Target Visualization", and Member, 'Panel of Firearms Experts', at the International Meeting of the American Society of Law Enforcement Trainers (ASLET), Albuquerque, NM
- 01/2005: Speaker, "Three Dimensional Target Visualization as a Technique for Law Enforcement Firearms Training, and Member, 'Panel of Firearms Experts', at the International Meeting of ASLET, Jacksonville, FL
- 01/2004: Speaker, "Tactical Anatomy:  A Firearms Training Model for Law Enforcement Officers", at the International Annual meeting of ASLET, St. Louis, MO
- 2004:  Member of  Panel of Experts in Firearms at International Annual meeting of ASLET, St. Louis, MO
- 04/2003: Lecturer & Instructor, "Tactical Anatomy: A Medical Overview of Gunshot Wounds for Police", given at several locations, including Chapman Firearms Academy,

Columbia, MO, and Ripon City Police Dept, Ripon WI
- 072002: Guest Lecturer, as above, at LFI's Level One course for civilians, given at Port Washington, WI
- 07/2001: Guest Lecturer; "Tactical Anatomy: A Medical Overview of Gunshot Wounds"; given at Ripon, WI, for LFI Level One course for civilians. (LFI is a training organization recognized by the American Society for Law Enforcement Training, International Law Enforcement Educators and Trainers Association)
- 12/1998, Conference attendee and panel member at Medical College of Wisconsin Conference on Firearms Injury Prevention, December 1998, Milwaukee, WI
- 03/1995, Chairman, "Family Practice Update at Kananaskis"
- 1993 – 2004:  Attendee at Continuing Medical Education conferences totaling at least 50 hours per year, thereby earning status in 2004 as a Fellow of the College of Family Physicians of Canada.

**Expert Witness Reports/Testimony**

- Richard Glossip v. Randy Chandler et al. (State of Oklahoma Department of Corrections), provided expert report, and advice, and was deposed in this case in 2021; I testified as an expert at trial in March, 2022.
- Floyd v. Daniels, et al. (State of Nevada Department of Corrections), provided expert report, advice, and testified as expert at trial in November, 2021.
- Cleveland Jackson v. State of Ohio, 2019; Provided expert report and advice to and on behalf of Federal Defenders Office, Columbus, Ohio, 2019-2020.
- McGehee v. Hutchinson, No. 17-cv-179 (E.D. Ark.) (State of Arkansas) 2019; provided expert report, advice, deposition and court testimony on behalf of Federal Defenders Office, Little Rock, AR.
- Danny Bible v. State of Texas, 2017; provided expert report and advice to Federal Defenders Office, Austin, TX.
- J.W. Ledford v. State of Georgia, 2017; provided expert report and advice to Federal Defenders Office, Atlanta, GA.

**References**

Available upon request.

# APPENDIX B

TMF 01/01.00    GENERAL PROVISIONS

TMF 01/01.01    Purpose of Technical Manual
TMF 01/01.02    Cross Reference
TMF 01/01.03    Policy
TMF 01/01.04    Definitions

REVISED 06/10/10                          TMF 01/01 – pg. 1

GLOSSIP000092

GLOSSIP000093

TMF 01/01.00    <u>GENERAL PROVISIONS</u>

TMF 01/01.01    <u>Purpose of Technical Manual</u>

    A. The purpose of this Technical Manual is to provide the Department's policies, procedures and post orders for planning and carrying out the sentence for the execution of a person convicted of a capital offense.

    B. This chapter shall include policies and procedures related to:

      1. planning and preparation;

      2. execution of the sentence;

      3. post-execution requirements and process;

      4. security and control;

      5. witnesses and official visitors

      6. news media access limitations and briefing;

      7. delays, stays, and commutations;

      8. support services functions;

      9. briefing and training; and

      10. documentation, review and audit.

    C. Post orders are included for the staff and others involved in the execution planning, implementation, documentation and review.

TMF 01/01.02    <u>Cross Reference</u>

    A. <u>Department Policies and Procedures Manuals</u>

      AGr05   Media Relations
      FDr14   Inmate Property

    B. <u>Other Authority</u>

      UCA 77-19-6  Judgement of death-Warrant-Delivery of warrant-Determination of execution time.

GLOSSIP000094

|                  |                                                                        |
|------------------|------------------------------------------------------------------------|
| UCA 77-19-10     | Judgement of death-Location and procedures for execution.              |
| UCA 77-19-11     | Who may be present-Photographic and recording equipment.               |
| UCA 77-19-12     | Return upon death warrant.                                             |
| UCA 26-4-6       | Investigation of deaths by county attorney-Requests for autopsies.     |
| UCA 26-4-7       | Deaths over which medical examiner has jurisdiction.                   |
| BPPPM 3.12       | Commutation Hearings for Death Penalty Cases                           |

TMF 01/01.03    Policy

It is the policy of the Department that:

A.   execution of persons sentenced to death under Utah law by a court of competent authority and jurisdiction be carried out in the legally prescribed manner;

B.   the Department shall make every effort in the planning and preparation of the execution event to ensure that the execution process:

1.   adheres to the intent of the law;

2.   is handled in a manner which minimizes negative impact on the safety, security and operational integrity of the prison;

3.   accommodates the need for public access to information concerning the event;

4.   reasonably addresses the privacy interests of those persons for whom the law, Department policy or commonly-held principles of decency require such privacy;

5.   provides sufficient staffing to ensure that unplanned problems can be accommodated and overcome;

6.   prepares for stays of execution, commutations and other delays in the execution count-down;

7.   provides an opportunity for interested persons to exercise their First

REVISED 06/10/10                                    TMF 01/01 – pg. 3

GLOSSIP000095

        Amendment rights to demonstrate for or against capital punishment in a lawful manner;

8.     ensures a firm and adequate response to unlawful civil disobedience, trespass, or other violations of the law by persons attempting to disrupt, prevent or other-wise frustrate the lawful process associated with the execution; and

9.     anticipates and provides for sufficient support needs for the execution and the prison as a whole;

C.    the Department shall arrest and encourage the prosecution of persons, including but not limited to, those who:

1.     violate 77-19-11 UCA prohibitions against filming, taping, sketching, broadcasting or otherwise electronically documenting the death of the condemned;

2.     trespass or otherwise enter upon prison property without proper permission and clearance from the Department;

3.     participate in unlawful demonstrations;

4.     unlawfully attempt to or disrupt, prevent or otherwise interfere with the execution;

5.     being inmates, are involved in disruptive, assaultive or other proscribed behavior; or

6.     unlawfully threaten, intimidate or terrorize persons involved in the execution process;

D.    staff involved in the execution make every effort within the requirements and limits of these polices and procedures and the laws of the State of Utah to:

1.     minimize the anxiety and negative impact of the execution on the victim's and inmate's family and friends witnessing the execution;

GLOSSIP000096

2.   display appropriate levels of
     professionalism, restraint, and courtesy
     in interaction with witnesses,
     demonstrators, news media, and other
     non-staff persons during the execution
     process; and

3.   not permit interactions, emotion or
     intimidation to prevent their proper
     handling of missions and duties;

E.   the Department review the adequacy and/or the
     performance of:

1.   the policies and procedures employed;

2.   the Department staff members involved in
     the execution;

3.   members of allied agencies assisting
     with the execution; and

4.   statutes and other authority impacting
                    the execution; and

F.   the evaluation of each execution event be
     used to improve operational procedures for
     the future.

TMF 01/01.04     <u>Definitions</u>

**allied agency**            refers to another criminal
                             justice agency

**Attorney General's**       staff at the Attorney
**Office**                   General's Office or any
                             designated contract attorney
                             approved to carry out the
                             responsibilities described in
                             this technical manual

**attorney of record**      the condemned inmate's
                            attorney and other assisting
                            legal personnel

GLOSSIP000097

| | |
|---|---|
| broadcast media | refers to radio and television media |
| civilians | any person not a member of the Department, allied law enforcement agency, nor mutual aid agencies |
| Command Post Director | the member who is assigned to supervise the command post functions and activities |
| commutation | the change from a greater to a lesser punishment after conviction |
| drug injection box | box or boxes each of which shall contain one complete set-up for lethal injection; with or without drugs |
| execution building | refers to the area containing the execution chamber |
| execution chamber | the immediate enclosed areas containing the condemned at the moment of execution |

GLOSSIP000098

| | |
|---|---|
| mutual aid | agencies or personnel that provide medical, fire suppression, and other support services to the Draper site |
| news magazines | magazines having a national circulation being sold by news stands to the general public and by mail circulation |
| news media | collectively refers to those involved with news gathering for newspapers, news magazines, radio, television or news services |
| news media members | persons over the age of eighteen who are primarily employed in the business of gathering or reporting news for newspapers, news magazines, national or international new services or radio or television stations licensed by the Federal Communications Commission |
| newspaper | for purposes of this chapter, the publication: |

REVISED 06/10/10                              TMF 01/01 - pg. 7

GLOSSIP000099

1.   circulates among the general public;

2.   publishes legal notices in the community in which it is located or the area to which it distributes; and

3.   contains items of general interest to the public such as political, commercial, religious or social affairs

**pardon**            an act of grace by an appropriate authority exempting a person from punishment for a crime

**press**             refers to the print media; also see "news media", generally

**reprieve**          the temporary suspension of the execution

**respite**           see "reprieve"

**security curtains** the curtains which cover the viewing room windows in the executionchamber

**Warden**            warden assigned to the Draper site

**witness viewing**   the areas from which the

REVISED 06/10/10                                      TMF 01/01 - pg. 8

GLOSSIP000100

area                    execution is viewed by
                        government witnesses, inmate's
                        witnesses and news media
                        witnesses

REVISED 06/10/10                        TMF 01/01 - pg. 9

GLOSSIP000101

TMF 01/02.00    PRE-EXECUTION CHECKLIST

TMF 01/02.01    General Provisions
TMF 01/02.02    Prior to Receiving Death Warrant
TMF 01/02.03    Receipt of Death Warrant to Thirty Days Prior to
                Execution
TMF 01/02.04    Twenty-Nine to Fourteen Days Prior to the
                Execution
TMF 01/02.05    Thirteen to Seven Days Prior to Execution
TMF 01/02.06    Six to Three Days Prior to Execution
TMF 01/02.07

GLOSSIP000102

TMF 01/02.00    <u>PRE-EXECUTION CHECKLIST</u>

TMF 01/02.01    <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

          1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur between the issuing of the death warrant and 24 hours prior to the execution.

          2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

          3.   This chapter will be divided to cover the following time periods:

              a.   prior to the death warrant being issued;

              b.   issuing of death warrant to 30 days prior to the execution;

              c.   14 to 29 days prior to the execution;

              d.   7 to 13 days prior to the execution;

              e.   3 to 6 days prior to the execution; and

              f.

      B.   <u>Policy</u>

          1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary in the preparation of the execution are completed in a timely manner.

GLOSSIP000103

2.  This count-down, though offering flexible application, should be observed and followed as written unless deviation or adjustment is required for carrying out the execution.

3.  The Executive Director/designee may direct deviation from or adjustment to the policies and procedures in this manual at any time when necessary for the good of the Department's mission in carrying out the execution. Approval for the changes shall be documented in writing.

TMF 01/02.02     <u>Prior to Receiving Death Warrant</u>

A.   <u>Execution Planning Team</u>

When it appears an execution is imminent, prior to the issuing of the death warrant, the Warden shall select an Execution Planning Team. The Team may include:

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

GLOSSIP000104

B.   Involve Additional Planning Assistance

Other persons who may be invited to attend on a meeting-by-meeting basis, include:

1.   a representative or representatives from the Attorney General's Office;

2.   a representative from the office of the County Attorney which prosecuted the condemned;

3.   a representative from the Board of Pardons and Parole;

4.   representatives from the law enforcement agencies which investigated the case involving the condemned;

5.   representatives from law enforcement and other allied agencies who may be asked to assist with various aspects of the execution; and

6.   any other persons deemed necessary or appropriate by the Executive Director/designee, DIO Director or Warden.

C.   Develop Assignments

When it is reasonable to believe a death warrant will be issued in the near future, the Execution Planning Team and those additional persons deemed appropriate shall meet to:

1.   review the Execution Plan (TMF 01);

2.   make assignments for the pending execution;

3.   develop a schedule of events;

4.   assign responsibilities related to revision of the Execution Plan, if needed; and

5.   take any other steps necessary to prepare for the issuance of the

GLOSSIP000105

deathwarrant and begin the execution count down.

D.   Identify Possible Execution Dates

1.   The Execution Planning Team shall review the Department's schedule of events and identify favorable and unfavorable dates within the period of time in which the execution may be ordered.

2.   Information concerning the Department's requests/concerns related to scheduling shall be communicated to the Attorney General's Office to be communicated to the sentencing court.

TMF 01/02.03   Receipt of Death Warrant to Thirty Days Prior to Execution

Upon receipt of a death warrant from a competent court, the following procedures shall be initiated and should be completed at least 30 days prior to execution.

A.   Receipt of Death Warrant

1.   Upon receipt of the death warrant and as soon as practical thereafter, a meeting of the Execution Planning Team shall be scheduled by the Warden.

2.   The Execution Planning Team shall then coordinate the implementation of the procedures set forth in this technical manual under the direction of the Warden.

B.   Time and Place of Execution

1.   Date

The date for the execution shall be that day set by the sentencing judge.

GLOSSIP000106

2.   <u>Time</u>

"The Department of Corrections shall determine the hour, within the appointed day, at which the judgment is executed." 77-19-6(3)

3.   <u>Location</u>

C.   <u>Condemned Inmate's Choice of Witnesses</u>

1.   The condemned inmate shall be informed that he may designate religious representatives, friends, or relatives not exceeding a total of five in number to witness the execution. 77-19-11 (2)(d) UCA

2.   Refer to TMF 01/07.

D.   <u>Disposition of Personal Property</u>

1.   The inmate shall be contacted for instructions concerning the disposition of his personal property.

2.   Refer to TMF 01/05.06.

E.   <u>Disposition of Funds in Inmate's Account</u>

1.   The condemned shall be contacted for instructions concerning the disposition of the funds in any accounts controlled or administered by the prison or Department.

2.   Refer to TMF 01/05.06 and TMF 01/05.07.

F.   <u>Organ Donation</u>

Organ donation is not an option for condemned inmates.

G.   <u>Disposition of Body</u>

GLOSSIP000107

1.   The condemned shall be asked for
instructions concerning the disposition
of his remains following the execution.

2.   Refer to TMF 01/05.08.

H.   Designate Persons Required to Assist with
Execution

1.   Those persons necessary to carry out the
execution shall be identified.

   a.   The Executive Director/designee,
DIO Director or Warden shall be
responsible for identifying,
selecting and obtaining the
services of the executioners.  See
TMF 01/05.03 and TMF 01/05.04.

   b.   The Public Affairs Director shall
be responsible for coordinating the
notification of the news media and
selection of individual news media
witnesses.  See TMF 01.08.02.

   c.   The Warden shall be responsible for
designating those persons necessary
to carry out and support the
execution.

2.   Redundancy in assignment may be
developed for all vital or important
positions.  The Warden, DIO Director,
and Executive Director/designee shall
determine which positions require back-
up and shall ensure adequate coverage is
provided.

3.   "Compensation for members of a firing
squad or persons administering
intravenous injections shall be in an
amount determined by the director of the
Division of Finance." 77-19-10 (4)UCA

   a.   The Department shall negotiate with
the executioners and Division of
Finance the fee to be paid to the
executioners.

REVISED 06/10/10                    TMF 01/02   - pg. 16

GLOSSIP000108

b.

c.

I.   Other Approved Witnesses

The Executive Director/designee shall
designate other approved witnesses as
outlined in TMF 01/07.03.

J.   Contact with State Medical Examiner

1.   Contact shall be made with the State
Medical Examiner to coordinate the
Medical Examiner's role.

2.   The Medical Examiner shall be requested
to provide direction concerning:

a.   transfer of custody of the executed
inmate from the Warden to the
Medical Examiner;

b.

c.

3.   Refer to TMF 01/04.

K.   Support Services

1.   The Support Services Deputy Warden
coordinates the functions of Support
Services Section Personnel.

2.   Support Services units shall include,
but not be limited to:

REVISED 06/10/10                           TMF 01/02   – pg. 17

GLOSSIP000109

        a.    the Food Services Unit (See TMF 01/05.19); and

        b.    the Maintenance Unit (See TMF 01/05.18).

L.  The Correctional Medical Administrator coordinates functions of the Medical Unit personnel.  (See TMF 01/05.18)

M.  <u>Brief Prison Administrators</u>

    1.    It is necessary to maintain as nearly as possible a normal prison operation during the execution and the activities preceding and following the execution.

    2.    Prison administrators should be briefed as appropriate on plans for the execution, restrictions on access, crowd control, additional security procedures, etc., on an on-going basis.

    3.    Briefings should begin as soon as plans begin to evolve which will effect the general prison operation, and should continue until the operation returns to normal.

TMF 01/02.04   <u>Twenty-Nine to Fourteen Days Prior to the Execution</u>

A.  <u>Witnesses</u>

    1.    The Executive Director/designee shall develop a final list of witnesses consistent with the requirements of 77-19-11 (2) and (3) UCA.

    2.    Any changes to the Government witness list shall be approved by the Executive Director.

    3.    Each witness shall be required to sign an agreement prior to being cleared and added to the witness list.

GLOSSIP000110

        4.    The Executive Director may make additions to the witness list when necessary.

        5.    Refer to TMF 01/05.05.

B.   News Media

        1.    Witness requests shall be received and processed by the Public Affairs Office in accordance with TMF 01/08.02.

        2.    Alternate coverage/accommodations for members of the press selected to be present at alternate site shall be handled consistent with TMF 01/08.03.

C.   Inmate Property and Accounts

        1.    Finalize arrangements for disposition of the condemned inmate's property and accounts 14 days prior to execution.

        2.    Refer to TMF 01/05.06 and TMF 01/05.07.

D.   Disposition of Body

        1.    Finalize, if possible, decision concerning disposition of the body.

        2.    Refer to TMF 01/05.08.

E.   Selection of Executioners

        1.    Finalize the selection of executioners and their back-ups.

        2.    Refer to TMF 01/05.03 and TMF 01/05.04.

F.   Medical/Medical Examiner

        1.    Finalize arrangements for a physician consistent with 77-19-10UCA.

        2.

GLOSSIP000111

3.   Refer to TMF 01/05.08.

G.   Practices and Rehearsals

1.   Initiate practice sessions for persons involved in the various parts of the execution event.

2.   Not all of the persons involved will practice together.  Individual teams will practice as units, with inter-team practices scheduled, as necessary.

TMF 01/02.05   Thirteen to Seven to Days Prior to Execution

A.   Inmate Property/Accounts

All paperwork on disposition of property and accounts should be completed at least seven days prior to the execution.

B.   Disposition of Body
All paperwork should be completed at least seven days prior to the execution.

C.   Food Services

1.   At least seven days prior to execution, contact the condemned inmate to arrange last meal.  TMF 01/05.18.

2.   Determine with the Warden, Draper Site Security Deputy Warden, and Public Affairs Director what beverage and food service will be needed at the various locations where staff will be working.

D.   Purchase of Substances to Be Used in Lethal Injection

1.   Purchase substances to be used in the execution.

2.   Refer to TMF 01/05.11.

E.   Support Services

GLOSSIP000112

Finalize all arrangements involving the
Support Services assistance with the Support
Services Director.

F.  Finalize all arrangements involving the
Medical Section assistance with the
Correctional Medical Administrator.

G.  Allied Agencies

Finalize arrangements with allied agencies
assisting with the execution.

TMF 01/02.06   Six to Three Days Prior to Execution

A.  Witnesses

1.  All witness agreements should be signed.

a.  Copies shall be provided to the:

(1)  Command Post Director; and

(2)  Auditor-in-Charge.

b.  Persons refusing to sign agreements
shall not be permitted to attend.

2.  Exceptions to the time requirements will
permit delayed signing of agreements for
witnesses coming in from out-of-state.

B.  Brief Allied Agencies

1.  Members of allied agencies who have not
participated in practice sessions or
have not otherwise been briefed
previously, shall be briefed and their
post or responsibilities explained.

2.  Briefings will include a detailed review
of the individual's post order.

C.  Inmate Property and Accounts

1.  Complete all unfinished paperwork and
arrangements.

2.  If the condemned fails to cooperate in
these arrangements, he shall be notified

REVISED 06/10/10                          TMF 01/02   - pg. 21

GLOSSIP000113

that the property and money will be
disposed of according to state law, and
Department policy.

D.  Executioners

The Warden shall:

1.


2.  ensure completion of all arrangements
    necessary for security of executioners
    and protection of their identities.

E.  Equipment Check/Inventory

1.


2.  Refer to TMF 01/05.10(Firing Squad) and
    01/10.09 (Lethal Injection).


TMF 01/02.07

A.  Observation Period

1.


2.



3.  Refer to TMF 01/05.12.

B.  Meeting of Execution Planning Team

The Team shall meet to examine preparation
for the execution.  The checklists shall be
reviewed and immediate assignments made to
bring all items current with the schedule of
events.


REVISED 06/10/10                         TMF 01/02  – pg. 22

GLOSSIP000114

Refer to TMF 01/02 pre-execution checklist
Refer to TMF 01/03 execution checklist
Refer to TMF 01/04 post execution procedure

C.  Review of Procedures

Conduct final review of procedures.

D.  Arrangements for Pickup of Executioners

1.

2.

E.  Food Services

1.  Verify last meal preparation.

2.  Verify beverage/food preparations for working teams.

F.  Communications

1.  Verify installation of and test communications equipment for:

a.

b.

c.  Information Center.

2.  Refer to TMF 01/05.10.

G.  Contact Support Agencies

1.  Contact:

a.  the Attorney General's Office;

b.  the State Medical Examiner's Office;

REVISED 06/10/10                    TMF 01/02   - pg. 23

GLOSSIP000115

      c.   allied law enforcement agencies; and

      d.   the Governor's Office.

   2.   Verify that each agency fully understands its role and is prepared to complete tasks.

H.   <u>Equipment Check</u>

   1.   Complete pre-execution inventory and equipment check.

   2.   All systems should be tested.

GLOSSIP000116

```
TMF 01/03.00    EXECUTION CHECKLIST

TMF 01/03.01    General Provisions
TMF 01/03.02
TMF 01/03.03
TMF 01/03.04
TMF 01/03.05
TMF 01/03.06
```

REVISED 06/10/10                    TMF 01/03   - pg. 25

GLOSSIP000117

TMF 01/03.00   <u>EXECUTION CHECKLIST</u>

TMF 01/03.01   <u>General Provisions</u>

        A.   <u>Purpose of Chapter</u>

            1.   The purpose of this chapter is to provide a checklist of procedures and events which should occur

            2.   Full detail will not be provided for each procedure or event in this chapter. For detail, reference will be made to Chapter TMF 01/05 and other chapters where such detail may be found.

        B.   <u>Policy</u>

            1.   It is the policy of the Department that the count-down to the execution be completed in a systematic manner to ensure that all procedures and events which are necessary to carry out the execution are completed in a carefully coordinated manner.

            2.   The execution shall be carried out in a manner consistent with state law.

TMF 01/03.02

        A.

            1.

            2.

            3.   Refer to TMF 01/05.12.

        B.

GLOSSIP000118

1.

2.    Refer to TMF 01/05.12.

C.    Inmate Communication

1.

2.

3.

4.    Refer to TMF 01/05.12.

D.    Food Services

1.    The Warden/designee shall contact the
condemned to make arrangements for the
final three meals.

2.    The final meal shall be served.

3.    Refer to TMF 01/05.18.

E.

GLOSSIP000119

        1.

            a.

            b.

            c.

            d.

        2.    Refer to TMF 01/03.03 and TMF 01/05.08.

F.    Equipment Check

        1.

        2.    Refer to TMF 01/05.10 and TMF 01/05.11.

TMF 01/03.03

A.    Final Briefing

        1.

        2.    The final briefing shall be attended by the Executive Director/designee, DIO Director, Warden, special teams and other persons specified by the Executive Director or Warden.  The Warden shall conduct the meeting, with the Executive Director/designee and DIO Director providing policy decisions, as needed.

        3.    During the briefing, participants shall:

            a.    identify problems, develop solutions and specify time lines and approve modified policy changes;

GLOSSIP000120

        b.    provide status reports;

        c.    coordinate support services involvement; and

        d.    conduct final review of count down procedures.

B.   <u>Food Services</u>

   1.   The condemned shall be fed at specified times

   2.

   3.   Refer to TMF 01/05.18

C.   <u>Visits</u>

   1.

   2.

D.   <u>Restricting Access to Prison Property</u>

   1.

        a.

        b.

        c.

        d.

        e.

   2.

GLOSSIP000121

a.

b.

3.

E.

1.

2.

3.

4.

TMF 01/03.04

A.

1.

a.

GLOSSIP000122

b.

c.

2.

    a.

    b.

    c.

3.

    a.

    b.

    c.

4.

    a.

GLOSSIP000123

        b.

B.

   1.

   2.

TMF 01/03.05

A.   <u>Pre-Execution Procedures</u>

   1.   The Warden shall ensure that all count-down procedures for all required activities and actions are completed.

   2.   Immediate action to complete any unfinished required procedures shall be initiated.

B.   <u>Execution Site Teams Assemble</u>

   1.

   2.   The Tie-Down Teams and their back-ups will be positioned to await escort of the condemned to the execution chamber.

C.   <u>Contact with the Attorney General's Office</u>

GLOSSIP000124

1.

    a.

    b.

       (2)

2.

3.

    a.

    b.

4.

GLOSSIP000125

TMF 01/03.06

A.  Communications with Attorney General's Office

Refer to TMF 01/03.05,C, above.

B.  Final Sequence of Events: Preparation

1.  Bringing Condemned Inmate to Execution Chamber

The condemned inmate shall be:

a.  removed from the observation cell by the Tie-Down Team;

b.          dressed in a clean jump suit (the color of the jump suit will be at the discretion of the Warden);

c.

d.  escorted to the execution chamber.

2.  Tie-Down Procedures

the condemned shall be tied down as explained in TMF 01/05.13(lethal injection) or TMF 01/05.14(firing squad).

3.  Prepare Condemned Inmate for Execution

The condemned shall be readied for execution:

a.  if lethal injection, by completing the I.V. set-up procedure (See TMF 01/05.15); or

b.  if firing squad, by completing the firing squad set-up procedures (See TMF 01/05.16).

4.  Admit Witnesses

REVISED 06/10/10                              TMF 01/03   – pg. 34

GLOSSIP000126

a.   Witnesses shall be admitted and escorted to assigned viewing areas.

b.   The government witnesses shall enter first and shall be escorted to the government witness area. The escort shall remain with the witnesses.

c.   Following the government witnesses, the authorized witnesses invited by the condemned, and the victim's witnesses shall be admitted and escorted to the designated witness area.

   (1)   If any of the condemned inmate's invited witnesses, or the victim's witnesses wish to be on-site but not actually witness the execution, accommodations may be made for them.

   (2)   The escort officers shall remain with the condemned inmate's witnesses and the victim's witnesses.

d.   The last witnesses to be admitted shall be the news media representatives.

   (1)   The members of the news media selected to witness the execution shall be escorted to the designated witness room. They shall be separate from the condemned inmate's witnesses and the victim's witnesses. Escort officers shall remain with the news media witnesses and ensure their separation from the other visitors while at the execution site.

   (2)   The two pool photographers shall be escorted to a designated site, away from, and out of sight of, the execution chamber. They shall

GLOSSIP000127

be secured inside the designated site until after the execution and until such time that they are allowed to film the cleaned up execution chamber.

C.   Final Sequence of Events: Execution

1.   Staff Witness

a.   Staff participating in the preparation for the execution shall exit the execution site.

b.   Staff members remaining to participate in and observe the execution shall include the:

(1)   Executive Director/designee;

(2)   Executive Director's back-up;

(3)   DIO Director;

(4)   Warden;

(5)   Executioners;

(6)   Escort Officers; and

(7)   other staff as designated by the Executive Director/designee, DIO Director, or Warden.

2.   Count-Down

a.   At the designated hour mandated for the execution, when everything is ready, the phone communication shall be terminated and the Executive Director/designee shall instruct the Warden to proceed with the execution.

b.   The Warden and DIO Director shall pull open the curtains covering the witness room windows.

GLOSSIP000128

c.   The Warden shall ask the condemned inmate if he has any last words or wishes to make a statement.

(1)   The statement should not exceed two minutes.

(2)   If the inmate uses foul language, the Warden should immediately proceed with the next step in the execution procedure.

(3)   If the statement exceeds two minutes, the execution shall proceed without waiting for the conclusion of his remarks.

(4)   Audio recording equipment may be used by the Department for the purpose of recording the defendant's last words.  The Department shall permanently destroy the recording made under this subsection not later than 24 hours after the completion of the execution.

d.

e.   The Executive Director/designee shall instruct the executioners in the case of death by injection, or the firing squad leader in the case of a firing squad execution to proceed with the execution:

(1)   upon receiving the Warden's signal to proceed;

(2)   after verifying the earliest legal execution time has passed; and

(3)   if no instruction to halt has been received from the Attorney General's Office.

GLOSSIP000129

f.   Following the instruction from the
     Executive Director/designee to
     execute the condemned inmate, the
     executioners shall immediately
     proceed with the execution as
     required in TMF 01/05.15(if by
     lethal injection) or TMF
     01/05.16(if by firing squad).

q.   If the execution is ordered delayed


     the Executive Director shall
     instruct the executioners to step
     away from the execution equipment
     and shall notify them that the
     execution has been stayed or
     delayed.  The procedures set forth
     under TMF 01/06 shall then be
     initiated.

