Exhibit 29

**DECLARATION OF AMANDA C. BASS**

I, Amanda C. Bass, declare under penalty of perjury the following to be true and correct to the best of my information and belief:

1. I am employed as an Assistant Federal Public Defender by the Office of the Federal Public Defender for the District of Arizona ("FPD"). I have worked as an attorney specializing in capital habeas litigation in the FPD's Capital Habeas Unit for approximately six years. Since 2019, I have served as lead counsel for Clarence Dixon in his federal habeas case.

2. On May 18, 2022, I signed a declaration recounting what I witnessed during Clarence's execution on May 11, 2022. I am providing this supplemental declaration to further describe what I could and could not see throughout the execution either from the television monitors positioned directly above the window that separated the execution chamber from the viewing room, or through the viewing room window itself.

3. While Clarence's entire body was visible on the television monitors, the overhead camera positioned directly above him was so far away that I could not see details of the medical staff members' attempts to place an IV in his left arm at a given site (e.g., his upper versus lower arm), or of their subsequent placement of IVs in his right arm and femoral vein. For example, while I could see on the television monitors that, at 9:36 a.m., a medical staff member attempted to place an IV into Clarence's left upper arm, I could not see how many times a needle may have been inserted at that site in an attempt to set the IV because the image of Clarence displayed from the overhead camera was too far away. Nor, from where I was seated, could I see details of the medical staff members' attempts to set the IVs in Clarence's arm through the viewing room window.

4. When, at 9:46 a.m., Clarence grimaced and groaned in apparent pain and it appeared that the medical staff members had successfully set an IV in Clarence's upper right arm, I could not see either from the television monitors or through the viewing room window how many attempts may have been made to set this IV before it was ultimately successful. At various times throughout the execution, the medical staff members stood between Clarence and the witnesses obstructing our view of what was occurring.

5. I could not see details of medical staff members' attempts to set an IV in Clarence's right femoral vein either from the television monitors or through the viewing room window. Right before the femoral vein IV procedure began, the medical staff left the execution room and returned with a tray that appeared to contain a blue medical

1

Initials _AG_

blanket and various metal instruments. Medical staff members stood between Clarence and the witnesses throughout the entire time the femoral vein was accessed obstructing our view through the window. From the television monitors, I could see a medical staff member inject a clear liquid into Clarence's right upper leg, but I could not tell whether Clarence was injected more than once. Through the viewing room window, I saw a medical staff member pick up a metal instrument from the tray that looked like a scalpel and, from the monitors, it appeared the medical staff member began to cut into Clarence's right upper leg. I could not see any details of how many times Clarence was cut and only saw a pool of blood that a medical staff member wiped.

6.    When, at 10:08 a.m., it appeared from the television monitors that a medical staff member was sticking a line into Clarence's right femoral vein, I could not see any details of that procedure. For example, I could not tell how many times insertion of the IV catheter into his femoral vein was attempted before it was ultimately set, nor did it appear that the medical staff members used anything other than their naked eye to set the femoral line.

Signed this 27th day of ____May____, 2022.

____Amanda C. Bass____                         ____Amanda C. Bass____
Name                                                             Signature

____Phoenix, Arizona____
City, State

2

Initials _ACB_

Exhibit 30

Pursuant to 28 U.S.C. § 1746(2)

SUPPLEMENTAL DECLARATION OF JOEL B. ZIVOT, M.D., FRCP(C), MA

I, Joel B. Zivot, declare:

1.     In view of the conduct of the Arizona Department of Corrections' execution team in obtaining intravenous (IV) access for Mr. Clarence Dixon on May 11, counsel for Mr. Atwood have asked me to review the Department's lethal injection procedures and to evaluate the process, procedures, and personnel described in the lethal injection protocol in the current Department Order 710 – Execution Procedures with reference to the first-hand observation of Mr. Dixon's execution reflected in the May 18, 2022 declaration of Ms. Amanda C. Bass, Esq. and her supplemental declaration on May 27, 2022.

2.     I have been asked to opine regarding application of this protocol to Mr. Frank Atwood, especially given his spinal problems, which I discussed in a previous declaration. In this declaration, I address his resulting inability to straighten his hips and lie supine without extreme pain and his great difficulty in turning his head to the side. These positional concerns dictate whether a central femoral line would be viable.

3.     It is reported that the 2014 execution of Joseph Wood required 15 injections and took almost 2 hours. Given the enormous quantity of lethal doses of the drugs used for Mr. Wood, it is likely that the IV catheters were not properly situated within the lumens of his veins. That improper placement may have been the leading factor explaining why the execution was botched. A couple of months before Mr. Wood's death in July 2014, Oklahoma botched the execution of Clayton Lockett from a failed IV insertion in his femoral vein, causing a saturation of the paralyzing execution drug into his tissue rather than an injection into his veins, resulting in slow and painful asphyxiation over a 40-minute time period that ultimately caused death via a heart attack. Lockett's death by this asphyxiating execution was without doubt an event of extreme suffering and indignity.

4.     Nearly eight years after Messrs. Locket and Wood's deaths, the Department executed Mr. Dixon earlier this month. The declarations of Ms. Bass provide a detailed timeline of the IV access procedure that Mr. Dixon was subjected to.

5.     With shaking hands, the IV team member made two failed attempts at IV access in Mr. Dixon's arms and then connected a third IV to the IV tubing. It is not known whether this third IV was properly situated in a vein, or whether, as has occurred in other states (California, Florida), the IV catheter was merely rammed via sharp needle penetration into the tissue surrounding the vein. By abandoning this third, possibly successful attempt, the IV team either lacked the knowledge to know if the IV was properly placed or simply chose to escalate the pain of obtaining IV access via the femoral vein, located within the delicate and tender tissues of the groin.

6.     During this process, it appears that a corrections officer was holding Mr. Dixon's leg down, a maneuver that would be used to keep Mr. Dixon from flexing his hip and thereby rendering femoral access unachievable.

7.     The execution procedure in Arizona is supposed to be visible and transparent to witnesses. The video camera used in the procedure was poorly positioned, judging from Ms. Bass's first-

hand account, and did not provide the requisite close-up view for observing the femoral access site in ascertaining the quality of the execution team's method to obtain such access.

