JOSEPH J. PERKOVICH, ESQ.
NY Bar No. 4481776
Phillips Black, Inc.
PO Box 4544
New York, NY 10163
Tel: (212) 400-1660
j.perkovich@phillipsblack.org

AMY P. KNIGHT, ESQ.
AZ Bar No. 031374
Knight Law Firm, PC
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Tel: (520) 878-8849
amy@amyknightlaw.com

DAVID A. LANE, ESQ. (*pro hac vice* pending)
CO Bar No. 16422
REID ALLISON, ESQ. (*pro hac vice* pending)
CO Bar No. 52754
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado   80202
Tel:  (303) 571-1000
dlane@kln-law.com
rallison@kln-law.com
Attorneys for Frank Jarvis Atwood

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Jarvis Atwood,<br><br>Plaintiff,<br><br>v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation & Reentry; James Kimble, Warden, ASPC-Eyman; Jeff Van Winkle, Warden, ASPC-Florence; Lance Hetmer, Assistant Director for Prison Operations, Arizona | CASE NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (FORMER CLAIMS VI AND VII)**<br><br><br>**This is a capital case.** |

1

Department of Corrections, Rehabilitation & Reentry; Mark Brnovich, Attorney General of Arizona,

Defendants.

**EXECUTION WARRANT ISSUED FOR JUNE 8, 2022, 10:00 A.M.**

---

## COMPLAINT[1]

1. Plaintiff Frank J. Atwood, through his counsel, seeks both preliminary and permanent relief, requesting this Court declare and enforce his rights under the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, 18 U.S.C. § 3599, and 42 U.S.C. § 1983, and issue an injunction commanding defendants not to carry out any method of execution as set forth in the applicable promulgation of the Arizona Department of Corrections, Rehabilitation and Reentry (the "Department"). The resulting execution protocols and procedures, facially and as applied to Plaintiff, pose an unnecessary risk of causing substantial pain and suffering in violation of his right to be free from the infliction of cruel and unusual punishments. The Arizona Supreme Court has issued a warrant for Plaintiff's execution scheduled June 8, 2022 and to transpire for 24 hours from time of commencement. Defendants have set 10:00 a.m. as the time of commencement.

---

[1] This Complaint is derived entirely from Plaintiff's Amended Complaint, in his original cause before this Court, *Atwood v. Shinn, et al.*, 2:22-cv-00860-PHX-MTL (JZV), Doc. 21. Pursuant to Plaintiff's Motion to Sever Claims VI and VII (Doc. 25), this new complaint pleads only what had been Claims VI and VII, along with the underlying facts from the original pleading.

## I.   INTRODUCTION

2.  If the State is to be allowed to execute people, Courts have held fast to the requirement, as a fundamental matter of decency, that they not do so in a way that is unnecessarily painful. It is death itself that is the punishment, not the method of its infliction.

3.  Arizona has undertaken to give its condemned a choice, enshrined in its Constitution, between two methods: lethal injection or lethal gas. That choice means nothing if one or both of the options are illegal, and for Frank Atwood, the ways the State has chosen to implement each of these options does not meet minimal constitutional standards.

4.  Mr. Atwood, a devout Orthodox Christian, is now 66 years old, wheelchair-bound, and in constant pain from a degenerative spinal condition, which has worsened significantly as he has received decades of inadequate care from the State.

5.  The way Arizona has chosen to conduct lethal injections, its default option, requires the inmate to be stretched flat on his back on a gurney—something that with his condition, Frank Atwood cannot do without suffering unimaginable pain. The State has also been careless with its execution drugs, failing to keep its own promises to ensure that it only uses drugs that have not expired and have passed important quality checks, according to the minimum standards considered medically acceptable.

6.  For its other option, lethal gas, Arizona has inexplicably chosen cyanide gas—the gas used by Nazi Germany to commit a genocide in the 1940s and widely acknowledged to cause an especially painful death—when other lethal gasses that could accomplish an

execution with far less suffering are available.

7.   Arizona promised Mr. Atwood he could choose the method by which the State ends his life, something it has a constitutional duty to do in a manner that is consistent with evolving standards of decency. Instead, he has been given the choice between two forms of torture, when non-torturous possibilities exist.

## II.   PARTIES

8.   Frank J. Atwood is a state prisoner incarcerated at the Arizona State Prison Complex—Eyman, housed in its Browning Unit. He is imprisoned under a death sentence entered in the Arizona Superior Court in 1987 and faces an execution date of June 8, 2022, due to a warrant of the Arizona Supreme Court entered May 3, 2022.

9.   Defendant Mark Brnovich is the Attorney General of Arizona, is the chief legal officer of the state, and has general supervisory authority over county and local prosecutors. Attorney General Brnovich is responsible for initiating and pursuing the execution process for state prisoners under sentence of death. Further, the Attorney General is responsible for the administration of the victims' rights program, which administers a plan for assisting and monitoring state and local entities that are required to implement and comply with victims' rights laws, including A.R.S. §13-4433(B). See A.R.S. § 41-191.06. Attorney General Brnovich is sued in his official capacity and is alleged to have acted in all regards under color of state law.

10. Defendant David Shinn is the director of the Arizona Department of Corrections, Rehabilitation and Reentry. He is being sued in his official capacity, and is alleged to have acted in all regards under color of state law. He is responsible for the oversight and

4

enforcement of policies and procedures generally applicable to all prisoners and is responsible for carrying out Mr. Atwood's execution.

11.  Defendant James Kimble is the warden of ASPC-Eyman. He is being sued in his official capacity, and is alleged to have acted in all regards under color of state law.

12.  Defendant Jeff Van Winkle is the warden of ASPC-Florence. He is being sued in his official capacity, and is alleged to have acted in all regards under color of state law.

13.  Defendant Lance Hetmer is the Assistant Director for Prison Operations of ADCRR. Arizona's execution protocol charges him with "the planning and overall direction of all pre-execution, execution and post-execution activities." He is being sued in his official capacity, and is alleged to have acted in all regards under color of state law.

## III.    JURISDICTION

14. This case arises under the United States Constitution and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). This action is brought pursuant to 42 U.S.C. § 1983. Further, 28 U.S.C. § 2254 is implicated also.[2]

15. The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 USC. §§ 2201 and 2202.

---

[2] Controlling authority dictates that a challenge to method of execution be brought under 42 U.S.C. § 1983. *See Hill v. McDonough,* 547 U.S. 573 (2006); *Bucklew v. Precythe,* 139 S.Ct. 1112 (2019). However, when the alternative method proposed by the inmate is not presently available under state law, it is unsettled whether the challenge should be brought instead as a petition for a writ of habeas corpus under 28 U.S.C. § 2254, and a case raising that question was recently argued in the Supreme Court. *See Nance v. Ward,* No. 21-439 (argued April 25, 2022).

5

16. The Court has the authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

## IV.   VENUE

17.   Venue is proper in this District under 28 U.S.C. § 1391(b). Defendants are sued in their official capacities, and their official places of business are located within this District. The events giving rise to this complaint have occurred or will occur within this District.

## V.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

18. Plaintiff attempted to exhaust any available administrative remedies. Defendants failed to process his grievances.

## VI.   FACTS

### A. Mr. Atwood Is Wheelchair-bound from Degenerative Spinal Disease, a Severely Painful Condition Worsened by the Deliberate Indifference of the Department.

19. Mr. Atwood, now 66 years old, has been incarcerated on Arizona's death row in the custody of the Department since 1987. For most of the term of this incarceration, Mr. Atwood has suffered from degenerative spondylosis in his spine, an excruciatingly painful condition that has worsened significantly as he has received, in the care of the Department, grossly insufficient medical treatment.

20. The treatment he was receiving was so inadequate to meet his medical needs that in 2020, he was forced to file a lawsuit against the Department simply to obtain a basic minimum standard of medical care. *Atwood v. Days*, No.: CV20-00623-PHX-JAT (JZB). A renowned orthopedic surgeon, Dr. Philip Davidson, evaluated him, and supported by a

detailed declaration from Dr. Davidson, Mr. Atwood moved for a preliminary injunction, asking the Court to order the Department to restore minimally adequate treatment, including effective pain medication. The Court held an evidentiary hearing on October 29, 2021, and on December 7, 2021, issued an Order (Exhibit 1) containing detailed findings of fact about Mr. Atwood's condition, which remain true today. The Court concluded Mr. Atwood had "shown a likelihood of success on the merits of his deliberate indifference claim regarding the treatment of his pain," and that a reasonable jury could find the Department's healthcare contractor "failed to competently treat [Mr. Atwood]'s serious pain needs and acted with deliberate indifference." *Id*. at 13.

21. Based on extensive interviewing and detailed review of voluminous medical records and imaging studies, Dr. Davidson opined that Mr. Atwood has "severe spondylosis with severe radicular symptoms," specifically including myelomalacia (softening of the spinal cord due to hemorrhaging inside the spine) at vertebrae C5-C6 in the neck, causing "radiating pain, weakness, and motor dysfunction." Exhibit 2, Davidson Dec., ¶ 27. The most painful condition he has, however, is in his lumbar (lower) spine, where neural compression and degenerative spondylosis are "highly painful." *Id*. ¶ 28.

22. Dr. Davidson opined that Mr. Atwood has critical need for both an interventional pain specialist and an orthopedic spine surgeon or neurosurgeon to address his severe chronic pain., *id.* ¶¶ 31-32, and that "to a great extent, more likely than not, his current state of spinal degeneration and symptomatology is a result of negligence and under-treatment rendered while this patient has been incarcerated by the State of Arizona." *Id.* ¶ 34.

23. Dr. Joel Zivot, a board-certified anesthesiologist, physically examined Mr. Atwood

on May 16, 2022, after conducting a detailed record review. He, too, concluded that "Mr. Atwood suffers from intense and profoundly debilitating pain along his spine as a consequence of chronic degeneration of vertebral bodies" that have "caused multiple compressions of the nerve roots as they pass from the spinal cord to the arms and legs," which "has resulted in permanent damage that manifests as profound weakness and unremitting pain." Exhibit 3, Zivot Dec, ¶ 6. He identified "among other indications of extreme disrepair, 16 instances of severe foraminal stenoses throughout his cervical and lumbar spine," causing pain that is "extremely difficult to treat." *Id*. ¶ 8.

24. The position of Mr. Atwood's body has a profound effect on the level of pain he experiences. Dr. Zivot explains that Mr. Atwood "has identified how he can position his body in an attempt to relieve the bony compression on his nerve roots," but unfortunately, that strategy "has also resulted in profound and permanent limitations of his body mechanics." *Id.* ¶ 9.

25. Both doctors agree that a slouched sitting position is the least painful for Mr. Atwood. Dr. Davidson recognizes:

> Mr. Atwood suffers constant pain. In order to minimize its severity, he seeks to continually maintain a seated posture, either slouching in his wheelchair or partially reclining on his back, in bed while attempting to sleep. This general condition causes considerable sleeping difficulties. Since Fall 2020, he has experienced too much pain to sleep either on his side or his back. Lying flat on his back severely exacerbates his conditions, causing maximum pain.

Ex. 2, ¶ 21.

26. Dr. Zivot confirms:

> Mr. Atwood is unable to assume a recumbent position less than with his body

8

at approximately a 60 degree head up angle. His neck extension is also limited secondary to fusion of the 5th and 6th cervical vertebrae. When his upper body is lowered to an angle less than 60 degrees, he experiences immediate and intense lower back pain, right greater than left, and radiating down the right leg to the knee. His right-side pain level is maximal, with the left nearly at that maximum level. . . . Any increase in recumbency results in intense and immediate pain.

Ex. 3, ¶ 10.

## B. As Applied to Mr. Atwood, the Department's Lethal Injection Protocol Will Superadd Significant Pain Not Necessary to Accomplish Execution.

27. Even if a compounded pentobarbital lethal injection is carried out on Mr. Atwood exactly as planned under the Arizona Department of Corrections, Rehabilitation and Reentry, Department Order 710 - Execution Procedures (effective Jun. 13, 2021, last revised Apr. 20, 2022), "Execution Procedures," Exhibit 4, and even if pentobarbital can be a humane form of execution—although neither premise is established—such an execution cannot be administered to Mr. Atwood, as a consequence of his particular physical condition, without superadding pain well beyond what is needed to effectuate a death sentence.

### 1. Restraint to the Execution Table Will Inflict Maximum Pain on Mr. Atwood.

28. The Execution Procedures outline the execution process in great detail. The required steps include:

13.5.2.2 Prior to moving the inmate from the holding cell to the execution table, the Director shall confer with the Attorney General or designee and the Governor or designee to confirm there is no legal impediment to proceeding with the lawful execution.

