JOSEPH J. PERKOVICH, ESQ.
NY Bar No. 4481776
Phillips Black, Inc.
PO Box 4544
New York, NY 10163
Tel: (212) 400-1660
j.perkovich@phillipsblack.org

AMY P. KNIGHT, ESQ.
AZ Bar No. 031374
Knight Law Firm, PC
3849 E Broadway Blvd, #288
Tucson, AZ 85716-5407
Tel: (520) 878-8849
amy@amyknightlaw.com

DAVID A. LANE, ESQ. (*pro hac vice*)
CO Bar No. 16422
REID ALLISON, ESQ. (*pro hac vice*)
CO Bar No. 52754
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel: (303) 571-1000
dlane@kln-law.com
rallison@kln-law.com
*Attorneys for Frank Jarvis Atwood*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Frank Jarvis Atwood,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>David Shinn, Director, Arizona Department of Corrections, Rehabilitation | No. CV-22-00860-PHX-MTL (JZB)<br><br>**REPLY TO RESPONSE TO MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELLIMINARY INJUNCTION** |

1

| | |
|---|---|
| & Reentry; James Kimble, Warden, ASPC-Eyman; Jeff Van Winkle, Warden, ASPC-Florence; Lance Hetmer, Assistant Director for Prison Operations, Arizona Department of Corrections, Rehabilitation & Reentry; Mark Brnovich, Attorney General of Arizona; John Doe, Arizona-licensed Pharmacist,<br><br>                         Defendants. | **EXECUTION WARRANT ISSUED FOR JUNE 8, 2022, 10:00 A.M.** |

## INTRODUCTION

The Defendants, other than Defendant John Doe, who is unrepresented and, due to his anonymity, has remained unavailable for process service (collectively, the "Named Defendants"),[1] have responded (Doc. 23, the "Response") to Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 16, the "Motion"), but have failed even to attempt to address a central justification for the injunctive relief requested: Defendants' expired execution drugs. The arguments the Response does make do not come close to adequately addressing the Eighth Amendment violation from the application of the Execution Procedures' protocol for lethal injection restraint to Mr. Atwood and entirely ignore his proposed alternative method on this point, namely his restraint while recumbent in his wheelchair at a 60 degree, head-up angle. Doc. 16 at 3. Defendants do address Plaintiff's invocation of nitrogen gas under state law, but they treat it merely as an alternative, not a right, and incomprehensibly suggest that the

---

[1] Defendants are further divided into "ADCRR Defendants" (Shinn, Kimble, Van Winkle, and Hetmer, of the Arizona Department of Corrections), and Defendant Brnovich.

2

abundant industrial uses of nitrogen somehow render it unavailable, as though that benign gas is harder to obtain than the poison, sodium cyanide, designated under its protocol.[2] Doc. 23 at 5-6. Defendants further strain credulity by asserting the establishment of a firing squad is somehow infeasible, given the longstanding existence of a dedicated space in the Utah Department of Corrections and the recently, rapidly set-up space for this method by the South Carolina Department of Corrections. Further, ADCR Defendants must be aware that the Eyman Complex, of which Defendant Kimble is the warden, and wherein Housing Unit 9, which contains the execution chambers is located, includes the ASPC Florence-Eyman Firearms Range, an obvious candidate for premises for a firing squad. The Response contains no reason to deny the requested relief on *any* of the asserted grounds.

**1. Defendants Ignore the Central Justification for an Injunction.**

Significant portions of the Motion are devoted to Plaintiff's pursuit of injunctive "relief in order to prevent Defendants from using inadequately tested, inadequately vetted high-risk compounded drugs for his lethal injection." Motion (Doc. 16 at 4). Defendants

---

[2] Defendants mischaracterize Plaintiff's choice of method, treating his explicit request for nitrogen gas merely as the positing of an alternative, rather than Plaintiff's express invocation of his right under the Arizona Constitution and statute to a constitutional lethal gas. By demand letters on May 14 and 18, Plaintiff repeatedly designated under Article XXII, § 22 a constitutional lethal gas, namely nitrogen, but refused hydrogen cyanide, the unconstitutional gas the Named Defendants have designated, prior to the May 19, 2022, date for choosing the gas method under A.R.S. § 13-757(B). Doc. 16 at 11-12. Because this issue is the subject of two claims currently subject to this Court's Order to Show Cause (Doc. 31), they will not be further addressed in this Reply.