REVISED 06/10/10                        TMF 01/03   - pg. 38

GLOSSIP000130

TMF 01/04.00    POST-EXECUTION PROCEDURES

TMF 01/04.01    General Provisions
TMF 01/04.02    Certification of Death
TMF 01/04.03    Removing Witnesses from Execution Chamber
TMF 01/04.04    Removal of Executed Inmate
TMF 01/04.05    Removing Executioners from the Execution Area
TMF 01/04.06    Site Clean-Up
TMF 01/04.07    News Media Re-Entry to Execution Site
TMF 01/04.08    Returning to Standard Operation
TMF 01/04.09    Audit of Execution
TMF 01/04.10    Post-Execution Countdown Schedule

GLOSSIP000131

TMF 01/04.00   <u>POST-EXECUTION PROCEDURES</u>

TMF 01/04.01   <u>General Provisions</u>

       A.   <u>Purpose of Chapter</u>

           The purpose of this chapter is:

           1.   to provide the procedures to be followed following the death by execution of the condemned inmate;

           2.   to identify the responsibilities for tasks to be completed; and

           3.   to provide for the transfer of the body of the condemned from the custody of the Department.

       B.   <u>Policy</u>

           It is the policy of the Department that:

           1.   the witnesses to the execution shall be removed from the execution chamber for the news media witnesses who shall be removed to a secondary location until permitted to return for a filming opportunity in the execution chamber;

           2.   the condemned inmate shall be examined by a licensed physician following the administering of the fatal drugs or the first volley by the firing squad to ensure that death has occurred;

           3.   the physician, when satisfied that death has occurred, shall certify the condemned inmate dead;

           4.   following the certification of death, the body of the condemned shall be surrendered to the State Medical Examiner;

           5.   after removal of the body, the chamber shall be restored and the news media permitted to return to photograph the chamber;

GLOSSIP000132

6.   after the chamber has been photographed, the news media shall be returned to the designated area to brief the other assembled members of the news media;

7.

8.   the entire execution process will be reviewed and evaluated by the AuditBureau to permit a post-execution examination of the competence, efficiency and effectiveness of the execution procedures and staff (see TMF 01/20).

TMF 01/04.02   Certification of Death

A.   After the drugs have been administered/or the execution completed by firing squad:

1.   the Warden shall wait a maximum of three minutes;

2.   the Warden shall then tell the DIO Director/designee to summon the attending physician to the condemned; and

3.   the physician shall take the condemned's vital signs.

B.   If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds until vital signs cease.

C.   If execution is by firing squad, and if after a maximum of ten minutes from the first volley, there are still signs of life, the physician will inform the Warden.  The Warden will then initiate the steps in TMF 01/05.16.

D.   When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

TMF 01/04.03   Removing Witnesses from Execution Chamber

GLOSSIP000133

2.    The Medical Examiner, or his designee,
      may issue the death certificate for
      deaths that occur at the prison. (UCA
      26-4-7, 26-4-10)

TMF 01/04.05    Removing Executioners from the Execution Area

A.

B.

C.

TMF 01/04.06    Site Clean-Up

A.    The injection team shall (if execution was by
      lethal injection):

      1.    use universal precautions and protective
            equipment to protect for blood or other
            potentially infectious materials;

      2.

      3.

      4.

      5.

B.    The Tie-Down Team shall be responsible for:

      1.    using universal precautions and
            protective equipment to protect against
            blood and other potentially infectious
            material; and

GLOSSIP000134

A.   After the certification of death by the physician, the curtains shall be closed by the Warden and DIO Director/designee and the witnesses shall be escorted from the witness viewing rooms

   1.

   2.

   3.

   4.

   5.

B.   The news media shall be escorted to an alternate location in the execution building until they can be returned for the filming opportunity after the execution chamber has been cleaned up.

C.   The condemned inmate's witnesses, government witnesses, and the victim's witnesses shall be escorted to waiting transportation vehicles

D.

TMF 01/04.04   Removal of Executed Inmate

A.   After the witnesses have been removed:

   1.   if the execution is by lethal injection, the IV should be cut by the executioners in order for the catheters to remain in the executed inmate's body; and

   2.

B.   The State Medical Examiner/designee shall be escorted into the death chamber

   1.   The State Medical Examiner has jurisdiction over all deaths that occur at the Utah State Prison. (UCA 26-4-7)

GLOSSIP000135

      2.    cleaning up the execution site, using
           universal precautions where appropriate.

TMF 01/04.07   News Media Re-Entry to Execution Site

    A.   After the site is restored and cleaned, the
        news media witnesses and pool photographers
        shall be escorted to the execution site.

    B.   The photographers shall be permitted to
        tape/photograph the site and observation cell
        (if approved by the Warden) as required in
        TMF 01/08.

    C.

TMF 01/04.08   Returning to Standard Operation

    A.

      1.

      2.

    B.

    C.

TMF 01/04.09   Review of Execution

Refer to TMF 01/20.

TMF 01/04.10   Post-Execution Countdown Schedule

    See Exhibit 04-1 for the proposed schedule for the
    post-execution period.
      (Sample for Lethal Injection)

               Execution

REVISED 06/10/10              TMF 01/04  - pg. 44

GLOSSIP000136

_____
Date

```
0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006  CURTAINS PULLED
0006 TO 0008  LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY WARDEN TO BEGIN EXECUTION
0023 SIGNAL BY EXECUTIONER THAT DRUGS HAVE BEEN ADMINISTERED
0024 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0027 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0028 CURTAINS CLOSED
0029
0030
0031
0034 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0036
0037

0038 CLEAN UP CREW INTO DEATH CHAMBER
0039
0040

0040 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0100 MEDIA RETURNED TO STAGING AREA
```

REVISED 06/10/10                    TMF 01/04  - pg. 45

GLOSSIP000137

(Sample for Firing Squad)

Execution Time Line

_____
Date

0005 DIRECTOR/DESIGNEE GIVES WARDEN OK TO BEGIN EXECUTION
0005 TO 0006 CURTAINS PULLED
0006 TO 0008 LAST STATEMENT BY CONDEMNED
0008 SIGNAL BY DIRECTOR/DESIGNESS TO BEGIN EXECUTION
0011 DOCTOR BROUGHT INTO EXECUTION CHAMBER
0014 DOCTOR PRONOUNCES DEATH AND DEATH WARRANT SIGNED
0015 CURTAINS CLOSED
0017
0018
0019
0021 TIE DOWN TEAM/MEDICAL EXAMINER INTO DEATH CHAMBER TO REMOVE
     BODY
0023
0025

0026 CLEAN UP CREW INTO DEATH CHAMBER
0031 WARDEN GIVES DIRECTIVE FOR MEDIA TO RETURN TO EXECUTION
     CHAMBER
0050 MEDIA RETURNED TO STAGING AREA

REVISED 06/10/10                              TMF 01/04   – pg. 46

GLOSSIP000138

TMF 01/05.00    EXECUTION PROCEDURES

TMF 01/05.01    General Provisions
TMF 01/05.02    Death Warrant
TMF 01/05.03    Selection of Executioners by Lethal Injection
TMF 01/05.04    Selection of Executioners by Firing Squad
TMF 01/05.05    Designation of Persons Required, Permitted or
                Prohibited from Witnessing the Execution
TMF 01/05.06    Disposition of Condemned Inmate's Property
TMF 01/05.07    Disposition of Money in Inmate Account
TMF 01/05.08    Disposition of the Body of the Condemned
TMF 01/05.09    Equipment Check/Inventory: Lethal Injection
TMF 01/05.10    Equipment Check/Inventory: Firing Squad
TMF 01/05.11    Acquisition and Storage of Drugs for Lethal
                Injection
TMF 01/05.12    Observation Period and Related Activities
TMF 01/05.13    Tie-Down Procedures: Lethal Injection
TMF 01/05.14    Tie-Down Procedures: Firing Squad
TMF 01/05.15    Execution by Lethal Injection
TMF 01/05.16    Execution by Firing Squad
TMF 01/05.17    Pre-Execution Rehearsals and Practices
TMF 01/05.18    Support Services Functions

GLOSSIP000139

TMF 01/05.00   <u>EXECUTION PROCEDURES</u>

TMF 01/05.01   <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

          1.   This chapter provides the procedures which are used when the Department exercises its statutory responsibility to carry out an execution.

          2.   The topics include those procedures which are employed:

              a.   immediately prior to receiving the death warrant;

              b.   from receiving the death warrant to and during the execution;

              c.   immediately following the execution; and

              d.   during the debriefing and audit phases of the execution.

      B.   <u>Policies</u>

          1.   It is the policy of the Department that the procedures employed in preparing for and carrying out an execution be comprehensive and clearly defined.

          2.   The procedures shall be developed consistent with state and federal law.

TMF 01/05.02   <u>Death Warrant</u>

      A.   <u>Judgement of Death</u>

          1.   When judgment of death is rendered, a warrant signed by the judge and attested by the clerk under the seal of the court, shall be drawn and delivered to the sheriff of the county where the conviction is made.  77-19-6 UCA

          2.   The Sheriff shall deliver the warrant and a certified copy of the judgment to the UDC Executive Director/designee at

the time of delivering the defendant to
the custody of the Department.  77-19-6
UCA

3.  The warrant states the conviction and
judgment, the method of execution, and
the appointed day the judgement is to be
executed.  The Department of Corrections
shall determine the hour, within the
appointed day, at which the judgement is
to be executed.

B.  Return Upon Death Warrant

1.  After the execution, the UDC Executive
Director/designee shall make a return
upon the death warrant showing the time,
place and manner in which it was
executed.  77-19-12 UCA

a.  The "Certificate of Execution":

(1)  shall be signed by the Warden
and the physician; and

(2)  shall include the full names
and official titles of the
official witnesses.

b.  The "Certificate of Execution"
shall be submitted for review to
the Executive Director/designee.

c.  Following review by the Executive
Director/designee, the "Certificate
of Execution" shall be returned to
the Warden.

2.  The "Certificate of Execution" shall be
directed by registered mail to the clerk
of the court of the county from which
the individual executed was sentenced.

3.  A return receipt shall be requested from
the recipient.

4.  A copy of the certificate shall be
placed in the deceased inmate's file.

TMF 01/05.03   Selection of Lethal Injection ExecutionTeam

GLOSSIP000141

A.   Statutory Requirements

    1.   The Executive Director/designee shall
        ensure that the method of judgment of
        death specified in the warrant is
        carried out at a secure correctional
        facility operated by the department at
        an hour determined by the department on
        the date specified in the warrant.  77-
        19-10 (1) UCA

    2.   When the judgment of death is to be
        carried out by lethal intravenous
        injection, the executive director of the
        department or his designee shall select
        two or more persons trained in
        accordance with accepted medical
        practices to administer intravenous
        injections, who shall each administer a
        continuous intravenous injection, one of
        which shall be a lethal quantity of
        sodium thiopental or other equally or
        more effective substance sufficient to
        cause death.  77-19-10 (2) UCA

B.   Selection of Execution Team

    1.   If the judgment of death is to be
        carried out by intravenous lethal
        injection, a minimum of two persons,
        each trained to administer intravenous
        injections shall be selected for the IV
        team.

    2.   Method of Selection

        a.   The DIO Director/designee and the
            Warden of the Utah State Prison,
            Draper site, shall be members of
            the execution team by virtue of
            their official position.

        b.   The Executive Director/designee,
            DIO Director/designee and the

REVISED 06/10/10                    TMF 01/05  – pg. 50

GLOSSIP000142

Warden shall select a minimum of four (4) additional members, other than the DIO Director/designee and Warden, for the execution team.

1. Of the four (4) additional members, a minimum of two (2) execution team members will be on the IV team.

2. No member of the execution team, other than the DIO Director/designee and Warden, shall be required to serve as a member of the execution team without consent.

3. The Executive Director/designee, DIO Director/designee, and Warden will designate one execution team member as the execution team leader.

   a. The execution team leader shall not be the DIO Director/designee or the Warden; and

   b. The execution team leader shall not be a member of the IV team.

4. The Executive Director/designee, DIO Director/designee, and Warden shall review the qualifications of the IV team members according to requirements outlined in subsection (3)(a through d) and other relevant information as to appropriate training and skills in administering intravenous injections. One IV team member will be designated as the IV team leader.

c. Following the examination and evaluation of candidates, the Executive Director/designee, DIO Director/designee and Warden, shall

GLOSSIP000143

select the execution team members.

d.   All execution team members shall
read and understand the execution
procedures.  The Warden shall
conduct a review of the execution
procedures annually.

3.   IV Team Qualifications

a.   At least two (2) members of the
execution team shall be designated
as the IV team for an execution by
lethal injection.

b.   Each member of the IV team shall be
a:

1.   Phlebotomist;

2.   Emergency Medical Technician;

3.   Paramedic; or

4.   Military Corpsman.

c.   Each member of the IV team shall:

1.   Have at least one (1) year of
professional experience in his
specialty;

2.   Remain certified in his
specialty or profession; and

3.   Fulfill all continuing
education requirements in his
specialty or profession.

d.   Prior to participating in an
execution, the members of the IV
team shall have participated in at
least three (3) complete execution
practices.

GLOSSIP000144

4.   Securing Services

a.   The Warden/designee shall contact those chosen for the execution team to notify them of their selection and verify their willingness and availability to perform the duties of execution by lethal injection.

1.   If any person declines participation, the Executive Director/designee, DIO Director/designee and Warden will select a replacement according to the processes outlined in this section.

2.   If all of the execution team members agree to participate, their individual roles as execution team members shall be explained to them.

b.

TMF 01/05.04   Selection of Executioners by Firing Squad

A.   Statutory Requirements

1.   "The Executive Director of Corrections/ designee shall ensure that the method of judgment of death specified in the warrant is carried out at a secure correctional facility operated by the Department of Corrections." 77-19-10(1) UCA

2.   "If the judgment of death is to be carried out by firing squad, the Executive Director of Corrections or his designee shall select a five-person firing squad of peace officers." 77-19-10 (3) UCA

REVISED 06/10/10                          TMF 01/05   – pg. 53

GLOSSIP000145

B. <u>Selection of Executioners</u>

1. A five-person execution team, plus two alternates and a team leader shall be chosen for the firing squad.

2. The alternate(s) shall be selected to replace any member(s) of the firing squad who are unable to discharge their required functions.

3. Persons selected for the firing squad shall be POST certified peace officers.

4. Selected peace officers will be required to demonstrate proficiency with weapons designated to carry out the execution.

    a. Under conditions substantially similar to those of the execution chamber, proficiency shall be exhibited by:

        1. Firing each weapon.

        2. At a minimum of 21 feet, accurately hitting the target of the same dimension as that which will be attached to the condemned.

    b. During the proficiency test, failure to accurately hit the specified target with one round from each weapon fired shall disqualify the officer.

5.

C. <u>Method of Selection</u>

1. The Executive Director/designee, DIO Director and Warden shall be responsible for the selection process.

GLOSSIP000146

2.

3.   The final choice of firing squad members shall be the responsibility of the Executive Director/designee, DIO Director and Warden.

4.   The Executive Director/designee, DIO Director/designee and Warden shall review the qualifications of the firing squad, including required proficiency as outlined in section (B4) and other relevant information.

D.   Securing Services

1.   The Executive Director and/or Warden shall contact those chosen for the firing squad, alternates and team leader to notify them of their selection and to verify their willingness and availability to perform the execution duties.

a.   If any person rescinds his original offer to participate, the selection team shall meet to select a replacement.

b.   If all of the selectees agree, their individual roles shall be explained to them.

2.

TMF 01/05.05   Designation of Persons Required, Permitted or Prohibited from Witnessing the Execution

A.   The Utah Code limits and identifies those persons who may attend and witness the execution.  (See TMF 01/07.03.)

REVISED 06/10/10                          TMF 01/05   – pg. 55

GLOSSIP000147

B.  The Warden shall designate the required
    personnel to carry out the statutory
    requirements of an execution.  Staff should
    include:

    1.       Deputy Warden;

    2.    Observation Officers

    3.       Tie-down Officers,

    4.    one Team Foreman for the escort/Tie-Down
          Team;

    5.    executioners (reference TMF 01/05.03 &
          .04);

    6.    Clean-up Officers (number to be
          determined by the Warden/designee),
          assigned to clean up the execution
          chamber immediately following the
          execution;

    7.    Guide Officers (number to be determined
          by the Warden/designee);

    8.

    9.

C.  The Warden/designee shall designate the
    appropriate resources necessary to carry out
    the requirements of an execution.  The
    designated individuals shall be responsible
    for:

    1.    advising the Warden concerning any
          medical supplies, etc.;

    2.    the preparation and supervision of meals
          prepared during the observation period,
          and for the condemned inmate's last
          meal;

REVISED 06/10/10                    TMF 01/05   – pg. 56

GLOSSIP000148

3.  ordering, verifying, picking-up the drugs, equipment, etc., necessary to carry out an execution by lethal injection; and

4.  pronouncing the death of the condemned inmate.

TMF 01/05.06    Disposition of Condemned Inmate's Property

A.  Contact with Condemned Inmate

1.  At least 30 days prior to the scheduled execution the condemned inmate should be contacted to discuss arrangements for disposing of his property.

2.  At least 14 days prior to the execution property-disposition arrangements should be finalized.

3.  At least seven days prior to the execution all paperwork required for final disposition should be completed.

4.  If the condemned is uncooperative, doesn't wish to make specific property-disposition arrangements, or for any other reason has not made arrangements for disposition, he shall be notified the property will be disposed of as required under 64-13-15 (1) UCA.

B.  Options for Disposing of Property

1.  Property may be released to an authorized visitor (family, friend or attorney).  The release would follow the normal property release procedures.

2.  Property may be mailed through the U.S. Postal Service.  The prison's Mail Unit shall process the mailing consistent with standard mail procedures.  Indigent status does not cover property-release postage.

3.  Property may be donated to a charitable organization.

GLOSSIP000149

4.  If the condemned fails to designate a
    property-disposition option:

        "if property is not claimed within
        one year of death...it becomes
        property of the state and may be
        used for correctional purposes or
        donated to a charity within the
        state."  64-13-15 (1) UCA

C.  Release Procedure

1.  Following a decision to release the
    condemned's property, the property shall
    be:

    a.  inventoried by        staff; and

    b.  transferred to the property room.

2.  The release will then follow according
    to the appropriate release procedures.
    Refer to FDr14, "Inmate Property" and
    FDr03, "Inmate Mail."

TMF 01/05.07   Disposition of Money in Inmate Account

A.  Contact with Condemned Inmate

    Follow the time-table for contact with the
    condemned outlined for property under
    TMF 01/05.06.

B.  Options for Disposing of Inmate Accounts

1.  The condemned shall be required to
    complete a money transfer form releasing
    the money in his account to his next of
    kin or other person or organization of
    his choice.

2.  If the condemned refuses or otherwise
    fails to complete the necessary forms,
    the funds shall be disposed of
    consistent with state law.

TMF 01/05.08   Disposition of the Body of the Condemned

A.  Release to Medical Examiner

REVISED 06/10/10                      TMF 01/05   - pg. 58

GLOSSIP000150

1.  After the executed inmate is pronounced dead, the body shall be released from the restraints and removed from the execution chamber.

2.  The body shall be immediately surrendered to the State Medical Examiner/designee.

REVISED 06/10/10                    TMF 01/05 - pg. 59

GLOSSIP000151

TMF 01/05.09   Equipment Check/Inventory: Lethal Injection

    A.   Responsibility

        1.   The IV team shall conduct a check of equipment and materials necessary to conduct the execution.

        2.

    B.   Inventory

        1.

        2.

        3.

            a.

            b.

        4.

    C.   Bloodborne Pathogen Precaution

        1.   As a precaution, all persons who may come in contact with the condemned's body fluids shall be issued rubber

REVISED 06/10/10                          TMF 01/05  - pg. 60

GLOSSIP000152

gloves and bloodborne pathogen
protection supplies and equipment.

TMF 01/05.10   Equipment Check/Inventory: Firing Squad

A.   The Warden shall ensurean equipment check of
appliances necessary to carry out an
execution.

B.

1.

2.

3.

4.

5.

6.

7.

C.   The execution team leader shall be
responsible to arrange for:

1.        .30-caliber rifles;

2.        live rounds of ammunition;

3.        blank rounds of ammunition;

4.    practice sessions and dry fire;

5.    ensuring equipment is clean and
operable; and

6.    back-up equipment for items 1, 2, 3,
above.

D.                   prior to the execution:

1.    the executioners shall be escorted into
the execution chamber by the DIO
Director/designee; and

GLOSSIP000153

2.

E.   Bloodborne Pathogens Precaution

As a precaution, all persons who may come in
contact with the condemned's body fluids
shall be issued rubber gloves and bloodborne
pathogen protection supplies and equipment.

TMF 01/05.11   Procurement, Storage and Accountability of
Chemicals for Lethal Injection

A.   Purchase

1.
the Warden shall provide to
the pharmacist for his official records
a memorandum specifying:

a.   The drugs which must be obtained;

b.   A copy of the judgment of death;
and

c.   A copy of the state statute.  77-
19-10(2) UCA

2.                                         the
pharmacist shall order the drugs from
the vendor.  Upon receiving the drugs,
the pharmacist shall:

a.

b.   Immediately notify the Warden that
the drugs have been received;

c.

d.

GLOSSIP000154

e.

    1.

    2.

    3.

    4.

f.

3.   Storage and Handling of Drugs

    a.

    b.   See the next two pages for the
       Equipment and Materials Checklist.

UTAH STATE DEPARTMENT OF CORRECTIONS
Equipment and Materials Checklist: Execution by Injection

GLOSSIP000155

| Quantity | Item | Code |
|---|---|---|
| | Sodium Thiopental (Pentathal), 500 mgm., w/diluent | A |
| | Pancuronium Bromide (Paravulon), 50 mgm. Ampules | A |
| | Potassium Chloride, 240 miliequiv. Ampules | A |
| | Valium injection, 10 mgm | A |
| | Syringe, 60 cc Lur Lock | |
| | Syringe, 10 cc Lur Lock | |
| | Syringe, 5 cc Lur Lock | |
| | Needle, 18 Ga., 1 ½ | |
| | Needle, 25 Ga., 1 ¼ | |
| | Angiocath, 14 Ga., 2 ¼" | |
| | Angiocath, 18 Ga., 1 ¼" | |
| | Angiocath, 16 Ga., 1 ¼" | |
| | Normal saline, IV bad, 1000C | |
| | Lidocaine HCL, 2% w/Epinephrine | |
| | Lidocaine HCL, 2% w/o Epinephrine 2 | |
| | Solution injection set, 70" long with | |
| | Y-injection site:  Travenol Code: #2C0005S | |
| | Extension set, 35" long; Travenol Code #2C0066 | |
| | Stethoscopes | |
| | Boxes of alcohol preps | |
| | Rolls of Kling | |
| | Adhesive tape, 1" | |
| | Adhesive tape, 2" | |
| | Scissors, bandage, Pr. | |
| | Tourniquet | |
| | Hemostat, sterile | |
| | Flashlight, w/batteries | A |
| | Batteries, flashlight, (spares) | A |
| | Ace wraps 3" | |
| | Needle holders | |
| | 10 packs sterile gauze | |
| | Sharp containers | |

| | BIO-Hazardous trash bags | |
| | Extra large impervious gowns | |
| | IV hangars | |
| | Mayo stand | |
| | Terry cloth towels | |
| | Goose neck light | |
| | Blood spill kits | |
| | Trash containers | |
| | Electronic Heart Monitor (EKG) | |

TMF 01/05.12   Observation Period and Related Activities

        A.   Access

             1.

             2.

             3.

        B.   Preparation of the Observation Cell

             1.

                a.

                b.

                c.

             2.   Stocking the Cell

GLOSSIP000157

a.   The observation cell shall be
     outfitted with the following items:

     (1)   mattress (1);

     (2)   pillow (1);

     (3)   pillow case (1);

     (4)   sheets (2);

     (5)   blankets (2);

     (6)   towel (1);

     (7)   soap, small (1);

     (8)   toilet paper, roll (1);

     (9)   jump suit (color to be
           determined by the Warden) (1);

     (10) socks (1 pr.);

     (11) shower thongs (1 pr.); and

     (12) pocket comb, no metal (1).

b.   If requested, the cell will also
     have the following items purchased
     new

     (1)   Bible (1);

     (2)   magazine

     (3)   newspaper
                 ; and

     (4)   photographs
                    .

c.   The following items may be given on
     request, as needed,

     (1)   toothbrush (1);

GLOSSIP000158

                    (2)   toothpaste

                    (3)

        d.   If the condemned inmate receives
mail the officer shall allow the
condemned inmate adequate time to
read the mail

        f.

        g.   Additional property shall be
approved by the warden.

3.   <u>Test Equipment</u>

        a.

        b.

C.

    1.

    2.

    3.

REVISED 06/10/10                        TMF 01/05 - pg. 67

GLOSSIP000159

4.

5.

6.

a

b.

D.   Securing Condemned Inmate's Property/Cell

1.

2.

3.

GLOSSIP000160

b.

    (1)

    (2)

    (3)

    (4)

c.

    (1)

    (2)

    (3)

    (4)

4.  Personal property shall be separated from prison property, and the personal property put into a suitable container and sealed.  Each search team member shall initial the seal.

5.  The designated property officer shall sign for and assume responsibility for the inventoried property.

6.

a.

GLOSSIP000161

b.

7.

8.    The personal property shall be taken to
      the DIO property room for storage.

E.    <u>Observation Function</u>

1.

a.

b.

c.

d.

e.

f.

g.

2.

a.

b.

GLOSSIP000162

3.

4.

5.

F.   Activities During the Observation Period

1.

2.   Unless previously served, meal service,
     including the last meal, shall be served
     during the observation period.

3.

GLOSSIP000163

4.

    a.

    b.

    c.

          TMF 01/05 – pg. 72

GLOSSIP000164

TMF 01/05.13   <u>Tie-Down Procedures: Lethal Injection</u>

      A.   <u>Transfer of Condemned Inmate to Execution Site</u>

          1.   The condemned inmate shall be escorted from the observation cell to the execution chamber by the Tie-Down Team.

          2.

              a.

              b.

              c.

              d.

      B.   <u>Positioning of Tie-down Team</u>

          1.

          2.

          3.

          4.

          5.

      C.   <u>Securing Inmate to Gurney</u>

REVISED 06/10/10                        TMF 01/05 - pg. 73

GLOSSIP000165

1.

2.

     a.

     b.

     c.

     d.

     e.

     f.

     g.

3.

GLOSSIP000166

4.

5.    Upon completion of the execution and as
      directed by the Warden, the Tie-Down
      Team shall enter the execution chamber
      and remove the straps in the reverse
      order as outlined above.

TMF 01/05.14    <u>Tie-Down Procedures: Firing Squad</u>

        A.    <u>Bringing Condemned Inmate to Execution</u>
              <u>Chamber</u>

              The condemned inmate should be escorted from
              the observation cell to the execution chamber
              by the Tie-Down Team

        B.    <u>Positioning the Tie-Down Team</u>

              1.

              2.

              3.

              4.

        C.    <u>Securing the Inmate to the Chair</u>

              1.

              2.

REVISED 06/10/10                          TMF 01/05 – pg. 75

GLOSSIP000167

a.

b.

3.

4.

5.    Upon completion of the execution and as
      directed by the Warden, the Tie-Down
      Team shall re-enter the execution
      chamber and remove the straps in reverse
      order as outlined above.

TMF 01/05.15    Lethal Injection Protocol

            A.

                1.

                2.

GLOSSIP000168

B.   Preparation of Syringes

1.

   a.

   b.

   c.

2.   The execution team leader shall
     providethe drug box to the IV team
     leader.

   a.   The IV team leader shall prepare
        each chemical in accordance with
        the manufacturer's instructions and
        draw them into the two (2) sets of
        syringes.

   b.   The second member of the IV team
        and the execution team leader shall
        observe
        preparation of the chemicals and
        verify that the instructions and
        procedures have been carried out
        correctly.

   c.

3.   The syringes containing the chemicals
     shall be prepared and loaded in the
     following order:

   a.   Two 60-cc syringes, each containing
        240 milliequivalents of Potassium
        Chloride in 50-cc and label
        syringes "Syringe #3.

   b.   Two 60-cc syringes, each containing
        fifty (50) milligrams of
        Pancuronium Bromide in 50-cc and

GLOSSIP000169

label syringes "Syringe #2".

c.  Two 60-cc syringes, each containing
three (3) gm of Sodium Thiopental
in 50-cc and label syringes
"Syringe #1".

d.  The secondary syringes containing
each of the three chemicals are to
serve the following purposes.

1.  Secondary syringe of Sodium
Thiopental is prepared in the
event the condemned
has not lost consciousness
sixty (60) seconds after the
first administration of the
chemical.

2.  Secondary syringes containing
Potassium Chloride and
Pancuronium Bromide are
prepared in the event the
condemned has not been
pronounced dead after the
first administration of the
chemicals.

4.  Any syringes that are loaded with lethal
injection chemicals that are not used
during the execution shall:

a.  Be returned to the Warden by the
execution team leader;

b.  Be destroyed by the Warden,

5.  Any unused chemicals that were not mixed
in preparation of the lethal injection
shall:

a.  Be returned to the Warden by the IV
team leader;

b.  Be destroyed by the Warden,

GLOSSIP000170

C.

D.