8.    The failure to persist with peripheral access, and, after such minimal effort, the decision to resort to femoral access, strongly suggests IV team incompetence. Further, the failure to use an ultrasound device, especially given that the Execution Procedures specify one must be present to guide catheter placement, was a total departure from the standard of practice. An ultrasound device is called for with femoral vein access because it can directly visualize the femoral vein. Absent ultrasound guidance, the vein is sought through a succession of so called "blind" stabs with the needle in the hope of eventually locating the vein. This "blind" technique greatly increases the risk of severe injury and makes the procedure slower and more painful.

9.    In hospitals, use of an ultrasound device to directly visualize the vascular anatomy during central venous access is the standard practice and considered mandatory.  Even during the State of Alabama's attempted (but botched and aborted) execution of Doyle Hamm in February 2018, an ultrasound machine was available and used as part of the femoral access procedure. I am also aware that ultrasound devices are available for possible femoral access in executions in other states.

10.   From the accounting of Ms. Bass, it is unclear if the femoral vein was ultimately cannulated by a "Cut-down" procedure. If this was in fact attempted, it would be an extraordinary departure from standard practice and require a level of expertise most certainly beyond anyone on the IV team. A cut down is surgical procedure a requires a surgeon to do it. To resort to this technique, or worse, begin with this technique, would represent a shocking lack of skill and extremely poor judgment on the part of the IV team. Blood was observed during the femoral vein cannulation. It is possible that the presence of blood indicates a cut down attempt.

11.   In order to determine the patency of access sites, it is necessary to visualize the IV as it enters the skin. A transparent covering is available and can be applied to the skin and IV. Mr. Dixon's execution team further departed from this necessary standard by covering intravenous access sites with gauze wrapping, preventing assessment of the integrity of the IV sites during injection of the drugs.

12.   Mr. Dixon began to cough during the placement of the femoral line and continued to cough after it was inserted. The sudden presence of coughing at this moment raises the very serious possibility that the IV team injected or allowed air to enter the catheter. Injected or entrained air would be carried by the venous system to the lungs, where the tiny vessels in the lungs would capture it. This so called "air-embolism" occurs when air enters the bloodstream during IV access. This can be fatal. That the IV team caused an air-embolism represents extreme and dangerous incompetence on the part of the IV access team

13.   While important details concerning the establishment of the central femoral IV were unobservable and are not yet known, it is clear that at least one of the IVs was working and properly placed in the lumen of a vein, because the lethal injection procedure did result in his death. It is equally apparent that the IV Team's conduct was far below the standard of practice and dangerous to the point of recklessness.

14.   Given the reporting in the media and through Ms. Bass's direct observations, it is apparent that a failure in establishing a working line was an entirely plausible outcome. This shoddy performance is deeply concerning given that the immediately prior execution (Joseph Wood), was disastrous, due in part to IV failure.

15.   Even if the next scheduled execution proceeded under optimal circumstances, including the circumstances of the prisoner's physical condition and ability to be positioned supine (lying flat on their back) without experiencing extreme pain, the Department has been shown to be incompetent and such incompetence is deeply problematic. I hold the highest level of concern about the qualifications, experience, and intentions of the Department's IV Team members.

16.   The switch to central IV access from peripheral access after only two failed attempts is a substantial and highly unusual departure from normal clinical practice. Femoral venous access carries numerous risks, including laceration of the femoral artery (and severe bleeding and exsanguination therefrom), painful injury to the femoral nerve (which is close to the femoral vein and artery), injury to the bladder, the urethra, and the colon.

17.   For instance, in the aborted execution of Mr. Hamm in February 2018 (*supra*), his femoral artery and bladder were both injured by the long, large-bore needle that was likely used to attempt femoral access.

18.   Thus, if the Department intends to maintain the option of central IV access for the execution of Mr. Atwood, it needs to possess on-site the equipment necessary for diagnosing and immediately treating the well-recognized and common complications of accessing central veins.

19.   I understand that the Department has not provided information regarding the training, credentialing, licensure, or current proficiency of the personnel charged with obtaining IV access on Mr. Atwood.

20.   Such information has been provided by numerous departments of correction in numerous other states, thus allowing for evaluation of whether the personnel are suitable for accomplishing the task in an acceptable manner.

21.   The placement of central intravenous catheters is rife with risks and complications and should never be undertaken by staff who lack demonstrated experience, proficiency, and licensing for this activity. As a point of clarification, I am unaware of an available license that would be granted for the purpose of placing intravenous access for the purposes of execution. No hospital or health care facility in the US or other industrialized country would grant such privileges nor would they allow an uncredentialed staff member to attempt central IV access in a therapeutic setting.

22.   Accessing the femoral vein requires that the individual be in a supine position with the hips extended (i.e., parallel to the spine). As I have explained in my previous declaration, Mr. Atwood is unable to assume this position because of extreme pain caused by his severe spinal disease. To avoid pain, he must keep his hips flexed. Extending his hips causes tension and stretching of the nerves that supply his lower back and lower extremities, and this stimulates and activates them at the places where the discs and bones of the diseased and narrowed holes in his spine impinge on them.

23.   Placing Mr. Atwood in the supine position with his hips extended would require physical force, much more than appears to have been needed for Mr. Dixon during the placement of the femoral IV in him. If Mr. Atwood could not be placed in a supine position with his hips flexed, femoral IV access would be highly dangerous and likely impossible, as the curved path of the femoral vein would be crimped and therefore prevent entry by a needle or catheter.

24.  Because the Department's Execution Procedures' lethal injection protocol contemplates and permits the use of femoral access, without any exception for prisoners who are unable to extend their hips and adopt a supine position, the use of these procedures will certainly inflict extreme pain on Mr. Atwood for an extensive period.

25.  In addition to femoral access, there are two other sites that can be used to obtain central intravenous access for someone for whom peripheral access is challenging or, like Mr. Atwood, impossible without inflicting extraordinary pain. These sites are the subclavian vein (under the collarbone) and the internal jugular vein (in the neck). Access to these veins also requires the use of ultrasound equipment to comply with basic standards.

26.  Subclavian and internal jugular vein access, like femoral vein access, are associated with numerous severe complications, including arterial laceration and severe bleeding, hematoma (a collection of blood) that compresses the trachea (airway) and causes agonizing suffocation, stroke, and tension pneumothorax (air collecting outside the lung but inside the chest, causing agonizing asphyxiation). Like femoral access, subclavian and internal jugular venous access should only be attempted by the most experienced and proficient practitioners. Further, with respect to either alternative central line method, Mr. Atwood would need to be positioned for the insertion in a head down, feet up position, which, at a minimum presents further considerations for the execution preparation.