13.5.2.3 When the inmate is secured on the execution table by the team and readied by qualified medical personnel, the Warden shall advise the Director.

29. In Attachment D, governing lethal injection, the Execution Procedures also state:

> D.5 After the inmate has been secured to the execution table, the Restraint Team Leader shall personally check the restraints which secure the inmate to the table to ensure they are not so restrictive as to impede the inmate's circulation, yet sufficient to prevent the inmate from manipulating the catheter and IV lines.

30. Upon information and belief, the "execution table" referred to is a flat table with two swiveling arm rests, both of which are extended during an execution so that the prisoner's arms are perpendicular to the body. When "secured on the execution table," the inmate is placed flat on his back and he is strapped down with leather straps from his ankles to his chest with each arm secured and extended to the side.

31. The Department has been conducting executions by lethal injection since 1993. A study of logs from the 14 executions prior to Arizona's resumption of executions with Mr. Dixon in May, 2022, reveals that inmates are secured on the table for a significant period of time, typically 44 minutes before the actual administration of chemicals begins. Exhibit 5, Execution Charts. This occurs while corrections personnel attempt to accomplish the delicate medical task of inserting an IV, which was a stage among the 14 comprising this set that, in itself, took more than 50 minutes to conduct for three individuals (with the longest time being 67 minutes), and had a median time of 23 minutes. *Id.*

32. While lying down on one's back while being held securely on the execution table, as the protocol requires, may not pose difficulties for most inmates, for Frank Atwood, that alone would cause him excruciating—and unnecessary—pain.

33. According to Dr. Davidson, "[b]eing strapped down to a gurney or table would cause [Mr. Atwood] severe pain. Sitting upright is considerably less painful for him. Ex.

2, ¶ 21. It is his "professional opinion that Mr. Atwood cannot be placed in a supine position on a gurney, strapped in place and maintained as such for any length of time without experiencing severe and immediate exacerbation of pain." *Id.* ¶ 29.

34. Dr. Zivot confirms that "Mr. Atwood is not able to lie in a recumbent position on the execution table as a result of the experience of intense and untreatable pain," (Ex. 3, ¶ 14), and "[f]orcefully subjecting Mr. Atwood to be positioned as stated in the written execution procedures would result in subjecting Mr. Atwood to intense, excruciating, and unremitting pain from the moment he is so placed on the execution table and for the duration of his restraint in performance of the execution procedures." *Id.* ¶ 17.

35. Both doctors opine that the only way to execute Mr. Atwood by lethal injection without inflicting extreme additional pain would be to do so while Mr. Atwood remains seated in a chair. Ex. 2,¶ 37; Ex. 3, ¶ 16.

36. The Execution Procedures do not contemplate the inmate being in a seated position, or any position other than fully supine. It would not be possible to conduct a lethal injection execution of Mr. Atwood under the current Execution Procedures without causing him severe, unremitting pain.

37. Conducting an execution—even an execution by lethal injection—does not inherently require the inmate to lie flat on his back; this is instead a requirement of the specific method Defendants have chosen. The pain it would inflict on Mr. Atwood is thus well beyond what is needed to effectuate a death sentence.

38. There is no penological or other justification for inflicting this unnecessary pain on Mr. Atwood, and subjecting him to this procedure amounts to the wanton infliction of pain

with no legal justification.

## 2. IV Team Lacks Competence to Ensure Viable Catheter Insertion for Mr. Atwood.

39. The Execution Procedures pose an additional problem for Mr. Atwood. Under ¶ 3.2.5.3, Defendant Shinn, as Director, is responsible for designating the IV Team Leader. Ex. 4, . This role of IV Team Leader has extensive, critical responsibility for performance of the execution, reflected in repeated specification of the IV Team Leader's discretion and duties, as do other IV Team members. But these procedures establish no minimum qualifications or other criteria for any individual to be eligible to be designated by the Director as the IV Team Leader or as a member of that team. Further, the Execution Procedures empower Defendant Shinn, as Director, to take certain critical medically-based decisions, such as whether to "instruct the Special Operations Team to administer an additional dose of the lethal chemical followed by the sterile saline solution flush. This may be administered via the primary or backup IV catheter, as determined following consultation with the IV Team." Ex. 4, Att. D, ¶ 6. Yet the position of Director is neither required to possess, nor currently held by someone who possesses, medical qualification to make such determinations.

40. Regarding IV lines, the Execution Procedures require that there be two possibilities, a peripheral IV catheter or, should personnel be unable to establish such a line, a central femoral line:

> 3.2.5.4 The IV Team shall be responsible for inserting either peripheral IV catheters or a central femoral line as determined by the Director acting upon the recommendation of the IV Team Leader. . . . A central femoral venous line shall not be used unless the person placing the line is currently qualified

by experience, training, certification or licensure within the United States to place a central femoral line.

41. If Mr. Atwood were to be in a seated position for his execution, it would not be possible to insert a central femoral line, should the corrections personnel be unable to establish a peripheral IV line, because "[t]he bent at the waist positioning of Mr. Atwood makes it not possible to access the femoral vein, which is located in the crease of the groin." Ex. 3, ¶ 16.

42. Nor would it be possible to insert a central line in the neck instead, even if the Execution Procedures contemplated that, which they do not. This is because "[a]n intravenous central line inserted in the neck while sitting carries the high likelihood of causing a venous air embolus – air is sucked into the blood stream and enters the heart resulting in a cardiac arrest." *Id*.

43. In the Department's most recent execution, of Clarence Dixon on May 11, 2022, after attempting for approximately 17 minutes to insert a peripheral line, corrections personnel ultimately inserted a femoral central line. Exhibit 6, Bass dec., ¶¶ 5-9. However, they struggled to accomplish that, too, ultimately making a set of incisions in his groin area that left staff cleaning up blood over the course of several minutes. *Id.* ¶¶ 10-12. Visibility of the IV insertion process was limited and often impaired. Exhibit 29, Bass suppl. dec., ¶3. As Mr. Dixon's counsel has observed, his body was generally "visible on the television monitors, [but] the overhead camera positioned directly above him was so far away that [counsel] could not see details of the medical staff members' attempts to place an IV in his left arm at a given site (e.g., his upper versus lower arm), or of their subsequent placement

of IVs in his right arm and femoral vein." *Id.* This configuration deprived counsel of sufficient visibility of the IV Team in this critical step.

44. Difficulties and complications in the IV insertion can, in their own right, elevate to the infliction of extreme pain and harm. Further, the risk of a botched execution elevates in correlation with the imprecision of the IV line. Exhibit 30, Zivot suppl. dec., ¶3.

45. As Mr. Dixon's counsel observed from the witness room, the IV Team Leader, with shaking hands, made two failed attempts at IV access in Mr. Dixon's arms and then, on a third attempt, connected IV tubing to the needle. Ex. 6 at ¶¶ 5-8. It is not known whether this third IV was properly situated in a vein, or whether the IV catheter was merely rammed into the tissue surrounding the vein.

46. After this third, possibly successful attempt, the IV team apparently abandoned peripheral IV access, and decided to place a catheter in Mr. Dixon's femoral vein (a large vein in the groin), *id.* at ¶¶ 10-13, doing so without the use of the ultrasound equipment the Execution Procedures required to be on hand, Ex. 4, Att. D, ¶ A.2.

47. It appears that execution team members used surgical instruments to access Mr. Dixon's femoral vein, though the physical positioning of the staff and the camera denied adequate visibility on the proceedings:

> Medical staff members stood between Clarence and the witnesses throughout the entire time the femoral vein was accessed obstructing our view through the window. From the television monitors, I could see a medical staff member inject a clear liquid into Clarence's right upper leg, but I could not tell whether Clarence was injected more than once. Through the viewing room window, I saw a medical staff member pick up a metal instrument from the tray that looked like a scalpel and, from the monitors, it appeared the medical staff member began to cut into Clarence's right upper leg. I could not see any details of how many times Clarence was cut and only saw a pool

14

of blood that a medical staff member wiped.

Ex. 29, ¶5.

48. Dr. Zivot observes, based on the creditable "reporting in the media and through Ms. Bass's direct observations, it is apparent that a failure in establishing a working line was an entirely plausible outcome. This shoddy performance is deeply concerning given that the immediately prior execution (Joseph Wood), was disastrous, due in part to IV failure." Ex. 30, ¶14.

49. Dr. Zivot further explains that the IV Team's

> switch to central IV access from peripheral access after only two failed attempts is a substantial and highly unusual departure from normal clinical practice. Femoral venous access carries numerous risks, including laceration of the femoral artery (and severe bleeding and exsanguination therefrom), painful injury to the femoral nerve (which is close to the femoral vein and artery), injury to the bladder, the urethra, and the colon.

Ex. 30, ¶16.

50. Should the IV Team, instead of inserting a peripheral IV line, hastily proceed to attempt to insert a central femoral line in Mr. Atwood while he is strapped to the table—as it did with Mr. Dixon— the pain and resulting uncontrollable movements such a procedure will cause, due to his preexisting poor health, is virtually certain to expose him to a very high risk of collateral severe injury, such as a punctured bladder, which could derail the execution process entirely. Exhibit 31, report of Dr. Heath at 19.[3]

.

---

[3] *See, e.g.*, *Hamm v. Dunn, et al.*, No. 2:17-cv-2084-KOB, Doc. 103 at 19 (N.D. Ala. Mar. 26, 2018).

**C. Defendants Recognize the Legal Obligation to Comply with Lethal Injection Compounding Procedures, Yet Fail to Do So.**

51. The Department's Execution Procedures include several specific provisions relating to the requirements for drugs to be used in a lethal injection and the information that must be provided to the condemned about those drugs at specific points in the process, to permit the condemned to investigate, assess, and verify that information while there is still time before his execution. Those provisions concerning the preparation of the lethal injection chemicals, which appear in Attachment D, include a requirement that

> A.1.III. . . . ADC will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that an execution is carried out.

The Procedures in Attachment D also specify:

> C.2. A quantitative analysis of any compounded or non-compounded chemical to be used in the execution shall be provided upon request within ten calendar days after the state seeks a Warrant of Execution.

**1. Compounded Pentobarbital often Causes Painful Executions.**

52. Compounded pentobarbital has a problematic history in lethal injection executions, with a long list of problematic executions, including but not limited to the following.

53. On January 14, 2021, the federal government executed Corey Johnson using compounded pentobarbital. Shortly after officials administered the drug, Mr. Johnson told his spiritual advisor that his "hands and mouth were burning."[4]

54. On January 13, 2021, the federal government executed Lisa Montgomery using compounded pentobarbital. Immediately after the drug entered her veins, Ms. Montgomery

---

[4] Michael Tarm, "Executioners Sanitized Accounts of Death in Federal Cases," *Associated Press*, February 17, 2021.

began gasping for air. Her stomach throbbed before she was pronounced dead.[5]

55. On December 11, 2020, the federal government executed Alfred Bourgeois using compounded pentobarbital. Seconds after prison officials administered the drug, Mr. Bourgeois's stomach began to quiver uncontrollably, and he grimaced in pain. Nearly 30 minutes passed between the administration of pentobarbital and the pronouncement of death.[6]

56. On September 22, 2020, the federal government executed William LeCroy using compounded pentobarbital. Immediately after federal officials administered the drug, Mr. LeCroy's stomach began to heave uncontrollably. In the fifteen minutes between the injection and his time of death, color drained from Mr. LeCroy's limbs, his face became ashen, and his lips tinted blue.[7]

57. On July 16, 2020, the federal government executed Wesley Purkey using compounded pentobarbital. A subsequent autopsy of Mr. Purkey revealed a buildup of fluid in his lung tissues, causing his lungs to expand to four times their normal weight. These findings were consistent with pulmonary edema, a condition which develops following the injection of high doses of pentobarbital, due to the drug's injurious effects on human blood vessels. When pentobarbital is administered at high doses, the drug damages the barrier

---

[5] Tom Wood, "Witness Reveals Final Moments of Lisa Montgomery Before Her Execution," *LAD Bible*, January 13, 2021.

[6] Michael Tarm, "U.S. Executes Truck Driver Who Killed Daughter," *Associated Press*, December 11, 2020.

[7] Michael Tarm, "Executioners Sanitized Accounts of Death in Federal Cases," *Associated Press*, February 17, 2021; Michael Tarm, "U.S. Executes Killer Obsessed with Witchcraft," *Associated Press*, September 21, 2020.

between the blood vessels and air sacs in the lungs, allowing the lungs to fill with fluid, and causing individuals to experience air hunger and feelings of suffocation and drowning prior to death.[8]

58. Since 2013, Texas has carried out executions via compounded pentobarbital. The state continues to rely on this single-drug protocol, and demonstrates a recent, documented history of visibly botched executions using this method.