3

make no mention of this central justification for an injunction. The Response simply ignores it.

As Plaintiff's Motion emphasizes, in light of the facts that emerged in the Department's execution of Mr. Clarence Dixon on May 11, 2022—its first execution in almost eight years—Defendants lack usable compounded drugs. *Id.* In desperation, rather than attempt to defend the viability of the drugs, "[a]pproximately 48 hours before [that] execution, Defendants jettisoned the batch" originally prepared for Mr. Dixon in order to settle his First Amendment suit in this District Court. *Id.* Defendants needed that radical step because Defendant Doe's so-called "specialized testing" on a test batch he had compounded, intended to establish an intended shelf life, had failed and provided no beyond-use date, or BUD, to be applied to the subsequently made batch for Mr. Dixon, as the Department's Execution Procedures demand. The entire premise of the "specialized testing" was to justify affixing a expiry from the test batch to *every subsequent batch* made from the kilogram of pentobarbital sodium salt of unknown provenance that the ADCRR Defendants procured from an unknown source in October 2020—and thus, this fatal flaw also afflicts the batch Defendant Doe made for Mr. Atwood.

Judging from what emerged during the *Dixon* litigation, the pentobarbital compounded for Mr. Atwood has already expired—without successful, valid testing to extend it, it most likely expired within the default BUD of three days post-compounding, or, at the latest, 45 days post-compounding (assuming, however improbably, that Defendant Doe and Named Defendants kept the batch frozen solid during that entire

span).³ Defendants *do not have usable drugs with which to execute Mr. Atwood*, and this *alone* necessitates an injunction to precipitate vacatur of Plaintiff's June 8, 2022, warrant. On this monumental obstacle to proceeding with the execution, Defendants keep mum. Instead, they offer tepid assurances (that they later had to correct) about a pillow obviating the consequences of restraining Mr. Atwood to the execution table for an hour before the injection of the expired drugs. Doc. 23 at 3-4.

Defendants—most pointedly, Defendant Doe, the Arizona-licensed pharmacist who has eluded service in this case—failed to conduct "specialized testing" to establish the BUD of the drugs ADCRR Defendants had retained him to compound. The Arizona Supreme Court ordered this "specialized testing" in the wake of gross mischaracterizations in 2021 of the State's readiness to conduct lethal injections. *See* Doc. 21-1 at 6-28 (Exhibits 6-7 to Amended Complaint). Defendant Brnovich returned to Court this January claiming without elaboration that Defendant Doe had now done that, and ultimately the Arizona Supreme Court issued Plaintiff's execution warrant on May 3, 2022.

From the Dixon execution, eight days later, we know that Defendant Doe's single "specialized testing" batch of drugs failed to yield samples within basic pharmaceutical standards. Ruble dec., ¶35, Doc. 21-2 at 78. These standards are uncontroversial, well

---

³ See Exhibit 13, ¶ 35, to Plaintiff's Amended Complaint, wherein Prof. James H. Ruble explains that "the default, empiric BUD assignment for high-risk sterile preparations [provide] … 24 hours at controlled room temperature, 3 days, at a cold temperature, or 45 days, in a solid frozen state." Doc. 21-2 at 77.

5

known, and even acknowledged by Defendant Doe, whose own declaration in *Dixon* recognizes the controlling nature of the United States Pharmacopeia. Defendant Doe dec., Doc. 21-2 at 34. For the high-risk compound sterile preparation of pentobarbital sodium injection, the USP has a published Monograph enunciating those parameters. Ruble dec., ¶40, 21-2 at 77-78. As Plaintiff has highlighted, the test batch did not fall within those parameters, critically exceeding the sensitive measure of pH—a factor of utmost importance in relation to the prospective "catastrophic effects on venous endothelial cells" comprising "the inner lining of veins and … the site of actual contact between injected solutions, i.e., pentobarbital sodium, and the venous circulatory system." Doc. 16 at 10-11 (quoting Ruble dec., ¶43, Doc. 21-2 at 78).