E.  <u>The IV team leader:</u>

   1.  Shall, along with the second IV team
       member, verify two (2) labeled sets of
       each of the three (3) chemicals are
       present, filled, and clearly labeled;

   2.  Provide the two (2) labeled sets of each
       of the three (3) chemicals contained in
       the drug box to the execution team
       leader who will verify, along with
       another execution team member, selected
       by the execution team leader, the
       appropriate number of syringes have been
       surrendered and are clearly labeled; and

   3.  Prepare the IV set-up.

F.  <u>IV Set-up Procedure by IV Team</u>

   1.  The connector of Administration Set
       (McGaw V1417 or equivalent) shall be
       inserted into the bag of Normal Saline
       IV solution.

   2.  The Flo Trol clamp located above the "Y"
       site shall control the flow of solution.

   3.  A 35-inch Extension Set (Travenol 2C0066
       or equivalent) shall be connected to the
       needle adapter of the Administration
       Set.

GLOSSIP000171

4.  The set-up for administration into the back-up IV site may require additional Extension Sets due to the potential of additional distance.

5.  All connections should then be taped to ensure they do not come apart during the procedure.

6.  The tubing shall be cleared of air by removing the protector from the needle adapter and opening the Flo Trol clamp letting the tube fill with solution.

7.  The Flo Trol clamp shall then be closed and the protective cap over the needle adapter replaced.

8.  Steps 1 through 7 shall be repeated for the second set-up.

G.  <u>Injection Procedure by IV Team</u>

1.  The Warden shall order the condemned person escorted to the execution chamber and strapped to the gurney.

2.  The IV team shall run the IV lines to the condemned person by the following:

    a.  Site and insert one (1) primary IV line; and

    b.  Site and insert one (1) back-up IV line.

3.  The IV team members shall determine the location of the IV sites on the body of the condemned person.

4.

    a.

    b.

    c.

    d.

GLOSSIP000172

H.    IV Placement Process by IV Team

1.    The angiocath shall be inserted into the vein of the primary IV site.

2.    To best ensure that a needle is inserted properly into a vein, the IV team members shall look for the presence of blood in the valve of the sited needle.

3.    The inner needle is then withdrawn and the needle adapter is placed on the angiocath.

a.

b.

4.    The flow of normal saline shall be started and administered at a slow rate to keep open.

5.    Step 1 through 3 shall be repeated for the back-up IV site.

6.    The Administration Sets shall be running at a slow rate of flow, to keep open and ready for the insertion of syringes containing the injection chemicals.

7.    Both set-ups shall be observed by the IV team members to ensure they are both patent and functioning properly.

8.    No further action is necessary at this time.

I.    Lethal Injection Procedure

1.    The execution team shall:

GLOSSIP000173

      a.   Securely connect the electrodes of
           the cardiac monitor to the
           condemned person; and

      b.   Ensure the equipment is functioning
           properly.

2.   At the designated hour mandated for the
     execution, when everything is ready:

      a.   The DIO Director/designee and
           Warden shall pull open the curtains
           covering the witness room windows.

      b.   The Warden shall ask the condemned
           inmate if he has any last words or
           wishes to make a statement.

         1.   The statement should not
             exceed two minutes.

         2.   If the inmate uses foul
             language, the Warden should
             immediately proceed with the
             next step in the execution.

         3.   If the statement exceeds two
             minutes, the execution shall
             proceed without waiting for
             the conclusion of his remarks.

         4.   The Department, for the
             purpose of recording the
             condemned inmate's last words,
             may use audio recording
             equipment.

            a.   The Department shall
                permanently destroy the
                recording made under this
                subsection not later than
                24 hours after the
                completion of the
                execution.

            b.   No form of duplication of
                the audio shall be
                permitted.

            c.   The Warden, witnessed by
                the DIO
                Director/designee, shall

GLOSSIP000174

destroy any audio
recording.

c.    At the conclusion of the remarks,
      or when the Warden determines it is
      time to proceed, a prearranged
      signal shall then be given by the
      Warden to the Executive
      Director/designee.

d.    The Executive Director/designee
      shall order the execution team
      leader to begin the administration
      of the chemicals providing:

      1.    The earliest legal execution
            time has been verified and has
            passed; and

      2.    No instruction to halt has
            been received from the
            Attorney General's Office.

e.    Following the instruction from the
      Executive Director/designee to
      execute the condemned inmate, the
      execution team leader shall
      immediately proceed with the
      execution.

f.

      1.

      2.

      3.

3.    Upon the Executive Director/designee's
      order to proceed, the execution team
      leader shall begin the following

GLOSSIP000175

sequence:

a. The flow of the normal saline into the arm shall be cut off using the Flo Trol clamp.

b. The clamp should be moved as close to the "Y" site as possible.

c. The 18 ga needle of Syringe #1 (three (3) gm of Sodium Thiopental) shall be inserted into the "Y" site and the injection shall commence.

   1. A steady, even flow of the injection shall be maintained with only a minimum amount of force applied to the syringe plunger.

   2. When the entire contents of the syringe have been injected, syringe #1 shall be removed from the "Y" site.

d. The Flo Trol clamp should then be opened fully and allowed to run for 15 seconds.

e. The Flo Trol clamps shall then be closed.

f. A period of sixty (60) seconds shall pass after the administration of the Sodium Thiopental and closure of the Flo Trol clamp.

   1. After the passage of sixty (60) seconds:

      a. If it appears to the Warden based on his visual inspection that the condemned person is not unconscious:

         i. The Warden shall notify the Executive Director/designee;

         ii. The Executive Director/designee

REVISED 06/10/10

TMF 01/05 - pg. 84

GLOSSIP000176

will order the
execution team to
switch to the back-
up IV site;

iii.   The Executive
Director/designee
shall order that the
back-up IV site be
used with a new flow
of Sodium Thiopental

(secondary syringe
labeled Syringe #1);
and

iv.    The Executive
Director/designee
shall order the
remaining sequence
of chemicals to be
injected through the
back-up IV site.

2.    If it appears to the Warden
based on his visual inspection
that the condemned person is
unconscious after the first
injection of Sodium
Thiopental, the Warden shall
notify the Executive
Director/designee who will
then order the execution team
to continue to the next step
in the sequence.

g.    The 18 ga needle of Syringe #2
(fifty (50) milligrams of
Pancuronium Bromide) shall be
inserted into the "Y" site and the
injection shall commence;

1.    A steady, even flow of the
injection shall be maintained
with only the minimum amount
of force applied to the
syringe plunger.

2.    When the entire contents of
the syringe have been
injected, Syringe #2 shall be

GLOSSIP000177

removed from the "Y" site.

h.    After syringe #2 has been given, the Flo Trol clamp should be opened fully for 15 seconds.

i.    The Flo Trol clamp shall then be closed.

j.    The 18 ga needle of Syringe #3 (240 milliequivalents of Potassium Chloride) shall be inserted into the "Y" site and the injection shall commence;

1.    A steady, even flow of the injection shall be maintained with only the minimum amount of force applied to the syringe plunger.

2.    When the entire contents of the syringe have been injected, Syringe #3 shall be removed from the "Y" site.

k.    The Flo Trol clamp shall then be opened fully and allowed to run for 15 seconds.

l.    The Flo Trol clamp shall then be closed.

m.    An execution team member designated by the execution team leader shall start a stopwatch once the lethal injections are complete.

n.    The execution team leader shall:

1.    Observe the heart monitor; and

2.    Advise the attending physician electrical activity of the heart has ceased as indicated by a flat line on the heart monitor.

o.    The Warden shall notify the Executive Director/designee if it appears an additional set of lethal chemicals needs to be administered

GLOSSIP000178

due to the following conditions:

1.   Heart monitor does not indicate a flat line after ten (10) minutes; or

2.   The attending physician is not able to declare the time of death after ten (10) minutes.

p.   In the event death has not occurred;

   1. The Executive Director/designee will order the process established in subsection (2)(f) of this section and subsequent sections to continue with the secondary set of syringes until death has occurred.

q.   During the execution by lethal injection, the DIO Director/designee and Warden shall:

1.   Watch the primary IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

2.   In the event that an IV fails, leaks, if the catheter comes out of the vein, or any other problem arises, the execution team shall be ordered to switch to the back-up IV.

3.   In the event the execution team is ordered to switch to the back-up IV, the DIO Director/Warden shall watch the back-up IV site for failure, leakage, the catheter coming out of a vein, or any other problem.

J.   <u>Post Lethal Injection Steps</u>

1.   When the physician declares death, the Executive Director/designee, DIO

GLOSSIP000179

Director/designee and Warden shall be
informed.

2. The DIO Director and Warden shall close
the viewing room curtains.

3. The Executive Director/designee shall
make appropriate contact with the
Governor and Attorney General informing
them of the completion of the execution.

K. Disposal of BIO-Hazardous Contaminated Items

1. The execution team leader shall place
items that have been contaminated with
blood or other potentially infectious
materials (OPIM) that have the potential
to puncture into a puncture proof
container (sharps container).

2. The execution team leader shall place
other types of blood or other
potentially infectious materials in
trash containers lined with a red BIO-
Hazardous waste bag.

3. The Correctional Medical Administrator
shall ensure that the contaminated waste
is disposed of in the proper Dumpster.

TMF 01/05.16   Execution by Firing Squad

A.

B.

1. Refer to TMF 01/05.10.

2. The team leader shall load the weapons
and prepare to issue them to the members
of the firing squad.

3. Two rounds shall be loaded in each
weapon.

4. Care shall be taken to preclude any
knowledge by the members of the firing

GLOSSIP000180

squad of who is issued the weapon with
two blank cartridges.

C.  The Warden shall direct that an aiming point
or target be placed over the condemned
inmate's heart.

D.  Upon completion of "C", above, the Warden
shall direct the person who placed the target
to exit the execution chamber.

E.  After the target is in place and all
witnesses are secured, the Warden shall
direct that the viewing room curtains be
opened.

F.  After all preliminaries are completed, the
Warden, at the conclusion of the condemned
inmate's last words (which shall not exceed
two minutes and cease at any point should the
condemned use foul language), shall place the
hood over the condemned's head.

(1)  Audio recording equipment may be used by
the Department for the purpose of
recording the defendant's last words.

(2)  The Department shall permanently destroy
the recording made under this subsection
not later than 24 hours after the
completion of the execution.

(3)  No form of duplication of the audio
shall be permitted.

(4)  The Warden, witnessed by the DIO
Director/designee, shall destroy any
audio recording.

G.  The DIO Director/designee, Warden, and any
other observers shall exit the execution
chamber.

H.  When the Warden enters the executioners' room
and secures the door, if no stay or delay in
the execution has been ordered, the Executive
Director/designee shall immediately order the
firing squad team leader to begin the cadence
for the executioners to fire.

I.  A designated execution team member shall start a stopwatch once the first volley has been fired.

J.  If the condemned inmate appears to be unconscious, upon the order of the Executive Director, the Warden and DIO Director shall re-enter the execution chamber after the first volley.

1.  The Warden shall wait a maximum of three minutes after the first volley and then call for the physician to check the vital signs of the condemned.

    a.  If there are signs of life, the physician shall wait beside the condemned and check the vital signs every 60 seconds.

    b.  When no vital signs are detected, the physician shall certify death in keeping with standard medical practices.

    c.  After death is certified, the Warden shall direct that the viewing room curtains be closed.

2.  If, after a maximum of ten minutes from the first volley, the inmate is unconscious but alive, the Warden shall direct the physician to make a final check of the condemned's vital signs.

    a.  If on final check, vital signs are detected, the Warden shall order the physician to exit the execution chamber.

    b.  The Warden and DIO Director shall re-enter the executioner's room.

    d.  The Executive Director/designee shall order the firing squad team leader to make the weapons ready to fire.

    e.  The Executive Director/designee shall immediately order the firing squad team leader to begin the

GLOSSIP000182

cadence for the firing squad to fire a second volley.

    f.   After the firing of the second volley, the Warden and DIO Director shall re-enter the execution chamber and proceed with paragraph "J,1", above.

K.   If, after the first volley is fired, the condemned is obviously conscious, the Executive Director/designee shall instruct the firing squad team leader to immediately prepare the weapons to fire again.

    1.   The firing squad team leader shall ready the weapons in a controlled and safe manner.

    2.   The firing squad team leader shall ensure the executioners do not see which weapon contains the blank cartridges.

    3.   When the weapons are ready, if the condemned is still obviously conscious, the Warden shall ensure no staff members are in the execution chamber.

    4.   Upon notice from the Warden that the execution chamber is clear, the Executive Director shall immediately order the firing squad team leader to begin the cadence for the executioners to fire a second volley.

    5.   After the second volley, continue with "J", above.

L.   The Executive Director shall make notification of the condemned's death to the Governor and the Attorney General.

TMF 01/05.17   <u>Pre-Execution Rehearsals and Practices</u>

A.   A minimum of three rehearsals and practices shall be conducted to carry out an execution in a timely fashion maintaining the necessary

GLOSSIP000183

security.   Practice/rehearsal shall be provided for but will not be limited to:

1.   briefing;

2.   removing the condemned inmate from the observation cell;

3.

4.   escort to execution chamber;

5.   tie-down procedures completed;

6.   approximate time for IV injection procedure (execution time approximate);

7.   clearing and escorting witnesses to/from execution site;

8.   security curtains opened and closed;

9.   condemned inmate's body removed from execution table/chair;

10.

11.   clean-up;

12.   debriefing outlined;

13.   firing of weapons; and

14.   ensure sufficient precautions are taken to minimize the risk of bio-hazardous exposure.

B.   Planning backward from the execution shall be used to develop realistic time lines for each function involved in the execution.

C.

1.   Discrepancies, concerns or proposed modifications due to system problems

REVISED 06/10/10                              TMF 01/05  -  pg. 92

GLOSSIP000184

shall be immediately reported to the Warden.

2.

TMF 01/05.18   Support Services Functions

A.   Food Services

   1.   Observation Period Meal Service

      a.

      b.   The Food Services Director/designee shall confirm the condemned's choice of a last meal.  The confirmation should be made 48-24 hours prior to the execution.

      c.

      d.

      e.   Alcoholic beverages shall not be served nor used for cooking.

   2.   Beverage and Food Service for Staff

      a.   Because of the length of time many persons will be required to remain on site without being able to leave, it may be necessary to serve food and beverages to those assigned to the execution.

REVISED 06/10/10                          TMF 01/05 - pg. 93

GLOSSIP000185

b.

c.   Food and beverage services may be
     provided to:

     (1)   the command post;

     (2)   the Information Center;

     (3)   the food preparation area of
           the building in which the
           execution will occur;

     (4)   to the Draper site Security
           Deputy Warden for delivery to
           perimeter posts; and

     (5)   other sites as needed.

d.

B.   Medical Staff

1.   Receipt of Death Warrant

     Upon receipt of the death warrant the
     Correctional Medical Administrator
     shall:

     a.   review the medical procedures, post
          orders and equipment checklist and
          make recommendations in writing to
          the Warden concerning any back-up
          or duplication of any medical

GLOSSIP000186

paraphernalia that may be necessary to carry out an execution; and

b.    shall confer with the Chief Physician and assign all execution-related tasks to be completed.

2.    <u>Thirteen to Seven Days</u>

a.    At least thirteen days prior to the execution the Warden shall provide to the pharmacist, for his official record, authorization to purchase drugs.  Authorization shall be in the form of a memorandum including:

   (1)  the names of the drugs which shall be obtained;

   (2)  a copy of the judgement of death; and

   (3)  a copy of the state statute (77-19-10 (2) UCA).

b.    At least seven days prior to the execution the pharmacist shall order the drugs from the vendor (refer to chapter TMF 01/05.11).

   (1)  If the state's prime vendor cannot deliver the drugs, the pharmacists shall make arrangements with other vendors or hospitals to obtain the drugs.

   (2)  If the drugs cannot be delivered to the prison by the primary vendor or their delivery service to the prison, the pharmacist shall notify the Correctional Medical Administrator.

   (2)  The Correctional Medical Administrator shall make arrangements with the Draper site Security Deputy Warden to have an officer accompany them

GLOSSIP000187

to the location where the
other drugs may be obtained.

c.

3.

4.

5.

a.

b.

c.

6.

a.

(1)  the sodium pentothal syringes
shall be prepared by the
pharmacist at the direction of
the Warden when it appears the
execution shall be carried
out;

REVISED 06/10/10                          TMF 01/05 – pg. 96

GLOSSIP000188

    (2)   a medical-response team shall
be on standby to provide any
medical attention which may be
needed during the time of the
scheduled execution;

    (3)   a USP emergency equipment kit
and a back-up kit shall be
made available at the
execution site; and

    (4)   the Correctional Medical
Administrator (CMA)/designee
and a USP Medical staff with
skills in intravenous
injections, I.V. set-up,
cut-down, etc., shall be
available at the execution
site to provide medical
assistance in the execution
chamber, if necessary.

b.   Equipment and lethal drugs shall be
gathered up by the CMA/designee
following the execution.

    (1)   The CMA/designee shall be
responsible for the disposal
of the medical equipment used
for lethal injection in
accordance with TMF 01/05.15.

    (2)

C.   <u>Maintenance Staff</u>

1.   <u>Receipt of Death Warrant</u>

a.   Upon receipt of the death warrant
the Deputy Warden Support Services
shall:

    (1)   review the maintenance
procedures and the equipment
checklist and make recom-
mendations in writing for
changes, additional equipment,
etc. as is viewed essential

GLOSSIP000189

and provide such recommendations to the Warden prior to the scheduled execution date; and

(2) confer with the Maintenance Director and assign all execution related tasks to be completed.

b. The Maintenance Director shall then prepare a task completion calendar which shall be presented to the Deputy Warden Support Services for approval, including:

(1) a review of the maintenance procedure and the equipment checklist;

(2) recommendations to the Warden in writing of changes, additional equipment, etc. as is viewed essential prior to the scheduled execution date;

(3) identification of strategies to ensure that all systems, equipment, and mechanisms associated with the execution facility are functional and are readily repairable given an unexpected malfunction;

(4) identification of emergency equipment, materials, and substances necessary to ensure that system, equipment, and/or mechanism malfunctions are expeditiously remedied;

(5) establishment of inspection checklist and time frames for:

(a) the facility designated for the execution;

(b) the observation cell; and

(c) emergency backup systems;

REVISED 06/10/10

TMF 01/05 - pg. 98

GLOSSIP000190

(6)   ensuring that all maintenance service/repair trucks are in good operational condition and supplied with equipment, tools, and supplies necessary to correct all execution related emergencies; and

(7)   identification of maintenance personnel necessary to address all execution day maintenance emergencies.

2.

The Maintenance Director shall:

a.   complete a pre-inventory check of the necessary equipment; and

b.   complete a written report to the Deputy Warden Support Services of equipment, etc. requiring repair, replacement or duplications, including recommendations to correct problems and time frame necessary to make necessary corrections.

3.

The Deputy Warden Support Services shall direct the Maintenance Director to:

a.

c.   conduct an inspection of the following equipment:

(1)   execution chamber;

(2)   observation cell; and

(3)   emergency back-up systems and equipment.

4.

GLOSSIP000191

a.

    (1)

    (2)

    (3)

b.    A pre-inventory check shall be completed to ensure equipment is operational and in proper working order.

5.

a.

    (1)

    (2)

        (a)

        (b)

        (c)

    (3)    emergency back-up systems and equipment.

b.    Emergency equipment shall be checked to ensure readiness for the execution.

6.

a.    Complete the procedures as outlined in 5, above.

b.

c.

TMF 01/05 - pg. 100

GLOSSIP000192

GLOSSIP000193

d.

(1)

(2)

(3)

(4)

(5)

(6)

REVISED 06/10/10                                    TMF 01/05 - pg. 101

GLOSSIP000194

GLOSSIP000195

TMF 01/07.00     WITNESSES

TMF 01/07.01     General Provisions
TMF 01/07.02     News Media Witnesses
TMF 01/07.03     Designation of Persons Required, Permitted or
                 Prohibited from Witnessing
TMF 01/07.04     Witness Agreement

REVISED 06/10/10                         TMF 01/07 - pg. 107

GLOSSIP000196

TMF 01/07.00   <u>WITNESSES</u>

TMF 01/07.01   <u>General Provisions</u>

      A.   <u>Purpose of Chapter</u>

          The purpose of this chapter is to:

          1.   identify the types and number of witnesses permitted to attend the execution; and

          2.   to provide legal requirements concerning the witnessing of the execution.

      B.   <u>Policy</u>

          It is the policy of the Department that:

          1.   procedures for selecting witnesses to the execution shall conform with 77-19-11 UCA;

          2.   witnesses shall enter into written agreements before being approved for attendance; and

          3.   witnesses shall be subject to search prior to being admitted.

TMF 01/07.02   <u>News Media Witnesses</u>

      A.   Members of the news media shall be permitted to witness the execution.

      B.   Selection shall be at the discretion of the Executive Director/designee.

      C.   Refer to TMF 01/08 for news media selection procedures.

TMF 01/07.03   <u>Designation of Persons Required, Permitted or Prohibited from Witnessing</u>

      A.   The Utah Code limits and identifies those persons who may attend and witness the execution.

GLOSSIP000197

1.  The Executive Director of Corrections or his designee shall:

    a.  cause a physician to attend the execution, 77-19-10 (5) UCA; and

    b.  permit the attendance at the execution of members of the press and broadcast news media named by the Executive Director of the Department/or his designee, 77-19-11 (4) UCA.

2.  At the discretion of the Executive Director of the Department of Corrections/designee, the following may attend the execution:

    a.  the prosecuting attorney, or his designated deputy, of the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(a) UCA;

    b.  no more than two law enforcement officials from the county in which the defendant committed the offense for which he is being executed, 77-19-11 (2)(b) UCA;

    c.  the Attorney General or his designee, 77-19-11 (2)(c) UCA;

    d.  religious representatives, friends, or relatives designated by the defendant, not exceeding a total of five persons, 77-19-11 (2)(d) UCA; and

    e.  unless approved by the Executive Director, no more than five close relatives of the deceased victim, as selected by the Executive Director, but giving priority in the order listed in TMF 01/01.04.

3.  The persons enumerated in Subsection (2) may not be required to attend, nor may any of them attend as a matter of right, 77-19-11 (3) UCA.

REVISED 06/10/10                        TMF 01/07  -  pg. 109

GLOSSIP000198

4.  The following persons may also attend the execution:

    a.  staff as determined necessary for the execution by the Executive Director of the Department of Corrections/designee; and

    b.  no more than three correctional officials from other states that are preparing for executions, but no more than two correctional officials may be from any one state, as designated by the Executive Director of the Department of Corrections or his designee, 77-19-11 (7)(a) UCA.

5.  Other necessary staff designated by the Executive Director of the Department of Corrections/designee shall be permitted to the execution.

    a.  The "necessary staff" shall include those persons identified in the post orders and procedures in TMF 01.

    b.  "Necessary staff" shall not be limited to members of the Utah Department of Corrections but may include members of allied agencies assisting with the execution.

6.  The Department is empowered and directed by 77-19-11 (8) UCA to adopt rules governing the attendance of persons at the execution.

7.  No person under the age of 18 may attend the execution.

B.  For those persons who shall carry out the execution or serve in support roles in the execution area, refer to TMF 01/05.05 B, C.

GLOSSIP000199

TMF 01/07.04    <u>Witness Agreement</u>

(See following page for Witness Agreement.)

**Rules of Conduct for Witnesses Observing an Execution
at the
Utah State Prison**

1.  That you will not bring onto prison property anything constituting legal or illegal contraband under any applicable statute, rule, or policy including any firearm, dangerous weapon, implement of escape, explosive, spirituous of fermented liquor, medicine, poison, or any other item creating a threat to the safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for contraband and other searches as considered necessary by the Department for entry to Department prison and staging area property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional personnel while on Department property;

5.  That you will not bring to the execution site any photographic or recording equipment; and

6.  That you understand that the Department of Corrections will not provide mental health services to witnesses.

7.  That you understand the Department of Corrections is required to record/report the names of all witnesses in attendance as well as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I understand that my failure to comply with the rules will result in my immediate removal from Department of Corrections property and that I may be subject to criminal prosecution.


| | |
|---|---|
| _____ | _____ |
| Signature of Witness | Date |
| _____ | _____ |
| UDC Representative | Date |


REVISED 06/10/10                          TMF 01/07 - pg. 111

TMF 01/08.00    NEWS MEDIA PROCEDURES

TMF 01/08.01    General Provisions
TMF 01/08.02    News Media Selection
TMF 01/08.03    Alternate Coverage/Accommodations
TMF 01/08.04    News Media Attendance at the Execution
TMF 01/08.05    Limitations on Coverage
TMF 01/08.06    News Media Briefing
TMF 01/08.07    News Media Support and Equipment
TMF 01/08.08    Media Representative Agreement

GLOSSIP000201

TMF 01/08.00   NEWS MEDIA PROCEDURES

TMF 01/08.01   General Provisions

A.   Purpose of Chapter

The purpose of this chapter is:

1.   to provide the policies, procedures and requirements for providing access to the execution and information relating to the execution to the news media;

2.   to provide the procedure for:

a.   releasing background information;

b.   releasing information during the execution;

c.   coverage of the execution; and

3.   to provide requirements for safeguarding the institution and protected information.

B.   Policy

1.   It shall be the policy of the Department to permit press access to the execution and information concerning the execution consistent with the requirements of the constitutions and laws of the United States and state of Utah.

2.   The Department is generally required to provide no more access to the news media, to the inmates and facilities it supervises and controls than that available to the general public.

3.   The Department and the Utah Code recognize the need for the public to be informed concerning executions conducted by the Department of Corrections.

a.   The Department will participate and cooperate with the news media to inform the public concerning the execution.

b.   Information should be provided in a timely manner.

GLOSSIP000202

4.   If the condemned is willing, the
Department may allow an opportunity
forthe condemned to speak with the news
media.  If allowed, the interview may:

a.   include those members of the news
media selected to witness the
execution;

b.   include additional members of the
news media authorized by the
Department, but not including more
than one reporter from the same
agency; and

c.   be held at a time and location
determined by the Department.

5.   During exigent circumstances,
communication may be temporarily
suspended until the situation has been
stabilized.  Exigent circumstances shall
include, but not be limited to:

a.   riots;

b.   hostage situations;

c.   fires or other disasters; or

d.   other inmate disorders.

6.   Refer to Chapter AGr05,"Media Relations"
for general news media access to
information, inmates and facilities.

TMF 01/08.02   News Media Selection

A.   Number in Attendance

The Department shall permit members of the
press and broadcast news media to witness the
execution.

B.   Authority to Select

The Executive Director/designee shall be
responsible for selecting the members of the

GLOSSIP000203

news media who will be permitted to witness
the execution.  77-19-11(4) UCA

C.  Selection Process

1.  After the court sets a date for the
    execution of the death penalty, news
    directors or editors may submit a
    written list of news media witnesses
    (one per organization) and other news
    personnel needed at the execution, to
    the attention of the Executive Director
    at least 30 days prior to the execution.
    When administrative convenience or
    fairness to the news media dictates, the
    Department in its discretion may extend
    the request deadline.

2.  Requests for consideration may be
    granted by the Executive
    Director/designee provided they contain
    the following:

    a.  a statement setting forth facts
        showing that the requesting
        individual falls within the
        definition of "member of the press
        and broadcast news media" set forth
        in these regulations;

    b.  an agreement to act as a pool
        representative as described in
        these regulations;

    c.  an agreement that the media member
        will abide by all of the
        conditions, rules and regulations
        while in attendance at the
        execution; and

    d.  agreement that they will conduct
        themselves consistent with existing
        press standards.

3.  Upon receipt of a news director's or
    editor's request for permission for news
    media witnesses to attend the execution,
    the Executive Director/designee may take
    such steps as he deems necessary to
    verify the statements made in the
    request.  After verifying the
    information in the requests, selection

of witnesses shall be made by the
Executive Director/designee.

4.  The Executive Director/designee shall
    identify the media members who have been
    selected to witness the execution.
    Media members shall be selected on a
    rotating basis from the following
    organizations:

    a.  Salt Lake daily newspapers;

    b.  television stations licensed and
        broadcasting daily in the State of
        Utah;

    c.  one newspaper of general
        circulation in the county in which
        the crime occurred;

    d.  one radio station licensed and
        broadcasting in the State of Utah;
        and

    e.  the remainder from a pool of
        broadcast, print and wire services
        news media organizations operating
        in Utah.

5.  In the event that the Executive Director
    is unable to name a news media witness
    from each of the above-described
    organizations, he shall name other
    qualifying media members to attend.

6.  No news media witnesses other than those
    named to attend the execution as
    described in this chapter shall be
    permitted to witness the execution.

D.  Pool Photographers

    1.  Two photographers shall be appointed as
        pool photographers to photograph/film
        the execution chamber following clean
        up.

    2.  The pool photographers may be selected
        from agencies other than those

GLOSSIP000205

represented among those witnessing the execution.

TMF 01/08.03    Alternate Coverage/Accommodations

A.    Additional Media Selected

1.    The Executive Director may designate additional members of the press and broadcast news media who request and receive permission to be allowed at a location designated by the Executive Director on prison property during the execution.

2.    The additional media selected shall be from both the print and broadcast media.

B.    Alternate Location

1.    The alternate location shall be a press briefing area.

2.    Media members must contact the Department's Public Affairs Director at least 14 days prior to the execution date to make any special arrangements for hook ups or other necessary arrangements.  Any expense incurred shall be borne by the specific news media requiring special equipment or hook ups.

3.    No special access nor briefings will be provided to members of the press who are not selected as witnesses nor selected for the alternate site.

4.    The alternate site shall be made available to the selected members of the news media at 1700 hours the day prior to the scheduled execution date.