27.  Obviously, in light of what was observed in Mr. Dixon's execution, the IV Team cannot be expected to be competent to establish access through either such alternative.

28.  The ADCRR should not contemplate central venous access in either the subclavian or internal jugular sites without first demonstrating that their personnel are suitable and capable experts and that the Department is equipped to diagnose and treat the well-known complications of these procedures.

29.  If femoral access is attempted on Mr. Atwood and, as can be anticipated to happen given what was observed with Mr. Dixon and prior Arizona executions, such as that of Mr. Charles Towery in 2012, results in a catheter placement that is in the tissue surrounding the vein (rather than properly situated in the lumen of the vein), any injected pentobarbital would infiltrate into the surrounding tissue causing an intense and caustic tissue burn. In this scenario, it is likely that the execution would be unsuccessful and only cause a severely painful complication.

I declare under penalty of perjury that the foregoing is true and correct.

Dated May 27, 2022

_____
Joel B. Zivot, M.D.

Exhibit 31

FILED

2018 Mar-05 PM 12:10
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DOYLE LEE HAMM, | ) | Civil Action No. |
| | ) | 2:17-cv-02083-KOB |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| JEFFERSON S. DUNN, Commissioner, | ) | |
| Alabama Department of Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## NOTICE OF SUBMISSION OF EXPERT REPORT
## OF DR. MARK HEATH RE. EXAMINATION OF
## PETITIONER DOYLE HAMM ON FEBRUARY 25, 2018

---

Bernard E. Harcourt
Bar Number: ASB-4316-A31B
Attorney for Doyle Lee Hamm
Columbia Law School
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946

Dated: March 5, 2018

**NOTICE OF SUBMISSION OF EXPERT REPORT
OF DR. MARK HEATH RE. EXAMINATION OF
PETITIONER DOYLE HAMM ON FEBRUARY 25, 2018**

Pursuant to the Order of the Court issued on February 23, 2018 (Doc. 78), modified orally during the conference on February 23, 2018, counsel for Plaintiff Doyle Lee Hamm hereby respectfully submits, as Appendix A, the preliminary report of Dr. Mark Heath regarding his physical examination of Doyle Hamm conducted on Sunday, February 25, 2018, at Holman Correctional Facility.

Should the Court need further information, Dr. Mark Heath is ready and willing to provide such information through a supplemental report and/or personal appearance before the Court.

Respectfully submitted,

Bernard E. Harcourt
Bar Number: ASB-4316-A31B
Attorney for Plaintiff Doyle Hamm
Columbia Law School
435 West 116th Street
New York, New York 10027
Telephone: (212) 854-1997
Fax: (212) 854-7946
Email: beh2139@columbia.edu


Dated: March 5, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2018, I served a copy of the attached pleading by electronic mail to opposing counsel, Assistant Attorneys General Thomas Govan and Beth Jackson Hughes at tgovan@ago.state.al.us and bhughes@ago.state.al.us, as well as to the Docket Clerk of the Capital Litigation Division of the Office of the Alabama Attorney General, Courtney Cramer at ccramer@ago.state.al.us.


_Bern E. Harcourt_

BERNARD E. HARCOURT
*Counsel of Record*

# Appendix A

Preliminary report of Doyle Hamm examination
March 5, 2018
<u>Mark. J. S. Heath, M.D.</u>

My name is Mark J. S. Heath.  I am a medical doctor with an active, licensed, full-time medical practice in New York State.  I am board certified in anesthesiology. I practice daily at the New York-Presbyterian/Columbia Hospital in New York City, where I provide anesthesia for open-heart surgeries.

I examined Doyle Hamm on Sunday morning, February 25th, 2018, in a conference room adjacent to the Warden's office in Holman Correctional Facility.

Mr. Hamm was unshackled and seated in a chair.  Some parts of the exam were conducted with him lying on a sheet on the conference table as no examining table was available.

Mr. Hamm was cooperative.  I explained that the main purpose of the examination was to assess the extent of any injuries caused by the attempted execution on the night of February 22nd.  I explained that the examination was voluntary, that he could end it at any time, and that he could decline any part of it at any time.  He understood and consented to the examination.  I explained that the results of the examination could, and likely would, be used in litigation that could, and likely would, be public.  He understood and consented.  I requested permission to create a photographic and video record of the exam, he consented to this also.

Also present in the room were Mr. Hamm's counsel Bernard Harcourt, his law associates Phoebe Wolfe and Nicola Cohen, and an officer from the ADOC.  The Warden opened the door several times to check if anything was needed.

<u>History</u>:

Obtaining the history related to the execution attempt was interleaved with the conduct of the examination.  Mr. Hamm stated that:

His standing dose of Norco had been switched to Tylenol No.3 when he arrived at Holman.  On the day of the execution he was given T#3 at 2:30 AM and 10:00 AM, but the routine 6:00 PM dose was withheld.  He stated that the T#3 was less effective at controlling his pain than the Norco.

He was taken from the holding cell to the execution chamber and strapped to the gurney.  His arms were extended straight out on each side. There were approximately nine other people in the room, none of them were wearing surgical masks or hair covers.  The room was brightly lit and there were multiple bright lights in the ceiling above the gurney.

1

Two men attempted IV access on his lower extremities, working simultaneously, one on each side.  The men were wearing hospital scrubs and gloves, but no surgical masks or hair covers. Tourniquets were applied below the knees. They first attempted access in his ankles, then moved up to his calves.  Mr. Hamm stated that each attempt involved one skin penetration but then multiple probing advances and withdrawals of the needle.  The continued probing was painful.  One of the probing needle advances was extremely painful and he felt that the "shin bone" in his right calf was reached by a needle.  He estimates that the probing in his right calf persisted for about 10 minutes and states that he could feel them "rolling and mashing" the tissue in his leg.  Overall he estimates that the two men spent about 30 minutes attempting IV access in his lower extremities.  At no point did Mr. Hamm see them attach IV lines or hear them discussing attaching IV lines to test whether a catheter had been successfully inserted.