59. On August 21, 2019, the State of Texas executed Larry Swearingen using compounded pentobarbital. After prison officials administered the drug, Mr. Swearingen declared that he could "taste" the effects of the lethal dose, and described burning in his right arm.[9]

60. On September 26, 2018, the State of Texas executed Troy Clark using compounded pentobarbital.  It took 21 minutes for Mr. Clark to die. After prison officials administered the drug, Mr. Clark stated that the pentobarbital "burned going in" and that "I feel it." He grunted and gasped before he stopped moving.[10]

61. On July 17, 2018, the State of Texas executed Christopher Young using compounded pentobarbital.  It took 25 minutes from the time of administering the drug until the time of death, and Mr. Young cried out twice using an obscenity to say he could

---

[8] Second Suppl. Expert Decl. of Gail Van Norman M.D. ¶ 20, *In re Fed. Bureau of Prisons Execution Protocol Cases*, Case No. 1:19-mc-00145 (D.D.C. Aug. 7, 2020), ECF No. 183-2.
[9] Keri Blakinger, "Larry Swearingen Executed Despite Claims of Innocence," *Houston Chronicle,* August 21, 2019.
[10] Juan A. Lozano and Michael Graczyk, "Texas Executes Man in the Torture, Drowning of Ex-Roommate," *Associated Press*, September 26, 2018.

taste the drug and that it was burning.  He also said something unintelligible before he stopped moving.[11]

62. On June 27, 2018, the State of Texas executed Danny Bible using compounded pentobarbital.  After the pentobarbital was administered, Mr. Bible cried out "burning" and "it hurts."[12]

63. On February 1, 2018, Texas executed John Battaglia using compounded pentobarbital. After prison officials administered the drug, Mr. Battaglia cried out, "Oh, I feel it!" 22 minutes passed between the injection of pentobarbital and the pronouncement of Mr. Battaglia's death.[13]

64. On January 30, 2018, the State of Texas executed William Rayford. During Mr. Rayford's execution, after compounded pentobarbital had been administered, he attempted to sit up, lifted his head, jerked his head back multiple times, grimaced, and shook.[14]

65. On January 18, 2018, Texas executed Anthony Shore using compounded pentobarbital. At the end of Mr. Shore's final statement, he began to tremble, appeared agitated, and said "I can feel that it does burn.  Burning!"[15]

66. On May 4, 2018, Georgia executed Robert Earl Butts, Jr. using compounded

---

[11] Christopher Young, Death Row Inmate From San Antonio, Executed for Deadly 2004 Robbery," *Associated Press*, July 17, 2018.

[12] Jolie McCullough, "Danny Bible Executed for a 1979 Rape and Murder, Despite Claims That He was Too Sick for Lethal Injection," *The Texas Tribune*, June 27, 2018.

[13] "Dallas Man Smiles Before Being Executed for Killing Two Daughters While Mother Listened," *CBS News*, February 1, 2018.

[14] "Texas Executes Dallas Man for Ex-Girlfriend's 1999 Slaying," *CBS News*, January 31, 2018.

[15] "Tourniquet Killer' Anthony Allen Shore Executed in Texas for 1992 Strangling," *CBS News*, January 19,  2018.

pentobarbital. Immediately after prison officials administered the drug, Mr. Butts cried out, "It burns, man."[16]

67. In March 2015, the State of Georgia attempted to execute Kelly Gissendaner using compounded pentobarbital. On March 3, prison officials called off the execution because the drugs appeared "cloudy." Observers reported particles floating in the syringe, which appeared "like clumps of cottage cheese." Experts opined that the drug had likely precipitated – causing solid clumps of pentobarbital active pharmaceutical ingredient (API) to appear in the solution – due to shortcomings in the compounding process.[17]

### 2. Defendants Have Undertaken Deeply Fawed Preparation of Pentobarbital.

68. In October 2020, the Department paid $1.5 million to purchase a kilogram (1,000 1-gram vials) of pentobarbital sodium salt from an undisclosed source to use in lethal injection executions. By March 2021, Defendant Director Shinn communicated to Defendant Attorney General Brnovich readiness to proceed with executions. Before seeking execution warrants in the Arizona Supreme Court, the Attorney General publicly identified 20 individuals whom his office intended to execute during his elected term.

69. On April 6, 2021, Defendant Brnovich initiated novel litigation in the Arizona Supreme Court, which depended on the State's unsubstantiated representations about the eventual expiry, or what is known in pharmaceutical terms as the "beyond-use date" or

---

[16] "It Burns Man,' Georgia Man Says During Execution for Killing Prison Guard," *CBS News*, May 4, 2018.

[17] Chris McDaniel, "Georgia Says 'Cloudy' Execution Drug Was Just Too Cold, But Expert Gave A Second Possible Cause," *Buzzfeed News*, May 11, 2015.

"BUD", of injectable pentobarbital solution compounded from those vials of salt. In short, the State wanted the Court to drastically shorten the time between its first request and the ultimate execution date so its drugs would not expire during the process. This litigation emanated from the State's obligations under the Department's Execution Procedures, and raised a central controversy: would the Department's pharmacist be able to establish a BUD later than execution dates that would be issued pursuant to the requested schedule?

70. The litigation culminated in scheduling orders on May 21, 2021, for Mr. Clarence Dixon and Mr. Atwood, based on Defendant Brnovich's representations that the State's drugs had a 90-day BUD. But by June 22, 2021, the State threw back into question the central controversy about the ability to establish a BUD when it conceded that prior representations of a 90-day BUD were mistaken and asserted that the Department's pharmacist had "revised" their prior opinion. The State explained, "until certain specialized testing of a sample batch is conducted," there would not be a sufficient BUD after all to conduct an execution under the schedule it had obtained from the Court. Exhibit 7, Motion to Modify. On July 21, 2021, the Court vacated its prior scheduling and instructed the State to return after conducting "specialized testing to determine a beyond-use date for compounded doses of the drug."

71. On January 5, 2022, the State proclaimed in a new motion that the Department's pharmacist had conducted "specialized testing" of injectable pentobarbital sodium made from the Department's kilogram of salt to determine a BUD it would then apply to later-compounded batches, and was poised to compound batches with a standard BUD adequate to schedule executions under the previously considered time constraints. Exhibit 8, Motion.

The Arizona Supreme Court ultimately granted the State's expedited motions for execution dates for Mr. Dixon (May 11, 2022) and Mr. Atwood (June 8, 2022), but the State did not disclose an actual BUD for the drugs it intended to use in either execution.

72. On May 3, 2022, Mr. Dixon filed suit in the District of Arizona against the Department concerning its failure to disclose the BUD of the drugs intended for his scheduled execution—drugs Defendants had compounded and tested the same way it intended to proceed with Mr. Atwood's drugs. Mr. Dixon then filed an emergency motion for injunctive relief to which the State responded and cross-moved for dismissal. On May 6, 2022, District Judge Humetewa ordered Defendants to file, later that same day, a notice "stat[ing] the Beyond Use Date for the compounded pentobarbital the State intends to use to execute Plaintiff . . . and, [i]f unable to provide such specific information, the Notice must explain to the Court why the State is unable to provide [the BUD]." Exhibit 9, Order.

73. The State then filed a notice, attaching as an exhibit a nine-paragraph declaration, redacted and anonymized, from the Department's compounding pharmacist, disclosing that the pharmacist is an Arizona-licensed pharmacist who "follow[s] the guidelines and requirements found in the United States Pharmacopeia." Exhibit 10, Notice. The pharmacist, Defendant Doe, attested that they prepared a single test batch of sodium pentobarbital solution, which they "provided to a [sic] FDA registered laboratory for stability testing in order to establish the solution's Beyond Use Date." *Id.* Defendant Doe then stated the "test results establish that the sodium pentobarbital solution has a Beyond Use Date of 180 days from the date of initial testing," considering this to constitute a "stability study." *Id.* The pharmacist then attested to having prepared the solution

designated for Mr. Dixon on February 26, 2022 (two days after the Stated moved this Court for Mr. Dixon's execution warrant) "from the same sodium pentobarbital powder that was used for the stability study." Finally, the pharmacist concluded that "[b]ased on the stability study results, the Beyond Use Date of the solution I prepared on February 26, 2022 is August 25, 2022." *Id.*

74. On May 8, 2022, in opposition to Mr. Dixon's motion for injunctive relief, the Department argued the federal court "should allow Defendants to carry out Dixon's execution [on May 11] with newly compounded pentobarbital that is within a BUD that does not require stability testing. Exhibit 11, Opposition. On May 9, 2022, the parties settled the action by Mr. Dixon's acceptance of the State's offer to compound a new batch of pentobarbital sodium and supply "quantitative" analysis to Mr. Dixon that same day. Exhibit 12, Stipulation. The pharmacist prepared the new drugs at that time.

75. Expert pharmacist James Ruble has explained that this "tight timeframe prevent[ed] sterility and endotoxins testing," as needed for "the detection of contaminants." Exhibit 13, Ruble dec., ¶ 52.

76. The only disclosures the State has made about the BUD for Mr. Atwood's drugs are third-party laboratory certificates for testing of a single sample batch of the prepared solution. The disclosures neither reflect any information about the methodology or procedures the pharmacist used in preparing the single test batch, nor the pharmacist's analysis to calculate and establish a transferrable BUD from the bald laboratory numbers. As of yet, there is no evidence that the pharmacist has established any documented methodology for the testing designed to yield a BUD that may be assigned to subsequent

preparations. *Id.* ¶¶ 27- 29.

77. As Dr. Ruble confirms, prevailing standards for such testing anticipate "a minimum of three batches and from each batch the provision of multiple samples." *Id.* ¶ 29. Further, it is necessary to document the kinds of testing, the testing conditions, and the storage conditions. *Id.* Prevailing standards recognize that the compounding ingredients—both the active ingredient (in this case, pentobarbital sodium) and inactive ones—remain the same in future batches and that documentation of this is maintained. Absent such identicality, a BUD cannot be extrapolated to a subsequently prepared compound. *Id.*

78. Review of the third-party laboratory results the Department provided reflect, on their face, that the single test batch Defendant Doe prepared failed to meet prevailing USP standards. *Id.* ¶¶ 39-40. Specifically, the batch failed to satisfy the USP Monograph-established pH range of 9.0 and 10.5, given that it returned a 10.6 pH. Such a result renders the "batch . . . unusable and it is self-evident that a batch that would need to be discarded cannot supply data for extrapolation to establishing BUDs for other batches." *Id.* "Elevation of a pH level outside the accepted parameters presents serious concerns," *id.* ¶ 43, due to "the exponential effects of pH deviations on the degradation of many drugs, certainly including high-risk sterile compounds such as pentobarbital sodium." *Id.* ¶ 42. Elevated pH levels are susceptible to "catastrophic effects on venous endothelial cells," which "constitute the inner lining of veins and comprise the site of actual contact between injected solutions, i.e., pentobarbital sodium, and the venous circulatory system." *Id.* A pH reaching 11 could "strip[] away any buffer for the innumerable nerve endings throughout the venous system." *Id.* ¶ 43.

79. Despite the failure of Defendant Doe's lone test batch to meet vital applicable standards, in the *Dixon* federal litigation, the Department asserted that these lab results permitted it to "extrapolate [a] 180-day BUD for *all future batches from the API salt*." *Id.* ¶ 39. That extrapolation is not permissible.

80. The inadequacy of the pharmacist's "specialized testing" or "stability testing" under USP requirements establishes that the drugs prepared circa April 7, 2022, for Mr. Atwood's lethal injection lack an extended BUD. As a result, the latest BUD these drugs could possess, if they "were immediately frozen and have been kept frozen solid" since their preparation (and there is no evidence that they have), would be May 22, 2022, well short of the June 8, 2022 execution date. *Id* ¶12. Thus, "the State has failed to compound pentobarbital for use on June 8, 2022, with a BUD after that date" *id.* ¶10, in violation of its obligations under the Department's Execution Procedures.

81. Aside from the BUD-related disclosures that have failed to establish a BUD, the State has provided just two pages, both heavily redacted, regarding the batch of drugs it intends for Mr. Atwood. The first was disclosed on April 15, 2022, and the second three days later, each reflecting a single test that measured only the potency of the pentobarbital sodium solution. Exhibit 14, Lab results.

82. These pages do not contain enough information to assess the suitability of the drugs for use in Mr. Atwood's execution, and do not constitute a "quantitative analysis" as contemplated by the Execution Procedures.