      The test batch itself was unfit for use, which Defendants fail even to acknowledge, yet Defendant Doe blithely relied on it to extrapolate a BUD for the subsequently prepared new batches of the drugs from the kilogram of salt that the ADCRR Defendants procured for Defendant Brnovich's aspiration to carry out a wave of executions before the end of his term this calendar year.[4] This failing was superficially considered in *Dixon* for the batch prepared February 26, 2022, and the Department, in an unprecedented turn, immediately sought to settle the controversy, volunteering the preparation of a whole new

---

[4] "Arizona Department of Corrections says it has lethal injection drugs, ready to resume executions," KJZZ 91.5, Mar. 5, 2021 (citing Defendant Brnovich's spokesperson listing 20 individuals whom the office deemed eligible for execution warrants) https://kjzz.org/content/1664369/arizona-department-corrections-says-it-has-lethal-injection-drugs-ready-resume.

batch immediately before Mr. Dixon's execution, which would avoid any scrutiny of the testing Defendant Doe had done.

Clearly, Defendants would now rather talk about anything but the incompetent drug preparation and the related failure of the premise that yielded the two execution warrants issued so far this year. The Named Defendants have not denied what Plaintiff has put forth in establishing the need for an injunction against the June 8, 2022, warrant based on serious problems with the injectable solution Defendant Doe prepared on/around April 7, 2022; they have simply ignored it.

As with Mr. Dixon's batch, the BUD for Mr. Atwood's batch is most likely just three days. *Supra* n.3. These execution drugs prepared in April for a June 8, 2022 execution thus expired nearly two months before that date. Now, less than a week from the execution date, Defendants can be expected to offer to have Defendant Doe make yet another desperation batch 48 hours before the appointed time of 10:00 a.m. on June 8.

Such an offer would be a nonstarter. In doing that with Mr. Dixon, Defendants immediately violated the binding lethal injection protocol embodied in the current Execution Procedures. That protocol, with its detailed requirements, was the result of the heavily negotiated resolution in 2017 of claims seeking to prevent a repeat of the two-hour spectacle that was Joseph Wood's 2014 execution. Defendant Brnovich repeatedly invoked the binding nature of this very protocol in justifying his manner of pursuing execution warrants in the Arizona Supreme Court. *See* Doc. 21-1 at 6-28 (Exhibits 6-7 to

Amended Complaint). Defendants cannot now claim it need not abide by those same requirements.

The Execution Procedures specifically require the provision of execution drugs to Housing Unit 9 within the Arizona State Prison Complex-Eyman upon issuance of a warrant of execution. Thus, in Mr. Atwood's case, on or around May 3, 2022, the prison was due to receive the batch of pentobarbital sodium that Defendant Doe prepared on or around April 7, 2022, with clear labeling identifying a BUD.[5] Whether the drugs were delivered at that time is unknown. If the drugs were delivered, one of two things would have occurred then: the drugs arrived either without the required BUD label or with an erroneous one stating an incorrect date later than June 8, 2022. The actual BUD for the drugs, as underscored above, would be three days from the date of compounding—circa April 10 or 11, 2022.

The Execution Procedures specify that the execution drugs for any given warrant are received immediately upon entry of an execution warrant for a reason: because it must be clear in advance that the compounding has yielded a usable batch for the appointed time. This lead time is crucial because a beyond-use date does not encompass

---

[5] Prof. Ruble explains:
> BUD ascertainment is not retrospective. This is a fact of compounding that the Department's own Execution Procedures recognize in requiring the following:
>> Upon receipt of the Warrant of Execution, the Housing Unit 9 Section Leader shall: . . . [e]nsure that complete sets of chemicals are on site, not expired, and immediately avaialbe for use. ADC will only use chemicals in an execution that have an expiration or beyond-use date that is after the date that an execution is carried out. … Attachment D, ¶A.1.III.

Ruble dec., ¶33, Doc. 21-2 at 76

all material concerns on the efficacy and adequacy of any given high-risk compounded sterile preparation, such as pentobarbital sodium. Having a viable beyond-use date at the outset of the 35-day warrant period, as the Execution Procedures require, permits ascertaining the adequacy of the execution drugs prior to their use. Essential in that further determination is the ability to permit the taking of standard measures, which include, for instance, visual examination,[6] as well as certain types of testing for purity and potency.