C.    Briefing Media at the Alternate Site

1.    The Public Affairs Director shall arrange for:

a.    pre-execution briefings;

b.    distribution of media briefing packages;

GLOSSIP000206

     c.   briefings throughout the execution
         event; and

     d.   post-execution briefings by the
         news media who witnessed the
         execution.

2.   The news media witnesses to the
     execution shall be returned to the media
     briefing area to answer questions from
     media members at the alternate site.

**TMF 01/08.04**    <u>News Media Attendance at the Execution</u>

A.   The Warden/designee shall permit the members
    of the press and broadcast news media,
    selected by the Executive Director/designee
    in accordance with these regulations, to
    witness the execution.

B.   Each news media witness attending the
    execution shall be carefully searched prior
    to admittance to the execution chamber.

    1.

        a.   Electronic or mechanical recording
            devices include, but are not
            limited to, still, moving picture
            or video cameras, tape recorders or
            similar devices, broadcasting
            devices, or artistic paraphernalia,
            such as notebooks, and drawing
            pencils or pens, etc.

        b.   Violation of this prohibition is a
            class B misdemeanor. 77-19-11(5)

        c.   Only a small notebook (no larger
            than 4" x 6") and a pen or pencil
            issued by the Department shall be
            permitted.

    2.   Only the selected members of the news
       media (witnesses and two pool
       photographers) shall be allowed to

GLOSSIP000207

attend the pre-execution briefing.  The
group will be escorted into a briefing
room.

a.

b.

c.

3.

a.

b.

4.  Persons requesting to witness the
execution shall be required to sign a
statement or release absolving the
institution or any of its staff from any

REVISED 06/10/10                    TMF 01/08  – pg. 119

GLOSSIP000208

legal recourse resulting from the
exercise of search requirements or other
provisions of the witness agreement.

C.   The Warden/designee shall not exclude any
news media witness duly selected in
accordance with these regulations from
attendance at the execution except as
described in these regulations, nor may the
Warden/designee cause a selected news media
witness to be removed from the execution
chamber unless the media member:

  1.   refuses to submit to a reasonable search
       as permitted in these regulations;

  2.   faints, becomes ill or requests to be
       allowed to leave during the execution;

  3.   causes a disturbance within the
       execution chamber; or

  4.   refuses or fails to abide by the
       conditions and regulations set forth by
       the Department.

D.   The execution chamber shall be arranged so as
to provide space for the attending news media
witnesses and the space arranged shall have a
view of the execution site, with the
exception of:

  1.   a view of the members of the firing
       squad, if employed; or

  2.   if lethal injection is chosen, those
       directly administering the method of
       execution, who shall be concealed from
       the view of the media members so that
       their identities will remain unknown.

E.   The selected news media witnesses shall be
transported as a group to the execution
location prior to the execution and shall be
allowed to remain there throughout the
proceeding.

F.   The Department shall designate a
representative or representatives to remain
with the media members throughout the
execution proceedings for the purpose of
supervising and escorting.

GLOSSIP000209

G.   News media witnesses shall be admitted to the execution area on the date set for the execution only after:

  1.   proof of identification have been presented to the Public Affairs Director/designee at the staging area;

  2.   receiving an orientation by the Public Affairs Director/designee; and

  3.   signing an agreement to abide by conditions required of news media witnesses to the execution.

H.   After the execution has been completed and the site has been restored to an orderly condition, news media witnesses may be permitted to return to the execution chamber for purposes of filming, photographing and recording the site.

  1.   Re-entry to the site shall be permitted only after the site has been restored to an orderly condition, including:

    a.   removal of the body of the condemned;

    b.   evacuation of those involved in administering the execution; and

    c.   clean up of the execution chamber.

  2.   Restoring the site to an "orderly condition" prior to the filming opportunity shall not unnecessarily disturb the physical arrangements for the execution.

  3.   Media members permitted to return to the execution chamber for the filming and recording of the site shall include:

    a.   the news media witnesses who were selected to witness the execution;

    b.   one pool television camera man; and

    c.   one pool newsprint photographer.

GLOSSIP000210

4. The film/videotape shall not be used in any news or other broadcast until made available to all agencies participating in the pool. All agencies receiving the film/videotape will be permitted to usethem in news coverage and to retain the film/videotape for file footage.

I. News media representatives shall, after being returned from the execution to the staging area, act as pool representatives for other media representatives covering the event.

1. The pool representatives shall meet at the designated media center and provide an account of the execution and shall freely answer all questions put to them by other media members and shall not be permitted to report their coverage of the execution back to their respective news organizations until after the non-attending media members have had the benefit of the pool representatives' account of the execution.

a. News media members attending the post-execution briefing shall agree to remain in the briefing room and not leave nor communicate with persons outside the briefing room until the briefing is over.

b. The briefing shall end when the attending news media members are through asking questions or after 90 minutes, whichever comes first.

2.

TMF 01/08.05   Limitations on Coverage

A. The Warden, with the concurrence of the Executive Director, may alter these regulations to impose additional conditions, restrictions and limitations on media coverage of the execution when such requirements become necessary for the

GLOSSIP000211

preservation of prison security, personal
safety or other legitimate interests which
may be in jeopardy.

B.   If extraordinary circumstances develop, the
additional conditions and restrictions
shallbe no more restrictive than required to
meet the exigent circumstances.

TMF 01/08.06   News Media Briefing

A.   Pre-Execution Briefing Packets

1.   The Public Affairs Director shall
prepare a press briefing packet for
reporters approved to witness the
execution, or to cover the execution
from the news media staging area.

2.   The briefing press packet should be
provided to news media representatives
as they arrive at the staging area.

3.   The contents of the press briefing
packet shall include, but not be limited
to, biographical information on the
condemned, the list of official
witnesses, pool reporters, family
witnesses, execution procedures,
sequence of events, and the history of
executions in Utah.

4.   Updates will generally be communicated
and/or distributed to the press on an
hourly basis beginning about 1700 hours
the day preceding the execution.
Briefing updates should include:

a.   a summary of activities related to
the execution procedures and
sequence of events; and

b.   a summary of the condemned inmate's
activities during his final 24
hours.

B.   Death Announcement

1.   The Public Affairs
Representative/designee shall read a
prepared statement to the press, prior
to the post-execution press conference,
announcing that the execution has been
completed.

GLOSSIP000212

2.   The announcement shall include, but not be limited to:

    a.   the time of the execution;

    b.   the time the condemned was pronounced dead; and

    c.   the condemned's final words.

C.   <u>Post-Execution Conference</u>

1.   The post-execution conference shall begin immediately following the arrival of the pool reporters from the execution site.

2.   The Public Affairs Director shall introduce the members of the press who witnessed the execution and facilitate the post-execution conference.

3.   The Executive Director, Deputy Director, Institutional Operations Division Director and/or Warden may appear and answer questions at the press conference.

4.   The post-execution conference shall continue for ninety minutes or until the questioning of the reporters who witnessed the execution has been completed; whichever comes first.

D.   <u>Travel Routes</u>

1.

2.

E.   <u>Media Center</u>

1.   The Media Center shall be located in the designated staging area.

REVISED 06/10/10                                TMF 01/08  – pg. 124

GLOSSIP000213

2.    The Public Affairs Director shall assume responsibility for routine press briefings at the Media Center.

3.    Press briefings and the post-execution conference will be held at the Media Center.

4.    News media personnel may not access nor occupy any other part of the staging area.  The media shall have access only to the designated media center.

5.    Members of the news media may not seek, speak to or interview any official visitor while at the staging area.

6.

TMF 01/08.07    News Media Support and Equipment

A.    Telephones

1.    The Public Affairs Director shall coordinate all telephone needs with the Deputy Warden Support Services at the Utah State Prison.

2.    Each news agency requiring dedicated telephone lines, shall submit in writing its telephone needs to the Public Affairs Director 14 days prior to the scheduled execution.  Agencies requesting dedicated phone lines will be responsible for the cost of those lines.

3.    The Department shall install a reasonable number of telephones, for local use and collect calls only, for news media use at the Media Center.  If the Department is unable to install collect-call only telephones, personal cellular phones may be used.

B.    Electrical Outlets

GLOSSIP000214

Each news agency must communicate its needs for electrical power to the Public Affairs Director 14 days prior to the scheduled execution.

C.    Refreshments

The Public Affairs Director may inquire about having a private caterer at the staging area for the media to purchase items.

D.    News Media Support Vehicles

    1.

    2.

TMF 01/08.08   Media Representative Agreement

(See following page for Media Representative agreement.)

Rules of Conduct for Media Representatives Observing an Execution
at the
Utah State Prison


1.  That you will not bring onto prison property anything
constituting legal or illegal contraband under any applicable
statute, rule, or policy including any firearm, dangerous weapon,
implement of escape, explosive, spirituous of fermented liquor,
medicine, poison, or any other item creating a threat to the
safety, security, or management of the prison;

2.  That you agree to submit to a reasonable search for
contraband and other searches as considered necessary by the
Department for entry to Department prison and staging area
property;

3.  That you conduct yourself in a lawful and orderly manner;

4.  That you comply with all lawful directives of correctional
personnel while on Department property;

5.  That you will not bring to the execution site any
photographic or recording equipment;

6.  That you understand that the Department of Corrections will
not provide mental health services to witnesses; and

7.  That you understand the Department of Corrections is required
torecord/report the names of all witnesses in attendance as well
as provide the information to media representatives.


I have read the above rules and agree to abide by them.  I
understand that my failure to comply with the rules will result
in my immediate removal from Department of Corrections property
and that I may be subject to criminal prosecution.


News Organization_____


_____        _____
    Signature of News Media Witness              Date


_____        _____
    News Agency Editor/Producer                  Date


REVISED 06/10/10                     TMF 01/08 - pg. 127

GLOSSIP000216

GLOSSIP000217

TMF 01/20.00    REVIEWAND DOCUMENTATION

TMF 01/20.01    General Provisions
TMF 01/20.02    Review Assignment
TMF 01/20.03    Documentation of Execution
TMF 01/20.04    Retention and Safeguarding Documentation
TMF 01/20.05    UDC Employee Questionnaire

TMF 01/20.00   REVIEW AND DOCUMENTATION

TMF 01/20.01   General Provisions

    A.   Purpose of Chapter

        The purpose of this chapter is to provide the policies, procedures and requirements for reviewingthe execution process.

    B.   Policy

        1.   It shall be the policy of the Department that of the execution process shall be performed as ordered by the Executive Director.

        2.   Auditors assigned to perform thesereviewsshall beallowed access to designated aspects of the executionpreparation.

        3.   Auditors participating in the reviewof the execution are not to be involved in the execution preparationprocess, but shall act as observers only and, at all times, act in such a way that they create the least disruption possible in that process.

        5.   Appropriate documentation of the execution shall be created, collected, safeguarded, and retained to provide an adequate review trail and a proper historical record.

        6.   Documentation shall be protected in accordance with 64-13-25(2) UCA.

TMF 01/20.02   ReviewAssignment

        Authority to Conduct a Review

        1.   The Executive Director shall be responsible for determining if a reviewis to take place in each execution.

        2.   The Auditor(s) selected for the execution review shall, upon direction

GLOSSIP000219

from the Executive Director, prepare a
questionnaire to be completed by staff
involved in the execution process.  The
survey shall be approved by the
Executive Director and all responses
shall be confidential.  Only the
Executive Director may grant release of
the survey responses.

TMF 01/20.03    Documentation of Execution

Documentation to be Retained

Documentation which shall be retained shall
include:

1.    the warrant and all other legal papers;

2.    correspondence, both official and
      unofficial, which is received by the
      Department of Corrections;

3.    minutes of meetings held for purposes of
      planning or disseminating information;

4.    inter-agency written communication;

5.    intra-departmental written
      communication;

6.    logs, journals, chronological notes,
      etc., of key locations; and

7.    a newspaper file.

TMF 01/20.04    Retention and Safeguarding Documentation

A.    Execution File

1.    An execution file shall be established
      for each condemned person.  The file
      shall be organized into sections which
      should include:

      a.    legal documents;

      b.    official correspondence;

       c.    unofficial correspondence;

       d.    intra-departmental written communication;

       e.    chronological notes, logs, etc.; and

       f.    meeting minutes.

  2.    Each section of the execution file shall have material filed in chronological order.

  3.    All working documents which cannot be filed during the execution process or immediately after, shall be copied and a copy shall be placed in the execution file.

  4.    All intra-departmental communication shall have a courtesy copy to the execution file.

B.    <u>Execution File Maintenance</u>

  1.

  2.

C.    <u>Access to Execution File</u>

Only those individuals authorized by the Executive Director of Corrections, DIO Director, or Warden, shall have access to the execution file.

D.    <u>Long-Term Storage</u>

To ensure that all documents concerning an execution shall be retained to provide a reviewtrail and an adequate historical record, the execution file shall be stored in accordance with the archive's plan of the Department.

TMF 01/20.05   <u>UDC EMPLOYEE QUESTIONNAIRE</u>


_____
Name of the Condemned

<u>INSTRUCTIONS</u>:

Please complete this questionnaire as soon after the execution as possible.  Answer each question completely and accurately.  Add as many pages as necessary if answers need more space.

Complete and return this questionnaire to the AuditBureau at Utah Department of Corrections, 14717 S. Minuteman Drive, Draper, 84020, by _____.

Thank you.


FULL NAME: _____
TITLE: _____
LOCATION: _____
FUNCTION DURING THE
EXECUTION: _____

1.  Were you provided adequate direction for your area of responsibility?

    If you answered "No," please explain what direction would havebeen beneficial to you.

    _____
    _____
    _____


2.  Were you adequately trained or briefed in your area of  responsibility?

    Yes___No___

    If you answered "No," please explain what training or briefing would have been beneficial to you.

    _____
    _____
    _____


3.  Did you observe anything that you thought was not adequately addressed?

    Yes___No___

    If you answered "Yes," please explain.

    _____
    _____
    _____


REVISED 06/10/10                              TMF 01/20- pg. 236

GLOSSIP000222

4.    Please make any additional comments or suggestions.
    _____
    _____
    _____
    _____
    _____
    _____
    _____
    _____

                        THANK YOU!

TMF 01/21.00    TRAINING AND BRIEFING

TMF 01/21.01    General Provisions
TMF 01/21.02    Training and Briefing Components

GLOSSIP000224

TMF 01/21.00    <u>TRAINING AND BRIEFING</u>

TMF 01/21.01    <u>General Provisions</u>

    A.   <u>Purpose of Chapter</u>

        The purpose of this chapter is to provide the policy and procedure concerning briefing and training of staff, members of allied agencies and others involved in an execution.

    B.   <u>Policy</u>

        It is the policy of the Department that staff and others involved in carrying out an execution:

        1.   receive comprehensive briefings covering:

              a.   their duties and responsibilities;

              b.   the specifics of post orders covering assigned positions;

              c.   communication and chain of command;

              d.   overview of functions and activities during the execution;

        2.   are provided copies of post orders outlining the duties and responsibilities of assigned positions;

        3.   receive the level of briefing and training necessary based on the requirements of assigned duties;

        4.   rehearse and practice functions which involve:

              a.   difficult timing;

              b.   a high degree of skill;

              c.   procedures of a highly critical nature; and/or

              d.   moderately difficult or complex interaction with others; and

GLOSSIP000225

5.    receive instructions concerning back-up
      systems to provide:

      a.    problem-resolution assistance;

      b.    policy decisions;

      c.    crisis management assistance; and

      d.    information requests.

TMF 01/21.02    Training and Briefing Components

A.    General

      Training and briefing shall include, but not
      be limited to:

      1.    issuing all members or other
            participants a post order for their
            assigned positions;

      2.    providing an orientation or briefing
            covering assigned duties and general
            operational information;

      3.    if necessary, detailed training covering
            legal, operational or technical aspects
            of assigned position;

      4.    if necessary, rehearsal of job
            functions; and

      5.    key positions in Manual TMF 01.

B.    Post Orders

      1.    Each member or other participant shall
            be issued the post order or instructions
            for his assigned position.

      2.    The post order shall include, but not be
            limited to:

            a.    the position title;

            b.    location(s) of assignment;

            c.    title of supervisor;

    d.    supervisory role, if any;

    e.    duties and responsibilities--
          general and specific; and

    f.    emergency role.

3.    When appropriate, one or more chapters
     of TMF 01 may be issued with a post
     order.

4.    All post orders (and any accompanying
     manual material) shall be returned at
     the completion of the execution event.

C.    <u>Briefing/Orientation</u>

1.    Most assignments will be very
     specialized, involving a narrow range of
     duties.  For such positions,
     briefing/orientation sessions will be
     all the training required in addition to
     the general training skills and
     experience of the persons assigned.

2.    Orientation sessions shall include but
     not be limited to:

    a.    an overview of the execution
          process and operational components;

    b.    location of assigned post;

    c.    chain of command and organizational
          information;

    d.    an overview of the countdown of
          activities and procedures leading
          to the execution;

    e.    an explanation of support and
          crisis intervention systems;

    f.    interaction with the news media;

    g.    a review of the specific post order
          requirements, duties and other
          elements; and

GLOSSIP000227

        h.    a question-and-answer period.

D.    <u>Training/Rehearsal</u>

    1.    For assignments requiring more technical or complex functions, critical timing or interaction elements, or duties of a particularly difficult nature, more comprehensive training shall be required.

    2.    Team leaders shall be responsible for training and scheduling rehearsals as needed for team members.

GLOSSIP000229

# APPENDIX C

ARMY REGULATIONS
No. 633–15

HEADQUARTERS,
DEPARTMENT OF THE ARMY
WASHINGTON 25, D. C., *7 April 1959*

# PROCEDURE FOR MILITARY EXECUTIONS

|  |  |  | Paragraph | Page |
|---|---|---|---|---|
| SECTION | I. | GENERAL |  |  |
|  |  | Definitions | 1 | 2 |
|  |  | Manner of execution | 2 | 2 |
|  |  | Witnesses | 3 | 2 |
|  |  | Multiple executions | 4 | 2 |
|  |  | Escort | 5 | 3 |
|  |  | Chaplain | 6 | 3 |
|  |  | Medical officer | 7 | 3 |
|  |  | Interpreter | 8 | 3 |
|  |  | Miscellaneous | 9 | 3 |
|  | II. | EXECUTION BY MUSKETRY |  |  |
|  |  | Officer charged with carrying out execution | 10 | 4 |
|  |  | Assembly of escort | 11 | 5 |
|  |  | Execution | 12 | 5 |
|  | III. | EXECUTION BY HANGING |  |  |
|  |  | Officer charged with carrying out execution | 13 | 6 |
|  |  | Executioner | 14 | 7 |
|  |  | Assembly | 15 | 7 |
|  |  | Execution | 16 | 8 |
|  | IV. | EXECUTION BY ELECTROCUTION |  |  |
|  |  | General | 17 | 8 |
|  |  | Officer charged with carrying out execution | 18 | 8 |
|  |  | Executioner | 19 | 8 |
|  |  | Execution | 20 | 8 |
|  | V. | PROCEEDINGS AFTER EXECUTION |  |  |
|  |  | Disposition of remains | 21 | 9 |
|  |  | Disposition of effects | 22 | 9 |
|  |  | Notification and reports | 23 | 9 |
|  | VI. | MODIFICATION OF PROCEDURES |  |  |
|  |  | Limited Facilities | 24 | 10 |
|  |  | In time of war | 25 | 10 |
|  | VII. | STRUCTURES |  |  |
|  |  | Permanent scaffold | 26 | 10 |
|  |  | Semipermanent scaffold | 27 | 10 |
|  |  | Emergency structures | 28 | 10 |
|  | VIII. | EQUIPMENT |  |  |
|  |  | Hood | 29 | 11 |
|  |  | Collapse board and binding strap | 30 | 11 |
|  |  | Rope | 31 | 11 |
|  |  | Post | 32 | 11 |
|  |  | Electrocution | 33 | 11 |

* These regulations supersede DA Pam 27–4, 9 Dec 1947, including C 1, 24 June 1953.

## Section I

## GENERAL

**1. Definitions.** For the purpose of these regulations only the following definitions apply:

*a. Confirming authority.* The competent authority of the agency through which military jurisdiction is exercised ordering the execution of a sentence of death.

*b. Officer designated to execute the approved sentence.* The officer designated by the confirming authority (*a* above) to execute the approved sentence of death.

*c. Officer charged with carrying out the execution.* The subordinate officer duly and officially named by an order of the officer designated to execute the sentence (*b* above) and directed therein to carry out the execution.

**2. Manner of execution.** Military executions will be in the manner designated by the confirming authority or by shooting, hanging, or electrocution.

**3. Witnesses.** The officer designated by the confirming authority to execute the approved sentence will prescribe whether the execution will be public or private, rules of secrecy as to time, place, and the presence of witnesses, military or civilian, including members of the press if the presence of the latter is deemed proper. In the case of the execution of a foreign national, the officer designatd to execute the sentence will prescribe whether persons of the same nationality as the condemned may be present. Neither photographs nor motion pictures of the actual execution will be permitted except for official purposes. The environs of the place of execution will be closely and securely guarded to prevent the intrusion of unauthorized persons. All persons in attendance will be cautioned that no demonstrations or unseemly conduct will be tolerated.

**4. Multiple executions.** In multiple executions by electrocution in the continental United States the prisoners will be executed in succession and the same electric chair will be used for each execution. In multiple executions by musketry or hanging, the prisoners may be executed either simultaneously or in succession. Where two or more prisoners are to be executed in succession by musketry or hanging, the same execution party or gallows may be used for each execution. Where two or more prisoners are to be executed simultaneously by musketry, a separate execution party will be provided for each of the prisoners. The latter will be placed in line at an interval of ten paces. Where two or more prisoners are to be executed simultaneously by hanging, the officer designated to execute

the sentence will prescribe the number of gallows to be erected, and the prisoners will be hanged from the gallows simultaneously or by groups.

**5. Escort.** The escort for execution by musketry or hanging may be dismounted or motorized, but upon arrival at the scene of execution, motorized escorts will form in the manner prescribed for dismounted escorts. The minimum escort will consist of components as prescribed in paragraphs 11a and 15a. Where the prisoner is to be executed by electrocution, the strength, formation, and duties of the guard escort will be as prescribed by the officer charged with carrying out the execution.

**6. Chaplain.** In all executions, a chaplain of the prisoner's choice will be provided if practicable. If no chaplain of the prisoner's choice or of his particular faith and/or race is available, the officer charged with the execution of the sentence will take all reasonable measures to provide a civilian clergyman of that faith and/or race. The chaplain should be available at all times after the prisoner is notified of the time of execution.

**7. Medical officer.** A medical officer will be officially designated to be in attendance upon the execution. It will be his duty to determine the extinction of life in the prisoner and to make pronouncement thereof. He will furnish a death certificate to accompany the report of execution.

**8. Interpreter.** In the event the prisoner does not speak English, an interpreter will be officially designated to be in attendance at the notification of the prisoner (par. 9a) and the execution. It is his duty to interpret the charge, finding, sentence orders, and any last statement made by the prisoner. Before entering upon his duties, the interpreter will take the oath or affirmation required of an interpreter for a court-martial.

**9. Miscellaneous.** *a.* The prisoner will be notified of the time of execution no less than 24 hours prior thereto if practicable, at which time the charge, finding, sentence, and order directing the execution will be read to him by the officer charged with carrying out the execution. The chaplain should be present.

*b.* Unless the exigencies of the situation preclude such action, due notice of the time and place of execution will be given to the next of kin of the prisoner and an opportunity provided for the claiming of the body following the execution.

*c.* Items of clothing and alterations thereto to be worn by a prisoner to be executed by hanging or electrocution will be as prescribed by the officer charged with carrying out the execution, in

accordance with the technical instructions of the executioner. A prisoner in the Armed Forces of the United States will be dressed in regulation uniform from which all decorations, insignia, or other evidence of membership therein have been removed. Likewise, no such evidences will appear on any clothing used in burial. Similar procedures may be dispensed with, at the discretion of the officer charged with carrying out the execution (or higher authority) in the case of a prisoner in the armed forces of another nation. A prisoner not within the foregoing categories may be dressed in any clothing available.

*d.* After the prisoner is notified of the time of execution (*a* above), the commanding officer of the place of confinement will, where practicable, approve any reasonable special request of the prisoner, including special request for food, and permission to have in his possession a Bible, Rosary, or similar religious articles during the execution. Sufficient writing paper and envelopes should be furnished and no limit placed on the number of letters which may be written. All letters are subject to censorship and may or may not be forwarded.

SECTION II

## EXECUTION BY MUSKETRY

**10. Officer charged with carrying out execution.** The officer charged with carrying out the execution will command the escort and make the necessary arrangements for the conduct of the execution. He will—

*a.* Instruct and rehearse the escort and the execution party in their duties, insuring that all members of the execution party are qualified in the weapon to be used.

*b.* Arrange for the receipt of the prisoner by the prisoner guard.

*c.* Arrange for an execution party of eight men and one sergeant.

*d.* Arrange for a chaplain to accompany the prisoner.

*e.* Arrange for the presence of a medical officer at the scene of the execution.

*f.* Cause a post with proper rings placed therein for securing the prisoner in an upright position to be erected at the place of execution.

*g.* Cause eight rifles to be loaded in his presence. At least one but no more than three will be loaded with blank ammunition. He will place the rifles at random in the rack provided for that purpose.

*h.* Provide a black hood to cover the head of the prisoner.

*i.* Provide a 4-inch round target, white or black as appropriate; a black target will be used when light colored clothing is worn.

*j.* Cause the prisoner's wrists to be secured either behind his back or in front at the waist (fig. 1), before or immediately after his receipt by the prisoner guard.

*k.* Provide straps to secure the prisoner to the post at waist and ankles.

**11. Assembly of escort.** *a.* The prisoner guard will consist of four men armed with rifles, under the command of a sergeant armed with a pistol. At the proper time, the prisoner guard will proceed to the place of confinement to receive the prisoner.

*b.* The execution party will be formed unarmed and proceed to a previously prepared rack of rifles, secure arms, and move to the scene of the execution, halting 15 paces from and facing the position to be taken by the prisoner. The sergeant of the execution party will be armed with a pistol. At close interval, at order arms, and at parade rest the execution party will await the arrival of the prisoner and escort.

*c.* Witnesses, if any, will take position facing the scene of the execution, 15 paces to the right and 5 paces to the front of the execution party.

*d.* At the designated time, the prisoner, with his wrists bound securely behind his back or in front at the waist (fig. 1), accompanied by the chaplain, will be received by the prisoner guard. The escort will then proceed to the scene of the execution.

*e.* The prisoner guard, prisoner, and chaplain will proceed directly to the prisoner's post, halt, and face the execution party.

**12. Execution.** *a.* The officer charged with carrying out the execution will take position in front of the execution party and face the prisoner. He will notify the prisoner and the chaplain that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will order the sergeant of the execution party and the sergeant of the prisoner guard to secure the prisoner to the post and to place the hood over his head. The medical officer then will place the target over the prisoner's heart. The prisoner prepared, the officer charged with carrying out the execution will order the prisoner guard to move to a position five paces behind the execution party. The chaplain and medical officer will take positions five paces to the left of and five paces to the front of the execution party. The officer charged with carrying out the execution will take position five paces to the right of and five paces to the front of the execution party.

*b.* Commands for the execution will be given orally as prescribed below:

    (1) At the command READY, the execution party will take that position and unlock rifles.

    (2) At the command AIM, the execution party will take that position with rifles aimed at target on the prisoner's body.

    (3) At the command FIRE, the execution party will fire simultaneously.

    (4) The officer charged with carrying out the execution will then bring the execution party to "Order Arms."

*c.* The officer charged with carrying out the execution will join the medical officer who will examine the prisoner and, if necessary, direct that the "coup de grace" be administered. Should the medical officer so decide, the sergeant of the execution party will administer the "coup de grace," with a hand weapon, holding the muzzle just above the ear and one foot from the head.

*d.* Upon pronouncement of the death of the prisoner by the medical officer, the execution party will proceed to the rack from which the rifles were originally obtained, and replace the rifles in the rack at random. The execution party will then be dismissed.

*e.* The prisoner guard will return to the area of their quarters and be dismissed.

## Section III

## EXECUTION BY HANGING

**13. Officer charged with carrying out execution.** The officer charged with carrying out the execution will command the escort and make the necessary arrangements for the conduct of the execution. He will—

*a.* Instruct components of the escort in their duties.

*b.* Arrange for the receipt of the prisoner by the prisoner guard.

*c.* Arrange for a chaplain to accompany the prisoner.

*d.* Arrange for the presence of a medical officer at the scene of the execution.

*e.* Provide a proper gallows.

*f.* Provide a black hood to cover the head of the prisoner.

*g.* Provide a collapse board for use if necessary.

*h.* Cause the prisoner's wrists to be secured before or immediately upon his receipt by the prisoner guard. The wrists may be secured either behind the back or in front, fastened to the belt (fig. 1).

*i.* Determine the proper amount of drop of the prisoner through the trapdoor. A standard drop chart for normal men of given weights is given below. Variation of the drop because of physical condition may be necessary. A medical officer will be consulted to determine whether any factors, such as age, health, or muscular condition will affect the amount of drop necessary for a proper execution.

| | | | |
|---|---|---|---|
| 120 lbs or less | 8′ 1″ | 170 lbs | 6′ 0″ |
| 125 lbs | 7′ 10″ | 175 lbs | 5′ 11″ |
| 130 lbs | 7′ 7″ | 180 lbs | 5′ 9″ |
| 135 lbs | 7′ 4″ | 185 lbs | 5′ 7″ |
| 140 lbs | 7′ 1″ | 190 lbs | 5′ 6″ |
| 145 lbs | 6′ 9″ | 195 lbs | 5′ 5″ |
| 150 lbs | 6′ 7″ | 200 lbs | 5′ 4″ |
| 155 lbs | 6′ 6″ | 205 lbs | 5′ 2″ |
| 160 lbs | 6′ 4″ | 210 lbs | 5′ 1″ |
| 165 lbs | 6′ 2″ | 220 lbs and over | 5′ 0″ |

*j.* Rehearse the execution within 24 hours prior to the scheduled time for the execution. A sandbag or similar object approximating the prisoner's weight may be used to insure proper functioning of the gallows, trapdoor, and hangman's noose.