After approximately five attempts in his lower extremities the execution team members stated that they could not gain access.  A few minutes later a man in a suit entered the room, accompanied by a woman with an ultrasound device. Mr. Hamm is of the understanding that the man is a doctor. The doctor was wearing a suit but no tie, he put on gloves but did not wear a gown or surgical mask or hair cover.  He did not remove the suit jacket. The ultrasound device was plugged in, Mr. Hamm could not see the screen.   EKG stickers were placed and leads attached.

The man stood by Mr. Hamm's right groin, the woman stood by his left groin and reached over his pelvis to place and hold the ultrasound probe on his right groin.  He could hear the machine making a swishing noise. The man washed the right groin with cold liquid, a drape was placed, and the woman began applying the probe to the right groin.  Cold jelly was used between the probe and Mr. Hamm's skin.  They were saying "artery" and "vein" while manipulating the probe and they marked his groin with a marker.

The doctor advanced a needle into Mr. Hamm's groin.  Mr. Hamm felt multiple needle insertions, and with each insertion he felt multiple probing advance-withdrawal movements.  It is not clear whether local anesthetic was administered.  Mr. Hamm felt the needle penetrating deep into his groin and pelvis.  Mr. Hamm stated that this probing was extremely painful.  Twice during needle advancement he experienced sudden sharp deep retropubic pain.  The doctor requested a new needle several times. During this time Mr. Hamm began to hope that the doctor would succeed in obtaining IV access so that Mr. Hamm could "get it over with" because he preferred to die rather than to continue to experience the ongoing severe pain.  He was shivering and trembling from a combination of fear and the fact that the room was very cold.  He states that the room was the coldest room he had ever experienced in either Donaldson or Holman prison.

At one point a large amount of blood began to accumulate in the region of Mr. Hamm's groin.  The blood soaked a pad or drape, and another one was applied.  A man who had been watching from the foot of the gurney and talking on a cellphone

2

began frowning.  This man left the room several times, each time returning after a few minutes.  The final time this man entered the room he stated that the execution was over.  The doctor stated that he wanted to keep attempting central access, and the man re-stated that the execution was over.  The doctor applied a bandage to the groin but did not apply pressure or direct anybody to apply pressure.  The doctor then moved to Mr. Hamm's feet and began examining them and palpating them, stating that he had not had an opportunity to attempt access in the feet.  The man then told the doctor to "get out".  The doctor and the woman who had been performing the ultrasound guidance were escorted from the room.  The doctor did not apply pressure to the groin or provide wound care instructions before leaving the room.

Mr. Hamm was unstrapped and lifted off the gurney by several correctional officers.  He was not able to support his own weight and almost collapsed, but was held off the floor by the officers.  He was escorted back to the holding cell with officers supporting him by his arms because he was in too much pain to walk and support himself.  At some point he was taken to the infirmary where a body chart was completed and band aids were applied to his legs.

Approximately one hour after he returned to the holding cell Mr. Hamm urinated and had gross hematuria.  He described the urine as being bright red.  He did not notice any clots.  He has never previously noticed gross hematuria, including on the day prior to the execution.  He had not ingested any food or liquid that was red colored, including beets.  He had declined a "final meal" that evening, and had only eaten potato chips earlier that day.  Over the following day, the next time he voided the urine was brown-yellow, the next time it was pale brown-yellow, and the next time (and subsequently) it was a normal yellow color.

Also approximately one hour after the execution Mr. Hamm developed a persistent irritating cough.  The cough was in response to an irritation he felt in his upper chest, not in his throat.  He could occasionally produce a small amount of white-yellow sputum.  He denies any hemoptysis, fever, or chills.  He did not experience any chest pain or shortness of breath during the execution.

Mr. Hamm's recollection was good, although I was mindful that he was recounting a long, complex, and stressful sequence of events he experienced.

I spoke with Mr. Hamm three times by phone after the examination.  He has developed a "knot" in his right axilla that he describes as being the size of a grape and a golf ball.  The mass is tender and he experiences a "stretching pain" in his upper right arm when he raises it.  On 3/2/2018 he was seen in the prison clinic and told that he had infected lymph nodes in his right groin and right axilla.  An oral antibiotic was prescribed.

Focused physical examination:

Oral temperature: 98.1
HR: 65 seated
BP: 121/77 (left arm, seated)
O2 saturation: ~95-98% (4 extremities)

Comfortable while seated but evincing pain when changing positions or climbing on/off the table.  Spontaneous coughing multiple times during the exam. Walking slowly, stiffly, and with an asymmetric gait from pain.

Lower extremity puncture wounds (photo 1):
2 Left medial malleolus (photo 2)
2 Right leg, medial aspect, upper calf (photo 3)
1 Right medial malleolus (photo 4)

Right inguinal puncture wounds (photo 5):
There is a large tender hematoma/ecchymosis in the right inguinal region, with diffuse subcutaneous discoloration bordering the margins.  The upper thigh and lower abdomen are tender.
There are approximately 6 puncture wounds approximately 2 cm inferior to the inguinal ligament.  There is partial overlap of some of the puncture wounds making it difficult to determine precisely the number of separate needle penetration events.  The femoral artery is pulsatile, with no appreciable enlargement.

Total of 11 lower extremities and right inguinal puncture wounds (photo 6)

Mental status:  he states that he is stressed and is experiencing intrusive flashbacks to the execution.  He is also experiencing nightmares.  His sleep has been very poor, and is also disturbed by coughing.  The flashbacks occur when he is alone, and involve imaging himself strapped to the gurney.  He can feel his heart racing during the flashbacks.  He is appreciative of the support of other death row prisoners who are asking what they can do to help him recover.


Assessment:

1 – large right inguinal hematoma from multiple failed femoral vein access attempts.  This is typical of post-arterial puncture hemorrhage, but could possibly be caused by an unusually large leak from the femoral vein.  The sudden bleeding that occurred during the procedure is more consistent with arterial puncture.

2 – gross hematuria is from penetration of a ureter, the bladder, the prostate gland, or the urethra.  Bladder penetration is a rare but reported complication of femoral cannulation.  The extent of the lower abdominal pain may be related to bladder or other visceral injury.

3 – new onset cough, etiology unclear.

4 – new onset tender axillary and inguinal adenopathy, attributed to infection.  It is possible that the cough and adenopathy are caused by bacterial dissemination during or after the failed femoral cannulation.  Bacteria may have been introduced into the circulatory system from the skin, from urogenital penetration, or from colon perforation.

5 – at risk for PTSD.