**D. Defendants' Ancillary Procedures May Impede Plaintiff's Rights During the Execution.**

83. The Execution Procedures contemplate one or more attorneys for the condemned having access to witness the execution. Ex. 4, ¶5.1.1.6; ¶13.5.1.3. Further, "[w]hile the attorney witness is in the witness room, a member of the Witness Escort Team shall hold one mobile phone designated by the attorney, to be made available to the attorney in exigent circumstances. The mobile phone may not be used inside the witness room." The term "exigent circumstances" is undefined. This condition may obstruct Plaintiff's counsel's exercise of professional judgment in communicating with counsel's legal team, the courts, or a medical expert.

84. The ability of Plaintiff's counsel to communicate at all will be dictated by an unspecified Witness Escort Team member. The procedures do not define "Witness Escort Team" or "Teams," although the latter term appears once, under the heading of Technical Operations Requirements (¶ 13.5.1). The Execution Procedures provide no indication of the qualifications, background, training, or anything else concerning criteria for selection to this team and their actual responsibilities and tasks.

85. Defendants' "Contingency Procedure" for the Department's lethal injection protocol requires that an AED (automated external defibrillator), "will be readily available on site in the event that the inmate goes into cardiac arrest at any time prior to dispensing the chemicals; trained medical staff shall make every effort to revive the inmate should this occur." *Id.*, Att. D, §6. Further, the Contingency Procedure expressly concerns only an emergency "aris[ing] at any time before the order to proceed with the execution is issued by the Director[,]" or "[i]f the Director determines to stand down [after commencement of the procedure]." *Id.*, G.2, G.3.

86. The execution could be halted for various reasons other than from Defendant Shinn's determination to cease the process, including because a stay is entered during the process because the execution is not going to plan. Resuscitation might be necessary after some amount of the compounded pentobarbital has been dispensed.

87. The Execution Procedures accord Defendant Shinn the authority to "direct the curtains to the witness viewing room be closed, and if necessary for witnesses to be removed from the facility, only in the event of a legitimate penological objective which would merit such closure and/or removal." *Id.*, ¶13.5.1.2. The provision provides no indication of criteria for penological objectives nor limits to Defendant's discretion in relation to visibility of the execution processes.

### E. Defendants' Specification of Hydrogen Cyanide as its Lethal Gas Is a Determination to Gratuitously Inflict Pain.

88. Amendment to Article XXII, § 22 of the Arizona Constitution, provides that individuals sentenced to death for an offense committed before November 23, 1992, "shall have the choice of either lethal injection or lethal gas" as the method of execution. This state-created interest is further enshrined in legislation, A.R.S. § 13-757(B). Neither the Arizona Constitution nor Arizona statute specifies the nature of the gas the Department shall use in the lethal gas method.

89. Like its lethal injection protocol, the Department's Execution Procedures for carrying out a lethal gas execution is part of D.O. 710, specifically Attachment E of that order ("the lethal gas protocol"). Ex. 4. The Execution Procedures can actually specify a gas method because Arizona is the only United States jurisdiction with a purportedly

operational gas chamber, a vessel manufactured and procured in 1949.[18]

90. The lethal gas protocol specifies the use of sodium cyanide with a sulfuric acid and water mixture, which produces hydrogen cyanide.

91. The selection of cyanide gas, as opposed to some other lethal gas, was made at the discretion of the Department, and thus ultimately of Defendant Shinn, its Director, and perhaps that of other Defendants with the Department.

92. Mr. Atwood has a constitutional and statutory right to choose between lethal injection and lethal gas as his method of execution. But hydrogen cyanide gas, the lethal gas method Defendants designated, has a documented history of producing agonizing, unconstitutional levels of pain as it inflicts death.[19]

     **1. Arizona Law Provides Mr. Atwood a Choice of Lethal Gas but the Nature of that Gas Is Left to Defendants' Discretion.**

93. In 1933, voters approved the addition of Article 22, Section 22 to the Arizona

---

[18] Just three other states contemplate a "lethal gas" choice. Cal. Penal Code § 3604 (lethal injection is administered, unless prisoner chooses lethal gas); Mo. Ann. Stat. § 546.720 (statute contemplates injection and gas and is ambiguous as to selection; Missouri has not used lethal gas in modern period); Wyo. Stat. Ann. § 7-13-904 (designates lethal gas only in the event lethal injection is deemed unconstitutional). In the past seven years, three states have legislated a nitrogen hypoxia option. On April 17, 2015, the Oklahoma Legislature first amended its methods statute to authorize nitrogen hypoxia in the event lethal injection is held unconstitutional or deemed "otherwise unavailable." Okla. Stat. Ann. Tit. 22 § 1014. On March 22, 2018, Alabama adopted a prisoner choice of nitrogen hypoxia or electrocution in conjunction with the default method of lethal injection. Ala. Code § 15-18-82.1.b. On April 14, 2022, the Mississippi Legislature amended its statute, effective July 1, 2022, to permit a nitrogen hypoxia execution even when lethal injection is available. 2022 Miss. Laws H.B. 1479, amending Miss. Code Ann. § 99–19–51.

[19] Generally, it is an internationally banned chemical. *See* Chemical Weapons Convention Implementation Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681. 22 U.S.C.A. § 6701 (12)(C) (Schedule 3 chemical agents, including hydrogen cyanide).

Constitution, which established lethal gas as the State's method of execution. Nearly 60 years later, in 1992, voters approved an amendment to that section of the constitution to establish lethal injection as the method of execution for all future offenses resulting in a death sentence. For older offenses, however, the 1992 amendment provided "that defendants sentenced to death for offenses committed prior to the effective date of the amendment to this section shall have the choice of either lethal injection or lethal gas." The amendment became effective on November 23, 1992.

94. The statutory counterpart of Article 22, Section 22 similarly reflects that capital defendants whose offenses predate the effective date of the 1992 amendment may, at their choice, select between lethal gas and lethal injection. It further specifies that that choice may be made 20 days prior to the defendant's execution date. The relevant statute provides in part: "A defendant who is sentenced to death for an offense committed before November 23, 1992 shall choose either lethal injection or lethal gas at least twenty days before the execution date." A.R.S. § 13-757(B).

95. In 1987, Mr. Atwood was sentenced to death for a crime which occurred in 1984. He thus has a right under Arizona's statutes and constitution to decide whether he will be executed by lethal gas or lethal injection.

96. Notably, neither Article 22, Section 22 nor any Arizona statute specify what lethal gas or gases can or shall be used to carry out a lethal gas execution, nor do they provide any guidance or limitation of any kind as to the identity of the gas to be used in executions, other than that it be lethal.

97. The decision about which lethal gas to use in a lethal gas execution is thus vested

entirely in the discretion of the Department, which is charged with carrying out executions, and its Director, Defendant Shinn, and other Defendants in their capacities serving the Department. The only implicit limitation is that the gas selected may not violate the bars against cruel and unusual punishment found in Article 2, Section 15 of the Arizona Constitution and the Eighth Amendment to the United States Constitution.

98. The decision to designate hydrogen cyanide gas to carry out lethal gas executions was thus made by Defendants in their sole discretion.

99. Under the lethal gas protocol, the condemned is strapped into a chair in the gas chamber. After the gas chamber is sealed, a system of valves and levers is used to combine sodium cyanide[20] with sulphuric acid and distilled water. This combination causes a chemical reaction that creates a cloud of hydrogen cyanide gas which fills the gas chamber. Inhaling cyanide gas is fatal to the inmate strapped to the chair located inside the chamber.

## 2. History and Precedent of Hydrogen Cyanide Gas Leaves No Doubt it Inflicts Extreme Pain and Suffering.

### a. Nevada innovates with cyanide gas execution in 1924

100.        Twenty-five years before the delivery of the Department's gas chamber (*supra*), Nevada was the first state to use cyanide, executing Mr. Gee Jon on February 8, 1924, after its supreme court upheld the statute ushering in the lethal gas method nationally.[21] Initially, Nevada envisioned administering the poison into the condemned's

---

[20] Despite the specification of sodium cyanide, public records reflect Defendants' purchase in late 2020 of substantial amounts of potassium cyanide, a different kind of cyanide from what the Department now specifies (*viz.*, sodium cyanide). Exhibit 15.
[21] *State v. Gee Jon*, 211 P. 676 (Nev. 1923).

"cell at night to execute him in his sleep," but "because half the cell block potentially could have been killed . . . a special enclosure had to be built."[22]

101.     Thus was born the prototypical gas chamber for penological use, a precursor to large-scale chambers to deploy cyanide gas for genocidal use.[23] In the years between Nevada's innovation and Nazi Germany's massive scaling of the technology, Arizona supplanted hanging with lethal gas by a 1933 plebiscite amending the constitution (*supra*), which the state supreme court promptly upheld.[24] States carried out nearly 600 cyanide gas executions in the decades following Nevada's legislation and before *Furman v. Georgia*, 408 U.S. 238 (1972), struck down all capital statutes.[25]

102.     Upon reestablishment of capital punishment after *Gregg v. Georgia*, 428 U.S. 153 (1976), only 11 lethal gas executions have occurred in the United States,[26] all of which used cyanide gas and the last of which was this Department's execution in 1999 of

---

[22] Allen Huang, *Hanging, Cyanide Gas, and the Evolving Standards of Decency: The Ninth Circuit's Misapplication of the Cruel and Unusual Punishment Clause of the Eighth Amendment*, 74 Or. L. Rev. 995, 1004 (1995) (citing Michael V. DiSalle, *The Power of Life or Death* (1965), at 21).

[23] *See generally United Kingdom v. Tesch*, 1 L. Rep. Tr. War. Crim. 93 (1947) (finding supplier of Zyklon B cyanide gas to German concentration camps in violation of "the laws and usages of war").

[24] *Hernandez v. State*, 43 Ariz. 424, (1934) (rejecting challenge on ex post facto and cruel and unusual punishments grounds).

[25] *See generally* Scott Christianson, *The Last Gasp: The Rise and Fall of the American Gas Chamber* (2010).

[26] Since the post-*Gregg* resumption of executions, in Utah in 1977, there were only nine lethal gas executions conducted outside of Arizona: one in Nevada in 1979, four in Mississippi between 1983 and 1989, two in California in 1992 and 1993, and two in North Carolina in 1994 and 1998. *See* Death Penalty Information Center, Execution Database: deathpenaltyinfo.org.

Walter LaGrand, entailing 18 minutes of violent asphyxiation.[27]

103.     Mr. LaGrand's was one of just two such executions the Department conducted post-*Gregg*; it also used hydrogen cyanide to execute Donald Harding in 1992,[28] a death reported as "extremely violent," in which Mr. Harden's "body turn[ed] from red to purple," and credited with the constitutional amendment adopting lethal injection as the state's default method.[29]

### b.  Arizona's Execution of Donald Harding, 1992

104.     The State of Arizona executed Donald Harding using cyanide gas in 1992. Multiple eyewitnesses described the gruesome, painful details of Mr. Harding's death, which took ten minutes and thirty-one seconds to complete.

105.     Later that year, Justice Stevens quoted the first-hand account of Mr. Harding's death from his attorney, who witnessed it:

> When the fumes enveloped Don's head he took a quick breath. A few seconds later he again looked in my direction. His face was red and contorted as if he were attempting to fight through tremendous pain. His mouth was pursed shut and his jaw was clenched tight. Don then took several more quick gulps of the fumes. [] At this point Don's body started convulsing violently. ... His face and body turned a deep red and the veins in his temple and neck began to bulge until I thought they might explode. [] After about a minute Don's face leaned partially forward, but he was still conscious. Every few seconds he continued to gulp in. He was shuddering uncontrollably and his body was racked with spasms. His head continued to snap back. His hands were clenched. [] After several more minutes, the most violent of the convulsions subsided. At this time the muscles along Don's left arm and back began twitching in a wavelike motion under his skin. Spittle drooled from his mouth.... [] Don did not stop moving for approximately eight minutes, and

---

[27] Patty Machelor, *LaGrand: 18 minutes to die*, Tucson Citizen, Mar. 4, 1999.
[28] Charles Howe, *Arizona Killer Dies in Gas Chamber*, S.F. Chron., Apr. 7, 1992, at A2.
[29] AP, *Gruesome Death in Gas Chamber Pushes Arizona Toward Injections*, New York Times, Apr. 25, 1992, § 1, 9.

after that he continued to twitch and jerk for another minute. Approximately two minutes later, we were told by a prison official that the execution was complete.

*Gomez v. U.S. Dist. Ct. for N. Dist. of California*, 503 U.S. 653, 655–56 (1992) (Stevens, J., dissenting) (citation omitted).[30]

106.     Other witnesses corroborate Mr. Belanger's account. Veteran Tucson Citizen reporter Carla McClain, a media witness with almost 25 years of experience as a reporter, testified that Mr. Harding immediately and continuously "groaned loudly and began to choke to death." Exhibit 16, McClain dec.