In the rush to whip up drugs to execute Mr. Dixon, Defendant Doe prepared a batch with no lead time for testing essential qualities of the resulting solution. Defendant Doe thus could not establish the drugs' fitness for use. Sterility and endotoxin testing are indispensable in that regard to rule out bacterial and other types of tainting of the solution, which can cause extreme pain or interfere with the drugs' action if injected. Indeed, the Governor of Tennessee mere weeks ago imposed a moratorium on lethal injections because officials had not been properly testing for bacteria – specifically, for endotoxins.[7] The failure to rule out, by testing, the presence of bacteria properly caused a

---

[6] *See* Amended Complaint, Doc. 21 at 20. In 2015, Georgia halted the execution of Kelly Gissendaner shortly before it was to begin because, upon visual inspection, the drugs appeared "cloudy," which could indicate contamination or inadequate mixing, either of which could cause severe pain. Gillian Mohney, "Kelly Gissendaner: Explaining the 'Cloudy' Drug that Stopped Georgia Execution," ABC news, March 3, 2013, https://abcnews.go.com/Health/georgia-execution-explaining-cloudy-drug-stopped/story?id=29357024.

[7] The execution of Oscar Smith was similarly halted mere hours before it was scheduled when officials realized they had not conducted required testing. Mariah Timms et al., "Records Raise New Questions About Tennessee's Plan to Execute Oscar Franklin

shutdown in Tennessee's process until the breakdown was understood and rectified. The drugs in question there may have been untainted; the point was that Tennessee's pharmacist and its corrections personnel could not say one way or the other—and thus could not use them. Because testing and verification is strictly necessary, Arizona cannot adopt a purported solution that forecloses those safeguards.

### 2. Plaintiff's Long-Term Spinal Degeneration and Nerve Damage is Not Alleviated by a Pillow.

The Response egregiously misrepresents the record concerning the implications from Mr. Atwood's spinal disease. Defendants falsely assert that "Atwood has taken no steps, prior to filing his complaint, to bring this matter to Defendants' attention or to ask ADCRR to accommodate his back issues during the execution." Doc. 23 at 3 n.3. Defendants have no basis for that assertion. Mr. Atwood filed *three* separate documents through the prison's grievance system, before the issuance of his execution warrant, specifically identifying the issue with his spinal condition and inability to lie flat on the table, and explicitly requesting that he be allowed to remain in his wheelchair and that only peripheral lines be used, in the event of a lethal injection execution. The Department refused to respond to his repeated requests and Defendants now deny that he ever made them.

---

Smith," Tennessean, May 13, 2022, https://www.tennessean.com/story/news/crime/2022/05/13/records-raise-new-questions-tennessees-plan-execute-oscar-franklin-smith/9769443002/.

Specifically, on April 14, 2022, Mr. Atwood filed both an informal complaint and an emergency grievance (recognizing that the usual timetable for resolution of grievances would not accommodate this issue given the likely execution date). In the former, he wrote:

> Spinal degeneration has left me requiring a wheelchair in & out of my cell, also, I am unable to lie flat on my back. The Protocol requires restraint to the execution table, which will inflict upon me outrageously severe pain. . . Resolution = If a lethal injection, use peripheral catheters while I am seated in my wheelchair.

Exhibit 13 (Informal (4/14/22)). In the emergency grievance filed the same day, he wrote:

> ADCRR Dept. Order 710 (Execution Procedures) & Attachment D thereto states that for a lethal injection execution, the I/M will be secured to the execution table by restraints (Attach D, p. 4, D5). I have a longstanding spinal degenerative condition that causes me severe pain. I have been essentially confined to a wheelchair for years. Inadequate treatment, or mistreatment, of a spinal cond. & related issues during my imprisonment has substantially worsened my condition. As a result, for yrs I've used my wheelchair in my cell & for all movement outside of my cell. My degenerative spine causes severe pain when attempting to lie flat on my back. Being restrained to the execution table will inflict maximum pain on me. Thus, application of the Execution Protocol to me would impose unimaginable pain & violates the 8th Amendment to the US Cons. prohibition against cruel & unusual punishment & the 14th Amendment's Due Process Clause. I request the ADCRR modify the application of the Execution Protocol so that, if I am to be executed by lethal injection, I will not be placed on the execution table. I request the ADCRR to administer any intravenous lines & lethal injection while I am seated in my wheelchair. . . Proposed Resolution: Contacted ADCRR counsel for resolution but no resolution. To resolve, please seat me in my wheelchair if a lethal injection & never employ a femoral line.