**14. Executioner.** An official experienced executioner will be appointed by the officer charged with carrying out the execution. If one is not available to the command, a professional civilian executioner may be obtained and appointed. In the event a professional executioner is not available, a suitable emotionally stable member of the command will be selected and appointed executioner.

**15. Assembly.** *a.* The prisoner guard will consist of 10 men armed with rifles, two corporals armed with pistols, under the command of a sergeant armed with a pistol. The prisoner guard will form in double ranks and at the proper time will proceed to the door of the place of confinement to receive the prisoner.

*b.* Witnesses, if any, will assemble at the scene of the execution in positions designated by the officer charged with carrying out the execution.

*c.* At the designated time the prisoner, with his wrists bound securely, accompanied by the chaplain, will be received by the prisoner guard and placed between the ranks. The escort will then proceed to the scene of the execution.

*d.* Upon the arrival of the escort at the scene of the execution, the corporals and the sergeant of the prisoner guard will conduct the prisoner to the platform of the gallows, the officer charged with carrying out the execution and the chaplain preceding the prisoner.

**16. Execution.** *a.* The officer charged with carrying out the execution will notify the chaplain and the prisoner that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will have the executioner place the hood over the prisoner's head, bind the prisoner's ankles, adjust the noose around the prisoner's neck, and then take position at the trigger. Upon signal from the officer charged with carrying out the execution, the executioner will spring the trap. The medical officer will then examine the body for time of death and report to the officer charged with carrying out the execution.

*b.* Upon the pronouncement of the death of the prisoner, the escort will return to the area of their quarters and be dismissed.

## Section IV

## EXECUTION BY ELECTROCUTION

**17. General.** Execution by electrocution may be effected only at the confinement facility designated by Headquarters, Department of the Army. Procedures for execution by electrocution will necessarily vary from those prescribed for execution by musketry or hanging.

**18. Officer charged with carrying out execution.** The officer charged with carrying out the execution will make the necessary arrangements for the conduct of the execution. He will—

*a.* Select and appoint such personnel, including guards, as may be required to carry out the execution.

*b.* Instruct all components of the execution party in their duties.

*c.* Arrange for a chaplain to accompany the prisoner.

*d.* Arrange for the presence of a medical officer at the scene of the execution.

*e.* Provide the mechanical facilities and items of equipment and clothing required to carry out the execution.

**19. Executioner.** The officer charged with carrying out the execution will obtain and appoint a professional civilian executioner to perform the execution. Execution by electrocution may not be performed by other than a professional civilian executioner.

**20. Execution.** *a.* On the day of execution, the prisoner will be clothed and otherwise prepared in accordance with instructions of the executioner.

*b.* At the designated time, the prisoner, accompanied by the chaplain, will proceed under guard from the prisoner's cell into the execution chamber. The officer charged with carrying out the exe-

cution will notify the chaplain and the prisoner that a brief time will be allowed the prisoner for any last statement. After a reasonable time, he will order the guards to place the prisoner in the electric chair according to the instructions of the executioner. Following the placing of the prisoner in the electric chair, the officer charged with carrying out the execution, the guards, the chaplain, and the medical officer will move to designated positions in the execution chamber. The executioner will then perform final preparations. Upon signal from the executioner that all final preparations have been completed and he is ready to proceed, the officer charged with carrying out the execution will signal the executioner to perform the execution.

*c.* Upon notification from the executioner that he may proceed, the medical officer will then examine the body, note the time of death, and report to the officer charged with carrying out the execution.

*d.* Upon pronouncement of the death of the prisoner, the officer charged with carrying out the execution will dismiss the execution party.

SECTION V

## PROCEEDINGS AFTER EXECUTION

**21. Disposition of remains.** The officer charged with carrying out the execution will arrange in advance for an ambulance or other conveyance with sufficient personnel to be in attendance upon the execution to receive and care for the body. If the next of kin or other relatives of the deceased desire the body, the officer charged with carrying out the execution will, if practicable, permit its delivery to them for burial. If no such claim is made, he will cause it to be buried in a post or civilian cemetery or at the pace of death, whichever may be deemed proper and is authorized by pertinent regulations. Disposition of remains of such personnel of the Armed Forces of the United States is governed by Army Regulations of the 638-series or comparable regulations of the United States Navy or United States Air Force as appropriate. All burials in post cemeteries are governed by AR 210-190.

**22. Disposition of effects.** See 10 USC 4712 et seq. and AR 643-50 or AR 643-55 as applicable. War criminals and civilan resident criminals convicted by a Military Tribunal and executed by military authorities are considered as subject to military law for the purpose of disposition of effects.

**23. Notification and reports.** The officer designated to execute the approved sentence will notify The Adjutant General immedi-

ately following the execution, by fastest available method of communication, of the carrying out of the sentence of death, the time, place and any unusual circumstances attendant thereon. He will likewise, in addition, furnish other notifications as may be required by AR 600–65 and AR 600–66 or AR 600–67. The quartermaster or other officer in charge of burial will furnish the report of burial as required in the regulations cited in paragraph 21.

SECTION VI

MODIFICATION OF PROCEDURES

**24. Limited facilities.** If the facilities are not available for the carrying out of each of the provisions of this regulation or if the exigencies of the situation require it, the officer designated to execute the approved sentence may make the necessary modification of the provisions herein contained, except that he may not change the mode of execution. Any modification will be reported in writing to the confirming authority.

**25. In time of war.** In time of war, only the minimum number of troops necessary to accomplish the execution need be employed.

SECTION VII

STRUCTURES

**26. Permanent scaffold.** A permanent type, demountable scaffold, with a metal trigger mechanism, will be erected when the need for such a structure is determined by the commanding officer (fig. 2). Where available, troops belonging to the Corps of Engineers will be employed in the constructing of the scaffold, but where not available, or where it is more practicable, other troops or civilans may be employed. Preliminary tests will be made to insure the strength of the rope and the stability of the scaffold's construction. If facilities are limited, a trapdoor on the second floor of the building may be constructed to effect the execution, or a similar improvisation employed.

**27. Semipermanent scaffold.** A semipermanent scaffold which requires no special metal fittings may be used in executions by hanging when deemed expedient by the officer charged with carrying out the execution (fig. 3).

**28. Emergency structures.** When the exigencies of the field so dictate, emergency type gallows may be used (fig. 4).

Section VIII

EQUIPMENT

**29. Hood.** The hood will be black, the outer surface of rough materials, split at the open end so that it will come well down on the prisoner's chest and back.

**30. Collapse board and binding strap.** A collapse board will be provided for use in case of the collapse of the prisoner (fig. 5).

**31. Rope.** The rope will be of manila hemp, at least ¾ inch and not more than 1¼ inches in diameter and approximately 30 feet in length. The rope will be boiled and then stretched while drying to eliminate any spring, stiffness, or tendency to coil. The hangman's knot (fig. 7) will be used in the preparation of the noose. That portion of the noose which slides through the knot will be treated with wax, soap, or grease to insure a smooth sliding action through the knot. The noose will be placed snugly around the prisoner's neck in such a manner that the hangman's knot is directly behind his left ear.

**32. Post.** Design for post used in execution by musketry as mentioned in paragraph 12a, is shown in figure 6.

**33. Electrocution.** Facilities and equipment for effecting execution by means of electrocution will be in accordance with Headquarters, Department of the Army instructions.



**A** = Body Strap
**B** = Arm Straps 1"x9"

*Figure 1. Binding strap.*



**PLAN OVER BEAM**



**PLATFORM AND STAIR PLAN AT SECTION A-A   SCALE ½″ = 1′**

*Figure 2 ①. Permanent scaffold.*



**FRONT ELEVATION SCALE ½″= 1′**

*Figure 2 ②. Permanent scaffold, front elevation.*



*Figure 2 ③. Permanent scaffold, side elevation.*



*Figure 2 ⊕. Permanent scaffold, bell crank.*

PLAN VIEW OF BELL CRANK



*Figure 8 ①. Semipermanent scaffold.*



Plan of Platform    $\frac{1}{4}$" = 12"

2"x8" Spiked All Around Top Of
6"x6" To Form Plate or Ribbon

Framing For Floor    $\frac{1}{4}$" = 12"

END

Plan of Underside
Trap Door, One Half
$\frac{3}{4}$" = 12"

Plan of Posts    $\frac{1}{4}$" = 12"

*Figure 3 ②. Semipermanent scaffold, details.*



Section A-A
3/4" = 12"

Elevation of Trigger Post 3/4" = 12"



4"x4" 9' 6" Long Cut In Two Pieces At Center
Hinged To Stand with 1-Inch Bow At Center

## MATERIALS

| | | | |
|---|---|---|---|
| 2 pcs | 6"x8"- | 22' Long | Gallows Posts |
| 4 | 6"x6"- | 12' | Platform Posts |
| 2 | 2"x10"- | 16' | Step Stringers |
| 4 | 2"x10"- | 10' | Cross Bar - Beam |
| 3 | 2"x8"- | 14' | Joist-Extend for stair landing |
| 1 | 2"x8"- | 12' | Joist- Short |
| 7 | 2"x8'- | 10' | Joists- Regular |
| 8 | 2"x6"- | 14' | X Braces |
| 4 | 2"x6'- | 10' | Gallows Braces |
| 1 | 4"x4"- | 10' | Knee Braces (cut to 5' 0") |
| 4 | 4"x4"- | 4' | Newels |
| 2 | 2"x4"- | 16' | Stair Rail |
| 1 | 2"x4"- | 14' | Stair Rail |
| 3 | 2"x4"- | 10 | Stair Rail & Trap Door Rail |
| | Flooring if 2" thick | 10 pc 2"x8" 12' Long<br>6  2"x8" 10' Long<br>3  2"x8" 8' Long | |
| 1 pc | 2"x6"- | 8' Long | Trap Door Rails |
| 1 | 2"x6 3/4" 8' | | 140 BM 3/4" T&G Pine Flooring |
| 4 | 2"x10"- | 14' | Cut into 3' 6" lengths Step Tread |
| 1 | 4"x4"- | 10' | Trigger |

*Figure 3* ③. *Semipermanent scaffold, details*—Continued.



*Figure 4. Emergency gallows, post type and tripod type.*

3 POLES SECURELY TIED AT TOP AND SUNK 18" IN GROUND

Tripod Lashing



A - Brace Board          B₁ B₂ B₃ = 1 Inch straps

*Figure 5. Collapse board.*



*Figure 6. Post used in execution by musketry.*



Length of loops: from A to B should be approximately 18 inches, and from C to Running End should be approximately 35 inches to 108 inches depending upon diameter of the rope. Wrap Running End around for six turns. No extra rope should remain.

*Figure 7* ① *and* ②. *Hangman's knot.*



Tighten loops by pulling at Running End. Lock loops and form knot by pulling down at point D. Slide knot up or down on Standing Part to adjust size of loop.

*Figure 7* ③ *and* ④.

[AG 250 (16 Mar 59) PMGK]

By Order of *Wilber M. Brucker,* Secretary of the Army:

MAXWELL D. TAYLOR,
*General, United States Army,*
*Chief of Staff.*

Official:

R. V. LEE,
*Major General, United States Army,*
*The Adjutant General.*

Distribution:

*Active Army:* D.

To be distributed as needed to Headquarters of Department of the Army Staff Agencies, Headquarters Army Audit Agency and field offices, Headquarters of Major Commands.

*NG:* State AG (3).

*USAR:* None.

☆ U. S. Government Printing Office: 1959—480522

AGO 5167B

# APPENDIX D

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

———————————

| | | |
|---|---|---|
| Frank Jarvis Atwood, | ) | |
| | ) | 2:20-cv-00623-PHX-JAT |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 29, 2021 |
| Unknown Arnold, Violetray | ) | 9:12 a.m. |
| Arnold, Panann Days, Unknown | ) | |
| Lopez, Unknown Scott, David | ) | |
| Shinn, Centurion, Pamela | ) | |
| Olmstead, Orin Romney, | ) | |
| Charles L. Ryan, Unknown | ) | |
| Wallis, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE: THE HONORABLE JAMES. A. TEILBORG, JUDGE**

**REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

**PRELIMINARY INJUNCTION - TESTIMONY OF PHILIP A. DAVIDSON, M.D.**

Official Court Reporter:
Hilda E. Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:
     KILLMER, LANE & NEWMAN, LLP
     By:  **David A. Lane,** Esq.
     and **Reid Robertson Allison,** Esq.
     1543 Champa Street, Suite 400
     Denver, Colorado 80202

For the Defendant:
     BROENING OBERG WOODS & WILSON, P.C.
     By:  **Sarah Lynn Barnes,** Esq.
     and **Danielle Nicole Chronister,** Esq.
     1122 E. Jefferson
     Phoenix, Arizona 85034

1

2                          **I N D E X**

3   **PLAINTIFF WITNESS:**          **DIRECT**      **CROSS**      **BY THE COURT**

4   Philip A. Davidson, M.D.        15            31             55
    Frank Jarvis Atwood             106           122            133

5

6

7   **DEFENSE WITNESS:**      **DIRECT**      **CROSS**          **BY THE COURT**

8   Thomas Fowlkes, M.D.      63            76                 98

9   **REDIRECT**
    102

10
    Pamela Olmstead, N.P.     135           155                190, 198

11

12  **REDIRECT**

    194

13

14                      **INDEX OF EXHIBITS**

15  **EXHIBIT**                                   **ADMITTED**

16  NO.        DESCRIPTION

17  54         Valleywise Health record dated 7-30-21    43
               Neurosurgeon's summary of findings

18
    52         Consultation Request dated 6-30-2021      146

19
    53         Health Services Encounter dated 7-16-21  148

20
    55         Consultation Request dated 8-3-21         148

21
    56         Consultation Request for epidural         150

22             steroid injections dated 8-2-21

23

24

25

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

1

2    ***** PARTIAL TRANSCRIPT BEGINS**

3         THE COURT:  Thank you.  Please be seated.  I will ask

4    the clerk to call the next matter, please.

5         COURTROOM DEPUTY:  This is Case No. CV 20-0623, Atwood

6    vs. Days, et al, before the Court for a preliminary injunction

7    hearing.

8         Counsel, if you please announce your presence for the

9    record.

10        MR. LANE:  Good morning, Your Honor, David Lane and

11   Reid Allison, from Denver, Colorado, pro hac vice for the

12   plaintiff.

13        THE COURT:  Good morning, and welcome.

14        MS. CHRONISTER:  Good morning, Your Honor,

15   Dani Chronister and Sarah Barnes on behalf of the defendant,

16   and we also have Defendant N.P. Olmstead here with us as well.

17        THE COURT:  So we have -- and I am going to get this

18   to business of trying to speak through a mask momentarily, but

19   I couldn't really hear a word you were saying.  So you're

20   Ms. Chronister?

21        MS. CHRONISTER:  I am.

22        THE COURT:  And Ms. Barnes.

23        MS. BARNES:  Hello, Your Honor.

24        THE COURT:  And nurse --

25        MS. BARNES:  We have Defendant Pamela Olmstead here as

1   well.

2           THE COURT:  Good morning to all of you.

3           MS. BARNES:  Good morning.

4           THE COURT:  We're required to wear masks except when

5   necessary to pull it down to speak, and I want to give each of

6   you permission to pull it down to speak, but I want to make, be

7   careful that if somebody feels that they don't dare pull it

8   down because of their own health concerns, then for heaven's

9   sake don't pull it down.  But in either event, these

10  microphones are meant for directional use and, of course,

11  pulling the mask down and talking in the microphone is a

12  perfect solution, but if you're not going to pull it down, why,

13  be sure to speak into that microphone.

14          Now, typically anyone speaking will typically use the

15  podium.  And with regard to the podium, you got -- I guess this

16  podium has the way -- this is not my regular courtroom, so I'm

17  kind of getting reoriented to how it's set up, but there is a

18  microphone at the main podium.  Just make sure you speak into

19  that.  In my courtroom I got two microphones and people feel

20  like if they speak between the two that's better, but that's

21  actually worse because neither one of them is picking it up.

22  So that's it on masks.

23          Now, on the subject of the -- and I now see Mr. Atwood

24  is appearing by -- he's hearing us now; is that right?  Okay.

25  I see Mr. Atwood moving.

1          Good morning, Mr. Atwood.  I'm sorry I didn't include

2     you in my greeting.

3          The subject of exhibits has already come up, and I

4     don't know what protocol you're going to use to offer them, but

5     I will say this at the beginning, and that is, in fact, if

6     there's some thought that you're just going to stipulate and

7     put all exhibits in evidence, I guess you're welcome.  Maybe

8     you're welcome to do that, but my stipulation is anything you

9     put in evidence you're going to tell me specifically what it's

10    being offered for.  And before you leave at the end of the day,

11    you're going to take a highlighter and go through the actual

12    exhibit and circle it or do something to show me what it is I

13    ought to look at, because if you had some thoughts that I am

14    going to spend the next two or three weekends thumbing through

15    exhibits looking for something without some guidance, I am not

16    going to do that.  So make sure we got that plan in place.  I

17    wanted to let you know that at the beginning.  But before you

18    leave I expect that any exhibits that have been received in

19    evidence, that you make sure that you have highlighted on the

20    actual exhibit what it is you think I need to look at.

21         Also, at the conclusion of the case I will order the

22    plaintiffs to propose a form of order, a form of injunction,

23    and -- and that's a task I don't envy, let me be clear, because

24    though it probably doesn't come as a surprise to you, I'm not a

25    doctor, and any order I issue will not, not pretend to be an

1    order of a doctor.  In order for that order to be followed, if

2    there is an order to the defendant, it's got to have

3    specificity in it or it's difficult to carry it out, on one

4    hand.

5            On the other hand, and this is a problem with

6    mandatory injunctions, on the other hand, the more specific it

7    is the prison people still have to exercise medical judgement

8    and medical people have to exercise medical judgement and

9    things change.  And what are they supposed to do, come back to

10   me every time?  When they come back to me that brings you here

11   again.  I don't have an off-the-top-of-my-head solution to that

12   conundrum, which -- which probably says a lot for the value of

13   you all being able to come up with something that doesn't

14   require my intervention, but that's where we are now and that's

15   where I am.

16           And let me say in this context just share some

17   preliminary and random thoughts, and believe me I have not any

18   predisposition in here, but based on the filings that I have

19   seen, it seems to me the plaintiff has made a rather powerful

20   case for his suffering and the magnitude of his suffering, and

21   the, say, consistency of his suffering, and I don't -- I'm not

22   immediately understanding what the defendants are going to

23   rebut that with to say, well, no, he didn't suffer and here's

24   somebody that's watched him on a daily basis and can testify he

25   is not suffering.  And by the way, I'm going to give each of

1    you a chance to make some kind of opening statement or opening

2    comments, and maybe after hearing my random comments you'll

3    want to weigh in on that in terms of what you're going to show,

4    either side, in terms of the evidence, but that's one point.

5         And the defendant's filings seem to suggest that

6    they've -- in fact, I think it sounds to me like the evidence

7    is pretty much uncontradicted that Mr. Atwood had Tramadol for

8    several years and suddenly he's being, suddenly, and I'm not

9    quite sure I understand from what I've read anyway what the

10   suddenly was, what the suddenly precipitating thing was that he

11   was going to be weaned off of it immediately.  I guess I could

12   read between the lines that it seems like they didn't want him

13   to become addicted or something like that, and that there have

14   been some other modalities used, and it sounds to me like the

15   defendants are taking the position that, well, at least that

16   it's appropriate, appropriate therapy.  Though I am not sure

17   they have gone so far, although I can point to a couple of

18   places where, I think in August and September this year he had

19   some physical therapy and seemed not to be complaining of pain

20   there, but other than that I haven't seen something that

21   suggests that this new appropriate treatment has now solved

22   this significant and regular pain.  Maybe -- I am not sure who,

23   looking at the people that are scheduled to testify, I'm not

24   sure who is prepared to say that, but certainly I'm raising

25   these questions hoping that that will at least zero you in on

1    the issue.

2          I guess those are my random comments for purposes of

3    giving you some preliminary thoughts.

4          So that brings us to the point -- I don't need a

5    full-blown opening statement, but you may be able to zero me in

6    on what you think you're going to prove and what I should be

7    listening for.  So you may proceed.

8          MR. LANE:  Thank you very much, Your Honor.  You've

9    pretty much hit it right on the head, I think.  For years

10   Mr. Atwood has been on Tramadol.  It's worked.  He has been

11   given multiple other pain relievers that have not worked.

12   Tramadol works.  He's not a constant complainer.  The problem

13   is he is in extremely ill health, not just with bone pain but

14   with all host of other illnesses.  And as a result, he gets

15   sent to the infirmary, which is different than Brownings death

16   row.  At the infirmary he's given Tramadol and they work with

17   him.  He's also in an assisted living kind of an environment in

18   the Tucson infirmary where he has, for example, handrails on

19   his bed or handles that he can use to get into his wheelchair.

20   If he needs assistance.  He is in a dorm kind of environment.

21   People can help him.

22          The problem here is right now he's on Tramadol 'cause

23   he is in the infirmary for an infection, and his pain is

24   reduced.  It works for him.  The problem is once he's cleared

25   the infection they send him back to Browning and Ms. Olmstead

1    cuts him off.  And he, again, has excruciating pain.  He has a

2    lack of mobility.  He has no assistance in the context of

3    getting in and out of his bed into his wheelchair.  He has to

4    literally crawl from his bed to the door, and the only way --

5            THE COURT:  Sorry for interrupting, I thought I saw

6    something that he's now getting a wheelchair porter.

7            MR. LANE:  Well, I am going to let Mr. Atwood talk

8    about that.  What has happened is he's had to crawl and he

9    misses meals, he misses meds, because he can't make it.  So

10   really what we're looking at here is there is no legitimate

11   medical reason to be cut off of Tramadol.  There is an

12   extremely acrimonious relationship between Mr. Atwood and

13   Ms. Olmstead.  Mr. Atwood, rightly or wrongly, feels that that

14   is in part the reason he's cut off the Tramadol because there's

15   no really compelling medical reason to cut him off, and he is

16   hoping that he can get the Tramadol 'cause it's the only thing

17   that works for him and has for years and years and years, and

18   get some -- get into an assisted living thing like the

19   infirmary that they can actually -- so he doesn't have to

20   crawl, so he has physical therapy, so he can, you know, have

21   the benefits of trying to relieve his pain consistently, and

22   that's all we're asking for here, and we're going to have

23   testimony essentially outlining all those things, Your Honor.

24           THE COURT:  Thank you.

25           MR. LANE:  Thank you.

1          THE COURT:  From the defense.

2          MS. CHRONISTER:  Good morning, Your Honor.  Just --

3          THE COURT:  You're going to need to, number one, get

4     that microphone.  It will move, I think.

5          MS. CHRONISTER:  Is that better?

6          THE COURT:  It's very directional.

7          MS. CHRONISTER:  This Court has already ruled on

8     Mr. Atwood's first request to receive an, essentially an

9     indefinite --

10         THE COURT:  Hold on just a second.  Could you hand me

11    one of those headsets down there?  Sometimes I am not able to

12    hear through a mask.  Is there hand cleaner down there?  I see

13    a squirt bottle, but is that the -- that's what I need.

14         I discovered some time ago -- you can take your mask

15    off -- I discovered some time ago that these things will allow

16    one to hear without the muffling effect of a mask, and I have

17    no idea how that's technologically even feasible, but I'm going

18    to use them.

19         Now you may proceed.

20         MS. CHRONISTER:  Okay.

21         THE COURT:  You're comfortable having your mask down?

22         MS. CHRONISTER:  I am.  Does that make it easier to

23    hear me?  Okay.

24         Your Honor, this Court has already once in this

25    litigation ruled that Mr. Atwood did not succeed on

1    establishing his chance of success on the merits on a

2    deliberate indifference claim for this exact same request he's

3    making.  As plaintiff's counsel just notified the Court,

4    Mr. Atwood is currently receiving a short course Tramadol

5    prescription for an unrelated infection to his back pain, which

6    was the subject of the original motion.  And so to the extent

7    that that's what they are requesting here today, that request

8    is moot.  He did receive a Tramadol dosage.  I believe last

9    night was the last one, and I am sure he'll testify today about

10    the dosage of that medication he is currently receiving.

11         To the extent he is asking this Court to order medical

12    providers to prescribe him with an indefinite prescription for

13    an opioid, our medical provider and our medical expert will

14    both testify that that is not medically indicated by his

15    current status.

16         THE COURT:  Excuse me, but they are going to testify

17    it's not medically indicated, but how are they going to explain

18    that 10 years, I think it's ten years, a long period of time he

19    had it before, what is the difference?

20         MS. CHRONISTER:  Sure, Your Honor, I think --

21         THE COURT:  I think logically he is probably worse

22    today than he was then.  Why was it medically necessary or

23    appropriate then and not now?

24         MS. CHRONISTER:  And I think you'll hear from both of

25    our witnesses that as patients who have chronic pain, their

1  prescriptions, especially when they are dealing with an opioid

2  prescription, the medical necessity changes as the patient's

3  status changes.  So you'll hear Nurse Practitioner Olmstead

4  explain her reasoning for deciding to discontinue his Tramadol

5  based on his other, his co-morbidities, the other medications

6  he was taking, an uptick in the number of falls he was taking,

7  his aging.  There is several factors that she took into

8  consideration for that decision.

9          She'll testify also about all the other alternative

10 pain management, both medications and therapies that she's

11 worked with Mr. Atwood to try to get him placed to try to make

12 him feel more comfortable.

13         And to the extent that plaintiffs or plaintiff is now

14 requesting for an indefinite stay in the infirmary, first of

15 all, that request was not briefed in the original motion, and

16 our witnesses will support the, again, that that is not

17 medically indicated; that he's in the infirmary for a brief

18 time due to an unrelated infection, and that chronic back pain

19 patient is not medically indicated for a permanent infirmary

20 stay.

21         THE COURT:  All right.  Thank you.

22         MS. CHRONISTER:  Thank you.

23         THE COURT:  Ms. Barnes, do you have anything to add?

24         MS. BARNES:  Thank you, Your Honor, for the

25 opportunity.  I guess the only thing I would say --

1          THE COURT:  Why don't you come up to the podium.

2          MS. BARNES:  -- at the outset is that because there is

3   no dispute that Mr. Atwood is currently on Tramadol, this is a

4   Motion for a Preliminary Injunction to get him back on a

5   medication that he's currently on, the matter is moot.

6          The request for permanent stay in the infirmary is not

7   briefed and it should not be considered here today, nor is it

8   medically necessary or indicated, but it should not even be

9   considered here today as it was not raised appropriately.

10          The plaintiffs have acknowledged that that is the

11   case.  And while the current prescription is only for a short

12   course, there's no indication of what's going to happen next,

13   how long he is going to be in the infirmary, what might

14   transpire over the next ten days, et cetera.  The fact that he

15   is currently on it should moot this proceeding and have the

16   motion be dismissed without prejudice, as they often are, and

17   they can bring the motion again if at some point he's taken off

18   it again and they feel it's medically indicated.

19          So that would be my only other position that

20   Ms. Chronister didn't present to you, Your Honor.

21          THE COURT:  All right.  Thank you.

22          Mr. Lane, you may call your first witness.

23          MR. LANE:  Thank you.

24          MR. ALLISON:  Your Honor, plaintiff calls

25   Dr. Philip Davidson.

```
 1              MR. ALLISON:  Good morning, Dr. Davidson.

 2   BY MR. ALLISON

 3   Q.  Can you spell your name for the record?

 4              THE COURT:  Would you like to have him sworn?

 5              MR. ALLISON:  Oh, yes.  Sorry, Your Honor.

 6              THE COURT:  I guess whether or not you would like to,

 7   we would.

 8              MR. ALLISON:  Yes, we all would.

 9              COURTROOM DEPUTY:  Raise your right hand.

10

11                   PHILIP A. DAVIDSON, M.D.,

12   being first duly sworn, was examined and testified as follows:

13

14                        DIRECT EXAMINATION

15   BY MR. ALLISON:

16   Q.  All right.  Now, Dr. Davidson, can you spell your name for

17   the record, please?

18   A.  Philip, P-H-I-L-I-P, Davidson, D-A-V-I-D-S-O-N, M.D.

19   Q.  Thank you.  Can you briefly describe your educational

20   background for us?

21   A.  Sure.  So I graduated magna cum laude from Harvard

22   University in 1983.  I graduated from Cornell University

23   medical college with honors in research in 1987.  I took

24   orthopedic surgical residency training and internship at the

25   Baylor College of Medicine, and completed that in 1992.  And in
```

```
1    1993 I completed a fellowship in orthopedic sports medicine and
2    surgical treatments.
3              THE COURT:  Let's just take a moment there.  Doctor,
4    good morning.  You're coming in rather weak, and I don't mean
5    you're weak, but the sound is weak.  I want to experiment here
6    to see if we can get it -- are you speaking into a microphone
7    that's visible or is it just --
8              THE WITNESS:  I'm speaking into my laptop.  I guess I
9    can speak louder, if need be.  Is that better?
10             THE COURT:  That is better.  We were trying to figure
11   out if we had any ability hear to make it loud, but that is the
12   most successful so far.
13             THE WITNESS:  Okay.  I will try to project my voice.
14             THE COURT:  Thank you, sir.
15   BY MR. ALLISON:
16   Q.  Thank you for your educational background.  Where do you
17   currently work?
18   A.  I'm a practicing orthopedic surgeon in Salt Lake City,
19   Utah.
20   Q.  And you have an active medical license?
21   A.  I do.
22   Q.  Do you have any certifications?
23   A.  I'm a Board certified orthopedic surgeon.  I have
24   certifications to do clinical research, and I'm the member of
25   multiple medical societies, including the American Academy of
```

1    Orthopedic Surgeons, the Arthroscopy Association of North

2    America, the Patellofemoral Society, the International

3    Cartilage Repair Society, and I'm probably missing some others.

4    I am in a bunch of other medical societies.

5    Q.  That's fair.  During your career as an orthopedist, have

6    you cared for patients with similar conditions to the one we're

7    discussing here today, spinal stenosis and various other

8    things?