Note: when I spoke with Mr. Harcourt shortly after the execution I asked him to ask the staff to preserve and provide the execution log and any notes taken during the procedure, the needle and sharps disposal containers, and the used catheters and central line kits.  I also asked to view the sheets, padding, and clothes worn by Mr. Hamm to help gauge the amount of blood loss.  The Warden said that all preserved items had been taken to another location and were not available.

This report represents my preliminary findings resulting from my examination of Mr. Hamm on February 25, 2018. I reserve the right to amend this report in light of any additional information.


_____
Mark J. S. Heath, M.D.
March 5, 2018



Photo 1: Lower extremity puncture wounds



Photo 2: Left medial malleolus puncture wounds



Photo 3: Right leg, medial aspect, upper calf puncture wounds



Photo 4: Right medial malleolus puncture wound



Photo 5: Right inguinal puncture wounds



Photo 6: lower extremities and right inguinal puncture wounds

Exhibit 32

**PHILLIPS BLACK, Inc.**

a nonprofit, public interest law practice

Joseph J. Perkovich                j.perkovich@phillipsblack.org        **Principal Attorneys:**
PO Box 4544                        212 400 1660 (tel)                   Jennifer Merrigan[†]
New York, New York 10163           973 221 9509 (fax)                   John R. Mills[‡]
                                                                        Joseph J. Perkovich[§]
                                                                        Jessica Sutton[^]

May 14, 2022

VIA E-MAIL (bkeogh@azadc.gov; Jeffrey.Sparks@azag.gov)
Brad Keogh                             Jeffrey L. Sparks
Arizona Dep't of Corrections,          Office of the Attorney General
    Rehabilitation and Reentry    Capital Litigation Section
1601 W. Jefferson                      2005 N. Central Avenue
Phoenix, AZ 85008                      Phoenix, AZ 85004

Re: Frank J. Atwood, June 8, 2022, execution date

Messrs. Keogh and Sparks:

I write regarding Mr. Atwood's impending execution date of June 8, 2022, and his Arizona constitutional and statutory option to choose lethal gas as its method, as noted in the warrant issued on May 3, 2022. The Department's Execution Procedures,[1] which specify cyanide gas, violate Mr. Atwood's right to a choice of method.

Article 22, section 22 of the Arizona Constitution guarantees Mr. Atwood the right to choose between lethal gas and lethal injection as his method of execution. Arizona Revised Statutes § 13-757(B) implements that right and contemplates a choice of lethal gas by twenty days before the execution date, which, for Mr. Atwood's warrant, falls on May 19, 2022. However, the Department's designation of sodium cyanide with a sulfuric acid and water mixture, to make hydrogen cyanide,[2] renders this statutory method unconstitutional. To be clear, locking a human being in a chamber and flooding it with gas to extinguish his life should be a barbarism banished to history, not a current mode of correctional administration. Nonetheless, numerous other gases instead of cyanide may be used to conduct a constitutional execution under Arizona law. After the issuance of his execution warrant, Mr. Atwood proposed such an alternative, nitrogen, to the Department through its administrative grievance procedure as called for under the Prison Litigation Reform Act of 1995.[3] The Department refused to process his grievance. Thus, this letter demands that the Department immediately implement a nitrogen lethal gas method.

Mr. Atwood, who is physically disabled, possesses a dire individual need for a lawful gas method due to spinal disease, worsened from years of medical neglect while in the Department's custody. Application of the Department's lethal injection procedures, which require the condemned's full restraint to the execution table, would inflict on Mr. Atwood the maximum level of pain the human

---

[1] *Infra* n.6.
[2] *Infra* n.6 (Attachment E).
[3] Pub. L. 104-134.

[†] Admitted in Missouri and Pennsylvania
[‡] Admitted in Arizona, California, and North Carolina
[§] Admitted in New York
[^] Admitted in Massachusetts and Missouri

Brad Keogh & Jeffrey Sparks                                                            2
May 14, 2022

brain can process.[4] Based on past execution logs, this would likely transpire for upwards of an hour *before* the actual administration of the Department's execution chemicals, a compounded injectable solution of unestablished adequacy and provenance that, itself, could cause extreme pain and fail in manifold ways, including by reducing Mr. Atwood to a vegetative state or by taking his life only after a prolonged, torturous process.

As you know, Arizona's constitution and statute fail to designate a kind of gas for its lethal gas method,[5] and historically that determination has fallen to the Department. As noted, the current manual specifies the use of sodium cyanide with a sulfuric acid and water mixture, which produces hydrogen cyanide.[6] The Execution Procedures can actually include gas method specifications because Arizona is the only United States jurisdiction with a purportedly operational gas chamber, a vessel manufactured and procured in 1949.[7] Notwithstanding the Department's possession of an operational chamber and the explicit persistence of this execution method under the state's constitution and statute, the Department's ten immediately prior manuals, dating back to 2010, make no mention of any procedure for a lethal gas execution, let alone designate the kind of gas for one.[8] I have not seen any manual issued between the date of the Department's last cyanide execution, Mar. 3, 1999,[9] and Dec. 16, 2010,[10] thus I am unaware whether the Department's procedures had thereafter ceased contemplating the gas method.[11]

Twenty-five years before the delivery of the Department's gas chamber, Nevada was the first state to use cyanide, executing Mr. Gee Jon on February 8, 1924, after its supreme court upheld the statute ushering in the lethal gas method nationally.[12] Initially, Nevada envisioned administering the poison into the condemned's "cell at night to execute him in his sleep," but "because half the

---

[4] *See Atwood v. Days, et al.*, 2:20-cv-623-JAT-JZB, Doc. 173 at 2 (D. Ariz. Dec. 7, 2021)

[5] Ariz. Const. art. XXII, § 22; A.R.S. § 13-757(B).

[6] Department Order 710 – Execution Procedures, effective Jun. 13, 2021, last revised Apr. 20, 2022; Attachment E, Lethal Gas.