107.     Ms. McClain observed Mr. Harding's hand clenching, followed by his head dropping down before jerking "high and back." *Id*.

108.     Ms. McClain recounted that Mr. Harding "groaned again and again, gasped, and his body turned bright red, almost purple as he clenched and convulsed in obvious pain." *Id*.

109.     Even after Mr. Harding appeared to have become unconscious, after several minutes of agony, Ms. McClain observed that "He seemed to continue gasping and shuddering," and that his "chest convulsed and muscles quivered." *Id*.

110.     Donna Hamm also witnessed Mr. Harding's execution. After Mr. Harding inhaled the cyanide gas, Ms. Hamm observed that his

head was thrown back violently against the chair and he turned his head from side to side. He jerked and twisted as if gasping for air. At the same time, his body buckled against the straps. Severe convulsing began, and continued throughout. Even through the thick glass of the gas chamber, I heard him

---

[30] See also Jim Belanger, Opinion, *I watched Don Harding's execution in an Arizona gas chamber. His face still haunts me*, Arizona Republic (June 8, 2021).

moan a low, gutteral [sic] sound of sheer torment. I prayed for him to go quickly.

Exhibit 17, Hamm dec.

111.     Ms. Hamm observed that Mr. Harding's body shook and convulsed so severely that she thought he might move the chair he was strapped into. She noticed that for a two minute period "his hand never stopped contorting in bizarre ways." *Id.* Ms. Hamm also noted that Mr. Harding's "body, especially his back and neck had turned a deepening red." *Id.*

112.     Ms. Hamm described Mr. Harding's death as "prolonged, ritualistic torture," and she believed that his death was more gruesome and painful than that of her own father, who burned to death in a fire following a plane crash. Memories of the manner of Mr. Harding's death were so traumatic that she found it difficult to sleep for days afterward. *Id.*

113.     Then-Attorney General Grant Woods also observed the execution. A supporter of the death penalty, Mr. Woods stated that Mr. Harding "needed to know from start to finish that we were not going to cut him any slack because he didn't deserve it. That means right up to the end." Michael Murphy, *Woods says he didn't see finger gesture*, Phoenix Gazette (April 7, 1992). Exhibit 18.

114.     Nonetheless, Mr. Woods also expressed that Mr. Harding's execution was "a terrible thing to witness" and that observing it hardened his opinion that the state should no longer use lethal gas as a method of execution. He further stated "It took so long… I don't know who came up with this concept of a gas chamber in the first place. Maybe that was innovative a while ago, but it's not today." *Id.*

*c. Execution of Walter LaGrand, 1999*

115.    Arizona's most recent lethal gas execution was that of Walter LaGrand in 1999 (*supra*). Like Mr. Harding, Mr. LaGrand was executed using cyanide gas. Like Mr. Harding, eye witnesses reported that his death was extremely painful.

116.    Patty Melchor, a reporter for the Tucson Citizen, served as a media witness at Mr. LaGrand's execution. Patty Machelor, *LaGrand: 18 minutes to die*, Tucson Citizen (Mar. 4, 1999), Exhibit 27.

117.    Ms. Melchor reported that after Mr. LaGrand "became enveloped in a cloud of cyanide vapor," he "began coughing violently – three or four loud hacks – and then, in what appeared to be his last moments of consciousness, he made a gagging sound before falling forward." *Id.*

118.    Afterwards, Ms. Melchor observed that Mr. LaGrand's body continued to twitch for several minutes after falling forward. *Id.*

119.    Another media witness, Bart Graves of KTAR, reported that during the execution Mr. LaGrand gurgled and coughed violently and that his back muscles contorted until his head finally dropped. Christina Leonard, *LaGrand dies in state gas chamber*, Arizona Republic (Mar. 4, 1999), Exhibit 19.

120.    A reporter with the Arizona Daily Star who witnessed the execution, Heather Urquides, reported that Mr. LaGrand strained against the straps holding him in place until he finally slumped over. *Id.*

121.    In total, it took approximately 18 minutes for Mr. LaGrand to die. *Id.*

*d. Cyanide Gas Executions Elsewhere*

122.    While the LaGrand and Harding executions are the only cyanide gas executions performed in Arizona over the last half century, other states had performed cyanide gas executions in the modern era, prior to LaGrand's. As with the two Arizona executions, accounts of those executions reflect that cyanide gas is an extremely painful method of killing.

123.    For example, in 1979, the State of Nevada executed Jesse Bishop using cyanide gas. Tad Dunbar served as a media witness to that execution and reported that after the cyanide was released into the acid, Mr. Bishop took a deep breath and

> immediately gasped and convulsed strenuously. His body stiffened and his head lurched back. His eyes widened, and he strained as much as the straps would allow. He unquestionably appeared to be in pain. I noticed that he had urinated on himself…. He alternately strained and then relaxed against the straps for about ten minutes.

Exhibit 20, Dunbar dec.

124.    While he did not have preconceptions about the nature of a lethal gas execution prior to observing the Bishop execution, Mr. Dunbar stated that he "was surprised to see that death did not appear to come rapidly or painlessly under that method of execution." *Id*.

125.    In 1983, the State of Mississippi executed Jimmy Lee Gray using cyanide gas. Mr. Gray's attorney, Dennis Balske, witnessed the execution. Exhibit 21, Balske dec.

126.    Mr. Balske was able to view the great physical distress Mr. Gray was in as soon as he breathed in the cyanide gas, testifying in an affidavit as follows:

> Once the gas reached Mr. Gray's face, he began to thrash around in his chair. He jerked forward and back, repeatedly slamming his head on a metal support pole situated behind the chair. The chilling sound of his head

desperately smashing against the pole reverberated through the area over and over again. About the seventh time he pounded his head against the pipe, his desperation was so great that the six-sided glass chamber seemed to shake with the impact. He slumped and lay still for a few moments, then tensed up and resumed his struggling, again smashing his head against the pole. Mr. Gray struggled for air while his body contorted and twisted.

*Id.*

127.     Eight minutes into the execution, Mr. Balske and other witnesses were ordered to leave the witness room despite the fact that Mr. Gray "was still struggling for air and banging his head." *Id*.

128.     Calling the execution "a nightmare," Mr. Balske stated that "Nothing in my experiences as an attorney or a human being could have prepared me to witness the prolonged and torturous death of Jimmy Lee Gray." He described the execution as "vile and repulsive to observe" and "clearly excruciating and horrific" for Mr. Gray. *Id*.

129.     A media witness to the Gray execution, Dan Lohwasser, corroborated Mr. Balske's account. He testified that after the cyanide gas was released, Mr. Gray strained against the straps holding him in place and that after several minutes he began to slam his head into the metal pole behind the chair he was placed in. Mr. Lohwasser reported that Mr. Gray's "mouth took on an anguished, distorted expression as he gasped for air… He let out a very long guttural groan. He looked like he was being strangled to death. It was obvious that Mr. Gray was in excruciating pain." Exhibit 22, Lohwasser dec.

130.     Mr. Lohwasser, who experienced combat and was exposed to violent deaths during the Vietnam War, described Mr. Gray's execution as "far more cruel, barbaric, and demoralizing than any other violent and gruesome acts that I have witnessed." *Id*.

131.     In 1987, Mississippi executed Connie Ray Evans using cyanide gas. One of Mr. Evans' attorneys, Robert Marshall, witnessed the execution. Mr. Marshall reported that after the cyanide gas was generated, Mr. Evans let out "the first of several loud agonizing gasps." Mr. Evans lost control of his bodily functions and a rope of saliva hung from his chin. The muscles on his neck tightened and bulged, and his "forced breathing and tensed body exhibited excruciating pain." It took 13 minutes for Mr. Evans to die. Exhibit 23, Marshall dec.

132.     Mr. Marshall reported experiencing nightmares about the Evans execution for years after it took place. *Id*.

133.     In 1989, Mississippi executed Leo Edwards using cyanide gas. The execution was witnessed by his attorney, Kenneth Rose. Mr. Rose reported that after the cyanide gas was released, Mr. Edwards began banging his head and straining fiercely against the straps which held him in place. He let out several "shriek[s] of terror." Exhibit 24, Rose dec.

134.     Mr. Rose was certain "that Mr. Edwards was conscious and suffering excruciating pain during the execution. I do not believe that an unconscious person could scream the agonizing screams that ripped through that room in Mississippi. I was disgusted and sickened by the pain and torment I saw in Leo Edwards' final desperate minutes of life." *Id*.

        *e. Cyanide Gas and Mass Exterminations*

135.     During the Second World War, Nazi Germany systematically murdered millions of civilians it deemed undesirable, including Romani people, Slavs, homosexuals, disabled persons, and approximately six million Jews, among others. Millions of these

victims died in gas chambers at Auschwitz-Birkenau and other extermination camps.

136.     Victims of the Nazis murdered in the gas chamber at Auschwitz-Birkenau and elsewhere were killed primarily using hydrogen cyanide gas, sold under a commercial formulation bearing the name "Zyklon B."

137.     Zyklon B was originally developed for agricultural purposes as a pesticide. During the 1940s, however, the Nazi regime obtained and began using it as a method of mass murder.

138.     The Nazis used Zyklon B to murder approximately 1.1 million people between 1942 and 1945. At its height, an average of 6,000 Jews were killed each day using Zyklon B at the Auschwitz II killing center, according to the U.S. Holocaust Memorial Museum.

139.     As a teenager in Czechoslovakia, Gloria Lyon and other members of her family were interned by the Nazis at Auschwitz-Birkenau. While she was imprisoned there, Ms. Lyon lived in constant fear of the gas chamber and witnessed countless others taken there to be killed. She "knew it was a painful death, as I had heard screams coming from the gas chamber." Exhibit 25, Lyon dec.

140.     Ms. Lyon stated that while

> [i]nnocent Holocaust victims can never be compared with convicted murderers…, the fact remains that being suffocated to death with poisonous gas is always cruel, painful, inhumane and barbaric. As a person who saw the daily horror of mass extermination by gas, I know that execution by gas is torture and it can never be anything less.

*Id.*

141.     Similarly, John Steiner, a Jewish man from Prague, along with his family

were captured and imprisoned by the Nazis. During his ordeal, Mr. Steiner was imprisoned at Auschwitz-Birkenau for more than a year, where he witnessed countless people taken away to be killed in the gas chamber. Exhibit 26, Steiner dec.

*142.*　　Years later, after immigrating to the United States, Mr. Steiner was employed at San Quentin prison in California and was asked to serve as a witness at a lethal gas execution. Mr. Steiner declined, stating that he "knew that lethal gas is an excruciatingly painful method of execution. Witnessing a person being gassed to death would bring back horrendous memories of the hideous fate suffered by millions, which included my family, extended relatives, and friends." *Id.*

143.　　Mr. Atwood has a family connection to the millions of innocent lives killed by the Nazis in the gas chamber. His mother, Alice Shelton, was a woman of Jewish heritage native to Vienna, Austria. Along with other members of her family, Alice fled Austria, after Nazi Germany annexed that country in 1938, and eventually settled in the United States.

144.　　Before emigrating, Alice and her family faced the fate of death in the Nazi gas chamber that befell millions of others.

### f.　*Fierro v. Gomez* and California's Use of Cyanide

145.　　In 1994, the Northern District of California held an extensive trial on whether executions by cyanide gas inflict torturous pain and suffering. *Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994). Following an eight-day trial, the Court entered a detailed factual order concluding that executions using cyanide gas constituted cruel and unusual punishment in violation of the Eighth Amendment.

146.    At issue in *Fierro* was the State of California's use of cyanide gas in executions, the same gas Arizona used in the Harding and LaGrand executions and which is called for by Defendants' current lethal gas protocol.

147.    Evidence considered by the district court included a review of accounts of Arizona's execution of Donald Harding by cyanide gas in 1992, discussed above. Based upon this review, the court noted that Mr. Harding's "execution was, by all accounts, prolonged and apparently agonizing." 865 F. Supp. at 1408.

148.    In *Fierro*, the Court, "based on the evidence presented at trial, the testimony of the experts and the scientific literature introduced as exhibits," found that an inmate exposed to cyanide gas remained conscious for up to several minutes after inhaling the gas. 865 F. Supp. at 1404.

149.    The Court continued:

> During this time [of consciousness after inhaling cyanide gas], the court finds that inmates suffer intense, visceral pain, primarily as a result of lack of oxygen to the cells. The experience of "air hunger" is akin to the experience of a major heart attack, or to being held under water…. Other possible effects of the cyanide gas include tetany, an exquisitely painful contraction of the muscles, and painful build-up of lactic acid and adrenaline. Cyanide-induced cellular suffocation causes anxiety, panic, terror, and pain.