Exhibit 14 (Informal (4/14/22)).

Mr. Atwood had received no response to these requests by May 1, 2022, so he filed a grievance appeal, explaining:

> An emergency grievance was lodged . . . on 4/14/22, however, COIV Brier has refused to timely answer so consequent to certain injury/death, I am proceeding to the next level. As detailed in the grievance, . . . I request: if lethal injection, not being secured on a table and no use of a femoral line...

Exhibit 15 (Emergency Grievance (4/14/22)). Four days later, he received responses to both his emergency grievance and his appeal, although neither acknowledged his informal complaint. To the grievance, the Department responded:

> This grievance is being unprocessed due to it falling under the category of a 'Judicial Proceeding or Decisions of the Courts' and does not qualify as an Emergency Grievance in accordance to the ADCRR 802 policy. You also have multiple issues listed on your grievance which is also in violation of ADCRR 802 policy. You must use the informal resolution prior to filing a Formal grievance and you must have one issue that pertains to ADCRR policy and not Judicial Proceedings or a decision of the Courts.

Exhibit 16 (Unprocessed Grievance (5/5/22)). And to the appeal, the response indicated:

> "This Appeal is being unprocessed at this time. This is due to grievance #22-040387 being unprocessed for repeating issues addressed in grievance #22-040386 which was also unprocessed for falling under the category of a 'Judicial Proceeding or Decisions of the Courts' and does not qualify as an Emergency Grievance in accordance to the ADCRR 802 policy. You must use the Informal Resolution process prior to filing a Formal Grievance."

Exhibit 17 (Unprocessed Appeal (5/5/22)). This is the state of affairs Defendants characterize as "no steps" to bring this issue to their attention.

Named Defendants erroneously assert that the use of a pillow will transform Plaintiff's imminent restraint to the execution table into something other than being "strapped down supine." Doc. 23 at 9. Defendants have failed to address the medical findings of severe pain resulting from positioning Plaintiff at an angle greater than 60

degrees. Apart from a mere allusion to the execution table's capability of being "tilted," *id.* at 4, Defendants do not engage with Plaintiff's argument, founded upon unrebutted medical evidence (Exhibit 1 to Motion), and the factual findings in December 2021 of a judge of this district in a prior suit. (Exhibit 4 to Motion).

### 3. Defendants' Incredibly Argue They Can Implement Neither Nitrogen nor Firing Squad Methods

The Response glibly complains that Plaintiff has not specified where, within or adjacent to the Department's death house or elsewhere on its many acres of land, it could possibly conduct a firing squad. The pleading burden on Plaintiff surely does not impose a duty to conduct granular planning of Defendants' physical plant, a plant for which Plaintiff's prior requests for inspection have been denied. South Carolina's Department of Correction has demonstrated no impediments to establishing its firing squad venue and a call to Utah's DOC would surely yield ample guidance as well. This alternative is non-statutory and would entail legislative action before Named Defendants could implement it. That process alone would permit the Defendants ample time to prepare sufficient accommodations for a method that has been in service for one jurisdiction or another for well over four hundred years. Doc. 21 at 55.

### CONCLUSION

For the foregoing reasons herein and in the prior briefing, this Court must enter a preliminary injunction to preserve Mr. Atwood's ability to fully litigate the meritorious issues in this action and to preclude grievous constitutional violations culminating in the taking of his life and mooting of this litigation. The Court must enjoin Defendants and

their agents from executing Mr. Atwood during the 24-hour period beginning at 10:00 a.m., June 8, 2022.

DATED: June 2, 2022

Respectfully submitted,

/s *Joseph J. Perkovich*

Joseph J. Perkovich
Amy P. Knight
David Lane
Reid Allison

Attorneys for Frank Atwood