9    A.  I have.  One of my roles is to serve as the medical

10   director of a clinic where we engage a number of neurosurgeons

11   and orthopedic spine surgeons that work under my direction.

12   Q.  How many patients with similar conditions would you say

13   you've treated in your career, very much ballpark?

14   A.  Thousands.

15        MR. ALLISON:  At this point, Your Honor, we move to

16   certify Dr. Philip Davidson as an expert in orthopedic

17   medicine.

18        THE COURT:  You know, that's a customary request

19   you're making here made from time to time in, across the

20   country, but I have never, never determined that that's a

21   motion that needs to be made or one that I need to decide.

22   Obviously if an expert is requested of an opinion by the

23   presenter, and the other side objects on grounds that he's not

24   an expert in that area, it's outside the area of expertise,

25   then that particular objection would tee up the discussion.

 1   Anyway, so no need to do that.

 2           MR. ALLISON:  Thank you, Your Honor.

 3   BY MR. ALLISON:

 4   Q.  Dr. Davidson, do you know the plaintiff in this case,

 5   Frank Atwood?

 6   A.  I do.

 7   Q.  Have you spoken with him before?

 8   A.  I have.

 9   Q.  Have you reviewed medical records for him?

10   A.  Yes.

11   Q.  Have you seen, I guess before today on Zoom, have you seen

12   Mr. Atwood in person?

13   A.  We did a telemedicine visit.  We had some difficulties with

14   connectivity, so most of the time I spent with Mr. Atwood was

15   by telephone, but I have seen him on a tele-med connection in

16   addition to speaking to him by phone more than once.

17   Q.  What is your understanding from speaking with him and

18   reviewing his medical records of Mr. Atwood's orthopedic

19   condition?

20   A.  Do you want me to speak broadly or go into detail?

21   Q.  Well, I can ask, you know, for example, what is spinal

22   stenosis in a broad and hopefully kind of lay sense for us here

23   in the courtroom?

24   A.  Spinal stenosis is -- is compression of the neurologic

25   structures within the spinal cord.  Using lay terminology, bone

1    spurs press the spinal cord and the nerves, but I think the

2    term "spinal stenosis" underestimates and understates Mr.

3    Atwood's condition.  He has both disease of the cervical spine

4    and the lumbar spine.  The cervical spine being the neck.

5           Again, I want to start with lay terminology and I will

6    use medical terminology for the record.  The lay terminology in

7    his neck is that he has what I would opine as severe

8    compression of the cord, and what is called adjacent segment

9    disease, meaning that he had a spinal fusion in the middle of

10   the cervical spine which has transmitted the forces to the

11   adjacent parts of the spine accelerating that degeneration.

12          So he has, and I differ with some of the reports I've

13   read, he has what I would describe as a progressively and

14   advanced degenerative condition of the spine, not just spinal

15   stenosis because the spinal cord has something -- in the

16   radiologist's report there was a very important term called

17   myelomalacia, meaning essentially his spinal cord is

18   degenerating and wearing away, winding of it is wearing, and

19   this is really an advanced condition.  So it's more than spinal

20   stenosis.

21          In the lumbar spine I was very interested to read, and

22   not only did he have degenerative spondylosis, which is

23   arthritis of the spine, but MRI imaging shows that it's

24   progressive over interval MRI scans.  And now the degenerative

25   changes in the lumbar spine that progressed to the point where

 1    acute intervention in the past few months has been recommended.

 2    And again, I don't think this is just simple spinal stenosis.

 3    This patient has advanced, what appears to be progressive

 4    problems in both the neck and back.

 5    Q.  Thank you for clearing that up for me.  You may have heard

 6    the judge earlier say something in general about this condition

 7    gets worse over time and has gotten worse over time; right?

 8    A.  I concur with that.  I mean, that's both the general nature

 9    of the condition, as well as what we're seeing in Mr. Atwood's

10    case.

11    Q.  How do these conditions impact Mr. Atwood's daily life?

12    A.  Well, I --

13            MS. BARNES:  Objection, Your Honor, foundation, form.

14    It calls -- it calls for speculation.  He has no personal

15    knowledge and has never examined this individual.

16            THE WITNESS:  Should I answer?

17            THE COURT:  Was foundation one of your objections?

18            MS. BARNES:  It was.

19            THE COURT:  Foundation would be sustained.  You can

20    lay some more foundation, if you can.

21    BY MR. ALLISON:

22    Q.  So you said you did a telemedicine consult, or multiple,

23    actually, I believe, with Mr. Atwood; correct?

24    A.  Yes.

25    Q.  In modern medicine, is that a well regarded way of getting

1    a feel for a patient and being able to diagnose that type of

2    thing?

3    A.  Yeah.  Telemedicine, by virtue of technology, was

4    increasing in our clinical use.  I say "we" meaning both in my

5    clinic and in the medical community of practitioners was

6    increasing before the pandemic.  And then once the pandemic

7    began, our utilization increased a lot because we had

8    physicians and patients that really couldn't or wouldn't leave

9    home, and I think it's really been an important advent.  It's

10   been recognized both by the government and medical payers that

11   are now reimbursing for it whereas they hadn't in the past.  So

12   I think both its utilization and acceptance have rapidly

13   increased in recent years, and I use it routinely.

14   Q.  And in addition to your telemedicine consults with

15   Mr. Atwood, you have also reviewed medical records for him?

16   A.  Yes.

17   Q.  And did those two sets of data inputs coalesce for you,

18   were they consistent with each other?

19   A.  Very much so.

20   Q.  So does Mr. Atwood's condition cause him pain?

21              MS. BARNES:  Objection, Your Honor --

22              THE COURT:  Just a second.  There is an objection.

23              MS. BARNES:  -- again, calls for speculation.  Also,

24   foundation.  This witness cannot testify to whether or not this

25   plaintiff suffers significant pain.  And more importantly, it

1   was never disclosed that he had these alleged telemedicine

2   visits.  It was disclosed that he had two telephonic

3   consultations.

4           THE COURT:  I am sorry, but your legal objection is

5   what?

6           MS. BARNES:  Foundation.  He does not have personal

7   knowledge to answer that question, and it calls for

8   speculation, and there is no proof that he -- the testimony

9   that he's given is accurate with respect to the telemedicine

10  visit that he had was mostly conducted on the phone.

11          THE COURT:  Now, the objection will be sustained.

12  Counsel, it seems to me you're asking an impossible question

13  because the particular conditions are indeed obviously

14  medically describable and determinable, and I doubt that

15  Mr. Atwood can relate his pain to a particular spinal stenosis

16  or whatever else.  It seems to me you're entitled to ask him by

17  way of history what the patient has told him about his -- the

18  effect of his pain.  I think he took a history by -- by the

19  tele-med conversation.

20          MR. ALLISON:  Thank you, Your Honor.

21  BY MR. ALLISON:

22  Q.  Has Mr. Atwood told you that his back, he suffers pain in

23  his back?

24  A.  Explicitly, and that formed the basis of our tele-med

25  consult.  I guess I would clarify that the standard of care now

1    in orthopedic medicine is that the practitioner, in this case

2    me, speaks with the patient, puts it in the context of imaging,

3    puts it in the context of written records, and then asks

4    leading questions to the patient, leading in terms of, you

5    know, the nature of the discomfort, the location of the

6    discomfort, trying to use validated outcome measures such as

7    VAS pain scores about the pain.

8         The idea is that we as clinicians formulate an opinion

9    about is this person describing something that's consistent

10   with the pathology seen on the imaging?  Is this story

11   consistent, or does it seem like it's consistent or

12   problematic?  And in my conversation with Mr. Atwood, as well

13   as in my review of the records and review of the data I had, it

14   seems very consistent.  The pain patterns that he describes are

15   consistent with the pathology seen on the radiographs and the

16   imaging.

17        The way he describes his suffering to me appears to be

18   very consistent with the many, many hundreds and perhaps

19   thousands of patients that I have interviewed and examined and

20   treated and overseen their care historically.  So to me this is

21   very straightforward.  I am not a legal expert.  I can't

22   comment on the legal conversation in the courtroom, but

23   medically this man is suffering.  This is a guy who described

24   to me in interviews that he would have to crawl from his bed to

25   doorway to obtain food or medication.  I mean, this plight is

1   so to me compelling with no -- no evidence of inconsistencies

2   nor exaggerations.

3          MS. BARNES:  Your Honor, move to strike the better

4   part of that speech as nonresponsive.  The question was:  Has

5   he communicated to you that his back hurts him, or his back is

6   causing him pain, and the better part of what Mr. Davidson just

7   provided to you by way of testimony went far beyond just

8   answering the question of whether or not the communication

9   occurred.

10         THE COURT:  Sustained.  We need to proceed -- we do

11  need to proceed on a question-by-question basis and not get

12  tempted and be unable to resist the temptation to lapse into a

13  narrative.

14         MR. ALLISON:  Thank you, Your Honor.

15  BY MR. ALLISON:

16  Q.  Has Mr. Atwood described his pain as constant or

17  intermittent?

18  A.  Both.

19  Q.  How has he described the severity of the pain?

20  A.  Very severe insofar as he said that the pain was so severe

21  that he felt as though if it couldn't be treated he would

22  rather end his life, he told me.

23  Q.  Has he told you that there are particular positions or

24  placing of his body that cause him particular pain?

25  A.  Multiple positions, including the fact that he was unable

```
 1   to find a comfortable position to sleep in such as a person
 2   might normally sleep.  He was having problems in regular
 3   positions to lessen the spinal pain, both in his neck and his
 4   back that he was experiencing.  He had pain with almost every
 5   activity.
 6   Q.  Did that include laying essentially supine flat on his
 7   back?
 8   A.  Yes.
 9   Q.  Are these symptoms consistent with other patients you have
10   treated?
11   A.  Yes.
12   Q.  What is Tramadol?
13   A.  Tramadol is a synthetic pain relieving medication that
14   works essentially in the brain and was several years ago
15   reclassified as a narcotic or an opioid.  It's not a
16   traditional opioid.  Traditional opioids are a derivation of
17   poppy; for example, morphine, heroin, codeine, these are
18   traditional opioids, so it's a nontraditional medication
19   working in the brain that has in recent years been classified
20   as an opioid.
21   Q.  Have you prescribed Tramadol to patients with similar
22   conditions to Mr. Atwood?
23   A.  Yes.
24   Q.  What are the downsides or side effects of Tramadol?
25   A.  Well, the side effects would include habituation,
```

```
 1   constipation, and then with any centrally active medication
 2   like this, it can impair, for example, coordination, balance,
 3   judgement, critical thinking.  It's a central system nervous
 4   system depressant, but in the context of other medications its
 5   side effect profile and those negative effects I just listed
 6   are less than other alternatives.
 7   Q.  Have you seen from the records and your calls with
 8   Mr. Atwood that he was previously prescribed Tramadol?
 9   A.  Yes.
10   Q.  Do you have an understanding from those records and/or
11   calls about how long Mr. Atwood was prescribed Tramadol?
12   A.  Many years.
13   Q.  According to him and his records, was Tramadol effective in
14   managing his pain?
15   A.  Yes.
16   Q.  Do you know that his Tramadol prescription was discontinued
17   last year in, I believe, September?
18   A.  That is my understanding, yes.
19   Q.  What did he tell you that this change in medication did to
20   his pain?
21   A.  That the Tramadol had been effective and the absence of
22   Tramadol left him in, you know, he described, his word was
23   excruciating pain.
24   Q.  Did he tell you that there were other painkillers that he
25   had been prescribed that were effective in managing his pain?
```

 1   A.  We discussed, and his records discussed many other

 2   medications for a variety of reasons that I guess we could

 3   potentially get into were not effective in managing his pain.

 4   Q.  In your experience, when prescribing a painkilling regimen,

 5   if one medication doesn't work for a patient, what's your next

 6   step?

 7   A.  Fortunately we have many alternatives, many families of

 8   medications and classes of medications that can be used to try

 9   to lessen pain, each as you've already indicated can carry side

10   effects, but in summary, the typical medications that would be

11   used and the different families of medications he was either

12   allergic, intolerant or they are contraindicated.  So the fact

13   that Tramadol was effective and safe for him makes it a

14   uniquely good choice.

15   Q.  Did Mr. Atwood tell you that he was in the infirmary

16   earlier this year?

17   A.  Yes.

18   Q.  Did he tell you that his Tramadol prescription, he received

19   Tramadol in the infirmary?

20   A.  I don't recall the sequence exactly of events when he

21   received which medication and what time, but I am aware that he

22   is in the infirmary and has received Tramadol periodically.

23   Q.  As described to you by Mr. Atwood, does his pain affect his

24   daily activities?

25   A.  Yes.

1   Q.  In what ways?

2   A.  I think in almost every way where there would be motion

3   imparted to the spine.  So I think the daily activities such

4   as, for example, I see right now he's writing, that would

5   probably not cause pain, but he could have difficulty with that

6   because of the cervical myelomalacia and the effect on the

7   nerves, but I think almost every activity to include basic

8   things like dressing, toileting, transferring, I think

9   everything is affected by pain given the multitude of the

10  conditions, particularly include the spinal disease.

11  Q.  Has he told you that his motor functioning is impaired by

12  his condition?

13  A.  He described weakness and radiating pain into his

14  extremities, and that deleteriously affects motor function and

15  manifests particularly in his inability or difficulty with

16  transfers and ambulation.

17  Q.  In your experience, does unmanaged pain also impact a

18  patient's strength or motor functioning or range of motion?

19  A.  Yes.

20  Q.  In Mr. Atwood's condition, is wheelchair transferring

21  risky?

22  A.  Yes.

23  Q.  What are the risks?

24  A.  Obviously falling.

25  Q.  Do you know if Mr. Atwood has a history of falls while

1    transferring?

2    A.  I read about multiple falls.  I don't know about of course

3    all of his falls, but I read about multiple falls, and I think

4    it's the fear of falling that, for example, causes him to crawl

5    around in his cell.

6    Q.  Does wheelchair transferring, in your experience, lessen

7    the risk of a fall?

8    A.  That question confuses me.  Could you re-ask it in a

9    different way?

10   Q.  In your experience as an orthopedist, does the availability

11   of wheelchair transfer assistance lessen the risk of a patient

12   falling?

13   A.  Oh, "assistance," I missed that word.  So yes, yes, I think

14   that's pretty obvious.  I agree with that.

15   Q.  What are some examples of what patients transfer from their

16   wheelchair to do, as in where do patients transfer from their

17   wheelchair to just --

18         MS. BARNES:  Objection, Your Honor.  I think, again,

19   this calls for speculation.  It's vague.  And in this case

20   foundation as well because this doctor has not indicated he has

21   any experience in a correctional setting or any experience with

22   patients in a correctional setting.

23         THE COURT:  Your response.

24         MR. ALLISON:  I'm asking about his experience with

25   orthopedic patients outside of the correctional setting.  They

```
 1    also are in wheelchairs and need to transfer out and to and

 2    from wheelchairs.

 3             THE COURT:  Sustained.

 4             THE WITNESS:  So typically say a wheelchair --

 5             THE COURT:  The objection is sustained.  He will go on

 6    to the next question.

 7             MR. ALLISON:  Yes.

 8             THE WITNESS:  Sorry.

 9    BY MR. ALLISON:

10    Q.  Are there side effects to Tramadol that would keep you from

11    prescribing it to a patient if you knew other painkilling

12    medications were not effective?

13    A.  We as physicians prescribe medications with knowledge of

14    the side effects profile.  We talked earlier today about the

15    side effects that Tramadol can have.  It's not always -- the

16    side effects do not always manifest, but the side effect

17    profile of Tramadol in my mind would be outweighed by the

18    benefit of the pain relief in this particular patient's case.

19             MR. ALLISON:  That's all I have for you at the moment,

20    Dr. Davidson.  Thank you.

21             THE WITNESS:  You're welcome.

22             THE COURT:  All right.  Defense.  Ms. Barnes, you were

23    doing the objecting, so I assume that means you're first up on

24    cross-examination.

25             MS. BARNES:  Ms. Chronister is prepared to do the
```

```
 1   cross-examination.
 2              THE COURT:  I'm sorry.
 3              MS. BARNES:  Ms. Chronister is prepared to do the
 4   cross-examination.
 5              THE COURT:  Why were you doing the objecting?
 6              MS. BARNES:  Well, we are both here --
 7              THE COURT:  Are you planning to cross-examine too?
 8              MS. BARNES:  There is a good chance that I will as
 9   well.  Ms. Chronister has prepared for this hearing and I am
10   here to oversee and to assist, and I will ask additional
11   questions when she is done.
12              THE COURT:  Very well.  Ms. Chronister.
13              MS. CHRONISTER:  Thank you, Your Honor.
14                       CROSS-EXAMINATION
15   BY MS. CHRONISTER:
16   Q.  Good morning, Dr. Davidson.  My name is Dani Chronister,
17   and I am here on behalf of the defendants.  You've never
18   provided medical care to a patient in a correctional setting;
19   is that correct?
20   A.  No.
21   Q.  Tell me when you've provided medical care to a patient in a
22   correctional setting.
23   A.  For the first approximately 15 years of my career I worked
24   in Pinellas County, Florida and prisoners were brought to our
25   clinic for medical treatment.  I also treated prisoners in the
```

1    emergency room but not in the correctional facility.

2    Q.  Okay.  So you've treated inmates who come off site out of

3    the prison, but not inmates who are in the prison currently, is

4    that fair to say?

5    A.  That is correct.

6    Q.  Okay.  And when did you say that the last time -- when

7    would you say the last time you saw a patient from a prison

8    would be aside from your conversations with Mr. Atwood in this

9    case?

10   A.  Probably maybe 2016 approximately.

11   Q.  Have you ever been an expert in a correctional medicine

12   case before?

13   A.  No.

14   Q.  Have you ever been an expert before in a noncorrectional

15   case?

16   A.  Yes.

17   Q.  Approximately how many times have you been retained as an

18   expert in a noncorrectional case?

19   A.  Over the course of my whole career?

20   Q.  Yes.

21   A.  Maybe 50.

22   Q.  50.  And of those 50 times, approximately how many times

23   have you represented the plaintiff versus the defendant?

24   A.  I would say the plaintiff the majority, but sometimes I

25   don't know insofar as there's agencies that hire orthopedic

1   surgeons, and we would accept or I would accept a case not

2   knowing whether it was plaintiff or defense that was hiring me.

3   Q.  And I believe you just testified that you've never actually

4   physically examined Mr. Atwood, is that fair to say?

5   A.  That is correct.

6   Q.  And the only medical records you've reviewed in this case

7   were the ones that were provided to you by the plaintiff, is

8   that fair?

9   A.  That is correct.

10  Q.  Now, have you reviewed any updated records after you

11  submitted your initial written opinions in this case on June

12  21st of 2021?

13  A.  Yes.

14  Q.  Did you review records from the neurologist Dr. Feiz-Erfan?

15  A.  Secondary reference.  I don't have his original documents.

16  Q.  What do you mean by secondary reference?

17  A.  I was sent some documents in the past 24 hours basically

18  summarizing his visits by Dr. Fowlkes, I believe, as well as

19  Nurse Practitioner Olmstead, so, but I don't have the original

20  documents, no.

21  Q.  Okay.  So you have not reviewed the actual medical records

22  of Mr. Atwood's neurosurgery visits since June 21st of 2021?

23  A.  Correct, only the secondary documents that I just

24  mentioned.

25  Q.  Okay.  Now, since you've prepared your opinions in this

1    case, are you aware that Mr. Atwood has been evaluated by a

2    neurosurgeon and is scheduled to undergo epidural steroid

3    injections in the near future?

4    A.  Yes, I read that.

5    Q.  Isn't that what you recommended in this case that may be

6    effective to help Mr. Atwood's pain?

7    A.  Yes, and I find that very gratifying.

8    Q.  Now, isn't it true that you primarily relied on

9    Mr. Atwood's own subjective history in reporting regarding his

10   past medical treatment to prepare your opinions in this case?

11   A.  Let's see, I reviewed medical records that were provided to

12   me as well as spoke with Mr. Atwood.

13   Q.  Okay.  And would you be surprised to hear that the

14   neurosurgeon considers Mr. Atwood's spinal stenosis to be a

15   mild case?

16   A.  Yes.  No, I am not surprised.  I read that.  Again, it was

17   secondarily quoted.  I only received this secondary information

18   in the past 24 hours, but I saw that Dr. Fowlkes, I don't know

19   if I am pronouncing that right, but Dr. Fowlkes referenced that

20   report that I haven't seen whereby the surgeon described that

21   as mild stenosis.

22   Q.  And the neurosurgeon also made no additional

23   recommendations for Tramadol or other opioid medications, is

24   that something you're aware of?

25   A.  Again, I don't have those original records, but whether he

1    recommended it or not, I am not exactly sure.

2    Q.  And you're not a neurosurgeon, is that fair to say,

3    Dr. Davidson?

4    A.  That is correct.

5    Q.  And as part of your opinions you've -- you've suggested

6    that Mr. Atwood be either seen by a neurosurgeon for his spinal

7    stenosis or an orthopedic surgeon; is that right?

8    A.  Specifically an orthopedic surgeon with spine training,

9    yes.

10   Q.  You testified earlier that you have prescribed a patient an

11   opioid before; is that right?

12   A.  Yes.

13   Q.  What are the things that you consider when you're

14   prescribing a patient an opioid?

15   A.  The clinical context.  For example, what generated the need

16   for the opioid, is it an acute injury, is it cervical pain, is

17   it as in this case a chronic pain issue?  Then we look at the

18   patient, his history, are they habituated, what's the potential

19   for habituation, what's their relevant medical history in terms

20   of, for example, their kidney and liver function?  We really

21   consider a lot of parameters.  The prescription of opioids over

22   the course of my career has become much more stringently

23   scrutinized and carefully undertaken.

24   Q.  Why has the prescription of opioids over the course of your

25   career have become more stringently scrutinized?

1    A.  Because of what's been commonly called the opioid epidemic.

2    Q.  What has lead to the opioid epidemic in your opinion as a

3    medical provider?

4            MR. LANE:  Objection, Your Honor, that's irrelevant.

5            THE WITNESS:  Should I answer?

6            THE COURT:  Overruled.

7    BY MS. CHRONISTER:

8    Q.  Yes.  Now you can answer.

9    A.  Okay.  I think the opioid epidemic is multifactorial.  I

10   mean, it's getting, just the general media perpetuated to some

11   extent by the pharma, perpetuated by some societal traumas,

12   poverty.  I mean, the opioid epidemic has also been contributed

13   by overprescribing at times.  I mean, there is an array of, you

14   know, large scale reasons that this is, remains a huge problem

15   in the United States.

16   Q.  Is part of the reason, in your opinion, the fact that an

17   opioid is extremely, or I guess can be extremely addictive?

18   A.  Yes.

19   Q.  Now, a few minutes ago you told us some of the things you

20   consider when prescribing opioids to a patient, it's fair to

21   say that the only thing that -- it's not the only thing you

22   consider when you're prescribing an opioid to a patient is its

23   effectiveness for that patient's pain complaints, is that fair?

24   A.  Right.  There is many considerations beyond effectiveness

25   that needs to be considered, yes, I agree.  That was a

  1   complicated question.

  2   Q.  I am sorry.  I could have worded it a little bit better

  3   maybe.

  4           Have you ever prescribed a patient an opioid --

  5           THE REPORTER:  I'm sorry, excuse me, counsel, can you

  6   repeat that, please?

  7           THE WITNESS:  Not personally.  The clinicians that I

  8   oversee in my clinic do that, yes.

  9   BY MS. CHRONISTER:

 10   Q.  Dr. Davidson, hold on just a second.

 11           MS. CHRONISTER:  Which question?

 12           THE REPORTER:  The question right before he started to

 13   answer.  I didn't get that.

 14   BY MS. CHRONISTER:

 15   Q.  Okay.  Have you ever prescribed a patient an opioid for an

 16   indefinite period of time?

 17   A.  Not personally, but physicians work with me in my clinic

 18   that do that.

 19   Q.  What do you mean by when you say that they prescribe it for

 20   an indefinite period of time?

 21   A.  There is an entire field of medicine, and I have several

 22   practitioners that work with me in my clinic called pain

 23   management physicians.  And pain management, which we've kind

 24   of been talking about but not naming it, pain management is

 25   this multimodal way to help people with chronic pain.

1          So I am a surgeon and I also am a director of a

2    clinic, and so if I have a patient that is going to need

3    chronic pain meds, I would refer them to a colleague that would

4    prescribe them modalities of treatment sometimes which include

5    chronic opioids.

6    Q.  Okay.  And just to clarify, Dr. Davidson, that prescription

7    written by a pain management doctor wouldn't be for an

8    indefinite period of time, is that fair to say?

9    A.  That is correct.  It's -- effectively patients can be on it

10   indefinitely, but what I see from my colleagues, and these are

11   my patients being cared for by my colleagues, what I see is the

12   prescription is periodically reviewed in terms of safety and

13   side effects, but, no, I mean, no one is getting a prescription

14   that says you have this permanently, but I do see patients on

15   medications which are effectively permanent but they require

16   ongoing monitoring.

17   Q.  So sometimes maybe when those patients are prescribed

18   chronic opioids, as you've testified, when their providers are

19   evaluating whether or not to continue on that prescription,

20   that's done on a periodic basis, is that fair?

21   A.  Yes.

22   Q.  Okay.  And you would agree that in any situation where a

23   patient is being evaluated for an ongoing opioid prescription,

24   the person in the best position to make that determination is a

25   provider who is treating that patient in person and evaluating

 1   him or her?

 2   A.  Yes.

 3   Q.  Okay.  And again, you have not personally treated

 4   Mr. Atwood in this case?

 5   A.  That's correct.

 6   Q.  Would you agree with me that his treating provider whose

 7   evaluated him personally over the course of almost two years

 8   has a better understanding of his needs than you do?

 9   A.  No, I disagree with that insofar as additional medical

10   prospectus can help in patient's care, and I have nothing good

11   or bad to say about Nurse Practitioner Olmstead.  I am saying

12   that as an orthopedic surgeon with the experiences that we

13   outlined already today, that in my opinion ongoing opioid

14   treatment is clinically appropriate in this particular example

15   with Tramadol.

16   Q.  And you would make that opinion here today even though it's

17   in disagreement with the neurosurgeon who you've opined in this

18   case that he should see?

19          MR. LANE:  Objection, assumes facts not in evidence,

20   Your Honor.

21          THE COURT:  Sustained.

22   BY MS. CHRONISTER:

23   Q.  Dr. Davidson, the exhibit that I'm referring to, the

24   neurosurgeon exhibit is Exhibit 54 of the defendant's exhibits,

25   you have not reviewed that exhibit in this case; is that

 1    correct?

 2    A.  I have not seen original notes from the neurosurgeon.

 3    Q.  Okay.  And that exhibit has been stipulated to and we

 4    entered in this case, 54.

 5            MS. BARNES:  Sorry, Your Honor.

 6    BY MS. CHRONISTER:

 7    Q.  To re-ask the question so we can establish that the record

 8    is in fact in evidence, would make your opinion that an opioid

 9    prescription for Mr. Atwood is medically indicated even though

10    that would be in opposite to the recommendations made by the

11    neurosurgeon who has recently treated Mr. Atwood essentially at

12    your, in line with your opinions that he see a neurosurgeon for

13    pain management?

14            MR. LANE:  I will object.  It's a compound question.

15    She hasn't referred to any page in Exhibit 54 that anybody can

16    look at.

17            THE COURT:  She makes reference to something being an

18    evidence.  I am not aware of anything in evidence yet.

19            MS. BARNES:  Your Honor, responding to that objection,

20    Exhibit 54 is in evidence, the entire exhibit.  She can refer

21    you to the page.

22            THE COURT:  I didn't -- I don't recall being -- I

23    don't recall something being offered in evidence and the Court

24    receiving it in evidence.

25            MR. LANE:  Your Honor is correct.  We have agreed --

 1          THE COURT:  That's one thing.  I get stipulations

 2   everyday that say: --

 3          MR. LANE:  Understood.

 4          THE COURT:  -- Judge, here's what we've stipulated and

 5   may come into evidence, but until something is offered in

 6   evidence, it is not in evidence.

 7          MR. LANE:  Correct.

 8          THE COURT:  And to embellish on that, I mentioned

 9   earlier, if you're going to put something in evidence, it needs

10   to be accompanied by a statement as to why it's being offered

11   in evidence 'cause we're not going to -- I guess you can offer

12   the whole thing wholesale if there is no objection that we

13   receive it in wholesale, but you're going to have to do the

14   homework as I told you at the end of the day, and that is go in

15   there and highlight what it is that I am supposed to look at.