[7] Just three other states contemplate a "lethal gas" choice. Cal. Penal Code § 3604 (lethal injection is administered, unless prisoner chooses lethal gas); Mo. Ann. Stat. § 546.720 (statute contemplates injection and gas and is ambiguous as to selection; Missouri has not used lethal gas in modern period); Wyo. Stat. Ann. § 7-13-904 (designates lethal gas only in the event lethal injection is deemed unconstitutional). In the past seven years, three states have legislated a nitrogen hypoxia option. On April 17, 2015, the Oklahoma Legislature first amended its methods statute to authorize nitrogen hypoxia in the event lethal injection is held unconstitutional or deemed "otherwise unavailable." Okla. Stat. Ann. Tit. 22 § 1014. On March 22, 2018, Alabama adopted a prisoner choice of nitrogen hypoxia or electrocution in conjunction with the default method of lethal injection. Ala. Code § 15-18-82.1.b. On April 14, 2022, the Mississippi Legislature amended its statute, effective July 1, 2022, to permit a nitrogen hypoxia execution even when lethal injection is available. 2022 Miss. Laws H.B. 1479, amending Miss. Code Ann. § 99–19–51.

[8] These ten manuals have the following effective dates: Dec. 17, 2010; Sep. 5, 2011; Jan. 25, 2012; Mar. 26, 2014; Sep. 30, 2015; Apr. 29, 2016; Jan. 11, 2017; Jun. 7, 2017; Jun. 13, 2017; and Nov. 20, 2019.

[9] *Infra* n.20.

[10] *Supra* n.8.

[11] Public records reflect the Department's purchase in late 2020 of substantial amounts of potassium cyanide, a different kind of cyanide from what the Department now specifies (*viz.*, sodium cyanide). While it is not apparent the Department is capable of carrying out its own cyanide gas plan, Mr. Atwood's present demand to use an alternative gas is premised on the nature, itself, of the poisonous gas the Department currently designates rather than any question of the Department's capacity to deploy it. But such capacity is by no means apparent.

[12] *State v. Gee Jon*, 211 P. 676 (Nev. 1923).

Brad Keogh & Jeffrey Sparks                                                                                       3
May 14, 2022

cell block potentially could have been killed . . . a special enclosure had to be built."[13] Thus was born the prototypical gas chamber for penological use, a precursor to large-scale chambers to deploy cyanide gas for genocidal use.[14] In the years between Nevada's innovation and Nazi Germany's massive scaling of the technology, Arizona supplanted hanging with lethal gas by a 1933 plebiscite amending the constitution, which the state supreme court promptly upheld.[15] States carried out nearly 600 cyanide gas executions in the decades following Nevada's legislation and before *Furman v. Georgia*[16] struck down all capital statutes.[17]

Upon reestablishment of capital punishment after *Gregg v. Georgia*[18] only 11 lethal gas executions have occurred in the United States,[19] all of which used cyanide gas and the last of which was this Department's execution in 1999 of Walter LaGrand, entailing 18 minutes of violent asphyxiation.[20] As I am sure you are aware, Mr. LaGrand's was one of just two such executions the Department conducted post-*Gregg*; it also used hydrogen cyanide[21] to execute Donald Harding in 1992,[22] a death reported as "extremely violent," in which Mr. Harden's "body turn[ed] from red to purple," and credited with the constitutional amendment adopting lethal injection as the state's default method.[23]

---

[13] Allen Huang, *Hanging, Cyanide Gas, and the Evolving Standards of Decency: The Ninth Circuit's Misapplication of the Cruel and Unusual Punishment Clause of the Eighth Amendment*, 74 Or. L. Rev. 995, 1004 (1995) (citing Michael V. DiSalle, *The Power of Life or Death* (1965), at 21).

[14] *See generally United Kingdom v. Tesch*, 1 L. Rep. Tr. War. Crim. 93 (1947) (finding supplier of Zyklon B cyanide gas to German concentration camps in violation of "the laws and usages of war").

[15] *Hernandez v. State*, 43 Ariz. 424, (1934) (rejecting challenge on ex post facto and cruel and unusual punishments grounds).

[16] 408 U.S. 238 (1972).

[17] *See generally* Scott Christianson, *The Last Gasp: The Rise and Fall of the American Gas Chamber* (2010).

[18] 428 U.S. 153 (1976).

[19] Since the post-*Gregg* resumption of executions, in Utah in 1977, there were only nine lethal gas executions conducted outside of Arizona: one in Nevada in 1979, four in Mississippi between 1983 and 1989, two in California in 1992 and 1993, and two in North Carolina in 1994 and 1998. *See* Death Penalty Information Center, Execution Database: deathpenaltyinfo.org.

[20] Patty Machelor, *LaGrand: 18 minutes to die*, Tucson Citizen, Mar. 4, 1999.

[21] *Supra* n.6.

[22] Charles Howe, *Arizona Killer Dies in Gas Chamber*, S.F. Chron., Apr. 7, 1992, at A2. *See Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 655–56 (1992) (Stevens, J., dissenting) (citation omitted). In dissent from per curiam order vacating stays of execution, Justice Stevens recapitulated eyewitness descriptions of Mr. Harding's cyanide gas execution, which took ten minutes and thirty-one seconds:

> When the fumes enveloped Don's head he took a quick breath. A few seconds later he again looked in my direction. His face was red and contorted as if he were attempting to fight through tremendous pain. His mouth was pursed shut and his jaw was clenched tight. Don then took several more quick gulps of the fumes. [] At this point Don's body started convulsing violently. ... His face and body turned a deep red and the veins in his temple and neck began to bulge until I thought they might explode. [] After about a minute Don's face leaned partially forward, but he was still conscious. Every few seconds he continued to gulp in. He was shuddering uncontrollably and his body was racked with spasms. His head continued to snap back. His hands were clenched. [] After several more minutes, the most violent of the convulsions subsided. At this time the muscles along Don's left arm and back began twitching in a wavelike motion under his skin. Spittle drooled from his mouth.... [] Don did not stop moving for approximately eight minutes, and after that he continued to twitch and jerk for another minute. Approximately two minutes later, we were told by a prison official that the execution was complete.

[23] AP, *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, New York Times, Apr. 25, 1992, § 1, 9.