*Id.* (citations omitted).[31]

---

[31] The district court's findings of fact and order were affirmed on appeal by the Ninth Circuit. *Fierro v. Gomez*, 77 F.3d 301, 309 (9th Cir. 1996). Subsequently, the California legislature amended the state's death penalty statute to eliminate lethal gas as a method of execution. On that ground alone, the U.S. Supreme Court vacated the decisions below and remanded for further proceedings. *See Gomez v. Fierro*, 519 U.S. 918 (1996). On remand, the Ninth Circuit dismissed case for lack of standing. *Fierro v. Terhune*, 147 F.3d 1158 (9th Cir. 1998). On information and belief, no federal court has reached the merits of a constitutional gas challenge since the initial *Fierro* decisions.

150.     Subsequent to *Fierro*, the State of Arizona conceded that the method of lethal gas execution it employed—that is, execution by cyanide gas—was substantially similar to the California method at issue in *Fierro. LaGrand v. Stewart*, 173 F.3d 1144, 1148 (9th Cir. 1999).

151.     The State further conceded the detailed testimony and findings of the intense pain and suffering inflicted on individuals executed with cyanide gas found by the district court in *Fierro*. 173 F.3d at 1149 ("Counsel for the State has candidly admitted that if the question of Arizona's use of lethal gas went to trial, the record would be no different than it was in Fierro."). *Id.*

152.     In the same case, the Ninth Circuit reaffirmed its earlier conclusion, based on the *Fierro* record, that execution by cyanide gas violated the Eighth Amendment. *Id.*

g.  *Arizona's Long Absence of Any Gas Protocol*

153.     Although Arizona conducted two lethal gas executions in the 1990s, from at least 2010 until 2021,[32] the Department did not maintain a formal lethal gas execution protocol.[33]

154.     During that period, D.O. 710, at times, provided that qualifying inmates be notified of their option to select lethal gas over lethal injection. It further broadly directed Department staff to ensure that the gas chamber was maintained.

---

[32] Counsel for plaintiff have not accessed any manual issued between the date of the Department's last cyanide execution, March 3, 1999, and December 16, 2010 (*infra* n.32).
[33] These ten manuals in effect prior to the current iteration (*supra*) have the following effective dates: Dec. 17, 2010; Sep. 5, 2011; Jan. 25, 2012; Mar. 26, 2014; Sep. 30, 2015; Apr. 29, 2016; Jan. 11, 2017; Jun. 7, 2017; Jun. 13, 2017; and Nov. 20, 2019.

155.     However, during this period, D.O. 710 contained no provisions outlining how gas executions were to take place or the identity of the lethal gas or gases to be used in a lethal gas execution.

156.     On March 10, 2021, D.O. 710 was amended. This amendment added Attachment E, the lethal gas protocol.

157.     With this addition, for the first time in at least a decade, the Department possessed a formal protocol for carrying out a lethal gas execution. The newly adopted lethal gas protocol described a method for carrying out executions via sodium cyanide with a sulfuric acid and water mixture, to make hydrogen cyanide.

158.     Thus, in 2021, the Department formally adopted cyanide gas as its method of lethal gas execution despite the State's concession more than two decades prior, in the *LaGrand* case, that execution by cyanide gas results in a torturous, highly painful death. 173 F.3d at 1149.

159.     The current version of the lethal gas protocol is identical to the one published in 2021, including its selection of cyanide gas as the lethal gas.

160.     Prior to the entry of his execution warrant on May 3, 2022, Mr. Atwood was, of course, unable to choose a method for his execution.[34] Thus, any dispute about the lethal gas method or, for that matter, Defendants' lethal injection method, did not ripen for Mr. Atwood until the date of that Arizona Supreme Court order. Under A.R.S. § 13-757(B) and

---

[34] In anticipation of the warrant, he sought administrative relief within the Department's proper grievance procedures, yet Defendants refused to process his submission and, further, refused to process his attempted appeal from the initial refusal.

per the terms of the Arizona Supreme Court's warrant, Mr. Atwood was entitled to choose lethal gas as his execution method until May 19, 2022, 20 days prior to his execution date of June 8, 2022.

161.    On May 14, 2022, undersigned counsel sent a demand letter to counsel for Defendants explaining that their designation of hydrogen cyanide gas renders the State's gas method unconstitutional and that the use of nitrogen could be readily implemented and would be constitutional. Exhibit 32. The following day, counsel for Defendants responded, stating their "disagree[ment] that ADCRR's current procedures regarding lethal gas violate any applicable statutory or constitutional provision and, therefore, ADCRR will not be making any changes to these procedures." Exhibit 33.

162.    On May 18, 2022, the day before the lapsing of the 20-day period at 12:01 a.m. on May 20, 2022, counsel for Mr. Atwood wrote Defendants' counsel to request nitrogen gas as his execution method while stating "Mr. Atwood is not hereby choosing cyanide gas as his method of execution." Exhibit 34. The letter further set forth:

> While the State is on the precipice of violating its obligation to provide a constitutional choice within the time period contemplated by the statute, the Arizona Constitution ensures Mr. Atwood's right to choose between the injection and gas methods. Unless and until the State provides the options it is statutorily and constitutionally required to provide, the fact that Mr. Atwood has refused to submit an ostensible choice of method that does not provide two real options cannot be construed as a failure to choose as contemplated by A.R.S. § 13-757(B), nor as an affirmative choice of lethal injection. In fact, the State has precluded Mr. Atwood from making the choice because of the State's violations, which he continues to demand that the State remedy.

163.    *Id.* With Defendants' designation of hydrogen cyanide gas, had Mr. Atwood selected the lethal gas method by the statutory deadline of May 19, Supreme Court

authority would foreclose his ability to challenge the method's violation of the Eighth Amendment.[35] Thus, Mr. Atwood brought the present action on May 19, seeking, inter alia, vindication of his liberty interest in the present Arizona constitutional and statutory guarantees of his choice of a lethal gas method and of his right to be free from cruel and unusual punishment.

164.     On May 19, 2022, Defendant Brnovich's office, in response, reiterated the Department "will not be making any changes to its current lethal gas procedures." Exhibit 35.

## VII.   Constitutional Pleading Requirement of Alternative Execution Methods

### A.  Seated Administration of Intravenous Catheter and Lethal Injection.

165.     Plaintiff maintains his challenge of Defendants' use of compounded pentobarbital sodium injection for the reasons pleaded herein concerning the adequacy of the compounding. Defendants have failed to establish that the compounded injectable solution prepared for use to execute Mr. Atwood on June 8, 2022, is adequate for its intended purpose.

166.     Apart from Defendants' unlawful use of the Department's retained compounding pharmacist's preparation of injection chemicals, Plaintiff has pleaded Defendants' violation of the prohibition against the infliction of cruel and unusual punishments as-applied to Plaintiff due to his particular health history and status.

167.     Defendants, through the operation of the Department's Execution

---

[35] *Stewart v. LaGrand*, 526 U.S. 115 (1999) (per curiam).

Procedures, for which Defendants are responsible for preparing, promulgating, and imposing, intend to restrain Plaintiff's arms, body, and legs to the Department's execution table before the insertion of any intravenous catheter, the conducting of other procedures associated with conducting lethal injection such as the seating of witnesses of the execution, and ultimately the administration of injectable solution to conduct the lethal injection. This restraint of Plaintiff to the execution table would gratuitously inflict extreme pain, doing so for an extensive period that the Department's record from prior executions indicates would transpire for a period of approximately an hour or more, even if the administration of the injection itself is successful as planned.

168.     Plaintiff hereby pleads an alternative to Defendants' lethal injection procedures. Plaintiff pleads that Defendants secure him to his wheelchair and insert an intravenous catheter and administer the lethal injection while he remains seated.

**B. Spinal Surgery**

169.     Defendants could also undertake to sufficiently treat Mr. Atwood's condition and attendant pain, addressing the reason he is unable to lie flat to begin with. As Dr. Davidson explains, "surgical intervention is likely necessary to address the underlying causes of his chronic pain." Ex. 2, ¶ 32.

**C. Nitrogen Gas**

170.     As set forth above, the Arizona Constitution and Arizona's method of execution statute provide for lethal gas as a method of execution for capital defendants, such as Mr. Atwood, who are sentenced to death for offenses which occurred before November 23, 1992. Ariz. Const. Art. 22 Sec. 22; A.R.S. § 13-757(B). Neither authority

specifies the kind of gas that may or must be used under that method.

171.    In the past seven years, three states have legislated a nitrogen hypoxia option. Nitrogen presents numerous advantages as a method.

172.    On April 17, 2015, the Oklahoma Legislature first amended its methods statute to authorize nitrogen hypoxia in the event lethal injection is held unconstitutional or deemed "otherwise unavailable." Okla. Stat. Ann. Tit. 22 § 1014.

173.    On March 22, 2018, Alabama adopted a prisoner choice of nitrogen hypoxia or electrocution in conjunction with the default method of lethal injection. Ala. Code § 15-18-82.1.b.

174.    In 2017, the Mississippi legislature amended that state's lethal injection statute to provide for nitrogen hypoxia as an alternative method of execution in the event that lethal injection is ruled unconstitutional or otherwise becomes unavailable. 2017 Miss. Laws Ch. 406, amending Miss. Code Ann. § 99–19–51.

175.    On April 14, 2022, the Mississippi Legislature amended its statute, effective July 1, 2022, to permit a nitrogen hypoxia execution even when lethal injection is available. 2022 Miss. Laws H.B. 1479, amending Miss. Code Ann. § 99–19–51.

176.    None of the foregoing states, however, possess even a purportedly operational gas chamber. Arizona is the single United States jurisdiction with such a chamber. Defendants encounter no impediments to implementing a nitrogen hypoxia protocol by revision to the Execution Procedures and modest measures in preparation with respect to the use of the Department's chamber. The following implementation scenarios use the chamber, which is adjacent to the execution room in Housing Unit 9. Ex. 4, Att. E,

¶ 2.

### 1. Implementation.

177.    In setting forth a lethal gas execution using nitrogen, three detailed implementation scenarios are presented here.  Each may be readily implemented and is inexpensive, simple, and much safer to prison staff and witnesses than an execution under the Department's hydrogen cyanide procedures pursuant to Att. E of the Execution Procedures.

*a.  Underlying scientific principles*

178.    Nitrogen gas ($N_2$) constitutes approximately 80% of the natural atmosphere. It is not perceived or recognized by the natural senses because it is odorless, tasteless, colorless, and non-irritating. Nitrogen gas is largely chemically inert under normal environmental conditions and has no substantial biochemical or medicinal activities.

179.    Nitrogen is intrinsically harmless to human health and well-being, however, inhaling nitrogen in the absence of oxygen (which comprises approximately 20% of the atmosphere) is universally lethal, because continued intake of oxygen, of course, is necessary for supporting human life. Hypoxia occurs when a gas, such as nitrogen, essentially displaces oxygen in someone's inhalation. In slight contrast, anoxia occurs when oxygen is eliminated entirely from inhalation.

180.    Inhaling concentrated nitrogen gas produces rapid and painless unconsciousness and death in both humans and animals. Its efficacy in producing death in humans is well-known and well-understood due to industrial accidents in which workers die due to inadvertent exposure to nitrogen-rich environments. Nitrogen gas is not

48

detectable by human senses, unlike many other industrial gases, thus workers entering or exposed to nitrogen-rich oxygen-depleted chambers succumb without awareness or warning that the chamber is uninhabitable.

181.    The sensation and experience of oxygen deprivation is well-understood by medical, industrial, chemical engineering, aerospace, military, and other scientific professions and organizations.[36] Oxygen deprivation, whether via displacement by inert gas (such as nitrogen) or by high altitude environments,[37] produces rapid decline in mental and cognitive faculties, followed by complete unconsciousness ("blacking out") and death by cardiac arrest. The initial phase is not unpleasant, and sometimes involves mild euphoria, mild giddiness, amusement, and a sense of well-being. It is painless. The process rapidly produces unconsciousness.

182.    Regarding aviation contexts, the literature is abundant on "Time of Useful Consciousness" ("TUC"), which denotes the amount of time a pilot has to correct hypoxia before losing the ability to do so.[38] Inhaling zero percent oxygen (i.e., 100% nitrogen) will

---

[36] J. Ernsting, *The Effect of Brief Profound Hypoxia upon the Arterial and Venous Oxygen Tensions in Man*, J. Physiol. 169, Air Force Inst. Of Av. Med. 1-23 (1963) 292-311.

[37] The observation of oxygen deprivation is also important because of high-altitude environments encountered in aviation and elevated terrain. The hypoxia caused by high-altitude is not caused by nitrogen displacing/replacing oxygen, rather it results from the low concentration of oxygen in the air causing decreased uptake in the lungs and blood. However, the effects on the brain are the same, as evidenced by the current method of training pilots for hypoxic exposure using excess nitrogen rather than hypobaric (low pressure) chambers.