16          MS. CHRONISTER:  Okay.  Your Honor, this is

17   Exhibit 54.  The neurosurgeon's summary of his findings is on

18   page 5 of the exhibit, but it's marked as page 3 of 11 on the

19   actual record.  Your Honor, may I show this exhibit to the

20   witness?

21          THE COURT:  You may.

22          MS. CHRONISTER:  May it be entered into evidence as

23   stipulated to by the plaintiff?

24          COURTROOM DEPUTY:  Did you admit that, Judge?  Did you

25   admit this exhibit?

1          THE COURT:  I'm pondering the -- are the exhibits

2     now -- the totality of the exhibits, are they now, do they each

3     have individual exhibit numbers on them?

4          MS. CHRONISTER:  Yes, Your Honor, they should.

5          THE COURT:  Let me look.  Well, I got it.  In view of

6     what Mr. Lane says, both parties are in agreement that all of

7     the exhibits can come into evidence.

8          MS. CHRONISTER:  All of the defendant's exhibits.

9     Some of the plaintiff's exhibits have not been stipulated to by

10    the defense.

11         MR. LANE:  Every single exhibit, Your Honor, basically

12    is a medical record, and we don't have any foundational

13    objections, we don't have any evidentiary objections, but I

14    have no doubt that this court is not going to go through a

15    stack of medical records, you know, 8 inches high.  So I'm

16    fully in support of the Court and what we should do rather than

17    just dump 8 inches of medical records on the Court, is go

18    through, like right now she's focused on page 3, no objection.

19    She can focus the witness and then maybe this little piece of a

20    medical record can come in.

21         THE COURT:  So you're offering then what is marked as

22    Exhibit 3?

23         MS. CHRONISTER:  What I am offering right now has been

24    marked as part of defendant's exhibits.  It's been marked as

25    Exhibit 54.  It's the first exhibit offered today to be

 1    admitted into evidence.

 2            MS. BARNES:  Tell him what it is.

 3            MS. CHRONISTER:  It's a medical record dated July 30th

 4    of 2021.

 5            THE COURT:  Let me ask the courtroom deputy, you would

 6    be treating it as Exhibit 54?

 7            COURTROOM DEPUTY:  Correct.

 8            THE COURT:  And that's -- is there any reason we can't

 9    treat it as Exhibit 54?

10            MS. CHRONISTER:  I don't believe so, Your Honor.

11            THE COURT:  Let's do it that way, so we don't end up

12    with me, causing me to get confused by things.  So we'll go

13    with 54.  You're offering that, no objection, and it's

14    received.  54 is received.

15                (Exhibit 54 is admitted)

16    BY MS. CHRONISTER:

17    Q.  Dr. Davidson, can you see Exhibit 54 on your screen?

18    A.  I can.

19    Q.  Okay.  And have you taken a look at the exhibit?

20    A.  I am reading it now.  Okay.

21    Q.  And do you see under "Plan" or mere plan where it says

22    epidural injection, Lumbar 1 to 2?

23    A.  Yes.

24    Q.  And your opinion, it was your opinion back in June of 2021

25    in this case that an epidural spinal injection was recommended

 1    for Mr. Atwood to help manage his chronic pain; is that

 2    correct?

 3    A.  I think that is appropriate, yes.

 4    Q.  And you also see where it says "physical therapy"?

 5    A.  Yes.

 6    Q.  And did I tell that you -- do you have any -- have you

 7    reviewed Mr. Atwood's physical therapy records after your

 8    opinions were offered in this case?

 9    A.  Only the secondary reference to them.

10    Q.  Okay.  You have no reason to dispute the fact that Mr.

11    Atwood has gone to physical therapy since the date of your

12    report?

13    A.  No.

14    Q.  Okay.  And anywhere in this Plan section do you see where

15    the neurosurgeon recommended that Mr. Atwood be resumed on

16    Tramadol or any other specific pain medication?

17    A.  No.

18    Q.  Okay.  And so again, it's your opinion here today that he

19    should be resumed on an opioid prescription even though his

20    treating neurosurgeon has not made that recommendation?

21    A.  Yes.

22    Q.  And you would agree with me that the appropriateness of a

23    medication may change over time as a patient's current health

24    status changes?

25    A.  Yes.

1    Q.  Just because an opioid prescription at one point may have

2    been effective and appropriate for a patient doesn't mean it

3    always will be?

4    A.  I agree with that.

5    Q.  Now, you testified earlier that Mr. Atwood had reported to

6    you during your telephone conferences with him about

7    experiencing excruciating pain; is that right?

8    A.  Yes.

9    Q.  Did you ever confirm what Mr. Atwood was telling you in his

10   medical records from an objective perspective?

11   A.  Pain is always subjective, so it's -- I am not sure how to

12   answer the question.  I mean, there's multiple reports and

13   things I read talking about pain, different locations of pain,

14   but the report of pain is always subjective.  That's a

15   challenge in managing and treating pain.

16   Q.  Is it your testimony that there are no objective findings

17   that a patient may be experiencing pain?

18   A.  There's ways that pain can be sort of quantified, but it's

19   always dependent upon the subjective.  It's only experienced by

20   the patient, right.  We as clinicians can only take input from

21   our patients.  It's definitionally subjective.

22   Q.  So you did not observe any objective -- you did not review

23   Mr. Atwood's medical records to confirm whether or not they

24   reflected any objective reports of his pain complaints, is that

25   fair?

1    A.  No.  Again, but this notion of objective and subjective

2    pain, like in my experience when a patient has described to me,

3    in this case Mr. Atwood, said that he was having so much pain

4    that he couldn't transfer and get to the toilet so he defecated

5    and urinated on himself at times, and was crawling around

6    because he was in so much pain, to me that provides what I

7    would describe as indirect and very, very important evidence of

8    pain.

9    Q.  Okay.  But you didn't review any medical record that

10   supported Mr. Atwood's statements about those events, is that

11   fair?

12   A.  I reviewed records where the clinicians described pain to

13   them and then the secondary reference to pain by other

14   clinicians.

15   Q.  Okay, but no specific record where he was crawling from bed

16   or anything else that you just described?

17   A.  No, just the clinician's description of pain.

18   Q.  Okay.  And would you be surprised to know that Mr. Atwood

19   wheels himself in his wheelchair to his med pass on a daily

20   basis?

21   A.  No.

22   Q.  And then he is in a wheelchair and is able to be in his

23   wheelchair in his cell at the Browning Unit?

24   A.  That doesn't surprise me.

25   Q.  My co-counsel may have a few questions for you, Dr.

 1    Davidson, but I don't at this moment.

 2              THE COURT:  I am sorry.  You're both in the same law

 3    firm --

 4              MS. CHRONISTER:  Yes, Your Honor.

 5              THE COURT:  Representing the same defendant?  We don't

 6    do it that way.

 7              MS. BARNES:  May I have one moment with my co-counsel

 8    then, Your Honor?

 9              THE COURT:  One person takes a witness and they make

10    the objection of the witness, and then they ask all the

11    questions.  That's the way it works.  Sorry about that.

12              MS. BARNES:  May I have one moment with her?

13              THE COURT:  You may.  In fact, I will tell you, what

14    we're going to do is we're going to take a 15-minute break

15    right now so you can confer, and we will return in 15 minutes.

16              MR. LANE:  Thank you, Your Honor.

17              MS. CHRONISTER:  Can we leave the exhibit up during

18    the break.  Thank you?

19                   (Whereupon, a recess was taken.)

20              THE COURT:  Thank you.  Please be seated.  And you may

21    continue, Ms. Chronister.

22              MS. CHRONISTER:  Thank you, Your Honor.

23    BY MS. CHRONISTER:

24    Q.  Dr. Davidson, I have additional question for you on the

25    exhibit.  Do you see on at the top of this exhibit on the

```
 1   screen where it says after the neurosurgeon physically examined
 2   Mr. Wood he noticed four plus out of five on the strength of
 3   his hands?
 4   A.  Yes.
 5   Q.  And also a four out of five strength on his legs?
 6   A.  Yes.
 7   Q.  You would agree with me, Dr. Davidson, that a neurosurgeon
 8   is an appropriate person to be evaluating and treating
 9   Mr. Atwood's pain complaints with respect to his back pain?
10   A.  Yes.
11   Q.  And you would agree with me that there are some objective
12   indicator for pain such an elevated heart rate, change in
13   vitals, whether or not the patient is moving around, things
14   like that?
15   A.  Yes, they are not consistent, but they are indicative, yes.
16   Q.  And in this case you never took Mr. Atwood's vitals, is
17   that fair to say?
18   A.  I did not do an examination of Mr. Atwood.
19   Q.  You didn't cross-reference his alleged pain complaints with
20   any changes in vitals if they exist in his medical records; is
21   that correct?
22   A.  That is correct, but I think if we're talking about the
23   records maybe you can put up the record you us just showed me
24   and took down.
25   Q.  It's not a specific record, Dr. Davidson.  I will make my
```

1    question a little that bit more clear.  When Mr. Atwood

2    expressed experiencing excruciating pain to you, you didn't on

3    a certain date depending what he said to you during the

4    conversation, you didn't then cross-reference his subjective

5    pain complaint to you to see if there were any objective notes

6    in his medical records?

7    A.  That wouldn't have been appropriate insofar as my interview

8    with Mr. Atwood was me asking him questions and him answering

9    me.  It wasn't meant to cross-reference with a particular

10   clinic visit.

11   Q.  Okay.  So in other words, you just took his word for it on

12   his subjective pain complaints?

13   A.  That's how medicine works.

14   Q.  Would the fact that a patient may be experiencing an

15   increase in falls be a reason to wean or discontinue that

16   person off an opioid medication?

17   A.  In general, yes, but in this particular case I think what

18   it tells me as an experienced and relevant clinician is he

19   needs more assistance with transfers.  He needs an environment

20   that's safer is what that tells me.

21   Q.  But from a prescription of an opioid medication

22   perspective, that would be something that you would take into

23   consideration in determining whether or not an opioid is

24   medically appropriate to continue to prescribe to somebody?

25   A.  Your question is strange to me because all clinical

1  decisions are made in a holistic context, so we need to think

2  about other things the patient has tried.  This is a patient,

3  for example, that can't take Tylenol or Aspirin.  This is a

4  patient that's tried multiple medications.  So in prescribing

5  any medication, you have to consider the context of their care,

6  and so your question to me is like off base or irrelevant.

7  Q.  Okay.  So you would agree with me whether or not a patient

8  has fallen in the context of their care is something that would

9  be evaluated in whether or not to continue to prescribe a

10  patient an opioid medication?

11  A.  It can.  It's irrelevant because we're talking about a

12  human being here.  We're not talking about a hypothetical or in

13  isolation, and this human being is being effectively treated

14  with an opioid and needs supportive assistance to transfer

15  safely.

16  Q.  Okay.  If a patient had a history of substance abuse, is

17  that something you would take into consideration when

18  determining whether or not to prescribe or discontinue an

19  opioid?

20  A.  It can.  It's all in context.  That's definitely something

21  that needs to be considered, but most importantly we want to

22  treat a human being.

23  Q.  Sure, and that's a history of substance abuse or whether or

24  not the patient has been experiencing falls are part of that

25  person's medical history you would consider?

1    A.  Yes.

2    Q.  And now, Dr. Davidson, would you agree with me that an

3    opioid has the potential side effect of altering an

4    individual's cognition?

5    A.  Yes.

6    Q.  You have no reason to disagree with me that an alteration

7    in an inmate's cognition may present unique security or safety

8    risks in a prison setting?

9    A.  I am not an expert on prison settings.

10   Q.  Okay.  Today what is your specific recommendation for

11   Mr. Atwood's Tramadol prescription?

12   A.  I would suggest that he be maintained on a prescription of

13   Tramadol with the idea of being that it would be monitored

14   periodically, that it would be given according to the formal

15   indications for use, and that he be monitored in terms of

16   routine blood testing, for example, every three to six months,

17   and then very importantly I think of equal importance is that

18   he be placed in an environment where he can be safe from falls.

19   Q.  Okay.  And so your recommendation, and just so I am clear,

20   is that Mr. Atwood is prescribed Tramadol and is monitored on

21   it for as long as it may be medically indicated?

22   A.  Yes.

23   Q.  Okay.  And as part of that monitoring by -- who would you

24   suggest monitors Mr. Atwood's, the medical necessity of

25   Mr. Atwood's Tramadol prescription?

1    A.  A primary care type physician.

2    Q.  Okay.  And so --

3    A.  It doesn't require a specialist.

4    Q.  Someone like a nurse practitioner who is seeing the patient

5    on a regular basis?

6    A.  Yes.

7    Q.  And that nurse practitioner has the ability based on her,

8    you know, holistic knowledge of that inmate patient's

9    treatment, both past and current, to make a determination on

10   whether or not an opioid is appropriate?

11   A.  Well, I think in this particular case the particular

12   practitioner that you mentioned has opined that it's not

13   necessary, and I disagree with that opinion.  I opined a moment

14   ago or answered your question that a primary care physician or

15   designee could appropriately monitor a patient in a situation

16   for side effects, but I strongly disagree with the opinion

17   rendered by the nurse practitioner that Mr. Atwood doesn't need

18   Tramadol.  It's my opinion that he does.

19   Q.  Okay.  And my question was just general as to a primary

20   care provider for an inmate, that that person is somebody who

21   has -- who is an appropriate person to evaluate whether or not

22   a patient could continue on an opioid like Tramadol?

23   A.  Again, I would reiterate, the primary care physician is

24   appropriate to monitor a patient for side effects of

25   medications to include narcotics.

1   Q.  If the result of those monitoring efforts indicates that an

2   opioid prescription should no longer be prescribed, that's

3   within what a nurse practitioner or a similar primary care

4   provider can determine?

5   A.  It would depend on available data, and the available data

6   that I have indicates that it's appropriate for him to maintain

7   on the medication.  So as I outlined a moment ago, and I don't

8   want to be redundant or waste the Court's time, it's my opinion

9   the Tramadol was definitively and strongly indicated in this

10  case.

11  Q.  Okay.  And that's your opinion despite the fact that the

12  neurosurgeon who has been appropriately treating Mr. Atwood has

13  not made a recommendation as to Tramadol or another opioid

14  medication?

15  A.  His note that you shared with me a few minutes ago made no

16  comment of medications for or against.

17  Q.  Right.  So there is nothing in the medical record that you

18  reviewed that recommends that Mr. Atwood maintain or receive an

19  opioid prescription or other similar pain medication?

20  A.  The note that you showed me a few minutes ago on the

21  scanner has to be put in context, as does all health care.  And

22  I recognize as an attorney, that may not be your bailiwick, but

23  the patient was sent from that visit urgently and emergently to

24  the emergency room.  So I don't think that that physician or

25  any physician in the context of a concurrent emergent event is

1  expected to make a comprehensive discussion about medications,

2  contraindications, old medications, new medications.  The

3  conclusion of that visit that you showed me was:  Go to the

4  emergency room immediately.  You're having an emergent event.

5  So the fact that it doesn't discuss medications one way or

6  another, to me is like, okay, whatever.

7  Q.  Dr. Davidson, didn't you just testify that you would agree

8  that a neurosurgeon would be an appropriate medical

9  professional to evaluate and treat complaints of back pain?

10 A.  Absolutely.

11 Q.  Okay.  And you just mentioned in your answer right before

12 that that Mr. Atwood was recently admitted to the emergency

13 room; is that correct?

14 A.  That's what the note you shared with me indicated.  You

15 showed to me, rather, indicated.

16 Q.  Have you reviewed any hospital records where a hospital

17 clinician has recommended that he resume a Tramadol

18 prescription?

19 A.  That question seems redundant because I already told you

20 that I don't have any primary records subsequent to my initial

21 review of Mr. Atwood's case.

22 Q.  So your answer to my question would be no, you have not

23 reviewed any hospital records where a hospital clinician has

24 recommended Tramadol for Mr. Atwood?

25 A.  The question doesn't make any sense because you know I

1   don't have those records.

2   Q.  I believe you testified earlier also that you don't have an

3   opinion either way about Nurse Practitioner Olmstead's course

4   of treatment with regard to Mr. Atwood?

5   A.  I said that I have no reason to -- no reason to doubt her

6   course of treatment.  I mean, you can read my transcript if you

7   want the exact wording.  I am not sure exactly what I said.

8        MS. CHRONISTER:  I don't have any further questions

9   for you, Dr. Davidson.  Thank you.

10       THE COURT:  Thank you.  I have a few questions, and

11  let me -- I will ask my questions and then give both counsel a

12  chance to follow up on anything I may have -- I may have

13  raised.

14                      EXAMINATION

15  BY THE COURT:

16  Q.  Doctor, I have been given the understanding over the years

17  that there's a variety of back conditions that can cause pain

18  and often times excruciating pain such as protruding discs,

19  compression fractures, osteoarthritis, osteoarthritis,

20  et cetera; correct?

21  A.  Yes.

22  Q.  And in this case the physical condition, as I understand

23  it, is the narrowing of the canal that in turn impinges on the

24  spinal cord; is that right?

25  A.  Yes.  In addition, the joints of the spine have the disc

1   and you have the facets, and those joints are also arthritic

2   and pressing on the nerves and the spine.

3   Q.  And is that true in his case both at the cervical level and

4   the lumbar level?

5   A.  Yes.

6   Q.  So is there any doubt that he suffers from a physical

7   condition that can be, well, let me ask this:  Were

8   radiological studies done in his case?

9   A.  Yes.

10  Q.  And did you review those?

11  A.  Yes.

12  Q.  So is there any doubt that he suffers from a physical

13  condition that's capable of the type of pain that he has been

14  describing and over the years he's suffered from it?

15  A.  None whatsoever in my mind.

16  Q.  And I know there's a reference to injections, epidural

17  injections.  In fact, did I understand you had suggested those

18  as well?

19  A.  Yes.  The recommendation -- the consultation with the

20  neurosurgeon, the recommendation for injections was made

21  subsequent to my suggesting such in the past four months.

22  Q.  Would you suggest that those would be a permanent -- well,

23  two questions.  Would you suggest that they would have to be

24  done periodically over the long-term, or would a series of

25  those likely mitigate the pain such that he wouldn't need

1   Tramadol?

2   A.  The injections for the spine, whether it be the cervical or

3   lumbar spine, provide typically only temporary or transient

4   relief in a case like this.  And if they were to be effective,

5   they could diminish the need for Tramadol, but those injections

6   would need to be repeated every two to three times each year.

7   But in all likelihood, if they were to be, quote, successful in

8   this case, they would provide partial relief and he may still

9   be well indicated to take Tramadol in addition.

10  Q.  I know you're licensed in Utah and I think Wyoming and

11  Washington currently.  I suppose at one time Florida 'cause I

12  think you practiced down there.

13  A.  Yes.  Yes.

14  Q.  Are you licensed in Arizona?

15  A.  I am not.

16  Q.  And the fact you're not, would that preclude you from being

17  his treating physician?

18  A.  I could not be a treating physician in the State of

19  Arizona.

20  Q.  That's what I mean.

21  A.  If requested, I could obtain licensure just as I obtained

22  licensure in many states, but I am not currently licensed and

23  couldn't treat a patient in the state of Arizona.

24  Q.  But if he was your, well, let me ask this:  Do you -- if he

25  was your patient, do you feel like you know enough by virtue of

```
 1    the history you've taken over the Zoom and the records you've

 2    reviewed, do you feel that you know enough to make a

 3    prescription of Tramadol?

 4    A.  Yes.

 5    Q.  And if you were to do that, what dose would you prescribe?

 6    A.  I would have to review the dosing schedule.  Offhand I

 7    think it would be -- let me just look that up.  I have a

 8    team -- I have a team that works with me that actually

 9    administers the prescriptions.  So if I were to prescribe on

10    occasion, they would adjust dosage, but the common dose is

11    50 milligrams twice a day or something like that, but the dose

12    would have to be adjusted based on what he had been taking in

13    the past, and I don't know the number of milligrams he's been

14    taking.

15    Q.  And would it -- would it periodically require or call for

16    adjusting sometimes upwards and sometimes downward, or would

17    that be a potential course?

18    A.  Yes.  For example, let's say he got an epidural steroid

19    injection or a facet injection, which are spinal injections to

20    relieve pain, let's say he got that injection that was

21    effective, then the Tramadol can be diminished or possibly even

22    stopped.  That's where the dynamic patient care comes into

23    play.  These are all palliative measures.  There is no curative

24    measure surgically in my mind that's called for in his lumbar

25    spine given his age and health status.
```

1    His cervical spine, if it continues to progress, may

2    benefit from more surgery.  But in every case, not just in

3    Mr. Atwood's case, the ongoing care is dynamic, meaning you

4    consider what are the side effects, what are the benefits, what

5    are the risks, what is the result of further imaging, what's

6    been the result of the response to pain relief from the

7    injection, and the medication could and would be adjusted

8    accordingly.

9    Q.  And based on your review of the records, did you determine

10   why the Tramadol was discontinued?

11   A.  I was not able to ascertain why it was discontinued.  It

12   was represented to me in the records I reviewed that there was

13   no particular reason given, but I would assume that in good

14   conscience, I am assuming in good conscious on the part of the

15   providers that maybe they were concerned about a fall risk

16   because he had been falling.

17   Q.  Is Tramadol potentially a problem for someone with kidney

18   disease?

19   A.  The answer is yes, but it's all considered relative to

20   other things.  For example, Tylenol, which so many of us take

21   for pain relief all the time, is formally contraindicated given

22   his kidney problems.  He also has cirrhosis, and so the kidney

23   and the liver are the principal ways in which most medications

24   are metabolized in our bodies, and Tramadol is excreted through

25   the kidney and the liver, but he appears to have tolerated it

1   well and taken it for many years.

2   Q.  I used the term "kidney disease," if I understood it

3   correctly, in looking at the records his kidney issues were

4   largely, were kidney stones; is that right?

5   A.  Correct.  That's what I read.

6   Q.  Was there any indication that he actually suffered from

7   chronic kidney disease?

8   A.  No, I don't think so now that I'm thinking about it more

9   closely.  The thing that I read was he had prostate disease,

10  cirrhosis and kidney stones.  I didn't read it as failure of

11  kidney filtration.

12  Q.  Other than monitoring the use of the drug Tramadol, based

13  on everything you've seen, would you, and if you were his

14  treating physician, would you, would you be recommending that,

15  that he be put back on Tramadol without reservation?

16  A.  Yes.

17  Q.  Is there another alternative drug that you would prefer him

18  on than Tramadol?

19  A.  The alternative drugs have been considered and tried most

20  recently.  The records that I was sent in the past day, I think

21  it was Nurse Practitioner Olmstead, perhaps it's Dr. Fowlkes'

22  reference of Nurse Practitioner Olmstead, that there was most

23  recently in the past weeks discussion about putting him back on

24  a drug called Duloxetine, the trade name is Cymbalta, and that

25  category of drug has been tried on him in the past and he's

1    expressed intolerance and it has been inefficacious, and he's

2    described intolerance to that family of drugs.  So I think that

3    to my knowledge, and I don't hold myself out as an expert on

4    pain management as much as the topic related to spine

5    conditions, I think that the things that are commonly used have

6    been tried and failed or he has been allergic or been

7    ineffective, or other narcotics would potentially help his pain

8    but be more addictive and more habit forming.

9           For example, Perc, the active ingredient in Percocet

10   is Oxycodone, would certainly help him with his pain, but it's

11   more constipating, it's more habit forming, it's more --  it

12   gives more dizziness.  I think in light of the failure of other

13   medications and the options, I think Tramadol is uniquely well

14   suited, especially given its efficacy and the fact that he's

15   tolerated it, his personal efficacy and his personal tolerance

16   of it in terms of the side effects.

17          THE COURT:  Those are all my questions.  Redirect, and

18   then I will give the defense counsel a chance to ask any

19   follow-up questions.

20          MR. ALLISON:  We have no further questions for

21   Dr. Davidson.  Thank you.

22          THE COURT:  Ms. Chronister.

23          MS. CHRONISTER:  Nothing from us, Your Honor.

24          THE COURT:  Then may this witness be excused?

25          MR. LANE:  Yes, Your Honor.  Well, actually he's going

1    to stay on because, with the Court's permission, what counsel

2    and I have agreed to is that they are now going to go out of

3    turn, put their doctor on.  Dr. Davidson can listen to their

4    doctor and then if there's a need to fill the Court in more

5    fully, Dr. Davidson will remain on if that's acceptable with

6    the Court.

7              THE COURT:  That is certainly acceptable.

8              MS. BARNES:  I have an objection to recalling

9    Dr. Davidson after his testimony, direct, cross, redirect now.

10   That wouldn't happen in the normal course of things.  It would

11   be our defense witness going.  We have agreed to call him now,

12   so it's not keep --

13             THE COURT:  He could -- they could call him on a

14   rebuttal in a typical trial; right?

15             MS. BARNES:  If they want to reserve the right to

16   that.  Sometimes -- I don't think that that's always true, but

17   that's fine.  The whole reason we were going to call him out of

18   turn was to let these gentlemen both go afterwards.

19             THE COURT:  To what?

20             MS. BARNES:  So that both of the experts could be

21   excused.

22             THE COURT:  Well, let's go with your doctor then and

23   Dr. Davidson can -- I guess he is going to be listening.

24             MR. LANE:  Listening, Your Honor.

25             THE COURT:  Very well.  You may proceed.

1            ***** END OF PARTIAL TRANSCRIPT

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    **C E R T I F I C A T E**

5

6          I, HILDA E. LOPEZ, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 9th day of November,

15   2021.

16

17

18

                              s/Hilda E. Lopez_____
19                            HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25

# APPENDIX E

MGD

1

2    WO

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Frank Jarvis Atwood,                      No.   CV 20-00623-PHX-JAT (JZB)

10                        Plaintiff,

11   v.                                         **ORDER**

12   Panann Days, et al.,

13                        Defendants.

14

15          Plaintiff Frank Jarvis Atwood, who is currently confined by the Arizona Department

16   of Corrections (ADC) in the Arizona State Prison Complex (ASPC)-Eyman, filed this civil

17   rights action pursuant to 42 U.S.C. § 1983.[1]  Before the Court is Plaintiff's Motion for

18   Temporary Restraining Order and Preliminary Injunction regarding his medical care.

19   (Doc. 109.)  The Court held a hearing on the Motion on October 29, 2021 and permitted

20   the Parties to file amended proposed findings of fact and conclusions of law.[2]  The Court's

21   findings of fact and conclusions of law based on the Parties' briefing and the hearing are

22   set forth herein.

23   . . . .

24   _____

25          [1] Plaintiff filed the original Complaint pro se but is now represented by counsel.

26          [2] Plaintiff and Defendants Centurion and Olmstead ("Centurion Defendants") had
     filed proposed Findings of Fact and Conclusions of Law prior to the hearing.  (Docs. 147,
27   151.)  After the hearing, only Plaintiff filed amended proposed Findings of Fact and
     Conclusions of Law as well as a proposed order (Doc. 166); Centurion Defendants filed an
28   Objection to Plaintiff's Proposed Order (Doc. 171).  Defendants Days, Shinn, Scott, Lopez,
     and Arnold ("ADC Defendants") did not file any proposed Findings of Fact and
     Conclusions of Law either before or after the hearing.

## I.    Findings of Fact

Plaintiff has been incarcerated by ADC since 1987.  (Doc. 147 ¶ 1.)  Philip A. Davidson, MD, a board-certified orthopedic surgeon, has evaluated Plaintiff telephonically, reviewed Plaintiff's medical records related to his current condition, and testified at the hearing.  Based on his review of Plaintiff's January 8, 2021 MRI of the lumber and cervical spine, Dr. Davidson concluded that Plaintiff has "severe cervical spondylosis with severe radicular symptoms to include, of great importance, C5-C6 myelomalacia.  He has apparently overt radicular symptomatology as well as radiating pain, weakness, and motor dysfunction."  (Doc. 109 at 28-29 ¶ 37.)  Plaintiff's lumbar spine is his most painful condition, and "[his] neural symptomatology has contributed to the weakness that is limiting his ability to transfer and position, let alone ambulate.  In addition, the neural compression and degenerative spondylosis are highly painful, most acutely when prone or in an erect seated posture."  (*Id*. at 29 ¶ 38.)

Plaintiff's back pain began around 1990, and he has been treated over the past 30 years with oral medications.  (*Id*. at 21 ¶ 14.).  Plaintiff began using a wheelchair in 2015 and at that time he was classified an ADA (Americans with Disabilities Act) patient.  (Doc. 167 (Hearing Tr.) at 117.)  From 2011 to September 2020, Plaintiff was prescribed Tramadol, which effectively treated his pain.  (Doc. 109 at 23 ¶ 20.)  Plaintiff has tried numerous other medications, such as Cymbalta, for his pain, but they have either failed or Plaintiff had negative reactions to them.  (Doc. 167 at 61, 121.)