Brad Keogh & Jeffrey Sparks                                                                                              4
May 14, 2022

As noted above,[24] California conducted two cyanide gas executions in the modern era, in 1992 and 1993, precipitating constitutional challenges in federal court culminating in the Ninth Circuit's ruling in *Fierro v. Gomez*,[25] which held "the district court's factual findings regarding . . . the type and level of pain inflicted during execution by lethal gas under California's [cyanide] protocol, when combined with its finding that there exists a substantial risk that this pain will last for several minutes, dictate" that the protocol violated the Cruel and Unusual Punishments Clause.[26] The State of California petitioned for certiorari review, and during the petition's pendency, the California Legislature made lethal injection the primary method of execution.[27] Given the overhaul of the statute, the Supreme Court summarily granted, vacated, and remanded the case,[28] calling for further consideration in light of the legislation.[29] In the wake of the California litigation, a habeas corpus petitioner challenged Arizona's lethal gas statute—as apart from its protocol of cyanide gas.[30] The Ninth Circuit ruled *sua sponte* that that question was unripe under Article III ripeness doctrine, which serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."[31]

Two years later, the aforementioned Walter LaGrand sought to challenge Arizona's lethal gas on the eve of his execution, having chosen that method in order to do so. During that litigation, Arizona conceded that its cyanide gas protocol was substantially similar to the California protocol held unconstitutional after trial in *Fierro*, and that a trial on its own gas protocol would produce a record identical to *Fierro*'s.[32] The Supreme Court, however, deemed the choice of gas as a waiver rather than the means by which a challenge of that method ripens.[33] Given these precedents, Mr. Atwood's present moment—under warrant and before Arizona's statute requires a choice of lethal gas—is precisely ripe for resolution of the constitutionality of cyanide gas.

In holding California's protocol unconstitutional in *Fierro* in 1996,[34] the Ninth Circuit found that the evidence of California's two cyanide gas executions established that the condemned endured conscious exposure to the poisonous gas "probably … anywhere from 15 seconds to one minute," with "a substantial likelihood that consciousness, or a waxing and waning of consciousness, persists for several additional minutes."[35] Of course, this degree of suffering from cyanide asphyxiation pales in comparison to Arizona's executions of Messrs. Harding and LaGrand,

---

[24] *Supra* n.19.

[25] 77 F.3d 301, 308 (9th Cir. 1996).

[26] *Id.*

[27] Cal. Penal Code § 3604.

[28] *Gomez v. Fierro*, 519 U.S. 918 (1996).

[29] Nonetheless, by the time of *Fierro*, it had become "clear that [the use of cyanide gas] exacted 'exquisitely painful' sensations of 'anxiety, panic, [and] terror,' leading courts to declare it unconstitutional." *Arthur v. Dunn*, 137 S. Ct. 725 (2017) (Sotomayor, J., dissenting from denial of certiorari in method of execution challenge) (quoting *Fierro*, 77 F.3d at 308).

[30] *Poland v. Stewart* ,117 F.3d 1094 (9th Cir. 1997).

[31] *Id.* at 1104 (quoting *Clinton v. Acequia, Inc.* 94 F.3d 568, 572 (9th Cir. 1996).

[32] *LaGrand v. Stewart*, 173 F.3d 1144, 1148 (9th Cir. 1999).

[33] *Stewart v. LaGrand*, 526 U.S. 115, 119 (1999).

[34] 77 F.3d at 308.

[35] *Fierro*, 77 F.3d at 308 (quoting *Fierro v. Gomez*, 865 F. Supp. 1387, 1389 (N.D. Cal. 1994)).

wherein the men agonized, largely conscious, for over 10 and 18 minutes, respectively, before succumbing.[36]

But lethal gas itself does not require the use of a chemical agent banned under the multilateral Chemical Weapons Convention.[37] Scientific, medical, and industrial hygiene research have long established that various inert or noble gases can be used in a constitutional execution.[38] Oklahoma, Alabama, and Mississippi have recognized this in the context of their own profound difficulties with lethal injection executions and thus in recent years have incorporated nitrogen hypoxia into their methods statutes.[39] At bottom, lethal gas per se is not an unconstitutional method, but the use of a radically noxious poison, especially one integral to the Nazi Holocaust, plainly is.

In closing, it is surreal that, in 2022, Mr. Atwood must make the case that cyanide gas is odious and unlawful. That Mr. Atwood must seek the refuge of a gas chamber prepared to extinguish his life with a *benign* gas such as nitrogen should also seem absurd. But it is a vitally necessary method for him now and the only conceivable one available under Arizona law for the Department to carry out his sentence constitutionally. I implore you to address the unmistakable failings of the Department's current procedures immediately and to thereby remedy this grave constitutional violation and potential moral failing in the name of the people of Arizona.

Sincerely,

*/s/ Joseph J. Perkovich*
JOSEPH J. PERKOVICH

cc:    Laura Chiasson, Esq. (laura.chiasson@azag.gov)
        Sam Kooistra, Esq. (sam@azcapitalproject.org)
        Amy P. Knight, Esq. (amy@amyknightlaw.com)
        David A. Lane, Esq. (dlane@kln-law.com)

---

[36] *Supra* nn.20, 22.
[37] *See* Chemical Weapons Convention Implementation Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681. 22 U.S.C.A. § 6701 (12)(C) (Schedule 3 chemical agents, including hydrogen cyanide).
[38] Lubomir Straka, et al., *Suicidal Nitrogen Inhalation by Use of Scuba Full-Face Diving Mask*, 58 J. Forensic Sc. 1, 3 (2013); J. Ernsting, *The Effect of Brief Profound Hypoxia upon the Arterial and Venous Oxygen Tensions in Man*, J. Physiol. 169, Air Force Inst. Of Av. Med. 1-23 (1963) 292-311.
[39] *Supra* n.7.

Exhibit 33

 Gmail

**Sam Kooistra <sam@azcapitalproject.org>**

---

# Frank Atwood: Jun. 8, 2022, execution

**Sparks, Jeffrey** <Jeffrey.Sparks@azag.gov>                    Mon, May 16, 2022 at 3:51 PM
To: Joe Perkovich <j.perkovich@phillipsblack.org>, Brad Keogh <bkeogh@azadc.gov>
Cc: "Chiasson, Laura" <Laura.Chiasson@azag.gov>, Sam Koistra <sam@azcapitalproject.org>, Amy Knight
<amy@amyknightlaw.com>, David Lane <dlane@kln-law.com>

Mr. Perkovich,

   We are in receipt of you letter of May 14 demanding that ADCRR implement a nitrogen lethal gas method.  We disagree that
ADCRR's current procedures regarding lethal gas violate any applicable statutory or constitutional provision and, therefore, ADCRR
will not be making any changes to these procedures.