[38] S. Izraeli et al., "Determination of the 'time of useful consciousness' (TUC) in repeated exposures to simulated altitude of 25,000 ft, 59 Aviat. Space Environ. Med 1103-05 (1988).

produce a TUC on order of 5 seconds, and total unconsciousness and death shortly thereafter.

### b. Implementations, specific to the Department's extant chamber

183. The Department's gas chamber is purported to be impervious to all forms of gas, as evidenced by the Department's ability to conduct executions using the highly toxic cyanide gas within feet of officials and witnesses who participate and observe, unaffected and unharmed. Ex. 4, Att. E.

184. Even in the event of the chamber's substantial leakage of nitrogen into the witness or working area of the facility, the dilution of that nitrogen by the volume in the environment would likely subject the witnesses and personnel to a lesser degree of hypoxia than they encounter during commercial air travel.

185. The Department's gas chamber is already equipped with a venting system and chimney historically for evacuating toxic cyanide gas upon completion of the given execution. This same system would be suitable and effective for evacuating concentrated nitrogen gas and replacing it with normal air to render the chamber safe for entry to remove Mr. Atwood's body. In contrast, Attachment E to the Execution Procedures contemplates the following measures post-hydrogen cyanide gassing:

> CAUTION: Although smoke tests suggest that the [gas] Chamber is purged in approximately 3 to 5 minutes, it is recommended that the period between opening the exhaust and air inlet valves and opening the Chamber door be about 15 minutes. As a precautionary measure, it is recommended that the Physician and the Restraint Team removing the body wear hydrocyanic acid gas masks or approved respirators and rubber gloves and that the hair of the deceased inmate be ruffled in order to allow any residually trapped gas to escape. Close the Chamber door, but not tightened more than contact with the gasket, and aerate for one hour as necessary to clear any residual

ammonia.

Ex. 1, Att. E, ¶ 31.

186.    Further, the Lethal Gas procedures provide: "The Restraint Team shall hose down all the surfaces and the deceased inmate prior to removal from the chair." *Id.* at ¶ 32.

### 2.   Three Potential Approaches.

187.    The following paragraphs plead three readily implemented alternative methods using nitrogen gas in the Department's chamber to cause nitrogen hypoxia. These are:

A. flooding the chamber with pure nitrogen gas delivered from readily purchasable nitrogen cylinders;

B. fitting a face mask, similar to those worn by pilots or by hospitalized patients, and delivering pure nitrogen gas from readily available purchasable nitrogen cylinders; and

C. combining (A) and (B): pure nitrogen would be delivered to the mask as in (B), while the chamber containing Mr. Atwood would be flooded with pure nitrogen as in (A).

*Method A:  Flooding the gas chamber with nitrogen.*

188.    Under this implementation, Nitrogen cylinders are placed in a convenient and proximal location to the gas chamber.[39] Standard cylinder regulators govern the flow

---

[39] Suitable nitrogen gas cylinders, regulators, and tubing can be readily purchased here: https://www.airgas.com/Gases/Nitrogen/category/626
Airgas
544 W Iron Ave, Suite 101
Mesa, AZ 85210

of nitrogen gas and are easily controlled by hand or simple wrench-like tools. The nitrogen gas is carried via tubing, which can be of any nature convenient to the Department. It would be necessary to drill holes in the gas chamber to permit the tubing to enter the chamber, and several states, such as California, have drilled holes in their gas chambers to pass intravenous tubing for lethal injection procedures.[40] If desired, the Department could run several tubes to increase the rate of flooding of the chamber with nitrogen. After securing Mr. Atwood within the chamber and closing the chamber, the nitrogen cylinder regulators would be opened, gas would flow via the tubing into the chamber, and Mr. Atwood would quickly and painlessly become unconscious and then succumb to the deep hypoxia.

189.    Monitoring of Mr. Atwood's vital signs during the procedure could be accomplished easily via routine monitors such as a pulse oximeter and EKG (although this would necessitate drilling another hole in the chamber for the leads).

190.    Upon completion of the procedure, the already existing ventilation system is used to remove the pure nitrogen gas and replace it with normal atmosphere. This process is identical to that used to clear the gas chamber after a hydrogen cyanide gas execution, but with enormously reduced risk of injury and death to the personnel. In order to prevent pressure accumulation in the chamber, the cyanide vent could be left open in the process.

*Method B:  Nitrogen gas delivery via face mask.*

191.    As noted above, pilot training for high-altitude hypoxia involves the delivery

---

*See also* airgas.com.

[40] The Department could create holes that are easily covered by screw caps to permit reversion to using hydrogen cyanide gas while maintaining the high-performance seal that cyanide toxicity requires (as compared to nitrogen).

of high-nitrogen low-oxygen gas into a face mask. Other vocations and avocations require such functionality from face masks.[41] There are numerous such masks readily available from numerous suppliers.[42] For example, looking to Tennessee's recent activity reflects five executions between 2018 and 2020 by electrocution, all involving a hood over the condemned's head under that state's protocol.[43] Pilot oxygen masks are designed for comfort and adequate seal, and would not cause any pain, suffering, or discomfort to Mr. Atwood.

192.    Under this implementation, flexible plastic tubing is used to deliver the pure nitrogen to the mask, and the flow rate (up to 50 liters/minute) can be controlled by a medical gas regulator such as what is used to deliver oxygen to patients. Delivery of the 50 liters/minute flow rate would exceed an individual's maximum inspiratory rate.[44] . Thus, the condemned's inspiration would become anoxic, that is, he would breathe pure nitrogen.

193.    A single nitrogen cylinder could be located within the gas chamber, turned on by hand, and the chamber door would not need to be closed or sealed as the delivery of nitrogen into the ambient air of the facility would be negligible. Alternatively, a nitrogen cylinder or cylinders could be located as described in Method A, via the creation of holes in the chamber wall for tubing to pass through.

---

[41] Lubomir Straka, et al., *Sucidal Nitrogen Inhalation by Use of Scuba Full-Face Diving Mask*, 58 J. Forensic Sc. 1, 3 (2013).

[42] https://www.aircraftspruce.com/menus/ps/oxygen_mask.html.

[43] *See, e.g.*, Matt Lakin, *What I saw when I watched David Earl Miller die*, The Tennessean, Dec. 8, 2018.

[44] Göran Berndtsson, Leif Ekman, "A New Simplified Technique for Measuring Inspiratory Flow Characteristics," 20 J. of Int'l Soc. For Respiratory Protection 91 (F/W 2003).

194.    Monitoring of vital signs, including oxygen saturation, and EKG can be accomplished as in Method A. Post-execution removal of Mr. Atwood's body can be accomplished after venting the chamber with no risk whatsoever of toxicity or death to the prison staff. *Compare* Ex. 4, Att. E, ¶ 31, *infra*.

*Method C:  Combined gas chamber flooding and mask.*

195.    Combining Method A and Method B is unnecessary, because each one on its own would deliver rapidly fatal anoxic inhaled gas.  However, the Department could combine those two methods for the sake of redundancy. The preparation and safety measures would be the same as those applicable to Method A.

**D. Firing Squad**

196.    Currently, firing squad is not a statutory alternative method of execution in Arizona. See A.R.S. § 13-757. As a practical matter of the method's required materials and technical capacity, there is no impediment to implementation of the firing squad immediately. The history of capital punishment reflects there is no method of execution simpler to carry out effectively.

197.    As reflected herein, the method is neither unusual nor cruel, and it is clearly a known method. *Glossip v. Gross*, 576 U.S. 863, 867 (2015) (citing *Baze v. Rees*, 553 U.S. 35, 61 (2008) (plurality opinion)).

198.    The first recorded use of a firing squad to carry out capital punishment in the

United States occurred over four hundred years ago, in 1608.[45] It has been a common means of military execution since at least the Napoleonic era. Exhibit 28, Williams dec., at 8. By 1879, the Supreme Court upheld a death sentence by firing squad. *Wilkerson v. Utah*, 99 U.S. 130, 134-35 (1879) (cited in Glossip, 576 U.S. at 869 (2015)). Following the restoration of capital punishment after *Gregg v. Georgia*, 428 U.S. 153 (1976), Utah famously executed Mr. Gary Gilmore, a volunteer for his punishment, *Gilmore v. Utah*, 429 U.S. 1012, 1013 (1976), ushering in the modern era of executions. In 2010, Utah once again used a firing squad to carry out a death sentence.[46]

199.    The most recent Supreme Court opinion on methods of execution once again noted the availability of "execution by firing squad" has long been understood as "[c]onsistent with the Constitution's original understanding" "that the Eighth Amendment forbade the gruesome methods of execution described by Blackstone [in Commentaries on the Laws of England]." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1123 (2019) (discussing *Wilkerson v. Utah*, in approval). In underscoring the *Bucklew* majority opinion's "statement that 'we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative,'" Justice Kavanaugh highlighted the State of Missouri, as well as Justice Sotomayor's, emphases on the availability of this alternative, with the latter, having previously described it as "an alternative method of execution that

---

[45] Deborah W. Denno, *The Firing Squad as "A Known and Available Alternative Method of Execution" Post*-Glossip, 49 U. Mich. J. Law Ref. 749, 778 (2016) (citing M. Watt Espy & John Ortiz Smykla, EXECUTIONS IN THE UNITED STATES: 1608-1987 at I (1987).
[46] Ed Pilkington, Rachel Stevenson, "Death row inmate executed by Utah firing squad," *The Guardian*, Jun. 18, 2010.

generally causes an immediate and certain death, with close to zero risk of a botched execution." *Id*. at 1136 (Kavanaugh, J., concurring) (citing *Arthur v. Dunn*, 137 S. Ct. 725, 733-34 (2017) (Sotomayor, J., dissenting from denial of certiorari).

200.    The basic operation of a firing squad is well known, and simply encompasses "multiple riflemen firing simultaneously" upon the subject. Ex. 28 at 8. Medical knowledge of the effects gunshot wounds have on the body is extensive. *Id.* at 4. Two ways of assuring an immediate and painless death are well established: targeting the cardiovascular bundle and the brainstem. *Id.* As James S. Williams, M.D., emergency trauma care physician and firearms expert, has explained, the cardiovascular bundle is "the aggregate anatomic region comprising the heart and the large arteries and veins near to and with the mediastinum." *Id.* at 9.

201.    The traditional manner of firing squad executions targets the former, viz., the heart and the great vessels which lead to and from it in the chest, thereby denying the blood supply to the central nervous system. *Id*. "When the firing squad's bullets strike the heart and great vessels, the immediate effect is to cause cessation of blood circulation at its source." *Id*. The resulting "trauma to the cardiovascular bundle" immediately "cause[s] cessation of blood circulation at its source," by either (a) stopping the heart "electrophysiologically (by cessation of organized beating)," (b) "structurally disrupt[ing] the heart ] to the point of being unable to generate pulse pressure," or (c) disrupting "the arteries leading from the heart [such that] blood flowing out of the heart cannot be delivered to the brain and body." *Id*. "[T]he net effect is a catastrophic drop in blood pressure in the brain." *Id*. "The brain's function depends upon a continuous supply of oxygen via the

blood, and if that blood supply is stopped, loss of consciousness ensues within a matter of 10 seconds or less, and cortical/brainstem death inevitably follows within a matter of minutes." *Id.* at 5.

202.    Longstanding "medical knowledge of the terminal effects of cardiovascular bundle gunshot wounds," reflects that death occurs rapidly. *Id*. at 5, citing M. Fackler, "Gunshot Would Review," 28 *Annals of Emergency Medicine* Vol. 2, 194-203 (1966); V.J.M. DiMaio, Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques (2d Ed. 1999) CRC Press.

203.    Further, experience reflects that this manner of death, by gunshot wound to the cardiovascular bundle, causes "minimal pain." Ex. 28 at 5. For instance, "field medics in the U.S. Armed Forces" report "that the response to being shot with a rifle in the chest can be highly variable, depending on range, ballistic trajectory, and point and angle of impact, and the anatomic path of the bullet within the body." *Id.* It is understood that "subjects who are shot in the central chest (cardiovascular bundle) typically exhibit no life signs when examined, even when the time between injury and examination is only a matter of a few (five to fifteen) seconds." *Id.* Specific inquiries of death by firing squad substantiate this "short interval between gunshot wound to the chest and death." *Id.* For instance, a published electrocardiogram from a 1938 firing squad execution reflects that "the subject experienced immediate onset of ventricular fibrillation after bullet impact." *Id.* at 5-6.