In September 2020, Defendant Nurse Practitioner Olmstead discontinued Plaintiff's Tramadol prescription, and from October 2020 to the present, Plaintiff has been prescribed a lidocaine patch and Tylenol, which have provided "no appreciable pain relief."  (Doc. 109 at 23 ¶ 20.)  Olmstead asserts that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects and that had or have been, at times, a part of his prescription medication regimen, and that there is no medical indication to continue this medication."  (Doc. 114-6 at 2 ¶ 4.)  According to Olmstead, "[n]arcotics are

very powerful medications that should only be used in the appropriate case and for the shortest duration needed, which is how they have been used." (*Id.*) Olmstead testified that Centurion's medical director told her it was Centurion's policy "that long-term opioids are not prescribed unless a patient has cancer pain or they are in a hospice setting." (Doc. 167 at 169.) During the hearing, the Court asked Defendants to produce the policy. (*Id.* at 208-209.) Following the hearing, Defendants notified the Court that "no formal written policy exists," and they submitted the declaration of Dr. Rodney Stewart, Centurion's Site Medical Director for ASPC-Eyman. (Doc. 165 at 1.) Dr. Stewart states that he has implemented a policy "that patients are not to be prescribed opioids, such as tramadol, for an extended or indefinite period of time unless that patient is suffering from cancer-related illness or pain, terminal illness with pain, and other serious long-term disease implicating severe pain symptoms." (Doc. 165-1 at 1 ¶ 5.)

Plaintiff has not walked since 2017 and without Tramadol suffers "incomprehensible pain every time he need[s] to transfer to bed, chair or wheelchair." (Doc. 109 at 22-23 ¶¶ 17, 19.) Plaintiff can only sleep sporadically because he cannot lie flat and must sit in his wheelchair or partially recline in bed to minimize the severity of constant pain. (*Id.* at 24 ¶ 23.) Plaintiff's pain interferes with nearly all activities of daily living. (Doc. 167 at 27-28.) Without Tramadol, Plaintiff's pain is severe at 9 or 10 out of 10, his ability to transfer to and from his wheelchair is decreased, and his sleep is even more compromised. (Doc. 109 at 27 ¶ 34.) With Tramadol, Plaintiff's pain decreases to a 5 or 6, a moderate and manageable pain level. (Doc. 167 at 112, 121.)

Plaintiff has a recent history of falling, secondary to weakness in his legs, including falls in November 2020 and March 2021 when he was not taking Tramadol. (Doc. 109 at 24 ¶ 22.) Plaintiff testified he has fallen a half dozen times since 2016, and he attributes his falls to his medical condition and not Tramadol because the falls occur when he tries to move, and he feels a twinge of pain and weakness and collapses. (Doc. 167 at 115.) Dr. Davidson testified that Plaintiff's falls are not necessarily attributable to Tramadol, and the

falls indicate to him that Plaintiff needs more assistance with transfers and needs to be in a safer environment.  (*Id*. at 49.)

In January 2021, Plaintiff suffered an extreme case of diarrhea, which was eventually diagnosed as a staph infection; the infection intensified Plaintiff's back pain and caused spasms, and he was unable to leave his bed or roll onto his side for nearly a week.  (Doc. 109 at 25 ¶¶ 25-26.)  To accept meals and medication, Plaintiff crawled or slid across his cell's urine-covered and feces-smeared floor.  (*Id*. ¶ 25.)  Plaintiff received injections of Toradol and a corticosteroid injection, which provided some pain relief for a couple of weeks.  (Doc. 109 at 21 ¶ 15.)

Plaintiff received Tramadol when he was hospitalized in April 2021 and afterwards in the infirmary, but when he was moved back to the Browning Unit in June 2021, NP Olmstead reduced the dose of Tramadol to once daily with the intention of weaning Plaintiff off Tramadol completely.  (Doc. 109 at 26 ¶¶ 28-33.)

On April 6, 2021, Olmstead submitted an urgent request for a neurosurgery consultation; Olmstead noted that she reviewed the case with Dr. Young, who asked that a consult be entered with a neurosurgeon to see if Plaintiff was a candidate for epidural injections.  (Doc. 114-1 at 5-6.)  On June 25, 2021, Plaintiff had an appointment with neurosurgeon Dr. Feiz-Erfan at Valleywise Health, but Dr. Feiz-Erfan first wanted an updated MRI and a follow-up appointment in 4 to 6 weeks.  (Doc. 114-6 at 2 ¶ 7; Doc. 114-4 at 36-39.)  On June 30, 2021, Olmstead submitted a routine consultation request for an MRI of the cervical spine and for a follow-up appointment with the neurosurgeon once the MRI is completed.  (Doc. 114-16 at 2 ¶ 7; Doc. 114-5 at 11.)  The MRI was authorized, and Plaintiff had the cervical MRI on July 16, 2021.  (Doc. 114-5 at 11.; Doc. 130-1 at 2.)

Plaintiff next saw Dr. Feiz-Erfan on July 30, 2021, and Dr. Feiz-Erfan noted that Plaintiff's chief complaint was neck and back pain, but Plaintiff was also febrile and short of breath.  (Doc. 132-1 at 15, 17.)  Dr. Feiz-Erfan diagnosed Plaintiff with "status post anterior fusion, cervical 5-6, for myelopathy done by me on 12/11/2018.  New Diagnosis is canal stenosis, lumbar 1-2; adjacent level disease, cervical spine."  (*Id*.)  Dr. Feiz-Erfan's

Plan of Care was "Epidural injection, lumbar 1-2. Physical therapy," follow up in 3 months, and to go to the nearest emergency room for acute symptoms, noting that Plaintiff "looks ashen and pale and appears sick acutely." (*Id.*) Under "Patient Instructions," the doctor wrote, "Patient to have injections and PT and follow up in 6 weeks.[3] (*Id.* at 19.) Olmstead noted in an August 2, 2021 medical record that Plaintiff was admitted to Valleywise Hospital on July 30 for urosepsis and had surgery for a new left stent placement and cystoscopy. (*Id.* at 37.) Dr. Davidson testified that in Plaintiff's case, spinal injections would provide only temporary or transient relief, and injections could diminish the need for Tramadol if repeated two to three times a year, but that it is likely they would only provide partial relief and Plaintiff may still need Tramadol in addition.[4] (Doc. 167 at 57.)

On August 2, 2021, Olmstead submitted a routine consultation request for epidural lumbar injections. (Doc. 132-1 at 37.) As of the date of the hearing, October 29, 2021, Plaintiff had not received his first epidural injection, but defense counsel asserted Plaintiff would have an injection in the next two weeks. (Doc. 167 at 199.) After seeing Dr. Feiz-Erfan, Plaintiff had four half-hour physical therapy sessions at the prison, but he testified that the physical therapy ended up causing more discomfort than any benefit. (*Id.* at 119.)

In October 2021, Plaintiff was again in the infirmary and while there, a doctor prescribed Tramadol for his pain on October 20, 2021, but Plaintiff did not receive Tramadol until the night before the October 29, 2021 hearing. (*Id.* at 109.) Plaintiff testified that a nurse told him he received Tramadol just before the hearing because "they wanted to be able to say [Plaintiff] was on the medication again." (*Id.* at 109-110.)

Dr. Davidson recommends without reservation that Plaintiff again be prescribed Tramadol given that trials of other medications have not worked and because other narcotics that might help his pain could be more addictive and habit forming. (*Id.* at 60-61.) Dr. Davidson stated a typical dose is 50 mg twice a daily, but the dose would have to

---

[3] It is not clear from the record if Dr. Feiz-Erfan was planning one epidural injection or a series of injections because he used the singular "injection" in the "Plan of Care" and plural "injections" in the "Patient Instructions."

[4] Dr. Feiz-Erfan did not testify.

be adjusted based on what Plaintiff has taken in the past and on the effectiveness of the spinal injections.  (*Id*. at 58.)  Dr. Davidson's professional opinion is that "it is imperative and humane that additional, palliative measures also be implemented on this patient's behalf immediately.  These include lumbar and cervical orthosis, along with a residency setting where immediate hands-on wheelchair transferring assistance is continually available."  (Doc. 109 at 30 ¶ 44.)  Defendants' expert, Dr. Thomas Fowlkes, is board-certified in emergency medicine and is currently the medical director at a county detention facility in Oxford, Mississippi.  (Doc. 167 at 64.)  Dr. Fowlkes reviewed Plaintiff's medical records and agreed there was no evidence Plaintiff was addicted to Tramadol, that Plaintiff was diverting or abusing Tramadol, or that his cognition suffered because of Tramadol.  (Doc. 167 at 80-85.)

## II.     Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right").  "A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The movant "has the burden of proof on each element of the test."  *See Envtl. Council of Sacramento v. Slater,* 184 F. Supp. 2d 1016, 1027 (E.D. Cal. 2000).

Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'"  *Hernandez v. Sessions,* 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879

1    (9th Cir. 2009)).  "A mandatory injunction orders a responsible party to take action," while

2    "a prohibitory injunction prohibits a party from taking action and preserves the status quo

3    pending a determination of the action on the merits."  *Marlyn Nutraceuticals*, 571 F.3d at

4    879 (internal quotation marks omitted).  "The 'status quo' refers to the legally relevant

5    relationship between the parties before the controversy arose."  *Arizona Dream Act*

6    *Coalition v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014).

7         The Prison Litigation Reform Act imposes additional requirements on prisoner

8    litigants who seek preliminary injunctive relief against prison officials and requires that

9    any injunctive relief be narrowly drawn and the least intrusive means necessary to correct

10   the harm.  18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal*., 220 F.3d 987,

11   999 (9th Cir. 2000).

12        "The urgency of obtaining a preliminary injunction necessitates a prompt

13   determination" and makes it difficult for a party to procure supporting evidence in a form

14   that would be admissible at trial.  *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th

15   Cir. 1984).  As a result, "a preliminary injunction is customarily granted on the basis of

16   procedures that are less formal and evidence that is less complete than in a trial on the

17   merits."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  In its determination on

18   a motion for a preliminary injunction, "a court may properly consider evidence that would

19   otherwise be inadmissible at trial."  *Cherokee Inc. v. Wilson Sporting Goods Co.*, No. CV

20   15-04023 BRO (Ex), 2015 WL 3930041, at *3 (C.D. Cal. June 25, 2015); *see Johnson v.*

21   *Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (district court did not abuse its discretion

22   by considering "unverified client complaints" and the plaintiff's counsel's interested

23   declaration when it granted a preliminary injunction); *Flynt Distrib. Co.*, 734 F.2d at 1394

24   (the district court has discretion to rely on hearsay statements when deciding whether to

25   issue a preliminary injunction).  A court may also consider evidence or developments that

26   postdate the pleadings.  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

27

28

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at trial on the merits. *Univ. of Tex.*, 451 U.S. at 395.

## III.   Conclusions of Law

Plaintiff seeks an order requiring Defendants to provide him (1) "the necessary pain medication to treat his constant severe pain," (2) "rehousing to a unit that has wheelchair transferring assistance available at all times," and (3) referral to an orthopedic surgeon "to evaluate Plaintiff for possible surgical intervention to treat and improve his spinal condition." (Doc. 109 at 15.)  Based on the hearing and Dr. Davidson's recommendation, it is clear Plaintiff is seeking a resumption of his previous Tramadol prescription and the epidural injection(s) recommended by Dr. Feiz-Erfan.  Because Plaintiff is not currently prescribed Tramadol and or received epidural injections as of the hearing date, he is seeking mandatory, rather than prohibitory, injunctive relief, with respect to his pain relief as well as his requests to be rehoused in a different unit with wheelchair transfer assistance available at all times and an evaluation by an orthopedic surgeon.

### A.   Pain Relief

#### 1.   Likelihood of Success on the Merits

To establish a likelihood of success on the merits of an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The prisoner must show (1) that his condition constitutes a "serious medical need" and (2) that the defendant's current response to that need is deliberately indifferent. *Jett*, 439 F.3d at 1096; *see Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (where a plaintiff seeks injunctive relief, the deliberate indifference determination is based on the defendant's current conduct).

##### a)   Serious Medical Need

Plaintiff has satisfied the objective prong of the deliberate indifference analysis.  In the Court's January 12, 2021 Order on Plaintiff's previous request for injunctive relief, the

Court found no meaningful dispute that Plaintiff suffers from severe spinal pain, a serious medical condition. (Doc. 87 at 9.) Moreover, Centurion Defendants do not dispute that Plaintiff suffers from degenerative disc disease. (Doc. 114 at 3.) Indeed, Plaintiff's condition causes him chronic and severe pain that medical personnel have found worthy of attention and treatment. *See McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997).

### b) Deliberate Indifference

With respect to the subjective prong, a plaintiff must first show that the defendant was "subjectively aware of the serious medical need[.]" *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017–18 (9th Cir. 2010) (quotation and citation omitted). A defendant's knowledge of a serious medical need or substantial risk to health "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a defendant may be found to have known of a substantial risk if the risk was obvious. *Farmer*, 511 U.S. at 842.

Here, there can be no dispute that Centurion Defendants are aware of Plaintiff's diagnosed condition and serious medical need because it is documented in his medical records showing decades of treatment for his spinal condition, including surgeries, medication trials, MRIs, and specialist appointments. Moreover, an orthopedic surgeon has recommended that Plaintiff have, at a minimum, palliative measures such as Tramadol and epidural injections, and a neurosurgeon has recommended epidural injection(s) and physical therapy.

After showing that a defendant was subjectively aware of the serious medical need, a plaintiff must show that the defendant "failed to adequately respond" to that need. *Simmons*, 609 F.3d at 1018. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted). Deliberate indifference may also be shown by the way in which

1   prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th

2   Cir. 1988), or "by a purposeful act or failure to respond to a prisoner's pain or possible

3   medical need." *Jett*, 439 F.3d at 1096.

4        In the January 12, 2021 Order denying injunctive relief, the Court noted that

5   Defendant Olmstead was taking steps to address Plaintiff's pain by means other than

6   Tramadol, including seeking authorization for MRIs of Plaintiff's lumbar and cervical

7   spine to assess whether there was further deterioration, which could support surgery or

8   epidural spinal injections, and providing lidocaine pain patches. (Doc. 87 at 10.) However,

9   at that time, the Court informed Defendants that a prolonged failure to address Plaintiff's

10  severe pain through other means may warrant consideration of a new motion for injunctive

11  relief. (*Id*. at 10-11.)

12       While Plaintiff had the lumbar and cervical spine MRIs on January 8, 2021, he did

13  not see the neurosurgeon until June 25, 2021, which Centurion Defendants assert was the

14  earliest appointment available to see the neurosurgeon. (Doc. 114 at 4 n.2.) But Olmstead

15  did not submit a consultation request for Plaintiff to see the neurosurgeon until April 6,

16  2021—three months after the MRIs were completed. There is no explanation for this three-

17  month delay in attempting to obtain authorization for the neurosurgery consult. When

18  Plaintiff saw the neurosurgeon in June 2021, the neurosurgeon wanted a new MRI, and

19  when Plaintiff returned to the neurosurgeon on July 30, 2021, the neurosurgeon

20  recommended epidural injections, physical therapy, and follow up in three months.

21  Afterwards, Defendant Olmstead only submitted a routine consultation request for epidural

22  lumbar injections, and as of the date of the hearing, October 29, 2021, Plaintiff had not had

23  an epidural injection. Plaintiff has had physical therapy sessions at the prison, but they

24  caused him more discomfort than benefit.

25       Centurion Defendants argue there is no evidence Plaintiff has been denied

26  appropriate medical care and that he simply disagrees with the medical providers who have

27  changed his pain medication from a narcotic to a non-narcotic. (Doc. 114 at 6.) They

28  assert that "alternative means to treat Plaintiff's pain, including epidural steroid injections

and/or additional surgery, are currently being evaluated by the appropriate specialists."[5] (*Id*. at 4.)

Centurion Defendants have provided no explanation why Tramadol was appropriate for ten years and is suddenly inappropriate, requiring immediate cessation, or how the minimal pain relievers Plaintiff has received outside of the hospital or infirmary have been adequate to treat his significant pain issues.  Defendant Olmstead makes the conclusory statement that "the medical decision has been made, after repeat examinations and other testing, that [Plaintiff] needs to be weaned off of narcotics, including Tramadol, due to poor tolerance/side effects . . . and that there is no medical indication to continue this medication."  (Doc. 114-6 at 2.)  Olmstead, though, does not say how Plaintiff manifested "poor tolerance/side effects" or point to any medical records showing poor tolerance/side effects to Tramadol.  Nor does she explain why, if Plaintiff had poor tolerance/side effects to Tramadol which would contraindicate its use, he has been prescribed Tramadol while in the hospital and prison infirmary.  Olmstead does say that Plaintiff "is still being prescribed some pain medication, including a topical aspercream [sic] lidocaine patch to place on his lower back for pain, due to the lower risk of drug interaction and side effects, especially with [Plaintiff's] advancing age the fact that he is a fall risk."  (Doc. 114-6 at 2 ¶ 5.)  But Olmstead does not address the history of falls Plaintiff has had since his regular Tramadol prescription was stopped in September 2020 or how Tramadol has increased the likelihood of falls by Plaintiff.  Moreover, Dr. Davidson, who reviewed Plaintiff's medical records and evaluated Plaintiff by telephone, did not attribute the falls to Tramadol use and recommends that a "prescribed moderate dose of Tramadol should be sustained," noting Tramadol's "prior effectiveness and its lack of side-effects over the span of many years." (Doc. 109 at 29 ¶ 41.)   Dr. Feiz-Erfan has recommended epidural injection(s), and, although Centurion Defendants indicated at the hearing that Plaintiff would have an

---

[5] Defendants made this argument before Plaintiff saw Dr. Feiz-Erfan for the second time on July 30, 2021.

injection around mid-November, it is unknown if Plaintiff will receive more than one injection or on a regular basis, as Dr. Davidson indicates may be necessary.

Centurion Defendants' post-hearing evidence of an unwritten policy that opiates only be prescribed for cancer patients with severe pain, terminal illness with pain, or other long-term disease implicating severe pain symptoms is unpersuasive, especially considering Plaintiff's past use of Tramadol for over ten years in the prison setting when Plaintiff was neither a cancer patient nor had a terminal illness. Specifically, the Court finds the policy unpersuasive because there was no evidence that it was based on a patient specific medical justification or a penological justification. Moreover, it appears Plaintiff's pain may fall under the unwritten policy's category of "long-term disease implicating severe pain symptoms."

Of particular concern to the Court is Centurion Defendants' delay of more than a year of treating Plaintiff's severe pain with something as effective as Tramadol. *See Hallet*, 296 F.3d at 744; *Jett*, 439 F.3d at 1096. Plaintiff's expert, who has interviewed and evaluated Plaintiff, recommended in June 2021 that Plaintiff be prescribed Tramadol on an ongoing basis, but Plaintiff has only received Tramadol when hospitalized or in the infirmary. Defendants finally sent Plaintiff to a specialist this summer, who recommended on July 30, 2021 that Plaintiff receive epidural injections and follow-up in three months, but Plaintiff had not received those injections as of October 29, 2021, and was not scheduled to receive an injection until sometime in November 2021, and there is no evidence that a follow-up appointment with Dr. Feiz-Erfan has been scheduled. The Ninth Circuit and other courts have routinely found that failure to follow a specialist's recommendation may amount to a course of treatment that is medically unacceptable. *See Colwell v. Bannister*, 763 F.3d 1060, 1069 (9th Cir. 2014) (denying summary judgment where prison officials "ignored the recommendations of treating specialists and instead relied on the opinions of non-specialist and non-treating medical officials who made decisions based on an administrative policy"); *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician and specialist recommended surgery, a reasonable

jury could conclude that it was medically unacceptable for the non-treating, non-specialist physicians to deny recommendations for surgery), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999) (the defendant physician's refusal to follow the advice of treating specialists could constitute deliberate indifference to serious medical needs); *McNearney v. Wash. Dep't of Corrs.*, C11-5930 RBL/KLS, 2012 WL 3545267, at *26 (W.D. Wash. June 15, 2012) (in granting a preliminary injunction for specialist treatment, the district court found that the prisoner plaintiff showed a likelihood of success on the merits of her Eighth Amendment claim where the defendants failed to follow an orthopedic surgeon's strong recommendation for further orthopedic evaluation). In addition, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) ("access to medical staff is meaningless unless that staff is competent and can render competent care"); *see Estelle*, 429 U.S. at 105 & n.10 (the treatment received by a prisoner can be so bad that the treatment itself manifests deliberate indifference); *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (prisoner does not have to prove that he was completely denied medical care).

Based on this record, Plaintiff has shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pain. While up until the time of the hearing Plaintiff had received minimal treatment, the evidence shows that treatment is inadequate. And, the continual delays in providing adequate alternative pain management also support that Plaintiff will succeed on the merits of this claim. A reasonable jury could find that, in these circumstances, Centurion Defendants failed to competently treat Plaintiff's serious pain needs and acted with deliberate indifference.

### 2. Irreparable Injury

In addition to showing a likelihood of success, Plaintiff must demonstrate that absent an injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th 1988) (speculative injury is not irreparable

injury sufficient for a preliminary injunction); *see Winter*, 555 U.S. at 22. To support a mandatory preliminary injunction for specific medical treatment, a plaintiff must demonstrate ongoing harm or the present threat of irreparable injury, not a past injury. *See Conn. v. Mass.*, 282 U.S. 660, 674 (1931) (an injunction is only appropriate "to prevent existing or presently threatened injuries"); *Caribbean Marine*, 844 F.2d at 674. "[T]here must be a presently existing threat of harm, although injury need not be certain to occur." *Villaneuva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct. 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). Pain can constitute irreparable harm. *See Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm includes delayed and/or complete lack of necessary treatment, and increased pain); *McNearney*, 2012 WL 3545267, at *14 (finding a likelihood of irreparable injury where the plaintiff's medical condition predated her incarceration and had not worsened, but the evidence showed that she continued to suffer unnecessary pain due to the defendants' inadequate treatment plan); *Von Collin v. Cnty. of Ventura*, 189 F.R.D. 583, 598 (C.D. Cal. 1989) ("Defendants do not argue that pain and suffering is not irreparable harm, nor could they").

Prior to his kidney issues earlier this year, Plaintiff reported to Dr. Davidson that his pain was constant at 8 out of 10, he suffers "incomprehensible pain" when he transfers to and from the wheelchair, a history of falls, that the pain is only somewhat lessened by remaining in a seated position, that he cannot lie down at all, and he only sleeps sporadically. After Plaintiff's treatment for kidney issues, his pain is now at 9 out of 10, his ability to transfer has decreased even more, and his sleep is even more compromised.

Plaintiff's ongoing severe pain and associated issues are sufficient to support a finding of irreparable harm. *See Estelle*, 429 U.S. at 103 (Eighth Amendment applies even to "less serious cases, [where] denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose"); *McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support a § 1983 action).

### 3.   Balance of Hardships

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (quotation omitted). The Ninth Circuit has held that the interest in protecting individuals from physical harm outweighs a government entity's monetary costs. *See Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 766 (9th Cir. 2004) ("faced with [ ] a conflict between financial concerns and preventable human suffering, [the court has] little difficulty concluding that the balance of hardships tips decidedly in plaintiff's favor") (quotation omitted).

Centurion Defendants argue that "restructuring the procedures and policies for one single inmate could result in security and safety breaches, inmate unrest and staffing issues, particularly where the relief sought is not necessary or is already being processed." (Doc. 114 at 9-10.) They further argue that the relief requested would trigger federalism concerns and cause the Court to needlessly interfere with the prison's operations.

The Court is unconvinced by Centurion Defendants' general argument, without any citation to any procedures or policies, that "restructuring the procedures and policies for one single inmate could result in security and safety breaches [and] inmate unrest and staffing issues." The Court is also unconvinced that granting Plaintiff pain relief would result in needless interference in the prison's operations.

As articulated above, Plaintiff is likely to suffer irreparable injury absent an injunction; thus, his injury is more than just speculative. Furthermore, Centurion Defendants have made no showing that they will face any harm if an injunction issues. The Court finds that the balance of hardships tips sharply in Plaintiff's favor.

### 4. Public Interest

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation omitted). Moreover, "the public has a strong interest in the provision of constitutionally-adequate health care to prisoners." *McNearney*, 2012 WL 3545267, at *16 (quoting *Flynn v. Doyle*, 630 F. Supp. 2d 987, 993 (E.D. Wis. 2009)); *see Farnam v. Walker*, 593 F. Supp.

2d 1000, 1017 (C.D. Ill. 2009) (holding that public had an interest in the maintenance of prisoner's health during the pendency of the lawsuit).

Centurion Defendants argue that granting injunctive relief "would not be in the public interest because it would require this Court to override the decisions of correctional authorities and medical providers, who are responsible for the safety, security, care and efficient operation of the prison, as well as for the healthcare of Plaintiff." (Doc. 114 at 10.) They further contend that "the public welfare militates against the issuance of extraordinary relief in the prison context, absent a sufficient showing of a violation of constitutional rights." (*Id.*)

Contrary to Centurion Defendants' assertions, the record supports Plaintiff's claims that he is suffering significant pain, sleeplessness, and related issues and is being denied constitutionally adequate medical care for his pain. The Court finds that it is in the public interest to prevent Plaintiff from suffering ongoing pain and other complications during the remainder of this lawsuit. Accordingly, this factor favors injunctive relief that requires Centurion Defendants to provide the epidural injection(s) recommended by Dr. Feiz-Erfan and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

### 5. Narrowly Tailored Relief

As stated, the PLRA requires any injunctive relief to be narrowly drawn and the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2). Centurion Defendants do not address this factor.

As noted, Plaintiff wants his prescription for Tramadol re-started, as recommended by Dr. Davidson, and the epidural injection(s) recommended by Dr. Feiz-Erfan. Adhering to the specialists' recommendations is the most narrowly drawn relief necessary to correct the harm identified by Plaintiff. Thus, Plaintiff's request for relief satisfies the requirements of the PLRA.

### 6. Bond Requirement

Rule 65(c) of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Despite this mandatory language, "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation omitted). The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct. *Id.*

Here, Centurion Defendants have not requested a bond or submitted any evidence regarding likely damages. Accordingly, the Court will waive the bond requirement.

Having met all requirements for injunctive relief, the Court will require Centurion Defendants to provide Plaintiff with the epidural injection(s) and to re-start Plaintiff's prescription for Tramadol, unless a specialist recommends an alternative pain medication.

### B. Housing

As to Plaintiff's request for different housing, ADC Defendants argue that this relief is wholly unrelated to the remaining claims in this lawsuit and therefore inappropriate. (Doc. 118 at 5.) In his First Amended Complaint, Plaintiff alleged that on July 12, 2019, Defendant Days moved Plaintiff from the death-row wheelchair pod to the death-row security threat group pod and housed Plaintiff in a cell without handicap bars, causing Plaintiff to fall repeatedly while transferring to and from his wheelchair to his bunk and toilet. (Doc. 36 at 5, 14.) ADC Defendants point out that the prison has now installed grab bars in Plaintiff's cell and the specific areas of the prison he requested. (Doc. 118 at 5, citing Doc. 61; *see also* Doc. 37 at 28 (denying as moot Plaintiff's request for grab bars in his cell and shower).) Plaintiff does not address ADC Defendants' argument that his request for a transfer to a different unit is unrelated to his existing claims or requested relief.

"[T]here must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation*

*Oncology, LLC v. Queen's Med. Center*, 810 F.3d 631, 636 (9th Cir. 2015); *see Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (affirming denial of a preliminary injunction request based on alleged retaliatory conduct unrelated to the basis of a prisoner's § 1983 claim). Plaintiff's requested relief for a transfer is unrelated to his claim about the lack of handicap bars in his cell and certain areas of the prison, which have been resolved, and there is no existing claim regarding 24-hour transfer assistance or that Plaintiff has requested and been denied such assistance. Accordingly, the Court will deny this request for relief.

### C.   Surgical Evaluation

Plaintiff filed his Motion on June 22, 2021, seeking "an immediate evaluation by an orthopedic specialist to determine available surgical options that could treat and improve his condition." (Doc. 109 at 2.) Plaintiff's expert, Dr. Davidson, recommended an evaluation by either an orthopedic spine surgeon or neurosurgeon to determine his surgical options. In his Reply, Plaintiff states that he "asked this Court to order an evaluation with a neurosurgeon, and although he "was evaluated by such a specialist in late June, nothing has yet come of that evaluation and consult." (Doc. 125 at 5 n.2.) After he filed his Reply on July 19, 2021, Plaintiff saw Dr. Feiz-Erfan a second time—on July 30, 2021—and Dr. Feiz-Erfan recommended epidural injection(s) to relieve Plaintiff's pain. Dr. Feiz-Erfan did not include any recommendations or comments regarding surgical options in his report.

Because Plaintiff has now been evaluated by a neurosurgeon, and the Court has already ordered compliance with Dr. Feiz-Efran's recommendations for epidural injection(s), this request for injunctive relief is moot.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109).

(2)     Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 109) is **granted in part** as follows:

(a)     Within **ten (10) days** of the date of this Order, Centurion Defendants must re-start Plaintiff's prior prescription for Tramadol, unless a <u>specialist</u> has recommended an equally effective alternative pain medication.

(b)     Within **ten (10) days** of the date of this Order, Centurion Defendants must schedule the epidural injection(s) recommended by Dr. Feiz-Erfan unless the injection(s) have already occurred.

(c)     Centurion Defendants must file a Notice with the Court within 20 days of the date of this Order, that Plaintiff has been re-started on Tramadol, or on an equally effective alternative pain medication recommended by a specialist, has received at least one epidural injection, and when any future injections are scheduled.[6]

(d)     This relief is narrowly drawn, extends no further than necessary to correct the harm, and is the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2).

(e)     Plaintiff is not required to post bond.

(3)     The Motion is otherwise **denied**.

Dated this 7th day of December, 2021.

James A. Teilborg
Senior United States District Judge

---

[6] The Court recognizes that for security reasons, it may not be appropriate for Defendants to divulge the exact dates and times of the scheduled appointments for injections. But Defendants' Notice must include the week(s) in which the injection(s) are scheduled. Defendants may redact the day—but not the month or year—of the appointments or may seek to file the dates under seal for ex parte review.