Thank you,


Jeff Sparks

Chief Counsel

Capital Litigation Section



Office of the Attorney General

Solicitor General's Office

Capital Litigation Section

2005 N. Central Ave.

Phoenix, AZ 85004

(602) 542-4686

Jeffrey.Sparks@azag.gov

[Quoted text hidden]

Exhibit 34

**PHILLIPS BLACK, Inc.**

a nonprofit, public interest law practice

Joseph J. Perkovich                    *j.perkovich@phillipsblack.org*           Principal Attorneys:
PO Box 4544                             212 400 1660 (tel)                        Jennifer Merrigan†
New York, New York 10163               973 221 9509 (fax)                        John R. Mills‡
                                                                                 Joseph J. Perkovich§
                                                                                 Jessica Sutton^

May 18, 2022

VIA E-MAIL (Jeffrey.Sparks@azag.gov)
Jeffrey L. Sparks
Office of the Attorney General
Capital Litigation Section
2005 N. Central Avenue
Phoenix, AZ 85004

Re:  Frank J. Atwood, June 8, 2022, execution date

Mr. Sparks:

I write in relation to Mr. Atwood's right to choose a lethal gas execution method under A.R.S. § 13-757(B), a choice that he is entitled to make through May 19, 2022, in relation to the June 8, 2022, execution date under his warrant entered May 3, 2022. *State v. Atwood*, CR-87-0135-AP.

Under Article 22, Section 22 of the Arizona Constitution and A.R.S. § 13-757(B), Mr. Atwood is entitled to a choice of lethal gas that does not violate the Eighth Amendment to the United States Constitution or Article 2, Section 15 of the Arizona Constitution.

As my correspondence to you and Mr. Keogh of May 14, 2022, reflects, the Department of Corrections, Rehabilitation and Reentry (the "Department")'s specification of cyanide gas under its Execution Procedures (DO 710) renders the State's lethal gas option unconstitutional.[1] Further, there is no impediment to the Department implementing a constitutional lethal gas method instead. The Department's failure to provide a constitutional gas method thus violates Mr. Atwood's rights under the Arizona and United States Constitutions and A.R.S. § 13-757(B). That right is especially important for Mr. Atwood because as explained in my May 14 letter (*supra*), the State's lethal injection method violates the Eighth Amendment as applied to Mr. Atwood. He therefore has extraordinary reasons to exercise his right to choose a constitutional lethal gas execution, as this choice permits self-help to overcome the State's Eighth Amendment violation by its lethal injection method.

---

[1] That demand letter follows Mr. Atwood's individual submission of a grievance against the Department's designation of cyanide gas submitted on May 1, 2022, and which the Department disposed of as "unprocessed," both initially and on appeal on May 5, 2022.

† Admitted in Missouri and Pennsylvania
‡ Admitted in Arizona, California, and North Carolina
§ Admitted in New York
^ Admitted in Massachusetts and Missouri

Jeffrey Sparks                                                                                           2
May 18, 2022

As you know, A.R.S. § 13-757(B) requires the inmate to choose his method 20 days prior to his execution, and further provides that if he fails to choose, the State will use lethal injection.[2] That provision cannot apply where the State has not offered lawful choices. Mr. Atwood is not hereby choosing cyanide gas as his method of execution. But Mr. Atwood respectfully demands that the State immediately designate a constitutional lethal gas method under the Department's Execution Procedures so he may have his right to choose a lethal gas method restored before the State violates § 13-757(B) upon the lapsing of the 20-day choice period ending 12:01 a.m., May 20. While the State is on the precipice of violating its obligation to provide a constitutional choice within the time period contemplated by the statute, the Arizona Constitution ensures Mr. Atwood's right to choose between the injection and gas methods. Unless and until the State provides the options it is statutorily and constitutionally required to provide, the fact that Mr. Atwood has refused to submit an ostensible choice of method that does not provide two real options cannot be construed as a failure to choose as contemplated by A.R.S. § 13-757(B), nor as an affirmative choice of lethal injection. In fact, the State has precluded Mr. Atwood from making the choice because of the State's violations, which he continues to demand that the State remedy.

Finally, it has come to our attention that both the Complex Warden and the Deputy Warden have approached Mr. Atwood in Browning Unit and exhorted him to elect one of the existing methods of execution, notwithstanding the unavailability of a legally valid choice. Mr. Atwood is represented by counsel, and the Department's staff must not communicate with him about his legal choices without counsel present. Please advise Department personnel that, on behalf of Mr. Atwood's legal team, I may be reached in relation to any future questions or matters of that nature.

Sincerely,

/s/ Joseph J. Perkovich
JOSEPH J. PERKOVICH

cc:     Brad Keogh, Esq. (bkeogh@azadc.gov)
        Laura Chiasson, Esq. (laura.chiasson@azag.gov)
        Sam Kooistra, Esq. (sam@azcapitalproject.org)
        Amy P. Knight, Esq. (amy@amyknightlaw.com)
        David A. Lane, Esq. (dlane@kln-law.com)

---

[2] The Department's Execution Procedures purport to curtail this statutorily dictated choice period by one day, requiring the condemned to choose 21 days prior to the execution. The Department does not have the power to override the statutory provision. Accordingly, Mr. Atwood is statutorily entitled to a lawful choice of method until May 19, and it remains the State's obligation to remedy its deprivation of his choice before that statutory period lapses. Beyond May 19, Mr. Atwood's state constitutional entitlement to lawful choices between injection and gas persists, as do his federal constitutional rights attendant to that right.

Exhibit 35



Sam Kooistra <sam@azcapitalproject.org>

---

## Frank Atwood: Jun. 8, 2022 execution date: choice of method

**Sparks, Jeffrey** <Jeffrey.Sparks@azag.gov>                                    Thu, May 19, 2022 at 8:26 AM
To: Joe Perkovich <j.perkovich@phillipsblack.org>
Cc: Brad Keogh <bkeogh@azadc.gov>, "Chiasson, Laura" <Laura.Chiasson@azag.gov>, Amy Knight
<amy@amyknightlaw.com>, Sam Koistra <sam@azcapitalproject.org>, David Lane <dlane@kln-law.com>

Mr. Perkovich,

As I stated previously, ADCRR will not be making any changes to its current lethal gas procedures.

Thank you,

Jeff



Jeff Sparks

Chief Counsel

Capital Litigation Section



Office of the Attorney General

Solicitor General's Office

Capital Litigation Section

2005 N. Central Ave.

Phoenix, AZ 85004

(602) 542-4686

Jeffrey.Sparks@azag.gov

[Quoted text hidden]