204.    While death occurs rapidly from gunshot wounds to the cardiovascular bundle, the loss of consciousness and therefore the capacity to feel pain is effectively

instantaneous. This "immediate onset of ventricular fibrillation" or "arrhythmia typically causes loss of consciousness almost immediately," rendering the subject "insensible to pain." *Id.*

205.    Survivors of thoracic gunshot wounds inform an understanding of pain levels from such gunshot wounds. "Invariably, these persons describe the sensation as being that of a severe blunt blow to the chest, like a hard punch, or being struck with a club or bat." *Id*. at 6.

206.    The simplicity of the firing squad presents an exceedingly low risk of a botched execution due to executioner error. *Id.* at 7. Individuals capable, by virtue of their familiarity with the use of firearms, to participate in a firing squad are in abundance. *Id*. Arizona possesses more than 14,500 sworn officers licensed to carry and use a firearm. *Id.*

207.    The feasibility of the firing squad method is well-established as "a traditional and common means of execution since at least the 19th Century." *Id*. As noted above, Utah has long provided execution by firing squad as a statutory method of execution. Utah Code Ann. § 77-19-10(3).[47] In 2015, Oklahoma revised its execution statute to contemplate firing squad as an alternative contingent upon the legal or actual unavailability of other methods.

---

[47] The Utah Code provides firing squad as an alternative to lethal injection, pursuant to a "court hold[ing] that a defendant has a right to be executed by a firing squad," § 77-18-113(2), or "[i]f a court holds that execution by lethal injection is unconstitutional on its face," § 77-18-113(3)(a), or "that lethal injection is unconstitutional as applied." § 77-18-113(3)(b). Further, "the method of execution for the defendant is the firing squad if the sentencing court determines the state is unable to fully obtain the substance or substances necessary to conduct an execution by lethal intravenous injection 30 or more days before the date specified in the warrant issued upon a judgment of death []." § 77-18-113(4).

Okla. Stat. tit. 22, § 1014(D).[48] Effective May 14, 2021, South Carolina's execution statute provides electrocution as its method but permits the choice of either "firing squad or lethal injection, if it is available at the time of election." S.C. Code Ann. § 24-3-530.[49] Effective July 1, 2022, Mississippi's execution statute will provide the Commissioner and other officials of the Department of Corrections the discretion to designate either lethal injection, nitrogen hypoxia, electrocution, or firing squad, with the stated "preferred method" being lethal injection. Miss. H.B. No. 1479, amending Miss. Code § 99-19-51.

208.    Historically, rifles have been the conventional choice for firing squads. Ex. 28 at 8. Historical practice also supports the use of "no fewer than five and the maximum no more than ten" rifles. *Id.* Typically, the given "squad's rifles are aimed at the central lower one-third of the condemned man's chest, in the vicinity of the heart. The primary purpose of this aiming point is to yield a quick death, and the secondary purpose is to avoid disfiguring the face and head of the person being shot." *Id.* at 9.

209.    The existing firing squad protocol from Utah, which used this method last in 2010 (*supra*), presents a very straight forward set of steps:

a.   The condemned is secured in a seated position, with an aiming point or target affixed to the chest;

---

[48] Okla. Stat. tit. 22, § 1014(A) specifies the method of lethal injection, and, under § 1014(B), if that method "is held unconstitutional by an appellate court of competent jurisdiction or is otherwise unavailable, then the sentence of death shall be carried out by nitrogen hypoxia," and if both preceding methods are deemed unconstitutional or unavailable, then by electrocution, § 1014(C). Firing squad is available if the three preceding methods are ruled out.

[49] Two men recently scheduled for executions challenged the constitutionality of this method and their dates were stayed pending determination of the question in the South Carolina Supreme Court. Caitlin Byrd and Maayan Schechter, "SC Supreme Court stays April execution by firing squad, another one set for May," *The State*, Apr. 25, 2022.

b.  The firing squad, consisting of 5 riflemen, faces the condemned at a distance of 21 feet, armed with service rifles of .30 caliber;

c.  The squad's rifles are loaded with 2 rounds each by the squad commander; one of the rifles is loaded with blank cartridges, but the members of the firing squad are not aware of which rifle is so loaded prior to firing;

d.  On the order of the D.O.C. Director or his Designee, the firing squad commander gives the order to fire, and all 5 riflemen discharge their rifles at the target on the condemned man's chest simultaneously;

e.  Three minutes after the first volley, the attending physician examines the condemned to determine if life signs are present; if so, he continues to check for life signs every 1 minute to a maximum of 10 minutes; and if life signs are still present, a second volley shall be fired;

f.   If, after the first volley, the condemned shows obvious signs of life or consciousness, a second volley shall be immediately fired.

Ex. 28 at 9-10 (see also Appendix B to Ex. 28 for a copy of this protocol).

210.   The positioning of the condemned requires the person's firm restraint "so an accurate aiming point may be established." *Id*. at 10. Further, it is advised to affix "[a] circular target roughly 3-4 inches in dimension . . . over the lower 1/3 of the subject's sternum, overlapping the left sternal border, but not overlapping the inferior margin or right border of the sternum." *Id.* Such targeting "direct[s] the riflemen's bullets into the upper half of the heart, where the pace-making structures of the heart reside, or into the aorta and other great vessels, where the outflow of blood from the heart proceeds." *Id.*

211.   Beyond considerations about the seated positioning of the condemned, various details further define the basic workings of the method. These include the distance from the rifleman to the target, and the presence of a "backstop … behind the body of the condemned," which "should consist of a layer of ballistically absorbent material such as layers of lumber or sandbags." *Id.* at 11.

212.   As noted herein, Mr. Atwood has been disabled since 2015 and needs the aid

of a wheelchair. Application of "the foregoing firing squad procedures for him while he is seated in a standard wheelchair" is entirely feasible. *Id.*at 10. Further, Mr. Atwood "could be placed in a purpose-built seat and secured to it" for a standard firing squad procedure. *Id.*

## VIII.  CLAIMS FOR RELIEF

213.

214.

215.

### Claim I
### 42 U.S.C. § 1983 – Violation of Fourteenth Amendment – Due Process of Law
### (Procedural Due Process — lethal gas option)

216.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

217.     Enactment of Article XXII, § 22 of the Arizona Constitution in 1933 established lethal gas as the method of execution for the state's death penalty

218.     The current amendment to Article XXII, § 22 of the Arizona Constitution, provides that individuals sentenced to death for an offense committed before November 23, 1992, "shall have the choice of either lethal injection or lethal gas" as the method of execution. This state-created interest is further enshrined in legislation, A.R.S. § 13-757(B). Neither the Arizona Constitution nor Arizona statute specifies the nature of the gas the Department shall use in the lethal gas method.

219.     Plaintiff was convicted and sentenced to death by the Arizona Superior Court in 1987, thus the underlying offense was committed before November 23, 1992, and this

choice applies to Mr. Atwood.

220.     Plaintiff has a state-created liberty interest, as established by the Arizona Constitution and Arizona statute, in choosing the method that the Defendants use to execute him.

221.     Plaintiff further has a state-created liberty interest in Defendants refraining from conduct that would gratuitously inflict extreme pain and suffering or from other conduct that renders either statutory method of execution in violation of the constitutions of Arizona or the United States, or other law.

222.     The Department's Execution Procedures contained in Attachment E (Ex. 4), which Defendants promulgate, interpret, and apply in the course of their duties, provide that hydrogen cyanide gas, known as Zyklon B when Nazi Germany deployed it for mass exterminations, shall be the lethal gas.

223.     As the Arizona Supreme Court specified in its execution warrant entered May 3, 2022, Arizona statute provides twenty days from the given execution date for the condemned individual to choose between injection and gas methods. A.R.S. § 13-757(B). With respect to Mr. Atwood's current date of June 8, 2022, he has been entitled to make such a choice through the date of the initial Complaint in this cause, filed May 19, 2022.

224.     The Arizona Constitution, itself, does not delimit a period for choosing an execution method pursuant to a pending execution warrant. Ariz. Const. Art. XXII, § 22.

225.      Historical and legal precedent, confirmed by scientific study, establish that execution by hydrogen cyanide lethal gas would gratuitously inflict extreme pain, plainly violating the prohibition against the infliction of cruel and unusual punishment under the

Eighth Amendment to the United States Constitution.

226.     Plaintiff (Mr. Atwood, individually), submitted a written grievance of this issue to Defendants on or around May 1, 2022, who refused to process his grievance. Plaintiff sought to appeal the decision, which Defendants also refused to process.

227.     Plaintiff's counsel have written counsel in Defendant Brnovich's office and general counsel for other Defendants on May 14 and May 18 to demand remediation of the rights violation arising from Defendants' designation of cyanide gas. Plaintiff specifically "respectfully demand[ed] that the State immediately designate a constitutional lethal gas method under the Department's Execution Procedures so he may have his right to choose a lethal gas method restored before the State violates § 13-757(B) upon the lapsing of the 20-day choice period ending 12:01 a.m., May 20."

228.     On May 19, 2022, Defendant Brnovich's office, in response, reiterated the Department "will not be making any changes to its current lethal gas procedures."

229.     Defendants exercise unfettered discretion in designating the use of cyanide gas for Arizona's lethal gas method, which negates Plaintiff's state-law right to choose a constitutional method of execution.

230.     Plaintiff has extraordinary reasons to exercise his right to choose a constitutional lethal gas execution, as this choice permits self-help to overcome Defendants' Eighth Amendment, American with Disabilities Act, and Rehabilitation Act violations by its lethal injection method as applied to him and otherwise.

231.     Defendants have entirely denied Plaintiff process before depriving him of his state-law liberty interest in choosing the manner of his execution. Defendants have violated

Plaintiff's right to be heard, in person (or indeed at all), to present witnesses and documentary evidence, to confront and cross-examine adverse witnesses, or to have evidence against him disclosed at a meaningful time and in a meaningful manner.

232.     As a direct and proximate result of Defendants' failure to provide Mr. Atwood sufficient process to challenge the deprivation of his liberty interest in choosing his method of execution, Plaintiff will suffer damages, including but not limited to a significant likelihood of the gratuitous infliction of extreme pain and suffering, as well as emotional distress and uncertainty and the denial of a modicum of dignity in the process for ending his life.

233.     Defendants are depriving Plaintiff of the foregoing liberty interest without due process of law, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Ariz. Const. Art. XXII, § 22, and A.R.S. § 13-757(B).

## Claim II
### 42 U.S.C. § 1983 – Violation of Eighth Amendment

234.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

235.     Enactment of Article XXII, § 22 of the Arizona Constitution in 1933 established lethal gas as the method of execution for the state's death penalty.

236.     The current amendment to Article XXII, § 22 of the Arizona Constitution, provides that individuals sentenced to death for an offense committed before November 23, 1992, "shall have the choice of either lethal injection or lethal gas" as the method of execution. This state-created interest is further enshrined in legislation, A.R.S. § 13-

757(B). Neither the Arizona Constitution nor Arizona statute specifies the nature of the gas the Department shall use in the lethal gas method.

237.     Plaintiff was convicted and sentenced to death by the Arizona Superior Court in 1987, thus the underlying offense was committed before November 23, 1992, and this choice applies to Mr. Atwood.

238.      Plaintiff further has a state-created liberty interest in Defendants refraining from conduct that would gratuitously inflict extreme pain and suffering or from other conduct that renders either statutory method of execution in violation of the constitutions of Arizona or the United States, or other law.

239.     The Department's Execution Procedures contained in Attachment E, which Defendants promulgate, interpret, and apply in the course of their duties, provide that hydrogen cyanide gas, known as Zyklon B when Nazi Germany deployed it for mass exterminations, shall be the lethal gas.

240.     Historical and legal precedent, confirmed by scientific study, establish that execution by hydrogen cyanide lethal gas would gratuitously inflict extreme pain, plainly violating the prohibition against the infliction of cruel and unusual punishment under the Eighth Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Frank Jarvis Atwood prays that the Court provide relief as follows:

1. That this Court assume jurisdiction of this cause and set this case for a hearing on the merits.

2.  That this Court issue a declaratory judgment declaring and enforcing Plaintiff's rights under the Sixth, Eighth, and Fourteenth Amendments and, further, issue a temporary restraining order or a preliminary or permanent injunction commanding Defendants not to carry out any execution of Plaintiff unless and until such time as Defendants remedy the foregoing enumerated violations of Plaintiff's rights, so that Plaintiff may be executed in a constitutional manner.

3.  Other such relief as this Court deems proper and just.


DATED this 31st day of May, 2022.

/s/ *Joseph J. Perkovich*
JOSEPH J. PERKOVICH

AMY P. KNIGHT
DAVID A. LANE
REID ALLISON
Attorneys for Frank Jarvis Atwood